# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and ROSLYN )
WOODARD SMITH, Individually and as )
Administrators of THE ESTATE OF )
HARRY SMITH, III )
                          )
       Plaintiffs, )     Case No. 04-1254-GMS
                          )
v. )
                          )
CITY OF WILMINGTON, JOHN )
CIRITELLA, THOMAS DEMPSEY, and )
MATHEW KURTEN, )
                          )
       Defendants. )

# DEFENDANTS' OPENING BRIEF IN SUPPORT
# OF THEIR MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

John A. Parkins, Jr. (#859)
K. Tyler O'Connell (#4514)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
302-651-7700
Parkins@rlf.com
Oconnell@rlf.com
Attorneys for Defendants

Dated: June 14, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

NATURE AND STAGE OF PROCEEDINGS ................................................................1

STATEMENT OF FACTS ...............................................................................................2

SUMMARY OF ARGUMENT ......................................................................................12

ARGUMENT ...................................................................................................................14

The Standard For Summary Judgment .........................................................................14

I.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY
      JUDGMENT ON THE PLAINTIFFS' SECTION 1983 CLAIM. .......................15

      A.  As A Matter Of Law There Were No Constitutional Deprivations
          Because The Police Officers Reasonably Believed That Mr. Smith
          Posed A Threat To Themselves And To The Public. ................................15

          1. Phase-1:  Plaintiffs Do Not Assert A Claim And None Of The
             Defendants Were Involved. .................................................................16

          2. Phase-2:  The Officers Acted Reasonably When Smith Tried To
             Run Over Detective Ciritella. ............................................................16

          3. Phase-3:  The Officers Reasonably Believed That Smith Posed A
             Serious Threat To The Safety Of Others And Were Justified In
             Using Deadly Force To Prevent His Escape. ......................................18

      B.  The Officers Did Not Violate Any Clearly Established Rights And
          Therefore Are Protected By Qualified Immunity. ...................................21

II.   THE UNREBUTTED EVIDENCE SHOWS THAT THE ALLEGED
      CONSTITUTIONAL DEPRIVATION COULD NOT HAVE BEEN THE
      PROXIMATE CAUSE OF MR. SMITH'S INJURIES. ......................................26

III.  PLAINTIFFS' CLAIMS UNDER 42 U.S.C. §§ 1985 AND 1986 MUST
      BE DISMISSED BECAUSE THEY HAVE FAILED TO ALLEGE --
      AND CANNOT SHOW -- A CONSPIRACY AND CLASS-BASED
      DISCRIMINATION. ............................................................................................28

      A.  Plaintiffs' Section 1985 Claim Must Be Dismissed. ...............................28

          1. Plaintiffs Purport To Allege A Claim Under Section 1985(3). ............28

i

2. Plaintiffs' Section 1985(3) Claim Must Be Dismissed Either Because (1) They Have Failed To Allege And Prove A Conspiracy Or (2) They Have Failed To Allege And Prove Invidious Race-Based Discrimination................................................................................29

    a.   Plaintiffs Have Failed To Allege And Prove The Existence Of A Conspiracy. ...............................................................................29

    b.   Plaintiffs Have Failed To Allege And Prove Any Racial Animus................................................................................................30

B.  Plaintiffs' Section 1986 Claim Must Be Dismissed Because There Is No Valid Section 1985 Claim.................................................................31

IV.     PLAINTIFFS' CLAIMS FOR PURPORTED VIOLATIONS OF THE DELAWARE CONSTITUTION SIMILARLY FAIL AS A MATTER OF LAW. ........................................................................................................32

V.      THE OFFICERS ARE STATUTORILY IMMUNE FROM PLAINTIFFS' STATE TORT LAW CLAIM FOR WRONGFUL DEATH............................33

VI.    PLAINTIFFS' STATE LAW ABUSE OF A CORPSE CLAIM MUST BE DISMISSED BECAUSE THE INDIVIDUAL DEFENDANTS WERE NOT INVOLVED AND THE CITY IS IMMUNE...............................................35

CONCLUSION...........................................................................................................37

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Creighton,*
483 U.S. 635 (1987) ............................................................................................21

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................14

*Brosseau v. Haugen,*
543 U.S. 194 (2004) ................................................................................21, 22, 23

*Carswell v. Borough of Homestead,*
381 F.3d 235 (3d Cir. 2004), *reh'g denied,* 126 S. Ct. 724 (2005) ....................22

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................14

*Couden v. Duffy,*
446 F.3d 483 (3d Cir. 2006) ..................................................................15, 16, 33

*Davis v. Southeastern Penn. Transp. Auth.,*
2001 WL 1632142 (E.D. Pa. Dec. 20, 2001) ..............................................19, 23

*DeShields v. State,*
534 A.2d 630 (Del. 1987), *cert. denied,* 486 U.S. 1017 (1988) ..........................32

*Desi's Pizza, Inc. v. City of Wilkes-Barre,*
321 F.3d 411 (3d Cir. 2003) ...............................................................................28

*Deubert v. Gulf Federal Savings Bank,*
820 F.2d 754 (5th Cir. 1987) ..............................................................................29

*Doherty v. Delaware,*
2005 WL 735557 (D. Del. Mar. 30, 2005) .........................................................30

*Dudley v. Eden,*
260 F.3d 722 (6th Cir. 2001) .........................................................19, 20, 23, 25

*Farber v. City of Paterson,*
440 F.3d 131 (3d Cir. 2006) ...............................................................................29

*Ferri v. Ackerman,*
444 U.S. 193 (1979) ............................................................................................36

RLF1-3023108-1

*Field v. Hall,*
  1995 WL 360744 (D. Del. May 19, 1995) ................................................................. 32

*Forbes v. Twp. of Lower Merion,*
  313 F.3d 144 (3d Cir. 2002), *aff'd,* 2003 WL 22245656 (3d Cir. Oct. 1, 2003) ........................... 21

*Foster v. Shropshire,*
  375 A.2d 458 (Del. 1977) ................................................................. 33

*Graham v. Connor,*
  490 U.S. 386 (1989) ................................................................. 15, 16, 32

*Griffin v. Breckenridge,*
  403 U.S. 88 (1971) ................................................................. 29, 30

*Grimes v. Smith,*
  776 F.2d 1359 (7th Cir. 1985) ................................................................. 31

*Haugen v. Brousseau,*
  339 F.3d 857 (9th Cir. 2003), *reversed and remanded,* 543 U.S. 194 (2004) ........................... 22

*In re Headquarters Dodge, Inc.,*
  13 F.3d 674 (3rd Cir. 1993) ................................................................. 14

*Hedges v. Musco,*
  204 F.3d 109 (3d Cir. 2000) ................................................................. 26

*Hernandez v. Jarman,*
  340 F.3d 617 (8th Cir. 2003) ................................................................. 23

*Malley v. Briggs,*
  475 U.S. 335 (1986) ................................................................. 21, 26

*Mian v. Donaldson, Lufkin & Jenrette, Sec. Corp.,*
  7 F.3d 1085 (2nd Cir. 1993) ................................................................. 31

*Monell v. Dept. of Social Services,*
  436 U.S. 658 (1978) ................................................................. 15

*Monroe v. Pape,*
  365 U.S. 167 (1961) ................................................................. 26

*O'Connor v. City of Newark,*
  440 F.3d 125 (3d Cir. 2006) ................................................................. 31

*Olson v. Gen. Elec. Aerospace*,
101 F.3d 947 (3d Cir. 1996)..................................................................14

*Pace v. Capobianco*,
283 F.3d 1275 (11th Cir. 2002) ....................................................*passim*

*Pacitti v. Macy's*,
193 F.3d 766 (3d Cir. 1999)..................................................................14

*Puglise v. Cobb County, Ga*,
4 F. Supp. 2d 1172 (N.D. Ga. 1998)..........................................18, 21, 25

*Ramsey v. Harley*,
2002 WL 32349129 (E.D. Pa. Mar. 8, 2002).........................................17

*Randall v. City of Fairbanks*,
352 F. Supp. 2d 1028 (D. Alaska 2005) ...............................................25

*Reid v. Ford*,
2005 WL 2898058 (M.D.N.C. Mar. 11, 2005), *aff'd*, 2005 WL 1725705 (M.D.N.C. Apr.
22, 2005) ........................................................................................19, 20

*Rogin v. Bensalem Township*,
616 F.2d 680 (3d Cir. 1980)..................................................................31

*Samuels v. Hall*,
2004 WL 1635529 (D. Del. July 19, 2004) ...........................................33

*Saucier v. Katz*,
533 U.S. 194 (2001)........................................................................21, 22

*Scott v. Clay County, Tenn.*,
205 F.3d 867 (6th Cir.), *cert. denied*, 531 U.S. 874 (2000)...................23

*Scott v. Edinburg*,
346 F.3d 752 (7th Cir. 2003) ......................................................17, 19, 24

*Shvrely v. Klein*,
551 A.2d 41 (1988)................................................................................34

*Smith v. Freland*,
954 F.2d 343 (6th Cir.), *cert. denied*, 504 U.S. 915 (1992)................17, 20

*State v. Phillips*,
366 A.2d 1203 (Del. 1976) ...................................................................32

v

*Tennessee v. Garner,*
471 U.S. 1 (1985) ..................................................................................................15, 17, 19

*United Brotherhood of Carpenters & Joiners v. Scott,*
463 U.S. 825 (1983), *reh'g denied,* 464 U.S. 875 (1983) .........................................29

*Waterman v. Batton,*
393 F.3d 471 (4th Cir. 2005) .....................................................................................18

*Williams v. City of Grosse Pointe Park,*
2005 WL 2173686 (E.D. Mich. Sept. 6, 2005) ....................................................20, 24

## STATUTES

42 U.S.C. § 1985 .......................................................................................................29

42 U.S.C. § 1986 .......................................................................................................31

Del. Const. Art. 1, § 6 ...............................................................................................32

Del. Const. Art. 1, § 11 .............................................................................................32

Fed. R. Civ. P. 56(c) .................................................................................................14

10 *Del. C.* § 3722 ................................................................................................33, 34

10 *Del. C.* § 4011(c) .........................................................................................*passim*

## OTHER AUTHORITIES

Randy J. Holland, The Delaware State Constitution:
A Reference Guide (Greenwood Press 2003) .............................................................32

## NATURE AND STAGE OF PROCEEDINGS

This case presents an assortment of federal and state law claims against three Wilmington police officers and the City of Wilmington arising from the death of Harry Smith, III. The purpose of this motion is to eliminate before trial those claims which are deficient as a matter of law or which lack sufficient evidentiary support.

When the Court conducted the scheduling conference in this case, the defendants advised the Court that they wished to file a motion to dismiss plaintiffs' Eighth and Fourteenth Amendment claims. The Court granted those motions and dismissed the Fourteenth Amendment claims brought by Mr. Smith's estate and the Fourteenth Amendment "wrongful death" claim brought by his parents. Plaintiffs voluntarily dismissed their Eighth Amendment claim.

1

## STATEMENT OF FACTS

Sometime on Thursday, September 11, 2003, 25 year old Harry Smith, III ("Smith") complained to his mother that he was hearing voices. (A68, A70-71).[1] His mother became concerned and late that Thursday she concluded her son should seek medical attention. Because she had recently broken her ankle, Mrs. Smith was unable to take her son to the hospital, so she called her former husband, Harry Smith, Jr., who agreed to take their son to the hospital.

Mr. Smith, Jr. drove his son to the Emergency Room of the Wilmington Hospital. The hospital records show that Smith was triaged in the early hours on Friday, September 12, 2003. (A102). According to a psych evaluation in the emergency room:

> Pt. admits to smoking some weed a few days ago and doesn't
> know what was in it. Has been paranoid since.

(A103). A physician report from that night contains the notation "Pt. senses that voices or sounds reflect that someone will hurt patient," and the clinical impression drawn by the physician was "new onset paranoia." Smith was given 2 mg. of Haldol and sent home along with instructions to return if his symptoms got worse. (A102-06).

The following day, September 13, Smith's symptoms seemed to worsen. Around 1:30 in the afternoon Mr. Smith, Jr. again took his son to the Wilmington Hospital. (A75-76). When he arrived the younger Smith stated he was no longer hearing voices and he did not enter the building. (*Id.* at A76-77). By late in the afternoon Smith was again hearing voices, and his father again drove him a third time to the Wilmington Hospital Emergency Room where, according to hospital records, he was triaged at 6:05 p.m. (A80-82; A107). The elder Mr. Smith told a nurse that his son was hearing voices and was no better than before. A psychiatric nurse

---

[1] Harry Smith, Jr. -- father of the decedent -- suffered a stroke after the filing of this lawsuit and so far has been unable to give his deposition.

was promptly summoned and Smith was placed in Treatment Room 24, where he was accompanied by his father. (A108). While in the treatment room, Smith opened a cabinet and removed a surgical kit containing a scalpel. A struggle ensued as the father attempted to subdue his son; either during the struggle or immediately thereafter, Smith stabbed himself at least once in the chest with the scalpel. He then ran out of the hospital toward Washington Street holding the scalpel. (A108, A109).

*   *   *

William Stevenson had just seated himself at the bar at the Washington Street Ale House, waiting to watch a University of Delaware football game on television with a friend, when the bartender suggested he would get a ticket if he did not move his car. Leaving his beer untouched, Stevenson left to move his car. Just as he finished pulling into a new space and was getting out, Stevenson saw a large man running toward him. (A85 at 5). At first he thought the man had been the victim of a robbery because he had a large bloodstain on the tee-shirt he was wearing. His thoughts soon changed, as the man ran toward him yelling "Get out of my way. I'm going to steal your f ___ ing car." (*Id.* at 5-6). Mr. Stevenson immediately started to get back into his car. There followed a tug of war, with Mr. Stevenson trying to pull the door closed and Smith trying to pull it open. Stevenson thought he was in a life and death struggle. Eventually he got the door closed whereupon Smith began banging on the roof of the car and on the window with the scalpel and his fist. Mr. Stevenson was now certain that his assailant would break the car window. (*Id.* at 6-7).

*   *   *

Uniformed Officers Johnny Saunders and Johnny Whitehead were driving southbound on Washington Street in marked patrol car 1180 on September 13 when they saw a heavyset man in

3

a white tee-shirt running southbound on the west sidewalk of Washington Street who then ran across Washington Street toward a car parked near the Washington Street Ale House. The man appeared to be attempting to carjack the automobile, so Officers Saunders and Whitehead turned on their flashing lights and siren and pulled up to the scene. (A97 at 15-17; A85 at 8). They got out of the car, unholstered their pistols and approached the apparent carjacker, who appeared to have some sort of weapon in his hand. They shouted to drop the weapon and get down, but the suspect ignored them, acting as if the police officers were not even there. (A96 at 8, A100 at 34-35; A85-86 at 8-9).

Finally, Smith turned and began walking toward the officers still holding the scalpel. The officers retreated, and as they did so, Smith made a quick turn and jumped into patrol car 1180, whose engine was still running. (A100 at 35-36; A86 at 10). Officer Whitehead grabbed hold of Smith's tee shirt and tried to pull him out of the car while Smith tried to get the car in gear. (A86 at 10). Fearing for his safety (Smith was still holding the scalpel), Officer Whitehead backed away and shot Smith once in the leg. (A100 at 35-36). Smith managed to get the car in gear and sped away heading southbound on Washington Street. A witness described Smith as driving like "a bat out of hell." (A56 at 11). The victim, Mr. Stevenson, held his breath fearing for the worst as he watched Smith run the red light at 12th and Washington Street. (A86 at 11-12).

\*   \*   \*

As the events were unfolding on Washington Street, Officer Saunders made an important series of radio transmissions: "16 Charles (Saunder's and Whitehead's identifying code). Officer needs assistance," followed by "He's got the car; he's got the car," and then "shots fired!"

\*   \*   \*

4

Sergeant Deborah Donohue was heading southbound in her marked car on Washington Street when a passing motorist told her of police activity behind her. (Donohue Aff. ¶ 2 (D.I. 104)). She made a u-turn at 11th Street and headed northbound on Washington Street toward the scene when she heard the radio transmission from 16-Charles. Donohue saw the speeding stolen police car heading southbound on Washington Street, and she made another u-turn on Washington Street to follow. She broadcast the route of the pursuit over the radio. (*Id.* ¶ 4).

\* \* \*

Detective John Ciritella was sitting at his desk at the Central police station on Fourth and Walnut Street doing paperwork when he heard 16-Charles's broadcast "Officer needs assistance." Detective Ciritella grabbed his portable radio and ran downstairs to the parking lot which contained his and other police vehicles. (A2 at 27-29).

Officer Thomas Dempsey had just arrived for work at Central when he too heard 16 Charles's broadcast. Like Detective Ciritella he ran to his police car in the parking lot. Detective Ciritella turned left and headed west on Fourth Street; he was followed by Officer Dempsey. (A28 at 39).

Officer Matthew Kurten was in the process of making an arrest for a minor crime when he heard 16 Charles's radio broadcast. The officer released the suspect and immediately went to his patrol car to respond. (A47 at 32-33).

\* \* \*

Smith, followed by Sergeant Donohue, sped south on Washington Street until he took a right turn onto 7th Street and headed westbound on 7th Street -- the wrong way on a one-way street. (Donohue Aff. ¶ 5 (D.I. 104)). Seventh Street is a narrow one-way street with traffic

flowing in an easterly direction. Officer Donohue noticed that three on-coming cars were forced to pull over to avoid the stolen police car driven by Smith. (*Id.* at ¶ 5).

Detective Michael Lawson, accompanied by Detective Donna DiClemente, was driving in a tan detectives' car when they heard 16 Charles's radio transmission and the subsequent radio description of the route taken by the suspect. (DiClemente Aff. ¶ 2 (D.I. 105); Lawson Aff. ¶ 2 (D.I. 103)). They drove south on Monroe Street to parallel the pursuit and were on Monroe Street at the intersection of 7th when they saw the stolen police car make a left turn off of 7th and onto Monroe Street heading south. The stolen car barely negotiated the turn and narrowly avoided hitting parked cars at the corner. (DiClemente Aff. ¶ 3 (D.I. 105); Lawson Aff. ¶ 4 (D.I. 103)).

Lawson and DiClemente now became the first cars in the pursuit as they followed Smith south on Monroe Street. (Lawson Aff. ¶ 5 (D.I. 103); Donohue Aff. ¶ 7 (D.I. 104)). Smith was driving erratically from side to side and ran stop signs. At the intersection with Fourth Street, Smith ran a red light and turned right onto Fourth Street. (DiClemente Aff. ¶ 4 (D.I. 105); Donohue Aff. ¶ 7 (D.I. 104)). Smith was followed onto Fourth Street by the Lawson/DiClemente car and Detective Ciritella and Officer Dempsey were approaching from the east. Sergeant Donohue slowed to allow the police cars approaching from the east to pass before she made the turn onto Fourth Street. (DiClemente Aff. ¶ 5 (D.I. 105); Donohue Aff. ¶ 6 (D.I. 104)).

Smith drove west on Fourth Street. Officer Donald Dempsey (not to be confused with defendant Thomas Dempsey) was on southbound Jackson Street where it intersects with Fourth Street when the stolen police car passed him. A gap had opened between the stolen car driven by Smith and the lead car (Lawson/DiClemente) so Donald Dempsey took a right onto Fourth Street

6

and became the lead car in the pursuit. (D. Dempsey Aff. ¶¶ 3-4 (D.I. 102); Lawson Aff. ¶ 7 (D.I. 103)). Behind Thomas Dempsey on Jackson was defendant Officer Matthew Kurten. Officer Kurten joined the chase pulling in behind defendant Ciritella. (A49 at 40).

Smith took a right turn off of Fourth Street onto VanBuren. He was followed by Thomas Dempsey and Lawson/DiClemente. (D. Dempsey Aff. ¶¶ 4-5 (D.I. 102); DiClemente Aff. ¶ 7 (D.I. 105); Lawson Aff. ¶ 8 (D.I. 103)). Detective Ciritella decided to parallel the chase and perhaps block Smith at some point, so he continued one block farther on Fourth Street and turned right onto Harrison Street. (A4 at 39-40). He was followed by Kurten and Thomas Dempsey. (A49 at 40; A29 at 42-43).

Smith's next move was a left onto Fifth Street. (D. Dempsey Aff. ¶ 5 (D.I. 102); Lawson Aff. ¶ 9 (D.I. 103)). Hearing that the stolen police car was heading west on Fifth Street, Detective Ciritella (now on Harrison) stopped his car at 5th and Harrison, blocking the northern half of Fifth Street; Officer Kurten pulled in behind Detective Ciritella, blocking the other half of Fifth Street. (A5 at 52; A43 at 10; Lawson Aff. ¶ 10 (D.I. 103)). Officer Thomas Dempsey stopped his car on Harrison just south of the intersection so as to avoid hitting Ciritella and Kurten who were getting out of their cars. (A29 at 43). Detective Ciritella, took cover behind a building on the northeast corner of the 5th and Harrison intersection, while Officer Kurten walked eastward on the southern side of 5th Street, using parked cars as cover. (A6 at 55, 57; A10 at 89; A50 at 43; A51 at 46).

As Smith approached the 5th and Harrison intersection, the defendant police officers:

- Knew there had been an officer-needs-assistance call from 16 Charles;

- Knew that a shot or shots had been fired. They did not know whether Smith or the officer had fired the shots;

7

- Knew that Smith had stolen a police car;

- Knew that Smith had ignored police sirens and lights and had led police on a chase in the City; and

- Knew that the stolen police car was equipped with a loaded shotgun which is usually kept in the front of the car where the driver has immediate access to it.[2]

Not surprisingly, therefore, the defendant officers on foot at 5th and Harrison had unholstered their pistols.

* * *

As Smith drove down 5th Street he slowed as he approached Harrison and appeared to be stopping. Officer Donald Dempsey, in the first car behind Smith, stopped his car and started to get out. Lawson slowed his car also and Detective DiClemente began to get out. Detective Ciritella came around the building, identified himself as a police officer and shouted to Smith to stop the car and get out. Officer Kurten, who was in uniform, shouted the same instructions to Smith. (A6 at 55-56, A8 at 80; A50 at 44-45; Lawson Aff. ¶ 10 (D.I. 103); D. Dempsey Aff. ¶ 8 (D.I. 102); DiClemente Aff. ¶ 8 (D.I. 105)).

Just as it appeared this incident was winding down, Smith gunned the car and drove straight at Detective Ciritella. In an effort to save his own life, Detective Ciritella for the first and only time in his career used his weapon at someplace other than a practice range; he fired three or four shots into the on-rushing stolen police car and jumped back. Fearing for Ciritella's life, Officer Kurten -- also using his gun for the first time in his career -- fired at least one round into the car from his position near the southeast corner of Fifth and Harrison Streets. (A6 at 55-

---

[2] That night either Officer Saunders or Officer Whitehead had placed the shotgun in the trunk of car 1180. (A98 at 19). The officers at 5th and Harrison were unaware of this and assumed the shotgun was in its usual location. (A29 at 44, A30 at 46, A33 at 75).

8

56, A9 at 82-85, A10 at 88, A11 at 90-93; A43 at 10; A29 at 45; D. Dempsey Aff. ¶ 9 (D.I. 102); Lawson Aff. ¶ 11 (D.I. 103)).

The shots apparently did not phase Smith, who kept going. He avoided the blockade by driving on the sidewalk, and struck a Jeep Cherokee parked on Harrison Street, spinning it nearly 180 degrees. (A44 at 20-21; D. Dempsey Aff. ¶ 10 (D.I. 102)). The wheels of the stolen police car squealed and the smell of burning rubber permeated the air as Smith plowed through the Jeep and made the turn onto Harrison Street. Smith was now in the open as there were no police cars ahead of him. (A6 at 56, A12 at 97, A13 at 98; A30 at 46; A51 at 47).

It was apparent to Detective Ciritella and Officers Thomas Dempsey and Kurten that Smith was now in the open and in danger of escaping. (A15 at 109; A29 at 45, A30 at 46, A51 at 47; D. Dempsey Aff. ¶ 13 (D.I. 102)). Fearing for the safety of the citizens of Wilmington, each of the officers concluded it was necessary and appropriate to use deadly force to prevent his escape. Ciritella proceeded on foot up the eastern side of Harrison Street (which would have been on Smith's right) and Thomas Dempsey and Kurten proceeded up the other side of Harrison as they shot at Smith. They stopped firing once the stolen police car appeared to stop. (A14 at 103-105, A15 at 106, A15 at 109; A29 at 45, A30 at 46-47, A32 at 67, A34 at 78, A42 at 9, A43 at 10, A44 at 21, A45 at 22-23).

Ciritella fired 13 rounds (including those he fired at Smith as Smith tried to run him down). (A15 at 109). Kurten fired five times (including the shot or shots he fired at Smith when he was trying to run down Detective Ciritella). (A42 at 9). Officer Thomas Dempsey, who, like Ciritella and Kurten, had never used his weapon other than on the practice range, fired 13 shots. (A2 at 27; A41 at 3; A24 at 25, A27 at 34). The shooting lasted only a few seconds. Officer Donald Dempsey and Detectives Lawson and DiClemente ran toward Harrison, but none of them

9

fired their weapons as the stolen police car had stopped. (A14 at 105, A15 at 106-07; A30 at 46-47; A46 at 28-29; D. Dempsey Aff. ¶ 11 (D.I. 102); Lawson Aff. ¶ 12 (D.I. 103); DiClemente Aff. ¶ 8 (D.I. 105)).

The stolen police car was still drifting as the officers approached. Detective Ciritella approached the passenger's side of the car and, after ascertaining he was safe, the detective reached in and put the car in park. (A15 at 106-107, A19 at 145, A20 at 46; D. Dempsey Aff. ¶ 12 (D.I. 102); Lawson Aff. ¶ 12 (D.I. 103)). Detective DiClemente ran up behind Ciritella, satisfied herself he was unhurt, then went behind the stolen police car to the driver's side. She assisted Detective Lawson in removing Smith from the car. Detective DiClemente, who saw that Smith was not responsive and did not appear to be breathing, checked for a pulse and found none. She immediately began chest compressions and continued her efforts until New Castle County paramedics arrived. (DiClemente Aff. ¶ 9 (D.I. 105)).

\*  \*  \*

An autopsy was performed by Assistant Medical Examiner Jennie Vershvovsky, M.D. Her report lists the cause of Smith's death as a "Gunshot wound to head." (A110). The bullet entered Smith's head above his right ear, went through the right parietal lobe of his brain and ended up in his left parietal lobe near the border with the occipital love. In other words, it traveled in a generally right to left direction. The bullet was retrieved from his brain and submitted to the police. (A112). All of the retrieved bullets, along with the shell casings and the officers' weapons, were submitted to the Bureau of Alcohol Firearms and Tobacco for analysis. The bullet retrieved from Mr. Smith's brain was found to have been fired from a Smith and Wesson pistol bearing serial number SAF0327 -- Detective Ciritella's weapon. (D.I. 106).

\*  \*  \*

The core of plaintiffs' claims is found in paragraphs 28 and 29 of their Amended Complaint, where they allege:

> 28.   Harry Smith, III was seen slumping over the car's steering wheel, apparently unconscious, helpless, unarmed, and non-threatening to himself or others.
>
> 29.   Defendants John Ciritella, Thomas Dempsey, and Matthew Kurten continued shooting into the car.

(Amended Complaint, ¶¶ 28-29 (D.I. 39)). (The officers vehemently deny this.) Despite plaintiffs' claim that the street was full of people, they are able to produce one witness to support their theory -- David Gwyn. This motion does not call upon this Court to make any judgments about Mr. Gwyn's credibility. Rather this motion assumes that his version of these events is true.

Mr. Gwyn, who now claims to have a "cloudy" recollection of these events, executed an affidavit which plaintiffs filed with this Court. In that affidavit, Mr. Gwyn swore that:

> I then saw a Wilmington Police Department officer walk over to the side of this police car and fire shots into the body of the man slumped over the steering wheel.

(Gwyn Aff. ¶ 7 (D.I. 15)). Gwyn explained in his deposition that the officer fired at Mr. Smith from the left [driver's] side of the car. (A38 at 22).

## SUMMARY OF ARGUMENT

1.     The use of deadly force by these police officers did not amount to a constitutional deprivation. As the uncontested record shows, these officers reasonably believed that it was necessary to use deadly force (1) when Smith attempted to run down Detective Ciritella with the stolen police car and (2) when Smith, who posed a serious risk to the safety of the citizens of Wilmington, attempted to flee by circumventing a police barricade and driving north on Harrison Street. Finally, in the event that the Court finds a constitutional deprivation, defendants are entitled to qualified immunity.

2.     It is axiomatic that plaintiffs must prove that any constitutional deprivation was the proximate cause of their injuries. They cannot do so here. The sole witness supporting plaintiffs' theory has sworn that an officer shot Mr. Smith from his *left*. But it is uncontradicted that the fatal shot entered Mr. Smith's head on the *right*, and, according to the medical examiner, could not have come from the left. Thus, the assumed constitutional deprivation could not have been the proximate cause of Mr. Smith's death.

3.     Plaintiffs' claims brought under 42 U.S.C. § 1985 must be dismissed for either of two reasons. First, plaintiffs have not alleged the existence of a conspiracy. This alone requires dismissal of this claim. Notably, there is no evidence in the record that any of the defendants participated in a conspiracy. Second, plaintiffs have not alleged any race-based animus, and indeed they concede that race is not an issue in this case.

Plaintiffs' claims brought under 42 U.S.C. § 1986 must also be dismissed because an action under that Section cannot be maintained absent a valid claim under Section 1985.

4.     The provisions of the Delaware Constitution invoked by plaintiffs are, in the words of the Delaware Supreme Court, "substantially identical" to the Fourth Amendment. Accordingly,

plaintiffs' claims based on the Delaware constitution must be dismissed for the same reasons which require dismissal of the federal constitutional claim.

5.     The individual defendants are immune from plaintiffs' state law wrongful death claim by virtue of 10 *Del. C.* § 4011(c). In any event, the unrebutted evidence shows that the alleged conduct that plaintiffs challenge did not cause Smith's death.

6.     Plaintiffs claim that the corpse of Mr. Smith was abused because it was allowed to lay in the street for hours. This claim -- which is exclusively predicated on state law -- must be dismissed because plaintiffs have not alleged that the individual defendants were in any way involved in the abuse of the corpse. Indeed, the uncontested evidence shows that the individual defendants were taken from the scene within minutes of the shooting and could not have participated in the alleged conduct giving rise to plaintiffs' claim. The same claim against the City must be dismissed because the City is statutorily immune from suit for this state law claim.

13

## ARGUMENT

### The Standard For Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When deciding a motion for summary judgment, the Court evaluates the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See, e.g., Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir. 1999). Although the moving party bears the initial burden of showing an absence of genuine issues of material fact (*see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), a properly supported motion for summary judgment shifts the burden to the non-movant to show that a genuine material factual dispute exists. *See Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). A fact is material only if it is probative with respect to an element of a claim. *Celotex Corp.*, 477 U.S. at 322. An issue is genuine only if the evidence would suffice to permit a reasonable trier of fact to find in favor of either party. *See In re Headquarters Dodge, Inc.*, 13 F.3d 674, 679 (3rd Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The evidence proffered must be viewed in light of the non-movant's burden at trial. *See Anderson*, 477 U.S. at 254. Summary judgment will be granted if the non-movant does not proffer "concrete evidence from which a reasonable [trier of fact] could return a verdict in [her] favor." *Anderson*, 477 U.S. at 256.

14

## I.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' SECTION 1983 CLAIM.

The plaintiffs allege a claim against the individual defendants[3] under 42 U.S.C. § 1983 ("Section 1983") for a violation of the decedent's Fourth Amendment rights under color of state law. Their claim fails for either of two reasons. *First,* the undisputed facts show that the officers always acted reasonably. *Second,* assuming there was a constitutional deprivation, defendants are entitled to qualified immunity.

### A.    As A Matter Of Law There Were No Constitutional Deprivations Because The Police Officers Reasonably Believed That Mr. Smith Posed A Threat To Themselves And To The Public.

This Court has previously ruled that the plaintiffs' constitutional claims must be evaluated under the Fourth Amendment. (D.I. 78). The Fourth Amendment prohibits police officers from seizing a suspect through the use of force that is "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). But the Supreme Court has made clear that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Pertinent factors include (i) the severity of the suspected crimes; (ii) whether the suspect poses an immediate threat to the safety of the officer or others; and (iii) whether the suspect is actively trying to evade arrest by flight. *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006). The test of objective reasonableness recognizes that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving ...." *Graham*, 490 U.S. at 397.

---

[3] Plaintiff's Amended Complaint does not assert a Section 1983 claim against the City. In any event, the City is not subject to vicarious liability for such a claim. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 691-92 (1978).

This test does not use "the 20/20 vision of hindsight," but rather considers the "perspective of a reasonable officer on the scene." *Couden*, 446 F.3d at 497 (*quoting Graham*, 490 U.S. at 396).

Defendants now turn to the application of these principles to the facts of this case. For purposes of this analysis defendants have divided the shootings into three phases: (1) Phase-1 consists of the shot fired at Mr. Smith on Washington Street; (2) Phase-2 consists of the shots fired at Mr. Smith at 5th and Harrison Streets as he drove the stolen police car at Detective Ciritella; and (3) Phase-3 consists of the shots fired at Mr. Smith as he attempted to flee on Harrison Street.

### 1.    Phase-1:    Plaintiffs Do Not Assert A Claim And None Of The Defendants Were Involved.

Plaintiffs do not allege that the shot fired at Mr. Smith when he was stealing the police car on Washington Street amounts to a constitutional deprivation. Moreover, there is no claim or evidence that the individual defendants were present on Washington Street. Indeed, it is undisputed that the Washington Street shot was fired by Officer Johnny Whitehead, who is not a defendant in this case.

### 2.    Phase-2: The Officers Acted Reasonably When Smith Tried To Run Over Detective Ciritella.

Plaintiffs do not allege that any of the shots fired in Phase-2 amount to a constitutional deprivation; rather they claim only that shots fired in Phase-3 deprived Mr. Smith of his constitutional rights. According to the Amended Complaint:

> 28.    Harry Smith, III was seen slumping over the car's steering wheel, apparently unconscious, helpless, unarmed, and non-threatening to himself or others.

> 29.    Defendants John Ciritella, Thomas Dempsey, and Matthew Kurten continued shooting into the car.

(Amended Complaint, ¶¶ 28, 29 (D.I. 39)). Plaintiffs' sole supporting witness -- David Gwyn -- did not even see Mr. Smith until the stolen police car plowed through the Jeep Cherokee and made the turn onto Harrison Street. Accordingly, the undisputed evidence shows events giving rise to this suit necessarily occurred during Phase-3. It follows, then, that plaintiffs do not claim that the shots fired at Mr. Smith as he attempted to run down Detective Ciritella amount to a constitutional deprivation. Nonetheless, out of an abundance of caution, defendants will briefly address the Phase-2 shots.

As a matter of law, the officers acted reasonably in shooting at Smith during Phase-2. It is uncontested that Smith accelerated the police car at Detective Ciritella and circumvented the barricade by driving on the sidewalk and plowing through a Jeep Cherokee parked on Harrison Street. There is no dispute that, after first slowing or stopping the stolen police car on Fifth Street before the roadblock, Smith suddenly accelerated directly at Detective Ciritella, who quickly retreated and moved to his left to avoid being run over. The Phase-2 shots were fired in response to the officers' reasonable perception that Smith had begun to use the car as a deadly weapon against Detective Ciritella. *See, e.g., Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) (suspect who drove vehicle at officer used it as a deadly weapon, justifying use of deadly force); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.), *cert. denied*, 504 U.S. 915 (1992). The officers had more than the "probable cause" needed to suspect that Smith posed a "threat of serious physical harm[,]" which suffices as a matter of law to justify their use of deadly force. *Garner*, 471 U.S. at 11; *see also Ramsey v. Harley*, 2002 WL 32349129, at *2 (E.D. Pa. Mar. 8, 2002) (granting defendants summary judgment on Fourth Amendment grounds where plaintiff-

17

suspect drove in direction of officer, which prompted officers to shoot at suspect); *Puglise v. Cobb County, Ga*, 4 F. Supp. 2d 1172, 1180 (N.D. Ga. 1998) (same).[4]

> **3.    Phase-3:    The Officers Reasonably Believed That Smith Posed A Serious Threat To The Safety Of Others And Were Justified In Using Deadly Force To Prevent His Escape.**

It is uncontested that by the time Smith made the turn onto Harrison Street -- and was now in the open field -- the officers reasonably believed the following:

- There had been an officer-needs-assistance call from Officers Whitehead and Saunders on Washington Street;

- A shot or shots had been fired on Washington Street. The officers did not know whether the suspect or a police officer had fired shots;

- The suspect stole a police car;

- The suspect led the police on a reckless chase through the City;

- The suspect likely had access to a loaded shotgun which is usually carried in the driver's compartment of a patrol car;

- The suspect had accelerated the stolen police car directly at defendant Ciritella in an apparent attempt to kill him;

- The suspect had recklessly driven the stolen police car on the sidewalk in order to avoid a barricade consisting of a marked and unmarked police car;

- The suspect crashed the stolen police car into a parked Jeep Cherokee and pushed it aside while accelerating the stolen police car in an effort to escape;

---

[4] It is equally clear that, in any event, the officers are entitled to summary judgment for the Phase-2 shots on qualified immunity grounds. *See infra* pp. 21 - 22 (discussing general qualified immunity standards); *see also Waterman v. Batton*, 393 F.3d 471, 471, 478-79 (4th Cir. 2005) (granting summary judgment on qualified immunity grounds to officers who shot at suspect that drove recklessly their direction).

- Smith was now proceeding the wrong way on one-way Harrison Street; and

- There were no police cars blocking the suspect's path once he turned onto Harrison Street.

For these reasons, each of the officers knew that Smith's continued flight through the City would threaten the lives of citizens of Wilmington. (A15 at 109, A18 at 131; A43 at 10, A52 at 51-52; A30 at 46, A34 at 79, A35 at 82).

*Garner's* standard, which only required that the officers have "probable cause" to believe that Smith posed "a threat of serious physical harm" to others, was plainly satisfied here. 471 U.S. at 11. Even viewed in the light most favorable to plaintiffs, the facts show that Smith had committed severe crimes and posed an immediate threat to the safety of others sufficient to justify the officers in preventing his further flight. *Scott*, 346 F.3d at 759 (affirming summary judgment in favor of officer because it was reasonable to use deadly force to seize car theft suspect who had driven recklessly, nearly running over officer, in attempt to escape); *Dudley v. Eden*, 260 F.3d 722, 726 (6th Cir. 2001) (affirming grant of summary judgment in favor of officer who shot to prevent the escape of a robbery suspect who had driven recklessly away from another officer in a shots fired incident); *Reid v. Ford*, 2005 WL 2898058, at *4 (M.D.N.C. Mar. 11, 2005), *aff'd*, 2005 WL 1725705 (M.D.N.C. Apr. 22, 2005) (granting summary judgment to officers who shot to prevent escape of armed robbery suspect who drove recklessly in attempt to escape officers); *Davis v. Southeastern Penn. Transp. Auth.*, 2001 WL 1632142, at *5 (E.D. Pa. Dec. 20, 2001) (granting summary judgment to officers who shot at fleeing suspect where officers had reason to believe suspect committed armed robbery and car jacking with a gun, even if the suspect actually had no gun). It is clear that Smith was attempting to flee from the police and would (and did) go through anything or anyone in his path of escape. *Scott*, 346 F. 3d at 759

19

(suspect who drove at officer and then attempted to flee posed immediate threat to bystanders); *Dudley*, 260 F.3d at 727 (suspect's "bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving" made it objectively reasonable to view him as a threat to other motorists); *Freland*, 954 F.2d at 347 (suspect's reckless driving in an attempt to escape "had proven he would do almost anything to avoid capture" and the officer could reasonably believe the suspect "would not stop at threatening others"); *Williams v. City of Grosse Pointe Park*, 2005 WL 2173686, at *5 (E.D. Mich. Sept. 6, 2005) (granting officers summary judgment where suspect's objective conduct "showed that he was not intimidated by the police presence, would not hesitate to deliberately use the vehicle as a weapon, and was intent on fleeing from the police, which in turn posed a threat to the public traveling on a major [city] thoroughfare."); *Reid*, 2005 WL 2898058, at *4 (granting summary judgment where suspect's driving showed he "clearly posed a threat to the [officers'] safety, other drivers' safety, and the safety of the residents of the neighborhood that he was driving wildly through.").

Given the danger created by Smith's reckless flight and the split-second nature of the decisions the officers had to make, their conduct was not objectively unreasonable even if (as the plaintiffs will contend based solely on Mr. Gwyn's inconsistent testimony) one or more shots were fired after the fleeing car had slowed or stopped. *See, e.g., Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (reversing denial of officers' motion for summary judgment and reasoning that, even if two shots were fired after chase ended, the suspect's "car was stopped for, at most, a very few seconds when shots were fired: no cooling time had passed for the officers in hot pursuit"); *Eden*, 260 F.3d at 727 (affirming summary judgment in favor of officer who shot and killed suspect after collision ending chase and reasoning that suspect could have decided to

continue to flee and officer could have reasonably feared suspect could use a weapon against the officer); *Puglise*, 4 F. Supp. 2d at 1177 (granting summary judgment in favor of officers who shot into a truck which was "stopped, blocked in by other patrol cars" where suspect had repeatedly escaped from officers by driving recklessly). The plaintiffs cannot point to evidence sufficient to create a material factual dispute that the officers' use of deadly force to prevent Smith's continued reckless flight during Phase-3 was reasonable under the Fourth Amendment.

**B.    The Officers Did Not Violate Any Clearly Established Rights And Therefore Are Protected By Qualified Immunity.**

Summary judgment is appropriate on qualified immunity grounds even if the officers' actions during Phase-3 did not comply with the Fourth Amendment, because Smith had no clearly established right to continue his reckless flight without being subjected to deadly force. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances[.]" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148 (3d Cir. 2002), *aff'd*, 2003 WL 22245656 (3d Cir. Oct. 1, 2003). The protections of qualified immunity are available unless the allegedly violated right was "clearly established" in a "particularized" sense at the time of the challenged actions. *Brosseau*, 543 U.S. at 198-99; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (reasoning that, in order for qualified immunity not to apply, "in the light of pre-existing law the unlawfulness must be apparent."). The doctrine "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force.'" *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (citation omitted).

21

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier,* 533 U.S. at 200 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). The protections of qualified immunity are "effectively lost if a case is erroneously permitted to go to trial." *Id.* at 201. The determination of qualified immunity is an objective question to be decided by the Court as a matter of law. *See Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir. 2004), *reh'g denied,* 126 S. Ct. 724 (2005). Thus, even if there are material factual disputes, qualified immunity permits a grant of summary judgment where the underlying alleged right was not clearly established in a particularized sense. *Saucier,* 533 U.S. at 202 (reasoning that "to deny summary judgment any time a material issue of fact remains on the excessive force claim - could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.") (citation omitted).

The officers are entitled to summary judgment on qualified immunity grounds for the shots fired during Phase-3 because Smith had no "clearly established" right to continue his flight from the police free from the use of deadly force. The Supreme Court recently held that, as of February 21, 1999,[5] a suspect did not have a "clearly established" right to flee from police in a vehicle where officers could reasonably believe that suspect's flight posed a risk of harm to others. *See Brosseau v. Haugen,* 543 U.S. 194, 200 (2004). In *Brosseau,* after a brief foot chase, an officer shot an unarmed, disturbed but non-violent suspect in the back after he entered his vehicle and had started the engine in an apparent attempt to flee from the officer.[6] *Id.* at 196.

---

[5] This was the date of the challenged conduct. *See Haugen v. Brousseau,* 339 F.3d 857, 860 (9th Cir. 2003), *reversed and remanded,* 543 U.S. 194 (2004).

[6] In comparison to the officer in Brosseau, officers Ciritella, Kurten and Dempsey had much more of a reasonable factual basis supporting the conclusion that each of them reached -- *i.e.,* that Smith's continued flight posed a danger of harm to others. *See supra* p. 18 (listing reasons).

22

The officer used deadly force to seize the suspect because, she testified, she feared for the safety of the other officers in the general area as well as the safety of the occupants of nearby vehicles. *Id.* at 197. The *Brosseau* Court reasoned that existing precedent only showed that "this area is one in which the result depends very much on the facts of each case" -- which in turn sufficed to show that the suspect had no "clearly established" right to flee without being subject to deadly force, compelling the entry of summary judgment in favor of the defendant officer. *Id.* at 201.

Analogous cases decided after the event in *Brosseau* but before September 13, 2003 further support that Smith had no "clearly established" right to continue to flee without being subject to deadly force. *See, e.g., Hernandez v. Jarman*, 340 F.3d 617 (8th Cir. 2003) (reversing denial of summary judgment on qualified immunity grounds, holding officer's shooting of a suspect-motorist who had fled from police, who drove recklessly and eluded police roadblocks, and who rammed an officer's vehicle before continuing to flee from officers was objectively reasonable under the Fourth Amendment); *Pace*, 283 F.3d at 1282 (reversing denial of summary judgment where officer shot suspect who had driven recklessly while fleeing from police, reasoning "we cannot conclude that the Fourth Amendment ruled out the use of deadly force"); *Dudley*, 260 F.3d at 727 (affirming grant of summary judgment where officers' use of deadly force was reasonable to prevent suspect's continued attempts to escape recklessly in vehicle); *Scott v. Clay County, Tenn.*, 205 F.3d 867, 878 (6th Cir.), *cert. denied*, 531 U.S. 874 (2000) (reversing denial of summary judgment motion of defendant officer, reasoning actions of officer who used deadly force to seize suspect fleeing recklessly in motor vehicle "were objectively reasonable, and thus did not violate the Fourth Amendment"); *accord Davis v. Southeastern Penn. Transp. Auth.*, 2001 WL 1632142, at *3 (E.D. Pa. Dec. 20, 2001) (granting officer summary judgment where officer shot at suspect fleeing in car after officer believed suspect

brandished firearm at officer). In the alternative, a factually analogous case decided during this time period reasoned that, even assuming a reasonable trier of fact could find the defendant's actions to be objectively unreasonable, summary judgment was appropriate on qualified immunity grounds because the law was not sufficiently clearly established, leading to the conclusion that reasonable officers could disagree. *See Pace*, 283 F.3d at 1282-83 (reasoning, in the alternative, that qualified immunity applied because "Plaintiff has identified no case demonstrating a clearly established rule prohibiting police officers from using deadly force in circumstances like those in this case"). Accordingly, the law as of September 13, 2003 did not clearly establish that a dangerous suspect such as Smith had a right to continue to flee from the officers.

Factually analogous cases post-dating September 13, 2003 also support that officers who use deadly force to prevent a dangerous suspect from fleeing in a vehicle are entitled to qualified immunity. *See, e.g., Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) (affirming grant of summary judgment to off-duty officer who shot suspect fleeing in stolen vehicle, where suspect had attempted to run over officer who had acted recklessly with respect to that possibility); *Williams v. City of Grosse Pointe Park*, 2005 WL 2173686, at *5 (E.D. Mich. Sept. 6, 2005) (granting summary judgment to officer who shot juvenile car thief who had backed into police car in order to flee from police and reasoning suspect's actions "showed that he was not intimidated by the police presence, would not hesitate to deliberately use the vehicle as a weapon, and was intent on fleeing from the police, which in turn posed a threat to the public traveling on a major [city] thoroughfare.").

Summary judgment on qualified immunity grounds would be similarly appropriate even if, as the plaintiffs rely solely upon Mr. Gwyn to prove, Smith's stolen police vehicle had slowed

24

or even stopped when the final shots were fired. *Randall v. City of Fairbanks*, 352 F. Supp. 2d 1028, 1037 (D. Alaska 2005) (granting summary judgment on qualified immunity grounds in favor of officer who shot suspect who had either slowed or stopped vehicle, reasoning "whether the car was moving slowly or not moving at all is not dispositive on whether the use of deadly force is clearly established in cases such as this"); *see also Pace*, 283 F.3d at 1282; *Eden*, 260 F.3d at 727; *Puglise*, 4 F.Supp 2d at 1177 (all granting summary judgment on Fourth Amendment grounds in favor of officers who had shot after a fleeing suspect's vehicle stopped). Because a reasonable officer in the circumstances could believe shooting at Smith during Phase-3 was justified, the officers are entitled to summary judgment on qualified immunity grounds.

## II.    THE   UNREBUTTED   EVIDENCE   SHOWS   THAT   THE   ALLEGED   CONSTITUTIONAL   DEPRIVATION   COULD   NOT   HAVE   BEEN   THE   PROXIMATE CAUSE OF MR. SMITH'S INJURIES.

It is settled that the plaintiff in an action brought under Section 1983 bears the burden of showing that the alleged constitutional deprivation was the proximate case of his injuries. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 345 & n.7 (1986) (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961)); *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) ("It is axiomatic that a § 1983 action, like its state tort analogs, employs the principle of proximate causation.") (quotation omitted). As a matter of law plaintiffs have failed to do so in this case.

The core of plaintiffs' claim is their allegation that the police officers continued to fire at the stolen police car after it stopped. The sole witness identified by plaintiffs to substantiate this theory -- David Gwyn -- signed an affidavit (which was filed by plaintiffs), in which he swears that:

> I then saw a Wilmington Police Department officer walk over to the side of this police car and fire shots into the body of the man slumped over the steering wheel.

(Gwyn Aff. ¶ 7 (D.I. 15)). He explained in his deposition that a uniformed officer fired at Mr. Smith from the *left* [driver's] side of the car. (A38 at 22).

It is undisputed, however, that the fatal shot had to have come from Mr. Smith's *right*. According to the autopsy report the fatal bullet struck Mr. Smith about two inches above his right ear, entered the right parietal lobe of his brain and traveled in a slightly backwards trajectory toward the border of the left parietal and occipital lobe. (A110-15). The Medical Examiner testified that the fatal bullet had to have come from Mr. Smith's right and could not have come from his left. (A92-93). This is consistent with other evidence in this case. The Bureau of Alcohol, Tobacco and Firearms examined the bullet retrieved from Mr. Smith's brain (among other bullets it examined) and identified it as having been fired from Detective Ciritella's

26

weapon. Shell casings found at the scene (also examined by ATF and linked to Det. Ciritella's gun), as well as Detective Ciritella's testimony, all place him to Mr. Smith's right. Thus, even accepting any of Mr. Gwyn's versions as true, it is uncontradicted that the fatal shot could not have been the result of the alleged constitutional deprivation described by Mr. Gwyn.

III.    **PLAINTIFFS' CLAIMS UNDER 42 U.S.C. §§ 1985 AND 1986 MUST BE DISMISSED BECAUSE THEY HAVE FAILED TO ALLEGE -- AND CANNOT SHOW -- A CONSPIRACY AND CLASS-BASED DISCRIMINATION.**

Plaintiffs assert a claim under 42 U.S.C. § 1985 which fails for either of two reasons. First, they have not even alleged that the defendants engaged in a conspiracy. For this reason alone their claim must be dismissed. It bears noting, though, that there is absolutely no evidence of a conspiracy here. Second, Section 1985 also requires plaintiffs to allege and prove some racial invidiously discriminatory animus. They have done neither and have gone so far as to concede that "race is not an issue in this case." This too requires dismissal of the Section 1985 claim.

Plaintiffs' Section 1986 claim must be dismissed because a requisite to such a claim is the existence of a valid Section 1985 claim, which plaintiffs have failed to allege.

A.    **Plaintiffs' Section 1985 Claim Must Be Dismissed.**

Although the Amended Complaint is not specific, it appears that plaintiffs seek to assert a claim under Section 1985(3). That section requires plaintiffs to allege and prove the existence of a conspiracy and (under the circumstances presented here) a racial animus.

1.    **Plaintiffs Purport To Allege A Claim Under Section 1985(3).**

Section 1985 contains three distinct causes of action -- each with separate elements -- in three separately numbered subsections. Unfortunately, the Amended Complaint does not specify under which of those subsections plaintiffs seek to proceed. By the process of deduction, however, it appears that plaintiffs rely upon subsection (3). "Section 1985(1) prohibits 'two or more persons' from interfering with a federal officer's performance of his duties ... and Section 1985(2) prohibits conspiracies to obstruct justice and to intimidate litigants and witnesses." *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 423 n.1 (3d Cir. 2003). Neither of those

28

scenarios are even remotely presented by the instant case, so plaintiffs' claim will be analyzed under Section 1985(3).

> **2.** **Plaintiffs' Section 1985(3) Claim Must Be Dismissed Either Because (1) They Have Failed To Allege And Prove A Conspiracy Or (2) They Have Failed To Allege And Prove Invidious Race-Based Discrimination.**

Section 1985(3) requires plaintiffs to allege and prove a conspiracy involving the defendants. They have failed to do either. The statute also requires, in the context of this claim, that the plaintiffs also allege and prove some racial invidiously discriminatory animus motivating the defendants. Again, they have failed to do either.

> **a.** **Plaintiffs Have Failed To Allege And Prove The Existence Of A Conspiracy.**

Subsection (3) creates a cause of action against anyone who conspires "for the purpose of depriving ... any person or class of persons of the equal protection of the laws ...." 42 U.S.C. § 1985(3). Central to this section, therefore, is the existence of a conspiracy. The Supreme Court "has made clear what a plaintiff must allege to state a claim under § 1985(3)." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). Among those elements is the existence of a conspiracy. *Griffin v. Breckenridge*, 403 U.S. 88, 102-3 (1971); *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-9 (1983), *reh'g denied*, 464 U.S. 875 (1983); *Farber, supra.* The Amended Complaint in the instant case is wholly devoid of any allegation of the existence of a conspiracy. For this reason alone, the Section 1985(3) claim must be dismissed. *Deubert v. Gulf Federal Savings Bank*, 820 F.2d 754,757 (5th Cir. 1987) (Plaintiffs' "failure to allege they were victims of a race-based conspiracy, however, forecloses the availability of relief under section 1985(3)").

In light of the instant record, it is not surprising that plaintiffs have failed to allege the existence of a conspiracy. The record contains not even the slightest hint of a conspiracy. It is

uncontested that after hearing the officer-needs-assistance call on the radio, the individual defendants responded in separate cars and did not communicate with one another. The shooting transpired within seconds of the officers' arrival at the scene, and there is no evidence they communicated with one another, much less formed a conspiracy during that very brief period. Indeed, Detective Ciritella was not even aware of Officer Kurten's presence at the scene until after the shooting concluded. (A17 at 116). And likewise, defendant Kurten became aware that Officer Thomas Dempsey was the other police officer at the scene only after the shooting stopped. (A47 at 30, A49 at 41).

### b.    Plaintiffs Have Failed To Allege And Prove Any Racial Animus.

Another element of a Section 1985(3) claim, in this context, is an invidiously discriminatory racial animus. The Supreme Court has held that a 1985(3) plaintiff must allege, and prove, "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).[7] Here, plaintiffs have not alleged any racial animus. Indeed, plaintiffs' counsel has stated on the record that there are no allegations of race in the lawsuit and "[r]ace doesn't matter in this [lawsuit]." (A31 at 50).[8] Absent even an allegation of racial animus, the Section 1985(3) claim must be dismissed. *Doherty v. Delaware*, 2005 WL 735557, at *5 (D. Del. Mar. 30, 2005) ("In the case

---

[7] While the Supreme Court left open whether some class-based discrimination other than race might satisfy Section 1985(3), this Court need not consider the issue here because there is no allegation as to what other class is involved. Consequently, the defendants proceed on the assumption the claim is somehow premised on racial discrimination.

[8] Plaintiffs' concession that race is not an issue in this case is not surprising, given that the officer who fired the Phase-1 shot -- Officer Johnny Whitehead -- is an African American. (A101 at 63).

30

at bar, plaintiff fails to even allege any racial or class-based animus by defendants. Therefore plaintiff's claim under Section 1985 must be dismissed.").

**B.    Plaintiffs' Section 1986 Claim Must Be Dismissed Because There Is No Valid Section 1985 Claim.**

Section 1986 is closely intertwined with Section 1985. In general terms, "[t]hese sections cover, respectively, conspiracies to violate federal rights, and failures to prevent such violations by those with relevant knowledge and power to do so." *O'Connor v. City of Newark*, 440 F.3d 125, 129 n.7 (3d Cir. 2006). The plaintiffs' Section 1986 claim fails because plaintiffs have failed to allege a valid Section 1985 claim which is a predicate to a Section 1986 claim.

Section 1986 imposes liability in certain circumstances upon a person "who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section 1985 of this title, are about to be committed ...." 42 U.S.C. § 1986. Thus, in order to establish a Section 1986 claim, plaintiffs must allege and prove a Section 1985 claim. *Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir. 1980) ("transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also."); *Mian v. Donaldson, Lufkin & Jenrette, Sec. Corp.*, 7 F.3d 1085, 1088 (2nd Cir. 1993) ([a] "§ 1986 claim must be predicated upon a valid § 1985 claim.") (subsequent history omitted); *Grimes v. Smith*, 776 F.2d 1359, 1363 n.4 (7th Cir. 1985) ("Liability under section 1986 is derivative of Section 1985(3) liability."). As discussed earlier, plaintiffs have not pled (nor can they show) a Section 1985 claim. Consequently their Section 1986 claim also fails.

## IV. PLAINTIFFS' CLAIMS FOR PURPORTED VIOLATIONS OF THE DELAWARE CONSTITUTION SIMILARLY FAIL AS A MATTER OF LAW.

The Second Cause of Action in plaintiffs' Amended Complaint purports to assert a claim against the officers for an alleged violation of provisions of the Delaware Constitution pertaining to (i) unreasonable searches and seizures, and (ii) the use of cruel punishments. *See* Am. Compl. ¶ 62 (D.I. 39) (*citing* Del. Const. Art. I, §§ 6, 11).

Section 6 of Article 1 of the Delaware Constitution ("Section 6") provides in pertinent part that "the people shall be secure in their persons . . . from unreasonable searches and seizures ...." *Id.* § 6. The rights provided by Section 6 are "substantively identical" to those provided by the Fourth Amendment. *See State v. Phillips*, 366 A.2d 1203, 1207 (Del. 1976); *Field v. Hall*, 1995 WL 360744, at *5 (D. Del. May 19, 1995) (same). Because the officers are entitled to summary judgment with respect to plaintiffs' Section 1983 claims for alleged violation of the Fourth Amendment, they also are entitled to summary judgment for the alleged violation of Section 6.

Section 11 of Article 1 of the Delaware Constitution ("Section 11") prohibits "cruel punishments" from being "inflicted." Del. Const. Art. 1, § 11. This provision has been interpreted similarly to the Eighth Amendment of the U.S. Constitution. *See, e.g., DeShields v. State*, 534 A.2d 630, 638-40 (Del. 1987), *cert. denied*, 486 U.S. 1017 (1988); *see generally* Randy J. Hollland, THE DELAWARE STATE CONSTITUTION: A REFERENCE GUIDE at 61-62 (Greenwood Press 2003) (same). Because plaintiffs challenge the use of force during a seizure, rather than after a conviction, the constitutional ban on "cruel punishments" is inapplicable. *Graham*, 490 U.S. at 395. Accordingly, the officers are entitled to summary judgment on this claim.

32

## V.    THE OFFICERS ARE STATUTORILY IMMUNE FROM PLAINTIFFS' STATE TORT LAW CLAIM FOR WRONGFUL DEATH.

The Third Cause of Action in plaintiffs' Amended Complaint is a wrongful death tort claim against the officers under state law.[9]  (*See* Am. Compl. ¶¶ 67-72; *see also*, 10 *Del. C.* § 3722 (Delaware's wrongful death statute) (D.I. 39)).  Under the Delaware County and Municipal Tort Claims Act, the officers are immune from suit under state tort law unless the plaintiffs can show that they engaged in wrongdoing "with wanton negligence or willful and malicious intent." 10 *Del. C.* § 4011(c) ("Section 4011(c)").  "Under Delaware law, conduct is 'wanton' only where it reflects a 'conscious indifference' or an 'I-don't-care' attitude." *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006) (*quoting Foster v. Shropshire*, 375 A.2d 458, 461 (Del. 1977)).  The Third Circuit Court of Appeals has read Section 4011(c) broadly to permit a grant of summary judgment in favor of defendant officers on state law claims, even if the defendants' conduct was not constitutionally permitted, where the officers were not indifferent to their duties. *See Couden*, 446 F.3d at 497-98 (holding defendants' use of force to arrest unarmed, unresisting suspect did not reflect wantonness).  Objectively reasonable conduct in the course of an officer's duties that complies with the Fourth Amendment satisfies Section 4011(c).  *See, e.g., Samuels v. Hall*, 2004 WL 1635529, at *4 (D. Del. July 19, 2004) (granting summary judgment to defendant officer under Section 4011(c) in case where Fourth Amendment was satisfied).  Accordingly, the undisputed facts show that the officers are entitled to summary judgment on this claim.

Even if the officers were not immune, summary judgment is appropriate because there is no evidence that the alleged acts plaintiffs challenge -- an officer firing from the driver's side after the stolen police vehicle stopped -- could have caused Mr. Smith's death.  *Cf. Shively v.*

---

[9] Plaintiffs' Amended Complaint does not seem to assert any state law claims against the City.  The City would be absolutely immune from liability for any such claims. *See* 10 *Del. C.* § 4011(a).

*Klein*, 551 A.2d 41, 43 (Del. 1988) (plaintiffs must prove that challenged conduct was the proximate cause of death); 10 *Del. C.* § 3722(a) (action may be maintained it a "wrongful act *causes* the death of another.") (emphasis added). As discussed above, there is no dispute that Mr. Smith's death was caused by a gunshot would to the head, which entered Mr. Smith's head from the right and therefore could not have been fired by an officer firing from the driver's side. In addition, there is no dispute that Detective Ciritella, who fired that round, was at all pertinent times on the passenger side of the vehicle.

Accordingly, the defendants are entitled to summary judgment on this claim.

34

## VI.  PLAINTIFFS' STATE LAW ABUSE OF A CORPSE CLAIM MUST BE DISMISSED BECAUSE THE INDIVIDUAL DEFENDANTS WERE NOT INVOLVED AND THE CITY IS IMMUNE.

Plaintiffs claim that Smith's corpse was abused because, according to their allegations, Smith's body was allowed to lie in the street "for several hours." (Amended Complaint, ¶ 32 (D.I. 39)). This claim -- which is exclusively predicated upon state law -- fails because the unrebutted record shows that none of the individual defendants played any role in this aspect of the case and the City is statutorily immune from this claim.

The abuse of corpse claim must be dismissed against the individual defendants because they were not involved. Nowhere in the Amended Complaint do plaintiffs allege that the individual defendants were in any way responsible for the purported treatment of Mr. Smith's body. This alone warrants dismissal of this claim. Moreover, the record in this case contains no evidence linking these defendants to the purported abuse of Mr. Smith's corpse. The uncontroverted evidence shows that the individual defendants were driven from the scene by Lt. Mulrine of the Wilmington Police Department within fifteen minutes after the shooting took place. (A7 at 59; A30 at 49; A53 at 59, A54 at 67). Accordingly, they could not have been responsible for what happened to the body in the "hours" after they left.

The abuse of a corpse claim against the City must also be dismissed because the City is statutorily immune from this state law claim. Plaintiffs' claim is predicated exclusively on state law. Count VIII of the Amended Complaint is entitled "Violation of Delaware Law -- Abuse of Corpse" and the claim is specifically premised on the allegation "Delaware statutes prohibit abuse of a corpse." (Amended Complaint, ¶ 74 (D.I. 39)). Nowhere is there any allegation of the violation of a federal right in connection with this claim.

The City is immune by Delaware statute from this claim. It is settled that "when state law creates a cause of action, the State is free to define the defenses to that claim, including the

35

defense of immunity, unless, of course, the state rule is in conflict with federal law." *Ferri v. Ackerman*, 444 U.S. 193, 198 (1979). Here, Delaware law provides an absolute bar to state tort claims against the City. The Delaware Code provides that "[e]xcept as otherwise expressly provided by statute, all governmental entities ... shall be immune from suit on any and all tort claims seeking recovery of damages." 10 *Del. C.* § 4011(a). Plaintiffs can cite to no applicable exception to § 4011(a) and, consequently, this claim against the City must be dismissed.

36

## CONCLUSION

Wherefore, defendants pray that the Court grant summary judgment dismissing all claims against them.  In the event that the Court concludes that defendants are not entitled to summary judgment on all claims, defendants pray that the Court dismiss those claims for which the Court finds that summary judgment is appropriate.

OF COUNSEL:

Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware  19801
302-576-2175

Dated:  June 14, 2006

John A. Parkins, Jr. (#859)
K. Tyler O'Connell (#4514)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
Oconnell@rlf.com
Attorneys for Defendants

37

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 14, 2006, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

      Kester I.H. Crosse, Esquire
      Williams & Crosse
      1214 King Street
      Suite 300
      Wilmington, DE  19801

I hereby certify that on June 14, 2006, I have sent by U.S. Regular Mail, the foregoing

document to the following non-registered participants:

      Anne T. Sulton, Esquire
      Post Office Box 2763
      Olympia, WA 98507

                                  John A. Parkins, Jr. (#859)
                                  Richards, Layton & Finger, P.A.
                                  One Rodney Square
                                  P.O. Box 551
                                  Wilmington, Delaware 19899
                                  (302) 651-7700
                                  Parkins@rlf.com