# APPENDIX
# A1 through A39
# (Continued)

Estate of Harry Smith, III, et al.
John F. Ciritella

Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 2 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 8, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,    )
HARRY SMITH, JR., and ROSLYN   )
WOODARD SMITH,                 )
                               )
            Plaintiffs,        )
                               )   Civil Action
        v.                     )   No. 04-1254
                               )      (GMS)
WILMINGTON POLICE DEPARTMENT,  )
MICHAEL SZCZERBA and ONE OR    )
MORE JOHN DOES,                )
                               )
            Defendants.        )

          Deposition of JOHN F. CIRITELLA taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Monday, May 8, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
              P.O. Box 2763
              Olympia, Washington   98507
              for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            K. TYLER O'CONNELL, ESQUIRE
            RICHARDS, LAYTON & FINGER
              One Rodney Square - Third Floor
              Wilmington, Delaware  19899
              for the Defendants Wilmington Police
            Department and Michael Szczerba
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
            WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

Page 26

1  Q.  When I say "whole week," 40 hours of time?
2  A.  Yes, ma'am.
3  Q.  Just learning how to use that particular
4  weapon?
5  A.  Yes, ma'am.
6  Q.  I assume that the instruction that you received
7  concerned not just use of it, but how to clean it and
8  so forth; correct?
9  A.  Yes, ma'am.
10 Q.  Every day of that week did you go down to the
11 range and discharge the weapon?
12 A.  I believe so, yes.
13 Q.  You were qualified with that weapon; correct?
14 A.  That's correct.
15 Q.  Between the time that you first became
16 qualified with that weapon, I assume they gave you
17 some certificate or something indicating that you are
18 qualified with the new weapon; is that correct?
19 A.  I don't know how that's handled. I mean,
20 again, if it were just qualified, I guess that's kept
21 through our human resources, so no one told you you
22 weren't qualified.
23 A.  That's correct.
24 Q.  From the time that you began carrying that

Page 27

1  weapon and up until September 13, 2003, had you ever
2  discharged that weapon at another person?
3  A.  No, ma'am.
4  Q.  Prior to September 13, 2003, had you ever shot
5  anybody?
6  A.  No, ma'am.
7  Q.  So this was your first shooting incident, that
8  of Harry Smith?
9  A.  That's correct.
10 Q.  So in the 19 years you've been on the force
11 here in Wilmington, you've only had one shooting
12 incident?
13 A.  That's correct.
14 Q.  Never shot at a dog or anything?
15 A.  No, ma'am.
16 Q.  Tell me what happened on September 13, 2003, as
17 best you can recall.
18 A.  As best I can recall?
19 Q.  Yes.
20 A.  I was working an on-call weekend, which meant I
21 was in detectives at the time, plain clothes
22 assignment working. I guess it would be 1600 to 2400,
23 4 p.m. till 12 midnight. Sitting at my desk typing a
24 report. I heard a call for assistance.

Page 28

1  Q.  So let me stop you there for just a second.
2  And I'll stop you from time to time, so I will
3  appreciate your indulgence as I do that.
4       So you're in the police station?
5  A.  That's correct. Detective division.
6  Q.  When were you promoted to detective?
7  A.  It's not a promotion. It's just a transfer.
8  Q.  So what is your rank?
9  A.  Master corporal.
10 Q.  Master corporal. But you were working in plain
11 clothes --
12 A.  As a detective.
13 Q.  -- on September 13, 2003?
14 A.  That's correct.
15 Q.  You're writing a report; correct?
16 A.  Typing a report.
17 Q.  You hear a call come in; correct?
18 A.  A call for assistance come across our radio.
19 Q.  What do you recall the call for assistance
20 saying? What was the content of that?
21 A.  Well, the content was that it appeared that one
22 of the officers was, I guess, yelling or screaming on
23 the radio. Could not make it out. What I could tell,
24 it was not your normal conversation over the radio,

Page 29

1  meaning that in my years of experience, I could tell
2  that something was going on. Heard that chatter.
3  Then I heard they need another car or need assistance
4  and they were able to give, I believe, a location
5  somewhere on Washington Street.
6       At that particular time I exited my desk.
7  I have to go down other steps, I guess, floor to where
8  my vehicle is. And as I exited the, I guess, the
9  police department, I heard that again, another call
10 for assistance. Shots fired. Police car taken.
11 Q.  It's just those words, call for assistance,
12 shot fired, car taken?
13 A.  They were the strongest words I heard.
14 Q.  So there may have been other words stated?
15 A.  There may have been.
16 Q.  Your car is an unmarked police car?
17 A.  That's correct.
18 Q.  So you're in civilian clothes and getting into
19 an unmarked police car; correct?
20 A.  That's correct.
21 Q.  Did you have any lights or sirens in that
22 unmarked car?
23 A.  Yes, I did.
24 Q.  So you get into your car. Then what do you do?

8 (Pages 26 to 29)

A2

Estate of Harry Smith, III, et al. v. Wilmington Police Department
John F. Ciritella                    C.A. # 044254 (GMS)                    May 8, 2006
Case 1:04-cv-01254-GMS    Document 114-2    Filed 06/21/2006    Page 4 of 40

Page 30

1    A.  Pull out of the parking lot.  We are right near
2  4th Street.
3    Q.  4th and --
4    A.  4th and -- I guess it would be Poplar.  Exited
5  from 4th and Poplar.  Westbound on 4th Street.
6    Q.  Speeding?
7    A.  Was I speeding?
8    Q.  Yes, sir.
9    A.  Yes, I was, with my lights on.  Activated my
10  unit.  Proceeded westbound on 4th Street.
11    Q.  What does that mean, activated your equipment?
12    A.  My lights and siren.
13    Q.  Okay.
14    A.  Westbound on 4th Street.  I can now hear
15  through the radio that a chase was now being, I guess,
16  initiated.
17    Q.  So let me stop you.
18        So whose voice do you think you heard when
19  you heard that the chase had been initiated?
20    A.  At that particular time it was Sergeant
21  Donohue, Debbie Donohue who was pursuing a marked
22  Wilmington police car.  Her transmission, she was
23  giving locations of where the car was, I guess, going.
24  It was going in, I guess, a southbound manner.  I was

Page 31

1  able to, I guess where I was at, westbound on 4th,
2  where she was at up near, I guess, 12th and
3  Washington, it proceeded, I guess, southbound on
4  Washington.  It's in a southbound manner.  And where
5  the police department is located, it kind of is going
6  to -- it would intersect eventually.
7        I continued westbound on 4th Street.  The
8  stolen police -- stolen police car was going in a
9  different direction.  Eventually it went to 7th or
10  8th Street.
11    Q.  How do you know that?
12    A.  Because I heard it on route.
13    Q.  Who did you hear talking on the radio?
14    A.  Again, it was still Sergeant Donohue giving
15  those commands at that particular time.  She was
16  pursuing the vehicle.
17    Q.  Now, as a sergeant she would have been the
18  supervising officer on duty at that time?
19    A.  I think she was a supervisor, but I don't know
20  if she was the supervising officer on duty at the
21  time.
22    Q.  Was there any lieutenant?
23    A.  If there was, I'm not sure who that was.
24    Q.  So what are the ranking systems in this

Page 32

1  department?
2    A.  I guess patrolman, sergeant, lieutenant,
3  captain, inspector, chief.
4    Q.  You don't have deputy chiefs here?
5    A.  No, ma'am.
6    Q.  Would the inspector, if we are looking at a
7  larger police department, would the inspector be a
8  deputy chief or might have that title or at least have
9  those similar functions?
10    A.  That I don't know, ma'am.  I mean, every
11  department is different, so I can't say.
12    Q.  So we have the sergeant on the radio advising
13  anyone listening on the radio the directional --
14    A.  The direction of travel of the stolen police
15  car, that's correct.
16    Q.  Okay.  All right.
17    A.  It ends up, I believe it's westbound on 7th or
18  8th Street and southbound on Monroe Street.  At this
19  particular time again, I guess I'm close to 4th and
20  Monroe streets, and at the time there's other
21  detective cars actually in front of me that had left
22  the building.
23    Q.  Who?
24    A.  I believe it was Sergeant William Brown.  I

Page 33

1  think Detective Stephen Misetic may have been in front
2  of me.
3    Q.  So how did they get in front of you?
4    A.  They left the building when I exited.  When the
5  call for assistance came over the radio, everybody
6  that's inside the building left the building to go
7  assist the officers.
8    Q.  How many officers was that?
9    A.  There were at least two detective cars in front
10  of me.
11    Q.  Were there any other officers in the building
12  that you knew also left when you were leaving?
13    A.  If there was, I don't remember them by name.  I
14  mean, I know that there was people leaving the police
15  department.  I remember -- the parking lot, I do
16  recall that.
17    Q.  Do you recall how many cars were in the parking
18  lot when you came out of the building?
19    A.  No, I don't.  I mean, I don't know that.
20    Q.  From the time that you were at your desk typing
21  a report to the time you activated your equipment, how
22  much time elapsed?
23    A.  Less than a minute.
24    Q.  Less than a minute?

9 (Pages 30 to 33)

Estate of Harry Smith, III, et al.
John F. Ciritella

Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 5 of 40

Wilmington Police Department
C.A. # 04-1254 (GMS)    May 8, 2006

Page 38

1 northern -- turned right, northbound.
2 Q. North on VanBuren?
3 A. That's correct.
4 Q. Let me stop you for a second if I could.
5 So we have six police cars going down the
6 street. Were all of you speeding?
7 A. Actually, I wouldn't call it speeding, no.
8 Q. About how fast do you think you were
9 travelling?
10 A. You know, I couldn't tell you, but it was -- at
11 that -- when I left the building, I left the building
12 in a -- I guess a faster pace. But upon catching the
13 chase at 4th and Monroe Street, we all slowed down
14 because the stolen vehicle was dictating the speed of
15 the chase at that particular time.
16 Q. It's fair to say that the stolen vehicle was
17 going at or lower than the posted speed limit?
18 A. I wasn't keeping track of that.
19 Q. But you wouldn't characterize it as a
20 high-speed chase at that point, would you, sir?
21 A. I had a visual on the vehicle, so again, I
22 wouldn't say it was -- I can't say that. I had a
23 visual on it, so I don't know.
24 Q. As you have this visual on the car, and now I'm

Page 39

1 talking about the stolen police car, were the lights
2 and sirens on?
3 A. The stolen police car?
4 Q. Yes.
5 A. Yes, it was.
6 Q. Were the lights and siren on the two marked
7 police cars being driven by officers?
8 A. Yes, ma'am.
9 Q. Were the lights and sirens on all of the
10 unmarked police cars?
11 A. Yes, ma'am.
12 Q. So what we have, then, is six police cars, all
13 with lights and sirens on, proceeding one after
14 another down VanBuren; correct?
15 A. I don't know on VanBuren.
16 Q. On 4th Street or --
17 A. They were westbound on 4th.
18 Q. Okay. On 4th Street.
19 Then the stolen police vehicle makes a
20 right on VanBuren?
21 A. That's correct.
22 Q. Then what happened?
23 A. The two marked units followed it along with the
24 two detective units. I continued westbound on 4th to

Page 40

1 Harrison Street.
2 Q. Why?
3 A. I was going to parallel the chase.
4 Q. Where did you learn that technique?
5 A. I don't know if it's an on-the-job training
6 technique. I guess that's just, you know, if I was
7 catching a bad guy, running after a bad guy and I was
8 given a, I guess, a street where an officer was
9 chasing him, I'm trying to intersect that. I'm best
10 trying to intersect where the vehicle is going.
11 Q. Did anyone ever teach you that technique of how
12 you make so many lefts and rights when you are chasing
13 someone in an urban area because you know that if you
14 make so many lefts and rights you're going to end up
15 intersecting them as you are doing that?
16 A. Never heard that theory.
17 Q. Never trained in that before?
18 A. No. Never heard that theory.
19 Q. No. It's not a theory. It's a technique.
20 A. No.
21 Q. You're unfamiliar with the technique?
22 A. That technique, yeah, I've never heard that
23 technique.
24 Q. So just on your own, you thought that breaking

Page 41

1 off from the pack would do what?
2 A. Well, by separating myself from the other
3 police cars, again, it's widening the attempt to
4 apprehend the suspect. Because, again, I don't know
5 if they're going to come back in a southbound manner.
6 At least this way there's another vehicle there.
7 Being in, I guess, you know, I guess past
8 incidents, you just want to keep as much -- what's the
9 word I'm looking for? Keep as much policemen in the
10 area so that if you have to cordoned off an area, you
11 have that opportunity.
12 Q. I want to make certain I correctly understood
13 you.
14 So you broke from the pack because you were
15 trying to specifically accomplish what end?
16 A. I guess apprehend a suspect. Again, giving the
17 more options that are available. Again, I don't know
18 where the vehicle was going. If the vehicle
19 continued, I guess, in a northbound manner, I was
20 going westbound and I was away from the chase. I'm
21 just trying to make our options that if it was a
22 westbound or a southbound, you know, foot pursuit,
23 vehicle pursuit, I was in possibly an area where I
24 could assist.

11 (Pages 38 to 41)

1  to Harrison, what did you do then, sir?

2  A. Turned here.

3  Q. So you turned right or north on

4  Harrison Street. Where is 5th Street?

5  A. Right here.

6  Q. Was anyone behind your car?

7  A. Not that I remember.

8  Q. So when you turned right on Harrison Street,

9  you were going with the proper or the directional flow

10  of the normal traffic; correct?

11  A. On Harrison Street?

12  Q. Yes, sir.

13  A. No, ma'am.

14  Q. You're going against the traffic?

15  A. That's correct.

16  Q. Harrison is a one-way street; is that correct?

17  A. That's correct.

18  Q. So when you were at the intersection of 4th and

19  Harrison, you were going up the hill or down the hill?

20  A. I would call this in a westbound manner -- I

21  would call it up the hill because it -- there is a

22  hill at the top of 4th and Broom, but I was going in a

23  westbound manner.

24  Q. Then when you made that right turn on Harrison,

1  are you going up the hill or down the hill?

2  A. I call the northbound manner, I guess there is

3  a grade or a hill towards 6th and Harrison, but I

4  would call it again just northbound is easier for me.

5  I don't classify it as a hill. I guess I just go by

6  direction. There is a hill there, but not here at

7  Harrison. This isn't a hill. That's flat.

8  Q. So 4th and Harrison it's still flat?

9  A. Yes, ma'am.

10  Q. So when does the hill start? Does it start at

11  5th and Harrison?

12  A. Again, I'm not sure which hill you're referring

13  to.

14  Q. I'm sorry. So let me be sharper in my

15  question.

16      When I was on Harrison Street in the 500

17  block, to me it seemed as though there was a steep

18  hill.

19  A. That's correct. This would be the 500 block

20  here. So there would be, I guess, an incline.

21  Q. So at 4th and Harrison are what I would call

22  then the 400 block of Harrison, is that two-way

23  traffic or one-way traffic?

24  A. It's actually two-way traffic, but it's got a

1  break line through it. Now, I can give you this. It

2  travels this way, also in a southbound manner.

3  Q. Then when we get to the 500 block of Harrison,

4  it's running in which direction?

5  A. Southbound.

6  Q. Southbound. Okay.

7      So after you turn at 4th and Harrison, what

8  did you do?

9  A. 4th and Harrison, I could hear that they were

10  westbound on 5th Street, at which point I parked my

11  vehicle in the intersection right here.

12  Q. So what was the color of the car you were

13  driving?

14  A. It was like a burgundy or maroon color.

15  Q. So let's use the red pen. Fill that in with

16  the red pen if you don't mind, that little square.

17  A. (Complies.)

18  Q. So the little red square that we have at the

19  intersection of 5th and Harrison is where you parked

20  your car?

21  A. That's correct.

22  Q. It appears as though you just parked kind of

23  right in the middle of the road; right?

24  A. Yes, ma'am. I pulled into the -- I guess in

1  this direction here.

2  Q. Were there any cars on either side of the road

3  in that block on 5th Street?

4  A. These blocks here on 5th Street?

5  Q. Yes.

6  A. I can't recall any.

7  Q. Were there cars that were parked on the street

8  of the 500 block of Harrison; correct?

9  A. Up here, yes, ma'am. Is that what we are

10  talking about? On that side of the block or on this

11  side?

12  Q. On either side of the block.

13  A. Yeah. There were cars in here and -- I guess I

14  should rephrase it. There are cars here, but I guess

15  what I thought your initial question was in this -- I

16  guess this vicinity. Is that what you are asking me?

17  Q. Let me be sharper with the question.

18      So if I'm at the intersection of 5th and

19  Harrison, but I'm actually on 5th Street, were there

20  cars in that block that was running on 5th between

21  VanBuren and Harrison?

22  A. Yes. There was cars on both sides of the

23  street here.

24  Q. Then if I'm on Harrison Street, were there cars

14 (Pages 50 to 53)

Page 54

1  in the 500 block parked on Harrison Street?
2      A.  Yes, ma'am.  Both sides of the street.
3      Q.  So you heard radio transmission that the stolen
4  police car and the other four police cars operated by
5  police officers were now all coming down 5th Street;
6  is that correct?
7      A.  What I heard is the stolen vehicle is westbound
8  on 5th from VanBuren.  So stolen vehicle had turned
9  here and was now westbound on 5th.
10     Q.  Do you know why the stolen vehicle turned onto
11 5th from VanBuren?
12     A.  No, ma'am.
13     Q.  Do you know if there were any other police cars
14 involved in the pursuit other than your police vehicle
15 and the other four police vehicles about which we
16 previously spoke?
17     A.  That -- no, I can't answer that.  I don't know.
18     Q.  When you got out of your vehicle at 5th and
19 Harrison, were there any police vehicles at 6th and
20 Harrison?
21     A.  I don't -- I don't know that.
22     Q.  Do you know what happened to the other four
23 police vehicles after the stolen vehicle made a
24 left-hand turn heading west on 5th?

Page 55

1      A.  I can't answer that, no.
2      Q.  So you get out of your car.  Then what do you
3  do?
4      A.  What I do is I come over to this building line.
5  I see the stolen police car travelling -- actually,
6  almost coming to a stop.  It does come to a stop and
7  I'm over here.  I know there's one marked vehicle
8  behind him at that particular time.
9      Q.  Whose car was that?  Do you know who was
10 driving that?
11     A.  I know it was a marked unit.
12     Q.  Okay.
13     A.  As the vehicle stopped, I gave verbal commands
14 for him to turn the car off, step out of the vehicle.
15 I know at which point, again, as I'm fearing that he
16 doesn't see me, I come out a little bit, identify
17 myself, tell him again, "Shut off the car.  Exit your
18 vehicle."
19          As I come out, he then looks over at me.  I
20 can actually see a black male with a white T-shirt
21 give me eye contact.  Again, I give him a verbal
22 command, at which point the police vehicle accelerates
23 towards me in my direction.
24          As I backpedal, the vehicle is getting

Page 56

1  closer.  I fire shots into the windshield.  I can see
2  them hit the windshield.  The vehicle still continues
3  to come after me.  Backpedaling, there's like a
4  sidewalk here.  I'm now on the sidewalk, at which
5  point the vehicle then comes by me.  Fearing my life,
6  I fire into the vehicle, at which point he strikes a
7  parked car here.
8          And then I guess he's turning the vehicle,
9  or at least he hits the vehicle and he's still
10 accelerating through the vehicle -- I guess and at
11 this particular time I don't know if he's going
12 westbound on 5th, or I guess it would be a northern
13 direction.
14          The vehicle gets out, I guess, into the 500
15 block and starts again.  I guess it's accelerating --
16 well, he's burning rubber.  I can smell the smoke from
17 the tires.  I come up here and fire into the vehicle,
18 at which point the vehicle comes to, I guess, a stop
19 or -- I guess it is a stop, at which point I have to
20 go over and I have to physically put the car in park
21 because I can see the gentleman is leaning over at
22 that particular time.
23          I put the car in park and come around,
24 which at that particular time other officers had

Page 57

1  responded up to where the vehicle was.
2      Q.  Now if you would be kind enough to put an X
3  using the red pen to signify or to represent where you
4  were standing at the corner of Harrison and 5th.
5      A.  Initially?
6      Q.  Initially.
7      A.  Behind the building line here.
8      Q.  We have cars on 5th Street and we have cars on
9  Harrison Street at that corner?
10     A.  I know there's cars there.  I can't tell you
11 where they're at, but I know there's cars on those
12 streets.
13     Q.  If we could take a look at some of those
14 photos.
15          MS. SULTON:  Did you happen to get those?
16          MR. PARKINS:  (Handing.)
17 BY MS. SULTON:
18     Q.  Let me see if I can pull out a couple of photos
19 here that may help us to be as precise as possible.
20 While I'm going through these photos, let me just ask
21 you a couple of questions, if I may.
22          Did you take any photos?
23     A.  Did I take any photos personally?
24     Q.  Yes.

15 (Pages 54 to 57)

**Page 58**

1  A.  No.
2  Q.  Do you know who would have taken photos at the
3  scene?
4  A.  That would have been our evidence detection
5  unit.
6  Q.  Do you have a name of it, a person responsible?
7  A.  For that particular scene? I think there were
8  multiple officers. I'm not sure exactly who handled
9  that.
10  Q.  Were you involved at all in placing numbers
11  over spent shell casings?
12  A.  No, ma'am.
13  Q.  That would have been handled by —
14  A.  The evidence detection unit.
15  Q.  Were you responsible at all for moving any
16  vehicles involved in this incident? I'm not talking
17  about the vehicle you drove, but like the jeep that
18  was hit,
19  A.  No, ma'am.
20  Q.  None of it?
21      Did you drive yourself from the scene at
22  the end of the incident?
23  A.  No, ma'am. I was actually driven away from the
24  scene.

**Page 59**

1  Q.  Who drove you?
2  A.  I believe it was Lieutenant Bruce Mulrine,
3  M-u-l-r-i-n-e.
4  Q.  Why did he drive you from the scene?
5  A.  I believe he drove all the officers that were
6  involved in the shooting away from the scene to,
7  quote, sequester us because we knew we had to be
8  interviewed.
9  Q.  Did you have conversation with him prior to or
10  during the time he drove you away?
11  A.  Reference.
12  Q.  Anything.
13  A.  Yes. We stopped and grabbed a coffee on the
14  way in, but not anything about the incident.
15  Q.  So you had no conversation with that lieutenant
16  about the incident at all?
17  A.  No, ma'am.
18  Q.  At any point after the shooting?
19  A.  Lieutenant Mulrine? No, ma'am.
20  Q.  Who was the first person with whom you spoke
21  about the shooting about the details?
22  A.  I believe that would have been Sergeant —
23  well, Sergeant William Brown is who initially
24  contacted me. But at the time I stated I wanted a

**Page 60**

1  lawyer at least present via the interview. So I had,
2  I guess, some conversation with him. But till my
3  lawyer came, I didn't go over any details until my
4  lawyer came.
5  Q.  Have you seen any of these photographs that are
6  in my hand?
7  A.  I'm not sure.
8  Q.  Do you recall how many shots you initially
9  fired? You mentioned that you fired some shots when
10  you were right there at the intersection of 5th and
11  Harrison. Do you have any idea how many shots you may
12  have fired?
13  A.  I believe it was two to four shots.
14  Q.  You don't know if it was two versus four?
15  A.  I can't recall right now, no.
16  Q.  At any point did you tell somebody how many
17  shots you thought you fired into the windshield?
18  A.  I may have. Maybe I talked to Sergeant Brown
19  about what I fired.
20  Q.  So that would be included in his report?
21  A.  Could be, sure.
22  Q.  Did you write out any report?
23  A.  No, ma'am, I did not.
24  Q.  Why not?

**Page 61**

1  A.  I believe -- well, I'm not sure what the policy
2  is, but I didn't have to write a report, no.
3  Q.  No one asked you to write a report about what
4  happened?
5  A.  No, ma'am.
6  Q.  The car that you were driving, did that have a
7  camera in it?
8  A.  No, ma'am.
9  Q.  At that time, and again, we are going to state
10  just on September 13, 2003, did any of the police
11  vehicles have cameras in them that worked?
12  A.  Because I worked in detectives, I can maybe
13  give you a statement on detective vehicles. We don't
14  have anything equipped with anything, no cameras.
15  Detective vehicles. I can't tell you what patrol has
16  assigned to them. Our patrol units, which are usually
17  our marked units, I can't tell you what they have
18  assigned to them.
19  Q.  Had you ever heard that the cameras in the
20  patrol vehicles weren't working?
21  A.  Ma'am, I can't be accurate with anything. I
22  mean, I know that we have some vehicles equipped with
23  them, but I couldn't tell you what they are assigned
24  to.

16 (Pages 58 to 61)

Page 78

1  verbal commands.
2      Q.  We can go ahead and mark on this
3  black-and-white copy number 5, our Exhibit Number 5,
4  mark an X where you would have positioned yourself as
5  you stepped away from the wall.
6      A.  Let me just make sure there's not a better
7  picture.
8      Q.  Sure.  Take your time.  You think that's the
9  best we can do is Number 5, at least for today?
10     A.  Number 4.
11         MR. PARKINS:  Don't mark on that
12 photograph.
13         THE WITNESS:  No, I'm not.  I'm just trying
14 to --
15 BY MS. SULTON:
16     Q.  This is Number 4 you are looking at?
17     A.  Yes, Number 4.
18     A.  Did you need to mark this?
19     Q.  I'll mark this Number 4.  So the record should
20 reflect we are now looking at Exhibit Number 4.
21     A.  And I came out and I'm positioning myself right
22 about here when I began giving verbal commands.
23     Q.  Now, do you have any recollection of -- because we
24 don't know exactly when these photos were taken

Page 79

1  because you didn't take them; right?
2      A.  No, ma'am.
3      Q.  Do you have any recollection as to whether or
4  not there were any cars here on 5th Street in front of
5  where you would have been standing as reflected where
6  you put the X mark?
7      A.  I don't believe so, no.
8      Q.  So you issued verbal commands and he's then --
9  what?  100 yards from you?
10     A.  No.  He's closer than that.  I think the
11 picture indicates maybe two car lengths, three car
12 lengths tops because here's two cars parked here, so
13 he would be the third car beginning with those two
14 cars.
15         So I don't know what a car is.  Maybe 30
16 feet.
17     Q.  A limousine is 30 feet if it's a long one.
18     A.  Well, then shorter than that then.
19     Q.  Yes.  Maybe 12 feet?  This truck is probably
20 18 feet.  Let me see if I can find a better picture
21 for you.
22     A.  If there's two cars parked here, and again when
23 I come out, he's still stopped there.  So he's at
24 least two car lengths away from him.

Page 80

1      Q.  So we are now again referring to Exhibit
2  Number 7.  So see here on Exhibit Number 7, we can't
3  really see in the black and white, but in the color
4  photo we can see that there are two cars.
5          These were on the other side of the street;
6  correct?
7      A.  They would be on the south side of the street.
8      Q.  You don't recall there being any cars on --
9      A.  No, ma'am.
10     Q.  -- the north side of the street?  Okay.
11         So you step out as reflected by your X mark
12 on Exhibit Number 4.
13     A.  That's correct.
14     Q.  As best you can recall, then, looking at
15 Exhibits 4 and 7 together, the stolen vehicle, when it
16 stopped and you first started issuing commands, would
17 have been on the other side of the house where on our
18 Exhibit 7 you made a circle; correct?
19     A.  That's correct.
20     Q.  Do you recall what you said, or as best you can
21 remember?
22     A.  Identified myself, "Wilmington Police.  Exit
23 the vehicle.  Turn it off.  Step out of the vehicle."
24 Again, repeated verbal commands.

Page 81

1      Q.  Were the windows up on the car or down?
2      A.  I couldn't tell you.
3      Q.  But you --
4      A.  I shouldn't say that.  I know on the
5  passenger's side both windows were up.
6      Q.  As he passed you, you know both of those
7  windows were up on the passenger's side; correct?
8      A.  That's correct.
9      Q.  As he passed you, were the lights and sirens
10 still on that car?  Still going?  Were they still on?
11     A.  Yes, ma'am.
12     Q.  Are those sirens loud?  I don't know how loud
13 they are here in Wilmington.  Are they fairly loud?
14     A.  I know he had the lights on.  I don't know if
15 he had the siren on.
16     Q.  Did you hear other sirens from other police
17 vehicles?
18     A.  At that particular time, I don't know if I was
19 paying attention to that.
20     Q.  Did you have the sirens still on your car when
21 you got out of your car?
22     A.  I don't believe so.
23     Q.  Did you turn the lights off of your car?
24     A.  Yes, ma'am, and I parked it.  Well, I shut the

21 (Pages 78 to 81)

A8

Estate of Harry Smith, III, et al.                     v.                      Wilmington Police Department
John F. Ciritella          Case 1:04-cv-01254-GMS          Document 112-2          Filed 06/21/2006          Page 10 of 40
C.A. # 04-1254 (GMS)                                                 May 8, 2006

Page 82

1   ignition off. It shuts off everything.
2   Q. That shuts off the lights and the siren?
3   A. Yes.
4   Q. So then you issued commands for him to get out
5   of the car?
6   A. Yes, ma'am.
7   Q. He doesn't do that; correct?
8   A. No, ma'am.
9   Q. Then what happens?
10  A. Again, there's a visual contact. Still giving
11  him verbal commands, at which point from the stopped
12  position of the stolen police car he accelerates
13  towards me.
14  Q. When you say accelerates towards you, if I look
15  at Exhibit Number 4, he accelerates toward where you
16  are -- are you still at where you put the X?
17  A. I may be a little bit in front of that to see
18  that he has visual contact of me to make sure that he
19  has heard me, that he sees me to exit out of the
20  vehicle.
21  Q. Is your gun in your hand at this point?
22  A. At this particular time, it is, as I approached
23  the vehicle.
24  Q. When did you unholster your weapon?

Page 83

1   A. When I got to the wall, I unholstered it.
2   Q. So when I first got out of the car, you didn't
3   have your gun in your hand?
4   A. No, ma'am.
5   Q. Were you standing in the street or on the curb
6   when you first were issuing those commands?
7   A. From the curb onto the street.
8   Q. So you were in motion or you are actually
9   walking and talking at the same time?
10  A. Yes, ma'am.
11  Q. When the car, the stolen car approaches you,
12  are you then physically in the street, do you think?
13  A. Yes, ma'am.
14  Q. Did you see any other police vehicles around at
15  that time?
16  A. I know there was a marked Wilmington police car
17  behind it.
18  Q. Behind --
19  A. Behind the stolen motor vehicle.
20  Q. So you saw at least one marked car behind it?
21  A. Yes.
22  Q. Was its lights and sirens going?
23  A. That I don't recall.
24  Q. Can you think of any reason they would have

Page 84

1   turned them off?
2   A. No, ma'am, I would not.
3   Q. That's not part of your training, is it?
4   A. What's that?
5   Q. Where if there's an officer who has positioned
6   his vehicle to block the street where a pursuing
7   officer behind a stolen vehicle would turn off their
8   lights and siren.
9   A. I'm sorry. Repeat the question again.
10  Q. It is not part of your training where once one
11  officer blocks the street that an officer behind the
12  stolen vehicle would turn off his lights and siren;
13  correct?
14  A. No, ma'am.
15  Q. So as best you can recall, the lights and siren
16  were still on the vehicle being driven by an officer?
17  A. Again, I don't recall that. I don't know that.
18  Q. Do you know who that officer would have been?
19  A. No, ma'am.
20  Q. All right. So you made the verbal commands.
21  Then what happens?
22  A. Vehicle starts coming towards me. I start
23  backpedalling, at which point I fear that he's going
24  to hit me, at which point I discharged my weapon.

Page 85

1   Q. So when you say "backpedalling," I'm going to
2   keep you on Exhibit 4 for just a minute.
3   A. Yes.
4   Q. You're backpedalling. When you say that, am I
5   to understand that you are walking backward?
6   A. Yes, ma'am.
7   Q. Did you trip over this curb as you are walking
8   backward?
9   A. No, ma'am.
10  Q. You had your gun in your hand?
11  A. Yes, ma'am.
12  Q. With the finger on the trigger?
13  A. I don't recall if it was on the trigger or not,
14  no.
15  Q. But as you're backpedalling, you are firing at
16  this car that's coming directly toward you; is that
17  correct?
18  A. That I cannot say.
19  Q. Was the car coming directly towards you?
20  A. Yes, ma'am.
21  Q. Did you see any citizens, any other bystanders
22  around at that time?
23  A. No, ma'am.
24  Q. You did not?

22 (Pages 82 to 85)

Estate of Harry Smith, III, et al.
John F. Ciritella

Case 1:04-cv-01254-GMS    Document 112    Filed 06/21/2006    Page 11 of 40

C.A. # 04-1254 (GMS)

Wilmington Police Department
May 8, 2006

Page 86

1    A. No, ma'am.
2    Q. Did you see anything other than that car?
3         MR. PARKINS: "That car" meaning —
4         MS. SULTON: The stolen car.
5    A. What do you mean did I see anything else?
6    BY MS. SULTON:
7    Q. Well, as you're standing in the street and
8    you're backpedalling, it is my understanding that you
9    clearly see the stolen vehicle heading in your
10   direction; correct?
11   A. That's correct.
12   Q. My question is: Did you see anything else?
13   A. Yeah. I saw this empty lot where I was able to
14   discharge my weapon as what's called clear cover. Or
15   not clear cover, but there was nothing in my backdrop
16   when I went to fire. This vacant wall here.
17        Do you want me to tell you what exhibit
18   this is?
19   Q. Yes. That's why I kind of left the photos down
20   there. If you see one —
21   A. Exhibit 7. This wall here was my backdrop. As
22   the vehicle came towards me, this was only in my
23   backdrop, this wall here.
24   Q. None of these people as indicated in Exhibit 7

Page 87

1    were there?
2    A. No, ma'am.
3    Q. It was still light out, wasn't it?
4    A. Yes, ma'am.
5    Q. As we go through this, if you see any photo
6    there which you think may help us understand better
7    what you experienced that evening, feel free to point
8    it out. Okay?
9    A. Okay.
10   Q. Thank you.
11        So you see — you used the term "clear
12   backdrop"?
13   A. Backdrop.
14   Q. Can you define that for me?
15   A. That I guess when you, I guess, go to shot,
16   again, I'm responsible for what I fire at. And again,
17   at that particular time I knew my backdrop was clear
18   with the building behind it whereas if I was to fire
19   and that round didn't go where it was supposed to go,
20   then I'm responsible for that round.
21   Q. So when you say "clear backdrop," you're
22   talking about —
23   A. My sight picture on my firearm.
24   Q. You're thinking in terms of where is the bullet

Page 88

1    going to go if it doesn't hit the intended target?
2    A. No, ma'am. I'm saying that I have a clear
3    backdrop. There's nothing behind my sight picture.
4    It's a clear backdrop.
5    Q. Why is a clear backdrop important?
6    A. Well, again, it's -- I'm responsible for
7    whatever I fire. So, again, that's enabling me to
8    know that there's nothing that I can hurt or damage
9    behind that.
10   Q. When you fired the first shot, how close was
11   the stolen vehicle from you?
12   A. A car length away. So whatever that would be.
13   Q. Do you have any idea how fast it was moving?
14   A. Appeared fast to me. I couldn't tell you a
15   speed, but didn't seem like I was getting out of the
16   way.
17   Q. So the first shot that you fired the car was
18   about a car length away; correct?
19   A. I'd say that, yes.
20   Q. Can you tell how long, and I know these things
21   happened fast, but can you tell how many seconds or
22   minutes passed from the time that you saw the car at
23   that house that seemed like it was maybe a half a
24   block away or a few car lengths away and you then left

Page 89

1    the protection or the safety of the wall on that
2    intersection of 5th and Harrison and the point after
3    which you stepped out into the street and were issuing
4    verbal commands that that car started coming at you
5    and you fired your first shot?
6    A. Again, I'd say seconds, but I'm not sure of
7    that.
8    Q. Do you have any idea as best you can recall as
9    you sit here today how long that car was stopped
10   before it began moving again in your direction?
11   A. It seemed like quite awhile.
12   Q. Can you give me a little bit better feel for
13   what you mean by "quite awhile"?
14   A. When I was behind the building line, appeared
15   the car -- it appeared that he had stopped and was
16   going to exit the vehicle.
17   Q. So we are talking about more than two minutes,
18   I would assume?
19   A. No, ma'am. I don't think the chase lasted more
20   than two minutes.
21   Q. So when you say "quite awhile" —
22   A. I said it felt like quite awhile.
23   Q. Felt like quite awhile. Okay.
24        But it was long enough where you thought he

23 (Pages 86 to 89)

Estate of Harry Smith, III, et.al.
John F. Ciritella

Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 3 of 40

v.

Wilmington Police Department
C.A. # 04-1254 (GMS)
May 8, 2006

Page 90

1  was going to get out of the car; correct?
2  **A. Yes, ma'am.**
3  Q. So you stepped in the street. He doesn't get
4  out of the car. You're issuing verbal commands and
5  the next thing you know the car is heading in your
6  direction; correct?
7  **A. That's correct.**
8  Q. Then you fire between two and four rounds into
9  the windshield?
10 **A. That's correct.**
11 Q. You're backpedalling as you're discharging your
12 weapon these first two or four times?
13 **A. That I don't know.**
14 Q. Was there ever any point at which you had got
15 into a crouching position and --
16 **A. No, ma'am.**
17 Q. No? So if someone says in some report
18 somewhere that you got into a crouching position,
19 that's just incorrect because that didn't happen, did
20 it?
21 **A. I don't believe so, no.**
22 Q. So you're now backpedalling. Do you think you
23 might have been stationary at some point and fired
24 your gun? I'm not talking about the first two or four

Page 91

1  rounds as this car is heading towards you.
2  **A. I'm sorry. Repeat the question again.**
3  Q. Do you think you may have been stationary at
4  any point at which you were firing the first two or
5  four rounds as this car is heading towards you?
6  **A. I may have been.**
7  Q. Let me see if I can find a photo that helps us
8  with that. Actually, this one is good. Let me see if
9  he can find the black and white match to this. This
10 is our Exhibit Number 8. But I'm going to show you
11 both the color and the black and white. Okay?
12 I want you to mark on our paper
13 black-and-white copy, let's use the red pen, where you
14 were standing as best you can recall when you fired
15 those first two to four rounds.
16 **A. This may not accurately depict that, so I don't**
17 **want to mark that.**
18 Q. Well, as best you can recall, if you look at
19 our Exhibit Number 8 --
20 **A. But I think it's on the other side of this**
21 **wall.**
22 Q. So let's see if we can find another picture.
23 Is this one better?
24 **A. No, ma'am. I don't know if there's a picture**

Page 92

1  here. I don't know if there's a picture --
2  Q. See, as I was looking at -- what was it? Our
3  Number 7 or our Number 4?
4  **A. That's Number 8.**
5  Q. Yes. But let's look at our Number 7 and
6  Number 4.
7  **A. Here is 10.**
8  Q. Where I thought you said you were standing in
9  the street.
10 **A. Seven, that's where the car was.**
11 Q. Let's take a look at Number 4. Yeah. Okay.
12 That if we use our Number 4, can you, as best you can
13 recall, do you know where you were standing when you
14 discharged the first --
15 **A. Let me see the color picture. That's hard to**
16 **see.**
17 Q. Yes.
18 **A. I'd say maybe in this area here going in this**
19 **direction. Here is possibly where they were fired and**
20 **I'm moving in this direction here.**
21 Q. So you think you were still in the street when
22 you fired your first two or four?
23 **A. Yes, ma'am.**
24 Q. So you retreated back behind that wall?

Page 93

1  **A. I just was moving backwards.**
2  Q. How close do you think that car came to you?
3  **A. How close?**
4  Q. Yes, as it was making that turn.
5  **A. It was not even an arm's length away from me**
6  **when it passed me.**
7  Q. As it passed you, you shot into the passenger's
8  side front window; correct?
9  **A. Passenger side front window, that's correct.**
10 Q. You didn't even have to extend your arm out
11 completely as you were shooting?
12 **A. That's about my extent, was right there, was**
13 **there. So that's an arm's length away.**
14 Q. So do you have any recollection of how close
15 your hand was or how close the muzzle of your gun was
16 to that car as it passed you when you were firing into
17 that passenger's side window?
18 **A. I think I would be accurate to say it wasn't**
19 **any more than 12 inches away.**
20 Q. So it was within a foot?
21 **A. That's correct.**
22 Q. When you fired the first shots through the
23 windshield, could you tell whether or not you hit him?
24 **A. No, I could not tell that.**

24 (Pages 90 to 93)

Estate of Harry Smith, III, et al.
John F. Ciritella.

Case 1:04-cv-01254-GMS     Document 112-2     Filed 06/21/2006     Page 13 of 40

Wilmington Police Department
C.A. # 04-1254 (GMS)
May 8, 2006

Page 94

1    Q.  When you fired your first shots into the
2  windshield, it was your intention to kill him; isn't
3  that correct?
4    A.  That's correct.
5    Q.  As he was driving around or past you and you
6  were shooting into the passenger's side window, it was
7  your intention to kill him; correct?
8    A.  That's correct.
9    Q.  Do you know if you hit him as you were shooting
10  through the passenger's side window?
11    A.  Yes, ma'am.  I know I hit him twice.
12    Q.  Where do you think you hit him?
13    A.  I knew I hit him in the arm region.
14    Q.  You are rubbing an arm and you think you hit
15  him in the right arm?
16    A.  Yes, ma'am.
17    Q.  Where else do you think you hit him?
18    A.  Well, I eventually know that I actually hit him
19  in the head area.
20    Q.  How do you know you hit him in the head?
21    A.  Because that's what the ATF report came back
22  and said.
23    Q.  I don't want you to think about anybody else's
24  report because it might be wrong.  I want you to tell

Page 95

1  me what you know based upon your recollection.  Okay?
2    A.  Well, then I know for sure I hit him in the
3  arm, the right arm.
4    Q.  As that car was passing you and you're shooting
5  through the front passenger's side window, how many
6  shots do you think you fired?
7    A.  Couldn't tell you, ma'am.
8    Q.  Were you doing rapid fire?
9    A.  I don't know if you'd call it rapid fire, but I
10  was firing.
11    Q.  Now you said --
12        MR. PARKINS:  I'm not sure the witness
13  finished his last answer.
14    A.  No.  I mean, I don't know if you'd call that
15  rapid fire.  I don't know what your -- kind of your
16  definition of "rapid fire" is.
17    Q.  Correct.  Thank you.
18    A.  Was I shooting?  Yes.
19    Q.  Let me ask you about the features of your gun.
20        If you hold the trigger, will the bullets
21  just continue to fire or do you have to pull the
22  trigger each time for it to fire?
23    A.  You have to pull the trigger each time for it
24  to fire.

Page 96

1    Q.  So as you're sitting here today, you don't
2  remember how many times you fired through the
3  passenger's side window; correct?
4    A.  I'd say at least three to four.
5    Q.  Where would you have been standing -- if our
6  Exhibit 4 works, let's use that one.  Otherwise, let's
7  try to find another exhibit that we can use from those
8  that we marked.  I want to figure out approximately
9  where you, as best you can recall --
10    A.  I want to use Number 5.
11    Q.  Okay.  Let's take a look at Number 5 then.
12        I'm trying to figure out approximately
13  where you would have been standing as you were
14  shooting into that side passenger's window.
15    A.  It would probably have been somewhere in this
16  area between this sign and my car, anywhere in these
17  four blocks, whatever they would have been.
18    Q.  Go ahead and mark that with a red pen, if you
19  would.
20    A.  (Complies.)
21    Q.  Now, you indicated an area that's a little bit
22  bigger than just that X.  So if you want to make a
23  little square, that would be fine, whatever --
24    A.  Make a square.

Page 97

1    Q.  Whatever works best for you to show the size of
2  the area.  If I think of the X, I'm thinking -- okay.
3  You're right here.  But --
4    A.  I can't say for sure, but that's what I'm
5  saying I know it's on this sidewalk in this area right
6  here.
7    Q.  I would suggest you just do a circle and then
8  we know you would be somewhere within that circle;
9  correct?  As best you can recall.
10    A.  (Complies.)
11    Q.  So somewhere inside this square you would have
12  been standing as that stolen vehicle passed by you;
13  correct?
14    A.  That's correct.
15    Q.  You know for sure you hit him in the arm.  You
16  don't know how many bullets you shot?
17    A.  Into his arm?
18    Q.  No.  I mean, as it's passing you --
19    A.  I think I said three to four, at least.
20    Q.  Then what did you do after that?
21    A.  I could then see that he struck, I guess, the
22  white jeep that's depicted here.  I can see that he
23  struck the white jeep.
24    Q.  If you happen to see a picture that is useful

A12

Page 98

1 for you, we can match it up and then when we finish
2 this picture, then we'll take our break for lunch. It
3 will be almost 12:30.
4   A. I guess we can use Number 5 again.
5   Q. Is Number 5 okay?
6   A. Yes.
7       He strikes the white jeep, but at the time
8 he strikes it, if I can refer back to C-1 --
9   Q. Of course.
10   A. At the time he, I guess, again, threw, I guess,
11 my vehicle onto the sidewalk between the sign here,
12 strike the vehicle that's parked here. But I don't
13 know which direction he's going to go. Is it going to
14 be 5th Street westbound or, I guess, north, but
15 eventually he turns this jeep depicted in the
16 photographs, turns it actually from a southbound
17 direction almost, I guess, into a northbound
18 direction, at which point he accelerates up the
19 street. I shouldn't say that. He is accelerating
20 because he's burning -- I can smell the tires burning,
21 at which point on foot I come up the sidewalk and then
22 exit -- or not exit, but enter into the street here in
23 the 500 block.
24   Q. Very good.

Page 99

1       MS. SULTON: Why don't we leave it there?
2 We will take our break and we will continue. My plan
3 is to finish not later than four.
4       MR. PARKINS: How long would you like to
5 take for your break?
6       MS. SULTON: Whatever suits you. I'm just
7 here working.
8       (A luncheon recess was taken at this time.)
9 BY MS. SULTON:
10   Q. So we took a lunch break. During the lunch
11 break, did you discuss your testimony with counsel
12   A. No.
13   Q. Prior to the beginning of our deposition this
14 morning I assume that you discussed your pending
15 testimony with counsel; correct?
16   A. That's correct.
17   Q. But you didn't get a chance to look at those
18 photographs?
19   A. No, ma'am.
20   Q. Did you look at any other documents in
21 preparation for the deposition today?
22   A. I was given my personnel file, looked through
23 that. And that was it.
24   Q. Have you ever seen the attorney general's

Page 100

1 report on this case?
2   A. No, ma'am.
3   Q. Ever seen the police department report on this
4 case?
5   A. No, ma'am.
6   Q. Ever see the report that was done by the city
7 solicitor's office?
8   A. No, ma'am.
9   Q. Did you ever see any other reports that were
10 written by other officers who may have investigated
11 the case or either responded to the incident? Ever
12 see anybody else's report?
13   A. Can't say I have.
14   Q. Have you seen any of the witness interviews
15 that were conducted by police officers in connection
16 with this case?
17   A. No, ma'am.
18   Q. Did you ever read any of the newspaper stories
19 about this case?
20   A. I have.
21   Q. We were at the point where I was asking you
22 some questions, and I think we got to the point where
23 I was asking you basically kind of how far you were
24 away as that car went past you. And if I remember

Page 101

1 correctly, you said maybe ten inches or 12 inches or
2 so away?
3   A. We are talking about the stolen police car?
4   Q. Yes, sir.
5   A. Okay. That's correct.
6   Q. As that stolen police car was moving past you,
7 was it moving at a high rate of speed as it was moving
8 past you?
9   A. I would say yes, a high rate of speed.
10   Q. When it left -- when it was still on 5th Street
11 and it had stopped, when it left from that stopped
12 position, did you hear any wheels screech as it was
13 coming in your direction as it moved from stopping to
14 moving again?
15   A. I can't recall that, no.
16   Q. Okay. So after you fired shots into that front
17 passenger window, what did you then do?
18   A. Is this from this point is what we are talking
19 about? Initially as the stolen vehicle is coming at
20 me?
21   Q. Yes, sir.
22   A. Again, I think we referred to number 5 here,
23 stepped back onto the sidewalk, car came, I guess, not
24 even 12 inches away from me, fired again, at which

26 (Pages 98 to 101)

A13

Estate of Harry Smith, III et al.
John F. Ciritella

Case of Harry Smith III et al.    Document 112-2    Filed 06/21/2006    Page 15 of 40

C.A. # 04-1254 (GMS)

Wilmington Police Department
May 49, 2006

Page 102

```
1    point --
2    Q.   Now referring to Exhibit C-1?
3    A.   The stolen vehicle again struck the white jeep
4    Cherokee, pushed that vehicle from -- I think I said
5    south to north direction, and the police vehicle was
6    attempting to go, I guess, in a northbound direction
7    pushing that vehicle.
8    Q.   At that point was the stolen police vehicle
9    heading up the hill moving in the wrong direction of
10   the normal flow of traffic?
11   A.   That's correct. It was travelling northbound.
12   Q.   Then what did you do?
13   A.   At that point on foot I proceeded in a
14   northbound direction on the sidewalk, at which point I
15   stepped out into the street and fired into the vehicle
16   as it was still moving in a northbound direction.
17   Q.   When you say that you got "on the sidewalk,"
18   you're talking about on the north side of the street;
19   correct?
20   A.   It would actually be considered the east side
21   of the 500 block of Harrison.
22   Q.   Thank you for that correction.
23        So you proceeded on the east side of the
24   500 block of Harrison on the sidewalk; correct?
```

Page 103

```
1    A.   That's correct.
2    Q.   While you were on the sidewalk before you
3    stepped into the street, did you fire any additional
4    shots?
5    A.   No, ma'am.
6    Q.   So you stepped into the street and you then
7    commenced firing for a third time; is that correct?
8    A.   That's correct.
9    Q.   Where are you pointing at this time?
10   A.   I'm pointing at, I guess, the individual that's
11   driving the police car.
12   Q.   Because I assume you're behind him at this
13   point, or are you still on the side?
14   A.   I'm alongside of him. I'm able to -- let's see
15   here.
16   Q.   If there's any photo you see that helps, please
17   feel free to point that out for us.
18   A.   I don't know if this is the best picture. This
19   is Exhibit 5 again.
20   Q.   Okay. Going back to Exhibit 5.
21   A.   I don't think you can really pick it up.
22        As I'm heading in a northbound direction,
23   after this vehicle here, I step out into the street.
24   As I step out into the street, the vehicle, when I
```

Page 104

```
1    look at the vehicle, I see -- I describe it as the
2    rocket panel, but I don't know if that's the -- it's
3    the separation between the front passenger and the
4    rear passenger. I'm using that as kind of a cover and
5    concealment into the vehicle, at which point I can
6    still see him operating the vehicle northbound in the
7    500 block attempting to allude us still.
8    Q.   So if I understand you correctly, looking at
9    the color photo, you proceeded along the sidewalk
10   until you passed this kind of blue-colored car?
11   A.   That's correct.
12   Q.   If you would, just put a little X where you
13   would have entered the street in red ink again.
14   A.   (Complies.)
15   Q.   Thank you so much.
16        If you were looking at the face of a clock,
17   would it be fair to say that you were following the
18   car at, say, about the 4:00 position?
19   A.   No. More of a 3:00.
20   Q.   About 3:00. Okay. You were firing --
21   A.   Let me just make sure if we're correct on this.
22   Q.   Yes.
23   A.   I don't want to draw on here, but --
24   Q.   You can draw on there.
```

Page 105

```
1    A.   If we're using this as your 12:00 here, three,
2    six, nine, is that what you're saying?
3    Q.   I'm sorry. I was using the 12:00 position as
4    the front of the vehicle, the stolen vehicle.
5    A.   Then I would be at the 3:00 marker. I was
6    parallel -- yeah, 3:00.
7    Q.   Were you firing as you're walking -- all right.
8    So you are not firing while you're on the sidewalk; is
9    that correct?
10   A.   Correct.
11   Q.   You step into the street. Do you then begin to
12   fire again into the car?
13   A.   I fire, I believe, just two rounds.
14   Q.   Into the car, and you're at the 3:00 position?
15   A.   Towards the driver.
16   Q.   Towards the driver?
17   A.   That's correct.
18   Q.   Do you think you struck him? I'm not talking
19   about any --
20   A.   I believe I did, yes.
21   Q.   Do you know where you struck him?
22   A.   I believe I struck him to the right temple
23   area.
24   Q.   Why do you believe that you struck him in the
```

27 (Pages 102 to 105)

Page 106

1  right temple?
2  A.  Because as the vehicle was proceeding, I guess,
3  northbound, the driver was upright, still driving,
4  still having function of the vehicle when I fired.
5  And then the next time I was able to, I guess, get --
6  I guess look around the panel, he was slumped over to
7  my side.
8  Q.  Then what did you do?
9  A.  The vehicle was still moving, so I had to
10  holster my weapon, go over to the vehicle, look in.
11  He was still slumped over.  I assumed he was
12  unconscious.  I had to open the passenger door and
13  reach in and place the vehicle in park.
14  Q.  Was the vehicle beginning to drift back when
15  you did that?
16  A.  I don't believe so.
17  Q.  How was he slumped?  Was he slumped over the
18  wheel or slumped over towards the side?
19  A.  No, ma'am.  I guess if you are using the clock,
20  to a 3:00 position to the passenger's side.
21  Q.  When you reached into the car, did you see a
22  shotgun?
23  A.  I was just trying to make the vehicle safe.  I
24  didn't pay attention to any shotgun.  I was keeping my

Page 107

1  eyes on him so I -- no, I didn't see a shotgun.
2  Q.  Did you see a scalpel?
3  A.  No, ma'am.
4  Q.  Did you see any weapon?
5  A.  Not in the time that I put the car in park, no.
6  Q.  I want to take you back to being on the
7  sidewalk, walking still on the sidewalk before you
8  step out into the street on the other side of that
9  blue car.
10      Did you see any people, any citizens on the
11  street?  On the porch?  Anything like that?
12  A.  No, ma'am.
13  Q.  When you stepped into the street and shot into
14  the car, did you see any people in the street on the
15  porches?  Anything?
16  A.  No, ma'am.
17  Q.  Was there ever a time where you became aware
18  that there were people on the street and on the
19  porches?
20      MR. PARKINS:  Objection to the form, but
21  you can answer.
22  A.  I never saw any people.  The only person that I
23  saw was Sergeant Dempsey, Tom Dempsey, and he would
24  have been in this area.  He's the only person that I

Page 108

1  saw.
2  Q.  If you would be kind enough with the black pen,
3  make a double X for where you saw Mr. Dempsey.
4  A.  All right.  That area right there.
5  Q.  At what point did you first realize
6  Officer Dempsey was where you placed the double X?
7  A.  When the vehicle, I guess, was proceeding -- I
8  don't even -- by me, I guess as I turned, at one point
9  I was able to get visual contact on Sergeant Dempsey.
10  Q.  Where did he come from?  Do you know?
11  A.  I do not know.
12  Q.  Did you see any police vehicle in the vicinity
13  of Officer Dempsey, not including your police vehicle?
14  A.  No, ma'am.
15  Q.  So as you're walking up the sidewalk, you saw
16  Mr. Dempsey, as well?
17  A.  No.  Again, I think this is my only visual of
18  him.
19  Q.  Did you see any other police officers --
20  A.  No, ma'am.
21  Q.  -- as you're walking on the sidewalk?
22  A.  No, ma'am.
23  Q.  As you step into the street and fire, did you
24  see any other police officers?

Page 109

1  A.  No, ma'am.
2  Q.  You saw no citizens, no civilians at all?
3  A.  No, ma'am.
4  Q.  Is it fair to say that you were completely
5  focused on killing Harry Smith?
6  A.  No, ma'am.
7  Q.  What was your focus?
8  A.  Stop a potential threat.  Stole a police car.
9  Had a shots-fired complaint.  Tried to run me over.
10  It's a threat as I perceive it.
11  Q.  As you're walking on the sidewalk, did you look
12  up the hill at any point to see if there was a police
13  car at the top of that hill?
14  A.  No, ma'am.
15  Q.  When I say "top of the hill," I'm talking about
16  the intersection of -- I guess it would be 6th and
17  Harrison.
18  A.  6th and Harrison, no, ma'am.
19  Q.  After you put the car in park, did you have any
20  bullets left in your gun?
21  A.  No.
22  Q.  So if we count the bullets, you have 12 in the
23  clip, one in the chamber; correct?
24  A.  That's correct.

28 (Pages 106 to 109)

Estate of Harry Smith, III, et al. v. Wilmington Police Department
Case: 1:04-cv-01254-GMS    Document #112    C.A. # 04-1254 (GMS)    Filed 06/21/2006    Page 17 of 40    May 8, 2006
John F. Critella

Page 110

1   Q.  You think you shot two to four when he first
2 started coming at you at the corner of 5th and
3 Harrison; correct?
4   A.  That's correct.
5   Q.  Then as he's driving past you and you're
6 shooting into the passenger window, you think you may
7 have shot three or four more?
8   A.  At least three to four more.
9   Q.  So that could take us up to as many as eight.
10       So after you step into the street, is it
11 fair to say that you then would have shot five more
12 times into that car?
13   A.  I don't believe so.
14   Q.  What happened to the other five bullets?
15   A.  I'm sorry. Say your math again. You said four
16 here? You said four here and how many here? Four
17 here and four here and that's eight, and I fired at
18 least two here. I think that's what I said. At least
19 two; correct?
20   Q.  I think that's what you said.
21   A.  So how many am I missing now? Three?
22   Q.  Yes, I think so.
23   A.  Could have been anywhere from here, here, and
24 here.

Page 111

1   Q.  So when we look at the first shots that you're
2 firing into the windshield as the car is coming at
3 you —
4   A.  That's correct.
5   Q.  -- at the intersection of 5th and Harrison, you
6 really don't know how many shots that you fired, but
7 you know it was more than two and perhaps less than
8 four or less?
9   A.  I'd say two to four is an accurate indication
10 of that.
11   Q.  As you're walking now up 5th Street and you
12 step -- I'm sorry, Harrison Street and you step into
13 the street -- I'm sorry. Let's come back to 5th and
14 Harrison again. I'm trying to count the number of
15 shots.
16       So into the windshield as the car is
17 approaching you, you would have shot somewhere between
18 two and four shots; is that correct?
19   A.  That's correct.
20   Q.  Then as the car is passing you and you're
21 shooting into the passenger window, front passenger
22 window, you would have shot maybe another three or
23 four shots; right?
24   A.  I think I stated at least three or four.

Page 112

1   Q.  So now we are up to about eight total; correct?
2   A.  That's correct.
3   Q.  So if you have 13 rounds available to you in
4 your gun, is it fair to say, based on your
5 recollection of the events, that when you stepped off
6 the sidewalk when you were kind of midway
7 Harrison Street, that you could have shot as many as
8 five shots into the police vehicle at Mr. Smith?
9   A.  I'd say no.
10   Q.  So where is my math wrong?
11   A.  I'd say at least two. I don't think I shot any
12 more than three.
13   Q.  So I'm still short two shots. So where do you
14 think you shot the other two shots?
15   A.  It could have been, I guess, in the middle
16 exchange, but I wasn't counting.
17   Q.  Did you have a clear backdrop when you're in
18 the middle of 5th and Harrison and you step into the
19 street behind the blue car? After you pass the blue
20 car, you step into the street and you're shooting into
21 the police vehicle, did you have a clear backdrop?
22   A.  One more time again.
23   Q.  Sure.
24   A.  In the 500 block?

Page 113

1   Q.  Yes.
2   A.  When I stepped into the street?
3   Q.  Right.
4   A.  Did I have a clear backdrop?
5   Q.  Yes, sir.
6   A.  Yes. I was shooting into the vehicle.
7   Q.  So define for me, again, "clear backdrop." I
8 think I missed something.
9   A.  I guess my sight picture, what's in my sight
10 picture I describe or I guess I determine is a, I
11 guess, a clear backdrop.
12   Q.  So when you say "clear backdrop," it doesn't
13 mean, and correct me if I'm wrong, because I'm trying
14 to understand your definition of "clear backdrop."
15   A.  Go ahead.
16   Q.  So "clear backdrop" in your definition does not
17 mean there's nothing behind the target at which you're
18 shooting?
19   A.  Clear backdrop in my definition --
20   Q.  Yes, sir.
21   A.  -- would be that if I'm to discharge a round,
22 there's nothing in that sight picture that I feel that
23 I can cause harm to or damage to beyond that sight
24 picture of what I'm aiming at.

29 (Pages 110 to 113)

Estate of Harry Smith, III, et al.    v.    Wilmington Police Department
John F. Ciritella,    C.A. # 04-1254 (GMS)
Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 18 of 40
May 8, 2006

## Page 114

1    **Does that make sense to you?**

2  Q.  Yes, sir, it does.

3    So you didn't see in your backdrop David

4  Gwyn standing near his home?

5  A.  **I don't even know who David Gwyn is.**

6  Q.  In your backdrop, you didn't see the little

7  girl who was standing on the street?

8  A.  **I don't know of a little girl.**

9  Q.  In your backdrop you didn't see a Hispanic male

10  in his early twenties standing on the street?

11  A.  **No, ma'am.**

12  Q.  Do you know who shot the innocent bystander

13  lady in the leg in this exchange?

14  A.  **No, ma'am.**

15  Q.  Did you ever see her?

16  A.  **No, ma'am.**

17  Q.  You were kind enough to point out where you saw

18  Mr. Dempsey at the intersection of 5th and Harrison.

19    Do you recall seeing Mr. Dempsey at any

20  other point before the car came to a halt and you put

21  it in gear or put it in park?

22  A.  **We're talking in this block?**

23  Q.  No, sir.  I'm sorry.

24    The car comes to a stop somewhere in the

## Page 115

1  middle of the 500 block of Harrison; correct?

2  A.  **The stolen vehicle we are talking about?**

3  Q.  The stolen vehicle.

4  A.  **Okay.**

5  Q.  Is that correct?

6  A.  **That's correct.**

7  Q.  So my question is:  Did you see Officer Dempsey

8  at any point between the corner of 5th and Harrison

9  and the point at which you put the car in park?  Do

10  you recall seeing Officer Dempsey between those two

11  points?

12  A.  **Other than the first time I saw him, no.**

13  Q.  When did you next see Officer Dempsey?

14  A.  **When I was attempting to aid the victim in the**

15  **police vehicle, still in the police vehicle.**

16  Q.  How are you trying to aid him?

17  A.  **Trying to see what medical attention he needs.**

18  Q.  How did you do that?

19  A.  **When I came around the vehicle, from the**

20  **passenger's side to the driver's side, we attempted to**

21  **bring him out of the vehicle, but at that time there**

22  **was two other detectives that had actually -- I guess**

23  **were right in front of me and they were determining**

24  **what first aid we needed to perform on him.**

## Page 116

1  Q.  So you weren't involved in pulling him out of

2  the car?

3  A.  **No, ma'am.**

4  Q.  Now, while you're still standing up, let me ask

5  you about Sergeant Kurten.

6  A.  **That's correct.**

7  Q.  Now let me ask you about Sergeant Kurten.  When

8  did you first see him?

9  A.  **Never saw him.**

10  Q.  Never saw him?

11  A.  **No, ma'am.**

12  Q.  That's it for that set of questions.  Okay.

13  You've been very kind.  We may end up using some more

14  of those photos.

15    You've been interviewed about this incident

16  many times; correct?

17  A.  **I couldn't say "many times."**

18  Q.  Can you tell me as best you recall as you're

19  sitting here today who interviewed you about the

20  incident?

21  A.  **Initially it was Sergeant Brown.**

22  Q.  Is he still Sergeant Brown or does he have --

23  A.  **Lieutenant, Lieutenant William Brown.**

24  Q.  Okay.

## Page 117

1  A.  **Then I think from here on out it's been through**

2  **attorneys.**

3  Q.  What's the name of the first attorney that had

4  come to you on --

5  A.  **Jeffrey Weiner.**

6  Q.  Who?

7  A.  **Jeffrey Weiner.**

8  Q.  He's from here?

9  A.  **I guess he's our FOP president, lawyer.**

10    MR. PARKINS:  What do you mean by "from

11  here"?

12    MS. SULTON:  Wilmington.

13    MR. PARKINS:  Yes.

14    MS. SULTON:  He is Wilmington based?

15    MR. PARKINS:  Yes.

16    MS. SULTON:  Okay.

17  BY MS. SULTON:

18  Q.  Then anyone other than Lieutenant Brown and

19  Attorney Weiner who interviewed you about this?

20  A.  **And everything else has been done through here.**

21  Q.  Through this office?

22  A.  **Yes, ma'am.**

23  Q.  Who here has interviewed you?

24  A.  **Mr. Parkins and Rose Tassone from the city law**

30 (Pages 114 to 117)

Estate of Harry Smith, III, et al.        v.        Wilmington Police Department,
John F. Ciritella                                                              May 8, 2006
Case 1:04-cv-01254-GMS     Document 112-2     Filed 06/21/2006     Page 19 of 40
C.A. # 04-1254 (GMS)

Page 130

1  in my presence, then I can, I guess, use whatever
2  discretion I need to do to make that arrest.
3      Q.  Including using deadly force?
4      A.  If I feel that my life is in danger, citizens,
5  absolutely.
6      Q.  Given your training and your understanding of
7  the policy, so if you have juveniles that you believe
8  are joyriding in a stolen car and they stop that car
9  and get out and run, you have the authority or the
10  discretion, you believe, to use deadly force?
11          MR. PARKINS:  Objection to the form.
12          You can answer.
13      A.  Repeat the question again, please.
14          MS. SULTON:  If you would read that back,
15  please?  Thank you.
16          (The reporter read from the record as
17  requested.)
18      A.  And I guess my only thing is what threat is it
19  against me, I guess.  Am I allowed to ask that?  I
20  don't -- if they just get out and run, then no,
21  that's not an authorization for me to shoot at
22  anybody.
23  BY MS. SULTON:
24      Q.  So --

Page 131

1      A.  There's no perceived threat there.
2      Q.  So your ability to use discretion, to use
3  deadly force is based upon what?
4      A.  My perception of the harm that could be done to
5  me, other persons, other persons of the City of
6  Wilmington.
7      Q.  So is it fair to say, sir, that when you
8  stepped off that sidewalk behind the blue car while
9  you were on Harrison Street and the car is midway in
10  the 500 block of Harrison, that you believed your life
11  was in danger?
12      A.  No.  Citizens of Wilmington.
13      Q.  What citizens did you see?
14      A.  None.
15      Q.  Where in your training have you been taught to
16  stop a stolen car by blocking the road?
17      A.  I don't necessarily know if -- I don't know if
18  I'm using -- you're using the term "blocking."  I
19  think that's -- I pulled into the intersection in an
20  attempt to stop the vehicle.  I necessarily wouldn't
21  call that blocking.  Was it blocking the intersection?
22  It's blocking the street, I guess, on 5th Street here.
23  It's not blocking the intersection.
24      Q.  You knew that stolen police vehicle was coming

Page 132

1  down 5th Street.  I'm sorry.  Yes, 5th Street;
2  correct?
3      A.  That's correct.
4      Q.  You positioned your vehicle intentionally to
5  impede the continued movement of the stolen police
6  vehicle up 5th Street; correct?
7      A.  That's correct.
8      Q.  Where in your training were you taught to use
9  your police vehicle to impede the movement of a stolen
10  vehicle?
11      A.  In my discretion, given the information I was
12  provided, shots fired, officer needs assistance,
13  police officer or stolen police vehicle that, again,
14  was stolen and was now fleeing from our police units,
15  my discretion is that that is a fleeing felon and in
16  my use of force, Bill of Rights through the State of
17  Delaware, I have authorization to attempt to stop that
18  person.
19      Q.  So it's your understanding of the law that you
20  have the right to shoot and kill a fleeing felon?
21      A.  If he's going to harm me, absolutely.
22      Q.  Is it your understanding that you have the
23  right to stop and shoot a fleeing felon if he's not
24  going to harm you?

Page 133

1      A.  I didn't know what his state of mind was.
2      Q.  I need a more direct answer if you can.
3      A.  I can't answer for the driver of that vehicle
4  what his intent was.
5      Q.  No, you can't, sir.  That I agree with you on
6  that.  So let me try to rephrase the question.
7          Is it your understanding of the law that
8  you have a right to shoot a fleeing felon if your life
9  is not in danger?
10      A.  If my life is not in danger?
11      Q.  Yes.
12      A.  To that question, if my life is not in danger,
13  I'd say no.
14      Q.  Under whose supervision were you working that
15  night?
16      A.  Sergeant William Brown.
17      Q.  The same Lieutenant Brown --
18      A.  That's correct.
19      Q.  -- who was the lieutenant, now-Lieutenant Brown
20  was sergeant?
21          Who was his supervisor?
22      A.  I believe that would have been Lieutenant
23  Clayton Smith.
24      Q.  Where is Lieutenant Clayton Smith now?  Is he

34 (Pages 130 to 133)

Page 142

1  else do you remember seeing other than Mr. Lawson?
2    A.  I think it was Sergeant Dempsey at the end of
3  that.
4    Q.  Do you recall seeing Sergeant Dempsey helping
5  anybody try to help get Mr. Smith out?
6    A.  He may have. I don't -- I don't remember. I
7  know there was people in front of me helping him or at
8  least trying to get him out of the vehicle, and that
9  situation, I don't -- other than Detective Michael
10 Lawson, that's the only person that sticks out.
11   Q.  What did you do after that? So you physically
12 saw them take him out of the car; right?
13   A.  I'd say more of attempting to take him out of
14 the vehicle. There was -- there was enough people
15 there that they were attempting to get him out of the
16 vehicle.
17   Q.  Did you actually physically see other officers
18 remove him from the vehicle?
19   A.  No.
20   Q.  What did you do then?
21   A.  At that particular time there was enough people
22 there, I went back over to the sidewalk tracing my
23 last steps, at which point I was met by Sergeant
24 Brown, at which point I told him that I had fired my

Page 143

1  weapon, at which point he said to stand by there and
2  just wait for his, I guess, next -- what's the word
3  I'm looking for? The -- he was -- he was to give me
4  orders on where I was to go next, because in the
5  departmental policy, at least in a shooting, a
6  departmental shooting, we generally have everyone
7  sequestered and not interviewed by anybody.
8    Q.  Then from there you went to the police station
9  and waited for your lawyer; correct?
10   A.  That's correct.
11   Q.  Did you talk to anybody other than sergeant,
12 now-Lieutenant Brown before you left the scene of the
13 incident?
14   A.  No, ma'am.
15   Q.  You didn't talk with any other police officers?
16   A.  About the incident?
17   Q.  Yes.
18   A.  No, ma'am.
19   Q.  When did you first learn that Officer Dempsey
20 and Officer Kurten had discharged their weapons?
21   A.  Officer Dempsey at the scene and Officer Kurten
22 at the scene.
23   Q.  So you talked about the incident at the scene
24 with officers Kurten and Dempsey?

Page 144

1    A.  No, ma'am.
2    Q.  Then how did you know they discharged their
3  weapon?
4    A.  Because they got in the car with me.
5    Q.  When did you first learn that a lady had been
6  shot, an innocent bystander?
7    A.  Actually, as I was attempting to leave, someone
8  had said that there had been a subject that was shot,
9  a female that was shot, I guess.
10   Q.  An innocent bystander; correct?
11   A.  I don't know what she was at the time.
12   Q.  When did you learn that an innocent bystander
13 had been shot?
14   A.  At the scene. I learned that the female was
15 shot. That's who we are referring to?
16   Q.  Yes.
17   A.  Yes.
18   Q.  But I'm saying that it was at the scene that
19 you learned that the woman who was shot was an
20 innocent bystander versus being somehow involved with
21 the incident; correct?
22   A.  That's correct.
23   Q.  Do you recall who told you that a lady had been
24 shot?

Page 145

1    A.  Actually, I think it was in that proximity when
2  I heard her saying that she had been shot and there
3  was officers that went over to her.
4    Q.  You weren't one of those officers?
5    A.  No, ma'am.
6    Q.  Were you there when the ambulance came to take
7  her to the hospital?
8    A.  No, ma'am.
9    Q.  Had you already been driven away from the scene
10 before the ambulance arrived?
11   A.  I could have been.
12   Q.  Still at the scene, at what point did you
13 realize that there were other people, neighborhood
14 residents, other citizens who were on the street?
15   A.  I don't think till I spoke to the law
16 department that there was other people out there.
17   Q.  When you put the car in park, were you aware at
18 that time that Mr. Smith was dead?
19   A.  When I put the car in park? No, I was not
20 aware of that.
21   Q.  But you knew you had shot him or you believed
22 you had shot him in the head?
23   A.  That I don't know. I think -- that I don't
24 know.

37 (Pages 142 to 145)

Estate of Harry Smith, III, et al. v.
John F. Ciritella
Case 1:04-cv-01254-GMS    Document 112-2    C.A. # 04-1254 (GMS)    Filed 06/21/2006    Page 21 of 40
Wilmington Police Department
May 8, 2006

Page 146

1  Q. When you say that you don't know, you're saying
2  that you don't know if --
3  A. I'm unsure if I shot him in the head.
4  Q. Would it be fair to say that you're sure that
5  he was unconscious when you put the car in park?
6  A. No, I can't be sure of that, either. He was
7  slumped over. I just assumed he was unconscious.
8  Q. He was not threatening?
9  A. At that particular time I was able to reach in
10 the car, so that's the best I can do. I mean, I
11 looked at it as I'm taking a chance reaching in the
12 vehicle to stop the vehicle.
13 Q. How long would you say the entire incident
14 lasted from the point at which you first saw that car
15 where you put that red star for me on Exhibit C-1 to
16 the point at which Lieutenant Brown asked you to get
17 in his car so he could take you back to the police
18 department?
19     MR. PARKINS: Objection to the form, but
20 you can answer.
21 A. A minute, minute and a half.
22 Q. From the point at which you were at the
23 intersection of 4th and Jefferson?
24 A. From here to here?

Page 147

1  Q. Yes.
2  A. Yes, ma'am.
3  Q. A minute and a half from the time that you're
4  at 4th and Jefferson to the point at which all the
5  shooting was done and you're now waiting to go back to
6  the police station?
7  A. About a minute -- yeah, about a minute and a
8  half.
9      MS. SULTON: Read back that last question
10 for me.
11     (The reporter read from the record as
12 requested.)
13 BY MS. SULTON:
14 Q. You heard her read back both the question and
15 the answer. Did you understand my question?
16 A. I think so. You asked me when I was at that
17 point at 4th and Jefferson --
18 Q. Yes, sir.
19 A. -- to the time I was done shooting?
20 Q. Yes, sir.
21 A. And Sergeant Brown came over to me, I explained
22 to him that I was shooting, at that particular time --
23 Q. Yes.
24 A. Maybe a minute and a half.

Page 148

1  Q. Okay. Thank you.
2      MS. SULTON: We can take a break now.
3  Thank you very much.
4      (A recess was taken at this time.)
5  BY MS. SULTON:
6  Q. So we took a brief break. During that break,
7  did you discuss your testimony with counsel?
8  A. No, ma'am.
9  Q. Is it fair to say that you've received training
10 in use of force that directs you when you should use
11 force and how much force should be used?
12 A. No, ma'am.
13 Q. Never?
14 A. You're going to have to rephrase the question.
15 Q. I'm going to have her read it back.
16 A. Well, the question the way it's answered is
17 inaccurate. I'd say no to the question.
18 Q. Okay. So let me try to rephrase it.
19     Is it fair to say that you have received
20 training that tells you when to use force and how much
21 force you should use?
22 A. No.
23 Q. Next question: You've never received that kind
24 of training?

Page 149

1  A. Not -- not the way you're asking it, no.
2  Q. What kind of use-of-force training have you
3  received?
4  A. I think the way you asked the question on a
5  when to use use of force --
6  Q. Well, have you ever received any training on
7  when to use force?
8  A. I've received use-of-force training.
9  Q. Has that training included lessons about when
10 you should use it?
11 A. Guidelines of when to apply any of the
12 applications of use of force.
13 Q. Have you received training that tells you how
14 much force to use?
15 A. No, ma'am.
16 Q. Never in your work here?
17 A. Not how much, no.
18 Q. Did you receive any counselling after the
19 shooting incident?
20 A. What kind of counselling, ma'am?
21 Q. Any kind of counselling. I don't know. Maybe
22 there's a departmental psychologist or psychiatrist
23 available to the department.
24 A. I did get to see a departmental psychologist,

38 (Pages 146 to 149)

A20

Case 1:04-cv-01254-GMS     Document 112-2     Filed 06/21/2006     Wilmington Police Department
Estate of Harry Smith III, et al.
Thomas Clifton Dempsey
C.A. # 04-1254 (GMS)
May 9, 2006

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,        )
HARRY SMITH, JR., and ROSLYN       )
WOODARD SMITH,                     )
                                   )
                Plaintiffs,        )
                                   )    Civil Action
           v.                      )    No. 04-1254
                                   )       (GMS)
WILMINGTON POLICE DEPARTMENT,      )
MICHAEL SZCZERBA and ONE OR        )
MORE JOHN DOES,                    )
                                   )
                Defendants.        )


           Deposition of THOMAS CLIFTON DEMPSEY taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Tuesday, May 9, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

           ANNE T. SULTON, PH.D., ESQUIRE
              P.O. Box 2763
              Olympia, Washington   98507
              for the Plaintiffs
           JOHN A. PARKINS, JR., ESQUIRE
           K. TYLER O'CONNELL, ESQUIRE
           RICHARDS, LAYTON & FINGER
              One Rodney Square - Third Floor
              Wilmington, Delaware  19899
              for the Defendants Wilmington Police
           Department and Michael Szczerba
-----------------------------------------------------
           WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

**Page 2**

1    THOMAS CLIFTON DEMPSEY,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MS. SULTON:
6    Q.    Would you state your name and spell your
7    first and last name for the record, please?
8    A.    Thomas C. Dempsey, Thomas, T-h-o-m-a-s,
9    Dempsey, D-e-m-p-s-e-y.
10    Q.    How are you employed?
11    A.    I am the academy and recruitment sergeant for
12    the Wilmington Police Department.
13    Q.    Have you ever taught in the academy?
14    A.    Yes.
15    Q.    What do you teach?
16    A.    I teach drug investigation and courtroom
17    testimony.
18    Q.    Can you tell me about use-of-force training at
19    the academy as you know it?
20    A.    Use-of-force training with the academy is done
21    by -- the deadly force component is conducted by the
22    internal affairs captain.  In the past two academies
23    that's been done by Captain Nancy Dietz.  She is no
24    longer the captain of internal affairs.  And I'm not

**Page 3**

1    sure if the other captain is going to be taking over
2    that position.
3        It's basically just going over our
4    directive on the use of force is what they do.  Just
5    telling them the guidelines and the continuum of the
6    use of force, not actually giving information other
7    than that.
8    Q.    So the use-of-force training at the academy for
9    those who are receiving in-service training,
10    approximately how much in-service training would an
11    officer receive on use of force?
12    A.    The deadly force component by the certification
13    of police officers is eight hours.  They have to have
14    at least eight hours of training.
15    Q.    Per year?
16    A.    For the academy, for the academy to be a
17    certified police officer.  I don't know -- I do not
18    know of any hours that are requested for --
19    prerequisite for a year of training.  I don't know
20    anything about that.
21    Q.    So if we're talking about a new hire, then to
22    be certified, that new hire, as he's coming through
23    the academy, is going to get at least eight hours of
24    use-of-force training?

**Page 4**

1    A.    In the area of deadly force of just -- what
2    that consists of is, like I said, the guidelines set
3    forth in our directive for deadly -- for the use of
4    deadly force.
5    Q.    I'm broadening the scope of my inquiry from
6    scope of force to use of force.
7    A.    Then you would go with all the training that
8    deals with defensive tactics.  You would broaden the
9    area to the 40 hours training of the range, of when
10    they are trained with their weapons.  You would
11    broaden that to the use of CAP-Stun and how to utilize
12    that.  So you would basically, through an academy, you
13    would have close to 40 -- let me add up the hours
14    here.  Forty-eight, 88 -- you have almost 100 hours of
15    training in the use of force during the academy.
16    Q.    How long do the recruits spend in the academy?
17    A.    Twenty -- well, last two academies, 24 weeks.
18    Q.    Twenty-four weeks?
19    A.    Correct.
20    Q.    So they spend 24 weeks in the academy and then
21    they go out on the street under the supervision of a
22    more senior officer?
23    A.    Field training officer for six months.
24    Q.    The field training comes completely after the

**Page 5**

1    conclusion of the academy training?
2    A.    Correct.
3    Q.    Then after an officer has successfully
4    completed his probationary period, I assume that that
5    is at the conclusion of the field training; is that
6    correct?
7    A.    No.  Probationary period is 18 months.  Six
8    months in the academy, six months with a field
9    training officer, and then six months with a higher
10    supervisory component with their street supervisors.
11    They all have to, during the six-month training with a
12    FTO, they have to give a daily activity report to me.
13        I'm the field training manager, also, and
14    they also have to, after the six months of FTO, the
15    supervisors have to give a monthly training to --
16    monthly training report to me -- evaluation report,
17    actually, to me every month for six months.
18        They both have -- at the 12-month period
19    they have to take a probationary 12-month test, and at
20    the 18-month period they have to take an 18-month
21    test.  They have to pass those tests in order to
22    become a police officer for the City of Wilmington.
23    Q.    Are those written or practical tests?
24    A.    They are written -- pretty much multiple

2 (Pages 2 to 5)

Estate of Harry Smith, III, et al. v. Wilmington Police Department
Thomas Clinton Dempsey          C.A. # 04-1254 (GMS)          May 9, 2006

Case 1:04-cv-01254-GMS     Document 112-2     Filed 06/21/2006     Page 24 of 40

Page 6

1  choices or true-and-false tests that I actually
2  prepare from all the tests throughout the academy.
3      Q.  Are there any skills tests that they are given
4  during this 18-month period?
5      A.  Other than the evaluations through the year
6  that they are going through, no.  I mean, the skills
7  are being honed for the year on the street.  That's
8  what they are being tested at.
9      Q.  After an officer in Wilmington successfully
10  completes the probationary period, does he or she
11  continue to receive in-service training on the use of
12  force?
13      A.  I don't know that.  I don't know exactly what
14  training they receive throughout.  I'm not the
15  training officer after that point.  We have another
16  training officer involved in that.
17      Q.  How long have you been with the department,
18  sir?
19      A.  Nineteen years.
20      Q.  In your 19 years, subsequent to successfully
21  completing the probationary period, have you received
22  any use-of-force training?
23      A.  Again, in the area of use of force, I perceive
24  use of force is any training dealing with my weaponry,

Page 7

1  my handgun, my baton, my CAP-Stun, I consider that
2  use-of-force training.  I'm not sure what you consider
3  use-of-force training.
4      Q.  Well, define for me use-of-force training and
5  then I'll ask the question based on your definition.
6      A.  Any -- any -- what I said.  Any -- if I have to
7  use my -- even verbal judo to me is considered use of
8  force because it is part of the continuum of use of
9  force.  So any time if I'm trained in verbal judo, if
10  I'm trained in any type of conversational, you know,
11  situation where I can talk a person down,
12  negotiations, I consider that a use-of-force
13  component.  Every time I go to the range is
14  use-of-force training.  Every time I use or have a
15  training defensive tactics is a use-of-force training.
16         All those things are use-of-force trainings
17  in my -- in what I believe.
18      Q.  Okay.  Now, relying upon the definition you've
19  provided, on average, subsequent to the successful
20  completion of your probationary period, each year how
21  much use-of-force training have you received?
22      A.  I cannot give you an exact -- there's no way I
23  can give you an exact hour or hours of what I receive.
24  I know that I have received on a yearly basis

Page 8

1  in-service or out of the department I've received
2  training every year on some component of my use of
3  force.  If it's utilization of a new baton,
4  utilization of a new weapon, or just going down the
5  range three times a year and training on my weapon for
6  three times a year, nighttime qualification courses,
7  daytime qualifications courses, I can tell you that.
8  We do that three times a year alone.
9      Q.  How much time do you spend when you're doing
10  qualification with your baton?
11      A.  My baton?
12      Q.  You said qualification.
13      A.  I'm talking about my handgun.
14      Q.  So when you do qualification with your handgun,
15  you do that three times a year; correct?
16      A.  Correct.
17      Q.  How much time do you spend doing that?
18      A.  Until we're done our qualification rounds.
19  Usually three rounds worth of shooting, 50 rounds
20  of component, which takes us about two hours.
21      Q.  About two hours?
22      A.  Yes.
23      Q.  So in a particular year you would spend about
24  six hours making certain that you're qualified with

Page 9

1  your handgun?
2      A.  Correct.
3      Q.  Do you spend any time making certain that
4  you're qualified with a shotgun or any other
5  departmentally issued weapons?
6      A.  Our shotguns are also the same time -- our
7  third time, our nighttime qualification for our pistol
8  we also must qualify with our shotgun.
9      Q.  What does it mean to qualify with your pistol?
10      A.  According to the certification of police
11  officers training by the state, we have to shoot a 80
12  or above on our qualification rounds.
13      Q.  Is that basically stationary or shooting from a
14  stationary position at a stationary target?
15      A.  It's a stationary target, but we're not always
16  stationary while we're shooting.  There are movement
17  shooting that we do while we're shooting.
18      Q.  So explain to me if you would, as best you can,
19  what the place looks like where you qualify.  Is it
20  similar to having a bank of booths and you're shooting
21  down toward targets and each officer has his little
22  cubicle that might be, say, three or four feet wide?
23      A.  No.  We have an outdoor range, ma'am.
24      Q.  You have an outdoor range.  So describe for me

3 (Pages 6 to 9)

Estate of Harry Smith, et al.  Document 112-2  Filed 06/21/2006  Page 25 of 40
Thomas Clifton Dempsey                    C.A. # 04-1254 (GMS)

Wilmington Police Department
May 9, 2006

Page 22

1  not.
2  BY MS. SULTON:
3  Q.  Did you receive anything subsequent to the
4  academy?
5  A.  We continue to update our policies and
6  procedures, and all I can say is that when we do that,
7  that's when we are trained on the additions or, you
8  know, whatever the updating is.  And other than that,
9  no, I can't recall any other type of training.
10  Q.  Did you ever receive any training in how to
11  recognize and to deal with people who may be suffering
12  from mental illnesses?
13  A.  Again, in the academy we have individuals that
14  come in from either crisis management, mental illness
15  facilities, and they will discuss different mental
16  illnesses, stuff of that nature, but they do not go
17  great in-depth to them.  It's basically just to give
18  us an overview on what may be out there and what to
19  look for when we do, you know, meet up with these
20  individuals.  And maybe how to, you know, talk to
21  them.  But it's not extensive in any way.
22        We basically -- the main thing that we are
23  trained in when it comes to, you know, trying to
24  identify what the problem is is:  Is the person in

Page 23

1  danger of themselves or endangering someone else?
2  That's what we, as police officers, look for.  That's
3  what we mainly are trained for.
4        We are not trained to identify what a
5  mental illness -- what the mental illness is if the
6  person is mentally ill.  The person could be, you
7  know, intoxicated or something of that nature.  We
8  don't determine that.  We have doctors and
9  psychiatrists that determine that.  We do not
10  determine that as police officers.  We determine if
11  they are a danger to themselves or endangering someone
12  else, at which time we act accordingly to take them to
13  the proper facility to be properly looked after.
14  Q.  That's training that you received in the
15  academy or as in-service training?
16  A.  Both.
17  Q.  Do you know how recently you received any
18  training in responding to situations involving mental
19  health issues?
20  A.  I cannot give you an exact date.  The last
21  training that I am aware of was dealt with our
22  transportation policy being a little bit revamped on
23  how -- who are we going to take to Delaware State
24  Hospital or the Wilmington Hospital.  Other than that,

Page 24

1  I can't recall any other training.
2  Q.  Since completing the academy, have you received
3  any in-service training on the law?
4  A.  In the law?
5  Q.  Law, l-a-w.
6  A.  Updates on Supreme Court rulings.  That's about
7  the only thing I can think of that we've had any other
8  updates on or that we've had any other training on.
9  Q.  Have you been involved in any other shooting
10  incidents other than this one involving the death of
11  Harry Smith?
12  A.  No.
13  Q.  In your service to the Wilmington Police
14  Department, have you ever shot anyone before?
15  A.  No.
16  Q.  Or since?
17  A.  No.
18        MR. PARKINS:  Would you read back, Kathy,
19  the last question and answer, please?
20        (The reporter read from the record as
21  requested.)
22        MR. PARKINS:  Okay.  Thank you.
23  BY MS. SULTON:
24  Q.  Have you ever discharged your weapon before as

Page 25

1  a Wilmington police officer?
2        MR. PARKINS:  Other than at practice?
3  Q.  Have you ever discharged your weapon other than
4  at Harry Smith in your service to the Wilmington
5  Police Department?
6  A.  At the range three times a year.
7  Q.  Never at an animal?
8  A.  No.
9  Q.  Has anyone ever filed a complaint against you?
10  A.  In reference to --
11  Q.  Any kind of complaint ever.
12  A.  Yes.
13  Q.  Okay.  Tell me about them.
14  A.  I -- they are very numerous.  I've had several
15  complaints of use of force.  I've had several
16  complaints of improper language, all of which have
17  been unsubstantiated.
18  Q.  Let's talk about the use of force.
19  A.  I can't recall them all.
20  Q.  How many have there been?
21  A.  I can't recall.
22  Q.  More than ten?
23  A.  I can't recall.
24  Q.  As best you can recollect while sitting here

7 (Pages 22 to 25)

**Page 26**

1  today, do you think it's less than ten complaints of
2  relating to improper use of force?
3        MR. PARKINS:  Objection to the form.
4  A.  I can't recall.
5  Q.  I asked for a complete copy of your personnel
6  file, sir.  Have you given it to me?
7  A.  Me?
8  Q.  Yes, sir.
9  A.  You are asking me?
10  Q.  Yes, sir.
11  A.  I didn't -- I haven't given you anything.
12  Q.  I don't have a complete copy of your personnel
13  file.
14  A.  Can I go back?  I don't ever remember you ever
15  asking me for anything, so it's --
16  Q.  I have to go through counsel.
17  A.  Okay.
18  Q.  But given the answer that you gave me that you
19  have numerous complaints of use of force against you,
20  I know now I don't have your complete personnel file
21  because I haven't seen numerous complaints against you
22  in the documents your lawyer sent me and I'm really
23  concerned about that.
24  A.  I don't believe you would have seen it in my

**Page 27**

1  personnel file.
2  Q.  I'm going to conclude this deposition and I'm
3  going to reserve the right to come back and depose you
4  because I have a right to depose you on the basis of
5  having a complete copy of your personnel file.
6        MR. PARKINS:  Counselor, you if you do
7  conclude the deposition now --
8        MS. SULTON:  Are you saying I have all of
9  them?  Are you representing that I was sent all of the
10  numerous use-of-force complaints about which he just
11  testified?  That if you're saying I have them all
12  based upon what you believe to be true, then I will
13  continue with this deposition.
14        But I have not, and I'm telling you the
15  honest to goodness truth, John, I have not seen in the
16  file, his personnel file you sent to me, numerous
17  complaints of use of force against him or any other
18  officer, not numerous.
19        MR. PARKINS:  Counselor, may I speak
20  without being interrupted?
21        MS. SULTON:  You may, Counsel, but I want
22  to make it clear that I flew here from Seattle,
23  Washington, to take this man's deposition on the
24  assumption that I had a complete copy of his personnel

**Page 28**

1  file that would include all of the use-of-force
2  complaints against him so that I could question him
3  about those.
4        And when he just said "numerous," that term
5  is not consistent with what I believe I have seen.  So
6  I've made my record.
7        Why don't you make your record and then
8  we'll continue the deposition.
9        MR. PARKINS:  Counselor, I did provide you
10  with his entire personnel file.  If you decide to
11  adjourn the deposition --
12        MS. SULTON:  I'm not going to adjourn it.
13  I'm not going to adjourn it.  I'm going to continue.
14  I'll just file a motion to compel as necessary.  I'm
15  not going to adjourn it because I came here from
16  Seattle and I'm not coming back here again to see this
17  man until trial.
18        So let's continue unless you want to make a
19  further statement on the record.
20        MR. PARKINS:  Since you interrupted me
21  again, I won't bother.
22        MS. SULTON:  Okay.  Good.  Let's go.
23  BY MS. SULTON:
24  Q.  Since September 13th, 2003, has anybody filed a

**Page 29**

1  complaint against you alleging that you use too much
2  force?
3  A.  No.
4  Q.  Prior to September 13, 2003, in the year of
5  2003, did anybody file a complaint against you about
6  using too much force?
7  A.  No.
8  Q.  What about in the year 2002?
9  A.  No.
10  Q.  2001?
11  A.  No.
12  Q.  2000?
13  A.  I can't recall.
14  Q.  1999?
15  A.  I can't recall anything other than past 2000.
16  I know that nothing was done after 2000.  The reason I
17  know that is that's when I was promoted and I haven't
18  been in that situation since then.
19  Q.  So in 1999, do you don't think that anyone
20  filed a complaint against you?
21  A.  I can't answer that.  I don't know.
22  Q.  What about 1998?
23  A.  Like I just said, I don't know anything after
24  2000.  I know that there were complaints made of me

Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 27 of 40

State of Harry Smith, et al.                                                    Wilmington Police Department
Thomas Clifton Dempsey                                                          May 9, 2006
                                   C.A. # 04-1254 (GMS)

Page 30

1  since between the day I hit the street, the year I hit
2  the street in 1986 to 2000, somewhere in there I
3  received several complaints of use of force during
4  my -- whatever -- however many years that is of being
5  on the street.
6    Q.  When you were hired, were you given a
7  psychological exam?
8    A.  Yes.
9    Q.  In the 19 years that you've served, have you
10 ever been disciplined?
11   A.  Ever been disciplined in what respect?
12   Q.  By the police department.  Any respect.  Has
13 the police department ever disciplined you for
14 anything?
15   A.  Yes.
16   Q.  What?
17   A.  Two car accidents and missing court once.
18   Q.  Anything else?
19   A.  No.
20   Q.  Have you ever been sued before?
21   A.  Yes.
22   Q.  When?
23   A.  I believe it was -- I don't have the exact
24 date, but I believe it was 1993.  '92, '93.

Page 31

1    Q.  What were you sued for?
2    A.  Use of force.
3    Q.  By whom?
4    A.  I can't recall the man's name.
5    Q.  Do you know the outcome of that case?
6    A.  It was a lawsuit and I was -- I'm not sure what
7  the verbiage is.  I was not guilty or found not to
8  have a problem.  I'm not sure what the ruling is on a
9  lawsuit, but we were found not guilty.
10   Q.  It was a civil case?
11   A.  Yes.
12   Q.  Who else was sued along with you?
13   A.  Three other officers.
14   Q.  Who are they?
15   A.  Retired Sergeant Quinn, Walter Ferris, and
16 retired Patrolman Guillermo Santiago.
17   Q.  Was that case in federal court or state court?
18   A.  State.
19   Q.  Any other lawsuits?
20   A.  No.
21   Q.  Have you ever been arrested for a crime?
22   A.  No.
23   Q.  Did you interview anyone in connection with the
24 incident of September 13, 2003?

Page 32

1    A.  No.
2    Q.  Did you take any of the photographs?  You'll
3  see a stack of photographs sitting in front of your
4  counsel.
5    A.  No.
6    Q.  Did you take any photographs?
7    A.  No.
8    Q.  Did you write a report?
9    A.  No.
10   Q.  Why?
11   A.  I was told not to.
12   Q.  Who told you not to write a report?
13   A.  Detectives.  I can't remember what the reason
14 was or why, but they said that they were going to take
15 my, you know, my interview.
16   Q.  Who are the detectives who told you not to
17 write a report?
18   A.  I can't recall exactly who it was.  I can't
19 recall if it was Sergeant Brown or not, but I was told
20 not to write a report.
21   Q.  Have you ever been told before not to write a
22 report?
23   A.  Yes.
24   Q.  By whom?

Page 33

1    A.  I was told not to write a report due to a
2  shooting that happened when I was a supervisor.  One
3  of my officers had a shooting and the internal affairs
4  captain and the detective captain said that I did not
5  have to write the reports on that; that they were
6  going to be handling all of that.
7    Q.  In the case involving the shooting of Harry
8  Smith, were you given the option of writing the report
9  if you wanted to or were you told do not write a
10 report?
11   A.  I don't recall being given an option.  I was
12 just told you don't have to write a report.  It wasn't
13 like an order.  They said you don't have to write a
14 report on this because I asked.  I wasn't sure.  Not
15 being in that position before, I wasn't aware what I
16 was supposed to be doing.
17   Q.  Any other situations in which you were told
18 you didn't have to write a report?
19   A.  No.
20   Q.  What kind of handgun were you using on
21 September 13, 2003?
22   A.  Smith & Wesson 40 caliber.
23   Q.  How many bullets does it hold?
24   A.  Twelve in the clip and one in the chamber.

9 (Pages 30 to 33)

Estate of Harry Smith, III, et al. v.
Thomas Clifton Dempsey

Document 112-2

C.A. # 04-1254 (GMS)

Filed 06/12/2006 Wilmington Police Department

May 9, 2006

## Page 34

1  Q.  How many bullets did you fire on September 13,

2  2003?

3  A.  Thirteen.

4  Q.  Why did you stop firing?

5  A.  My weapon ran out and he started to back up the

6  vehicle.  It looked like the situation was calmed

7  where I was getting to, at which time we approached

8  the vehicle.  I reload and approached and observed I

9  did not have to shoot again.

10  Q.  Was that your clip that was left on the ground,

11  your empty clip?

12  A.  Possibly.  I'm not sure what clip you mean.

13  Q.  You reloaded at the scene; correct?

14  A.  Yes.

15  Q.  Do you recall recovering your clip at the scene

16  before you left?

17  A.  No, no.

18  Q.  Do you know how far a bullet will travel when

19  shot from the handgun that you were using on

20  September 13, 2003?

21  A.  No.

22  Q.  That's not part of your training?

23  A.  It may be part of my training.  You asked me if

24  I knew.  I don't know.

## Page 35

1  Q.  Has anyone ever told you how far a bullet from

2  that handgun will travel?

3  A.  I believe that mention of, you know, feet per

4  second.  I'm not sure what it is.

5  Q.  I'm talking about distance when I say how far.

6  A.  I know.  I'm saying I'm not -- no, I don't know

7  of anyone telling me that.

8  Q.  Did you have any informal interviews regarding

9  the situation on September 13, 2003?  When I say

10  "informal interviews," I'm not talking about any

11  conversations you may have had with attorneys about

12  the case, but with other people at the police

13  department or other individuals about the incident.

14  A.  I don't understand what you mean by informal.

15  Q.  Have you had any informal interviews with

16  anybody about the shooting on September 13, 2003?

17  A.  And again, I'm going to ask.  I don't know what

18  you mean by "informal."  I don't know if that means

19  conversation.  I don't know if that means I'm actually

20  talking to someone about the case for a purpose.  I'm

21  not sure what "informal" means.  I'm sorry.

22  Q.  Okay.  Let me sharpen my question.

23       You were interviewed about the incident on

24  September 13th, 2003; correct?

## Page 36

1  A.  Yes.

2  Q.  Who interviewed you?

3  A.  Sergeant Brown.

4  Q.  When?

5  A.  Somewhere -- actually, it would have been on

6  the 14th because I believe it was around 1:00 in the

7  morning.

8  Q.  Was that interview tape recorded?

9  A.  I believe it was.

10  Q.  Did you see Sergeant Brown who's now Lieutenant

11  Brown; correct?

12  A.  Correct.

13  Q.  Did you see him make handwritten notes while he

14  was interviewing you?

15  A.  I saw him take my name down and a time, but

16  that was it.  After that I did not see him write

17  anything else.

18  Q.  Did you or were you interviewed by anyone other

19  than Lieutenant Brown?

20  A.  I was interviewed by Sergeant Reutter of the

21  internal affairs division.  I cannot give you a date

22  or time on when that occurred.  I have no idea.

23  Q.  Do you think it was fairly close in temporal

24  proximity to the September 13th, 2003, shooting

## Page 37

1  incident?

2  A.  No.  I'm sorry.  It would have been -- it was

3  after pretty much the entire investigation was

4  concluded.  It was pretty much like a wrap-up, they

5  believe, a final interview by internal affairs.  They

6  were doing their part in the investigation, I believe,

7  at that time.  But it was well after the shooting.

8  Q.  Could it have been before Christmas of 2003?

9  A.  It could have been.

10  Q.  You don't think it was as far out as Easter of

11  2004, do you?

12  A.  Again, ma'am, I really -- I don't know.  I

13  can't recall when it was.  All I know is that most of

14  the investigation was concluded because I remember

15  Sergeant Reutter having the detective investigative

16  and the ATF and all that stuff.  So I know it was much

17  later in the process.  When, I can't recall.

18  Q.  Were you interviewed by anyone else?

19  A.  I wasn't interviewed, no.  I can't recall being

20  interviewed by anyone else, no.

21  Q.  Let me take you to September 13 of 2003, and

22  the next series of questions I ask you will be focused

23  all on that particular date.  Okay?

24       What time did you start your shift work, as

State of Delaware v. Daniel Gavin
Thomas Clifton Dempsey

Document 112-2    Filed 06/21/2008    Page 29 of 40

Wilmington Police Department
May 9, 2006

C.A. # 04-1254 (GMS)

Page 38

1  best you can recall?
2    A.  Actually, I started at approximately 1900 --
3  I'm sorry -- 7 p.m.  My shift actually started at
4  4 p.m., but I had a family function for the first
5  three hours, so I came in three hours late.  Once
6  arriving, you know, I went right to my office.
7    Q.  So you clocked in at 7 p.m.?
8    A.  I came in at seven.  I didn't clock in.
9    Q.  You don't clock in?
10   A.  No.
11   Q.  How do they know the precise arrival of your
12  time?
13   A.  Trust pretty much.  We are police officers.  We
14  come in when we are supposed to come in.  I came in
15  actually 15 minutes earlier for my shift.
16   Q.  So you arrive around 7 p.m. to work.  Where do
17  you go when you arrive at work?  What's the address of
18  the place that you go?
19   A.  My address is 300 North Walnut Street.
20   Q.  The address of the police station?  I'm going
21  to ask you to take a look at Exhibit C-1.
22   A.  Yes.  4th and Walnut police station.
23   Q.  Can you tell me what happened after you arrived
24  at work?

Page 39

1    A.  I went to my desk to start some paperwork.  I
2  was probably in the process of reading some crime
3  reports on a computer for maybe 15 minutes when I
4  heard "16 Charles" come over the radio, Officer
5  Saunders.
6        I'm not sure how far you want me to go with
7  this, ma'am.
8    Q.  Just tell me as best you can recall everything
9  that happened after you arrived at work.
10   A.  I, like I said, I heard "16 Charles" come over
11  the radio.  As soon as I heard "16 Charles," Officer
12  Saunders come over the radio, being with them for
13  about two years at that point, I knew right away that
14  something was wrong.  All he was able to get out was
15  "16 Charles," but just a reflection in his voice told
16  me that something wasn't right.
17       I immediately started to look for my key
18  peg.  We have key pegs to pull, unlock our keys to our
19  vehicles out of the -- our boards that we have.  I
20  immediately start looking for that because I didn't
21  have it on my person.  It was in my police bag.
22  Because I wanted to get a vehicle in case that
23  something was happening that I needed to be on the
24  street for.

Page 40

1        While looking for my key peg, I heard "16
2  Charles" come back over the radio again, again
3  asking -- at that time got more of the information out
4  stating the fact that they needed assistance.  You
5  could hear things in the background going on.  I
6  believe Officer Whitehead screaming at someone to
7  "Get" out, get out," at which time, obviously, you
8  know, we were needed on the street.  They were asking
9  for assistance.
10       So I located my key peg, got my key out.
11  At about the same time I got my key peg out, I --
12  again, it came back over the radio saying, "Shots
13  fired."  And that's all I heard coming over the radio,
14  was that shots were fired.
15       I proceeded out to my vehicle.  There were
16  several officers going out.  I can't recall how many
17  and I can't recall who they were.
18       It took me a few minutes to locate my
19  vehicle in the parking lot.  Probably a few minutes
20  being, saying, two or three.
21       I located the vehicle.  I got into it.  I
22  started it up.  I waited for several other vehicles to
23  leave the parking lot in front of me.  I was pretty
24  much the last vehicle -- I believe I was the last

Page 41

1  vehicle to leave the parking lot.  I was the last
2  vehicle.
3        We went out onto 4th Street from Poplar
4  onto 4th heading westbound.  I was behind -- I believe
5  it was Officer Kurten at the time, and I know that
6  John Ciritella was in front of him.  And I don't know
7  anybody else other than those two officers, only the
8  two.  I could actually see the back of their heads and
9  recognized who they were.  The rest of them, there was
10  a few cars in front of me, but I don't know who they
11  were.
12       At which time we were all proceeding west
13  on 4th Street.  I stayed behind Matt Kurten the entire
14  time.  There was no reason for me to try to go by
15  anybody.  We were listening to the pursuit on the
16  radio being conducted by Sergeant Debbie Donohue,
17  giving us a good street direction of travel.
18       We pretty much -- everyone pretty much
19  proceeded west on 4th, but it did sound like they were
20  heading south the entire time towards us, so we pretty
21  much were just going to parallel and hopefully block
22  it off somewhere in one of those streets in the center
23  city area.  I think that was what my intention was.
24  I'm sure -- I can't answer for the rest of them.

11 (Pages 38 to 41)

Estate of Harry Smith, III, et al. v. Thomas Clifton Dempsey
Case 1:04-cv-01254-GMS    Document 112-2    Filed 08/21/2006    Page 30 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 9, 2006

Page 42

1    We proceeded westbound on 4th.  The next
2    transmission I can recall hearing was the fact that
3    they were south on Monroe approaching 4th Street.
4        Shortly after that transmission went out, I
5    observed several vehicles in front of me, but
6    probably -- probably almost a block away with the
7    vehicles between me and the suspect vehicle, the
8    suspect vehicle come out onto 4th Street from Monroe
9    westbound.  Lights and sirens on, on the vehicle --
10   lights on.  I can't say there were sirens.  I couldn't
11   hear that from where I was at.  Everybody had sirens
12   on.  I had sirens on, so I couldn't say.  But there
13   were lights on on the vehicle.
14       He proceeded westbound.  All the
15   vehicles -- like I say, I know I was the last vehicle
16   in line.  There was no one else behind me at the time.
17   We proceeded west on 4th.  He crossed Jackson -- I'm
18   sorry.  We crossed Adams.  We all crossed Adams
19   against the red light.  We all crossed Jackson against
20   the red light pretty much all travelling in the opposite
21   lanes the entire convoy.
22       At which time once we hit VanBuren, the
23   suspect vehicle went north on VanBuren along with -- I
24   can't give you the exact count, but there were several

Page 43

1    vehicles, police vehicles that followed him onto
2    VanBuren.
3        I observed Ciritella going -- continue west
4    and I actually out loud said to myself, "That's a good
5    idea.  Let's not follow him all the same way.  Let's
6    parallel him."  I remember saying that to myself in
7    the car.  Said, "Good job.  Let's parallel him."  So I
8    followed, followed Kurten, obviously decided the same,
9    and Ciritella was the first to do it.
10       So I followed John and Matt, at which time
11   we heard them saying he was travelling west on 5th at
12   which time John turned north on Harrison.  I followed
13   him and Matt onto Harrison Street.  They approached,
14   being sergeant -- I'm sorry -- John Ciritella and Matt
15   Kurten approached the intersection and actually went
16   into the intersection in an attempt to block the
17   intersection.
18       I stopped in the 400 block of Harrison,
19   mainly because as soon as we got all in that area,
20   those two officers jumped out of their vehicles, and
21   if I entered the intersection, I was afraid I might
22   hit them, so I just stopped short of the intersection,
23   probably about two feet, and I bailed out of my
24   vehicle.

Page 44

1        I observed -- I could hear the vehicles
2    coming up the road at that time.  I observed officers
3    Ciritella and Kurten go to the front of their
4    vehicles, at which time I lost sight of them.
5        I started to head into the intersection
6    to -- my intention was to get behind John Ciritella's
7    vehicle on the north -- he was located on the
8    northeast corner, I believe, of 5th and Harrison, at
9    which time approaching -- in the process of
10   approaching that, I had my handgun out knowing that
11   the suspect had a police vehicle, and to my knowledge,
12   having a shotgun in his possession.  And not knowing
13   who got shot and who did the shooting at 14th and
14   Washington because none of that information was given
15   to us.
16       At which time approaching John's car, the
17   vehicle was stopped for -- I noticed -- I observed
18   that the suspect vehicle was stopped for a short
19   amount of time.  I observed that several officers were
20   starting to get out of their vehicles behind the
21   suspect car.  A feeling that now he was not going to
22   be able to go anywhere now with the fact that the two
23   vehicles were blocking the intersection behind him.
24   There were -- I don't know how many cars were behind

Page 45

1    him, but there were several.  I felt that he was
2    contained at that point and that hopefully, you know,
3    we could contain the situation at that area.
4        Upon approaching the rear -- or the front
5    of, actually, John Ciritella's vehicle, the suspect
6    vehicle started to proceed forward at actually, for
7    the short distance he had, at a high rate of speed
8    towards John Ciritella.  I observed that.  I observed
9    John starting to back up from him, attempting to get
10   out of his way, at which time he was also basically
11   heading in my direction, also.
12       I had a vehicle I believed that would
13   protect me at that time, but I had a vehicle between
14   me and the car at that time, so I backed up a little
15   slower than John into the intersection, at which time
16   he was -- what I could observe, he got past John.
17   John had to move out of the way or get hit.  And he
18   ran into the -- I believe it was a white Cherokee
19   which I was standing just a few feet behind.
20       I ran back a few more feet fearing that
21   either one of the cars were going to hit me, the white
22   Cherokee because it was pretty much, to my knowledge,
23   flying in the air at that time, and the police vehicle
24   was coming pretty much at me at that time, also.

Estate of Harry Smith, III, et al.
Case 1:04-cv-01254-GMS    Document 112-v    Filed 06/21/2006    Page 31 of 40
Thomas Clifton Dempsey    C.A. # 04-1254 (GMS)

Wilmington Police Department
May 9, 2006

Page 46

1    At which time I felt that due to the danger
2   this guy just posed to John Ciritella, due to the fact
3   that he's already obviously posed danger by stealing a
4   police car, felony suspect, all these things coming
5   into play, the fact that he had a shotgun in his
6   possession, not knowing who got shot, who did the
7   shooting at 14th and Washington, all these things
8   coming into play, and also the fact that it appeared
9   that he was -- if he got through that area, he would
10   be gone, he would have a good distance on any police
11   vehicles that would have to chase him, I proceeded to
12   discharge my weapon to halt the situation at that
13   point at the 500 block of Harrison.
14    I proceeded -- he was approximately three
15   to five feet away from me at one point. I waited,
16   actually, a second because of a crossfire situation
17   between myself and several officers down the block.
18    Once he started to pass me and I had a
19   better backdrop of buildings and nobody was in the
20   area, I started -- proceeded to fire my handgun at the
21   driver's side window of the vehicle shattering same.
22    I remember, I recall while shooting and
23   moving towards the vehicle going northbound on
24   Harrison up the hill, firing and hitting the -- I

Page 47

1   recall hitting the rear driver's side -- or the rear
2   driver's side window and the back or rear of his seat
3   several times. The weapon drylocked. I stopped for
4   that one second because the entire time I was
5   moving -- the entire time I was shooting I was moving.
6   I drylocked. I reloaded.
7    At the same time I was reloading, the
8   vehicle started to coast back. It wasn't driving
9   back. You could tell that it had stopped and started
10   to coast back, at which time I felt that the situation
11   had been pretty much over. He had stopped driving,
12   which is what I wanted to happen.
13    At which time I started to approach the
14   vehicle in a fire stance, firing stance for my safety
15   to make sure that he was not, you know, still a danger
16   to me or anyone else.
17    Upon approaching the driver's side window,
18   I observed that he was incapacitated. I attempted to
19   open the door. It was locked. Even though the window
20   was shot out, I put my hand in, unlocked the door, at
21   which time I don't know who it was, but at least three
22   officers had approached behind me, and when -- they
23   opened the door, and upon opening the door where I was
24   positioned, they pretty much pushed me to the front of

Page 48

1   the vehicle.
2    Being the supervisor at that time, the only
3   one that I could observe in the area, I immediately
4   got on the radio, proceeded to ask for what we call a
5   10-100, which is a restriction on the radio so I could
6   have it.
7    My call sign at the time was Charles 2. I
8   asked for restriction, I believe, twice because there
9   was a lot of chatter obviously on the radio at the
10   time. They -- the radio supervisor got on the radio
11   and told everybody basically to be quiet, Charles 2
12   had the air, at which time I advised them that we
13   needed an ambulance, paramedics to respond to the
14   scene for the suspect. And I also advised that we
15   needed detectives.
16    Probably less than a second after that
17   Sergeant Brown got on the radio and said he's the
18   detective on the scene; he will be taking over the
19   scene. At which time I stopped all transmission. I
20   saw Sergeant Brown about half a block away and I
21   proceeded to a vehicle -- I'm sorry -- a set of steps
22   on the west side of the block, 500 block, and sat
23   down.
24   Q.   Then after you sat down, what happened over the

Page 49

1   course of the next two hours?
2   A.   First I was transported pretty much -- we have
3   a very -- well, we did have a very large black
4   gentleman of about six-seven, Michael Brown, who was
5   one of my officers, pretty much picked me up
6   physically and put me in a patrol car and secured my
7   weapon for me, at which time I waited there for a few
8   minutes.
9    And then next thing I can recall happening
10   was Lieutenant Mulrine, M-u-l-r-i-n-e, my immediate
11   supervisor, approached me, asked me if I was okay and
12   I believe at which time they asked me to get in his
13   patrol -- his unmarked police vehicle and to respond
14   back to central with him.
15   Q.   You went back to central with him?
16   A.   Actually, we did originally, you know,
17   eventually go back with him.
18   Q.   When you say "central," we are talking about
19   the police department at --
20   A.   Correct.
21   Q.   -- 300 Walnut?
22   A.   I'm sorry. Yes. The police department, yes.
23   Q.   When you arrived back at central, what
24   happened?

13 (Pages 46 to 49)

A30

Estate of Harry Smith, III, et al. v.
Thomas Clifton Dempsey

Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 32 of 40

C.A. # 04-1254 (GMS)

Wilmington Police Department
May 9, 2006

Page 50

1  A. I was escorted to the detective conference room
2  or we were told to go to the detective conference
3  room. Lieutenant Mulrine took us up there and pretty
4  much at that point along we were in there awaiting our
5  interviews. And that's pretty much all we did. We
6  just sat in there awaiting our interviews.
7  Q. Your interview occurred about 1:00 in the
8  morning?
9  A. I can't give you -- I know it was after one,
10 but I can't give you exact time.
11 Q. Now, you do realize we are not alleging in this
12 suit any issues pertaining to race?
13 A. I don't know what you are alleging.
14 Q. Have you seen the lawsuit?
15 A. Yeah, I've read over it.
16 Q. You didn't see any allegations of race in
17 there, did you?
18 A. No.
19 Q. Race doesn't matter in this case.
20    Let me go through a couple of issues with
21 you, if I could.
22    Have you received any training, whether you
23 were in the academy or in-service training, related to
24 or seen any policy statements or any directives or any

Page 51

1  guidelines relating to whether or not you should or
2  should not shoot at a moving vehicle?
3  A. We have a policy in our use-of-force continuum
4  that states that we are not supposed to shoot at a
5  moving vehicle unless it's exigent circumstances and
6  of a life-threatening situation.
7  Q. That's in the use-of-force policy?
8  A. Yes.
9  Q. Do you know the number?
10 A. The exact number of the directive?
11 Q. Yes.
12 A. It would be in Chapter 6, but no, I don't have
13 the exact number of the directive. It's a very small,
14 two-line paragraph.
15 Q. Is it in your standards manual?
16 A. It's in our police officer's manual, what we
17 call The White Book because it's in a white book.
18    MS. SULTON: I didn't get that. I asked
19 for it.
20    MR. PARKINS: You received the police
21 officer's manual.
22    MS. SULTON: Right. So let me do it as a
23 question.
24

Page 52

1  BY MS. SULTON:
2  Q. I requested all of the documents, guidelines,
3  policies, and so forth on use of force and I received
4  a police officer's manual that's a couple of inches,
5  maybe three inches thick?
6  A. Four inches, actually.
7  Q. Four inches? Yes, I would agree with you.
8  It's about four inches thick. I did not see a
9  specific policy on --
10 A. It is something you must search for, ma'am. It
11 is on the use-of-force policies, Chapter 6. I cannot
12 recall what the exact directive it is, but it is in
13 there.
14 Q. So the policy, then, is in Chapter 6?
15 A. I can't give it to you verbatim, but pretty
16 much it's what I said.
17 Q. Other than the policy statement that says
18 generally you're not supposed to shot at a moving
19 vehicle, have you received any specific training on
20 what you should do vis-a-vis a moving vehicle if
21 you're trying to stop it?
22 A. I can't recall what training I've had. I have
23 observed videos during -- it wouldn't be specific
24 training on that specific item. It probably would

Page 53

1  have been either a use of force or more likely a
2  weapons qualification type of training where they
3  would have shown us -- I recall on my 19 years of
4  seeing videos of different weapons being utilized on
5  vehicles moving and not moving and what they do to it
6  and what they don't do to them.
7     Other than that, I can't give you a date
8  and time. I can't give you what the training was.
9  But I do recall having that type of information given
10 to me through videos and some type -- like I said, I
11 don't know what actual training it was. I know I've
12 never had training on something saying training on
13 shooting at a moving vehicle. There's never been
14 anything dealing with that. It would have been
15 encompassed in some other type of training, you know.
16 Q. Would it have been in-service versus academy?
17 A. I've had a lot of training in-service and out
18 and -- other agencies. So I don't know when it would
19 have been or what type of training it would have been.
20 Q. So what other agencies have provided you with
21 training? Have you gone to like the FBI training
22 academy in Quantico, Virginia?
23 A. I've been trained -- I'm an expert in
24 electronic surveillance. I've been trained by the

14 (Pages 50 to 53)

Estate of Harry Smith, III, et al.  v.  Wilmington Police Department
Thomas Clifton Dempsey  C.A. # 04-1254 (GMS)  May 9, 2006

Case 1:04-cv-01254-GMS   Document 112-2   Filed 06/21/2006   Page 33 of 40

Page 66

1   A.  I'm not sure what that meant, and I'm not sure
2   when he was pronounced dead, so I'm not sure anything
3   about that.
4   Q.  So let me rephrase the question if I could.
5       Was there any point at which Mr. Smith was
6   removed from the stolen police vehicle that you went
7   onto the sidewalk?
8   A.  Again, I went on the sidewalk after I got done
9   my radio transmissions.  I don't know about him being
10  removed from the car or anything or when it coincided
11  with me going to the sidewalk.  I don't know anything
12  about that.
13  Q.  Did you see him removed from the car?
14  A.  No.
15  Q.  You didn't?
16  A.  No.
17  Q.  Do you know who removed him?
18  A.  No.
19  Q.  Did you see anybody give him medical assistance
20  or CPR or anything?
21  A.  The next thing I saw is when I was being placed
22  in the police van by Officer Michael Brown was him
23  being worked on by paramedics.
24  Q.  So you did see someone working on him?

Page 67

1   A.  Yes.
2   Q.  You did physically --
3   A.  Paramedic crew was there very shortly after we
4   called out for a paramedic crew.
5   Q.  You did see him, his body lying on the ground?
6   A.  I did at that point.
7   Q.  Do you know, was there any point at which you
8   stopped firing your weapon once you started firing?
9   Did you pause at all, or did you just fire 13 shots?
10  A.  I fired 13 shots until the vehicle stopped and
11  until I locked and loaded, which happened at the exact
12  same time.
13  Q.  So you fired it 13 shots in a row without
14  pausing?
15  A.  Correct.
16  Q.  Why did you fire 13 shots in a row without
17  stopping?
18  A.  Because 13 shots, he was still not stopping.
19  And if I reloaded and he was continuing, probably
20  would have been more.  But as soon as I reloaded, he
21  stopped.  The car had started to back up.
22  Q.  Were you able to see any portion of his body as
23  you were firing?
24  A.  His head and shoulders.

Page 68

1   Q.  Were you able to tell whether you hit him with
2   any of those 13 shots?
3   A.  No, I can't tell for sure if I hit him.  I know
4   I hit the back of the seat cushion on his headrest at
5   least twice, and I know I hit the back of the seat a
6   couple times only because I could actually see the
7   seat cushions disintegrate at time of impact.
8   Q.  How close were you as you were firing these 13
9   shots?
10  A.  The first round I was approximately three to
11  five feet away.  The rounds continuing, I believe I
12  was no -- the farthest away was probably ten to
13  15 feet.
14  Q.  How was that distance created, the gap between
15  the 3 feet where you initially were shooting and the
16  distance of the 15, so we went from about 3 feet to
17  15 feet, how was that gap created?
18  A.  He was in a police car and I was walking or --
19  yeah, I was walking.  So he was able to get a little
20  bit of distance on me being in a police car going up
21  the hill.
22  Q.  So you were walking up the hill firing your
23  gun?
24  A.  We don't run firing our gun; we walk.

Page 69

1   Q.  So if in the answer to the complaint -- have
2   you seen the answer to the complaint filed on your
3   behalf?
4   A.  I don't know what you're inferring or what
5   you're talking about.
6   Q.  I'll show you.  It's not a secret.  It's in the
7   court.  I have some personal notes, so I'm not going
8   to mark it.
9       MR. PARKINS:  If you are going to show it
10  to the witness, you are going to mark it.
11      MS. SULTON:  Well, no.  I'm not going to
12  give you my personal notes, John.
13      MR. PARKINS:  Then you are not going to
14  show it to the witness.
15  BY MS. SULTON:
16  Q.  I'm going to read it to you and then you tell
17  me if it's correct.  Okay?  Okay.  That's what we'll
18  do.
19      This was filed on your behalf by your
20  attorney, and let me read to you what he told the
21  Court you did and you will tell me if it's correct or
22  not.
23      At paragraph 25 on page 4 of the answer
24  filed under your name, on your behalf, it says:  "It

18 (Pages 66 to 69)

Estate of Harry Smith, III, et al. v. Wilmington Police Department
Thomas Clifton Dempsey
Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 34 of 40
C.A. # 04-1254 (GMS)    May 9, 2006

Page 74

1 there were any police cars?
2 A. My concentration was on Mr. Smith in that
3 police vehicle and Officer Ciritella. Other than
4 that, no.
5 Q. Is it fair to say that you were totally focused
6 on killing Mr. Smith?
7 A. No. I was focused on effecting the arrest with
8 the reasonable -- the most reasonable force necessary
9 to effect the arrest.
10 Q. Did you really think that shooting 13 shots was
11 going to result in something less than death?
12 A. No. It was probably going to result in that.
13 We don't shoot to wound. We shoot to kill.
14 Q. So it's fair to say that you were totally
15 focused on killing Mr. Smith?
16 A. I was focused on effecting the arrest, using
17 the most reasonable force necessary.
18 Q. In your view, that was for what purpose? For
19 what purpose did you need to shoot what you knew was a
20 car thief?
21 A. I didn't know -- I didn't know he was a car
22 thief. He was a car thief along with a lot of other
23 things. With the lack of knowledge I had, I did not
24 know if he had shot -- I know that he had a weapon on

Page 75

1 him. That's -- you know, he was escaped with a police
2 car. Not a normal, everyday vehicle. And he was also
3 in possession of a shotgun to my knowledge.
4 Q. Who told you that, that he had a shotgun?
5 A. All police cars have shotguns in them that
6 patrol officers take out.
7 Q. I'm sorry. I don't want to be argumentative.
8 I really don't. I apologize if I have been.
9 Who told you he had a shotgun?
10 A. No one has to tell me that. I'm a supervisor
11 for the City of Wilmington for the street that those
12 officers were on. They all take shotguns out to their
13 vehicles.
14 Q. So is it fair, sir, no one told you he had a
15 shotgun; correct?
16 A. I am -- I'm aware that my patrol officers have
17 shotguns in their vehicles or they are not properly
18 equipped.
19 Q. I'm not disagreeing with you that the proper
20 equipment for a police vehicle might be a shotgun.
21 My question simply is: Isn't it true that
22 at no time did someone tell you --
23 A. They didn't have to tell me that.
24 Q. You walked up to the car after Mr. Smith was

Page 76

1 shot; correct?
2 A. Yes, I did.
3 Q. Did you see a shotgun in the car?
4 A. No, I did not.
5 Q. So he didn't have a shotgun, did he?
6 MR. PARKINS: Objection to the form.
7 You can answer.
8 A. I don't know that. He was supposed to have a
9 shotgun. That vehicle is supposed to have a shotgun.
10 Put it that way.
11 Q. So assume as true there was not a shotgun in
12 that car.
13 A. I don't know, ma'am.
14 Q. Okay.
15 A. I did not search the vehicle. I did not even
16 get a chance to even go inside the vehicle. I did not
17 get a chance -- other than touching the lock on the
18 door handle, that's the closest I got to that vehicle.
19 Q. Did you, sir, ever see the attorney general's
20 report, the city solicitor's report, the police
21 department report on this incident?
22 A. I might have several -- once, if not a year
23 ago. And to be honest with you, I read it maybe one
24 time.

Page 77

1 Q. There's no report that indicates a shotgun was
2 found in that car?
3 A. I don't recall that. I don't know.
4 Q. Well, then I want you to assume it's true for
5 the purpose of this next question that there was no
6 shotgun in that car with Mr. Smith.
7 A. I'm sorry. Was that a question?
8 Q. I want you to assume it's true that there was
9 no shotgun in that car with Mr. Smith. Does that
10 change anything about your testimony as it relates to
11 reasonable force?
12 A. In reference to this case?
13 Q. Does it change your discussion of whether or
14 not 13 shots was reasonable force given the fact that
15 there wasn't a shotgun in that car?
16 A. I still don't know if he -- who had been shot
17 at 14th and Washington, who did the shooting. I
18 wasn't even aware if he had his own weapon because I
19 was not advised if he did or not. I know that someone
20 was shot. I don't know who it was, and also I noticed
21 the fact he has a police car and to my knowledge he
22 had a shotgun. Even if you are telling me to assume
23 the fact he doesn't, I can't -- I'm not going to
24 imagine this on that situation. It's not the case.

20 (Pages 74 to 77)

Case 1:04-cv-01254-GMS    Document 112    Filed 06/21/2006    Page 35 of 40

Estate of Harry Smith, III, et al. v.    Wilmington Police Department
Thomas Clifton Dempsey    C.A. # 04-1254 (GMS)    May 9, 2006

Page 78

1    Q.   Well, why didn't you ask?
2    A.   I'm sorry?
3    Q.   Why didn't you ask?
4    A.   I don't have to ask. I'm the supervisor of
5    that platoon. All my officers take shotguns out to
6    their cars.
7    Q.   So you assumed that he had a shotgun because as
8    a supervisor of the platoon, you assumed that the car
9    was properly equipped with a shotgun; correct?
10   A.   Correct.
11   Q.   Okay. So you were working on assumptions that
12   he was armed with a shotgun, not on your personal
13   knowledge; correct?
14   A.   Yes. We already answered that.
15   Q.   When you looked at the report for the brief
16   moment you had a chance to look at the car, did you
17   ever see a scalpel or a knife in the car?
18   A.   I'm talking a matter of a second, ma'am, of
19   unlocking a door and being pushed away. I did not
20   have a chance to look at anything other than the fact
21   that he was incapacitated and that's all I was worried
22   about at the time.
23   Q.   Your goal was to incapacitate him; correct?
24   A.   My goal was to effect an arrest with reasonable

Page 79

1    force necessary to do so.
2    Q.   The reasonable force that you selected was
3    shooting your weapon until all the bullets were gone;
4    correct?
5    A.   My -- intention was to shoot all my -- or shoot
6    my weapon until the vehicle stopped and the
7    apprehension of the suspect was made with a reasonable
8    force necessary. It took 13 bullets to do that. Yes.
9    Q.   From a distance of three feet to 15 feet?
10   A.   That's what I said, yes.
11   Q.   You were qualified in the use of this gun;
12   correct?
13   A.   Yes.
14        MR. PARKINS: Let's take a break. We've
15   been here for an hour and a half.
16        MS. SULTON: No. I'm going to be finished
17   in a half an hour.
18        MR. PARKINS: I'm going to take a break,
19   anyway.
20        MS. SULTON: How much of a break are you
21   going to take, John?
22        MR. PARKINS: Ten minutes.
23        (A recess was taken at this time.)
24

Page 80

1    BY MS. SULTON:
2    Q.   From start to finish, from the point at which
3    you were in the police vehicle going up 4th Street to
4    the point at which you made that telephone call for
5    emergency --
6    A.   It was a radio transmission. It wasn't a
7    telephone call.
8    Q.   I'm sorry. Thank you for the clarification.
9        So from the point at which you got into
10   your car as part of this convoy chasing the stolen
11   police car to the point at which you made the call for
12   emergency healthcare professionals, how much time
13   elapsed?
14   A.   Approximately between five and ten minutes, if
15   that long. Approximately five minutes, I would say.
16   Q.   Not less than five would you say?
17   A.   Not less than five. Not from the time we left
18   the parking lot, you mean?
19   Q.   Yes, sir.
20   A.   I wouldn't say no more than -- or no less than
21   five. Probably not much more than five, either.
22   Q.   Can you tell me what your understanding of the
23   term "excessive force" means? Or how would you define
24   it?

Page 81

1    A.   Use of excessive force is to use force that's
2    unwarranted to make an arrest. It's used to shoot
3    somebody for stealing a pack of gumballs. I mean, it
4    all depends what the situation is, what excessive
5    force is. But it's basically using force that's not
6    necessary to use for that crime or for -- to enforce
7    that law to make that arrest or to calm that
8    situation.
9    Q.   How would you define the term "reasonable
10   force"?
11   A.   Reasonable force is just the force necessary to
12   effect the arrest. Reasonable force. Reasonable --
13   what we -- the best way to possibly effect that
14   arrest.
15   Q.   Are there any written departmental guidelines,
16   policies, and/or has there been any training what kind
17   of force should be used when or under what kind of
18   circumstances?
19   A.   We have the use-of-force policy. That's a
20   continuum. It's a guideline. Both words are used in
21   that policy. It tells us what we shouldn't do with
22   some of our equipment and what we can do with some of
23   our equipment.
24        But it never specifically states that you

21 (Pages 78 to 81)

Page 82

1  have to do this, you have to do that. There's no
2  definites because in every -- that's why it's a
3  continuum. That's why it's a guideline, because every
4  situation is different. Every single situation that
5  we come across every day is different and you have to
6  react to each situation differently.
7      So they are not going to hold you to a set
8  thing that you have to do because they never know.
9  It's the continuum itself. You don't have to go
10  through each step of the continuum. If you have to
11  skip a step of the continuum to effect the arrest,
12  that's part of the continuum. That's why what it is.
13  Q.  Does the department have a policy relating to
14  shooting a fleeing felon?
15  A.  Yes.
16  Q.  What is that policy?
17  A.  The law is, and the policy, it's in the use of
18  force that you can shoot at a fleeing felon if you
19  believe he to be endangering others or yourself.
20  Q.  Am I correct in assuming that when you became
21  a part of the chase, that as the police vehicles were
22  proceeding up 4th Street, that there were, first, the
23  stolen vehicle driven by Harry Smith and eight other
24  police cars behind the stolen vehicle?

Page 83

1  A.  I believe my testimony was I'm not sure how
2  many cars were involved in that chase.
3  Q.  So you think you were the last one in the line;
4  correct?
5  A.  I was pretty sure I was. I don't remember
6  seeing anyone behind me.
7  Q.  Then right in front of you, who do you recall
8  seeing?
9  A.  Officer Matthew Kurten.
10  Q.  Then right in front of Mr. Kurten, who do you
11  recall seeing?
12  A.  Detective John Ciritella.
13  Q.  Do you recall seeing a car in front of Officer
14  Ciritella?
15  A.  I recall seeing police cars, several in front
16  of him, but I can't tell you who they were, how many
17  they were, what they were.
18  Q.  You can't say if they are marked or unmarked?
19  A.  No.
20  Q.  Do you recall anybody not having their lights
21  and sirens on as you were all proceeding down
22  4th Street?
23  A.  I don't recall.
24  Q.  Were you injured in this incident at all, sir?

Page 84

1  A.  No.
2  Q.  Do you know if any police officers were
3  injured?
4  A.  I don't know.
5  Q.  Did you receive any counseling in reference to
6  this incident, any psychological counseling?
7  A.  Mandatory counseling by the city.
8  Q.  How many sessions were you ordered to attend?
9  A.  I believe it was two.
10  Q.  Is there a reason for the number?
11  A.  If there is, I don't know it.
12  Q.  Were you placed on administrative leave?
13  A.  Yes, I was.
14  Q.  For how long?
15  A.  From the time of the incident to, I believe --
16  I don't know the exact date because I actually
17  unofficially came back to work a little early to
18  review my new job, to learn it, the academy sergeant,
19  so I came back around April. I think that's about --
20  we came shortly after that.
21  Q.  Prior to your deposition today, did you speak
22  with Officer Ciritella about his deposition yesterday?
23  A.  No.
24  Q.  Just one more little segment that I wanted to

Page 85

1  go through with you and then we'll be done.
2      Do you remember completing some request for
3  admissions?
4  A.  I'm sorry. Say that again.
5  Q.  Do you recall completing a request for
6  admissions?
7  A.  A sheet of questions? Is that what you are
8  referring to?
9  Q.  It's a request for admissions.
10  A.  I don't know the legal wording of it. I know I
11  was given a questionnaire on the incident awhile lack.
12  If that's what it's called, if that's what it is, I'm
13  not sure.
14  Q.  We have to go through this because I don't see
15  a signature and I will mark this as an exhibit.
16      (Dempsey Exhibit 2 was marked for
17  identification.)
18  BY MS. SULTON:
19  Q.  Sir, would you take a look at what we've marked
20  as Exhibit Number 2 and tell me if you've ever seen
21  that document before? Just take your time.
22  A.  (The witness reviews the document.) Yes.
23  Q.  I want you to review it and take your time in
24  so doing, but I want you to tell me whether or not all

22 (Pages 82 to 85)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,      )
HARRY SMITH, JR., and            )
ROSLYN WOODARD SMITH,            )
                                 )
            Plaintiffs,          )
                                 )    Civil Action No.
v.                               )      04-1254-GMS
                                 )
WILMINGTON POLICE DEPARTMENT,    )
MICHAEL SZCZERBA and ONE OR      )
MORE JOHN DOES,                  )
                                 )
            Defendants.          )

       Videotape deposition of DAVID NATHANIEL GWYN
taken pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:34 a.m. on
Wednesday, August 24, 2005, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.

APPEARANCES:

       ANNE T. SULTON, PH.D., ESQUIRE
         P.O. Box 2763
         Olympia, Washington   98507
         for the Plaintiffs
       JOHN A. PARKINS, JR., ESQUIRE
       RICHARDS, LAYTON & FINGER
         One Rodney Square - Third Floor
         Wilmington, Delaware  19899
         for the Defendants Wilmington Police
         Department and Michael Szczerba

------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

**Page 18**

1    A.  Yeah.  They were together.

2    Q.  All three together?

3    A.  Mm-hmm.

4    Q.  How far apart were they?

5    A.  Well, they were close together.  I can't

6    say how -- I mean, I can't --

7    Q.  Okay.

8    A.  I can't say how far.

9    Q.  But they were standing near the intersection of

10   5th and Harrison Street when they started shooting at the

11   police car?

12   A.  They weren't standing.  They were running.

13   Q.  They were running?

14   A.  Mm-hmm.

15   Q.  How far away from you were they?

16   A.  I made it down to about half a way the block.

17   Q.  Okay.  Why don't you put a "2" there so we

18   know what --

19   A.  Okay.

20   Q.  That describes where you were standing.

21       And how far away were the police officers

22   from you when they started shooting?

23   A.  Here's one house -- you say how far from me?

24   Q.  Yes.

**Page 19**

1    A.  Oh, okay.  I can't recall feet if that's what

2    you want.  I can't.

3    Q.  Okay.  Can you estimate for me how far apart

4    they were -- how far away they were from you?  Were they

5    ten feet away?  Were they 50 feet away?

6    A.  I -- I can't...

7    Q.  All right.  Did you see all three of the police

8    officers firing their weapons?

9    A.  Yes, sir.

10   Q.  Were all three of the police officers in police

11   uniforms or were some of them in plain clothes?  Or how

12   were they dressed?

13   A.  They were in uniforms, all three of them.

14   Q.  Did any of them have like a jacket that said

15   "Police" on it, or were they all in their regular blue

16   uniforms?

17   A.  They were in police -- police uniforms.

18   Q.  In their regular blue uniforms; is that correct?

19   A.  Police uniforms, yes.

20   Q.  Yes.

21   A.  They were.

22   Q.  Did you see the police running after the car or

23   walking after the car?

24   A.  They was running.

**Page 20**

1    Q.  Were they running in the same direction as the

2    police car was going?

3    A.  Mm-hmm, yeah.

4    Q.  You need to say yes.

5    A.  Yes.

6    Q.  How many shots did you see the police officers

7    fire?

8    A.  How many?

9    Q.  Yes.

10   A.  I just heard this here pop, pop, pop, pop, pop,

11   pop, pop.

12   Q.  Well, how many is that?

13   A.  I can't say how many because they was -- just

14   started shooting.  I can't -- I can't say how many.

15   Q.  How close to the police car were they when they

16   were shooting?

17   A.  From the time the police car turned the corner,

18   after it hit the jeep, they started running behind the

19   police car shooting.  I mean, I can't say how many times.

20   Q.  How far away were they, though, from the police

21   car?

22       MS. SULTON:  Objection.  At what point in

23   time?

24       MR. PARKINS:  At any time.

**Page 21**

1        MS. SULTON:  I'm going to object to the

2    form of the question because he said they were running.

3    That's why I'm trying to get you to be more specific.

4        MR. PARKINS:  That's a fair question --

5    objection.

6    BY MR. PARKINS:

7    Q.  How close did the police get while they were

8    still firing?

9    A.  Well, they got right up on the car.

10   Q.  How far away from the car?

11   A.  I can't -- I mean, I can't recall, I mean, no

12   feet or nothing like that.

13   Q.  I'm sorry?

14   A.  I can't recall no feet or nothing like that.

15   Q.  Were they ten feet away?  Were they five feet

16   away?  Were they closer?

17   A.  I can't recall, I mean, how many feet.  I can't.

18   Q.  Were they shooting at the back of the car or the

19   front of the car or the side of the car?

20   A.  No.  They started out shooting at the back of

21   the car.

22   Q.  Did they end up shooting at other parts of the

23   car?

24   A.  When they -- one officer, and that's the one on

Estate of Harry Smith, III, et al.    v.    Wilmington Police Department, et al.
Case 1:04-cv-01254-GMS    Document 112-2    Filed 06/21/2006    Page 39 of 40
David Nathaniel Gwyn    C.A. # 04-1254-GMS    August 24, 2005

Page 22

1  the left, when he got up to the car, he shot, it looked
2  like, through the window, the side window. But at the
3  car -- as they was running behind the car, they were all
4  shooting -- shooting through the back window.
5      Q.  And you saw one officer go up to the side of the
6  car and shoot in the window; is that correct?
7      A.  I can't -- I'm a little cloudy.
8      Q.  Okay. Did you see any officer stick his hand or
9  arm in the car and fire his weapon?
10      A.  Stick his hand in the car?
11      Q.  Yes. And shoot his weapon.
12      A.  Not stick his hand in the car.
13      Q.  Okay. Did you see a police officer shoot from
14  the side of the car?
15      A.  I'm cloudy on that.
16      Q.  Okay. What happened -- did the car eventually
17  stop?
18      A.  Yes.
19      Q.  The police car?
20      A.  Mm-hmm, yes.
21      Q.  What happened after it stopped?
22      A.  After -- after it stopped?
23      Q.  Yes.
24      A.  The officer on the side where I was ran up

Page 23

1  and opened the door.
2      Q.  That's the driver's side?
3      A.  Yes.
4      Q.  Okay. And what did the officer do?
5      A.  Took him out.
6      Q.  Took out Mr. Smith?
7      A.  Mm-hmm.
8      Q.  You need to say yes.
9      A.  Yes, yes, yes. I keep on forgetting that.
10      Q.  That's all right.
11          What happened after that?
12      A.  After they pulled him out?
13      Q.  Yes.
14      A.  They -- they tried this here, what you call
15  it --
16      Q.  They tried to what?
17      A.  What you call it when you try to re --
18      Q.  Did they try CPR?
19      A.  Yeah, yeah, yeah, that kind of stuff, yeah.
20      Q.  So they tried to revive Mr. Smith?
21      A.  Mm-hmm.
22      Q.  You need to say yes.
23      A.  Yes, yes, yes, yes.
24      Q.  That's okay.

Page 24

1      A.  Yes.
2      Q.  Did an ambulance come or emergency medical
3  technicians?
4      A.  Not then.
5      Q.  Not that you saw?
6      A.  No.
7      Q.  What did you do after Mr. Smith was pulled out
8  of the car?
9      A.  I stood on the porch after a while before I -- I
10  mean before I left.
11      Q.  You sat on the porch of your house?
12      A.  No. I said I stood on the porch where I was at
13  for a while.
14      Q.  How long did you stand on the porch?
15      A.  I can't exactly recall. It was a little -- it
16  was a little while, I think.
17      Q.  Was it a matter of minutes or was it a matter of
18  hours?
19      A.  No, it was no hours.
20      Q.  And what did you do after you were -- stood on
21  the porch where you were at?
22      A.  I think I came down and I went in my house.
23      Q.  What did you do next?
24      A.  I checked on my wife.

Page 25

1      Q.  And how was she?
2      A.  She was crying. She was upset and she was
3  crying.
4      Q.  All right.
5          (Kester I.H. Crosse, Esquire, is now
6  present in the deposition room.)
7  BY MR. PARKINS:
8      Q.  All right. Did you talk to her about what you
9  had seen?
10      A.  Not at that moment I don't.
11      Q.  Did your wife talk to you about what she had
12  scene?
13      A.  She asked me how could I be so calm. And I said
14  at that time, you know, it really didn't refrain me. I
15  mean, she said, "Pop," she said, "how can you be so calm
16  and cool?" It just hadn't, you know, really hit me at
17  that time.
18      Q.  Now, when you were in your house, were you
19  sitting with your wife in the front of the house or in
20  the back of the house?
21      A.  I don't think I was sitting. I think I was
22  standing there. I wasn't sitting.
23      Q.  Okay. Was this in the front or the back of the
24  house?

7 (Pages 22 to 25)

Estate of Harry Smith, III, et al.
David Nathaniel Gwyn

Case 1:04-cv-01254-GMS    Document 112    Filed 06/21/2006    Page 40 of 44

Wilmington Police Department, et al.
August 24, 2005

Page 30

1   Q.   This is a quote, and I'm going to read the quote
2   that appeared in the newspaper.
3          "'Three police officers came running up
4   behind the car and one officer on the left side of where
5   I was standing shot four or five times through the back
6   window.'"
7          Is that what you told the reporter?
8   A.   A lot -- well, I don't remember that I said it
9   like that.  I said it was three police officers.
10  Q.   Well, I think it says "three police officers."
11  A.   Oh.
12  Q.   Yes.
13  A.   Oh, okay.  And I said it was three police
14  officers shooting, not one.
15  Q.   All right.  Did you tell her that they were shot
16  four or five times?
17  A.   That they were shot --
18  Q.   That they shot four or five times?
19  A.   No.  They just kept on shooting.
20  Q.   Did you tell this reporter that they shot
21  through the back window?
22  A.   Yeah.  They were shooting through the back
23  window.
24  Q.   All right.

Page 31

1          Would you take a look, please, at what has
2   been marked as Gwyn Exhibit Number 1?
3   A.   Where that at?
4   Q.   It's right in front of you, sir.
5   A.   Right here?
6   Q.   That, yes.
7   A.   Oh.
8   Q.   And if you look at --
9   A.   Where's it at?
10  Q.   Do you have it in front of you, sir, Gwyn
11  Exhibit Number 1?  Would you look at the third page that
12  says "Affidavit of David Gwyn"?  Do you see that?
13  A.   Oh, down at the bottom, yes.
14  Q.   Yes.
15          Do you remember signing an affidavit?
16  A.   I can't recall.  Maybe I did.
17  Q.   Would you take a look at this -- does that
18  appear to be your signature on the next page?
19  A.   Yes.
20  Q.   Was there a notary public present when you
21  signed it?
22  A.   A notary public?  I -- I can't remember where I
23  signed it at.
24  Q.   All right.  Did you write this affidavit or did

Page 32

1   someone write it for you?
2   A.   Did I write it?  I don't remember writing
3   anything.
4   Q.   Okay.  Did someone write this for you?
5   A.   It must have did because I haven't written
6   anything.
7   Q.   When you signed this, did you understand that
8   you were signing this under oath?
9   A.   I don't know where I signed it at.
10  Q.   Did you understand that you were signing it
11  under oath?
12  A.   My name is on there, but I don't remember.
13  Q.   Okay.
14  A.   I don't remember.
15  Q.   Would you take a look at numbered paragraph 4?
16  I'm going to read the first sentence.
17  A.   Oh, okay.
18  Q.   Okay?  "I saw several Wilmington Police
19  Department officers indiscriminately and wildly discharge
20  their weapons in the 500 block of Harrison Street."
21          Do you see that?
22  A.   Mm-hmm.
23  Q.   What does "indiscriminately" mean?
24  A.   To me it mean wildly.

Page 33

1   Q.   Okay.  You say:  "Approximately 40 bullets flew
2   through our neighborhood, hitting one neighborhood
3   resident in the leg, hitting neighbors homes."
4          How do you know there were 40 bullets?
5   A.   Recounted 39 casings.
6   Q.   Did you count them or did someone else count
7   them?
8   A.   My neighbor counted them.
9   Q.   So that's something your neighbor told you?
10  A.   Mm-hmm.
11  Q.   You need to say yes.
12  A.   Yes, yes, yes.
13  Q.   Who was your neighbor?
14  A.   I don't -- I don't know her name, but she lives
15  two doors up from me.
16  Q.   So she would have lived at 511?
17  A.   There's not no 511.  She lives at 513.
18  Q.   513?
19  A.   Mm-hmm.
20  Q.   All right.
21  A.   There's no 511 there.
22  Q.   How do you know that a neighborhood resident was
23  hit in the leg?
24  A.   She lived across the street.

9 (Pages 30 to 33)