# APPENDIX
# A40 through A78
# (Continued)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Document 112-3    Filed 06/21/2006    Page 2 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 10, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,    )
HARRY SMITH, JR., and ROSLYN   )
WOODARD SMITH,                 )
                               )
            Plaintiffs,        )
                               )  Civil Action
            v.                 )  No. 04-1254
                               )     (GMS)
WILMINGTON POLICE DEPARTMENT,  )
MICHAEL SZCZERBA and ONE OR    )
MORE JOHN DOES,                )
                               )
            Defendants.        )

            Deposition of MATTHEW W. KURTEN taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Wednesday, May 10, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
               P.O. Box 2763
               Olympia, Washington   98507
               for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            K. TYLER O'CONNELL, ESQUIRE
            RICHARDS, LAYTON & FINGER
               One Rodney Square - Third Floor
               Wilmington, Delaware  19899
               for the Defendants Wilmington Police
            Department and Michael Szczerba
---------------------------------------------------
            WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

Page 2

```
 1  APPEARANCES:
 2        ROSAMARIA TASSONE, ESQUIRE
          CITY OF WILMINGTON LAW DEPARTMENT
 3        City/County Building - 9th Floor
          Wilmington, Delaware  19801-3537
 4        for the Defendants
 5        - - - - -
 6        MATTHEW W. KURTEN,
 7    the witness herein, having first been
 8    duly sworn on oath, was examined and
 9    testified as follows:
10  BY MS. SULTON:
11    Q.  Would you be kind enough to spell your first
12  and last name for the record, please?
13    A.  Sure.  First name is Matthew, M-a-t-t-h-e-w,
14  last name is Kurten, K-u-r-t-e-n.
15    Q.  Your first name is misspelled on the complaint.
16  You are the same Matthew Kurten that is spelled as
17  M-a-t-h-e-w; correct?
18    A.  I believe so.
19    Q.  Before I ask you a question --
20        MS. SULTON:  Let me just put on the record
21  that I did receive this morning -- and thank you,
22  John -- the videotape of Harry Smith and the letter
23  concerning Sergeant Dempsey's former complaints
24  indicating that those are routinely purged from an
```

Page 3

```
 1  officer's file after five years.
 2        MR. PARKINS:  Well, not complaints, but
 3  unsubstantiated complaints.
 4        MS. SULTON:  Okay.  Thank you.  That helps
 5  to clear the discussion from his deposition.  I
 6  appreciate that.
 7  BY MS. SULTON:
 8    Q.  How long have you been a police officer,
 9  Mr. Kurten?
10    A.  Almost seven years.  This June will be seven
11  years.
12    Q.  What is your current rank?
13    A.  I'm sergeant.
14    Q.  What was your rank on September 13, 2003?
15    A.  Corporal.
16    Q.  Prior to or since the incident on September 13,
17  2003, have you ever been involved in a shooting
18  incident?
19    A.  No.
20    Q.  Have you ever discharged your weapon as a
21  police officer outside of practicing at a range or
22  qualifying with the use of your weapon?
23    A.  No.
24    Q.  Have you ever had any complaints filed against
```

Page 4

```
 1  you ever?
 2    A.  There may have been some filed, yes.
 3    Q.  When?
 4    A.  I couldn't give you the exact dates.  There's
 5  only one substantiated complaint in my file.
 6    Q.  Can you tell me about that, please?
 7    A.  It's for failing to do a prearrest felony
 8  intake.
 9    Q.  What does that mean?
10    A.  I did not do a felony intake on somebody who I
11  had assigned felony charges for, signed warrants for.
12    Q.  That was in connection with your job as a
13  Wilmington police officer?
14    A.  That's correct.
15    Q.  Have you ever had anyone file any complaints
16  about you ever, whether or not you were a police
17  officer?
18    A.  They may have spoke with somebody.  As far as
19  formal complaints, no, not to my knowledge.
20    Q.  Are you aware of any informal complaints?
21    A.  Again, if somebody had spoken with the
22  supervisor in an informal fashion and everything was
23  taken care of, if there was something that they didn't
24  like or whatnot, then that would have been handled.  I
```

Page 5

```
 1  couldn't say for sure if I would have been made aware
 2  of that.
 3    Q.  When did you go through the police training
 4  academy in connection with your job with the
 5  Wilmington Police Department?
 6    A.  Started June 14th, 1999.
 7    Q.  Were you given a psychological test before or
 8  as a part of your academy?
 9    A.  Yes.  It's a prerequisite.
10    Q.  Do you have a college degree?
11    A.  Yes, ma'am.
12    Q.  From where?
13    A.  University of Delaware.
14    Q.  What was your major?
15    A.  Criminal justice.
16    Q.  You graduated in what year?
17    A.  1995.
18    Q.  Prior to joining the Wilmington Police
19  Department, how were you employed?
20    A.  I did two years as a probation and parole
21  officer for State of Delaware.
22    Q.  Prior to that, how were you employed?
23    A.  My father had his own business.  I worked for
24  him.
```

2 (Pages 2 to 5)

Estate of Harry Smith, III, et al
Matthew W. Kurten

State of Harry Smith, III, et al          Document 112-3          Filed 06/21/2006          Page 4 of 40

Wilmington Police Department
May 10, 2006

C.A. # 04-1254 (GMS)

Page 6

1  Q.  What kind of business was it?
2  A.  Wallpapering and painting and the like.
3  Q.  I would like to talk with you about your
4  training, both in the academy and since.
5         Did you receive use-of-force training
6  during the academy?
7  A.  Yes.
8  Q.  What kind of training did you receive?
9  A.  Use-of-force training would be as far as one of
10  our directives in the Wilmington police officer's
11  manual, directive 6.7, governs our use of force as
12  Wilmington police officers.  Also defensive tactics.
13  I believe they go hand in hand.  Defensive tactics
14  course.
15  Q.  What did they teach you about use of force?
16  A.  Basically there's guidelines as far as --
17  there's use-of-force continuum and they went through
18  the different steps and when to escalate, de-escalate
19  the best you can.  Use the minimum force necessary to
20  effect an arrest.
21  Q.  As a part of your training on the use of deadly
22  force, in particular, what were you taught were the
23  guidelines you should follow?
24  A.  There are certain criteria to be followed to

Page 7

1  use deadly -- when to use deadly force.
2         For instance, if my life was in danger,
3  another officer, another citizen, if there was a
4  fleeing felon who was armed and we believed there
5  would be a great harm or danger to the public.
6  Q.  Any other guidelines that you recall being
7  taught either in the police training academy or
8  subsequent thereto?
9  A.  I believe those are the standard ones, the main
10  ones.
11  Q.  What other criteria are you to consider before
12  using deadly force based upon your training?
13  A.  What type of deadly force are you referring to?
14  Q.  Use of the service weapon, gun, shotgun,
15  handgun.
16  A.  Certainly you need to be aware of what's in
17  your surrounding area, what's in your backdrop.  For
18  example, children, if there's children playing in a
19  playground, you certainly don't want to discharge your
20  weapon for fear of accidentally striking one of them.
21  So...
22  Q.  Any other guidelines?
23  A.  Certainly you wouldn't take -- you want to take
24  your lighting into account.  You want to make sure you

Page 8

1  have your intended target in your line of fire as
2  intended, so -- weather is -- there's certainly a
3  whole bunch -- whole bunch of things to take into
4  account.
5  Q.  Anything else you should take into account
6  based upon your training?  And take your time as you
7  reflect on that question, please.
8  A.  Sure.  You just have to, I guess, have a good
9  faith and reason to believe that deadly force is
10  necessary.
11  Q.  Anything else that you should consider based on
12  your training?
13  A.  Not off the top of my head.
14  Q.  On or before September 13, 2003, did you
15  supervise any other officers?
16  A.  No.
17  Q.  Who was your supervisor?
18  A.  Ronald Fioravanti.  I can spell the last.
19  F-i-o-r-a-v-a-n-t-i.
20  Q.  Do you recall the names of any of the people
21  who served as your training officers either in the
22  academy or subsequent thereto?
23  A.  I'm sure there's a multitude of people.  Any
24  specific courses or --

Page 9

1  Q.  Yes.  And thank you for focusing the question.
2  As it relates to use of force, deadly force, in
3  particular.
4  A.  No, not who taught that particular agenda for
5  use of deadly force.  I know the range master, which
6  is still as of this date, is Sergeant Scott Sowden.
7  So he would have to do as far as application of the
8  firearms, usage of firearms down at the range.  But as
9  far as who taught directive 6.7, no.
10  Q.  I'd like to focus your attention on
11  September 13, 2003.  What kind of handgun were you
12  carrying at that time?
13  A.  Smith & Wesson 40-caliber semiautomatic.
14  Q.  That holds 13 bullets, 12 in the clip and one
15  in the chamber?
16  A.  Yes.
17  Q.  How many shots did you discharge from your
18  weapon on that day?
19  A.  Five, I believe.
20  Q.  Why did you discharge those five bullets from
21  your weapon?
22  A.  I was in fear that Detective Ciritella would be
23  injured and/or killed, seriously injured and/or
24  killed.

3 (Pages 6 to 9)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS    Document 112-3    Filed 06/21/2006    Page 5 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 10, 2006

Page 10

1  Q.  Why did you think that?
2  A.  Because of the actions taken by Harry Smith on
3  that date.
4  Q.  So tell me what you saw that led you to believe
5  you needed to discharge your weapon.
6  A.  At 5th and Harrison streets, I was parked right
7  behind Detective Ciritella.  He went to the northeast
8  corner of 5th and Harrison.  I was on the south side
9  initially of the 1100 block of west 5th Street, which
10  is just east of Harrison Street where Harry Smith
11  initially stopped.
12       Once he proceeded to accelerate, drive up
13  on the sidewalk towards Detective Ciritella, I moved
14  around towards the intersection of 5th and Harrison
15  Street and I observed that he was going straight
16  towards Detective Ciritella.
17  Q.  You then did what after you made that
18  observation?
19  A.  Detective Ciritella had fired on the subject
20  fearing for his life and I also fired fearing for not
21  only Detective Ciritella's life, but also the life of
22  anyone else that was at the scene or could encounter
23  this individual at some point in time thereafter if he
24  should escape.

Page 11

1  Q.  I am going to show you both a color and
2  black-and-white version of what we previously marked
3  as Deposition Exhibit Number 7.  Have you seen these
4  photos before?
5  A.  No.
6  Q.  Did you take any photos of the scene at all?
7  A.  No.
8  Q.  In that photo is a kind of
9  reddish/maroonish-color car.  Do you see that?
10  A.  Yes.
11  Q.  Do you know who was driving that particular
12  vehicle?
13  A.  Detective Ciritella.
14  Q.  Behind it is a marked squad car.
15  A.  Yes, ma'am.
16  Q.  Was that the car you were driving?
17  A.  It is.
18  Q.  The point at which you saw Officer Ciritella,
19  do you recall where he was standing?
20  A.  At what point are you referring to?
21  Q.  The first, initially when you first saw Officer
22  Ciritella, when you first saw him, where was he
23  standing?  Do you recall?
24  A.  After he exited the vehicle?

Page 12

1  Q.  Yes, sir.
2  A.  He took a position on the northeast corner of
3  5th and Harrison.
4  Q.  I'm going to show you what we previously marked
5  as Deposition Exhibit Number 4 and ask you if you've
6  seen these photos before.
7  A.  I have not seen them before.
8  Q.  Do you recognize what is depicted in Exhibit
9  Number 4?
10  A.  Yes, I believe so.
11  Q.  Can you tell me what that is?
12  A.  I believe this is the northeast corner of 5th
13  and Harrison Street.
14  Q.  On the black-and-white paper copy, not on the
15  original color copy, would you be kind enough to take
16  that red Magic Marker that's sitting there in front of
17  you and mark with a red X where you first saw Officer
18  Ciritella when he exited his vehicle?
19  A.  That wouldn't be depicted in this picture when
20  he first exited his vehicle.  We would have to go to
21  Number 7 here.
22  Q.  Is Number 7 a better shot of that?
23  A.  That only shows the driver's side of his
24  vehicle.

Page 13

1  Q.  I do have some other photos.  I tell you what.
2  I'm going to give you a handful of photos that may be
3  a little bit better and you can pick the one that you
4  think best depicts the scene as you recall it and then
5  I'll pull out the paper copy and then I'll have you
6  mark on the paper copy.  Okay?
7  A.  That sounds fine.
8  Q.  So I'm going to hand you four photos and you
9  tell me if any of these help you a little bit better
10  and then flip it on the back and you'll see a number
11  and tell me what number you're looking at.  Okay?
12  A.  For clarification, you're just asking where I
13  first saw him after he exited his vehicle; correct?
14  Q.  Yes.
15  A.  Not as he's exiting?
16  Q.  Correct.
17  A.  All right.  In that case, we can use Number 4
18  and I believe in this area here.  Right at the corner.
19  Q.  Okay.  So he was at the corner of the building?
20  A.  Yes.
21  Q.  He still is on the sidewalk?
22  A.  Yes.
23  Q.  Now, take a look again at the six photos that
24  you have in front of you and pick the one that you

4 (Pages 10 to 13)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS   Document 112-3   Filed 06/21/2006   Wilmington Police Department
C.A. # 04-1254 (GMS)                                          May 10, 2006
Page 8 of 10

Page 18

1  I'm still on that.
2  A.  Okay.  I believe I was in front of the vehicle
3  off to the driver's side front corner panel.
4  Q.  While I'm looking for a photo that I think may
5  help us, let me ask you about whether or not you
6  recall -- I found one, and I don't want you to mark on
7  this photo.  We haven't marked it as an exhibit.  I
8  don't think I actually want to mark it as an exhibit.
9  I just want to show it to you.
10       MR. PARKINS:  If you are showing it to the
11  witness, we need to mark it.
12       MS. SULTON:  You want to mark it?  Okay.  I
13  don't remember where we left off on the numbers.
14       (Kurten Exhibit 1 was marked for
15  identification.)
16  BY MS. SULTON:
17  Q.  I am showing you a photo that I believe was
18  taken after the car was removed from the scene of the
19  incident, and I think the vehicle physically may have
20  been inside a police garage or some other government
21  facility.  But it shows the car involved in this
22  incident.
23       When you say the front corner panel, can
24  you show me about, by just pointing to it with your

Page 19

1  finger because I don't want you to mark on the photo,
2  can you tell me where you think you fired your first
3  two or three rounds?
4  A.  If the car was here, I would be off in this
5  direction, off towards the front driver's tire, off at
6  an angle.
7  Q.  Do you think that you were shooting into the
8  windshield given what you just told me?
9  A.  Certainly that was my intention.
10  Q.  So you're not certain whether you hit the front
11  windshield and you're not certain whether you hit the
12  driver?
13  A.  From this depiction, no, I couldn't tell you.
14  Q.  But it's fair to say that you were positioned
15  somewhere in the intersection of 5th and Harrison as
16  you discharged your first two or three rounds?
17  A.  Yes.
18  Q.  The vehicle was heading in the direction where
19  you and Officer Ciritella were standing?
20  A.  Where Officer Ciritella was standing.  He
21  remained on the passenger's side of the vehicle the
22  entire time.  I was on the driver's side.  We were
23  never standing right next to each other.
24  Q.  There were two cars.  I believe we were looking

Page 20

1  at Exhibit Number 4.  Let me make sure I have the
2  right exhibit.  No.  I want to refer to that one right
3  there.
4  A.  This one?
5  Q.  Yes.  Number 7.  Can you mark on Exhibit
6  Number 7 approximately where you think you might have
7  been standing.
8  A.  What color ink this time, ma'am?
9  Q.  Red is good.
10  A.  Okay.
11  Q.  If you can mark it where you think you were
12  standing when you fired your first two or three
13  rounds.
14  A.  Okay.
15  Q.  Then after you fired your first two or three
16  rounds, what did you do?
17  A.  I observed the suspect vehicle continue on and
18  strike a parked jeep Cherokee that was parked on
19  Harrison Street at the 500 block.
20  Q.  Then what did you do?
21  A.  As the suspect vehicle struck the jeep
22  Cherokee, I observed this and it turned the vehicle
23  around 180 degrees and then the vehicle -- I wasn't
24  sure which path the vehicle was going to take, so I

Page 21

1  kept myself safe, first and foremost.  The vehicle
2  ended up going in a northbound manner at the corner of
3  5th and Harrison.
4  Q.  How did you keep yourself safe?
5  A.  Out of the path of the vehicle.  Made sure I
6  stayed behind the vehicle so if it were to drive
7  westbound or northbound, I wouldn't be in its path of
8  where it intended to go.
9  Q.  When you say "vehicle," we're talking about the
10  stolen police vehicle?
11  A.  Absolutely.
12  Q.  Then what did you do?
13  A.  As the vehicle continued northbound, I fired
14  either two or three more shots, the remainder of the
15  five, and that was my initial -- that is initially
16  what happened as it continued northbound.
17  Q.  When you fired the second two or three rounds,
18  were you behind the car?
19  A.  Yes, ma'am.
20  Q.  Was there any point at which you went, as you
21  were firing, on either side of the car so you'd be at,
22  say, a 3:00 or 4:00 position or 8:00 or 9:00 position?
23  A.  Did not occur, no, ma'am.
24  Q.  Do you know where you were aiming when you were

6 (Pages 18 to 21)

Page 22

1  firing the second two or three rounds?
2  **A. At the defendant -- or at Mr. Smith.**
3  Q. Were you aiming through the back window?
4  **A. Yes.**
5  Q. Did you shatter the back window with your
6  shots?
7  **A. I don't recall if I actually shot at the**
8  **windows or not.**
9  Q. You don't recall seeing them shatter?
10  **A. No.**
11  Q. When you were going up the hill -- and at that
12  point in the 500 block of Harrison Street it's a
13  fairly steep hill; correct?
14  **A. Yes, it does turn into one.**
15  Q. You were going up the hill shooting your gun?
16  **A. That would be accurate.**
17  Q. Were you running?
18  **A. No.**
19  Q. So if someone says that you were running, that
20  you ran up the hill, that's incorrect?
21  **A. Yes.**
22  Q. Do you recall the pace of your walk up the
23  hill?
24  **A. I would say slightly faster than my normal**

Page 23

1  **walking pace.**
2  Q. When you first shot at the car -- I'm going to
3  take you back to the first two or three shots -- how
4  far do you think you were from the vehicle at that
5  time?
6  **A. I would say within 15 feet. Maybe ten to 15**
7  **feet, in that area.**
8  Q. When you fired the second two or three shots,
9  how far do you think you were from the car?
10  **A. From the rear of the car or from where**
11  **Mr. Smith sat or what point are you looking at?**
12  Q. From the rear bumper of the car.
13  **A. Rear bumper?**
14  Q. Yes, sir.
15  **A. I'd say anywhere from 12 to 17 feet.**
16  Q. Was there any point at which the stolen police
17  vehicle got closer to you than, say, 15 feet, as best
18  you can recall?
19  **A. Only after it was placed in park and I**
20  **approached it.**
21  Q. At the point at which you were shooting, was
22  there any point at which the suspect vehicle got
23  within 15 feet or so of you?
24  **A. I do not believe so.**

Page 24

1  Q. After you stopped firing your weapon, what did
2  you then do?
3  **A. I reholstered it.**
4  Q. Then what did you do?
5  **A. Approached the driver's side of the vehicle.**
6  Q. Then what did you do?
7  **A. Mr. Smith was slumped over to his right.**
8  **Detective Ciritella opened the passenger door when he**
9  **deemed safe to do so he wouldn't be in any more**
10  **threat of harm. Put the car in park.**
11       **At that point in time I was met by, I**
12  **believe, Detective Donna DiClemente --**
13  **D-i-C-l-e-m-e-n-t-e, I believe -- at which point in**
14  **time other officers -- I'm not sure exactly who they**
15  **are -- approached and started tending to the victim.**
16  Q. Did you attempt to participate in taking
17  Mr. Smith out of the police vehicle?
18  **A. My initial reason for being there was to**
19  **attempt to render any assistance that I could. Other**
20  **officers being on the scene, I stepped back and they**
21  **took care of or they did everything else. I had no**
22  **further contact.**
23  Q. So is it fair to say that you were not involved
24  in removing Mr. Smith from the vehicle?

Page 25

1  **A. That would be accurate.**
2  Q. Did you look inside the vehicle?
3  **A. At what point?**
4  Q. At the point at which Officer Ciritella was
5  reaching into the car placing it in park.
6  **A. Just enough to see Mr. Smith slumped over to**
7  **the right-hand side.**
8  Q. Did you see a shotgun in that car?
9  **A. I did not look, nor did I see one.**
10  Q. Did you see a scalpel or any other weapon in
11  that car?
12  **A. Did not see one.**
13  Q. Did you write a report on this incident?
14  **A. No, I didn't.**
15  Q. Why not?
16  **A. Wasn't directed to do so. My interview was**
17  **taken by Detective Sergeant Brown at the time.**
18  Q. Did anyone tell you not to write a report?
19  **A. No.**
20  Q. Is there any other situation wherein you have
21  not written a report?
22  **A. More specific, please.**
23  Q. Any other situation in which you have not
24  written a report?

7 (Pages 22 to 25)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS    Document 112-3    Filed 06/21/2006    Page 8 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 10, 2006

Page 26

1      MR. PARKINS: I object to the form of the
2  question.
3    Q.  Is there any other situation involving a
4  serious police matter in which you did not write a
5  report?
6    A.  No.
7    Q.  Were you told why it was not necessary for you
8  to write a report in this case?
9    A.  No, I wasn't told.
10    Q.  Were you placed on administrative leave?
11    A.  I was.
12    Q.  For how long?
13    A.  Approximately seven months.
14    Q.  Do you know why you were on administrative
15  leave so long?
16    A.  Departmental policy until our city solicitor
17  office and the attorney general's office review the
18  case, all the facts.
19    Q.  You were paid for your leave; correct?
20    A.  I was.
21    Q.  Did you hold other employment during that time?
22    A.  I did not.
23    Q.  Did you see a psychologist subsequent to the
24  shooting on September 13, 2003?

Page 27

1    A.  I did.
2    Q.  How many times did you go?
3    A.  I believe it was two or three.
4    Q.  Have you seen a psychologist on the any other
5  time?
6    A.  In reference to shooting?
7    Q.  Any other time.
8      MR. PARKINS: Well, I object to the extent
9  that you are inquiring about events before the
10  shooting because I think they are clearly not relevant
11  to this case and inquire into potentially personal
12  matters.
13      MS. SULTON: Are you instructing him not to
14  answer?
15      MR. PARKINS: Yes.
16      MS. SULTON: What?
17      MR. PARKINS: Yes.
18  BY MS. SULTON:
19    Q.  Have you seen a psychologist subsequent to this
20  shooting incident?
21    A.  Yes.
22    Q.  Other than the two or three times?
23    A.  No.
24    Q.  Have you ever seen a psychologist in reference

Page 28

1  to aggressive behavior ever?
2    A.  No.
3    Q.  Why did you stop shooting your weapon on
4  September 13, 2003?  You said you fired a total of
5  five rounds.  Why did you stop shooting?
6    A.  As the incident unfolded, it appeared that
7  Mr. Smith was incapacitated.  I remember watching him
8  slump over to the right-hand side.  The car was
9  approached, safely put in park, and there was no
10  further use of force necessary at that point.
11    Q.  At what point did you see him slumping over?
12    A.  At some point in time, I believe, just prior to
13  the car stopping or as the car was still moving.  I
14  can't remember exactly.  But towards the end of the
15  incident, yes.
16    Q.  It's important for us to be clear on this
17  point.
18    A.  Okay.
19    Q.  But I have to go with your best recollection.
20    A.  Sure.
21    Q.  If you can, using your best recollection, at
22  what point did you first see Mr. Smith slumping over?
23    A.  At the end of the incident.  There were no more
24  shots fired after that certainly.

Page 29

1    Q.  What was the end of the incident?
2    A.  When the officers approached, the car was put
3  in park, and then aid was rendered to Mr. Smith the
4  best that they could.
5    Q.  So no shots were fired after the car was put in
6  park?
7    A.  Absolutely not.
8    Q.  Were there shots fired after the car stopped
9  before Officer Ciritella reached in and put the car in
10  park?
11    A.  No.
12    Q.  Did you shoot the female bystander that was on
13  the corner?
14    A.  I don't think it's ever been deemed who
15  actually shot her.
16    Q.  Before you fired your first two or three shots,
17  did you see the lady?
18    A.  Never, no.
19    Q.  Before you fired your first two or three shots,
20  did you see the children playing on the street in the
21  500 block of Harrison Street?
22    A.  Absolutely not.
23    Q.  Did you see the old lady on the porch in a
24  wheelchair in the 500 block of Harrison Street?

8 (Pages 26 to 29)

Page 30

1  A. No.
2  Q. Did you see David Quinn standing on the
3  sidewalk in the 500 block of Harrison Street?
4  A. No.
5  Q. Did you see a Hispanic gentleman who stands
6  about 5 foot 10, 5 foot 11, probably 250 pounds
7  standing on the street in the 500 block of Harrison?
8  A. No.
9  Q. Did you see any citizens not involved in this
10 incident on the street or on their porches in the 500
11 block of Harrison Street when you discharged any of
12 the five shots?
13 A. No.
14 Q. Did you see Officer Dempsey prior to the point
15 at which you fired your first two or three rounds?
16 A. I do not believe so.
17 Q. Did you see Officer Dempsey when you fired the
18 second two or three rounds as the car was going up the
19 hill?
20 A. At some point in time I believe I saw which
21 later turned out to be Mr. Dempsey, yes, or Sergeant
22 Dempsey, yes.
23 Q. At what point in time? You said "at some point
24 in time."

Page 31

1  A. Yes, ma'am. As we were going northbound on
2  foot in the 500 block of Harrison on foot I saw a blue
3  uniform off to my left which I believe was Sergeant
4  Dempsey.
5  Q. Do you recall the position that Officer Dempsey
6  was in relationship to the car as it was travelling
7  northbound in the 500 block of Harrison Street?
8  A. He would be off to the driver's side certainly.
9  I do not recall if he was on the street or the
10 sidewalk at that point in time. So if we are using
11 the front of the vehicle at 12:00, he'd be -- I don't
12 know, seven, eight, somewhere in there, I believe.
13 Q. As you were firing your weapon as you are going
14 up the 500 block of Harrison Street, were you aware at
15 the time that you were firing those two or three
16 rounds that Officer Ciritella was firing his weapon?
17 A. I can't recall specifically if we were in synch
18 or if he was totally engaging the stolen vehicle at
19 that point in time. I can't recall that, no.
20 Q. So as you sit here today, you can't recall
21 whether or not you were aware that he was shooting his
22 weapon as the car was going up Harrison Street?
23 A. In relationship to my shots fired, which I
24 believe your question was, I don't know at what point

Page 32

1  in time he was firing, as well.
2  Q. What about Sergeant Dempsey, were you aware as
3  you were going up Harrison Street that he was firing
4  his weapon?
5  A. I knew that shots were being fired. I don't
6  recall to this day exactly when or at what point
7  either were firing. I know there were other shots
8  being fired other than myself.
9  Q. At the time you were firing, you were hearing
10 shots, other shots being fired; correct?
11 A. Yes.
12 Q. Let me take you back to the beginning of the
13 pursuit, if I could.
14 A. Sure.
15 Q. Do you recall where you were and how you got
16 involved in this pursuit?
17 A. Absolutely.
18 Q. Can you tell me about that?
19 A. When the initial call came in through our
20 dispatch, I was in the 1300 block of West 5th Street.
21 Q. Why were you there?
22 A. I had a subject detained I was trying to
23 identify. At that point in time he was cut loose once
24 I heard the "shots fired; officers need assistance"

Page 33

1  and I started making my way towards the initial scene.
2  Q. If I could stop you for just a moment.
3  Did you hear the call for assistance come
4  over your vehicle radio or did you hear it because you
5  had some kind of handheld device?
6  A. I believe I was out of the car at that point in
7  time, so I had my handheld.
8  Q. Do you recall what you heard, specifically?
9  A. Specifically, no. I haven't listened to the
10 tapes. Certainly it sticks out in your mind when you
11 hear "shots fired" and "need assistance" or something
12 to those -- to that effect.
13 Q. So after you received the call, you then did
14 what?
15 A. I let the gentleman go and I started driving my
16 marked patrol vehicle towards the initial scene and I
17 was listening to the pursuit as it was called in.
18 Q. So let me stop you for a second, please.
19 A. Sure.
20 Q. Thank you.
21 So you were driving a marked unit; correct?
22 A. Yes.
23 Q. Was it equipped with a camera?
24 A. No.

9 (Pages 30 to 33)

Page 34

1    Q.  Had you ever heard that some of the cameras in
2    the cars that were equipped with cameras were not
3    working?
4    A.  That they were not working?
5    Q.  Yes.
6    A.  I can't say that I did or did not hear whether
7    they were not working.
8    Q.  Had you ever operated a police vehicle that had
9    a camera in the car?
10   A.  I believe that had it, yes, that had one.  Was
11   it functional at that point in time?  I don't believe
12   so.
13   Q.  You don't believe it was functional?
14   A.  No.  I've never used it myself as a tool.
15   Q.  So why do you think the car you were driving
16   didn't have a functional camera?
17   A.  Because I know it didn't have a camera.
18   Q.  No.  I'm not talking about on September 13,
19   2003.  Let me be clear in my question.
20       At some point prior to September 13, 2003,
21   had you operated a police vehicle that had a camera in
22   it?
23   A.  Yes.
24   Q.  Did that camera work?

Page 35

1    A.  I'm not sure.
2    Q.  Okay.
3    A.  I know they were at the beginning stage or at
4    the inception of the program, and I believe they were
5    still setting up all the cameras and everything, so it
6    was certainly never activated and I couldn't tell you
7    whether it worked or not.
8    Q.  But you hadn't heard that the cameras didn't
9    work?
10   A.  Not to my recollection.
11   Q.  So after you let go of the suspect that you had
12   in another matter, you decided to join the pursuit on
13   September 13, 2003?
14   A.  Eventually, yes.  I was, I guess you could say,
15   part of it.
16   Q.  Do you recall where you were when you joined
17   the pursuit?
18   A.  Yes.
19   Q.  At what street intersection?
20   A.  Yes, I do.
21   Q.  Can you tell me where that was?
22   A.  4th Street and Jackson Street, 4th and Jackson.
23   Q.  When you joined the pursuit, were there any
24   other police vehicles involved in the pursuit?

Page 36

1    A.  Yes.
2    Q.  Can you tell me what you recall were the other
3    vehicles involved, police vehicles involved in the
4    pursuit?
5    A.  As I was on Jackson Street right at 4th Street,
6    I remember seeing the stolen vehicle and then I could
7    say two or three marked units, marked police units.
8    Q.  Were they right behind?
9    A.  Yes, pursuing it, actively pursuing it.  And
10   then a couple detective cars were behind that.
11   Q.  When you say "detective cars," you mean
12   unmarked?
13   A.  Unmarked, yes, ma'am.
14   Q.  What else did you see?
15   A.  They were just basically in a caravan heading
16   westbound on 4th Street at Jackson.
17   Q.  Is it fair to say that you saw five or six
18   police vehicles including the stolen vehicle?
19   A.  I think that would be fair.
20   Q.  So your vehicle would have been the 6th or 7th?
21   A.  Yeah.  At the point where I joined in, yes.
22   Q.  Do you recall how fast those cars were going
23   down the road in what appears to be some sort of
24   caravan?

Page 37

1    A.  I would say certainly the speed limit is 25
2    there.  Over 25.  If I had to -- I don't know if I
3    could give you an accurate estimate.  But certainly it
4    was in excess of that in my opinion.
5    Q.  In excess of 25?
6    A.  Yes, ma'am.
7    Q.  Do you think it was in excess of 40?
8    A.  Again, in just my opinion, I'm certainly not
9    trained on that.  I would say somewhere in that
10   vicinity, maybe 40 to 50, in that range in my opinion.
11   Q.  You're not trained in observing car speeds?
12   A.  No.  Just not by visual, no.
13   Q.  At what point did you activate your lights and
14   siren, if you did?
15   A.  I believe they were activated as soon as the
16   call for assistance came in and I was able to leave
17   the 1300 block of West 5th Street.
18   Q.  So as you were joining the pursuit, did you
19   hear the sirens of any other police vehicles?
20   A.  I believe I did coming over the radio broadcast
21   as they were calling in the direction and the path of
22   pursuit, yes.
23   Q.  As you joined the pursuit, do you recall
24   hearing the sirens and seeing the lights of other

10 (Pages 34 to 37)

Case 1:04-cv-01254-GMS    Document 112-3    Filed 06/21/2006    Page 11 of 41
Estate of Harry Smith, III, et al.                                    Wilmington Police Department
Matthew W. Kurten                                                     May 10, 2006
C.A. # 04-1254 (GMS)

**Page 38**

1 police vehicles involved in the pursuit?
2 A. At 4th and Jackson Street you're referring to?
3 Q. Yes.
4 A. Yes, ma'am.
5 Q. Was there any point at which prior to engaging
6 the stolen vehicle that you observed personally any of
7 the sirens or lights on the other vehicles being
8 turned off?
9 A. No.
10 Q. Did you ever turn off your lights and siren?
11 A. At 5th and Harrison I believe I shut off my
12 siren. I believe my lights were left on, to the best
13 of my recollection, after I was parked and as I was
14 exiting my vehicle.
15 Q. Did you turn off the ignition of your vehicle
16 when you exited?
17 A. I can't recall at this time.
18 Q. If you turned off your ignition on your
19 vehicle, does it turn off the lights and the siren?
20 A. No.
21 Q. You can keep both on?
22 A. I'm not 100 percent sure about the siren, but
23 the lights certainly can remain on.
24 Q. Then what happened? I'm going to take you back

**Page 39**

1 to Jackson where you joined the pursuit.
2 A. Okay.
3 Q. Tell me then what happened.
4 A. When I had the opportunity, I joined the line
5 of vehicles. The suspect vehicle went northbound on
6 VanBuren from 4th Street. In an attempt to parallel
7 the chase, I continued westbound on 4th. I heard at
8 some point, I guess when I was approaching 4th and
9 Harrison, that the suspect vehicle was going west on
10 5th.
11 Q. So let me stop you for one second if I could.
12 A. Sure.
13 Q. When you joined the pursuit on Jackson, you saw
14 vehicles in front of you; correct?
15 A. Yes.
16 Q. Did you see any vehicles behind you?
17 A. I believe there was vehicles coming, but I
18 couldn't tell you how many or exactly what point.
19 That was not -- I had a clear shot to get into the
20 line, so that's when I did it.
21 Q. As you're now part of this line or caravan of
22 police vehicles, do you recall any other police
23 vehicle getting behind you?
24 A. I couldn't tell you one way or the other.

**Page 40**

1 Q. So there was a point at which the stolen
2 vehicle makes a right-hand turn; correct?
3 A. Northbound on VanBuren, 400 block, yes.
4 Q. You didn't follow the line of police cars;
5 correct?
6 A. Correct.
7 Q. Do you recall if you were the first car that
8 did not follow the line of police cars making the
9 right-hand turn with the stolen car?
10 A. I was not.
11 Q. Who was the first car, if you recall?
12 A. Detective Ciritella.
13 Q. So you were following Detective Ciritella?
14 A. It's fair to say.
15 Q. Were you following Detective Ciritella for the
16 entire point at which you were involved in the pursuit
17 from when you entered it around Jackson Street?
18 A. I -- as it turns out, he may well have been the
19 person right in front of me when I first engaged or I
20 first joined the pursuit. I do know that I did follow
21 him from 4th and VanBuren, westbound on 4th to
22 Harrison, north to 5th.
23 Q. Were you in radio contact with Detective
24 Ciritella?

**Page 41**

1 A. There was no time for that.
2 Q. All right. So you just saw him go straight,
3 essentially --
4 A. Yes.
5 Q. -- when everyone else was turning and you
6 decided to follow him; correct?
7 A. I believe that was the wise choice at the time,
8 yes.
9 Q. So you followed him. When he parked at the
10 intersection of 5th and Harrison Street, then you
11 parked right there along with him; correct?
12 A. Behind him, yes.
13 Q. Did you see Officer Dempsey park in the
14 vicinity of 5th and Harrison, as well?
15 A. No.
16 Q. Did you see any other police cars parked in the
17 vicinity of 5th and Harrison?
18 A. Not at that point in time.
19 Q. So now I want to take you to the point where
20 you parked at 5th and Harrison.
21 A. Okay.
22 Q. Did you see Detective Ciritella get out of his
23 unmarked police vehicle before you got out of yours?
24 A. Yes. I believe he parked and exited prior to

11 (Pages 38 to 41)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS   Document 112-3   Filed 06/21/2006   Page 12 of 40
C.A. # 04-1254 (GMS)

Wilmington Police Department
May 10, 2006

Page 42

1  me.
2  Q.  How much time do you think elapsed between the
3  time that you saw Detective Ciritella get out of his
4  vehicle and move to the position that you marked on
5  the exhibit for us and the time at which you got out
6  of your vehicle?
7  A.  At the time at which Detective Ciritella got
8  out of his vehicle and moved to that position by the
9  wall at 5th and Harrison, northeast corner?  Is that
10  what you're referring to?
11  Q.  Right.  And the time that you got out of your
12  vehicle.
13  A.  It was very quick.  A matter of seconds.
14  Q.  When you first got out of your vehicle, where
15  did you position yourself?
16  A.  Initially I saw the suspect vehicle in the 1100
17  block of West 5th Street.
18  Q.  How far away was the vehicle from you when you
19  first saw it on that 1100 block?
20  A.  It was still moving westbound, I believe, at
21  the time very slow.  I would say -- I don't know --
22  maybe 40, 50 feet east of me.
23  Q.  Did you ever see the vehicle stop, the stolen
24  police vehicle stop?

Page 43

1  A.  Yes, at one point it did.
2  Q.  When it stopped, how far away was it from you
3  at that point?
4  A.  Again, when it stopped, I actually made my way
5  into the 1100 block of West 5th Street on the south
6  side of the street on the sidewalk using other parked
7  vehicles as cover to try to see if I can't get a
8  closer visual on the suspect.
9      So the closest point in time where I was in
10  relation to him, I would say I was maybe 15, 20 feet
11  away when the vehicle was stopped -- the suspect
12  vehicle was stopped initially.
13  Q.  When say that you were 15 to 20 feet away from
14  the stolen vehicle when you first observed it and it
15  was stopped, how far away were you from the police
16  vehicle that you were driving?
17  A.  At the point where I was closest to him?
18  Q.  Yes, sir.
19  A.  Maybe 15, 20 feet.  Maybe a couple -- maybe a
20  couple car lengths.  Somewhere in that vicinity.
21  Fifteen to 25 feet, I would say.
22  Q.  Is it fair to say that when you got out of your
23  vehicle that you then walked toward the suspect
24  vehicle?

Page 44

1  A.  I would not put myself in danger and walk in
2  the middle of the road, no, towards him.  That's my --
3  what I'm picturing right now, I would not do that.
4  Q.  Were you walking on the sidewalk?
5  A.  Yes, on the south side of the street.
6  Q.  Were there other vehicles parked on the south
7  side of that street?
8  A.  Certainly.  Certainly.
9  Q.  Did you see any citizens on the street as you
10  were walking toward the suspect vehicle?
11  A.  I did not.
12  Q.  On either side of 5th Street?
13  A.  I don't recall seeing any.
14  Q.  At the point that you were closest to the
15  vehicle when it was on 5th Street parking and it was
16  stopped, I should say, at the point at which you were
17  the closest to it, did it then begin moving?
18  A.  At a certain point, yes, it began accelerating.
19  Q.  Do you recall how long it sat there stopped,
20  the stolen vehicle, before it started moving again?
21  A.  I would say -- I don't know.  Five to ten
22  seconds.  Certainly enough time for him to heed the
23  warnings of Detective Ciritella and exit the vehicle.
24  Q.  Did you hear Detective Ciritella issue verbal

Page 45

1  orders?
2  A.  Yes, I did.
3  Q.  What did you hear him say?
4  A.  Stop.  Police.  Exit the vehicle.  Turn off the
5  car.  I don't know verbatim at this point in time due
6  to the time frame, but certainly along those lines.
7  Q.  Do you wear glasses?
8  A.  No.
9  Q.  Contacts?
10  A.  No.
11  Q.  Do you have 20/20 vision?
12  A.  I don't know offhand my last reading.
13  Q.  But it's fair to say that you have vision good
14  enough where you don't wear glasses?
15  A.  Certainly good enough where I don't have to
16  wear glasses.
17  Q.  It was daylight?
18  A.  Yes.
19  Q.  Were you able to see into the vehicle to see
20  Mr. Smith?
21  A.  Yes.
22  Q.  Do you recall whether or not Mr. Smith saw you
23  and was aware of you?
24  A.  I believe his attention, from what I could see,

12 (Pages 42 to 45)

Estate of Harry Smith, III, et al.     Document 112     Filed 06/21/2006     Page 13 of 40
Estate of Harry Smith, III, et al.                                                    Wilmington Police Department
Matthew W. Kurten                              C.A. # 04-1254 (GMS)                              May 10, 2006

Page 46

1  basically stayed straightforward and/or towards the
2  direction of Detective Ciritella. So I don't know if
3  he saw me, and certainly I don't believe I made eye
4  contact with him, so...
5  Q. So a few seconds pass and then the stolen
6  vehicle begins moving; is that correct?
7  A. That's correct.
8  Q. As that vehicle is moving, what did you then
9  do?
10 A. I moved around back up the sidewalk to 5th and
11 Harrison Street to the intersection. And as I
12 observed it going up on the sidewalk as its only
13 possible avenue of escape, the one actually that he
14 chose, I moved myself around eventually towards the
15 front of Detective Ciritella's car. So I had to
16 circle a few cars just to get back into position.
17 Q. Is it fair to say that as you were going back
18 down the sidewalk and back into the street that you
19 were using the various vehicles, whether they were
20 citizen-parked vehicles or police vehicles, kind of as
21 cover for you so that you would not put yourself
22 physically in between yourself and that car?
23 A. Absolutely.
24 Q. Then when you got back around, coming around

Page 47

1  the rear bumper of your car and the side of Detective
2  Ciritella's car, that was when you discharged your
3  weapon; correct?
4  A. After Detective Ciritella feared for his life
5  and discharged his, yes.
6  Q. Did you ever look up the hill to see if other
7  police units had positioned themselves at the top of
8  the hill which then would be 6th and Harrison?
9  A. As the incident was unfolding?
10 Q. Yes, sir.
11 A. I will say that I did not notice any up there.
12 I think -- I believe the majority of the units would
13 be -- involved in the pursuit would be behind us, not
14 up at that point. So, no, I did not see any up there.
15 Q. Did you look?
16 A. Can't say that I did.
17 Q. I want to take you back to when you were on the
18 sidewalk on 5th Street and the point at which you saw
19 the stolen vehicle stopped.
20      Do you recall seeing any police units
21 behind that car?
22 A. Yes.
23 Q. Do you recall what you saw in terms of whether
24 they were marked or unmarked?

Page 48

1  A. I guess my attention at that point in time -- I
2  know there was a couple marked. I don't know if there
3  was two, three. I don't have a number, but I know
4  that they were directly behind the stolen vehicle.
5  Q. Do you know whether or not they still had their
6  lights on?
7  A. I believe they did, yes.
8  Q. Do you know if they had their sirens on?
9  A. At that point in time I couldn't tell you who
10 did or who didn't out of everybody.
11 Q. At that moment did you hear sirens, do you
12 recall?
13 A. Yes.
14 Q. Was there any point at which you did not hear
15 sirens? From the point at which you got out of your
16 car to the point at which you stopped shooting your
17 weapon, do you recall any point at which you did not
18 hear sirens?
19 A. I don't recall.
20 Q. Did you hear sirens at the time that Officer
21 Ciritella was issuing verbal commands to Mr. Smith?
22 A. I believe there were at that point in time.
23 Q. From your vantage point, could you tell whether
24 or not the windows were up or down on that stolen

Page 49

1  police vehicle?
2  A. The driver's side front window where he was
3  seated was up at that point in time.
4  Q. Did you see any windows on that police vehicle
5  down from your vantage point?
6  A. I couldn't tell the passenger side at all.
7  Q. Did you ever receive any training on car chases
8  or car pursuits and what kind of steps you should take
9  when involved in pursuit of a vehicle?
10 A. We do have -- in our Wilmington police
11 officer's manual, we do have a directive that has
12 guidelines. Yes, we received direction under that.
13 Q. So I want to move you from the "we" to the you,
14 if I could --
15 A. Okay.
16 Q. -- to focus on what you personally have
17 experienced in terms of training.
18 A. Yes.
19 Q. So have you received specifically training
20 beyond just someone giving you guidelines and saying
21 read this, this is the policy or this is our
22 guideline? Have you received any training on what you
23 should do when you're involved in a car chase
24 situation?

13 (Pages 46 to 49)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS    Document 112-3    Filed 08/21/2006    Page 14 of 40

Wilmington Police Department
May 10, 2006

Page 50

1    A.  As part of our basic officer's course in the
2    police academy, there's, I believe -- I'm not sure if
3    it's defensive driving or a pursuit driving course
4    where we actually physically go out and try the
5    vehicles and maneuver.  So if that's what you're
6    looking for, yes.  Other than that, I can't say that I
7    have.
8    Q.  Have you received any training in shooting at
9    moving vehicles?
10   A.  No.
11   Q.  Have you ever received any guidelines,
12   directives, or policy statements or any kind of
13   training whatsoever as it relates to whether or not
14   you should or should not shoot at a moving vehicle?
15   A.  I don't think should or should not -- to answer
16   your question, no, in that terminology, should or
17   should not.
18   Q.  Have you ever received any guidance at all in
19   terms of whether you should or should not shoot at a
20   moving vehicle?
21       MR. PARKINS:  It's been asked and answered.
22       You can answer again.
23   A.  Certainly shooting at a motor vehicle, no.
24   There is a section with our pursuit policy and

Page 51

1    use-of-force policy as far as exigent circumstances.
2    Q.  What is your understanding of what you should
3    or should not do as it relates to moving at a shooting
4    vehicle?
5    A.  Moving at a shooting vehicle?
6    Q.  Yes.  Shooting at a moving vehicle.
7    A.  I don't think -- there's nothing in black and
8    white saying that.  Certainly if a threat is
9    perceived, as I mentioned before, to myself and
10   another officer, citizen, then certainly exigent
11   circumstances allow or permit for the use of deadly
12   force.
13   Q.  That includes shooting at a moving vehicle?
14   A.  That would certainly include it.
15   Q.  Have you received any training in reference to
16   using your -- well, let me ask the question this way
17   first:  When you parked your car at the intersection
18   of 5th and Harrison, why did you park it in the
19   fashion that you did as depicted in the photograph we
20   previously marked?
21   A.  In the best interest of public safety.
22   Q.  Tell me:  What do you mean by that?
23   A.  At that point, in that certain block, if we
24   could end this pursuit, end this matter, hopefully in

Page 52

1    a peaceful manner, by my parking the vehicle there,
2    then I believe the exigent circumstances existed and I
3    was just in doing so.
4    Q.  I'm sorry.  I'm not being clear in my question.
5    Let me try again.
6    A.  Okay.
7    Q.  Did you park your vehicle in that manner
8    because you were using it as a blockade or barricade
9    to stop the progression of the stolen vehicle up
10   5th Street?
11   A.  Certainly that was my hope so no other lives of
12   citizens would be in danger.
13   Q.  So you were using your vehicle as a barricade;
14   correct?
15   A.  Yes.  I guess you could say that.
16   Q.  Have you received any training that says you
17   should use your police vehicle as a barricade in a car
18   pursuit or car chase situation?
19   A.  Again, I can't say that happened, but certainly
20   my discretion, I believe it was warranted.
21   Q.  Is there anything in your policy manual that
22   authorizes you to use your police vehicle as a
23   blockade or barricade in a car chase situation?
24   A.  I'm not 100 percent sure if there is or is not

Page 53

1    at this point in time.
2    Q.  Were you dressed in your uniform on
3    September 13, 2003?
4    A.  Actually, I was in a bicycle uniform, but, yes,
5    it was marked with Wilmington police decals and had a
6    badge on it, yes.
7    Q.  Have you ever received any training as it
8    relates to shooting at moving targets or at targets
9    that are moving?
10   A.  I want to say that I have at probation and
11   parole some type of device or some type of object that
12   they had fixed that would move on you or flip a turn.
13   And also doing shoot or no shoot, which is a simulated
14   shooting where you would decipher between your --
15   between your targets whether to shoot or not shoot,
16   and certainly they would be moving at the time.
17   Q.  Was that a video simulation --
18   A.  Yes.
19   Q.  -- shooting sideways --
20   A.  That would be.
21   Q.  -- where you go into a room and they put a
22   video up and they show you a film and you're standing
23   there with either real or looks real handgun and they
24   have people pop up and you are kind of trained whether

14 (Pages 50 to 53)

Estate of Harry Smith, III, et al.
Matthew W. Kurten

Case 1:04-cv-01254-GMS    Document 112-3    Filed 06/21/2006    Page 15 of 40

Wilmington Police Department
C.A. # 04-1254 (GMS)    May 10, 2006

Page 58

1    place, if you will, the action, certainly no.
2    Q.  Have you ever been disciplined?
3    A.  I received one written reprimand at the
4    Wilmington police.
5    Q.  That was for this matter we previously
6    discussed?
7    A.  Yes, ma'am.
8    Q.  Have you ever been sued before?
9    A.  No.
10   Q.  Have you ever been arrested?
11   A.  Traffic tickets a long time ago.
12   Q.  Can you define for me or can you tell me what
13   your understanding of excessive force is?
14   A.  Force which is over and above the reasonable
15   amount necessary to effect an arrest.
16   Q.  Can you define for me or tell me what your
17   understanding of reasonable force is?
18   A.  That minimal use of force necessary to effect
19   an arrest.
20   Q.  Did you leave the scene of the incident prior
21   to any ambulances arriving?
22   A.  I believe the ambulances were there or had
23   arrived prior to leaving.
24   Q.  How did you leave the scene?

Page 59

1    A.  By vehicle.
2    Q.  Whose vehicle?
3    A.  Lieutenant Mulrine, M-u-l-r-i-n-e.
4    Q.  Why didn't you drive yourself away?
5    A.  Because my vehicle was part of the crime scene
6    and he was the commanding officer at that point in
7    time.
8    Q.  Where did he take you?
9    A.  We went to Dunkin' Donuts and then we went back
10   to the detective division conference room.
11   Q.  What did you do when you got there?
12   A.  To detective division or Dunkin' Donuts?
13   Q.  Well, I know what you were doing at
14   Dunkin' Donuts.
15        If you would tell me what you were doing
16   when you got to the detective bureau, please.
17   A.  We were sequestered in their conference room
18   and we remained there until we spoke with our attorney
19   and we were free to leave.
20   Q.  How long were you there before you left, before
21   you were told you were free to leave?  Do you recall
22   how much time passed?
23   A.  I believe the incident happened at six
24   something, 6:18, if I'm not mistaken.  So we were

Page 60

1    probably there from, I would say, seven till three in
2    the morning, maybe two in the morning.  We were there
3    for quite a while, the best I can recollect.
4    Q.  Why do you think the incident happened at 6:18?
5    A.  I believe that's the time it happened, if I'm
6    not mistaken.
7    Q.  Any particular reason why you chose that time?
8    A.  No.
9    Q.  Could it have been earlier?  Could it have been
10   later?
11   A.  I have six in my head, so that's what I said.
12   Q.  During the six hours or so that you were at the
13   police station, did you provide any verbal statements
14   about what happened?
15   A.  Yes.
16   Q.  To whom did you provide those statements?
17   A.  That would be in the -- initially to my lawyer,
18   would be Jeffrey Weiner, W-e-i-n-e-r.  And after that,
19   after I consulted with him, we sat down with Detective
20   Sergeant Brown at the time.
21   Q.  I don't want you to tell me anything that you
22   said to your lawyer.
23   A.  Understood.
24   Q.  But if you would tell me what you told the

Page 61

1    investigating officer for the police department that
2    you recall.
3    A.  Basically the accounts that were given today.
4    If you want me to recount them, I can certainly do
5    that.
6    Q.  Not necessarily.
7        Was there anything different that you told
8    him than you told me today?
9    A.  No.
10   Q.  So everything that you told me today is the
11   same as what you told the investigating officer that
12   evening?
13   A.  To the best of my recollection, yeah.
14   Q.  Other than your service gun, did you have any
15   other police equipment on your person?
16   A.  Yes.
17   Q.  Other than your radio and your gun, what else
18   did you have?
19   A.  I had my full-duty belt on, handcuffs,
20   CAP-Stun, baton, flashlight.
21   Q.  You weren't injured in this incident, were you?
22   A.  No.
23   Q.  Do you know if anyone was injured outside the
24   lady who was shot while she was on her porch and

16 (Pages 58 to 61)

Page 66

1    may have received on use of force or use of deadly
2    force.
3        Do you recall, or let me put it this way:
4    As we look at your training at or before September 13,
5    2003, are you including in your training receiving
6    copies of documents that may talk about directives or
7    policy statements or guidelines?
8    **A.  It may very well have been.  Off the top of my**
9    **head, I cannot remember that far back what I may or**
10   **may not have received or when and where.**
11   Q.  Is your understanding of the use-of-force
12   continuum that it tells you when to use force and how
13   much force you should use?  Is that your understanding
14   of what the use-of-force continuum is?
15   **A.  I think it's inaccurate to say when to use it.**
16   **It gives you guidelines, gives you guidelines.  As**
17   **actions of a defendant suspect are escalated, you can**
18   **certainly escalate your actions.  If they de-escalate,**
19   **you need to de-escalate.  It's a continuum.  Certainly**
20   **there are guidelines there to follow.**
21       MS. SULTON:  Thank you for your time.  I'm
22   done.
23       THE WITNESS:  Thank you.
24

Page 68

1        INDEX TO TESTIMONY
2
3
THOMAS CLIFTON DEMPSEY                    PAGE
4
5    Examination by Ms. Sulton                2
     Examination by Mr. Parkins               67
6
7
8        - - - - -
9
10       INDEX TO EXHIBITS
11
DEMPSEY EXHIBIT NO:                        PAGE
12
13   1  A photograph                         18
14   2  A multipage copy of Defendant Matthew
15   Kurten's Responses to Plaintiff's First
     Request for Admissions               63
16
17       - - - - -
18
19
20
21
22
23
24

Page 67

1    BY MR. PARKINS:
2    Q.  I have one question, Sergeant.
3        Can you estimate for us the amount of time
4    that elapsed from the end of the shooting until you
5    left with Lieutenant Mulrine?
6    **A.  I would say anywhere between maybe ten**
7    **minutes -- ten, 15 minutes, in that area.**
8        MR. PARKINS:  Thank you.
9        Nothing further.  We will reserve reading
10   and signing.
11       Thanks.
12       (The deposition was then concluded at
13   11:35 a.m.)
14       - - - - -
15
16
17
18
19
20
21
22
23
24

Page 69

1
2
3
4
5
6
7
8        REPLACE THIS PAGE
9
10       WITH THE ERRATA SHEET
11
12       AFTER IT HAS BEEN
13
14       COMPLETED AND SIGNED
15
16       BY THE DEPONENT.
17
18
19
20
21
22
23
24

18 (Pages 66 to 69)

Estate of Harry Smith, III, et al.
Charles Vincent Romano

Document 112-3    Filed 06/21/2006    Page 17 of 40

Case 1:04-cv-01254-GMS

v.

C.A. # 04-1254-GMS

Wilmington Police Department, et al.
May 9, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,      )
HARRY SMITH, JR., and            )
ROSLYN WOODARD SMITH,            )
                                 )
          Plaintiffs,            )
                                 )  Civil Action No.
v.                               )  04-1254-GMS
                                 )
WILMINGTON POLICE DEPARTMENT,    )
MICHAEL SZCZERBA and ONE OR      )
MORE JOHN DOES,                  )
                                 )
          Defendants.            )


          Deposition of CHARLES VINCENT ROMANO taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 4:25 p.m. on Tuesday,
May 9, 2006, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          JOHN A. PARKINS, JR., ESQUIRE
          K. TYLER O'CONNELL, ESQUIRE
          RICHARDS, LAYTON & FINGER
            One Rodney Square - Third Floor
            Wilmington, Delaware  19899
            for the Defendants Wilmington Police
            Department and Michael Szczerba


          ------------------------------------------------
                         WILCOX & FETZER
            1330 King Street - Wilmington, Delaware 19801
                         (302) 655-0477

Page 10

1  A. Oh, yeah, yeah.
2  Q. What did you think had happened when you heard
3  the motor rev up?
4  A. I knew he was going to leave because obviously
5  he was trying to get away and didn't realize he wasn't in
6  gear and hit the gas in neutral and, of course, he wasn't
7  going to go anywhere in neutral or in park. And put it
8  in gear and then drove off.
9  Q. Did you observe the officers' attempt to stop
10 him before he left?
11 A. Yes. They -- like I said, they ran back to the
12 car -- because the car, as I recall, was parked at an
13 angle, once it broke away, one officer was on one side of
14 the car and they kind of split up and then the other one
15 was coming around. So the other officer had to walk
16 around the front of the car. And by then he broke away
17 from the one other, to the best of my recollection, and
18 just shot right to the other car, the police car.
19 So by the time the other guy got around, he
20 was already in the car and that's -- then they drew their
21 weapons and he was taking off. And it was too late then.
22 They couldn't have stopped him then.
23 Q. The suspect eventually was able to put the car
24 in gear?

Page 11

1  A. Yes, he was.
2  Q. Could you please describe his driving?
3  A. He took off pretty quick, as fast as he could.
4  And he just blew across the intersection and passed me in
5  front of my car. And I backed up because the officers
6  did draw their weapons and were about to fire, I assume,
7  and they did. And as far as I remember, he just drove --
8  just drove past me at full throttle, I would imagine.
9  Q. Do you recall when the officers fired their
10 weapons?
11 A. He had -- after he had taken off from the car
12 after he tried to flee the scene.
13 (Discussion off the record.)
14 BY MR. O'CONNELL:
15 Q. When you spoke with the police, you
16 characterized his driving as being like a bat out of
17 hell?
18 A. Yes, that's what I did say. He took off like a
19 bat out of hell the way I recall it.
20 Q. Is that how you recall it?
21 A. Yes.
22 Q. Do you know what color the light was at 12th and
23 Washington?
24 A. No, I don't. I don't recall that. I don't

Page 12

1  think it mattered to him, anyway.
2  MR. O'CONNELL: No further questions.
3  (The deposition was then concluded at
4  4:40 p.m.)
5  - - - - -
6  INDEX TO TESTIMONY
7
8
   CHARLES VINCENT ROMANO                    PAGE
9
10 Examination by Mr. O'Connell               2
11
   - - - - -
12
13 INDEX TO EXHIBITS
14
   ROMANO EXHIBIT NO.:                       PAGE
15
16 1  An 11-page copy of the typewritten interview
   of Charles Romano                          8
17
18 - - - - -
19
20
21
22
23
24

Page 13

1
2
3
4
5
6
7
8  REPLACE THIS PAGE
9
10 WITH THE ERRATA SHEET
11
12 AFTER IT HAS BEEN
13
14 COMPLETED AND SIGNED
15
16 BY THE DEPONENT.
17
18
19
20
21
22
23
24

4 (Pages 10 to 13)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


| | |
|---|---|
| HARRY SMITH, JR. and ROSLYN WOODARD SMITH, individually and as Administrators of the ESTATE OF HARRY SMITH, III, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action ) No. 04-1254-GMS ) |
| CITY OF WILMINGTON, JOHN CIRITELLA, THOMAS DEMPSEY and MATTHEW KURTEN, | ) ) ) ) |
| Defendants. | ) |


          Deposition of ROSLYN WOODARD SMITH taken pursuant to notice at the law offices of Richards, Layton & Finger, One Rodney Square, Third Floor, Wilmington, Delaware, beginning at 10:15 a.m., on Tuesday, May 30, 2006, before Kurt A. Fetzer, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          KESTER I.H. CROSSE, ESQ.
          WILLIAMS & CROSSE
            1214 King Street - Suite 300
            Wilmington, Delaware  19801
                 - and -
          ANNE T. SULTON, ESQ. (Via teleconference)
          SULTON LAW OFFICES
            Post Office Box 2763
            Olympia, Washington  98507
            For the Plaintiffs

                  WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A57

```
1   APPEARANCES:  (Cont'd)

2           JOHN A. PARKINS, JR., ESQ.
            RICHARDS LAYTON & FINGER
3             One Rodney Square - Third Floor
              Wilmington, Delaware  19801
4                  - and -
            ROSAMARIA TASSONE, ESQ.
5           CITY OF WILMINGTON LAW DEPARTMENT
              City/County Building - 9th Floor
6             Wilmington, Delaware  19801
              For the Defendants

7

8                 -   -   -   -   -

9           MS. SULTON:  I had a conversation

10  yesterday with Harry Smith and it is clear to me that

11  he is not yet beyond the effects of a massive stroke

12  and heart attack he had just a few months ago.  He

13  spent almost two months in the hospital and it's my

14  understanding that he continues to be under the care

15  of a doctor and currently is under the care of a

16  speech therapist.  And I believe as we are speaking

17  this morning that he is on his way to a speech

18  therapist.

19          I do not know when he will be in a

20  position, in a physical position to provide a

21  deposition in this case.  I do believe that the

22  defendants have a right to depose him and so I will be

23  in touch with his healthcare provider to try to get

24  some idea of when that might be, that is, his ability
```



```
1    to do a deposition.  And then I think we should alert

2    the Court to the fact that I do not think we will be

3    able to take Harry's deposition within the discovery

4    time frame that we have set forth and to allow his

5    deposition to be taken whenever it can be taken by the

6    defense.

7              MR. PARKINS:  Thank you, Anne.  I

8    appreciate that report.

9              I'm, of course, sorry to hear that

10   Mr. Smith has been under the weather.  And I would

11   appreciate it if you keep me posted from time to time

12   on how he's doing.  And, of course, we will not take

13   his deposition until he's medically able.

14             I will write a letter to the Court just

15   sort of memorializing that he has been ill and was

16   unable to attend his deposition today and that we hope

17   to take his deposition when he gets better without

18   leave of Court.

19             MS. SULTON:  That's fine.

20             MR. PARKINS:  Thank you.

21             Do you want to swear the witness?

22                  -   -   -   -   -

23

24
```



1              ROSLYN WOODARD SMITH,

2        the deponent herein, having first been

3        duly sworn on oath, was examined and

4        testified as follows:

5                      EXAMINATION

6    BY MR. PARKINS:

7      Q.   Mrs. Smith, as you know, my name is John

8    Parkins and I represent the City of Wilmington and the

9    three police officers that you and your former husband

10   have sued.

11              Seated next to me is my colleague, Rose

12   Tassone, who also works on this case and who is

13   involved and works for the city's attorneys' office.

14   I'm about to ask you a number of questions relating to

15   your son and to his death and I understand how painful

16   this must be for you.  And I certainly have no desire

17   to make it more painful than it needs to be.

18              If at any time you would like to take a

19   break for whatever reason, please let us know and we

20   will be happy to accommodate you.

21              And if at any time I ask you any questions

22   which don't seem clear to you, please let me know and

23   I will be happy to rephrase it so that we're sure that

24   both of us understand it.



1              Is that okay?

2      A.   Yes.

3      Q.   Are you taking any medications or suffering

4   from any illnesses which would make it difficult for

5   you to give your deposition today?

6      A.   No.

7      Q.   Is there any reason that you can think of why

8   you should not be giving your deposition today?

9      A.   No.

10     Q.   When were you and Harry Smith, Jr. married?

11     A.   May of 1976.

12     Q.   Now, I gather at the time of your son's death

13  you and Mr. Smith were not married?

14     A.   Correct.

15     Q.   When were you divorced?

16     A.   The year was February 2003 -- no.

17              2001.

18     Q.   All right.  I understand that Harry Smith, III

19  had a twin brother.  Am I correct?

20     A.   Yes.

21     Q.   What is his name?

22     A.   Thomas Dore Smith.

23     Q.   Did you and Harry Smith, Jr. have any children

24  other than the twin boys?

1   A.   No, we didn't.

2   Q.   Am I correct that Harry Smith, III was 25 at

3   the time of his death?

4   A.   Yes.

5   Q.   Tell me a little bit about your formal

6   education.  Did you go to high school?

7   A.   Yes.

8   Q.   Where did you go?

9   A.   William Penn High School.

10  Q.   Did you graduate from William Penn?

11  A.   Yes.

12  Q.   Did you have any formal education after high

13  school?

14  A.   Yes.

15  Q.   Where did you go?

16  A.   University of Delaware.

17  Q.   Did you graduate?

18  A.   Yes.

19  Q.   And what was your major?

20  A.   Education and speech and communication.

21  Q.   When did you graduate from the university?

22  A.   In 1974.

23  Q.   Did you work outside of the home after you

24  graduated?

1       A.    Yes.

2       Q.    Where did you work?

3       A.    St. Michael's Day Care Center, JCPenney

4    Corporation, Children's Bureau of Delaware and

5    Hockessin Community Center.

6            MS. SULTON:  Roslyn, you're going to have

7    to speak louder.

8            THE WITNESS:  Hockessin Community Center.

9    BY MR. PARKINS:

10      Q.    Do you live on Valley Road?

11      A.    No.

12      Q.    Did you at the time of Harry, III's death?

13      A.    No.

14      Q.    Where do you live now?

15      A.    Paynter Street.

16      Q.    Paynter Street?

17      A.    Yes.

18      Q.    Is that in Bear?

19      A.    Yes.

20      Q.    Did Harry Smith, Jr. ever live at Valley Road

21   in the Hockessin area?

22      A.    Yes.

23      Q.    You told me a number of places where you worked

24   outside of the home.  Did you work outside of the home

1     more or less continually after you graduated from

2     college?

3          A.    All of my work has been outside of the home.

4          Q.    I'm sure you have done quite a bit of work in

5     the home too raising two boys.

6          A.    Yes.

7          Q.    But did you take time off for the birth of the

8     boys?

9          A.    Yes.

10         Q.    And aside from that, have you pretty much

11    worked continually?

12         A.    Yes.

13         Q.    Where do you work now?

14         A.    Hockessin Community Center.

15         Q.    Does Harry Smith, Jr. work outside of the home

16    as far as you know?

17         A.    No.

18         Q.    Did he work outside of the home prior to

19    becoming ill?

20         A.    Yes.

21         Q.    What did he do?

22         A.    He was an auditor and a postal worker.

23         Q.    Have you, aside from your attorneys, given any

24    interviews concerning the circumstances surrounding

1    your son's death?

2        A.   No.

3        Q.   Have you ever spoken to Charles Brittingham

4    about your son's death?

5        A.   Briefly.

6        Q.   Have you ever spoken to the newspapers about

7    it?

8        A.   No.

9        Q.   Do you recall what you told Mr. Brittingham?

10       A.   I personally -- well, I shared with

11   Mr. Brittingham my feelings about what had happened.

12                I also was with him when we did go to the

13   scene of where the killing had taken place.

14       Q.   That's at Fifth and Harrison Street in

15   Wilmington?

16       A.   Yes.

17       Q.   Have you been back to there since then?

18       A.   Probably on one occasion, one or two occasions

19   just to take a look at the location.

20       Q.   Sure.

21                MR. PARKINS:   Would you excuse me for one

22   second, please?

23                MR. CROSSE:   Yes.

24                (Discussion off the record.)

1    BY MR. PARKINS:

2        Q.   You told me that you shared your feelings with

3    Mr. Brittingham about what had happened.   What were

4    those feelings that you're referring to?   Tell me

5    about those.

6        A.   The shock of what had happened and the shock

7    and devastation that had occurred when he was seeking

8    medical attention and instead of getting medical

9    attention, he ended up being killed.

10       Q.   When was the last time you saw your son?

11       A.   On his way to the hospital.

12       Q.   I have read someplace that in the late summer,

13   August or September of 2003, you broke your ankle.   Is

14   that correct?

15       A.   Yes.

16       Q.   And so you weren't able to travel at that time?

17       A.   I was confined to a wheelchair.

18       Q.   So did you see him at your home before he was

19   taken to the hospital?

20       A.   Yes.   I wheeled myself to the window to make

21   sure that he was in the car.

22       Q.   Where physically were you at that time?   At

23   Paynter Road?

24       A.   Yes.   Paynter Street.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.   Paynter Street.  I'm sorry.

2         And I gather then that you did not witness

3    any of the events that occurred in the City of

4    Wilmington.  Is that right?

5    A.   Correct.

6    Q.   Tell me about what Harry, III was like in the

7    days or weeks before this event.

8    A.   Well, he was focused on my health and care.  He

9    was my -- well, he carried me on his back many times

10   to the hospital back and forth for treatment.  He

11   seemed to be concerned about my health.

12   Q.   There are reports that I have read that your

13   son began hearing voices.  Were you aware of that?

14   A.   Yes.

15   Q.   Tell me what you know.

16   A.   He came to me one day to let me know of his

17   concern because he had been hearing voices.

18   Q.   Did he say what the voices were saying?

19   A.   He couldn't be clear what the voices were

20   saying.  And I immediately let him know that maybe we

21   needed to seek some medical attention.

22   Q.   Did he agree to do so?

23   A.   Very much so because he was concerned himself.

24   Q.   So what did he do?

1      A.    Well, I made arrangements for his father to

2    take him to the hospital.

3      Q.    You say the hospital.  Are we referring to the

4    Wilmington Hospital?

5      A.    Yes.

6      Q.    Did his dad take him?

7      A.    Yes.

8      Q.    There are reports that he was at the Wilmington

9    Hospital on September the 12th.  Is that the day that

10   you have in mind?

11     A.    Yes.

12     Q.    What time of day or night was it when he went?

13     A.    I'm thinking it was late evening.

14     Q.    I believe there are reports that he may have

15   arrived somewhere between 12:00 and 1:00 in the

16   morning.

17           Is that about what you have in mind?

18     A.    Yes.

19     Q.    How long before he went to the hospital this

20   first time was it that he had told you about hearing

21   voices?

22     A.    I know when I had my accident on Sunday it

23   seemed to have really put him in a very depressive

24   state because that was the first time I guess he ever



1    witnessed me not being able to move and so I noticed

2    he was in his bedroom reading the Bible a lot of the

3    time and just stayed in his room.

4        Q.   Did he read the Bible often before this?

5        A.   Yes.

6        Q.   September the 13th was a Saturday.  You had

7    broken your ankle the previous Sunday?

8        A.   Yes.

9        Q.   And where did you go for care for your ankle?

10       A.   Christiana Care Hospital.

11       Q.   How did you get there the first time?  Was it

12   an ambulance or somebody drove you?

13       A.   Someone drove me.

14       Q.   Was it your son Harry?

15       A.   My mother and my son Harry was with us.

16       Q.   Now, you told me that Harry had taken you for

17   medical appointments after that.  Where were those?

18       A.   St. Francis Hospital, Christiana Care.  I had

19   not only my ankle broken but my left ankle broken and

20   my right foot sprained so I couldn't walk.  So I had

21   injuries on both, so my care was at the Christiana

22   Hospital and then other appointments were to St.

23   Francis Hospital and therapy.

24       Q.   Did you have anyone else at home helping to



1    care for you other than Harry, III?

2    A.   My son, other son Thomas.

3    Q.   Did Harry at that time live with you?

4    A.   Yes.

5    Q.   Did Thomas live with you?

6    A.   Yes.

7    Q.   You told us that Harry was first taken to the

8    Wilmington Hospital by his dad and I think we have

9    agreed it was probably on September the 12th, which

10   would have been a Friday.

11             And we have also I think agreed it would

12   have been early on the day of September 12th,

13   somewhere around midnight, 1:00 o'clock in the

14   morning, in that range.

15             When did Harry first tell you that he was

16   hearing voices?

17   A.   Probably a day before, like a Wednesday.

18   Q.   Did you tell anyone, call his dad or anyone to

19   say that Harry was hearing voices?

20   A.   Yes.

21   Q.   Did Harry tell you at that time that anyone was

22   trying to hurt him?

23   A.   Yes.  He brought that to my attention, that

24   that's what it sounded like, that someone was after



1    him.

2    Q.    Do you know whether Harry ever used marijuana?

3    A.    I think he may have.

4    Q.    Did he tell you at this time that he had

5    thought he might have had some marijuana which may

6    have been laced with something?

7    A.    No.

8    Q.    So you called his dad sometime on Thursday or

9    early Friday morning to take Harry to the hospital.

10    Is that correct?

11    A.    Yes.

12    Q.    Did Harry come back home that night?

13    A.    Yes.

14    Q.    Who went with Harry other than his dad?

15    A.    My son.

16    Q.    Thomas?

17    A.    Yes.

18    Q.    Did his dad say anything to you about what had

19    happened at the hospital on that night?

20    A.    No.

21    Q.    Did Harry say anything to you?

22    A.    Yes.

23    Q.    What did Harry say?

24    A.    He said that they gave him five pills.  And I

1    said, "For what?"  And he said to put him to sleep, to

2    calm him down.

3       Q.    Did he appear restless to you before he went to

4    the hospital?

5       A.    Yes.

6       Q.    Did he appear to be having difficulty sleeping?

7       A.    Yes.

8       Q.    Do you have any idea how long this difficulty

9    in sleeping had lasted?

10      A.    Well, I know he was restless and he asked if he

11   could come in my room to sleep.  And I told him to

12   bring his quilt in and I noticed that -- well, I

13   turned the TV on to one of the stations and he brought

14   his Bible in my room.

15              And I said, you know, I couldn't

16   understand what was going on with him, but that we

17   started reading the Bible.  And so we started reading

18   the Bible and he said he couldn't see because the

19   Bible he had was small.  And so I started praying with

20   him and this lasted through the morning.

21      Q.    Did Harry attend church?

22      A.    Yes.

23      Q.    Which church was that?

24      A.    He attended Victory Christian Fellowship and at

1    other times he attended Community Presbyterian Church.

2       Q.   How often did he go to church?

3       A.   As a child just about every other Sunday and

4    then when we moved he would go with us.  When he got

5    to be a teenager he went while he was in college to

6    their church and then as an adult he would go

7    especially for special events.

8       Q.   How often as an adult did he go?  Every week?

9    Once a month?  Couple times a year?

10      A.   No.  He went more than that.  But his jobs, a

11   lot of times his jobs prevented him from going.

12      Q.   When you said he went more than that, you're

13   referring to a couple times a year?

14      A.   Yes.

15      Q.   Okay.  What did Harry tell you other than, what

16   did Harry, III tell you other than that they gave him

17   five pills when he came back from the hospital?

18   Anything else?

19      A.   No.  Because at that time it was in the wee

20   hours of the morning and I was tired.

21      Q.   Sure.  Did he seem better?

22      A.   I was waiting for the medicine to kick in.

23      Q.   Did it kick in?

24      A.   No.  Because he came in my room and laid down



1    and talked with me and I must have fallen asleep while

2    he was still in the room laying on the floor.

3        Q.    Did he take the medicine?

4        A.    I assumed he did.  The five pills were given to

5    him there at the hospital.

6        Q.    Oh, he consumed them at the hospital?

7        A.    Right.

8        Q.    I see.  He didn't bring anything home with him

9    then?

10       A.    No.

11       Q.    Did you hear any instructions that he had been

12   given at the hospital about what to do?

13       A.    I read the instructions.  I had him get them

14   for me and I read them.

15       Q.    So this would have been sometime in the wee

16   hours of Friday, September 12th.  Am I correct?

17       A.    Yes.

18       Q.    What do you remember next as happening on

19   September the 12th?

20       A.    He woke me up and let me know that he didn't

21   get any rest and he went outside because he was still

22   hearing noises and he had asked the neighbor across

23   the street if he heard anything.  And he said the

24   neighbor said he heard the birds.

1    And so he said that something was really
2    wrong because he said that "I would have hoped that
3    the guy didn't think I was crazy or anything."
4    So I said, "Well, we're going to just have
5    to go back to the hospital."  And he agreed.
6    Q.   This would have been sometime on Friday during
7    the day?
8    A.   This would have been --
9    Q.   Saturday?
10   A.   -- Saturday, yes.
11   Q.   Did he seem to be getting worse?
12   A.   He seemed to be getting a little agitated
13   because he had thought his visit at the hospital,
14   whatever relief that he had been given through the
15   medication would have stopped whatever he was feeling
16   or hearing.
17   Q.   And the medication wasn't working?
18   A.   Apparently it didn't.
19   Q.   What time did Harry then go back to Wilmington?
20   A.   I telephoned my mother to see if she would be
21   able to take Harry back into the hospital.  And I also
22   called his father to let his father know that I was
23   sending him back.
24   And so the two of them took Harry back



1    around 11:30 that morning.

2        Q.   Does your mother live nearby?

3        A.   Yes.

4        Q.   So they drove to your home?

5        A.   Yes.

6        Q.   And picked up Harry?

7        A.   Yes.

8        Q.   And took him into the Wilmington Hospital

9    again?

10       A.   Yes.

11       Q.   I'm sorry.  You told me what time it was and I

12   have forgotten.

13       A.   This was like around 11:00 o'clock or so.

14       Q.   In the morning?

15       A.   Yes.

16       Q.   Harry didn't go into the hospital at that time,

17   did he?

18       A.   No.

19       Q.   What were you told when he got back?

20       A.   That the voices had stopped.

21       Q.   Did he seem better?

22       A.   To me it seemed like something that would come

23   and go.  And when -- I'm trying to think.

24            When he didn't go into the hospital, he



1    went over to his grandmother's house and I was told

2    that he didn't go in.

3        Q.   Now, when you said on Saturday when he went

4    into the hospital around 11:00 o'clock in the

5    morning --

6        A.   When he went to the hospital, he went to the

7    emergency, but he didn't get out of the car to

8    actually register or go back in.

9        Q.   So he actually did not go in?

10       A.   Right.  They just took him to the hospital.

11       Q.   And then he returned to his grandmother's

12   house?

13       A.   Yes.

14       Q.   Does that mean your mother or Harry, Jr.'s

15   mother?

16       A.   Harry, Jr.'s mother.

17       Q.   And did someone telephone you and tell you what

18   happened?

19       A.   Harry had called me to let me know that Harry

20   didn't want to go into the hospital because the voices

21   had stopped.  So I had told Harry "Well, just keep him

22   with you" because I had been up all night with him and

23   I was tired.

24            So he said, "Okay."

1      Q.    What happened next after he got back to his

2    grandmother's home?

3      A.    With me or with him?

4      Q.    Well, what do you know happened with them?

5    What did they tell you?

6      A.    He went over there to his grandmother's house.

7      Q.    Where does his grandmother live?

8      A.    In Wilmington on Sixth Street.

9      Q.    Did he spend the rest of the afternoon there?

10     A.    For a while, until I had him, until I had my

11   son pick him up because he had called, Harry had

12   called and said that he wanted to come home.

13     Q.    Harry, III called?

14     A.    Yes.

15     Q.    You had succeeded in finally getting some rest?

16     A.    Not really because I had gotten on the phone to

17   see whether or not, since he didn't go to the, go into

18   the hospital, I got on the phone to try to see what

19   type of help that I could get other than the

20   Wilmington Hospital.

21     Q.    Who did you call?

22     A.    I called MeadowWood and I also called Rockford

23   Center.

24     Q.    Did you consider sending Harry to either of