# APPENDIX
# A79 through A115

1    those institutions?

2        A.    Yes.

3        Q.    Did you talk it over with anyone?

4        A.    The lady who was I guess the admissions person

5    who was taking the information.

6        Q.    At Rockford?

7        A.    Yes.

8        Q.    And did she suggest that he could come over and

9    they would take care of him?

10       A.    She took all of the intake information and then

11   she did ask about his prior treatment and I let her

12   know that he had been to the Wilmington Hospital.

13             And then she was scheduling an appointment

14   and then she asked about his insurance.  And when I

15   told her that I didn't think he had insurance at that

16   time, she said, "Well, what I would suggest is that he

17   continue his treatment with the Wilmington Hospital

18   because they had a very good mental program."

19       Q.    And this was the MeadowWood facility?

20       A.    Rockwood.

21       Q.    Rockford?

22       A.    Rockford.

23       Q.    Did you talk to someone at MeadowWood?

24       A.    I didn't get through in actually spending any

1     real time with them.

2        Q.    Because this is a Saturday afternoon?

3        A.    Yes.

4        Q.    When Harry, III called you from his

5     grandmother's and said he wanted to come home, did you

6     get Thomas to drive him home or did his dad drive him

7     home?

8        A.    No.  His cousin brought him home.

9        Q.    Who is his cousin?

10       A.    They have a lot of cousins.

11       Q.    Why don't we come back to it?

12       A.    Okay.

13       Q.    Was his cousin a male or a female?

14       A.    A male.

15       Q.    And did he bring Harry, III home by himself?

16       A.    Yes.

17       Q.    How did Harry, III seem when he got back to

18    your house?

19       A.    He seemed okay coming in.  And then I would say

20    in about twenty minutes to a half an hour he said that

21    it must be something with this house because he hears

22    voices again and he wants to go back to the hospital.

23       Q.    About what time did he get back to your house

24    after having been at his grandmother's?



1    A.    I know it was daytime.  I would say around

2    4:00, 5:00.  At that time I wasn't really cognizant of

3    time.

4    Q.    That's understandable.  We're just trying to

5    get some ballpark picture.

6    A.    Mm-hmm.

7    Q.    And shortly after he got back into your home,

8    he said it must be the house because he was hearing

9    the voices again?

10    A.    Yes.

11    Q.    Did you notice any change in his behavior other

12    than that statement?

13    A.    He seemed agitated.  I know he was sweating a

14    lot because when he said he wanted to go back to the

15    hospital I said, "Well, you know I can't take you."

16    He said, "I'll take myself." I said, "Well, I will

17    arrange for you to go."

18                And I told him to change his clothes

19    because he was sweating.  And I can recall him wiping

20    the sweat off his face and going through the motions

21    of changing his clothes.

22    Q.    What did you do in order to arrange for him to

23    get to the hospital?

24    A.    I called his brother again, I called his father



1    again to come and pick him back up.

2    Q.   Do you recall where his brother was at that

3    time?

4    A.   He had just left the house.

5    Q.   Did you call him on a cell phone?

6    A.   Yes.

7    Q.   Did Harry, Jr. take his son to the hospital

8    that evening?

9    A.   Yes.

10   Q.   Was your former husband accompanied by anybody

11   on that trip to the hospital?

12   A.   Yes.

13   Q.   Who is that?

14   A.   My son.

15   Q.   Thomas?

16   A.   Mm-hmm.

17   Q.   About what time did they leave for the

18   hospital?

19   A.   Again, the time I'm not sure, but I do know it

20   was early evening because it was still light outside.

21   And when Tom came to get Harry, I wheeled myself to

22   make sure they had gotten in the car.

23   Q.   You rolled to the window?

24   A.   Yes.



1    Q.   Was there any concern that Harry would not get

2    in the car?

3    A.   No.  He was willing because he wanted to go.

4    Q.   What's the next thing you heard after they

5    drove off?

6    A.   I was just praising the Lord because he got in

7    the car and was on his way to the hospital.  And then

8    I would say about -- the next thing I did I called the

9    hospital.

10   Q.   Did you speak to someone in the emergency room?

11   A.   Yes.

12   Q.   Do you remember that person's name?

13   A.   It was a gentleman.

14   Q.   Do you remember his name?

15   A.   No.

16   Q.   Was he a physician?

17   A.   No.

18   Q.   What was the purpose of your call?

19   A.   When I spoke to the people at Rockford, they

20   suggested that when I send Harry back or if he went

21   back to Wilmington to give the head nurse or to give

22   the person information that he had been there.

23             And so when I called the hospital, I

24   shared that information with them.



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
------

HARRY SMITH, JR., and        :C.A. NO.  04-1254(GMS)
ROSLYN WOODWARD SMITH        :
Individually and as          :
Administrators of the ESTATE:
OF HARRY SMITH, III          :
        Plaintiffs           :
                             :
    vs.                      :
                             :
CITY OF WILMINGTON, JOHN     :
CIRIELLA, THOMAS DEMPSEY     :
And MATTHEW KURTEN           :
        Defendants           :

------

Oral deposition of WILLIAM STEVENSON, III,
taken by and before Joanne H. Gusler, Registered
Professional Reporter and Notary Public, at the Law
Offices of Richards, Layton & Finger, One Rodney Square,
920 King Street, Third Floor, Wilmington, Delaware
19801, on Wednesday, May 31, 2006, commencing at 2:21
p.m.

KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

**Page 2**

1  A P P E A R A N C E S:
2
3    Richards, Layton & Finger
     BY: JOHN A. PARKINS, ESQUIRE
4    BY: TYLER O'CONNELL, ESQUIRE
     One Rodney Square
5    920 King Street, Third Floor
     Wilmington, De 19801
6    (302) 651-7700
     Attorney for the Defendants
7
8
9    City of Wilmington Law Department
     BY: ROSAMARIA TASSONE, ESQUIRE
10   City/County Building, 9th Floor
     Wilmington, De 19801
11   (302) 576-2175
     Attorney for the Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

```
1                I N D E X
2
3
4    WITNESS              PAGE
5    WILLIAM STEVENSON, III
6    BY MR. PARKINS         4
7
8
9
10
11               E X H I B I T S
12               --NONE--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

1        WILLIAM STEVENSON, III, having been duly
2  sworn, was examined and testified as follows:
3                - - -
4  BY MR. PARKINS:
5    Q.  Mr. Stevenson, my name is John Parkins and
6  along with my colleagues, Tyler O'Connell and Rosamaria
7  Tassone, we represent the City of Wilmington and three
8  Wilmington police officers who are sued in connection
9  with a shooting of a person on September 13, 2004 at 5th
10 and Harrison Streets.
11       Do you recall what you were doing on the
12 evening of September 13, 2003?
13   A.  Yes.  You changed the date, right?
14   Q.  Yes.  I'm mistaken.  It's 2003 was the date.
15   A.  Yes.
16   Q.  Would you tell us what you recall?
17   A.  What basically happened that night was my
18 roommate from college, Michael Kalmer and I talked on the
19 phone and we were getting ready to go to the University
20 of Delaware football game.  But it had rained and there
21 was the threat of rain and we'd been to many of the
22 games, and he suggested that we go to the Washington
23 Street Ale House and watch it on TV because it's rare
24 that the Delaware games are on TV.
25       We decided that we would meet at the

1 (Pages 1 to 4)

**Page 5**

1  Washington Street Ale House. I pulled up in front of the
2  ale house I guess around 7:30. I'm not sure exactly what
3  the time was. It was dusk. I think the game either --
4  if the game started at 7:00, I got there at 6:30.
5       If the game was on TV at 8:00, I got there at
6  7:30. Is that all right to explain that?
7       Q.  About a half an hour before game time?
8       A.  A half an hour before the game. That's
9  exactly right. I pulled right up front and noticed that
10  the parking meters were missing. Hadn't seen the sign.
11  I walked inside, I sat down, I ordered a beer and the
12  bartender, Russell, said to me, "Is that your Mercedes
13  out front?" And I said, "Yes."
14       He said, "You're going to get a ticket or they
15  might even tow it." I said, "What's going on?" He said,
16  "They changed the pattern of the road and they needed the
17  spaces because they're doing construction."
18       I put my beer down. It hadn't even taken a
19  sip yet. I walked outside and went around the front of
20  my Mercedes Benz. Didn't notice anything at all strange.
21  It was dusk. And I got in my car, I started the car and
22  I don't know what caught my attention but the gentleman
23  who attacked me, I looked out the corner of my eye and I
24  saw the man across the street.
25       He had a white T-shirt and it was covered with

**Page 6**

1  blood. And at that point, I believe he was just standing
2  on the sidewalk. I said, "Wow, what happened to him?"
3  I got out. I thought he was hit by a car or something.
4  I didn't know what was happening but he looked like he
5  was hurt. Possibly stunned.
6       As I opened the car door, he started running
7  toward me. At this point, I still didn't think anything
8  was strange. And then all of a sudden, he raised his
9  right hand and screamed, "Get out of my way." I'm either
10  taking your F'ing car or something like that. I don't
11  know exactly what the words he said. They were mumbled.
12  But he screamed.
13       At this point, I said oh, my god. I'm being
14  attacked. At first, he sort of -- I pushed the door --
15  pulled the door in a little bit and he sort of hit the
16  door. And then I shoved him where he came down like this
17  (indicating) with I don't know what it was at that point.
18       I knew he had a weapon in his hand. He hit my
19  car. There was blood all over the place. And I realized
20  that I am in, like, a fight. I tried to push him away
21  from the door. He had his elbow (indicating) crossed
22  between the door and my door trying to push it back.
23       I'm in pretty good shape and I'm a pretty
24  decent size and god knows how, I got the door closed.
25  I'm holding it with all my might. My car was already

**Page 7**

1  running. I don't know whether I got the lock down. I
2  don't even know what -- that's unclear exactly what
3  happened there. But then all of a sudden, I heard this
4  big crash on the side of my door and I went oh, my god.
5  He's going to shatter my window.
6       Now, I'm looking around. At this point, I'm
7  terrified. I'm thinking I'm going to get killed to be
8  perfectly honest because I thought whatever he hit the
9  window with, was going to shatter the window.
10       I looked up. I could see people on the deck
11  leaning over the deck horrified. I looked around again,
12  and then approximately 70 yards in front of me, I saw a
13  police car stopped at the stop sign -- the red light.
14       I'm holding my door. I got the car into gear.
15  I started pulling slowly away and he started slamming the
16  window again. He -- I just said, I cannot believe it's
17  not shattering. He hit it again.
18       By this time, I am horrified and I'm saying I
19  cannot believe the police officers don't see this. Now,
20  I'm out on the road. He -- I'm moving slowly because I
21  don't want to run over him, but I also want to get away
22  with him. Thinking back over the last couple of years,
23  if I had any brains at all, I would have floored it and
24  just not cared.
25       But then, just when I was getting ready to do

**Page 8**

1  that, the police officers, I saw them seeing what was
2  happening by their lights going on. Man, I'm sorry. It
3  gives me chills. I'm sorry.
4       Q.  That's all right.
5       A.  You know what's weird, I keep on thinking I'm
6  past this. I'm so sorry.
7       Q.  Don't feel -- don't apologize.
8       MS. TASSONE: It's okay. Do you want --
9       THE WITNESS: -- I'm just glad they saw me.
10  And I'm also glad, when you think about it, that he
11  didn't try to attack somebody else on the street.
12  So he slammed it one more time.
13       I started to pull forward. I got out into the
14  middle of the street. They pulled the police car
15  right up. I remember the lights being on, the
16  siren.
17       I don't know whether they had a megaphone or
18  whether it was their voice. I think they had a
19  megaphone, and it said, "Drop the weapon. Drop the
20  weapon." But they were out of the car immediately.
21       I'm in the car. He swung one more time like
22  he never even heard them. But at this point, I was
23  away. I already had it over -- I was over to the
24  right side of the seat because I just kept thinking
25  that the window was going to shatter.

2 (Pages 5 to 8)

Page 9

1  He -- somehow the one officer got out of the
2  front and he's holding, drop the weapon. He finally
3  sees them. I mean, I couldn't even believe that he
4  didn't realize they were there behind. He took the
5  weapon and swung at the officer that was driving.
6  I think they're both -- I've never seen them
7  again. I talked to them that night but he swung the
8  weapon at him. He jumped back. The other one was
9  telling him to drop the weapon.
10  They were trying to get around in front of
11  them to me. And the one got between my car and the
12  one was in front of the other police car. I'm
13  looking out at this guy and his eyes are, like,
14  rolled back in his head and he's just swinging.
15  And then he backs up one step and I seen him
16  look at the police car. Now, they're trying to
17  protect me. The door's open on the police car. I
18  never thought anything about this, and he swings
19  again and they're trying to tell him to drop the
20  weapon. And I'm watching this thing literally from
21  like here to the end of the table. (Indicating.)
22  Because the police car was like where the
23  chair was. I'm here in my car and they're sort of
24  between him.
25  BY MR. PARKINS:

Page 10

1  Q.  It's about 12 feet or so?
2  A.  Eight to ten feet. Maybe not 12 because we
3  were right in the middle of the road. Then I look back
4  and I realize that there were people watching this thing
5  and I'm saying to myself oh, my god.
6  So he steps back and he swings (indicating)
7  the thing again. The two officers are between us. All
8  of a sudden, he backs up like real quick and jumps into
9  the police car. The one officer grabbed him by the
10  shoulder, the other one's got him by the leg. At this
11  point, I opened up my door and jumped out thinking I can
12  help now, you know.
13  But I knew he had that thing in his right hand
14  too. I'm saying to myself, he got his right foot on the
15  gas. He kept revving it. (Indicating.) You know what I
16  mean? And he was trying to jam it into gear but he must
17  have been aware that he had to get his foot off the
18  brake.
19  So the one officer's got him by the shoulder.
20  I don't know how, but all of a sudden, he gets it into
21  gear. The door -- the one officer jumps out of the door.
22  He was in front of the door with his gun. Just at that
23  point right there, I was trying to, like, I didn't touch
24  anybody yet. I didn't touch the police car. It was like
25  right a couple feet from him. I heard the shot.

Page 11

1  I don't know where the shot went truly. I
2  didn't see any glass shatter or anything like that, but
3  he shot into the car. At that point, the car just took
4  off. You know, all sorts of noise. The door slammed
5  shut. I thought it might have even slammed shut on his
6  leg.
7  I'm standing there. I can't even believe
8  this. I'm looking around, you know. The car went flying
9  over the hill and the two officers --
10  Q.  -- is the car going southbound on Washington
11  Street?
12  A.  The car is going up the hill southbound, yes.
13  Southbound on Washington Street. And then in front of
14  all of us, he runs that red light. I couldn't even
15  believe with as much traffic was there, that nobody hit
16  him. He just went right through it. So that's the last
17  time I saw him.
18  The police officer turned to me and said, "Are
19  you okay?" I said, "I'm fine. I'm fine." They started
20  running up the street and then it was like surreal. You
21  know, my car's in the middle. My door's open and
22  there's, like, ten people standing around me, "Are you
23  all right? Are you all right?"
24  I said, "I'm fine. I'm fine. I can't believe
25  it. You know what I mean? I'm fine." I just feel

Page 12

1  personally horrible that he was in the police car. But
2  the fact that he went through that intersection, didn't
3  kill somebody was like a true miracle. At that point, my
4  car's in the middle of the street. Traffic which had
5  stopped is going around me. I'm thinking like Jesus,
6  these people are crazy, you know.
7  Because there were cars behind the police car
8  and they're all squeezing by and everything in the -- the
9  police officers were literally running past two of them.
10  All of a sudden, another police car comes -- wait a
11  minute. They might have gotten into a pedestrian's car.
12  Anyway, they got picked up by a car. I don't
13  even remember. I was in such shock. They jumped in the
14  back seat of either a white police car or a white car
15  that somebody just stopped and then took off through the
16  intersection themselves.
17  It might have been an unmarked police car. I
18  was just looking around and seeing if my car was all
19  right and everything. At this point, I didn't know what
20  to do because I was there completely alone.
21  Now, next thing I know, I get my car. I pull
22  it up across the street from the Washington Street Ale
23  House. I got out of the car and I said, "Oh, my god,"
24  you know. Look at this. There's blood all over the
25  doors, you know. I said, "This is insane." So Michael

3 (Pages 9 to 12)

## Page 13

1 Kalmer, my roommate, comes walking out and he goes, "Oh
2 my god. What happened? What happened?" He goes, "I was
3 inside." Everybody's telling him that I was carjacked
4 and that he said, "The only" -- I said, "What happened?
5 What did you see?"
6       He says, "I didn't see anything except two
7 police officers run by the front window and everybody
8 went running outside." He says, "I didn't think it was
9 you because I thought you were parking."
10      I said, "No." I said, "Somebody just tried to
11 carjack me and kill me." I said, "Other than that, I'm
12 fine." So this is where I feel bad and I'll explain this
13 to you and I feel really stupid that I did this.
14      My friend calls me and he says, "Michael just
15 called me." It was about three minutes. He goes, "Are
16 you all right? Are you all right?" I said, "Yeah." He
17 goes, "I'm going to pick Linda up. I'm coming down."
18      I said, "No, no. Don't bring Linda down." He
19 goes, "No" -- that's my wife. I'm sorry. My wife Linda.
20 I said -- and I was talking to a man by the name of Buddy
21 West. Who was supposed to meet us there too but was
22 running late.
23      And he said -- I said, "Don't pick up Linda.
24 Don't call Linda. I'm fine. I'm fine." And Buddy goes,
25 "I'm going to call Linda." Two minutes later, Linda

## Page 14

1 calls and she's crying and she's going, "Are you all
2 right? Are you all right?" I said, "I'm all right."
3 She goes, "I'm coming down with my sister. I'm coming
4 down." I said, "No. Don't come down." I said, "It's
5 over. I don't even know whether anything's going to
6 happen."
7       I stood by my car. I'm looking around. I'm
8 saying to myself, I cannot believe that this guy didn't
9 stab me, you know what I mean? I'm saying to myself how
10 did he miss me? You know, I'm looking at my car.
11      At that point, I wasn't even sure -- there was
12 a small scratch on my car before. I didn't even see the
13 scratch until later that had been done by him, because it
14 was sort of behind the chrome thing.
15      I walked in and I said to Russell, "Could you
16 please give me a bar rag." I said, "If Linda comes over
17 here and sees this car, she will never drive it again."
18 I sat there for, like, ten minutes without gloves,
19 without anything. I didn't have any blood on me because
20 it was, like, sort of on the corner of the door. It was
21 on the back of my seat which I can't figure out how it
22 got there.
23      It was on the arm, the little pillar. I wiped
24 this down and literally wiped the car down. I took those
25 rags around back. By this time, there are no other

## Page 15

1 police officers there, and then all of a sudden, all hell
2 broke loose. (Indicating.) You know, like five or ten
3 police cars are pulling up. They ran tape down the
4 bottom.
5       I went in, got another bar rag, wiped myself
6 off. You know, I didn't want the blood on anybody else
7 because I had already started this thing without thinking
8 about the blood, you know what I mean? Whether he was
9 hurt and whether he was a drug addict or anything like
10 that.
11      Because his face looked like he was crazy. I
12 thought he -- he looked like a rabid dog when he attacked
13 me. I don't know what. His eyes were just gone. You
14 know what I mean? When somebody's like so crazy and he's
15 screaming and. Then the police car had said sit over
16 here. They made me sit in the police car and, you know,
17 they asked me what happened and, you know, I told them
18 this story. And then we got out of the car and then they
19 said, "We got to find the shell."
20      We're missing the shell. Where were you? Why
21 did you move your car?" I said, "Well, my car was in the
22 middle of the road." I said, "I just pulled it right
23 over there but," I said, "here's where we were. Within a
24 couple feet." And then everybody was looking for the
25 officer's shell.

## Page 16

1       And I'm not sure whether anybody found it or
2 not. But my theory is about 50 to 100 cars went by
3 before they got that tape across. I don't know where it
4 went or what had happened, but it was a lot of traffic.
5       I went over to the police department. They
6 put me in a room. They brought in a very nice lady who I
7 cannot remember her name from victim services. I'm
8 embarrassed I don't remember her name because she was
9 really sweet.
10      And then I was interviewed, gave my story, and
11 that's the last I've heard from anybody.
12   Q.  How would you describe the speed of the stolen
13 police car when it left the area?
14   A.  He was on it. He never took his foot off the
15 gas. It was like, you know, it's -- I don't know whether
16 he peeled out because he was revving the engine so much,
17 when he hit the gas, he never stopped going through the
18 intersection.
19      I'm not a great estimate of speed but from the
20 hill through the thing, he might have been doing 40, 45.
21 But I mean, like it literally went through the
22 intersection because I remember going ahh (indicating.)
23 I remember just going like that and I know the officers
24 held their breath too.
25      Everybody watched. And then he went flying

4 (Pages 13 to 16)

WILLIAM STEVENSON, III
May 31, 2006

Page 17

1  through the intersection. And then I just remember
2  listening to see if there was going to be a crash at the
3  other intersection. But I mean, the light was red.
4  Whether it turned green when he hit Delaware Avenue, I
5  have no idea, but he never let off the gas.
6      Q.  When you say he ran through a red light, was
7  that the red light at the intersection of 12th and
8  Washington?
9      A.  Yes.
10         MR. PARKINS: Right. I have nothing
11  further. Thank you, very much.
12         THE WITNESS: Thank you, very much.
13            (Witness excused.)
14            (Deposition concluded at 2:37 p.m.)
15               - - -
16
17
18
19
20
21
22
23
24
25

Page 18

1          C E R T I F I C A T E
2
3      I, Joanne H. Gusler, a Notary Public and
4  Registered Professional Reporter, do hereby
5  state that prior to the commencement of the
6  examination,
7         WILLIAM STEVENSON, III
8  was duly sworn by me to testify to the truth,
9  the whole truth and nothing but the truth.
10  I do further state that the foregoing is a true
11  and accurate transcript of the testimony as
12  taken stenographically by and before me at the
13  time, place and on the date hereinbefore set
14  forth.
15      I do further state that I am neither a
16  relative nor employee nor attorney nor counsel
17  of any of the parties to this action, and that I
18  am neither a relative nor employee of such
19  attorney or counsel and that I am not
20  financially interested in this action.
21
22
        Joanne H. Gusler
23      Notary Public, State of
        Delaware
24      Cert# 190-RPR
        Exp. 1/31/08
25

5 (Pages 17 to 18)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


HARRY SMITH, JR. and ROSLYN          )
WOODARD SMITH, individually and      )
as Administrators of the ESTATE      )
OF HARRY SMITH, III,                 )
                                     )
          Plaintiffs,                )
                                     ) Civil Action
v.                                   ) No. 04-1254-GMS
                                     )
CITY OF WILMINGTON, JOHN             )
CIRITELLA, THOMAS DEMPSEY and        )
MATTHEW KURTEN,                      )
                                     )
          Defendants.                )


          Deposition of JENNIE VERSHVOVSKY, M.D.
taken pursuant to notice at the law offices of
Richards, Layton & Finger, One Rodney Square, Third
Floor, Wilmington, Delaware, beginning at 2:10 p.m. on
Tuesday, May 30, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          ANNE T. SULTON, ESQ. (Via teleconference)
          SULTON LAW OFFICES
            Post Office Box 2763
            Olympia, Washington  98507
            For the Plaintiffs


                  WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

                                        A89



WILCOX & FETZER LTD.
Registered Professional Reporters



1    APPEARANCES:   (Cont'd)

2            JOHN A. PARKINS, JR., ESQ.
         RICHARDS LAYTON & FINGER
3            One Rodney Square - Third Floor
             Wilmington, Delaware  19801
4                  - and -
         ROSAMARIA TASSONE, ESQ.
5        CITY OF WILMINGTON LAW DEPARTMENT
             City/County Building - 9th Floor
6            Wilmington, Delaware  19801
             For the Defendants

7

8                 -   -   -   -   -

9            JENNIE VERSHVOVSKY, M.D.,

10    the deponent herein, having first been

11    duly sworn on oath, was examined and

12    testified as follows:

13                   EXAMINATION

14    BY MR. PARKINS:

15    Q.   Dr. Vershvovsky, I'm about to ask you a series

16    of questions concerning an autopsy that you performed

17    on or about September 14th, 2003 on Harry J. Smith,

18    III.

19            I'm afraid that I am not well-versed in

20    medical technology -- excuse me -- in medical parlance

21    so I may misspeak.  And if I ask you anything which is

22    unclear to you, please don't hesitate to tell me that

23    and I will attempt to rephrase my question.

24    A.   Okay.

1    03.1434.  Is that the number of this particular

2    autopsy?

3        A.    Yes.  It's the case number.

4        Q.    And then there is a number 1 here.  Does that

5    show the bullet and the jacket that was recovered from

6    Mr. Smith's head?

7        A.    Yes.

8        Q.    All right.  And this would have corresponded

9    then to injury number 1 on your report?

10       A.    Yes.

11       Q.    Did you give that to the police?

12       A.    Yes.

13       Q.    Is that standard operating procedure in

14    homicide cases?

15       A.    Yes.

16       Q.    Now, I believe you told me earlier that the

17    direction of this bullet was from right to left?

18       A.    Yes.

19       Q.    Would it have been feasible for someone who was

20    standing on Mr. Smith's left to have fired this

21    bullet?

22       A.    I don't think so.

23       Q.    Assume for the moment that Mr. Smith were

24    sitting in a police car in the driver's position.

1          Would it have been feasible for somebody

2     standing to the rear of the car on the driver's side

3     to have fired this bullet?

4     A.   It's possible.

5     Q.   And what would have Mr. Smith's position have

6     had to have been at that time?

7     A.   I can tell you how the position of the -- the

8     gun has to be on the right side of the shooter.

9     Q.   On the right side of Mr. Smith?

10    A.   Yes.   The bullet has to enter from the right

11    side or his head would have to be turned.

12    Q.   Well, I guess my question is:   If you had

13    somebody to the rear of the car, on the left-hand side

14    of the car on the driver's side, is it feasible that

15    they would have been able to shoot this projectile, to

16    the rear and to Mr. Smith's left?

17    A.   So if we imagine this (indicating) is a car,

18    he's sitting facing front.

19    Q.   Facing front.

20    A.   And somebody is standing here?

21    Q.   The other side.   The driver's side.

22    A.   The driver's side?

23    Q.   Yes.

24    A.   (Pause)



1    Q.    Let me draw this for you.

2    A.    The bullet can't come from the left.  The

3    bullet has to come from the right or Mr. Smith's head

4    has to be turned to the right, to the side from where

5    the bullet was coming.

6    Q.    Now, assume for the moment that Mr. Smith were

7    sitting in the driver's seat of the car and he had

8    turned his head slightly to look at, say, if we think

9    of this as a clock with front ahead as being 12:00

10   o'clock and if he had turned his head slightly to,

11   say, look at 2:00 o'clock, could the bullet have come

12   from the right rear?

13   A.    From right, the bullet can come from right.

14   Q.    Yes.  In your view, if there were testimony

15   that he was being shot at from the left, it's not

16   likely that those shooters would have fired this

17   projectile?

18   A.    No.

19   Q.    Now let's take a look, if we could, at

20   paragraph numbered 13.  There's reference to a round

21   gunshot wound.  The previous one was a stellate wound.

22            Is there any significance to the fact that

23   this is round as opposed to stellate?

24   A.    Wounds have different appearance on the head

1    than on the body because on the head, as I explained,

2    we have a bone.  That is why we have a stellate wound

3    more often on the head.

4                On the body because we have skin,

5    underlying soft tissue bullets most common have round

6    entrance wounds.

7        Q.   Now, this particular wound entered Mr. Smith's

8    left upper back?

9        A.   Yes.

10       Q.   And do you have a photograph here?

11       A.   Yes.

12       Q.   This is wound number 2?

13       A.   Yes.

14       Q.   Did we recover a bullet for wound number 2?

15       A.   Yes, we did.

16       Q.   Now, did the wound number 2 strike the spinal

17   cord?

18       A.   No.

19       Q.   Did it strike any major arteries or organs?

20       A.   I didn't perform a dissection of the whole path

21   of the wound, so I can't tell you about the vessels,

22   but it didn't strike major organs.

23       Q.   The direction of the wounding is from back to

24   front.  Am I correct?



Case 1:04-cv-01254-GMS   Document 112-4   Filed 06/21/2006   Page 18 of 39

Smith                                                                    City of Wilmington, et al.
Johnny Whitehead                  C.A. # 04-1254-GMS                           June 6, 2006

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and ROSLYN        )
WOODARD SMITH, individually and    )
as Administrators of the ESTATE    )
OF HARRY SMITH, III,               )
                                   )
          Plaintiffs,              )
                                   ) Civil Action
v.                                 ) No. 04-1254-GMS
                                   )
CITY OF WILMINGTON, JOHN           )
CIRITELLA, THOMAS DEMPSEY and      )
MATTHEW KURTEN,                    )
                                   )
          Defendants.              )
```

          Deposition of JOHNNY WHITEHEAD taken
pursuant to notice at the United States District
Court, District of Delaware, Conference Room 2204, 844
North King Street, Wilmington, Delaware, beginning at
8:35 a.m., on Tuesday, June 6, 2006, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

          KESTER I.H. CROSSE, ESQ.
          WILLIAMS & CROSSE
            1214 King Street - Suite 300
            Wilmington, Delaware  19801
                  - and -
          ANNE T. SULTON, ESQ.
          SULTON LAW OFFICES
            Post Office Box 2763
            Olympia, Washington  98507
            For the Plaintiffs

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com              A95

Smith
Johnny Whitehead

City of Wilmington, et al.
C.A. # 04-1254-GMS
June 6, 2006

Page 6

1    A.  Yes.

2    Q.  Okay.  Was the scalpel -- I'm going to show you

3  this, but I am not going to mark it as an exhibit at

4  this time.

5         MR. PARKINS:  Well, if you are going to

6  show it to the witness, we have to mark it.

7         MS. SULTON:  No, we do not, John.

8         MR. PARKINS:  Officer Whitehead, we're

9  not going to --

10        MS. SULTON:  I'll tell you what.  Then we

11  will mark it so he doesn't get his blood pressure up.

12        MR. PARKINS:  It's not up.  Don't worry

13  about that.

14        MS. SULTON:  There's no federal rule that

15  requires that.  There just isn't.

16        But go ahead and mark it.  I don't have

17  time.

18        I'm only going to keep you for about an

19  hour.

20        THE WITNESS:  Okay.  No problem.

21        MS. SULTON:  Would you mark that?

22        (Whitehead Deposition Exhibit No. 1 was

23  marked for identification.)

24

Page 7

1  BY MS. SULTON:

2    Q.  I'm going to show you what I have marked as

3  Exhibit No. 1.  Was it a scalpel that looks like that

4  that we marked Exhibit No. 1?

5    A.  Similar.  I don't think it was that big.

6    Q.  Okay.

7        MS. SULTON:  Mark that Whitehead No. 2,

8  please.

9        (Whitehead Deposition Exhibit No. 2 was

10  marked for identification.)

11  BY MS. SULTON:

12    Q.  I'm showing you what I have marked as Whitehead

13  No. 2.  Did it look like what's depicted in Whitehead

14  No. 2?

15    A.  Something like that, yes.

16        MS. SULTON:  Mark that No. 3.

17        (Whitehead Deposition Exhibit No. 3 was

18  marked for identification.)

19  BY MS. SULTON:

20    Q.  I'm showing you what's been marked as Whitehead

21  No. 3.  Did it look like what's depicted in Exhibit 3?

22    A.  No.

23    Q.  Did it look more like what's depicted in No. 2?

24    A.  Yes.

Page 8

1    Q.  At any time did Harry Smith, III try to use a

2  scalpel against your partner?

3    A.  No.

4    Q.  At any time did he try to use the scalpel

5  against you?

6    A.  No.

7    Q.  Did you perceive a threat of Harry Smith, III

8  to your partner?

9    A.  No.

10    Q.  Did you perceive a threat of Harry Smith, III

11  to you?

12    A.  Yes.

13    Q.  And why did you perceive a threat to you?

14    A.  When we were on Washington Street he was armed

15  with a scalpel walking towards me ignoring my orders.

16    Q.  And what were you saying?

17    A.  I was telling him to drop the knife, which at

18  the time I believed it was a knife, repeatedly and I

19  was backing up giving him an opportunity to drop the

20  knife.

21    Q.  At any time did you think it was a needle?

22    A.  I thought it was a needle initially.

23        MS. SULTON:  Do you have a revised copy of

24  that videotape you sent me, only two minutes of eight

Page 9

1  are audible?

2        MR. PARKINS:  No. I haven't gotten a -- I

3  have the same copy you have.

4  BY MS. SULTON:

5    Q.  So you initially thought that he had a knife?

6    A.  A needle.

7    Q.  A needle?

8    A.  Yes.

9    Q.  Thank you.

10        How far away was he when you first saw him

11  in terms of feet or half a block?

12    A.  When I first saw him?

13    Q.  Yes.  When you first saw him, how far away was

14  he?

15    A.  Maybe half a block.

16    Q.  And what drew your attention to him?

17    A.  He was running southbound on the west side of

18  the street with a gown, what appeared to be a gown, a

19  hospital gown and a band, a hospital band.  And just

20  prior to that complaint we responded to the park which

21  is in that area for a tall, black male with a gown who

22  ran away from the hospital.

23    Q.  Okay.  And who called you from the hospital?

24    A.  Who called me from -- I imagine dispatch.  We

3 (Pages 6 to 9)

Page 14

```
 1   Q.  What authority do you have to take somebody
 2   back to the hospital as a law enforcement officer?
 3   A.  If they impose a risk to themselves or to
 4   others, then it's my duty to make sure, to ensure that
 5   they receive treatment, proper treatment from the
 6   hospital.
 7   Q.  And when you say, "risk," you're talking about
 8   some kind of mental health ailment, correct?
 9   A.  It could possibly be, yes.
10   Q.  Have you had a situation where you thought
11   somebody was infected with a contagious disease and
12   they had eloped from the hospital and you had to go
13   and round them up and take them back for fear that
14   they posed a physical threat to other folks in the
15   community?
16   A.  I don't think I've had that, a disease.
17   Q.  So it's always been mental health?
18   A.  I can't say always or will never say always
19   because I'm not a physician. I can't say okay, well,
20   this is what's wrong with that person. I just know,
21   you know, weird behavior. I can recognize that, so...
22   Q.  So when you saw Harry Smith, III was he
23   exhibiting any weird behavior?
24   A.  He was just running. I just thought it was
```

Page 15

```
 1   another patient running from the hospital.
 2   Q.  So he's running. Then what did you do after
 3   you observed that?
 4   A.  I made a left onto Washington Street and he
 5   paused. I watched him. He stopped at the corner and
 6   he paused and then he ran in a southeastern direction
 7   directly towards a gray Mercedes-Benz.
 8   Q.  And what did you see him do?
 9   A.  He began to pull on the door of the
10   Mercedes-Benz and the operator of that vehicle began
11   to attempt to hold the door. And the door kind of
12   opened and shut and he was leaning back this
13   (demonstrating) way.
14   Q.  Now, at the time that you saw Harry Smith
15   pulling on this door, was he pulling on it with two
16   hands or what do you recall seeing?
17   A.  I couldn't tell you if it was two hands or one
18   hand.
19   Q.  When you saw him approach the gray Mercedes,
20   did you see him with what you thought was a needle in
21   his hand at that time?
22   A.  No, I did not see the needle at that time.
23   Q.  What did you think you were seeing when you saw
24   this man in a hospital gown with a hospital band
```

Page 16

```
 1   trying to pull on a Mercedes?
 2   A.  Well, at that time I thought it was a
 3   carjacking in progress.
 4   Q.  Define for me carjack.
 5   A.  Someone who physically will try to get you out
 6   of your vehicle to obtain it and flee.
 7   Q.  And so you don't have to have a weapon to
 8   consider it a carjack?
 9   A.  Yes. I believe you would have to have some
10   sort of weapon.
11   Q.  But you did not see a weapon at that time?
12   A.  I did not see a weapon, no.
13   Q.  Is it fair to say then what you weren't seeing
14   was a carjacking because you didn't see a weapon?
15   A.  What I did see is that someone was attempting
16   to remove someone out of their vehicle in an attempt
17   to obtain it. That's basically all I need to see to
18   act, act on it, so that's what I did.
19   Q.  Okay. But I want to be clear about carjacking.
20   When I think of a carjacking I think of someone
21   putting a gun or knife to somebody's face and saying
22   get out of the car or I'm going to kill you.
23   A.  Right.
24   Q.  That's a carjacking. You would agree with me,
```

Page 17

```
 1   yes?
 2   A.  Yes, I would agree.
 3   Q.  And if you don't have that, what you may be
 4   looking at is just auto theft, correct?
 5   A.  Auto theft. Okay. Yes, I agree.
 6   Q.  So is it fair to say that what you first saw
 7   since you didn't see a weapon was what you thought was
 8   an auto theft?
 9   A.  Yes.
10   Q.  And then what did you do?
11   A.  I activated my overheads and drove right behind
12   Mr. Smith.
13   Q.  So while you're doing all this observation
14   you're physically in your patrol car?
15   A.  Yes, ma'am.
16   Q.  Were your windows up?
17   A.  That I don't recall.
18   Q.  Prior to September 13th, 2003 had you ever used
19   that particular patrol vehicle before?
20   A.  I'm pretty sure I have.
21   Q.  More than once do you think?
22   A.  Yes.
23   Q.  Have you ever operated the vehicle with its
24   windows up, all the windows up?
```

5 (Pages 14 to 17)

A97

Smith v. City of Wilmington, et al.
Johnny Whitehead                                    June 6, 2006

Case 1:04-cv-01254-GMS     Document 112-4     Filed 06/21/2006     Page 2 of 39
                           C.A. # 04-1254-GMS

Page 18

1  A.  Yes.
2  Q.  And when you have done that, is it possible for
3  you to hear what is occurring half a block away from
4  you when all of the windows are up?
5  A.  With the windows up, unless you have a
6  jackhammer or a loud weapon, there's no way that you
7  can actually hear with all of the windows up from a
8  block away.
9  Q.  Or half a block?
10 A.  Again, unless you have a loud weapon.  That's
11 the only way you will be able to hear.
12 Q.  So if I'm a half a block -- well, when you
13 first saw Mr. Smith, he was about half a block from
14 you, correct?
15 A.  Yes.
16 Q.  Could you hear, while you were sitting in your
17 patrol car could you hear anything that he was saying
18 to the driver of the gray Mercedes?
19 A.  No.
20 Q.  Did it appear to you based upon what you
21 observed that he was saying something to the operator
22 of the Mercedes?
23 A.  No, not from my position.
24 Q.  So after you observed this you activated your

Page 19

1  lights and siren or just your lights?
2  A.  Just the lights.
3  Q.  And why didn't you activate the siren?
4  A.  I didn't activate the siren because he was
5  maybe 15 feet from me.  I didn't think it was
6  necessary.
7  Q.  If your ignition is off on that patrol vehicle,
8  are the lights and siren off?
9  A.  You can activate the overheads with the
10 ignition off.
11 Q.  Without the key in the ignition?
12 A.  Yes.
13 Q.  Can you activate the siren without the key in
14 the ignition?
15 A.  No.  No.
16 Q.  You did not have a shotgun inside the passenger
17 compartment of that car on September 13, 2003,
18 correct?
19 A.  Yes.  That's correct.
20 Q.  Where was your shotgun?
21 A.  The shotgun was in the trunk of the vehicle.
22 Q.  And why was it in the trunk?
23 A.  If we have difficulties placing it in I
24 guess -- see now we have a vertical.

Page 20

1  Q.  No.  I want to keep you on September 13th, 2003.
2  A.  Oh, okay.  I don't think I loaded the shotgun
3  in the car, but I know that it was in the trunk that
4  day.
5  Q.  But you don't think it was loaded?
6  A.  No.  Loaded as in packing the car, placing the
7  shotgun in the car.
8  Q.  So there's a shotgun that comes as a part of
9  the car's equipment, correct?
10 A.  We have to obtain the shotgun before we enter
11 our vehicle before starting our shift, yes.
12 Q.  So let me make certain I understand you.
13      So before you start your shift sometime
14 during roll call or right after roll call --
15 A.  Right after roll call.
16 Q.  -- everyone goes and they pick up their gear,
17 correct?
18 A.  Yes.
19 Q.  And part of your gear is picking up the
20 shotgun?
21 A.  Yes.
22 Q.  You sign it out, correct?
23 A.  Yes.
24 Q.  And then you are to put the shotgun where when

Page 21

1  you get in the patrol car?
2  A.  You can put it in the -- there's a shotgun rack
3  right behind your head and there are times when
4  officers will just place it in the trunk because
5  sometimes it sticks.  It's difficult to place it in
6  there, so they just put it in the trunk.
7  Q.  So in this car that you were driving on
8  September 13th of 2003 there was a shotgun rack right
9  behind you?
10 A.  There was a shotgun rack.
11 Q.  Inside the passenger compartment?
12 A.  It actually is behind the operator's
13 compartment, the operator compartment.
14 Q.  Correct.  So in the patrol car in question that
15 you were operating on September 13th, 2003 the vehicle
16 has a driver's seat, a passenger's seat, there's a
17 partition and then there's seating available for
18 someone you might arrest?
19 A.  Yes.
20 Q.  And in front of that partition there is behind
21 your head a shotgun rack, correct?
22 A.  Yes.
23 Q.  And is that rack locking?
24 A.  Yes.  It's possible to lock that rack, yes.

6 (Pages 18 to 21)

A98

Smith v. City of Wilmington, et al.
Johnny Whitehead                                          June 6, 2006

Case 1:04-cv-01254-GMS   Document 112-4   Filed 06/21/2006   Page 22 of 39
C.A. # 04-1254-GMS

Page 30

1   Q.  Why don't you know?
2   A.  Well, because I did not see any audio or video
3   from that day.
4   Q.  And who would have shown it to you?
5   A.  I believe a supervisor would have showed us
6   where the tape, I believe it was mounted in the back,
7   but the video is right up front in the front of the
8   car, right in the rear-view mirror, right around
9   there, right in that area.
10  Q.  So no one showed you any video?
11  A.  No.  On that day, no.
12  Q.  Did you ask to see it?
13  A.  No.
14  Q.  Do you believe the camera was running on that
15  day?
16  A.  It could have been.
17  Q.  Have you received any specific training at any
18  point from when you first got hired by the department
19  up until September 13th, 2003 -- I'm not going to ask
20  you any questions beyond September 13, 2003 at this
21  time.  Okay?
22  A.  Okay.
23  Q.  Any specific training in what to do in a car
24  theft situation?

Page 31

1   A.  Vehicle theft?
2   Q.  Car theft.
3   A.  You investigate it.  You investigate the car
4   theft.
5   Q.  Let me take you back to the situation where
6   Harry Smith, III was in your view attempting to steal
7   that Mercedes.
8           Had you received any training that taught
9   you how to deal specifically with that kind of
10  incident?
11  A.  Car theft, yes.
12  Q.  And what were you taught to do if you walk up
13  on what you believe is a car theft in progress?
14  A.  You can arrest the suspect.
15  Q.  Have you ever been told you can use deadly
16  force?
17  A.  For a car theft?
18  Q.  Yes.
19  A.  No.
20  Q.  In fact, you have been trained that you can't
21  use deadly force for a car theft?
22  A.  That is correct.
23  Q.  What about car chases, what were you trained to
24  do in car chases?

Page 32

1   A.  Basically, they don't last too long in the
2   city.  We're told to -- they don't condone that.  I
3   mean, usually it will last a couple of blocks, but
4   usually a supervisor will call it off because the city
5   is so condensed so they will usually cut them off.
6   Q.  And when you say, "cut them off," you mean
7   that --
8   A.  Terminate it.
9   Q.  -- they will let the guy who is trying to get
10  away get away?
11  A.  Yes.
12  Q.  Because you don't want the citizens getting run
13  over and that kind of thing, correct?
14  A.  Absolutely.
15  Q.  Did you get any training on whether or not you
16  can use your patrol vehicle as a barrier or a block to
17  block a street to stop a car chase?  Did you get any
18  training in that area?
19  A.  Now, see, I know we did, but I don't know if it
20  was after that incident.  The Attorney General's
21  Office said that you don't put yourself or your
22  vehicle to form a roadblock to prevent someone from
23  stealing a vehicle.
24  Q.  And you don't recall the exact time frame, but

Page 33

1   is it fair to say that before the shooting incident no
2   one had specifically told you yeah, go ahead and put
3   your patrol car out there as a barrier?
4   A.  That's correct.  I don't think anyone would
5   condone that.
6   Q.  Have you ever heard of that before, somebody
7   using their car as a barrier in the city?
8   A.  Well, I'm pretty sure that there are those who
9   have done that, but that is not, that is not proper
10  protocol.
11  Q.  And what about securing the shotgun, did you
12  get any training in whether or not it's proper for you
13  just to place your shotgun in the trunk without a
14  holder or anything?
15  A.  Yes.  We were trained to put it in the locking
16  mechanism that you see here in Exhibit 4.
17  Q.  Why didn't you do that on that date?  Because
18  it doesn't work well?
19  A.  No.  Well, I know that was the problem.  I
20  don't know, I don't recall if I had the shotgun or my
21  partner.  I know one of us did, one of us loaded it.
22  I just know exactly where it was that day.
23  Q.  Now let me ask you the question that leaves
24  many wondering what in the heck was going on that

9 (Pages 30 to 33)

Smith v. City of Wilmington, et al.
Johnny Whitehead

Case 1:04-cv-01254-GMS   Document 112-4   Filed 06/21/2006   Page 23 of 39
C.A. # 04-1254-GMS                                           June 6, 2006

Page 34

1  night.
2      How did Harry Smith get into your patrol
3  vehicle?
4  A.  He entered it.
5  Q.  How did he do that?  How did that happen?
6  A.  Well, like I said, I had him, I drew my weapon
7  on him and he began -- he was nonresponsive to my
8  weapon.
9  Q.  So at what point did you draw your weapon on
10 him?
11 A.  When I was outside the vehicle.
12 Q.  So you see him approaching the Mercedes.  You
13 think he's trying to steal this guy's car?
14 A.  Yes.
15 Q.  You hit your lights and you start driving
16 toward him?
17 A.  I drove right behind him.
18 Q.  And then tell me what happened, step by step
19 what happened.
20 A.  Sure.  He had his back to me when I pulled up.
21 He was right outside of my driver's side window.  And
22 he turned to me.  He was breathing hard and there was
23 blood on his shirt.
24     Now I'm thinking that he was a victim of

Page 35

1  some type of assault-related complaint and he was
2  seeking help.  So I opened my door and I said, "Okay,
3  sir, just calm down."  That's what I said to him.  And
4  then I noticed what I thought was a needle from the
5  hospital and he was breathing hard and holding the
6  needle.
7      So then I said, "Okay.  Drop it."  And he
8  was unresponsive.  Then I drew my weapon on him and
9  ordered him to drop the needle.
10 Q.  And then what did he do?
11 A.  He was basically looking through me.  He wasn't
12 responsive to my weapon.  And I told him, I said,
13 "Look, I don't want to shoot you.  I don't want to
14 kill you.  Drop the weapon.  Drop the knife."
15     That's when I looked at it and he was
16 breathing hard.  And then I'm still at my door and
17 he's maybe two or three feet from me.  Then he began
18 to walk towards me, which scared me.  I still had my
19 gun trained on him.  I told him to drop the knife.  I
20 said, "Drop the knife.  I don't want to kill you.
21 Drop the knife."
22     And then he began walking towards me and
23 then I began to walk backwards thinking that okay, I'm
24 going to give him every opportunity to drop this

Page 36

1  knife.  But he's not dropping it, which scared me even
2  more.
3      He was looking at me the whole time and
4  then the only time he took his eyes off of me is when
5  he looked at my door to my vehicle.
6      And at that time now I'm at the rear left
7  door passenger side.  I'm sorry.  Driver's side door.
8  With my gun still trained on him.  He jumps into my
9  vehicle.  So I'm running after him and he began to rev
10 the car and he's trying to get the car into gear.
11     Now, I have my hand on his wrist and I'm
12 trying to get him out of the car and I'm trying to get
13 his -- I'm trying to actually pull him out of the car,
14 but he still has this scalpel.  And, again, I'm still
15 giving him orders continuously, "Get out of the car,
16 get out of the car or I'll shoot."
17     And he didn't say, at no time did he say
18 anything.  He was just, you know, basically struggling
19 with me.  He still had the knife.  I said okay, well,
20 I'm going to have to disengage to stop him.
21     So I disengage.  I shot him.  I actually
22 aimed my gun at his head.  I did not want to kill him.
23 So I lowered it to center of mass and then I fired one
24 shot with the door was opened.  I'm in the doorway

Page 37

1  when I fired my shot and he kind of winced.  As the
2  door shut, he drove off southbound and I took off on
3  foot after him.
4  Q.  Why did you shoot him?
5  A.  Because he still had a scalpel and he also had
6  a shotgun in the car.  He was attempting to take the
7  car with a weapon.  Actually, he took weapons at that
8  time so I didn't want him to leave the area.
9  Q.  You didn't want him to leave the area because
10 he's a shotgun in the trunk of the car?
11 A.  And he was armed with a scalpel, yes.
12 Q.  What happened to that scalpel?
13 A.  He was still armed with it when he left, so I
14 don't know what happened to the scalpel.  He still had
15 it on his person when he left.
16 Q.  Are you sure of that?
17 A.  I'm pretty sure.  He didn't, he didn't drop it
18 outside the car or anything.  I didn't notice if he
19 did.  I didn't notice him dropping it outside of the
20 vehicle.
21 Q.  So you shot him because he had a scalpel that
22 looked something like Exhibit No. 2?
23 A.  That's correct.
24 Q.  And because there was a shotgun in the trunk of

Case 1:04-cv-01254-GMS    Document 112-4    Filed 06/21/2006    Page 24 of 39

Smith v. City of Wilmington, et al.
Johnny Whitehead    C.A. # 04-1254-GMS    June 6, 2006

Page 62

1   Q.   No. Just the term discretion broadly.
2   A.   Oh, discretion?
3   Q.   Right. Are there any guidelines within which
4   an officer must exercise his discretion or is he free
5   to do whatever he wants to do?
6   A.   We have guidelines.
7   Q.   And where are those guidelines? Are they
8   written?
9   A.   They're written in the white book.
10  Q.   What's the white book?
11  A.   The white book is our rules and regulations.
12  Q.   And do you carry that in your car?
13  A.   No.
14  Q.   Too thick?
15  A.   Yes.
16  Q.   Is it fair to say that you were shooting at
17  Harry because you were trying to stop him or were you
18  shooting at him because you were trying to kill him?
19  A.   I was trying to stop him.
20  Q.   We're almost done. Let me just check real
21  quick.
22       Just one second.
23       Do you know of any officer ever in your
24  work with the Wilmington Police Department who has

Page 63

1   been disciplined for excessive use of force?
2   A.   I'm pretty sure that there are officers that
3   have been disciplined. I do not know of any.
4   Q.   You don't know of any?
5   A.   No.
6        MS. SULTON: I am done. Thank you.
7        MR. PARKINS: I have just a few questions.
8   BY MR. PARKINS:
9   Q.   Officer, are you an African-American?
10  A.   Yes.
11  Q.   How far away were you from Mr. Smith when you
12  fired your weapon?
13  A.   About a foot, less than a foot.
14  Q.   Was the car door opened or closed at the time
15  you fired your weapon?
16  A.   It was opened.
17  Q.   Was the car in motion at that time?
18  A.   No, it was not.
19       MR. PARKINS: Thank you. Nothing further.
20  BY MS. SULTON:
21  Q.   Sir, you did not get sued because you are
22  African-American, nor would I sue you because you're
23  African-American. Your race has no bearing on this
24  case whatsoever.

Page 64

1        MR. PARKINS: Counsel, you've raised a
2   1985 claim, so it does have a basis.
3   Q.   Your race has no bearing on whether or not I
4   decided to sue you or not sue you. It's the facts of
5   the case. Okay?
6   A.   That's fine.
7   Q.   Okay?
8   A.   That's fine.
9   Q.   So I don't appreciate him raising the issue of
10  race like that because I'm African-American too and I
11  sue anybody if I think they have used excessive force.
12  You didn't not get sued because you're black. I
13  didn't sue you because I don't see your conduct as the
14  same.
15       Do you understand?
16  A.   That's fine.
17       MR. PARKINS: Thanks, Kurt. We reserve
18  reading.
19       (Deposition concluded at 9:55 a.m.)
20
21
22
23
24

Page 65

1              I N D E X
2   DEPONENT: JOHNNY WHITEHEAD          PAGE
3     Examination by Ms. Sulton          2
      Examination by Mr. Parkins         63
4     Examination by Ms. Sulton          63
5          E X H I B I T S
6   Whitehead DEPOSITION EXHIBITS       MARKED
7   1 Photograph of scalpel             6
8   2 Photograph of scalpel             7
9   3 Photograph of scalpel             7
10  4 Photograph of shotgun rack        25
11  5 Photograph of shotgun rack        26
12  ERRATA SHEET/DEPONENT'S SIGNATURE   PAGE 66
13  CERTIFICATE OF REPORTER             PAGE 67
14
15
16
17
18
19
20
21
22
23
24

17 (Pages 62 to 65)

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# MEDICAL RECORDS

# REDACTED

# AUTOPSY REPORT

# REDACTED

# AUTOPSY REPORT

# REDACTED

# AUTOPSY REPORT

# REDACTED

# AUTOPSY REPORT

# REDACTED

# AUTOPSY REPORT

# REDACTED

# AUTOPSY REPORT

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

      Kester I.H. Crosse, Esquire
      Williams & Crosse
      1214 King Street
      Suite 300
      Wilmington, DE  19801

I hereby certify that on June 14, 2006, I have sent by U.S. Regular Mail, the foregoing document to the following non-registered participants:

      Anne T. Sulton, Esquire
      Post Office Box 2763
      Olympia, WA 98507

                        John A. Parkins, Jr. (#859)
                        Richards, Layton & Finger, P.A.
                        One Rodney Square
                        P.O. Box 551
                        Wilmington, Delaware 19899
                        (302) 651-7700
                        Parkins@rlf.com