**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HARRY SMITH, JR. and
ROSLYN WOODARD SMITH,
Individually and as Administrators of
The ESTATE OF HARRY SMITH, III,

      Plaintiffs,

v.                                    CIVIL ACTION NO. 04-1254-GMS

CITY OF WILMINGTON,

JOHN CIRITELLA, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

THOMAS DEMPSEY, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department, and

MATTHEW KURTEN, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

      Defendants.

_____

**PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

Dated this 5th day of July

                              Plaintiff's Attorneys

                              Anne T. Sulton
                              Post Office Box 2763
                              Olympia, WA 98507
                              Telephone: (609) 468-6029
                              E-Mail: annesulton@comcast.net

                              **Local Counsel:**

                              Kester I.H. Crosse [Bar I.D. 638]
                              1214 King Street, Suite 300
                              Wilmington, DE  19801
                              Telephone: (302) 652-3141
                              E-Mail: kesterih@aol.com

**TABLE OF CONTENTS**

Page

I.      Table of Citations                                                    4

II.     Statement of the Nature and Stage of Proceeding                       5

III.    Statement of Facts                                                    6

IV.     Summary of Argument                                                   32

V.      Argument                                                              32

VI.     Conclusion                                                            39

VII.    B - Appendix / Attachments

**Please note: Some of these exhibits are being sent to the Court under seal, because defendants marked them confidential during discovery.**

| Page(s) | Exhibit |
| --- | --- |
| 1-6 | Photos of Car and Street [Filed Under Seal] |
| 7-27 | *Abraham v. Raso*, 183 F.3d 279 (3rd Cir. 1999) |
| 28 | Delaware §§ 803 and 602 |
| 29-39 | Delaware Pattern Jury Instructions |
| 40 | Congressman Baca Letter Re Hollow Point Bullets |
| 41 | Information on Hollow Point Bullets |
| 42 | Ashton Article on Flashing Police Lights |

| | |
|---|---|
| 45-59 | WPD Policy 6.7 [Filed Under Seal] |
| 60-78 | WPD Policy 6.8 [Filed Under Seal] |
| 79 | Page from Dr. Vershvovsky Deposition |
| 80-91 | Waters Expert Report |
| 92-108 | Stine Expert Report |
| 109-110 | Norby Expert Report |
| 111-112 | Bungy Affidavit |
| 113-117 | Gwyn Deposition |
| 118-122 | Brittingham Deposition |
| 123-130 | Dempsey 3/8/04 Statement [Filed Under Seal] |
| 131-149 | Whitehead Deposition |
| 150-160 | Ciritella Deposition |
| 161-165 | Kurten Deposition |
| 166-176 | Dempsey Deposition |

## I. TABLE OF CITATIONS

Page

**Cases:**

*Abraham v. Raso*, 183 F.3d 279 (3rd Cir. 1999)            34

*Couden v. Duffy*, 446 F.3d 483 (3rd Cir. 2006)            34

*Curley v. Klem,* 298 F.3d 271 (3rd Cir. 2002)            34

*Saucier  v. Katz,* 533 U.S. 194 (2001)            34

**Statutes and Other Authorities:**

28 U.S.C. § 1331            5

28 U.S.C. § 1343            5

28 U.S.C. § 1391            5

42 U.S.C. § 1983            5, 32

42 U.S.C. § 1985            5, 32

42 U.S.C. § 1986            5, 32, 33

42 U.S.C. § 1988            5

Article 1, §§ 6 and 11 of the Delaware Bill of Rights            33

10 Del. C. § 4011            33

DEL.P.J.I.CIV § xx.xx(2000)            33

## II.  Statement of the Nature and Stage of Proceeding

**Nature:**

This civil action arises from a uniquely disturbing set of circumstances, wherein three Wilmington police officers threw to the wind reason, common sense, police department policies, their training, and our cherished constitutional guarantees, as they fired thirty-one 40 caliber jacketed hollow point bullets at a suspected misdemeanor car thief in a densely populated low to moderate income neighborhood.  In the process, a female neighborhood resident just inches from these officers is shot in the leg, bullets bounce off neighborhood homes, children and elderly alike flee for their life, and Harry Smith, III, a college student and accomplished musician, is shot to death in a hail of gunfire.  Adding insult to injury, the Wilmington Police Department did not even require the defendant officers to write a report, in clear violation of their written policies.  And, not surprisingly, the videotape that should have been in the camera in the stolen police car has not been produced.

Plaintiffs seek money damages under 42 U.S.C. Sections 1983, 1985, 1986 and 1988; the Fourth Amendment to the United States Constitution; and the common, statutory and constitutional laws of the State of Delaware.  This action is brought to redress injuries, damages, and other losses plaintiffs suffered as a result of the violation of Harry Smith, III's right to be free from excessive use of force by Wilmington police officers when they killed him on September 13, 2003.

This Court has jurisdiction over this action per the above mentioned statutes and 28 U.S.C. Sections 1331 and 1343, including supplemental jurisdiction to hear plaintiffs' state law claims.  Written notice of plaintiffs' claims was timely served upon the Mayor of Wilmington, as required by applicable state law.  This Court is the proper federal venue for this action, per 28 U.S.C. Section 1391(b).

**Stage of Proceeding:**

Defendants filed a motion for summary judgment. Discovery is complete, except for the depositions of expert witnesses. The case currently is set for a five-day jury trial on November 6, 2006.

### III. Statement of Facts

1. On September 13, 2003, around 6:00 PM, Harry Smith, III (hereinafter "Harry") visits a local hospital, complaining of mental health related ailments. He is accompanied by his father, plaintiff Harry Smith, Jr. (hereinafter "father").

2. Before receiving treatment for his diagnosed ailments, which included hallucinations, paranoia and agitation, Harry obtains a scalpel from the emergency room and begins stabbing himself in the chest.

3. Harry's father attempts to restrain him. However, Harry wrestles free from his father's grasp and leaves the hospital with the scalpel.

4. Wilmington Police Department (hereinafter "WPD") police officers Johnny Whitehead and Johnny Saunders are driving a marked WPD patrol car. This is a standard issue Ford police cruiser, used by police departments across the country. This particular vehicle is equipped with emergency flashing lights, siren and a key-locked shotgun rack in the driver's portion of the car. [B-1]

5. At the beginning of their shift, Whitehead and Saunders violate WPD policies, storing their loaded shotgun in the truck of their patrol car, rather than placing it into the key-locked shotgun rack located in the driver's portion of the car. Ensuring officers' compliance with WPD policies rests with the immediate shift supervisor. [B-138 to148]

6. Shortly after Harry leaves the hospital, Whitehead and Saunders are notified by WPD dispatch via radio that a patient left the hospital, and they are directed to respond to the situation. [B-133 to 134]

7. Shortly after this notification, Whitehead and Saunders spot Harry cross the street and approach a car. They activate the emergency flashing lights on their marked patrol car and proceed in Harry's direction. [B-135]

8. Harry slowly approaches the police car, looking like he is not in his right mind. [B-111 to 112]

9. Whitehead sees the blood on the front of Harry's white t-shirt. At first, he does not know if Harry is a victim of a crime or exactly what is going on. Whitehead believes Harry is the hospital patient about whom he was notified. [B-142]

10. Whitehead and Saunders get out of their marked squad car, leaving the lights flashing, the engine running, all windows up or closed, and the driver's side car door open.

11. As Harry approaches him, Whitehead first thinks he sees Harry with a needle in his hands. Whitehead soon realizes it is a small scalpel, about the size of a writing pen. [B-136]

12. Whitehead tells Harry to stop. [B-112]

13. Harry continues to slowly walk toward Whitehead, taking baby steps. [B-111]

14. Harry puts his hands up in the air. His hands are empty. [B-111]

15. As Harry approaches Whitehead, Harry does not say or do anything that is threatening to Whitehead or Saunders. [B-112]

16. As Harry approaches Whitehead, Whitehead backs up. As Whitehead backs up, Harry jumps into the car's open door. [B-112]

17. Whitehead tries to pull Harry from the car, but is not able to so do.

18. Whitehead then shoots Harry in the leg. [B-112]

19. In Whitehead's gun are 40 caliber Smith & Wesson jacketed hollow point bullets, which long have been subject of heated debate because of the lethal nature of

these bullets.  These bullets are designed to spread, almost in a mushroom shape, upon impact and cause far greater damage than non-hollow point bullets.  [B-40 to 41]

20. Whitehead is not trying to kill Harry.  He is trying to stop Harry from taking his car.  [B-149]

21. Although now severely injured because he is shot with a 40 caliber Smith & Wesson jacketed hollow point bullet, Harry is able to drive away in the car, with the emergency lights flashing and all windows up or closed.  [B-112]

22. Saunders immediately radios in to WPD dispatch and advises it they need assistance because someone took their marked patrol car.

23. Watching these events unfold is WPD Sgt. Deborah Donahue.  She is very nearby and is able to hear the gun shot. [B-143 to 144]

24. Donahue immediately begins pursuing Harry, and immediately radioes in to WPD dispatch, saying "shot fired". [B-145]

25. These WPD radio transmissions are heard by other WPD police officers, including those patrolling the streets and those at their desks at the station house. [B-145 to 146]

26. Among the dozen or so officers in pursuit are Sgt. Donahue, Detective Michael Lawson, Detective Donna DiClemete, non-defendant Donald Dempsey, Sgt. William Brown, Detective Stephen Misetic, defendant Ciritella, defendant Dempsey, and defendant Kurten.  Within a minute or so, at least six marked and un-marked police cars now are in a caravan immediately behind Harry, all with lights flashing and sirens screaming.  At least one of these police cars closely tail Harry, never letting him out of sight, while other police cars take off in different directions down other nearby parallel or cross streets.  And these defendants know this because they are part of this six-car caravan following Harry and they are listening to the radio transmissions. [B-8]

27. Harry allegedly is driving erratically, likely due to his severe gun shot wound and not being familiar enough with the police car to even turn off the flashing emergency lights.

28. Citizens and other motorists likely are in little danger because they are being alerted to the on-coming police action because there are so many cars with flashing lights (including the car Harry is driving) and screaming sirens.

29. The pursuit lasts for about one mile and two minutes.  No one is injured and no property is damaged.  And these defendants know this. [B-155]

30. Inexplicably, and contrary to WPD policies 6.7 and 6.8, defendant Ciritella uses his un-marked police car to block the intersection of 5th and Harrison streets. [B-45 to 78]

31. Inexplicably, and contrary to WPD policies 6.7 and 6.8, defendant Kurten uses his marked patrol car to block the intersection of 5th and Harrison streets. [B-45 to 78]

32. Defendant Dempsey parks his car so that it does not block the intersection.

33. The intersection of 5th and Harrison streets is a densely populated low to moderate income neighborhood.   And, the defendant police officers are aware of this. [B-156]

34. At this time, there are cars parked along both sides of 5th Street and both sides of Harrison Street.  These are fairly narrow streets, allowing for parking on both sides of the street and one-way traffic.  When cars are parked on both sides of the street, about three feet or so of space remains on either side of a car traveling down the middle of the street.  The homes on these streets vary in structural components, some have brick faces.  Others appear to be primarily wooden structure.  All have windows facing the street, on both top and lower levels.  And, the defendant police officers are aware of this. [B-3]

35. At this time, there are many neighborhood residents on their porches and on the sidewalks near their homes.  Many of these residents are young children and elderly. [B-14]  And, the defendant police officers are or should be aware of this. [B-113 to 122]

36. Maria Garcia is one of these neighborhood residents.  She is sitting on the front steps of a brick home right on the corner of 5th and Harrison streets, within just a few feet of where Ciritella and Kurten stop their police cars. [B-113 to 122]

37. At this corner of the intersection, there is a stop sign which is located a few feet from the corner of the brick home, where Maria Garcia is sitting on the front steps. On the other side of this stop sign is Ciritella's parked un-marked police car.  There is a space of several feet between the front of Ciritella's parked car and the curb.  There is enough space between the stop sign and the front of Ciritella's car for another car to pass without striking Ciritella's car or the stop sign.  However, to pass likely would require driving diagonally over the curb of the sidewalk. [B-4]

38. After using his car as a barricade, inexplicably, without taking time to get additional information from dispatch about the nature of the threat, contrary to WPD policies 6.7 and 6.8, and placing himself and others in potentially grave danger, Ciritella jumps out of his car and pulls his gun.  His gun has 40 caliber jacketed hollow point bullets, as do the guns of the other two defendants.  [B- 109 to 110]

39. When Ciritella jumps out of his car, all he knows is that someone took a police car without authorization, i.e., a misdemeanor car theft has occurred. [B-28]

40. There is no radio or other communication saying an attempted car jacking might have occurred.  And the defendant officers know this.  [B-147]

41. There is no radio or other communication saying an officer is down or injured. And the defendant officers know this. [B-147]

42. There is no radio or other communication saying anyone is injured or any property damaged.  And the defendant officers know this. [B-147]

43. There are many other WPD officers in the immediate vicinity. And the defendant officers know this.

44. The emergency lights on the stolen car are still flashing. And the defendant officers know this.

45. Ciritella, with gun drawn and in plain clothes (he was not in uniform), takes cover at the corner of the building. [B-4 and 157]

46. Within inches of Ciritella is Maria, sitting on the front steps of the brick home right there on the corner. Within yards of Ciritella are old women sitting on their porches, small children are playing on the sidewalks, and old men are on the sidewalks talking and just passing the day. [B-4]

47. Harry comes down 5th Street, headed toward Harrison Street, and stops about a ½ block from Ciritella. Directly behind Harry is at least one police car. A ½ block in front of him are two police cars blocking the intersection. Many other officers are responding to the pursuit and are very nearby. The entire area of narrow one-way streets is surrounded by police. Flashing lights and screaming police sirens replace the previously quiet, easy going afternoon enjoyed by the residents of 5th and Harrison Streets. [B-4]

48. Inexplicably, Ciritella leaves his position of cover and takes a few steps into the street. He begins to yell at Harry to get out of the car. [B-157]

49. Whether Harry can see Ciritella is unknown. First, Ciritella is ½ block away and dressed in plain clothes. Second, there are many neighborhood residents on the street. Third, with police emergency lights flashing behind him, in front of him, and on top of the car he is driving, his visibility likely is impaired by all the flashing lights. [B-42 to 44]

50. We do know Harry is seriously hurt and in great pain – a 40 caliber jacketed hollow point bullet hit his leg.

51. We do know Harry cannot hear Ciritella. Harry is about a ½ block away, all the windows are up or closed, and police car sirens are screaming. [B-137 to 138]

52. Like Ciritella, Kurten and Dempsey too inexplicably jump out of their cars, without getting additional information from dispatch. Kurten begins walking along the sidewalk on 5th Street in Harry's direction and while Harry is stopped ½ block from the intersection. [B-161 and 166]

53. Dempsey jumps out of his car and stands behind Ciritella's and Kurten's cars, leaving his siren and lights activated. [B-167]

54. The car Harry is driving then begins to move forward and toward the intersection of 5th and Harrison. At first, it looks like Harry is heading straight for the police cars blocking the intersection. [B-169]

55. At this moment, the window of opportunity to use deadly force **opens** because a car is headed in their direction and they do not know the intentions of the driver. [B-84]

56. Even though the window **opened** to use deadly force, the factors weigh heavily against using it. These defendant police officers know or should know that even a 40 caliber jacketed hollow point bullet will not stop a car. They know or should know that the driver if hit likely will lose control of the car. And they know or should know that if they miss they likely will hit a neighborhood resident or other innocent bystander with their 40 caliber jacketed hollow point bullet. [B-45 to 108]

57. The reasons for not shooting at moving vehicles are obvious. And this is why WPD trained these defendants not to shoot at moving vehicles, not to shoot if a citizen likely will be hit, not to use their vehicles as barricades, and to discontinue a vehicle pursuit if it appears likely a citizen will be injured. [B-139 to 141]

58. Ciritella is on the passenger side of the stolen car as it approaches the intersection. He backs up and fires at least three shots. [B-158]

59. However, when Ciritella fires, the window of opportunity to use deadly force had **closed**. Ciritella is no longer in danger because he is back on the sidewalk and between the stop sign and the brick building. All three of these bullets go through the windshield at an angle showing Ciritella was on the passenger side, not in front of, the stolen car when he fired these first shots. The physical evidence shows the car was passing Ciritella when he fired his first three or four shots. [B-2 and 84]

60. Even though severely injured, Harry sees the gap or space between Ciritella's car and the stop sign – almost just enough room for him to get away from the hail of gunfire. He desperately moves in the direction of this opening and tries to squeeze through, which is away from Ciritella and his gunfire, moving very slowly and using the power of the car to force a parked Jeep out of the way. [B-4]

61. We know the car Harry is in is moving very slowly because the airbags do not deploy.

62. We also know the car Harry is in is moving very slowly because all three defendants **walked** to keep up with this moving vehicle.

63. As the car continues to pass within a few feet of him, Ciritella, still on the passenger side of the car, shoots more bullets. This time the window on the front passenger side of the car shatters. [B-158]

64. As Ciritella shoots, he knows Harry does not have a gun in his hand. His right hand definitely is on the steering wheel. And Ciritella is close enough to and does see Harry is not armed. We know this because Ciritella says as he fires he has his target in sight and a clear backdrop, and he knows he hits Harry in the right arm. [B-158]

65. Ciritella continues walking on the sidewalk for a few yards and then steps into the street. Now he is only a few feet from Harry. The front passenger window is gone.

He can clearly see Harry is not armed and that the shotgun is not in the key-locked shotgun rack.  But Ciritella continues to shoot until all 13 bullets are fired from his gun. [B-159]

66. All Ciritella knows at the time he fires all 13 bullets is: a) no one previously had been injured; b) no property previously had been damaged; c) he is dealing with a car thief; d) the car thief is alone in the car and the lights are still flashing; e) the car thief did not exit the vehicle when told to so do; f) no one in the immediate vicinity is in any danger because he claims he did not see them; and g) there are many other police in the immediate vicinity, making it extremely unlikely, if not impossible, for Harry to leave the 500 block of Harrison Street.

67. At the moment Ciritella fires the bullet hitting Harry's head, Ciritella knows Harry is not armed – has no weapon.

68. As Ciritella is walking up the passenger side of the stolen car, defendant Dempsey is near the rear driver's side of the vehicle. As the car rounds the corner, Dempsey sees Harry's hands turn the steering wheel.  Thus, Dempsey too knows Harry does not have a gun in his hand. [B-170]

69.  Dempsey is aware other officers had responded and are in the immediate vicinity.  At page 44, lines 20 and 21 of his deposition says: "I observed that several officers were starting to get out of their vehicles behind the suspect car."  At page 46, lines 15 to 21, Dempsey states: "I waited, actually, a second because of a crossfire situation between myself and several officers down the block.  Once he started to pass me and I had a better backdrop of buildings and nobody was in the area, I started -- proceeded to fire my handgun at the driver's side window of the vehicle shattering same." [B-168]

70. Dempsey walks to keep up with the car as it slowly moves away from him. As the car is moving away from him, Dempsey fires until all 13 bullets from his gun are discharged, and then he stops to re-load, dropping his first bullet clip on the ground. [B-171]

71. All Dempsey knows at the time he fires all 13 bullets is: a) no one previously had been injured; b) no property previously had been damaged; c) he is dealing with a car thief; d) the car thief is alone in the car and the lights are still flashing; e) the car thief did not exit the vehicle when told to so do; f) no one in the immediate vicinity is in any danger because he claims he did not see them; and g) there are many other police in the immediate vicinity, making it extremely unlikely, if not impossible, for Harry to leave the 500 block of Harrison Street.

72. As Dempsey fires all 13 shots, he knows he did not see a shotgun in Harry's hands.

73. Inexplicably, Kurten starts firing after any perceived danger to Ciritella passed. At page 16 of his deposition Kurten states [B-162]:

20    Q. So at the point at which you fired two or three

21    shots, where was Officer Ciritella then standing?

22    A. I believe he was back or at the corner of the

23    building, 5th and Harrison, northeast corner.

**Page 23**

8    Q. When you fired the second two or three shots,

9    how far do you think you were from the car?

10    A. From the rear of the car or from where

11    Mr. Smith sat or what point are you looking at?

12    Q. From the rear bumper of the car.

13    A. Rear bumper?

14    Q. Yes, sir.

15    A. I'd say anywhere from 12 to 17 feet.

**Page 30**

9    Q. Did you see any citizens not involved in this

10    incident on the street or on their porches in the 500

11    block of Harrison Street when you discharged any of

12    the five shots?

13    A. No.

14    Q. Did you see Officer Dempsey prior to the point

15    at which you fired your first two or three rounds?

16    A. I do not believe so.

74. As Ciritella and Dempsey walk on opposite sides of the stolen car, Kurten walks behind the car, firing his gun.  He stops firing when the other two defendants stop firing.  [B-163]

75. All Kurten knows at the time he fires all five bullets is: a) no one previously had been injured; b) no property previously had been damaged; c) he is dealing with a car thief; d) the car thief is alone in the car and the lights are still flashing; e) the car thief did not exit the vehicle when told to so do; f) no one in the immediate vicinity is in any danger because he claims he did not see them; and g) there are many other police in the immediate vicinity, making it extremely unlikely, if not impossible, for Harry to leave the 500 block of Harrison Street.

76. Defendant police officers continue to fire their guns even after the car stops. According to David Gwyn, a neighborhood resident, right in the middle of the firing and definitely in a position to see testifies during his deposition as follows [B-113 to117]:

16

**60**

14    Q.  Okay.  Between the time that you first noticed

15    Mr. Smith slumped over toward the steering wheel and the

16    time that the car stopped, were the officers still firing

17    their weapons?

18    A.  Yes.

19    Q.  After that car came to a stop, were the officers

20    still firing their weapons?

21    A.  Yes.

22    Q.  Were they behind the car?  On the side of the

23    car?  In front of the car?  Where were the officers?

24    After that car stopped and they were still firing their

**61**

1    weapons, where were those officers?

2    A.  At no time did I see them in front of the car.

3    At no time.

4    Q.  When that car first stopped, the officers were

5    still firing their weapons; correct?

6    A.  Yes.

7    Q.  Where were those officers?  Were they behind the

8    car?

9    A.  They was in the back of the car.

10    Q.  All right.  They were in the back of the car?

11    A.  Mm-hmm.

12    Q.  Was Mr. Smith slumped over the steering wheel at

13    the time that that car was stopped?  When you first

14    **noticed that car stopped, was Mr. Smith still slumped**

15    **over or toward the steering wheel?**

16    **A.  Yes.**

17    **Q.  And were those officers still shooting?**

18    **A.  Yes.**


77. When defendant police officers are certain Harry is dead, Ciritella and Dempsey signal each other, indicating Ciritella can reach in and place the car in park, which Ciritella does.  [B-127]

78. When Ciritella reaches in, he sees no weapon – no scalpel is recovered from the police car and the shotgun is stored in the trunk.

79. A total of about five minutes now have passed from the moment Ciritella was sitting at his desk at the police station to the moment he is placing the stolen car in park.

80.   Now a young man with a promising future lies dead, a middle-aged lady sitting on her porch is shot in the leg (Maria Garcia), bullet holes dot houses up and down Harrison Street, and shocked and trembling neighborhood residents are picking up themselves from the ground where they had fallen in their attempt to avoid being shot.

81. Harry's lifeless and bloody body is removed from the car, handcuffed, and left on the street for several hours.  [B-120]

82. While Harry dead and bloody body laid on the city street, much of his blood streams down the street's very steep hill, and in full view of neighborhood residents and other on-lookers.  It is a shocking, gruesome, disturbing and frightening site.

83.   As the ambulance arrives to take Maria to the hospital, the three defendant police officers are taken to Dunkin Donuts and then to the police station.   All four shooting police officers are placed together in a single room for several hours before their brief interviews, lasting about ten minutes or less each. [B-172]

84.  Each officer is directed by WPD not to write a report, in clear violation of WPD policies 6.7 and 6.8.  At page 26 of Kurten's deposition, he states [B-164]:

3      **Q. Is there any other situation involving a**

4      **serious police matter in which you did not write a**

5      **report?**

6      **A. No.**

7      **Q. Were you told why it was not necessary for you**

8      **to write a report in this case?**

9      **A. No, I wasn't told.**

85. The neighborhood residents complain loudly about police endangering them by shooting up their neighborhood.  They request and receive assistance from the local NAACP to demand a federal investigation of this incident. [B-118 to 122]

86. The coroner performs an autopsy and concludes all of the bullets contributed to Harry's death.  [B-79]

87. No scalpel is found in the stolen car.  The shotgun is in the trunk.

88. The videotape from the stolen police car's camera?  Plaintiffs repeatedly have asked for it but it has **not** been produced.

**Physical Evidence:**

According to the coroner, Dr. Jennie Vershvovsky, all shots fired contributed to Harry's death.  During her deposition taken by defense counsel, the coroner testified [B-79]:

10      **Q. Were the other wounds, I mean I'm excluding the**

11      **gunshot wound to the head, either singularly or in**

12      **combination fatal?**

13    **A. I considered all the gunshot wounds which he**

14    **received equally attributing to his death.**

15    **Q. So the gunshot wounds, for example, to his**

16    **wrist contributed to his death?**

17    **A. Yes. We don't separate one wound from another.**

18    **We look at them as an aggregate.**

The photos of the police car, showing the trajectory of bullets, establishes that all of the 31 shots fired were fired while the defendant police officers were on the side of the stolen car or behind it. [B-2, 5 and 6]

**Expert Reports:**

Plaintiffs retained the services of two expert witnesses.  Plaintiffs believe the Court will qualify them as experts at trial, given their training, knowledge and experience.

Following are excerpts from Elbert Waters' Rule 26(a)(2) Report [B-80 to 91]:

**"From 1976 to 1991, I worked as a patrol officer for the Chicago Police Department. For five years, I served as a tactical officer, wearing plain clothes.  During my sixteen years service as a Chicago police officer, I responded to thousands of calls for assistance.  Based upon my training, knowledge and experience, I am familiar with what a reasonable police officer on the scene should do when faced with a car theft situation, including the theft of a police car, after hearing radio transmissions containing words such as "officer needs assistance" and "shots fired" and after observing the stolen car drive through densely populated streets erratically at speeds exceeding posted limits.**

**Documents Reviewed:**

**1) Amended complaint**

**2) Wilmington, Delaware Police Department policies**

**3) Delaware Statutes**

**4) Depositions of Gwyn, Whitehead, Ciritella, Dempsey, and Kurten**

**5) Affidavit of Bungy**

**6) Photos**

**7) Delaware Attorney General Report on shooting of Harry Smith**

These are the types of documents reasonably relied upon by experts in the field when trying to determine whether the force used by police officers was excessive. …

To a reasonable degree of professional certainty, based upon my review of the above noted documents and my training, knowledge and experience, it is my opinion Wilmington police officers shooting Harry Smith on September 13, 2003 violated clearly established statutory and constitutional rights of which a reasonable police officer would have known. It would be clear to a reasonable police officer on the scene that his conduct in shooting Smith, after he passed Ciritella, was unlawful in the situation he confronted. The actions of the police officers were not objectively reasonable in light of the facts and circumstances confronting them. The shooting of Smith was an excessive and unreasonable use of force. The shooting officers knowingly and flagrantly violated generally accepted practices for the use of force and their own departmental policies for vehicle pursuits and use of deadly force.

Prior to this shooting incident, it was clearly established by departmental policy and Delaware law that it was not appropriate to shoot a non-felon (car theft suspect), not necessarily set on avoiding capture through vehicular flight (because he is driving a marked police car with emergency lights flashing), when the officers knew they were not in danger and believed there are no persons in the immediate area at risk from that flight. The crimes here were manufactured or caused by the numerous blunders of the police, who were plainly incompetent and knowingly violated the law and their own departmental policies.

Among the factors I have considered in making a determination of reasonableness include the severity of the crime at issue, whether Smith posed an immediate threat to the safety of the police officers or others, whether he actively resisted arrest or attempted to evade arrest by flight, the duration of the incident, the possibility Smith might have been armed, the number of police officers responding to the incident, the number of persons with whom the police officers had to contend, and the information the officers had and/or should have had available to them at the time they used deadly force.

The nature and extent of the blunders of the police in this case are stunning. First, Whitehead violates departmental policy at the beginning of his shift by placing his shotgun into the trunk. He then approaches Smith, whom Whitehead has reason to believe is mentally ill, in a manner allowing Smith to enter and take his patrol car, which Whitehead left running with the car door open. Whitehead then fails to alert dispatch and responding officers that he is the shooter and his shotgun is in the trunk of the car.

As officers respond, all they know is that they are chasing a stolen police car (which is a misdemeanor), with a shotgun under lock and key, and no one has been injured. Inexplicably, and in clear violation of departmental policies, Ciritella blocks the road in a densely populated neighborhood, jumps out of his car without contacting dispatch to assess the nature of the threat (putting himself at risk), and steps into the street and shouts at a person in a car ½ block away from him (not giving proper warning and again putting himself at risk). As the stolen car begins to move, Ciritella begins firing, and as he removes himself from danger he continues to shoot while now knowing the suspect is not armed and is injured. Whether Ciritella knew other innocent bystanders or other police officers were potentially in his line of fire is unclear, but he should have known. He was trained to make certain he had a "clear backdrop" before discharging his weapon. He did know other police officers responded and were very near by, making it highly unlikely, if not impossible, for Smith to escape beyond the 500 block of Harrison Street.

Inexplicably, the other two officers shoot at Smith while the vehicle is very slowly moving away from them. Like Ciritella, they too knew or should have known the location of each other and innocent bystanders and that other officers were near by.

As a result of these numerous and serious blunders and violations of clearly established departmental policies based upon constitutional and statutory laws, an innocent bystander is shot in the leg, bullets hit neighbors' homes, citizens on the street are jumping out of the way to avoid being shot, and a car thief is killed.

It is unreasonable for an officer to seize an unarmed non-dangerous suspect by shooting him dead. There is no reasonable misapprehension of the law governing the circumstances these officers confronted. They had fair notice this type of conduct is not appropriate because of the departmental policies in place. A reasonable officer in these circumstances could not believe shooting Smith until he was dead was justified. A reasonable officer would not have believed Smith posed a threat of serious physical harm to officers or others or that he would escape given the number of responding officers. Therefore, it was unreasonable to use deadly force to prevent Smith's escape, assuming that is what he was doing as the car moved toward the road block and/or very slowly up the hill on Harrison Street.

When viewing these facts in a light most favorable to police, it is my opinion that these police officers were plainly incompetent and knowingly violated the law. These officers did not have probable cause to suspect Smith posed a threat of serious physical harm to themselves, citizens in the immediate area, or other citizens in Wilmington. They

had no information he harmed any person or caused any property damage.  They could not have reasonably believed that Smith's flight posed a risk of harm to themselves or others because he was surrounded by other officers very nearby and they had no information other than he stole a police car.  They knew or should have known Smith could not escape – there were adequate numbers of police present to prevent his escape.

The defendant police officers manufactured or created the situation, which they then later use to justify their shooting of Smith.  These officers had plenty of time to plan a strategy to capture or apprehend Smith.  They were not forced to make a split second decision.  Instead, they intentionally positioned themselves to use deadly force to kill a person having stolen a police car.  No reasonable officer would have emptied his gun at a vehicle moving away from him in a densely populated neighborhood, particularly when he knows that should the chase continue there are other nearby police officers readily available to apprehend the car theft suspect driving a marked police car with flashing emergency lights.

The explanations offered by these officers for their actions is questionable.  Unfortunately, the police department's handling of the investigation was inconsistent with established and generally accepted police practices and their own departmental policies.  After the shooting, all of the defendant police officers were placed in a single room for several hours.  They did not write a report on their actions, in violation of written departmental policies.  Their only interview lasted just a few minutes."

Joseph Stine has 40 years of police experience, about 10 of these as police chief.  In his Rule 26 (a)(2) Report, Mr. Stine states that among the documents he reviewed are defendants' depositions, recorded interviews of the defendants, the official reports (Attorney General, Police Department and City Solicitor), recordings of police radio calls, and photographs.  His conclusions include [B-92 to 108]:

1. "The WPD and its personnel failed to act in accordance with generally accepted practices and procedures for professional police departments during the pursuit of Mr. Smith." …

2. "Detective Ciritella, Officer Kurten and Sgt. Dempsey utilized excessive and unreasonable deadly force." …  "B. There is nothing that was known to Detective

**Ciritella that would have justified the use of deadly force against a person who was operating a vehicle without the consent of the owner. There were no exigent circumstances or emergencies that warranted the unreasonable and excessive use of deadly force in the successful attempt to kill Mr. Smith."** …

3. **"Detective Ciritella, Officer Kurten and Sgt. Dempsey acted in a manner contrary to generally accepted police practice procedures when they fired a total of 31 shots in a congested and densely populated residential area."**

4. **"It is my opinion that the entire focus of the follow up investigations into the deliberate killing of Mr. Smith was to find someway to justify the actions of the officers who killed him. The record is replete with examples of that attempt."** …

5. **"It is never acceptable to use deadly force to stop a stolen car even if that car happens to be a police car. It is certainly not permissible to summarily execute a person for operating a vehicle without the owners consent."** …

6. **"The rational for this justification is nonsensical."** …

The reports of Mr. Waters and Mr. Stine are attached hereto, from pages B-80 to 108.

**WPD Policies:**

Governing the actions of the defendant police officers in this type of situation are WPD policies 6.7 and 6.8 [B-45 to 78]

Policy 6.7 says:

V.    **Procedure:**

A.    **Parameters for use of deadly force:**

3. **An officer is authorized to use deadly force if the officer has probable cause to believe that the suspect poses an imminent threat of serious physical harm to the officer or others.**

4. **An officer may use deadly force to prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.**

6 (c). **Police officers shall not fire their weapons at, or from a moving vehicle except for under exigent, life-threatening circumstances.**

6 (d). **Firearms shall not be discharged when it appears likely that an innocent person maybe injured.**

**VI. The Departmental Shooting Investigation Process**

4. **When a police officer discharges a weapon and a person is either injured or killed, that officer(s) will complete his preliminary report of the incident and then be directly placed on "Administrative Leave."**

Policy 6.8 says:

A.      **Responsibilities of Communications Personnel**

…

3. **Whenever a unit is dispatched on a complaint, the dispatcher will provide the responding officers with all the information that he/she has relative to:**

a. **The presence of potential danger.  …**

B.      **Emergency Call Where A Criminal Act Is Taking Place**

…

4. **In those cases necessitating promptness and speed on the part of the responding unit, the dispatcher will:**

a. **Ensure that a force is sent which is adequate to meet the need.**

**b. Direct the force so that it will be deployed in such a manner as to increase the likelihood of apprehension of the criminal.**

**c. Ascertain, if possible, whether the crime is in progress, and if so, what is involved – a threat to life, or a threat to property.**

**D.     Motor Vehicle Pursuit Policy**

**2. Preliminary Assessment**

**When an officer decides to undertake the pursuit of a vehicle …**

**b. The officer shall indicate the criminal offenses and violations that he/she knows or has reasonable articulable grounds to believe have been committed or were attempted to have been committed by the occupant of the vehicle being pursued. …**

**3. Consideration for Undertaking a Pursuit**

**a. The apprehension of the suspect is not the sole factor which merits consideration in a motor vehicle pursuit.  The officer has an important duty to evaluate the conditions and not to create a situation in which the pursuit becomes a greater danger to the public than the escape of the individual being pursued.  In making the decision to initiate or continue pursuit, the officer's decision shall include a consideration of the following factors:**

**(1) Due regard for the safety of all persons;**

**(2) The level of seriousness of the suspected offense (example, greater speeds are warranted in pursuit of a murderer than in pursuit of a speeder) …**

**(4) … the ease of apprehending the person at another time …**

**(5) The effectiveness of audible warnings, including the audibility of the warning …**

**4. Rules for a Pursuit**

**…**

**d. An officer shall end a pursuit if the pursuit poses an unreasonable risk to the safety of persons, including the officer.  …**

**5. Supervisory Responsibilities**

**…**

**d.  … Additionally, he/she shall order all the officers involved in the pursuit to submit reports outlining their actions.**

**12. Alternatives**

**…**

**Additionally, a police officer must always remember that attempting to stop the pursued vehicle by boxing-in, cutting off, ramming, or other force may constitute the use of deadly force and such attempts to stop the pursued vehicle are governed by the standards listed in the policy directive dealing with the authorized use of firearms, 6.7. …**

**Consequently, boxing-in, cutting-off ramming, or other force to stop a pursued vehicle should only be used in exceptional circumstances when no other reasonable means exist to apprehend the suspect.**

**13. Pursuit Reporting**

**(a) All law enforcement officers who operate law enforcement vehicles in vehicular pursuit situations shall be required to file a report of the incident utilizing one, or a combination of, the following forms:**

**Crime/vehicle report**

**Arrest report**

**Accident report …**

**This report is to be filed immediately following the incident and should contain, ….**

**Whitehead Deposition Says Police Received Following Training:**

According to WPD officer Whitehead, the police officers have received training in WPD policies 6.7 and 6.8.  During his deposition he testified [B-139 to 149]:

**Page 31**
    **12   Q.  And what were you taught to do if you walk up**

27

13    on what you believe is a car theft in progress?

14      A.  You can arrest the suspect.

15      Q.  Have you ever been told you can use deadly

16    force?

17      A.  For a car theft?

18      Q.  Yes.

19      A.  No.

20      Q.  In fact, you have been trained that you can't

21    use deadly force for a car theft?

22      A.  That is correct.

23      Q.  What about car chases, what were you trained to

24    do in car chases?

                    Johnny Whitehead            32

1      A.  Basically, they don't last too long in the

2    city.  We're told to -- they don't condone that.  I

3    mean, usually it will last a couple of blocks, but

4    usually a supervisor will call it off because the city

5    is so condensed so they will usually cut them off.

6      Q.  And when you say, "cut them off," you mean

7    that --

8      A.  Terminate it.

9      Q.  -- they will let the guy who is trying to get

10    away get away?

11      A.  Yes.

12      Q.  Because you don't want the citizens getting run

13    over and that kind of thing, correct?

14    A.  Absolutely.

15    Q.  Did you get any training on whether or not you

16  can use your patrol vehicle as a barrier or a block to

17  block a street to stop a car chase?  Did you get any

18  training in that area?

19    A.  Now, see, I know we did, but I don't know if it

20  was after that incident.  The Attorney General's

21  Office said that you don't put yourself or your

22  vehicle to form a roadblock to prevent someone from

23  stealing a vehicle.

24    Q.  And you don't recall the exact time frame, but

                    Johnny Whitehead            33

1  is it fair to say that before the shooting incident no

2  one had specifically told you yeah, go ahead and put

3  your patrol car out there as a barrier?

4    A.  That's correct.  I don't think anyone would

5  condone that.

6    Q.  Have you ever heard of that before, somebody

7  using their car as a barrier in the city?

8    A.  Well, I'm pretty sure that there are those who

9  have done that, but that is not, that is not proper

10  protocol.

11    Q.  And what about securing the shotgun, did you

12  get any training in whether or not it's proper for you

13  just to place your shotgun in the trunk without a

29

14  holder or anything?

15   A.  Yes.  We were trained to put it in the locking

16  mechanism that you see here in Exhibit 4.

Page 41

5   Q.  Is it your understanding that if someone steals

6  a police car then the police may use deadly force?

7   A.  Not for just stealing a police car, no.

Page 49

14   Q.  What does it mean when a Wilmington police

15  officer says he has a clear backdrop?

16   A.  It means that you can shoot without the bullet

17  missing its target and hitting someone else, an

18  innocent bystander.

19   Q.  Have you received any training about whether or

20  not a Wilmington police officer can shoot his gun when

21  there are citizens on the street?

22   A.  From what I understand, it is not recommended

23  that you shoot your gun at someone when there's a lot

24  of citizens that could be hit.  I choose not to.

                    Johnny Whitehead            50

1   Q.  Were you trained that if there's citizens on

2  the street and somebody else could get hit so,

3  therefore, you don't have a clear backdrop that you're

4  not supposed to shoot your gun?

5   A.  Yes.

6   Q.  What is your definition of excessive use of

7   force?

8     A.  Any force that is unnecessary to effect an

9   arrest.

**Page 58**

1     Q.  Yes, should you give.

2     A.   The only information is what type of weapon, if

3   any, that the suspect or defendant may have that could

4   pose a threat to me or him.

5     Q.  Any other information?

6     A.  And a description so that he or she will know

7   who I am talking about.

8     Q.  Are you trained that it's okay to shoot at a

9   moving vehicle?

10    A.  It is not.

11    Q.  Say again?

12    A.  It is not.

13    Q.  It is not okay to shoot at a moving vehicle?

14    A.  Yes.

15    Q.  That's how you were trained?

16    A.  Yes.

**Page 60**

21    Q.  Are the police vehicles ever checked by the

22   shift supervisor before you guys go out after roll

23   call?

24    A.  Seldomly.

Johnny Whitehead          61

1    Q.  Are they supposed to check them?

2    A.  I believe so, yes.

3    Q.  Did anyone check your vehicle on 9-13-03?

4    A.  No.

**Page 62**

3    Q.  Right.  Are there any guidelines within which

4    an officer must exercise his discretion or is he free

5    to do whatever he wants to do?

6    A.  We have guidelines.

7    Q.  And where are those guidelines?  Are they

8    written?

9    A.  They're written in the white book.

10    Q.  What's the white book?

11    A.  The white book is our rules and regulations.


## IV.  Summary of Argument

Defendants are not entitled to summary judgment because they violated the clearly established constitutional rights of Harry.  There are genuine issues of material fact in dispute, requiring a jury's determination.


## V.  Argument

Plaintiffs allege defendants' above-noted conduct violates 42 U.S.C. §§ 1983, 1985 and 1986.  § 1983 provides a cause of action when police officers acting under color of state law violate a clearly established constitutional right.  § 1985 (3) provides a cause of action when two or more police officers conspire to deprive any person of the

equal protection of the laws, or of equal privileges and immunities under the laws, and a person is injured in his person or deprived of having and exercising any right or privilege of a citizen of the United States.   § 1986 provides a cause of action when persons having knowledge of the wrongs conspired to be done are about to be committed and having the power to prevent or aid in preventing the commission of the wrong, neglect or refuse so to do.   None of these three federal statutes require any of the acts be done by the wrongdoer on the basis of the race of the wronged.   Plaintiffs do not now, and never have alleged, race is an issue in this case.

Plaintiffs also allege defendants' above-noted conduct violates Delaware laws. Delaware's Constitution specifically prohibits the unreasonable seizure of a person. Article I, §§ 6 and 11 of the Delaware Bill of Rights.

Delaware's statutes provide a cause of action when a person is injured because police officers and/or other city employees are negligent.   Delaware Code Section 4011 (c) states: "An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent." (62 Del. Laws, c. 124, § 2; 70 Del. Laws, c. 186, § 1.)   According to Delaware Pattern Jury Instructions for Civil Practice in the Superior Court of the State of Delaware, Revised in part 8/1/2003, [DEL.P.J.I.CIV §xx.xx (2000)]: "Willfulness indicates an intent, or a conscious decision, to disregard the rights of others.   Willfulness is a conscious choice to ignore consequences when it is reasonably apparent that someone will probably be harmed.   Wanton conduct occurs when a person, though not intending to cause harm, does something so unreasonable and so dangerous that the person either knows or should know that harm will probably result.   It reflects a foolhardy 'I don't care' attitude."

The law is well settled in this area.  Before there is a jury trial in this case, this Honorable Court must find the defendant police officers' conduct violated a clearly established constitutional right.  *Saucier v. Katz*, 533 U.S. 194 (2001); *Couden v. Duffy*, 446 F.3d 483 (3rd Cir. 2006).  In so doing, the Court must consider the "totality of circumstances" and determine whether the defendant police officers' actions were objectively reasonable in light of the facts and circumstances confronting them at the time they made the decision to use deadly force.  If "disputed historical facts pertinent to determining objective reasonableness" of defendants' conduct exist, then "a decision on qualified immunity will be premature" and the matter must be submitted to a jury.  "A jury can evaluate objective reasonableness when relevant factual issues are in dispute." *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002).

The Court also must decide "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier v. Katz*, 533 U.S. 194 (2001).  In this case, we know it was clear to a reasonable officer, on September 13, 2003, that he could not shoot a misdemeanor car theft offender fleeing in a vehicle after a police officer told the offender to surrender and the fleeing offender hit a parked car in the process of fleeing.    We know this because in 1999 the Third Circuit issued its decision in a case entitled *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999).  The *Abraham* case is right on point with the facts of this case.  For the Court's convenience, a copy of this important decision is attached hereto and made part of the Appendix.

The *Abraham* case is important for two reasons.  First, it helps to answer the question regarding whether the constitutional right was clearly established on September 13, 2003.  And, second, it helps focus our attention on: a) comparing the physical evidence to the defendants' verbal accounts of what happened; and b) comparing the various versions of events the defendants provide over the course of time.

The physical evidence in this case contradicts the police version. First, the stolen car's airbag did not deploy, indicating this was either a very low speed crash into the Jeep or this was a very slow speed pushing of the Jeep out of the way.

Second, the photo numbered B-4 (in the sealed materials being sent to the Court) show the bullet casings from defendant Ciritella's bullets land between the stop sign and the building. It is reasonable to assume this is where he was standing as Harry tried to go through the opening between the stop sign and Ciritella's car, meaning Harry was intentionally moving **away** from Ciritella. We know Harry was intentionally moving away from Ciritella to avoid the gunfire. We know this because of the next photo.

The photo numbered B-2 (in the sealed materials being sent to the Court) show three bullet holes in the front windshield. In this photo are the trajectory sticks, placed there by someone working on defendants' behalf. The trajectory sticks clearly show Ciritella was on the passenger side of the car when he fired into the windshield, not in front of the car.

At page 88, lines 17-19 of his deposition, Ciritella testifies that when he fired the first shot the car was about a car length away from him. At page 110, line 9, Ciritella claims Harry "Tried to run me over." This means we have a disputed issue of fact, requiring the jury to resolve it. There are many unanswered questions because of the factual disputes, e.g., Were defendants shooting at Harry because Harry drove at Ciritella with the intent to kill him, as defendants claim? Was Harry just trying to avoid the bullets by squeezing through the opening between Ciritella's car and the stop sign? Was Harry trying to surrender as he approached the intersection? Was Ciritella out of harm's way when he fired the first shots from the passenger side of the vehicle? Were all of the defendants shooting to kill only because Harry stole a police car?

We know all of the other 28 plus shots were fired as Harry was moving away from the officers. The officers fired shots from both sides and the rear of the car, as they walked up the street.

We also know these officers knew there was no imminent threat to anyone nearby. They claim they did not see any people on the street. According to Ciritella's deposition testimony:

**Page 107**

10     **Did you see any people, any citizens on the**

11     **street? On the porch? Anything like that?**

12     **A. No, ma'am.**

13     **Q. When you stepped into the street and shot into**

14     **the car, did you see any people in the street on the**

15     **porches? Anything?**

16     **A. No, ma'am.**

17     **Q. Was there ever a time where you became aware**

18     **that there were people on the street and on the**

19     **porches?**

22     **A. I never saw any people. The only person that I**

23     **saw was Sergeant Dempsey, Tom Dempsey, and he would**

24     **have been in this area. He's the only person that I**

**Page 108**

1.     **saw.**

15     **Q. So as you're walking up the sidewalk, you saw**

16     **Mr. Dempsey, as well?**

17     **A. No. Again, I think this is my only visual of**

18     **him.**

36

19      Q. Did you see any other police officers --

20      A. No, ma'am.

**Page 110**

2       Q. You saw no citizens, no civilians at all?

3       A. No, ma'am.

**Page 115**

7       Q. So my question is: Did you see Officer Dempsey

8       at any point between the corner of 5th and Harrison

9       and the point at which you put the car in park? Do

10      you recall seeing Officer Dempsey between those two

11      points?

12      A. Other than the first time I saw him, no.

**Page 116**

7       Q. Now let me ask you about Sergeant Kurten. When

8       did you first see him?

9       A. Never saw him.

10      Q. Never saw him?

11      A. No, ma'am.

Dempsey contradicts Cirritella's version. According to Dempsey, during a March 8, 2004 interview: "I feel I'm in a good shooting position where I'm not endangering Officer Ciritella and I could not see that anyone else was in front of me. . . . I observed from my peripheral vision that Officer Ciritella was doing the exact same thing I was doing. He had locked back his weapon also, was reloading it the exact same time and also started on a tactical to the vehicle on the drivers, on the passenger side of the car.

Uh I know we both made eye contact and we were looking you know make sure we you know knew what both of us were doing."

The physical evidence shows that when all shots were fired no one was in danger.  All shots were fired when the officers were on the sides of or behind the stolen car.  The defendants claim they saw no one in imminent danger.  And we know, in part through Dempsey's words, that he is aware of other officers in the immediate vicinity and able to prevent Harry's flight.

In this case, like in the *Abraham* case, we have changing stories and contradictions with physical evidence.  For example, Dempsey said, during his March 8, 2004 interview: "I stopped I actually quickly looked for cover and there was none, there was no parked cars.  So I just locked and loaded you know reloaded my weapon."  But take a look at picture B-3, it clearly shows cars parked bumper to bumper on the side of Harrison Street on which Dempsey was walking.  Then Dempsey really leaps beyond the physical evidence and says: "So I used the uh automatic you know unlock, unlock the door.  Uh at which time somebody went in and uh took the gun, the suspect out of the car."  The gun was never in the car.  The gun was in the trunk.

Also, when these defendants were interviewed in September 2003, they said they ran up the street after the stolen car.  This information is repeated in their response to plaintiffs' Complaint.  When their depositions were taken in 2006, they all said they were walking up the street after the stolen car.  When pressed on the apparent inconsistency, Dempsey said, at page 70 of his deposition:

**1    is admitted that Defendants Ciritella, Dempsey, and**

**2    Kurten ran up the hill and fired their weapons."**

**3    Is that correct or not, sir?**

**4    A. I never run anywhere.**

**5    Q. Did you see Defendant Ciritella run up the**

6      **hill?**

7      **A. No.**

8      **Q. Did you see Defendant Kurten run up the hill?**

9      **A. I didn't see Kurten.**

## VI. Conclusion

Plaintiffs respectfully request that this Honorable Court deny defendants' motion

for summary judgment. They request oral argument.

July 5, 2006.

/s/ Anne T. Sulton
Anne T. Sulton
Admitted: Pro Hac Vice

Sulton Law Offices
Post Office Box 2763
Olympia, WA 98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**LOCAL COUNSEL:**

Kester I.H. Crosse
Delaware State Bar I.D. #638
1214 King Street
Wilmington, DE 19801
Telephone: (302) 658-3488
E-Mail: kesterih@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2006, I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Attorney John Parkins   E-mail Parkins@rlf.com

I also sent via FedEx to the Court and Attorney John Parkins documents under seal.

/s/ Anne T. Sulton
Anne T. Sulton