# U.S. 3rd Circuit Court of Appeals

## ABRAHAM v RASO, ET AL

Filed July 26, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
Nos. 98-5405 and 98-5406
VANESSA ABRAHAM, IN HER OWN RIGHT AND AS ADMINISTRATRIX OF
THE ESTATE OF ROBERT ABRAHAM, DECEASED, AND ON BEHALF OF
ROBERT CHRISTOPHER ABRAHAM, JR., LABREEA VON ABRAHAM AND
TAQUAN CAREY, THE MINOR CHILDREN OF DECEDENT;
CNA INSURANCE COMPANY (Intervenor-Plaintiff in D.C.)

v.

KIMBERLY RASO, BADGE NO. 243, INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS A TOWNSHIP OF CHERRY HILL POLICE OFFICER; THE
TOWNSHIP OF CHERRY HILL; CHERRY HILL CENTER, INC.; THE ROUSE
COMPANY OF NEW JERSEY, INC.; THE ROUSE COMPANY; MACY'S EAST INC.

LIBERTY MUTUAL INSURANCE COMPANY (Intervenor-Defendant in D.C.)
(D.C. Civil No. 96-4884)
KIMBERLY RASO; JORIS HOOGENDOORN

v.

THE ESTATE OF ROBERT C. ABRAHAM, Deceased; VANESSA ABRAHAM,
Administratrix of the Estate of Robert C. Abraham; VANESSA ABRAHAM,
Individually; MACY'S DEPARTMENT STORE; JOHN DOE(S), a fictitious name or
names, jointly severally or in the alternative

(D.C. Civil No. 96-5146)

Vanessa Abraham, Appellant in No. 98-5405 Kimberly Raso; Joris Hoogendoorn,
Appellants in No. 98-5406 On Appeal from the United States District Court for the
District of New Jersey (D.C. Civil No. 96-cv-04884) District Judge: Honorable Joseph E.
Irenas

Argued March 23, 1999
Before: BECKER, Chief Judge , COWEN, Circuit Judge , and STAGG,* District Judge
(Filed July 26, 1999)
Alan L. Yatvin, Esq. (Argued) Popper & Yatvin 1600 Market Street Suite 1416
Philadelphia, PA 19103
Counsel for Appellant/Appellee Vanessa Abraham

Louis J. Kotlikoff, Esq. (Argued) Kotlikoff, Littlefield & Fishman 412 White Horse Pike Audubon, NJ 08106
Counsel for Appellants Kimberly Raso and Joris Hoogendoorn in No. 98-5406
*Honorable Tom Stagg, U.S. District Judge for the Western District of Louisiana, sitting by designation. Mario A. Iavicoli, Esq. (Argued) 43 Kings Highway West Haddonfield, NJ 08033
Counsel for Appellee Kimberly Raso in No. 98-5405
John C. Simons, Esq. Hoagland, Longo, Moran, Dunst & Doukas 40 Paterson Street P.O. Box 480 New Brunswick, NJ 08903
Counsel for Appellee CNA Insurance Company
Carl D. Poplar, Esq. Jeffrey A. Ahren, Esq. (Argued) Poplar & Eastlack 215 Fries Mill Road P.O. Box 8320 Turnersville, NJ 08012
Philip R. Lezenby, Jr., Esq. Lezenby, Zane & Cure 208 White Horse Pike P.O. Box 699 Barrington, NJ 08007
Counsel for Appellee Township of Cherry Hill
Frank D. Allen, Esq. (Argued) Archer & Greiner One Centennial Square P.O. Box 3000 Haddonfield, NJ 08033
Counsel for Appellees Cherry Hill Center, Inc.; The Rouse Company of New Jersey, Inc.; and The Rouse Company Steven B. Prystowsky, Esq. (Argued) Lester, Schwab, Katz & Dwyer 120 Broadway New York, NY 10271
Counsel for Appellee Macy's East Inc.
Lewis K. Jackson, Esq. (Argued) 401 Route 73 North 10 Lake Center Executive Parks Marlton, NJ 08053
Counsel for Appellee Liberty Mutual Insurance Company

## OPINION OF THE COURT

COWEN, <u>Circuit Judge</u> :

Kimberly Raso, an off-duty police officer, shot and killed Robert Abraham in a mall parking lot while Abraham was trying to escape from a Macy's store where he had been stealing clothes. Raso was working as a mall security guard at the time and testified that she fired at Abraham because he tried to hit her with his car after she blocked its path. Abraham's estate alleges that Raso used excessive force. According to the estate, Raso was not in front of the vehicle, her life was never in danger, and she fired simply to prevent Abraham from evading arrest. The estate points to physical evidence showing the bullet shattered the driver's side window, rather than the front windshield, and struck Abraham in his left arm before passing into his chest.

Vanessa Abraham filed this suit as administratrix of Robert Abraham's estate, in her own right, and on behalf of Robert Abraham's three children. (Collectively referred to as "the estate.") The estate sought relief against Raso and the Township of Cherry Hill under 42 U.S.C. § 1983 based on violations of Robert Abraham's Fourth and Fourteenth Amendment right to be free from unreasonable seizures. The complaint also included pendent state claims against Raso, the owners of the Cherry Hill mall that employed Raso, and the Macy's store where Abraham had stolen the clothes.

Raso and her husband in turn brought negligence claims against Macy's, Abraham's estate, and Vanessa Abraham in her individual capacity and as administratrix. Raso also sued her own auto insurer, CNA Insurance Co., invoking an uninsured motorist provision in her policy. CNA then sued Liberty Mutual, the insurer for one of the mall defendants. The District Court held on summary judgment that regardless of whether Raso's use of deadly force was justifiable in self-defense, Abraham posed an immediate threat of physical harm to the public, making the shooting objectively reasonable. Based on this "core" holding, the District Court dismissed all the parties' claims, except for the few remaining claims not subject to a summary judgment motion, i.e., Raso's tort claims against Abraham's estate and Vanessa Abraham.

We will reverse and remand for further proceedings. We conclude that the District Court resolved genuine factual disputes that, if a jury decides in favor of the estate, would entitle the estate to relief. Since the District Court disposed of all claims brought in Abraham's complaint based on the Court's "core" holding that Raso's use of force was objectively reasonable, we will vacate summary judgment for all of those claims, except for the dismissal of the estate's claim against Macy's, which we will affirm.

Turning to Raso's claims, we will similarly affirm summary judgment in favor of Macy's for Raso's claim against the store, but we will reverse the dismissal of Raso's claim against her insurer, CNA Insurance Co. We conclude that under New Jersey law, Raso may be entitled to uninsured motorist coverage. We likewise will vacate summary judgment on CNA's claim against Liberty Mutual Insurance Co., the Cherry Hill mall's insurer.

I

## Background

On Saturday evening, October 15, 1994, Mary Jane

Thomulka was watching Macy's security monitors when she noticed Robert Abraham and his cousin, Dennis Redding, stealing clothes in the men's clothing department. Thomulka contacted Shawn Waters, another Macy's guard, and asked him to investigate. Waters did but decided that he needed help before confronting the two. Because Waters was concerned about having Thomulka, a woman nearfifty, involved if the suspects reacted violently, he specifically asked to have someone from the mall's security force back him up. Thomulka called Carmen Inverso, a security officer for the mall, who then put out a call to Raso and David Washick, the two off-duty police officers patrolling the mall. Raso responded that she was near Macy's while Washick, who was further away, headed toward Macy's. Mall guards Eriberto Avilez and Gary Saraceni also responded. According to Raso, she was told the suspects were possibly intoxicated.

Abraham and Redding initially walked together as they left the mall but soon parted apparently because they realized they were being followed. With Raso and Avilez walking steadily after them, the two suspects headed towards Abraham's car, parked facing west in aisle 68. Shortly after exiting the mall, Raso and Avilez also separated so that they could approach the suspects from different directions.

Abraham reached his car first and entered on the driver's side while Raso called out to him to stop. As Raso approached from the rear of the car, Avilez arrived near the front

and tried in vain to pull Abraham from the car. With Avilez trying to stop Abraham, Redding fumbled at the door on the passenger's side of the car, but was unable to get in. (Redding was so intoxicated at the time that he does not recall the shooting.) Saraceni and Waters meanwhile were driving up aisle 68 in an unmarked mall pickup truck.

Raso, who was in police uniform, testified that she repeatedly commanded Abraham to stop, but by the time she reached the rear driver's side of the car, he had begun backing. Either before or shortly after Abraham's backing, Avilez grabbed Redding and called out that he had him. The mall truck was very close at this point, withinfive or six feet of Abraham's car according to Saraceni, giving Saraceni and Waters a view of events. All witnesses agree that Abraham backed out of his parking spot in an east- southeast direction and hit a white Ford Mustang parked in the opposing row of cars.

Photographs of the rear of Abraham's car and the Mustang show that Abraham's car left a black mark roughly a foot long and an inch wide where his car hit the rear bumper of the Mustang. Abraham's car was left with a shorter, wider white mark on its rear bumper. Neither car's bumper appears in the photographs to have been dented in any way.

Raso testified that Abraham began backing "very fast," forcing her to "jump out of the way." Abraham App. at 173. In an interview conducted by the Cherry Hill Police Department on October 31, 1994, roughly two weeks after the shooting, Raso said that Abraham backed up "in a reckless fashion" and she heard a "loud crash" when he hit the Mustang. Raso App. at 198.

Waters agreed that Abraham's car struck the Mustang forcefully, but his testimony conflicted with the physical evidence and differed in a number of details from Raso's account. On June 26, 1997, several years after the incident, he testified in his deposition that:

To the best of my recollection, [Abraham's car] hit the front of the parked car. I believe he did damage to the front passenger side and he broke glass. I don't know if it was on the car that he struck or his own vehicle. And his back -- the back of his car was damaged. I don't know to what extent... [It] was a severe accident. He hit -- struck the car so hard he actually moved it out of its spot.

Abraham App. at 137-138. Waters's testimony also conflicted with Raso's account when he stated in his deposition that as Abraham began backing, Raso was"on the passenger side of the car towards the front of the vehicle." Raso App. at 468. In a statement taken the day after the shooting, Avilez agreed with Raso and Waters about how fast Abraham drove and said that Abraham"just floored it" in reverse and "smashed into another car." Raso App. at 508. Because the parties dispute how much of a threat Abraham posed to others when he began backing, it is important to understand how close surrounding cars were and to what extent they hemmed in the officers and Redding. Video footage taken immediately before the shooting by a mall surveillance camera shows a car that the estate identifies as Abraham's with two open spaces on the driver's side and one open space on the passenger's side. A view of the same area just after the shooting shows the car is missing, leaving four empty spaces. Raso stated at one point in her deposition, however, that a car was immediately next to Abraham's car on the passenger's side where Redding stood. Raso App. at 438-39. At oral argument, the parties did not dispute the estate's account of where Abraham's car was parked, but following the arguments, counsel for one of the mall defendants submitted a letter questioning the location of the car. Although the estate's identification of the car's position appears compelling, for our purposes all

that matters is that the estate has established a genuine factual dispute about how close other cars were.

The video tape from the surveillance camera bears special mention. The camera shows Raso and Avilez exiting Macy's and follows Avilez after he separated from Raso and began working his way between cars up aisle 68. The tape then abruptly switches back inside, and filming of events outside resumes shortly after the shooting. According to testimony by Thomulka and Waters, Macy's has well over twenty cameras but only one or two video tapes to capture the various cameras' signals. Since the estate has not drawn any incriminating inferences from this unfortunate switch in the taping, we also have not. After Abraham hit the Mustang, Avilez reported that Raso "got in front of the car" and stood "more towards the center." Raso App. at 508. Avilez continued that Abraham "inched his vehicle towards police officer Raso" while she told him "to stop the car." Id. Avilez described the last moments before the shooting as follows:

She drawed her weapon and said, "please don't let. Don't, please don't force me to do this. Please don't let me do this. Stop the car." That's when he floored it, um, catching officer Raso in her left leg when um, at the time she was falling she fired and discharged her weapon towards the driver's side window.

Id. at 509.

Saraceni testified that when Raso walked in front of Abraham's car, she stood "[t]o the driver's side in front of the headlight." Abraham App. at 202. Saraceni estimated that Raso told Abraham to get out of his car "between eight and ten" times, and after the sixth or seventh time, according to Saraceni, she drew her weapon and said, "please, please don't make me do this. Just get out." Id. at 203. Saraceni continued: "After about the fourth plea from officer Raso, I heard a distinct sound of Abraham's foot hitting the floorboards in the car, like stomping down on the accelerator. The car lunged forward. It didn't spin the wheels or anything." Id. at 204. He added: "When officer Raso fired the shot, everything was in motion. So she was moving out of the way. She was being struck at the same time. The car was moving forward. And the shot wasfired at that point." Id. at 205.

Raso similarly testified in a deposition taken on July 30, 1997 that she stood in front of the car before the shooting, by her account about two-and-a half feet towards the center of the car on the driver's side. She stated that as she walked closer towards the car, "he moved up maybe a foot or so." Id. at 174. At that point, she says she backed up, continuing to yell at him to stop, but Abraham moved forward a second time, about "six inches, a foot. I don't know." Id. at 176. Abraham then began"inching up, and at this time is when I pulled my weapon." Id. at 180. "It was like - he kept inching and inching up towards me. And it was a standoff. And I was looking to go - and I couldn't get out of his way" because "[t]here were vehicles there." Id. at 181-82. She said, "he looked right at me. And all I heard and saw was he slammed the accelerator to the floor. And I could see him go back as one would when the vehicle excels, [sic] and you're sitting in the driver's seat." Id. at 183. Raso testified that she fired at Abraham because "[i]f I didn't, I was going to be killed." Raso App. at 442. In her statement on October 31, 1994, she testified that she did not remember when she pulled her gun and recounted:

I remember just bringing the gun up and pointing it at the windshield and screaming for him to stop, and that's when I remember him hitting the accelerator and I tried to jump out of the way, and I couldn't, and I remember my left leg got caught, on the car, andfired

a round, into the windshield, pointing it at the windshield, fired a round at the driver in order to stop him.

Raso App. at 199. Her testimony here is contradicted by the physical evidence showing that the bullet did not go through the front windshield, but entered from the side of the vehicle.

The estate points out that Raso had initially testified that she could not remember whether she was hit by the car or carried by her own momentum, and later she claimed to recall having her leg caught by the car as she moved out of the way. But as the estate notes, when the mall surveillance video returned to the parking lot view immediately after the shooting, Raso is shown walking around without difficulty.

According to the estate, Raso never stood in front of the car with Abraham driving toward her. Rather, Abraham backed out, and Raso shot him from the side as he drove away. In the alternative, the estate argues that even if Raso was at some point in front of the car, she was never in danger and did not fire until she was safely out of the way and standing along side the car.

The estate notes that all of the witnesses who say Raso stood in front of the car and fired from that position are security officers working for the mall or for Macy's. These witnesses' testimony, the estate urges, could be rejected by a jury as self-serving. Relying on various pieces of physical evidence, the estate argues that the officers inflated the damage to the Mustang and hence the speed Abraham was driving, and the estate maintains that cars were not parked immediately beside Abraham's car as Raso suggested. A proper reading of the physical evidence, the estate argues, deflates the charge that Abraham was driving recklessly and threatening lives. More importantly, physical evidence shows Raso's shot went through the driver's side window, not the front windshield, as Raso claimed in her statement on October 31, 1994. Autopsy photographs show the bullet struck Abraham in the back of his arm, and the medical examiner's report concluded, "The course of the gunshot wound is from left to right. In the chest it is slightly from front to back and slightly from above downward." Abraham App. at 247.

The parties also refer to the testimony of two bystanders, Lisa Brittingham and her boyfriend, Bill Duhart, a reporter for a local newspaper. Brittingham and Duhart were leaving the mall just as Abraham and Redding walked out and soon found themselves in the midst of the officers' pursuit. Recognizing that a confrontation was about to occur, Duhart and Brittingham hurried inside their car and then watched what they could. According to Duhart, the officers and suspects were "approximately twenty-five to thirty-five yards in front of us in a couple of lanes over..." Abraham App. at 312. Because their view was obscured, neither Duhart nor Brittingham observed the shooting. When the police took Brittingham's statement, she was specifically asked, "You say you heard what sounded ah, to you like a gun shot. Did you see anyone fire a weapon?" She responded, "No." Abraham App. at 307. Duhart likewise was asked in a deposition, "After [Abraham's car] has struck [the Mustang]... what position is the police officer, the female officer, in at that point relative to[Abraham's] car, as best you can tell?" Duhart replied, "I couldn't tell. Primarily, she was on the driver's side rear of the car before it took off." Raso App. at 330. In short, Brittingham and Duhart have no relevant testimony about where Raso stood or what Abraham did after he backed up.

Brittingham and Duhart do confirm what all witnesses agree happened after the shooting. With the mall pickup in pursuit, Abraham continued driving away from the scene for

several hundred yards before finally coming to a stop. Officers quickly surrounded him and found he was mortally wounded. Abraham was pronounced dead upon arrival at Cooper Hospital. To establish Cherry Hill's liability under Monell v. New York City Department of Social Servs. , 436 U.S. 658 , 98 S.Ct. 2018 (1978), the estate relied on a variety of evidence. Prior to the shooting, several citizen complaints had been filed against Raso, and the Cherry Hill Police Department had disciplined her for "mouthing off " at roll call, getting in "verbal altercations" with other officers, wearing a gym suit for roll call, and going to the gym when she was supposed to be on patrol. In early 1991 the police department, prompted by concerns about stress and fatigue Raso was experiencing, reduced her authorized hours of secondary employment. For a number of years, Raso had had problems with anxiety and depression which led her to seek treatment, and at the time of the shooting, she was taking Xanax and Prozac, two prescription drugs used to treat those conditions. In response to Raso's ongoing treatment, the police department consulted on several occasions with Raso's health care providers, who responded that neither Raso's mental health nor the drugs she was taking would prevent her from performing her duties. Following the shooting, Raso's mental health has worsened, leaving her unable to work.

The parties initiated this action in two separate suits: (1) the estate's case against Raso, the Cherry Hill Township, and the various mall defendants, and (2) Raso and her husband's suit against the estate, Macy's, and Raso's insurer. After consolidating the two cases, the District Court dismissed on summary judgment all claims brought by the estate, as well as Raso's claims against Macy's and her insurers, leaving only Raso and her husband's claim against Abraham's estate. The parties filed notices of appeal, but we dismissed the appeals on July 22, 1998 for lack of jurisdiction, as there was no final order disposing of all claims. The parties returned to the District Court and jointly requested a final judgment pursuant to Fed.R.Civ.P. 54(b). Since the estate apparently was uninsured and without funds, the claims remaining in the District Court, i.e., those brought by Raso and her husband against the estate, evidently were of little value absent reinstatement of the claims against CNA and Liberty Mutual. Consequently, the District Court entered a Rule 54(b) order dated August 11, 1998. This appeal followed. II

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we exercise plenary review of a district court's grant of summary judgment. Barnes v. American Tobacco Co. , 161 F.3d 127, 138 (3d Cir. 1998). On a motion for summary judgment, the court must determine whether the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Any factual dispute invoked by the nonmoving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248-251 , 106 S.Ct. 2505, 2510-12 (1986). In opposing summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586 , 106 S.Ct. 1348, 1355-56 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson , 477 U.S. at 249 , 106 S.Ct. at 2511. Thus, while the

nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party. See , e.g. , Boyle v. County of Allegheny Pa. , 139 F.3d 386, 393 (3d Cir. 1998). Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment. Id.

III

To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins , 487 U.S. 42, 48 , 108 S.Ct. 2250, 2254-55 (1988). Before we examine whether Raso violated Abraham's federal rights by shooting him, the central issue in this case, we will first analyze the requirement that Raso acted under color of state law.

The Supreme Court has explained, "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power `possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " West , 487 U.S. at 49 , 108 S.Ct. at 2255 ( quoting , United States v. Classic , 313 U.S. 299, 326 , 61 S.Ct. 1031, 1042-43 (1941)). In Griffin v. Maryland , 378 U.S. 130, 135 , 84 S.Ct. 1770, 1772-73 (1964), the Court held that a deputy sheriff acting as a security guard for a private park operator satisfied the state action requirement under the Fourteenth Amendment because the deputy wore a sheriff's badge, identified himself as a deputy sheriff while escorting the plaintiff off park property, and arrested the plaintiff for criminal trespass. As we have previously noted, conduct qualifying as state action under the Fourteenth Amendment also counts as acting under the color of state law for the purposes of § 1983, although the reverse is not necessarily true. Groman v. Township of Manalapan , 47 F.3d 628, 638 n.15 (3d Cir. 1995)( citing Lugar v. Edmondson Oil Co. , 457 U.S. 922, 935 n.18, 102 S.Ct. 2744, 2752 n.18 (1982)). Based on Griffin , it is clear that even though Raso was working off duty as a security guard, she was acting under color of state law: she was wearing a police uniform, ordered Abraham repeatedly to stop, and sought to arrest him.

Turning to Abraham's claim of excessive force under the Fourth and Fourteenth Amendments, we note that excessive force in the course of an arrest is properly analyzed under the Fourth Amendment, not under substantive due process. Graham v. Connor , 490 U.S. 386, 393-94 , 109 S.Ct. 1865, 1870-71 (1989). The Fourth Amendment provides, "The right of the people to be secure in their persons... against unreasonable searches and seizures, shall not be violated." To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. Brower v. County of Inyo , 489 U.S. 593, 599 , 109 S.Ct. 1378, 1382-83 (1989). Abraham obviously was "seized" when shot. As the Supreme Court recognized in Tennessee v. Garner , 471 U.S. 1, 7 , 105 S.Ct. 1694, 1699 (1985), "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." The pivotal question is when the use of deadly force is reasonable.

Deadly force will only be considered reasonable, the Court held in Garner , when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. at 3 , 105 S.Ct. at 1697. Applying this rule, Garner held unconstitutional a state

14

statute that authorized officers to use deadly force, as the law in many states did at the time, against any felon fleeing or resisting arrest. The specific use of force challenged in <u>Garner</u> was a police officer's decision to shoot an eighth grader who had broken into an unoccupied house and stolen ten dollars and a purse, a crime that indisputably constituted a felony under state law.

While investigating a call from a neighbor, the officer had walked behind the unoccupied house and spotted the decedent scaling a chain link fence. The officer called out to the decedent to stop and, when he did not, shot him in the back of the head. Although it was dark outside, the officer frankly admitted that he had no reason to believe the decedent was armed or dangerous and explained that his reason for firing was that the decedent would have escaped and very likely never would have been apprehended.

The Supreme Court held it was unreasonable to rely on the technical, legal classification of the offense to determine when deadly force was justified. Instead, the Court required that deadly force must be necessary to prevent escape <u>and</u> the fleeing suspect must pose "a significant threat of death or serious physical injury to the officer or others." <u>Id.</u> at 3, 105 S.Ct. at 1697. The Supreme Court expressly recognized that suspects who do not pose a significant threat and successfully flee may never be apprehended: "we proceed on the assumption that subsequent arrest is not likely." <u>471 U.S. at 9</u> n.8, 105 S.Ct. at 1700 n.8. But applying a balancing approach, the Court concluded that the government's interest in effective law enforcement was insufficient to justify killing fleeing felons who did not pose a significant threat of death or serious injury to anyone. Weighty interests militate against the unrestrained pursuit of arrest. As the Supreme Court explained, "The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." <u>471 U.S. at 9</u>, 105 S.Ct. at 1700. Echoing the concepts that defendants are entitled to the procedural protections of a trial, must be shown to be guilty beyond a reasonable doubt, and should be punished according to the proportional scheme embodied in sentencing law, the Supreme Court emphasized, "It is not better that all felony suspects die than that they escape." <u>Id.</u> at 11, 105 S.Ct. at 1701. Subsequently, in <u>Graham v. Connor</u>, <u>490 U.S. at 394</u>, 109 S.Ct. at 1871, the Court amplified on the reasonableness standard applied under the Fourth Amendment while considering a claim that did not involve deadly force. How much force is permissible to effectuate an arrest, the Court explained, is determined based on the "totality of the circumstances."

Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. <u>See Terry v. Ohio</u>, <u>392 U.S. 1, 22-27</u>, 88 S.Ct. 1868, 1880-83, 20 L.Ed.2d 889 (1968). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, <u>Bell v. Wolfish</u>, <u>441 U.S. 520, 559</u>, 99 S.Ct. 1861, 1884 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. <u>See Tennessee v. Garner</u>, <u>471 U.S. at 8</u>-9, 105 S.Ct. at 1699-1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of... seizure").

Graham , 490 U.S. at 396 , 109 S.Ct. at 1871-72.

After explaining that reasonableness should be assessed in light of the "totality of the circumstances," the Supreme Court emphasized that the test is "whether the officers' action are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Id. at 396, 109 S.Ct. at 1872.

Objective reasonableness, the Court made clear, has two important implications: First, if the shooting was not objectively reasonable under the circumstances, it is irrelevant that the officer was acting in good faith. Second, if the shooting was objectively reasonable, by contrast, then any bad faith motivating the officer would not matter for the purposes of the Fourth Amendment. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." Id. at 396, 109 S.Ct. at 1872.

The Court cautioned that what force is objectively reasonable "must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396, 109 S.Ct. at 1872. As Justice Holmes memorably said in a different context, "Detached reflection cannot be demanded in the presence of an uplifted knife." Brown v. United States , 256 U.S. 335, 343 , 41 S.Ct. 501, 502 (1921).

Combining the standards announced in Garner and Graham , our inquiry for the use of deadly force is as follows: Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others? In determining the reasonableness of all degrees of force, the Supreme Court has said that the factors to consider include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor , 490 U.S. at 396 , 109 S.Ct. at 1872.

Because we are applying this standard on a summary judgment motion, we must address to what extent questions of "reasonableness" can be resolved on summary judgment. Reasonableness under the Fourth Amendment resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment. This sensitivity to context suggests that regardless of whether objective reasonableness invokes a different and heightened standard from negligence, reasonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared. While analyzing an excessive-force claim under the Fourth Amendment, the Ninth Circuit has explained that

even though reasonableness traditionally is a question of fact for the jury, see , e.g. , White v. Pierce County , 797 F.2d 812, 816 (9th Cir. 1986); Akhil R. Amar, The Bill of Rights as a Constitution , 100 Yale L.J. 1131, 1179 (1991), defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in

favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.

Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). While we agree with this statement and find it difficult to improve upon, we are aware that it does not resolve the fundamental issue: how willing should district courts be to find a use of force objectively reasonable assuming a given set of undisputed facts? To the extent that there is a general answer to this question, it depends on a court discerning differences in degree familiar in evaluating factual questions on summary judgment. As the Supreme Court said in Anderson, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249, 106 S.Ct. at 2511.

Since the District Court relied on the risk Abraham posed to others in granting summary judgment, we will consider first whether there are genuine disputes that Abraham posed a "significant threat of death or serious physical injury" to members of the public. Finding there are such disputes, we turn to the alternative ground not reached by the District Court; namely, are there any genuine disputes about whether Raso's actions were justifiable in self- defense? On this issue, we also find summary judgment cannot be granted.

The District Court's conclusions were premised on the following overview of events:
[T]his Court finds that the following material facts have been established: (1) Raso was advised that Abraham was intoxicated or under the influence; (2) Abraham evaded apprehension by Mall security guard Roberto Avilez, got into his car and disobeyed Raso's commands that he not get into the car or that he exit the car; (3) Abraham recklessly drove his car in reverse and at a high rate of speed -- with Avilez, Redding and Raso all in close proximity to the car -- out of his parking space and rammed into another parked car; (4) Raso, in police uniform, positioned herself towards the front of Abraham's car and commanded him at least half a dozen times to stop the car and get out of the car, and effectively warned him that she would use her gun to stop him if he kept driving at her; (5) Raso was close to Abraham's car as Abraham inched his car towards her and, at some point, Abraham accelerated his car and drove it towards Raso; (6) Raso believed that Abraham was trying to hit her or was acting with reckless disregard for whether or not he hit her; and (7) Raso jumped to her right out of the car's path and fired her gun once at the driver-side window. Abraham v. Raso, 15 F. Supp.2d 433, 444 (D.N.J. 1998).

We will focus first on Abraham's conduct before he allegedly accelerated toward Raso because we find many genuine factual disputes about how much of a threat Abraham posed to others through that conduct. Before describing those disputes, however, we want to express our disagreement with those courts which have held that analysis of "reasonableness" under the Fourth Amendment requires excluding any evidence of events preceding the actual "seizure." See, e.g., Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993)("we scrutinize only the seizure itself, not the events leading to the seizure"); Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir. 1992)("pre- seizure conduct is not subject to Fourth Amendment scrutiny."); Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994) ( quoting Bone and Carter ). The District Court alluded to similar cases confining the reasonableness inquiry to the moment the officer used force.

Based on these cases, we apparently should not consider any of the circumstances before the moment Abraham was actually struck by Raso's bullet because, following California

17

v. Hodari D. , 499 U.S. 621 , 111 S.Ct. 1547 (1991), a suspect is not seized until he submits to the police's show of authority or the police subject him to some degree of physical force. Bone , Carter , and Bella might be understood as only excluding evidence that helps the plaintiff show the force was excessive, so on this more narrow reading, we could consider Abraham's pre-seizure conduct if it undermines the estate's case. But even apart from the problematic justification for such a distinction, there are considerable practical problems with trying to wrest from a complex series of events all and only the evidence that hurts the plaintiff. (What do we say about Abraham's inching forward before he began accelerating? Assuming the inching occurred, does it help him by showing he really did not want to hit Raso and was just wondering whether she would shoot when he drove past her, or does it show that he weighed his options and decided he would hit her? If the evidence can only be considered on the latter interpretation, should a limiting instruction be available upon request?) In any event, since the cases purport to exclude all pre-seizure conduct and do not expressly draw any distinction between who the evidence helps, our discussion will assume the rule applies generally to all pre-seizure conduct.

We reject the reasoning of Bone , Carter , and Bella because we do not see how these cases can reconcile the Supreme Court's rule requiring examination of the "totality of the circumstances" with a rigid rule that excludes all context and causes prior to the moment the seizure is finally accomplished. "Totality" is an encompassing word. It implies that reasonableness should be sensitive to all of the factors bearing on the officer's use of force.

A more fundamental point is that it is far from clear what circumstances, if any, are left to be considered when events leading up to the shooting are excluded. How is the reasonableness of a bullet striking someone to be assessed if not by examining preceding events? Do you include what Raso saw when she squeezed the trigger? Under at least some interpretations of Hodari , Abraham evidently was not seized until after the bullet left the barrel and actually struck him. See Hodari D. , 499 U.S. at 630 , 111 S.Ct. at 1552 (dissenting opinion)(suggesting that under the majority's analysis, there may be no seizure when the police shoot and miss). If we accept both this interpretation of Hodari as well as the rule that pre-seizure conduct is irrelevant, then virtually every shooting would appear unjustified, for we would be unable to supply any rationale for the officer's conduct.

Courts that disregard pre-seizure conduct no doubt think they could avoid this problem. But even rejecting the rigorous interpretation of Hodari , courts are left without any principled way of explaining when "pre-seizure" events start and, consequently, will not have any defensible justification for why conduct prior to that chosen moment should be excluded.

The Supreme Court has allowed events prior to a seizure to be considered in analyzing the reasonableness of the seizure. In Brower , the Court remanded for a determination of whether the police acted reasonably in constructing a roadblock used to seize a suspect in a car chase. The suspect's estate alleged that the police designed the roadblock in a way likely to kill by placing a tractor trailer behind a curve and directing car headlights to blind the suspect as he rounded the curve. Brower , 489 U.S. at 599 , 109 S.Ct. at 1383. Under the analysis encouraged in Bone , Carter , and Bella , preparations predating the moment of seizure, i.e., the moment the car actually collided with the tractor trailer, must

be barred from consideration. But if preceding conduct could not be considered, remand in Brower would have been pointless, for the only basis for saying the seizure was unreasonable was the police's pre- seizure planning and conduct. Hodari itself cited Brower but did not suggest the Supreme Court was now rejecting Brower 's implication that pre-seizure conduct is relevant to the reasonableness of a seizure.

We agree with the First Circuit which concluded that Bone , Carter , and other courts following their rule are mistaken and misread Hodari when they suggest the case supports their rule. As the First Circuit explained:

[T]he question in [ Hodari ] was not whether the seizure was reasonable , which requires an examination of the totality of the circumstances, but whether there had been a seizure at all. We do not read this case as forbidding courts from examining circumstances leading up to a seizure, once it is established that there has been a seizure . We understand Hodari to hold that the Fourth Amendment does not come into play unless there has been a seizure...

St. Hilaire v. City of Laconia , 71 F.3d 20, 26 n.4 (1st Cir. 1995)(emphasis in original). In sum, we think all of the events transpiring during the officers' pursuit of Abraham can be considered in evaluating the reasonableness of Raso's shooting. Cf. Rowland v. Perry , 41 F.3d 167, 173 (4th Cir. 1994) ("The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.").

We are not saying, of course, that all preceding events are equally important, or even of any importance. Some events may have too attenuated a connection to the officer's use of force. But what makes these prior events of no consequence are ordinary ideas of causation, not doctrine about when the seizure occurred.

When the District Court found that Abraham posed a significant threat of death or serious physical injury to others, it emphasized the violence of Abraham's efforts to flee. In doing so, the District Court did not read the evidence in the light most favorable to the estate and failed to rely on the estate's version of events where there were genuine factual disputes. According to the District Court, Abraham "recklessly" drove in reverse at "a high rate of speed" with people in "close proximity" before he "rammed" into a parked car. A jury may ultimately accept this version of the facts, but they also may not.

We begin by noting that the pursuit of Abraham in the parking lot appears to have been measured, not frantic. When the mall's surveillance video showed the actors out in the parking lot, they were all walking. As Avilez headed up aisle 68 just a short distance from where Abraham's car was located, he took his time, talking into a radio and maneuvering in between two rows of cars parked head to rear against each other. How frenzied this initial pursuit was does not necessarily show anything about Abraham's conduct once in his car, but it does at least suggest that Abraham's actions were less desperate, giving the officers more time for considered action and less reason to fear his acts.

Much more significantly, when Abraham began backing, it is far from clear just how close Redding, Avilez, and Raso were and consequently whether they were put in jeopardy by the backing. The estate maintains, with considerable plausibility, that the video shows there was one open parking space next to Abraham's car on its passenger side and two open spaces to the driver's side. Testimony also suggests Avilez and

Redding were standing near the front end of the car, leaving them much less exposed as Abraham backed away from them. Raso testified that she was approaching the car from the rear, leaving doubt about how close she was and whether Abraham really was at risk of hitting her as he backed. She did say in her deposition taken on July 30, 1997, she had to "jump" out of the way when the car backed up. But in her statement taken just two weeks after the shooting, her description was less dramatic: "as the driver accelerated in reverse... I had to move back away from the vehicle so he didn't hit me then." Raso App. at 198. Raso also suggested that a car was next to Abraham's, making the space tight. The video tape evidence suggests otherwise. A reasonable jury could decide she embellished. How fast Abraham drove in reverse is also not beyond rational dispute. The District Court stated that Abraham "rammed" into a parked car, and it is true that witnesses testified that Abraham accelerated quickly out of his spot and collided forcefully with a Mustang parked behind him. But the photographs we have in the record of both Abraham's car and the Mustang do not show any damage to either car beyond smudges of paint on their bumpers. Based on that physical evidence, a reasonable jury could reject the witnesses' recollections as inaccurate. A more fundamental point is that given the doubts about whether Abraham was close to hitting someone when he backed, the fact that he collided forcefully with a parked car (if it is a fact) does not by itself show that Abraham posed a significant threat of death or serious physical injury to other people. In sum, the undisputed facts are that Abraham had stolen some clothing, resisted arrest, hit or bumped into a car, and was reasonably believed to be intoxicated. Given these facts, a jury could quite reasonably conclude that Abraham did not pose a risk of death or serious bodily injury to others and that Raso could not reasonably believe that he did. The remaining crucial fact obviously is that Raso and the security officers allege that Abraham tried to hit her with his car, or at least gave her the reasonable belief that he was going to hit her.

Although the District Court expressly avoided finding on summary judgment that Raso's decision to shoot was justifiable in self-defense, instead relying on the risk Abraham posed to others, the District Court did say that "Raso believed that Abraham was trying to hit her or was acting with reckless disregard for whether or not he hit her." Abraham , 15 F. Supp.2d at 444. Since at this point the evidence that Abraham was a threat to the public turns largely, if not entirely, on the threat to Raso, we turn now to whether a court can decide on summary judgment that Raso's shooting was objectively reasonable in self-defense.

We disagree with the District Court that there is no genuine dispute that Raso was in front of the car. Although it is true that the security officers all testified that Raso was in front of the car, the fatal shot indisputably came through the driver's side window. The District Court emphasized that the autopsy report described the path of the bullet in Abraham's chest as "slightly from front to back and slightly from above downward." Abraham App. at 247. While that trajectory may rule out that Raso was behind the vehicle, it hardly precludes a jury from finding that Raso fired from somewhere along the front side of the vehicle and that she was never in front of the vehicle. The bullet indisputably shattered the driver's side window, struck Abraham first in his arm, and then passed into his chest. It is true that the autopsy report stated that the path of the bullet was "slightly from front to back," but the report also was quite clear that "[t]he course of the gunshot wound is from left to right." Based on this physical evidence, a jury could reasonably decide to

reject the security officers' testimony. Considering the physical evidence together with the inconsistencies in the officer's testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment. Boyle, 139 F.3d at 393.

As the Ninth Circuit has recognized, since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story -- the person shot dead -- is unable to testify." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). "[T]he court may not simply accept what may be a self-serving account by the officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably." Id. See also Hopkins v. Andaya, 958 F.2d 881, 885 (9th Cir. 1992). Even assuming there is no genuine dispute that Raso was in front of the car at some point, the video tape of the parking lot shows a wide lane between the rows of parked cars and open parking spaces near where Abraham backed out. Raso is shown walking around immediately after the shooting, suggesting that even if hit or brushed by the car, she was not significantly injured. Together with the questions about how fast Abraham accelerated, these facts raise genuine disputes about whether Raso had room to get out of the way. Again, the fact that Raso's shot was fired through the driver's side window and hit Abraham in the left arm suggests she may have had time to get out of the way, take aim, and fire. A jury might not believe the officers' testimony that Raso was simultaneously in front of the car, being struck by it, jumping out of the way, and firing through the driver's side window.

We want to be clear that the ultimate question is not whether Raso really was in danger as a matter of fact, but is instead whether it was objectively reasonable for her to believe that she was. A jury will have to determine, after deciding what the real risk to Raso was, what was objectively reasonable for an officer in Raso's position to believe about her safety, giving due regard to the pressures of the moment. After weighing the evidence, the jury may very well conclude that Raso had an objectively reasonable belief that she faced a significant threat of death or serious physical injury, but this is a question for the jury. In light of the record so far, we cannot say as a matter of law that it was objectively reasonable for Raso to believe that she was in danger.

Even assuming Raso was in front of the car and was in danger at some point, a jury could find, notwithstanding her testimony, that she did not fire until it was no longer objectively reasonable for her to believe she was in peril. A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect. See, e.g., Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). We can, of course, readily imagine circumstances where a fleeing suspect would have posed such a dire threat to an officer, thereby demonstrating that the suspect posed a serious threat to others, that the officer could justifiably use deadly force to stop the suspect's flight even after the officer escaped harm's way. But in our case, if the jury decides that Raso did not fire until safely out of harm's way, the jury could also reasonably decide that Abraham's conduct was not so dangerous as to warrant Raso's use of deadly force.

We find instructive the Ninth Circuit's decision in <u>Hopkins</u>, a case testing the limits of an officer's self- defensive use of deadly force. In <u>Hopkins</u>, a police officer responded to a call about a suspect, Stancill, who was creating a disturbance. Although the officer noticed Stancill was acting strangely, the officer made no arrest and left after deciding he was not "a danger to himself or others." A short time later, the officer observed Stancill"howling or braying" under a traffic light. When the officer got out of his patrol car, approached Stancill, and tried to frisk him, Stancill allegedly grabbed the officer's baton and began hitting him, knocking him down in the process. The officer claimed that as he rose from the ground, deflecting the blows, he fired six shots at Stancill from a range of three to four feet, visibly wounding him and apparently knocking him to the ground. Despite the officer's commands to stay down, Stancill continued to advance, the officer said, causing the two to wrestle for a minute. Breaking free, the officer had enough time to get away, radio for help, reload his weapon and cross a street. Once across the street, the officer said that, after warning Stancill again to stop, he fired four more shots at him at close range. This time the shots were fatal.

The Ninth Circuit held that even apart from a number of disputes about the accuracy of the officer's story which precluded summary judgment, the court could not accept as a matter of law that the officer acted reasonably when he fired the final shots. Even though Stancill was attacking the officer, "[a]t the time of the second shooting, it was far from clear that [the officer] reasonably feared for his life." <u>Hopkins</u>, 958 F.2d at 887. The officer knew help was on the way, had a number of weapons besides his gun, could see that Stancill was unarmed and bleeding from multiple gunshot wounds, and had a number of opportunities to evade him. Two of the total shots, all of which had been fired from a distance of four feet or less, struck Stancill in the head. "To endorse [the officer's] chosen course of action -- firing <u>four</u> more shots -- would be to say that a police officer may reasonably fire repeatedly upon an unarmed, wounded civilian<u>even when alternative courses of action are open to him</u>." <u>Id.</u> (emphasis in original) In short, the fact that a suspect attacked an officer, giving the officer reason to use deadly force, did not justify continuing to use lethal force.

In seeking reversal, the estate has argued that Raso's use of force would still be unreasonable even if a jury found that she fired while she was in front of Abraham's car and in danger. According to the estate, if Raso jumped in front of the car to block Abraham's escape, she would have violated police department policy and, through that breach of policy, would have unreasonably created the need for deadly force. Because we find other grounds for reversal, we do not reach this issue. We note that a number of courts have refused to find officers liable based on their lapses in following police department procedures, even though those lapses may have contributed to the use of force. <u>See</u>, <u>e.g.</u>, <u>Drewitt v. Pratt</u>, 999 F.2d 774, 779-80 (4th Cir. 1993); <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1275-76 (5th Cir. 1992). By contrast, where an officer's conduct amounted to more than a minor departure from internal department policy, and in particular where the officer engaged in intentional misconduct, courts have found that the officer's acts creating the need for force are important in evaluating the reasonableness of the officer's eventual use of force. <u>See</u>, <u>e.g.</u>, <u>Gilmere v. City of Atlanta</u>, 774 F.2d 1495, 1501- 02 (11th Cir. 1985)(en banc). Similarly, in <u>Estate of Starks v. Enyart</u>, 5 F.3d 230, 234 (7th Cir. 1993), the court concluded that if an officer jumped in front of the decedent's car after the car began accelerating, the officer "would have unreasonably

created the encounter that ostensibly permitted the use of deadly force." We will leave for another day how these cases should be reconciled.

IV

Raso and the estate each sued Macy's for negligence. For the sound reasons given by the District Court, we find no merit to these claims and, therefore, will affirm summary judgment for all claims against Macy's, including any claims by the estate for gross negligence, negligence per se , assault, battery, negligent hiring, and negligent supervision.

The estate brought a number of other claims, including a § 1983 claim against the Township of Cherry Hill, negligence against Raso and the mall defendants (not including Macy's), negligent hiring and negligent supervision against the mall defendants, punitive damages against Raso and the mall defendants, and assault and battery against Raso and the mall defendants. Because the District Court's analysis of all these other claims was premised on the "core" holding that Raso's use of force was objectively reasonable as a matter of law, a holding we have now reversed, we will vacate summary judgment on these other claims and afford the District Court an opportunity to reassess those claims in light of our decision.

In analyzing the state assault and battery claim, the District Court provided an extended discussion of the state law granting officers a privilege to commit battery. We note that the parties have not raised or discussed in any way whether state law could, for the purposes of state tort liability, allow officers greater immunity for using force than the Fourth Amendment permits. Consequently, the parties have not discussed whether reversing summary judgment on the estate's § 1983 claim necessarily implies that the state battery claim must also be vacated. Because the parties have not briefed this issue, we will not reach it. We will simply vacate the grant of summary judgment on the estate's assault and battery claims against Raso and the mall defendants and remand for the issue to be resolved in the District Court.

V

Both Raso and her insurer, CNA Insurance Co., filed cross-motions for summary judgment on whether Raso was entitled to uninsured motorist coverage under CNA's policy. Liberty Mutual, which provided a business automobile insurance policy to one of the Cherry Hill mall defendants, also filed a motion for summary judgment. Liberty Mutual became involved in the case because once Raso sued CNA, CNA sued Liberty Mutual as a third-party defendant, arguing that Liberty Mutual must share in any liability CNA might be found to have. In Liberty Mutual's motion for summary judgment, it argued, as did CNA, that uninsured motorist coverage did not apply when Abraham's car allegedly struck Raso.

We enter this thicket of claims to address a single, narrow issue: under New Jersey law governing uninsured motorist claims, should courts look at the tort victim's perspective or the tortfeasor's in deciding whether there was an "accident?" If a court looks to the tortfeasor's perspective, then assuming Abraham intended to hit Raso, he committed an intentional tort, making the incident no "accident." (Raso takes the incongruous position that even if the tortfeasor's perspective is used, Abraham did not really intend to hit her.) If the victim's perspective is used, on the other hand, then Raso maintains that she never intended for Abraham to strike her with his car, making any injuries she sustained an accident.

While we recognize that New Jersey law leaves room for doubt on the issue, we predict that the New Jersey Supreme Court would hold that what counts as an accident for the purposes of uninsured motorist insurance should be judged from the victim's perspective. Thus, we will reverse summary judgment for CNA and Liberty Mutual and remand for further proceedings. We express no further view on the merits of Raso's claim against CNA or on the claim against Liberty Mutual.

CNA's uninsured motorist provision states:

We pay damages which you or any covered person are legally entitled to recover from the owner or operator of an uninsured motor vehicle or boat because of bodily injury: 1. Sustained by you or any covered person; and 2. Caused by a motor vehicle or boat accident... The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured or under insured motor vehicle or boat. "Accident" or "Occurrence" means an event or series of related events resulting from continuous or repeated exposure to the same general conditions that unexpectedly, unintentionally, and suddenly causes bodily injury or property damage during the policy period.

Raso App. at 121 and 133.

Under the terms of the policy, "accidents" must be "unexpected" and "unintentional." The difficulty, of course, is that the policy does not say from whose perspective the injury-causing events must be unexpected and unintentional. Contract language aside, the policy could not provide less uninsured motorist coverage than state law requires. See , e.g. , Allstate Insurance Co. v. Malec , 514 A.2d 832, 834 (N.J. 1986). Unfortunately, the state statute governing uninsured motorist insurance also does not define whose perspective should be used in determining what is an "accident." See N.J.S.A.§ 17:28-1.1(a). And New Jersey courts have made conflicting statements about whose perspective should be used.

In Continental Insurance Co. v. Miller , 654 A.2d 514 (N.J. Super. Ct. Law Div. 1994), a case that granted uninsured motorist benefits to two police officers who were intentionally hit by an uninsured car thief, the court reviewed what had been up to that point a clear line of cases in New Jersey supporting use of the victim's perspective for uninsured motorist claims. See , e.g. , Sciascia v. American Ins. Co. , 443 A.2d 1118, 1120 (N.J. Super. Ct. Law Div. 1982)(Fatal injuries an insured suffered from a drive-by shooting were "unforeseen, unusual, and unexpected" and hence an "accident" within the meaning of uninsured motorist coverage.).

In Malec , the New Jersey Supreme Court held that an insured was not covered by automobile liability insurance for her own intentional, wrongful acts, but the court specifically distinguished personal injury protection (or PIP) insurance and uninsured motorist coverage. Malec , 514 A.2d at 836. In particular, the court described one lower court opinion as "eminently sound" which held that for PIP insurance the term "accident" encompasses harm caused intentionally by someone other than the insured. Id. The court likewise noted the opinion in Sciascia and cited it for the proposition that what counts as an accident for uninsured motorist coverage should be viewed from the injured insured's perspective. Id.

Courts adopting the victim's perspective for uninsured motorist coverage have done so in part because they recognized that a major rationale for using the tortfeasor's perspective vanishes once you move from liability coverage to uninsured motorist coverage. Liability

coverage protects the insured from the costs of his or her own acts, so for obvious reasons, the coverage typically does not extend to the insured's intentional wrongdoing. See , e.g. , Malec , 514 A.2d at 837-38. Thus, the rule evolved in the context of liability coverage that since the insured and the tortfeasor are one and the same person, the insured tortfeasor's perspective should be used for deciding when there is an accident triggering coverage. Uninsured motorist coverage, however, is different. Unlike liability coverage, it protects an insured from harm caused by other people's acts, and an insured is equally blameless and surprised regardless of whether the tortfeasor acted negligently or intentionally. Covering the insured under these circumstances does not encourage the insured to commit intentional, wrongful acts and protects the insured from unexpected losses.

One natural response is that uninsured motorist coverage is intended to replace the coverage a tort victim would have if the tortfeasor actually had liability insurance. Since the tortfeasor's liability insurance would not pay for the tortfeasor's intentional acts, the argument continues, people are no worse off when they are denied uninsured motorist coverage for the intentional acts of others. The difficulty with this argument is that it begs the question. When the tortfeasor's auto insurance denies coverage because the insured's acts were intentional, then the tort victim is faced with an uninsured motorist. See N.J.S.A. § 17:28-1.1(e)(2)(b). At that point, the insured victim's argument is that the insured motorist policy was bought to cover unforeseen accidents caused by others who have no insurance coverage, and we return to our original question: whose perspective should be used in determining whether there was an accident? The District Court rested its decision on dicta in Lindstrom v. Hanover Insurance Co. , 649 A.2d 1272 (1994), a case which held that the victim of a drive-by shooting was entitled to personal-injury insurance benefits. While Lindstrom held that the victim's perspective should be used to determine what was an accident for PIP insurance, the court inexplicably grouped automobile liability insurance and uninsured motorist coverage together and declared that "neither... applies to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor." Lindstrom , 649 A.2d at 1276. The court added that Sciascia is "no longer respectable authority." Id.

We believe the dicta in Lindstrom was ill-considered, poorly supported, and does not accurately reflect the position of the New Jersey Supreme Court. Consequently, we will not follow it. See , e.g. , Travelers Indemnity Co. v. DiBartolo , 131 F.3d 343 (3d Cir. 1997)(adopting the position taken by state superior courts over ill-considered dicta by the state supreme court). The court in Lindstrom made no mention of Malec , its earlier decision endorsing, albeit in dicta, the decision in Sciascia , and the court did not recognize that the reasons offered in Lindstrom for using the victim's perspective for PIP insurance apply with equal force to uninsured motorist coverage. Indeed, Lindstrom 's eventual holding on PIP insurance is actually supported by cases such as Miller and Sciascia that adopt the victim's perspective where the insured is not the tortfeasor .

The court apparently felt compelled to reject Sciascia because that case held not only that the accidents are determined from the victim's perspective for uninsured motorist coverage, but also that a drive-by shooting did not have a sufficient nexus with the use of an automobile to qualify for uninsured motorist coverage. Lindstrom , by contrast, held that a drive-by shooting was covered under PIP insurance, notwithstanding a similar requirement of a nexus between an automobile and the shooting. But the requirement of a

nexus between the accident and the use of an automobile is a separate issue from the question of whose perspective should be used to determine what is an accident. Once this is acknowledged, it is clear that the court's statement in Lindstrom rejecting the victim's perspective for uninsured motorist coverage not only was unnecessary to the outcome in Lindstrom, but was actually contrary to Lindstrom's own reasoning.

We think it is telling that an uninsured motorist case decided after Lindstrom discussed the decision but did not follow it. See Gregory v. Allstate Insurance Co., 716 A.2d 573, 575-76 (N.J. Super. Ct. Law Div. 1997). Gregory held that:

Considering the fact that the law clearly mandates a liberal interpretation of the no fault statute with the view to providing coverage to the victim of an accident, and taking into account the clear and plain language of the statute which provides coverage to persons "legally entitled to recover damages of Uninsured Motor Vehicles," this court is compelled to conclude that the Uninsured Motorist Coverage must be afforded to victims of intentional automobile collisions.

Gregory, 716 A.2d at 576. As the court in Malec noted, "Legislation involving automobile insurance must be construed with `liberality in effecting the broadest protection of auto accident victims consistent with the language of the pertinent statute.' " Malec, 514 A.2d at 834 (citation omitted).

We predict that the New Jersey Supreme Court would adopt the tort victim's perspective for uninsured motorist coverage: all the uninsured-motorist cases raising the issue have used the victim's perspective, and legislation involving automobile insurance is to be interpreted broadly according to the New Jersey courts. Lindstrom, the one New Jersey Supreme Court decision rejecting the victim's perspective for uninsured motorist insurance, did so in dicta, without explanation, without addressing the substantial arguments made by its own lower courts for the competing position, and without recognizing that its dicta was deeply in tension with Lindstrom's own holding. A recent state decision did not follow Lindstrom's dicta, and finally, earlier dicta by the New Jersey Supreme Court in Malec, also not mentioned in Lindstrom, suggests the tort victim's perspective should be used for uninsured motorist coverage. Raso raises one last argument we must address. She contends that the scope of coverage of her insurance coverage should have been submitted to an arbitrator, as she asserts her insurance contract requires. The issue was not raised before the District Court and is waived.

VI

In conclusion, we will affirm summary judgment granted in favor of Macy's for all claims brought by Raso and Abraham. We will reverse summary judgment granted in favor of Raso for the estate's § 1983 claim for excessive force, and we will reverse summary judgment in favor of CNA for Raso's claim for uninsured motorist coverage. We will vacate summary judgment on the following claims: (1) the estate's § 1983 claim against the Township of Cherry Hill; (2) the estate's assault and battery claims against Raso and the mall defendants, excluding Macy's; (3) the estate's claims for negligence, gross negligence, and negligence per se against Raso and the mall defendants, excluding Macy's; (4) the estate's claims for negligent supervision and negligent hiring against the mall defendants, again excluding Macy's; (5) the estate's claims for punitive damages against Raso and the mall defendants, not including Macy's; and (6) Raso's coverage under Liberty Mutual's policy. For the foregoing reasons, the judgment of the District

Court is reversed or vacated in part, affirmed in part, and remanded for further proceedings.

Each party to bear its own costs.

A True Copy: Teste:

<u>Clerk of the United States Court of Appeals for the Third Circuit </u>35

§ 853. Unauthorized use of a vehicle; class A misdemeanor.

A person is guilty of unauthorized use of a vehicle when:

(1) Knowing that the person does not have the consent of the owner the person takes, operates, exercises control over, rides in or otherwise uses a vehicle;

(2) Having custody of a vehicle pursuant to an agreement between the person or another and the owner thereof whereby the person or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of the vehicle, the person intentionally uses or operates it, without the consent of the owner, for the person's own purposes in a manner constituting a gross deviation from the agreed purpose;

(3) Having custody of a vehicle pursuant to an agreement with its owner whereby it is to be returned to the owner at a specified time, the person intentionally retains or withholds possession thereof, without the consent of the owner, for so lengthy a period beyond the specified time as to render the retention or possession a gross deviation from the agreement; or

(4) Such person obtains possession or control over a vehicle, knowing of the existence of a creditor or creditors who are entitled to receive payments on a debt where such vehicle is the only security or represents the major portion of the creditor's security, and such person transfers or purports to transfer the vehicle and responsibility for making payments on such vehicle to a 3rd party, whether or not such 3rd party continues or resumes payment to the creditor or creditors.

Unauthorized use of a vehicle is a class A misdemeanor. (11 Del. C. 1953, § 853; 58 Del. Laws, c. 497, § 1; 67 Del. Laws, c. 130, § 8; 68 Del. Laws, c. 333, §§ 1, 2; 70 Del. Laws, c. 186, § 1.)

§ 602. Menacing; unclassified misdemeanor.

(a) A person is guilty of menacing when by some movement of body or any instrument the person intentionally places another person in fear of imminent physical injury.

Menacing is an unclassified misdemeanor.

(b) A person is guilty of aggravated menacing when by displaying what appears to be a deadly weapon that person intentionally places another person in fear of imminent physical injury. Aggravated menacing is a class E felony. (11 Del. C. 1953, § 602; 58 Del. Laws, c. 497, § 1; 67 Del. Laws, c. 130, § 8; 70 Del. Laws, c. 159, §§ 1, 2; 70 Del. Laws, c. 186, § 1.)