IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and
ROSLYN WOODARD SMITH,
Individually and as Administrators of
The ESTATE OF HARRY SMITH, III,

    Plaintiffs,

v.

CIVIL ACTION NO. 04-1254-GMS

CITY OF WILMINGTON,

JOHN CIRITELLA, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

THOMAS DEMPSEY, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

and

MATHEW KURTEN, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

    Defendants.

---

### PLAINTIFFS' RULE 26(a)(2) DISCLOSURE OF EXPERT TESTIMONY

### JUNE 30, 2006

---

At the trial in this matter, plaintiffs intend to call as an expert witness former Chicago police officer Elbert Waters to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. His report is attached hereto. As part of Mr. Waters report, he notes his qualifications. He has not previously testified or published articles, and his base compensation rate is noted as $200 per hour.



*Plaintiffs will supplement this disclosure when required under Rule 26 (e)(1).*

Dated this 30th day of June 2006.

s/ Anne T. Sulton
Attorney Anne T. Sulton
Attorney for Plaintiffs
**Mailing Address:**
Sulton Law Office
Post Office Box 2763
Olympia, WA 98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**LOCAL COUNSEL:**
Kester I.H. Crosse
Delaware State Bar I.D. #638
1214 King Street, Wilmington, DE 19801
Telephone: (302) 658-3488
E-Mail: kesterih@aol.com

### CERTIFICATE OF SERVICE

I hereby certify I caused to be sent via e-mail a true and correct copy of this document via e-mail and regular USPS on June 30, 2006 to:

Attorney John Parkins
Richards, et al.
One Rodney Square
Post Office Box 551
Wilmington, DE  19899

parkins@rlf.com

s/Anne T. Sulton
Anne T. Sulton


81

<h1 style="text-align:center">ELBERT WATERS</h1>
<h2 style="text-align:center">EXPERT WITNESS REPORT</h2>

To:     Attorney Anne T. Sulton

Date:   June 29, 2006

Re:     Shooting of Harry Smith, III

From 1976 to 1991, I worked as a patrol officer for the Chicago Police Department. For five years, I served as a tactical officer, wearing plain clothes. During my sixteen years service as a Chicago police officer, I responded to thousands of calls for assistance. Based upon my training, knowledge and experience, I am familiar with what a reasonable police officer on the scene should do when faced with a car theft situation, including the theft of a police car, after hearing radio transmissions containing words such as "officer needs assistance" and "shots fired" and after observing the stolen car drive through densely populated streets erratically at speeds exceeding posted limits.

**Documents Reviewed:**

1) Amended complaint
2) Wilmington, Delaware Police Department policies
3) Delaware Statutes
4) Depositions of Gwyn, Whitehead, Ciritella, Dempsey, and Kurten
5) Affidavit of Bungy
6) Photos
7) Delaware Attorney General Report on shooting of Harry Smith

These are the types of documents reasonably relied upon by experts in the field when trying to determine whether the force used by police officers was excessive.



1

**Facts Assumed True:**

1) Lighting is not an issue because the incident happened on the street and it still was daylight. There were no impairments to visibility complicating this situation.
2) Only one suspect in a stolen vehicle.
3) The potential escape routes are limited by the configuration of the city streets.
4) An adequate number of police officers responded for control and containment, and all were in close proximity to the stolen vehicle at all times, either directly behind it, in front of it, or paralleling its movements on adjacent streets. Responding officers were aware of this.
5) At no time were responding officers advised they were pursuing a known felon or a violent person (felony or misdemeanor).
6) There was an "officer needs assistance" call from officers Whitehead and Saunders on Washington Street, indicating their car was stolen. There was no call of "officer down" or any other call indicating an officer or citizen had been injured in any way.
7) Smith was not familiar with the police car because he left the emergency lights flashing while he operated the vehicle.
8) Some, if not all, of the responding officers also heard shots had been fired on Washington Street. The responding police officers did not know whether Smith or police officers fired these shots.
9) Responding police officers saw this stolen car traveling through the narrow streets of Wilmington with police emergency lights flashing.
10) Police joining the pursuit also had their lights and sirens on, alerting citizens and motorists a police action was occurring.
11) Smith led at least six police cars on a reckless chase through the city, wherein speeds exceeded the posted limits, but no injuries to citizens or property damage occurred during this two or three minute pursuit running about one mile.
12) Responding officers believed there might be a loaded shotgun in the driver's compartment of the stolen patrol car, which they also believed was securely locked into place, requiring a key to unlock and remove.
13) Ciritella used his unmarked patrol car to block the intersection of 5th and Harrison Street, which he knew was in a densely populated neighborhood.

2    

14) While dressed in plain clothes, Ciritella got out of his unmarked car, drew his gun, and took cover at the corner of a building.

15) Ciritella observed Smith and other police cars approach the intersection of 5th and Harrison, and when Smith was a half block away he stopped.

16) Ciritella then left his position of cover and walked a few steps into the street and shouted directions to Smith.

17) While Ciritella was shouting directions to Smith, there were sirens from other police cars wailing and the windows were up on the stolen police car driven by Smith.

18) Smith could not hear Ciritella's directions because he was too far away, the sirens were wailing, and the car windows were up.

19) Smith might not have seen Ciritella, who was in plains clothes, because of the ½ block distance between them, the flashing lights behind and in front of both Smith and Ciritella, and the number of people on the street, including police and citizens.

20) Smith drove the stolen police car in the direction of the intersection, where the road block and three defendant officers were located. Whether Smith saw these men is unclear, as are his intentions (one cannot assume the mental state or condition of Smith was such that he had the "intent" to kill Ciritella).

21) At that moment, the window of opportunity for Ciritella to use deadly force **opened** because it is reasonable to assume that an officer in his position feared for his life.

22) Ciritella fired several shots at this moving vehicle, backed up and took cover at the corner of the building.

23) At this moment, the window of opportunity for all three defendant police officers to use deadly force **closed** because none of them were in danger, they claim they saw no citizens on the street, and they knew other police were in the very near vicinity, making it extremely unlikely Smith would travel beyond that immediate area or escape, in part, because he was driving a marked police car with the emergency lights flashing and had been shot by Ciritella.

24) Smith drove the stolen car across a portion of the sidewalk in order to avoid a barricade consisting of a marked and an unmarked police car.



3

25) At this time, Ciritella was close enough to clearly see into the vehicle. He could clearly see his target (Smith) and that his target did not have a weapon in his hands.

26) Although he no longer was in any danger, because the car was passing and moving away from him, and he claims he did not see any citizens in the immediate vicinity, Ciritella fired additional shots, breaking the glass on the passenger side window, and likely hitting Smith several times because of Ciritella's close proximity to the vehicle – just a few feet at most from it.

27) Smith crashed the stolen car into a parked Jeep, pushing it aside while attempting to avoid being shot by Ciritella and the other two officers.

28) After pushing the Jeep aside, the stolen car very slowly continued to travel about a half block the wrong way up the one-way street in the 500 block of Harrison Street.

29) During this time, Ciritella was walking on the sidewalk for a few feet, parallel to the stolen car, and then stepped into the street and fired additional shots into the car. He had a very clear and unobstructed view of his target because the window now was missing. He could see Smith did not have a weapon in his hands. The car was moving very slowly at this time because Ciritella was able to walk to keep up with it.

30) Demsey and Kurten also fired numerous shots from the rear and/or opposite side of the stolen car, while the stolen car was moving away from them. They too were walking, so we know the stolen car is moving away from them very slowly.

31) Ciritella, Dempsey and Kurten claim they were not aware of any citizens on the street.

32) Ciritella, Dempsey and Kurten claim they were not aware of the precise locations or positions of other police responding to the call for assistance.

33) Ciritella, Dempsey and Kurten did not want Smith to leave the 500 block of Harrison Street.

34) Two officers stopped firing when their bullet clips were empty. The third officer stopped firing when the other two stopped.

35) The three officers' fired to kill Smith and stopped when they believed their goal was accomplished.



4

**Guiding Principles:**

Wilmington Police Department (WPD) policies guide officers in vehicle pursuits and the use of deadly force. Delaware statutes also provide guidance. There also are generally accepted police practices that guide officers.

Delaware identifies this type of car theft as a misdemeanor. Consistent with this definition, WPD policies direct officers to discontinue active vehicle pursuits if it is likely citizens might be injured. Thus, even when a police officer believes a person evading the police might escape, the officer may be required to discontinue the pursuit.

WPD policies also emphasize communication between and among responding police officers and dispatch is key in all situations. The policies state the dispatcher will provide responding officers with information about the presence of potential danger. This assumes dispatch will make certain it obtains this information so that the information may be transmitted to responding police officers. Calls are prioritized, with those not indicating bodily injury assigned lower priority. The goal is apprehension, not punishment of the suspect.

The policies direct officer actions when they stop a fleeing traffic violator. They are told that if the violator is alone in the vehicle then they should maintain a position of cover, order the driver out of the car, and await the arrival of other units.

WPD policies caution the officers in boxing in or cutting off pursued vehicles, because this may constitute the use of deadly force. The policy, Directive 6.8, states: "Consequently, boxing in, cutting off . . . or other force to stop a pursued vehicle should only be used in exceptional circumstances when no other reasonable means exist to apprehend the suspect." When ever an officer is involved in a pursuit, he must complete a written report.

WPD policies indicate a police officer may use deadly force if the officer has a reasonable belief there is an imminent threat of serious physical harm to himself or others. He also may use deadly force to prevent the escape of a fleeing felon. However, WPD officers are directed not to fire their weapons at a moving vehicle, except under exigent, life threatening circumstances or when it appears likely an innocent bystander might be injured. This is similar to the policies used throughout the nation by police departments in New York, Los Angeles, Boston, Portland, St. Louis, Cincinnati, Alexandria, and Tempe. It is generally recognized that shooting at vehicles places police

5 

officers and the public at risk because a bullet will not stop a 2,500 pound car and an injured driver likely will lose control of the car.

WPD policies define reasonable belief as: "The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances." It also notes that the continuum of force should be followed, suggesting WPD uses the linear model. There also is a circular model, sometimes referred to as the Ontario model. Both models are similar in that they call for escalation and de-escalation of force as fluid circumstances warrant. Some refer to this as the "opening" and "closing" of the window of opportunity to use deadly force. WPD policies also require police officers using deadly force to write a report.

**Opinions:**

This report is preliminary. I reserve the right to change, alter or supplement my opinions should other facts come to my attention that bear upon the question posed, i.e., was it objectively reasonable in light of the facts and circumstances for police to shoot Harry Smith, III.

To a reasonable degree of professional certainty, based upon my review of the above noted documents and my training, knowledge and experience, it is my opinion Wilmington police officers shooting Harry Smith on September 13, 2003 violated clearly established statutory and constitutional rights of which a reasonable police officer would have known. It would be clear to a reasonable police officer on the scene that his conduct in shooting Smith, after he passed Ciritella, was unlawful in the situation he confronted. The actions of the police officers were not objectively reasonable in light of the facts and circumstances confronting them. The shooting of Smith was an excessive and unreasonable use of force. The shooting officers knowingly and flagrantly violated generally accepted practices for the use of force and their own departmental policies for vehicle pursuits and use of deadly force.

Prior to this shooting incident, it was clearly established by departmental policy and Delaware law that it was not appropriate to shoot a non-felon (car theft suspect), not necessarily set on avoiding capture through vehicular flight (because he is driving a marked police car with emergency lights flashing), when the officers knew they were not in danger and believed there are no persons in the immediate area at risk from that flight.

The crimes here were manufactured or caused by the numerous blunders of the police, who were plainly incompetent and knowingly violated the law and their own departmental policies.

Among the factors I have considered in making a determination of reasonableness include the severity of the crime at issue, whether Smith posed an immediate threat to the safety of the police officers or others, whether he actively resisted arrest or attempted to evade arrest by flight, the duration of the incident, the possibility Smith might have been armed, the number of police officers responding to the incident, the number of persons with whom the police officers had to contend, and the information the officers had and/or should have had available to them at the time they used deadly force.

The nature and extent of the blunders of the police in this case are stunning. First, Whitehead violates departmental policy at the beginning of his shift by placing his shotgun into the trunk. He then approaches Smith, whom Whitehead has reason to believe is mentally ill, in a manner allowing Smith to enter and take his patrol car, which Whitehead left running with the car door open. Whitehead then fails to alert dispatch and responding officers that he is the shooter and his shotgun is in the trunk of the car.

As officers respond, all they know is that they are chasing a stolen police car (which is a misdemeanor), with a shotgun under lock and key, and no one has been injured. Inexplicably, and in clear violation of departmental policies, Ciritella blocks the road in a densely populated neighborhood, jumps out of his car without contacting dispatch to assess the nature of the threat (putting himself at risk), and steps into the street and shouts at a person in a car ½ block away from him (not giving proper warning and again putting himself at risk). As the stolen car begins to move, Ciritella begins firing, and as he removes himself from danger he continues to shoot while now knowing the suspect is not armed and is injured. Whether Ciritella knew other innocent bystanders or other police officers were potentially in his line of fire is unclear, but he should have known. He was trained to make certain he had a "clear backdrop" before discharging his weapon. He did know other police officers responded and were very near by, making it highly unlikely, if not impossible, for Smith to escape beyond the 500 block of Harrison Street.

Inexplicably, the other two officers shoot at Smith while the vehicle is very slowly moving away from them. Like Ciritella, they too knew or should have known the location of each other and innocent bystanders and that other officers were near by.

7



As a result of these numerous and serious blunders and violations of clearly established departmental policies based upon constitutional and statutory laws, an innocent bystander is shot in the leg, bullets hit neighbors' homes, citizens on the street are jumping out of the way to avoid being shot, and a car thief is killed.

It is unreasonable for an officer to seize an unarmed non-dangerous suspect by shooting him dead. There is no reasonable misapprehension of the law governing the circumstances these officers confronted. They had fair notice this type of conduct is not appropriate because of the departmental policies in place. A reasonable officer in these circumstances could not believe shooting Smith until he was dead was justified. A reasonable officer would not have believed Smith posed a threat of serious physical harm to officers or others or that he would escape given the number of responding officers. Therefore, it was unreasonable to use deadly force to prevent Smith's escape, assuming that is what he was doing as the car moved toward the road block and/or very slowly up the hill on Harrison Street.

When viewing these facts in a light most favorable to police, it is my opinion that these police officers were plainly incompetent and knowingly violated the law. These officers did not have probable cause to suspect Smith posed a threat of serious physical harm to themselves, citizens in the immediate area, or other citizens in Wilmington. They had no information he harmed any person or caused any property damage. They could not have reasonably believed that Smith's flight posed a risk of harm to themselves or others because he was surrounded by other officers very nearby and they had no information other than he stole a police car. They knew or should have known Smith could not escape – there were adequate numbers of police present to prevent his escape.

The defendant police officers manufactured or created the situation, which they then later use to justify their shooting of Smith. These officers had plenty of time to plan a strategy to capture or apprehend Smith. They were not forced to make a split second decision. Instead, they intentionally positioned themselves to use deadly force to kill a person having stolen a police car. No reasonable officer would have emptied his gun at a vehicle moving away from him in a densely populated neighborhood, particularly when he knows that should the chase continue there are other nearby police officers readily available to apprehend the car theft suspect driving a marked police car with flashing emergency lights.

8



The explanations offered by these officers for their actions is questionable. Unfortunately, the police department's handling of the investigation was inconsistent with established and generally accepted police practices and their own departmental policies. After the shooting, all of the defendant police officers were placed in a single room for several hours. They did not write a report on their actions, in violation of written departmental policies. Their only interview lasted just a few minutes.

**My Personal Information:**

I served for sixteen years as a police officer for the Chicago Police Department, retiring in 1991. I currently reside in Memphis, Tennessee and work for the Memphis City Schools.

I have not testified as an expert. I have no publications. For my services, I charge $200 per hour for consultation with counsel and report writing, four hour or $800 minimum for depositions, and $1,600 minimum for trial appearances, plus expenses.



All of the opinions offered in this report are to a reasonable degree of professional certainty, and are based upon the documents I reviewed and listed herein. In forming my opinions, I have relied upon my training, knowledge and experience obtained in 16 years as a police officer with the Chicago Police Department.

Dated this 29th day of June 2006

_Elbert M Waters_
Elbert Waters

