

**WILCOX & FETZER LTD.**

In the Matter Of:

# Estate of Harry Smith, III, et al.
# v.
# Wilmington Police Department, et al.

C.A. # 04-1254-GMS

Transcript of:

Charles E. Brittingham

August 24, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

(118)

```
                                                          4
 1    A.  That is correct.
 2    Q.  As I understand it, you have talked with
 3  residents in the area of 5th and Harrison streets; is
 4  that correct?
 5    A.  Yes.
 6    Q.  Residents have given you their recollection of
 7  the events that took place on September 13th; is that
 8  correct?
 9    A.  Yes.
10    Q.  Can you tell me what residents you have spoken
11  with?
12    A.  Yes. I don't quite recall the names at this
13  point, but I do have a list of names. The bulk of the
14  community we spoke with.
15    Q.  When did you speak with them?
16    A.  We started to speak with them a week after this
17  event, so that would be like the 20th, in that area.
18    Q.  How long did it take you to interview the bulk
19  of the residents?
20    A.  Wow. It's -- week and a half, two weeks.
21    Q.  Did you take notes during these interviews?
22    A.  Yes.
23    Q.  Do you have notes?
24    A.  Yes, but not with me at this time.
```

```
                                                         12
 1  told her not to say too much, so we didn't go into
 2  indepth. There were houses that had bullet holes in
 3  them, we talked to -- I don't know if it's the owners,
 4  but the people who lived there.
 5    Q.  Sure.
 6    A.  Again, I'd have to get the addresses, but -- but
 7  we thoroughly canvassed that neighborhood.
 8    Q.  I'm sorry. I sort of have gotten away from what
 9  I was trying to ask you and I'll try again.
10        I want to focus on the people who
11  contradicted the police version of these events.
12    A.  Okay.
13    Q.  And I believe we started out and you told me
14  that some of the people who lived on the same side of the
15  street as Mr. Gwyn and above him contradicted the police
16  version?
17    A.  Yes. I personally did not see anyone or hear
18  anyone even come close to the police version.
19    Q.  All right. And what about the people on the
20  opposite side of the street from Mr. Gwyn, did they
21  contradict the police version?
22    A.  Most of them were not home. They were working
23  at that time.
24    Q.  Working at the time of the interviews or working
```

```
                                                          9
 1    A.  In this building here, the names of the
 2  suspects -- not the suspects -- the names of the people
 3  that we interviewed that wished to tell their side of the
 4  story, I gave a list of those names to the FBI in this
 5  building.
 6    Q.  All right. Did you ever prepare a written
 7  report describing your investigation?
 8    A.  Yes.
 9    Q.  Was that report submitted to the NAACP?
10    A.  Are you referring to my national office?
11    Q.  To any office. Let me back up.
12    A.  Since the case -- the case is still opened, so
13  no. The answer is no.
14    Q.  What have you done with your written report?
15    A.  We are trying to -- we are trying to see this
16  case all the way through to the end.
17    Q.  Okay.
18    A.  So the report is still with me.
19    Q.  Have you given it to anyone yet?
20    A.  I have discussed this with the legal counsel
21  with the NAACP at the national headquarters.
22    Q.  Have you given the report to anyone else?
23    A.  No, no. They don't have the report. I
24  discussed it with them.
```

(119)

Estate of Harry Smith, III, et al.    v.    Wilmington Police Department, et al.
Charles E. Brittingham    C.A. # 04-1254-GMS    August 24, 2005

### Page 13

19  Q. Tell me generally what the resident said who
20  contradicted the police version of the events.
21  A. There was a young man, he's Hispanic of nature,
22  was trying to protect his niece. I think she was three
23  or four years old. When the shooting started, he jumped
24  on her to protect her. When he questioned the

### Page 14

1   authorities, when things quieted down, they told him he
2   didn't see what he saw and he wanted to tell his side of
3   the story. He said he saw the police car come up the
4   hill. At first he didn't know what was going on. He
5   thought police was chasing someone until he realized they
6   was chasing the car.
7       Then in his words, all heck broke loose
8   with the shooting and that's when he dove on the ground
9   to protect his niece.
10  Q. Did he tell you anything else?
11  A. As far as --
12  Q. What happened.
13  A. Yeah. This particular guy -- this particular
14  guy, he -- he didn't really get in too much. He was
15  talking about some other stuff because he had a brother
16  that was doing something else crazy. But there were
17  others who had told me about the car coming up, slowing
18  down, stopping, and the police officers coming behind the
19  car shooting.
20  Q. Did anybody tell you that the police went to the
21  front of the car to shoot?
22  A. No.
23  Q. Did anyone tell you that the police went to the
24  side of the car to shoot?

### Page 15

1   A. Yes.
2   Q. Do you recall who said that?
3   A. I believe it was more than one person gave me a
4   version of that.
5   Q. Do you recall who they were?
6   A. I would have to double-check notes before I give
7   a name because I don't want to say a name if I'm not
8   sure.
9   Q. Well, can you just estimate for me? Then we'll
10  give you an opportunity to double-check or look at your
11  notes later, but I'd like to know who you think it might
12  be.
13      MS. SULTON: I object to the form of that
14  question. It is asking him to speculate.
15      MR. PARKINS: That's all right.
16  BY MR. PARKINS:
17  Q. You can speculate.
18  A. I choose not to speculate.
19  Q. Okay. What did they say?
20  A. Okay. The car is coming up the hill, which is
21  up Harrison Street, opposite way. Everybody's running
22  around screaming because there's gunfire. The car stops
23  pretty much in front of Mr. Gwyn's house, 511. The
24  person is slumped over in his seat. The shooting stops.

### Page 16

1   They walk around. And they heard other shots. They saw
2   him put handcuffs on the body and drag him out the car
3   and let him lay on the street.
4   Q. Did they say how long they let him lay on the
5   street?
6   A. Yes. For hours. This was one of our big
7   sticking points. That was for hours.
8   Q. Was he uncovered at the time he was laid on the
9   street?
10  A. Yes.
11  Q. For hours?
12  A. Yes.
13  Q. Did any of these people tell you that they saw
14  the police give Mr. Smith CPR?
15  A. No, no one I talked to mentioned anything about
16  CPR.
17  Q. Did anyone tell you about emergency medical
18  technicians arriving at the scene?
19  A. Yes. Yes, they did, but that was in reference
20  to how long he was laying in the street.
21  Q. Well, what did they say?
22  A. Well, why did it take so long for them to get
23  here? That's what the general population statement was,
24  Why did it take so long for the ambulance or the

4 (Pages 13 to 16)

Wilcox & Fetzer, Ltd. Professional Court Reporters    (302) 655-0477



120

a2daa60f-285b-4113-9f9c-a11e222c1a80

Estate of Harry Smith, III, et al.   v.   Wilmington Police Department, et al.
Charles E. Brittingham   C.A. # 04-1254-GMS   August 24, 2005

**17**

1 emergency vehicles to get here?
2   Q. Did they say how long it took for the emergency
3 vehicle to get to the scene?
4   A. At least three or four hours.
5   Q. Three or four hours?
6   A. Yes.
7   Q. Did, in your investigation, did you talk to the
8 emergency medical technician people?
9   A. We made an attempt to, but we were shut down.
10 They was told by their people not to talk to us.
11   Q. You probably have already told me this and I'm
12 not trying to trick you by asking again. I just have
13 forgotten.
14   A. Sure.
15   Q. I know you're kidding; right?
16       Mr. Brittingham, did the people who you
17 interviewed say where the police were when they were
18 doing their shooting?
19   A. I've actually got that statement from the chief
20 of police.
21   Q. What did the chief tell you?
22   A. The chief of police drew a diagram for me on our
23 first meeting on this issue that the car came up 5th
24 Street, stopped, the police had a barricade there. There

**18**

1 was no -- well, this is what the chief told me. The car
2 stopped and looked at the barricade for the other car
3 blocking the road. The driver, Mr. Smith, made a choice
4 to drive across or over the sidewalk hitting the other
5 car, rammed it out the way to go up Harrison Street.
6       At that point -- during all of this the
7 police start shooting, shooting when the car first start
8 jumping the curb to ride. As he kept moving, they kept
9 right on shooting. This is how the innocent bystander
10 got shot.
11   Q. Did the people you interviewed tell you where
12 the police were when they were shooting?
13   A. Closer to 5th and -- the intersection of 5th and
14 at the bottom of the hill there, 5th and Harrison Street.
15   Q. Did they tell you whether they were in front of
16 the car, beside the car, or in back of the car?
17   A. At that point in the back of the car. No one
18 told me nobody was in front of the car.
19   Q. Did anyone ever tell you they went to the side
20 of the car and fired shots?
21   A. As I said earlier, when the car came to a
22 complete rest, they said they went to the side of the car
23 and heard shots.
24   Q. Did the people who heard shots see the police

**19**

1 officer shooting?
2   A. There is -- I'm going to say yes, in a sense,
3 yes.
4   Q. Did they tell you whether the police officer at
5 the side of the car was in the driver's side or the
6 passenger's side?
7   A. Driver's side.
8   Q. Did you interview people after you had talked to
9 the chief?
10   A. Yes, because talking to the chief was early on
11 in the investigation. I called him up and asked him to
12 let's sit down and find out what happened. That was
13 within a few days of the incident.
14   Q. Was the chief cooperative in the sense that he
15 met with you?
16   A. Oh, yeah, he met with me. That was no problem.
17   Q. Did you find him forthcoming in terms of
18 providing you with information?
19       MS. SULTON: I'm going to object to the
20 form of the question.
21   Q. You can answer, Mr. Brittingham.
22   A. He answered all the questions I asked.
23   Q. After you met with the chief, you then
24 interviewed residents who lived in the vicinity of 5th

**20**

1 and Harrison?
2   A. Yes. Mostly on the Harrison Street side, yes,
3 between 5th and 6th.
4   Q. Did you meet with anybody who lived on
5 5th Street?
6   A. Actually, I hate to keep saying the young lady
7 who got shot, she actually has family on 5th Street, too,
8 so that's where she was staying after that. So very
9 briefly we spoke to them.
10   Q. When you had these interviews, you knew about
11 the police version, about there being a barricade across
12 5th Street, did you not?
13   A. That part of our investigation, yes, because I
14 had already spoken to the chief. The chief is --
15   Q. I'm sorry. I didn't mean to interrupt you.
16   A. The chief is the one who told me about the
17 barricade.
18   Q. Did anyone that you spoke with dispute the fact
19 that there was a barricade across 5th Street?
20   A. No. I don't recall anybody objecting to that.
21   Q. The chief told you that Mr. Smith had run up
22 around the sidewalk to get around the barricade, did he
23 not?
24   A. Over the sidewalk.

5 (Pages 17 to 20)

Wilcox & Fetzer, Ltd. Professional Court Reporters   (302) 655-0477



a2daa60f-285b-4113-9f9c-a11e222c1a80

```
                                                              21
 1     Q.  Yes.
 2     A.  Right.
 3     Q.  Did anyone that you spoke with dispute that?
 4     A.  Dispute that?
 5     Q.  Yes.
 6     A.  No. They all said that he was trying to get
 7  away from the police.
 8     Q.  Now, did the chief tell you that in doing so
 9  Mr. Smith hit a white vehicle, a jeep?
10     A.  Said he hit a vehicle, yes.
11     Q.  Did anyone that you spoke with dispute that?
12     A.  No.
```



122

PAGES 123 - 130 OF THE APPENDIX
ARE PAGES FROM DEFENDANT DEMPSEY'S
STATEMENT ON 3/8/2004
SENT TO THE COURT UNDER SEAL