IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and ROSLYN )
WOODARD SMITH, individually and )
as Administrators of the ESTATE )
OF HARRY SMITH, III, )
)
Plaintiffs, )
) Civil Action
v. ) No. 04-1254-GMS
)
CITY OF WILMINGTON, JOHN )
CIRITELLA, THOMAS DEMPSEY and )
MATTHEW KURTEN, )
)
Defendants. )

Deposition of JOHNNY WHITEHEAD taken
pursuant to notice at the United States District
Court, District of Delaware, Conference Room 2204, 844
North King Street, Wilmington, Delaware, beginning at
8:35 a.m., on Tuesday, June 6, 2006, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary Public.

12   JOHNNY WHITEHEAD,
13   the deponent herein, having first been
14   duly sworn on oath, was examined and
15   testified as follows:

16 EXAMINATION

17 BY MS. SULTON:

Page 4

13   Q.   And other than the training that you have

14   received for the Wilmington Police Department, have

15   you received any special training related to law

131

16   enforcement in any way?

17   A.   No.

Page 8

1    Q.   At any time did Harry Smith, III try to use a

2    scalpel against your partner?

3    A.   No.

4    Q.   At any time did he try to use the scalpel

5    against you?

6    A.   No.

7    Q.   Did you perceive a threat of Harry Smith, III

8    to your partner?

9    A.   No.

10   Q.   Did you perceive a threat of Harry Smith, III

11   to you?

12   A.   Yes.

13   Q.   And why did you perceive a threat to you?

14   A.   When we were on Washington Street he was armed

15   with a scalpel walking towards me ignoring my orders.

16   Q.   And what were you saying?

17   A.   I was telling him to drop the knife, which at

18   the time I believed it was a knife, repeatedly and I

19   was backing up giving him an opportunity to drop the

20   knife.

21   Q.  At any time did you think it was a needle?

22   A.  I thought it was a needle initially.

Page 9

13   Q.  Yes.  When you first saw him, how far away was

14   he?

15   A.  Maybe half a block.

16   Q.  And what drew your attention to him?

17   A.  He was running southbound on the west side of

18   the street with a gown, what appeared to be a gown, a

19   hospital gown and a band, a hospital band.  And just

20   prior to that complaint we responded to the park which

21   is in that area for a tall, black male with a gown who

22   ran away from the hospital.

23   Q.  Okay.  And who called you from the hospital?

24   A.  Who called me from -- I imagine dispatch.  We

                    Johnny Whitehead         10

1   were dispatched to the park for the runaway patient

2   and then after we cleared that, I was responding to

3   the hospital to use the bathroom.
6    Q.  Well, no.  I'm sorry.  The question was poorly

7   framed.  Let me try again.

8        From the time that you received the

9   initial call from dispatch that a patient had run away

10   from the hospital to the time that you saw Harry

11   Smith, III, how much time passed?

12   A.  I would say maybe five to ten minutes.

13   Q.  When you heard that a patient had run away from

14   the hospital, you heard it over your radio?

15   A.  We were dispatched over the radio, yes.

16   Q.  Would anyone who was working at that time as a

17   police officer have heard that dispatch over the radio

18   that they're looking for a patient having run away

19   from the hospital?

20   A.  Yes.

Page 11

3   Q.  Now, so you hear this call over the radio and

4   you say you were dispatched.  Did they specifically

5   ask for you and your partner, your car to go and check

6   it out or was it kind of a general call to everybody

7   working keep your eye out?

8   A.  I don't recall.  I believe it may have been,

9   because that's our district I believe we were

10   dispatched.

19   Q.  How was your attention drawn to Harry Smith,

20   III?

21   A.  Well, I was responding to the hospital to go to

22   the bathroom and, again, I saw him running southbound

134

23   on the west side of the street with a band and a

24   hospital gown. And then I thought that, I said man,

              Johnny Whitehead      12

1   you know, this must be an epidemic. Clearly he wasn't

2   the guy we were looking for. His physical stature did

3   not match the guy we were initially looking for, so...

4   Q. And how did he appear to you when you saw him?

5   A. When I first saw him, he was just running

6   southbound. So I didn't see his facial expression. I

7   just know it was a dark-skinned, heavyset, black male

8   running southbound.

9   Q. And it was your understanding what you were

10   looking for was a perhaps taller, light-skinned male

11   but someone who had eloped from the hospital?

12   A. Yes.

Page 15

8   Q. And what did you see him do?

9   A. He began to pull on the door of the

10   Mercedes-Benz and the operator of that vehicle began

11   to attempt to hold the door. And the door kind of

12   opened and shut and he was leaning back this

13   (demonstrating) way.

14   Q. Now, at the time that you saw Harry Smith

15   pulling on this door, was he pulling on it with two
16   hands or what do you recall seeing?
17   A.  I couldn't tell you if it was two hands or one
18   hand.
19   Q.  When you saw him approach the gray Mercedes,
20   did you see him with what you thought was a needle in
21   his hand at that time?
22   A.  No, I did not see the needle at that time.
23   Q.  What did you think you were seeing when you saw
24   this man in a hospital gown with a hospital band

                Johnny Whitehead        16

 1   trying to pull on a Mercedes?
 2   A.  Well, at that time I thought it was a
 3   carjacking in progress.
19   Q.  Okay.  But I want to be clear about carjacking.
20   When I think of a carjacking I think of someone
21   putting a gun or knife to somebody's face and saying
22   get out of the car or I'm going to kill you.
23   A.  Right
24   Q.  That's a carjacking.  You would agree with me,

                Johnny Whitehead        17

 1   yes?
 2   A.  Yes, I would agree.

3   Q.  And if you don't have that, what you may be

4   looking at is just auto theft, correct?

5   A.  Auto theft.  Okay.  Yes, I agree.

6   Q.  So is it fair to say that what you first saw

7   since you didn't see a weapon was what you thought was

8   an auto theft?

9   A.  Yes.

10   Q.  And then what did you do?

11   A.  I activated my overheads and drove right behind

12   Mr. Smith.

13   Q.  So while you're doing all this observation

14   you're physically in your patrol car?

15   A.  Yes, ma'am.

Page 17

23   Q.  Have you ever operated the vehicle with its

24   windows up, all the windows up?

    Johnny Whitehead  18

1   A.  Yes.

2   Q.  And when you have done that, is it possible for

3   you to hear what is occurring half a block away from

4   you when all of the windows are up?

5   A.  With the windows up, unless you have a

6   jackhammer or a loud weapon, there's no way that you

7   can actually hear with all of the windows up from a

8   block away.

9   Q.  Or half a block?

10   A.  Again, unless you have a loud weapon. That's

11   the only way you will be able to hear.

12   Q.  So if I'm a half a block -- well, when you

13   first saw Mr. Smith, he was about half a block from

14   you, correct?

15   A.  Yes.

16   Q.  Could you hear, while you were sitting in your

17   patrol car could you hear anything that he was saying

18   to the driver of the gray Mercedes?

19   A.  No.

Page 19

16   Q.  You did not have a shotgun inside the passenger

17   compartment of that car on September 13, 2003,

18   correct?

19   A.  Yes. That's correct.

20   Q.  Where was your shotgun?

21   A.  The shotgun was in the trunk of the vehicle.

Page 21

20   Q.  And in front of that partition there is behind

21   your head a shotgun rack, correct?

22   A.  Yes.

23   Q.   And is that rack locking?

24   A.   Yes. It's possible to lock that rack, yes.

Page 22

11   Q.   Would I as a person off the street never having

12   driven a patrol car know where the button is on the

13   center console to unlock the shotgun?

14   A.   Probably not if you're not used to the police

15   vehicles.

Page 31

12   Q.   And what were you taught to do if you walk up

13   on what you believe is a car theft in progress?

14   A.   You can arrest the suspect.

15   Q.   Have you ever been told you can use deadly

16   force?

17   A.   For a car theft?

18   Q.   Yes.

19   A.   No.

20   Q.   In fact, you have been trained that you can't

21   use deadly force for a car theft?

22   A.   That is correct.

23   Q.   What about car chases, what were you trained to

24   do in car chases?

Johnny Whitehead        32

1  A. Basically, they don't last too long in the
2  city. We're told to -- they don't condone that. I
3  mean, usually it will last a couple of blocks, but
4  usually a supervisor will call it off because the city
5  is so condensed so they will usually cut them off.
6  Q. And when you say, "cut them off," you mean
7  that --
8  A. Terminate it.
9  Q. -- they will let the guy who is trying to get
10 away get away?
11 A. Yes.
12 Q. Because you don't want the citizens getting run
13 over and that kind of thing, correct?
14 A. Absolutely.
15 Q. Did you get any training on whether or not you
16 can use your patrol vehicle as a barrier or a block to
17 block a street to stop a car chase? Did you get any
18 training in that area?
19 A. Now, see, I know we did, but I don't know if it
20 was after that incident. The Attorney General's
21 Office said that you don't put yourself or your
22 vehicle to form a roadblock to prevent someone from

23   stealing a vehicle.

24   Q.  And you don't recall the exact time frame, but

Johnny Whitehead            33

1   is it fair to say that before the shooting incident no

2   one had specifically told you yeah, go ahead and put

3   your patrol car out there as a barrier?

4   A.  That's correct.  I don't think anyone would

5   condone that.

6   Q.  Have you ever heard of that before, somebody

7   using their car as a barrier in the city?

8   A.  Well, I'm pretty sure that there are those who

9   have done that, but that is not, that is not proper

10  protocol.

11  Q.  And what about securing the shotgun, did you

12  get any training in whether or not it's proper for you

13  just to place your shotgun in the trunk without a

14  holder or anything?

15  A.  Yes.  We were trained to put it in the locking

16  mechanism that you see here in Exhibit 4.

Page 35

18  Q.  And then tell me what happened, step by step

19  what happened.

20  A.  Sure.  He had his back to me when I pulled up.

21  He was right outside of my driver's side window.  And

141

22  he turned to me.  He was breathing hard and there was

23  blood on his shirt.

24         Now I'm thinking that he was a victim of

Johnny Whitehead         35

1  some type of assault-related complaint and he was

2  seeking help.  So I opened my door and I said, "Okay,

3  sir, just calm down."  That's what I said to him.  And

4  then I noticed what I thought was a needle from the

5  hospital and he was breathing hard and holding the

6  needle.
Page 40

14   Q.  So while you're tussling with him and he's

15   actually in your vehicle before that door closes and

16   he pulls off, before you fire a shot you're tussling

17   with him, he doesn't use that scalpel to try to cut

18   you, does he?

19   A.  No.

20   Q.  He didn't curse at you, did he?

21   A.  No.

22   Q.  Did he say anything to you?

23   A.  No.

Page 41

5   Q.  Is it your understanding that if someone steals

6   a police car then the police may use deadly force?

7   A.  Not for just stealing a police car, no.

Page 43

8   Q.  So incoming from where?

9   A.  Well, my partner called it in before we engaged

10  and units were already en route and there was another

11  unit before Mr. Smith took off, there's another unit

12  right in the block.

13      As a matter of fact, there was -- what's

14  her name?

15  Q.  Donohue?

16  A.  Sergeant Donohue, yes.

17  Q.  So as you're running those two blocks, are you

18  seeing other cars come in and begin --

19  A.  The only vehicle that I seen, that I saw was

20  Sergeant Donohue's vehicle.

21  Q.  In this two blocks where you were running?

22  A.  Chasing, I'm sorry, pursuing our vehicle which

23  was operated by Mr. Smith.

24  Q.  Is it fair to say that within the first block

             Johnny Whitehead        44

1   of your foot chase of the vehicle that you were aware

2   that Sergeant Donohue was now engaged in also pursuing

3   the vehicle?

4  A.  Yes.  Yes.

5  Q.  Why did you continue to do a foot chase if you

6  have Sergeant Donohue driving a police vehicle?

7  A.  Well, I knew that I struck him and maybe I was

8  hoping that he would lose consciousness and crash and

9  that way I can effect an arrest.  That's what I was

10  hoping, but the car just kept going southbound.

Page 49

14  Q.  What does it mean when a Wilmington police

15  officer says he has a clear backdrop?

16  A.  It means that you can shoot without the bullet

17  missing its target and hitting someone else, an

18  innocent bystander.

19  Q.  Have you received any training about whether or

20  not a Wilmington police officer can shoot his gun when

21  there are citizens on the street?

22  A.  From what I understand, it is not recommended

23  that you shoot your gun at someone when there's a lot

24  of citizens that could be hit.  I choose not to.

          Johnny Whitehead      50

1  Q.  Were you trained that if there's citizens on

2  the street and somebody else could get hit so,

3  therefore, you don't have a clear backdrop that you're

4   not supposed to shoot your gun?

5   A.  Yes.

6   Q.  What is your definition of excessive use of

7   force?

8   A.  Any force that is unnecessary to effect an

9   arrest.

Page 52

4   Q.  So Sergeant Donohue got on the radio and said

5   what based on your understanding?

6   A.  I believe it was shots fired.

7   Q.  And how did she know shots were fired?

8   A.  She was responding, she was in the block when I

9   fired my shot.

10   Q.  So she saw you shoot Harry?

11   A.  I don't know what she saw.  I know that she was

12   in the block.  She was close enough to see.  Whether

13   or not she saw it or not, I don't know.

Page 55

18   Q.  Were you listening to the radio?

19   A.  Yes.

20   Q.  Okay.  And what were you hearing on the radio?

21   A.  I was hearing sirens.  I was hearing officers

22 speaking in a loud tone and excited tone.

Page 56

13   Q. Now, you're not saying that he was armed with a

14 shotgun, are you?

15   A. No.

16   Q. So he wasn't armed with a shotgun?

17   A. No, he was not armed with a shotgun.

18   Q. So as best you know, he was armed with a

19 scalpel?

20   A. A scalpel.

Page 58

1   Q. Yes, should you give.

2   A. The only information is what type of weapon, if

3 any, that the suspect or defendant may have that could

4 pose a threat to me or him.

5   Q. Any other information?

6   A. And a description so that he or she will know

7 who I am talking about.

8   Q. Are you trained that it's okay to shoot at a

9 moving vehicle?

10   A. It is not.

11   Q. Say again?

12   A. It is not.

13   Q.   It is not okay to shoot at a moving vehicle?

14   A.   Yes.

15   Q.   That's how you were trained?

16   A.   Yes.

17   Q.   Is it fair to say, sir, that -- we will be done

18   in just a few minutes here.

19        Is it fair to say, sir, that at no point,

20   and again I'm going to keep you on this date of

21   September 13, 2003, that at no point between the time

22   when you observed what you thought was a car theft in

23   progress of the Mercedes and the point at which you

24   became aware that Harry Smith had been killed, at no

Johnny Whitehead        59

1   time did anybody ask you whether he had a weapon?

2   A.   I don't think so.  I don't think anyone asked

3   me if he had a weapon.

4   Q.   Is it fair to say that from the point at which

5   you first observed him and he was running across the

6   street and then you saw what you thought was this car

7   theft in progress and the point at which you heard

8   that he had been killed, at no point did anybody ask

9   you had he tried to carjack a car?

10   A.   I don't think so.

147

11   Q.  Using the same time period, is it fair to say

12   that nobody asked you whether or not Harry Smith had

13   threatened you?

14   A.  Did someone ask me if he had threatened me?  No

15   one asked me if he had threatened me.

16   Q.  Other than that interview that you did with

17   Sergeant Brown that was videotaped, I think it runs

18   maybe eight minutes or so, did you do any other

19   interviews, formal interviews?

Page 60

21   Q.  Are the police vehicles ever checked by the

22   shift supervisor before you guys go out after roll

23   call?

24   A.  Seldomly.

          Johnny Whitehead          61

1   Q.  Are they supposed to check them?

2   A.  I believe so, yes.

3   Q.  Did anyone check your vehicle on 9-13-03?

4   A.  No.

Page 62

3   Q.  Right.  Are there any guidelines within which

4   an officer must exercise his discretion or is he free

5   to do whatever he wants to do?

6   A.  We have guidelines.

148

7   Q.  And where are those guidelines?  Are they

8   written?

9   A.  They're written in the white book.

10  Q.  What's the white book?

11  A.  The white book is our rules and regulations.

12  Q.  And do you carry that in your car?

13  A.  No.

14  Q.  Too thick?

15  A.  Yes.

16  Q.  Is it fair to say that you were shooting at

17  Harry because you were trying to stop him or were you

18  shooting at him because you were trying to kill him?

19  A.  I was trying to stop him.

23          Do you know of any officer ever in your

24  work with the Wilmington Police Department who has

                Johnny Whitehead          63

1   been disciplined for excessive use of force?

2   A.  I'm pretty sure that there are officers that

3   have been disciplined.  I do not know of any.

4   Q.  You don't know of any?

5   A.  No.