# EXHIBIT A

## EXPERT TESTIMONY REPORT
### By JOSEPH J. STINE

### QUALIFICATIONS

I am the former Police Chief of New Britain Township Pennsylvania (1990 –
2000). I am the former executive officer of the Police Training Bureau for the City of
Philadelphia. In my 25 years with the Philadelphia Police Department I served in every
rank from Patrolman through Inspector. I was a Detective for three years and the night
command Captain in charge of the Detective Bureau for 2 years. I was a patrol district
supervisor at the ranks of Sergeant, Lieutenant and Captain for 12 years. I am the former
School Director for the Philadelphia Police Recruit Training Academy. I am currently
certified as an instructor for Police training for the Commonwealth of Pennsylvania. I
have been retained by the Southeast Pennsylvania Transportation Authority Police
Department to develop and deliver training to its officers.

I have been an adjunct faculty member in Criminal Justice Departments at Temple
University, Holy Family College. Delaware Valley College and Philadelphia Community
College.

I am a graduate of the Federal Bureau of Investigation National Academy and the
Police Executive Research Forum. I graduated from St. Joseph University with a Master
of Science in Administration of Criminal Justice. I am a life member of the International
Association of Chiefs of Police where I served on the Education and Training Committee
from 1991 through 2003.

I have been recognized as an expert in the training, practices and procedures
utilized by the police in the performance of their duties. My expertise in these areas has
been accepted in the Commonwealths of Pennsylvania and Virginia, the States of
Maryland and Connecticut and Federal Courts in numerous jurisdictions.

A copy of my curriculum vitae has been previously provided.

I have been retained by Attorney Anne T. Sulton, Ph.D., Esq. to review the case
of and pertinent documents and materials relating to Estate of Harry Smith v. Wilmington
Police Department, et al.

I now render my expert opinion, to a reasonable degree of professional certainty,
on the practices and procedures utilized. This opinion is based upon the review of the

1

## Opinions

It should be noted that all of the ensuing opinions are preliminary and are based on the limited materials available to me. I reserve the right to modify and/or change these opinions when additional materials are in my possession.

#1.

The WPD and its personnel failed to act in accordance with generally accepted practices and procedures for professional police departments during the pursuit of Mr. Smith. These failure included the following:

A. Failure of the officers who had their vehicle taken without their permission to provide adequate information.

B. Failure of the Police Communications facility to request the proper and pertinent information.

C. Failure of the officers and supervisors involved in the pursuit to ascertain the pertinent information regarding the necessity of a pursuit.

D. violation of numerous generally accepted practices and procedures for conducting a police pursuit ( this includes but is not limited to the policies of the WPD).

E. Failure of the on duty supervisors, many of whom were actively participating in the pursuit, to exercise their supervisory authority to direct control and terminate the pursuit.

F. Utilization of a Blockade;

G. Failure to consider the ramifications of forcing an encounter in a highly congested residential neighborhood;

H. Failure to consider the ramifications of shooting at a moving vehicle.

4

# EXHIBIT B

ELBERT WATERS
EXPERT WITNESS REPORT

To:     Attorney Anne T. Sulton

Date:   June 29, 2006

Re:     Shooting of Harry Smith, III

From 1976 to 1991, I worked as a patrol officer for the Chicago Police Department. For five years, I served as a tactical officer, wearing plain clothes. During my sixteen years service as a Chicago police officer, I responded to thousands of calls for assistance. Based upon my training, knowledge and experience, I am familiar with what a reasonable police officer on the scene should do when faced with a car theft situation, including the theft of a police car, after hearing radio transmissions containing words such as "officer needs assistance" and "shots fired" and after observing the stolen car drive through densely populated streets erratically at speeds exceeding posted limits.

**Documents Reviewed:**

1) Amended complaint
2) Wilmington, Delaware Police Department policies
3) Delaware Statutes
4) Depositions of Gwyn, Whitehead, Ciritella, Dempsey, and Kurten
5) Affidavit of Bungy
6) Photos
7) Delaware Attorney General Report on shooting of Harry Smith

These are the types of documents reasonably relied upon by experts in the field when trying to determine whether the force used by police officers was excessive.

The crimes here were manufactured or caused by the numerous blunders of the police, who were plainly incompetent and knowingly violated the law and their own departmental policies.

Among the factors I have considered in making a determination of reasonableness include the severity of the crime at issue, whether Smith posed an immediate threat to the safety of the police officers or others, whether he actively resisted arrest or attempted to evade arrest by flight, the duration of the incident, the possibility Smith might have been armed, the number of police officers responding to the incident, the number of persons with whom the police officers had to contend, and the information the officers had and/or should have had available to them at the time they used deadly force.

The nature and extent of the blunders of the police in this case are stunning. First, Whitehead violates departmental policy at the beginning of his shift by placing his shotgun into the trunk. He then approaches Smith, whom Whitehead has reason to believe is mentally ill, in a manner allowing Smith to enter and take his patrol car, which Whitehead left running with the car door open. Whitehead then fails to alert dispatch and responding officers that he is the shooter and his shotgun is in the trunk of the car.

As officers respond, all they know is that they are chasing a stolen police car (which is a misdemeanor), with a shotgun under lock and key, and no one has been injured. Inexplicably, and in clear violation of departmental policies, Ciritella blocks the road in a densely populated neighborhood, jumps out of his car without contacting dispatch to assess the nature of the threat (putting himself at risk), and steps into the street and shouts at a person in a car ½ block away from him (not giving proper warning and again putting himself at risk). As the stolen car begins to move, Ciritella begins firing, and as he removes himself from danger he continues to shoot while now knowing the suspect is not armed and is injured. Whether Ciritella knew other innocent bystanders or other police officers were potentially in his line of fire is unclear, but he should have known. He was trained to make certain he had a "clear backdrop" before discharging his weapon. He did know other police officers responded and were very near by, making it highly unlikely, if not impossible, for Smith to escape beyond the 500 block of Harrison Street.

Inexplicably, the other two officers shoot at Smith while the vehicle is very slowly moving away from them. Like Ciritella, they too knew or should have known the location of each other and innocent bystanders and that other officers were near by.