IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARRY SMITH, JR. and ROSLYN WOODARD SMITH, Individually and as Administrators of THE ESTATE OF HARRY SMITH, III | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 04-1254-GMS |
| v. | ) ) ) | |
| CITY OF WILMINGTON, JOHN CIRITELLA, THOMAS DEMPSEY, and MATHEW KURTEN, | ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' PRETRIAL BRIEF

OF COUNSEL:

Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

John A. Parkins, Jr. (#859)
K. Tyler O'Connell (#4514)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
302-651-7700
Parkins@rlf.com
Oconnell@rlf.com
Attorneys for Defendants

Dated: September 25, 2006

RLF1-3059640-2

## NATURE OF THE CASE

Plaintiffs are the Estate and parents of Harry Smith, III, who was shot and killed by Wilmington Police after he led them on a chase in a stolen police car through the city. The Estate alleges a claim pursuant to 42 U.S.C. § 1983 and a state law survival action. The parents allege a wrongful death claim under state law.

The individual defendants are three Wilmington police officers who shot at Mr. Smith near the intersection of 5th and Harrison Streets.

Early in this case this Court dismissed certain of plaintiffs' claims and held, insofar as the Estate's federal claims are concerned, that only the Fourth Amendment was implicated. This Court also dismissed the parents' Fourteenth Amendment claim.

Defendants' Motion for Summary Judgment is currently pending. Defendants have also filed five motions *in limine*.

## CONTESTED FACTS WHICH DEFENDANTS WILL PROVE

Sometime on Thursday, September 11, 2003, 25 year old Harry Smith, III ("Smith") complained to his mother that he was hearing voices. His mother became concerned and late that Thursday she concluded her son should seek medical attention. Because she had recently broken her ankle, Mrs. Smith was unable to take her son to the hospital, so she called her former husband, Harry Smith, Jr., who agreed to take their son to the hospital.

Mr. Smith, Jr. drove his son to the Emergency Room of the Wilmington Hospital. The hospital records show that Smith was triaged in the early hours on Friday, September 12, 2003. According to a psych evaluation in the emergency room:

> Pt. admits to smoking some weed a few days ago and doesn't know what was in it. Has been paranoid since.

1

A physician report from that night contains the notation "Pt. senses that voices or sounds reflect that someone will hurt patient," and the clinical impression drawn by the physician was "new onset paranoia." Smith was given 2 mg. of Haldol and sent home along with instructions to return if his symptoms got worse.

The following day, September 13, Smith's symptoms seemed to worsen. Around 1:30 in the afternoon Mr. Smith, Jr. again took his son to the Wilmington Hospital. When he arrived the younger Smith stated he was no longer hearing voices and he did not enter the building. By late in the afternoon Smith was again hearing voices, and his father again drove him a third time to the Wilmington Hospital Emergency Room where, according to hospital records, he was triaged at 6:05 p.m. The elder Mr. Smith told a nurse that his son was hearing voices and was no better than before. A psychiatric nurse was promptly summoned and Smith was placed in Treatment Room 24, where he was accompanied by his father. While in the treatment room, Smith opened a cabinet and removed a surgical kit containing a scalpel. A struggle ensued as the father attempted to subdue his son; either during the struggle or immediately thereafter, Smith stabbed himself at least once in the chest with the scalpel. He then ran out of the hospital toward Washington Street holding the scalpel. Louise Truax, an emergency room nurse treating Mr. Smith thought he was "very dangerous."

William Stevenson had just seated himself at the bar at the Washington Street Ale House, waiting to watch a University of Delaware football game on television with a friend, when the bartender suggested he would get a ticket if he did not move his car. Leaving his beer untouched, Stevenson left to move his car. Just as he finished pulling into a new space and was getting out, Stevenson saw a large man running toward him. At first he thought the man had been the victim of a robbery because he had a large bloodstain on the tee-shirt he was wearing.

His thoughts soon changed, as the man ran toward him yelling "Get out of my way. I'm going to steal your f ___ ing car." Mr. Stevenson immediately started to get back into his car. There followed a tug of war, with Mr. Stevenson trying to pull the door closed and Smith trying to pull it open. Stevenson thought he was in a life and death struggle. Eventually he got the door closed whereupon Smith began banging on the roof of the car and on the window with the scalpel and his fist. Mr. Stevenson was now certain that his assailant would break the car window.

Wilmington Police Officers Johnny Whitehead and Johnny Saunders were on routine patrol in marked car 1180 when they spotted the activity on Washington Street. They pulled their car up to the scene, got out and approached Mr. Smith with their guns drawn. The driver of the police car, Officer Whitehead, left the engine running and door open. They saw Mr. Smith holding what appeared to be a knife. As Mr. Smith approached them, the officers retreated, all the while telling Mr. Smith to drop the knife and get down. Mr. Smith suddenly spun and jumped into patrol car 1180. Officer Whitehead tried to pull Mr. Smith out of the car and failing to do so, shot Mr. Smith once in the leg.

While this was taking place, Officer Saunders broadcast an "Officer needs assistance" call. Part of this call consisted of:

> "He's got a knife", and
>
> "Shots fired. Shots fired. Shots fired. He's in the
> police car. Shots fired."

Mr. Smith took off in the police car driving south on Washington Street. One witness described him as driving like a "bat out of hell." Mr. Stevenson held his breath as he watched Mr. Smith run the red light at 12th and Washington Streets. Mr. Smith drove south on Washington until he reached 7th Street, where he turned right and headed west (7th street is one-way eastbound). Mr. Smith next turned left and headed southbound on Monroe where he ran

3

stop signs. At the corner of 4th and Monroe he ran a red light, turned right and headed west on 4th. After proceeding on 4th for several blocks he turned north onto VanBuren and, one block later, turned west onto Fifth Street. Along with other officers, Detective Ciritella and Sergeant Dempsey pursued Mr. Smith as he proceeded west on 4th Street. Officer Kurten fell in behind Detective Ciritella as the pursuit passed the intersection of 4th and Jackson. When Mr. Smith turned right onto Van Buren Street, the police cars ahead of Detective Ciritella followed him. Detective Ciritella, followed by Officer Kurten and Sergeant Dempsey continued west one block on 4th and turned right and headed northbound on Harrison Street so as to be able to parallel the pursuit of Mr. Smith.

Detective Ciritella was approaching the intersection of 5th and Harrison when he heard the police dispatcher announce Mr. Smith was heading westbound on 5th. The detective pulled his car into the intersection, got out and positioned himself behind a building on the northeast corner of 5th and Harrison. Officer Kurten pulled his marked patrol car directly behind Detective Ciritella's car. Together those cars blocked 5th Street where it intersects with Harrison. Officer Kurten walked eastward on the sidewalk on 5th Street using parked cars as cover. Sergeant Dempsey stopped his car on Harrison, got out and used the two police cars blocking 5th Street as cover.

At this time, the three defendant police officers knew the following:

- There had been an officer needs assistance call from Officers Whitehead and Saunders on Washington Street.
- Shots had been fired.
- The suspect had stolen a police car.

- The suspect had led police on a chase, refusing to stop even though being followed by police cars with their sirens and lights operating.
- The suspect likely had access to a loaded shotgun in the front seat of the stolen police car.
- The suspect had a knife.

As he drove down 5th Street, apparently seeing the barricade ahead of him, Mr. Smith began to slow and appeared to be stopping. Detective Ciritella stepped out from behind the building to take charge of the situation. He shouted to Mr. Smith that he was a police officer and to get out of the car. Up until this point, none of the officers at 5th and Harrison had fired their weapons.

Suddenly, and without warning, Mr. Smith quickly accelerated the stolen police car and drove directly at Detective Ciritella. For the first time Detective Ciritella fired his weapon at the on rushing car in an attempt to save his own life. In previous filings with this Court, plaintiffs have been fond of characterizing (incorrectly) Mr. Smith's conduct as nothing more than the unauthorized use of an automobile. All of this changed at this moment, for Mr. Smith had now attempted to murder a police officer.

After attempting to run down Detective Ciritella, Mr. Smith ran up over the curb to circumvent the barricade and smashed into a parked Jeep Cherokee as he accelerated up Harrison Street (again traveling the wrong way on a one-way street) in an apparent attempt to escape. In addition to what they had known seconds before when they attempted to peacefully stop Mr. Smith, they now reasonably believed that Mr. Smith had:

- ignored a blockade
- attempted to kill a police officer

5

RLF1-3059640-2

- rammed a car in an effort to escape.

The defendant officers could not see any police cars in front of Mr. Smith on Harrison Street, and knew of no officers in a position to immediately intercept him. These circumstances thus reasonably led them to conclude in a split second decision that Mr. Smith represented a substantial risk of death or serious physical injury to the citizens of Wilmington and that it was necessary to use deadly force to stop him.

Detective Ciritella followed the stolen police car up the eastern side of Harrison Street; the remaining defendants followed the car from the western half of Harrison Street. The locations of shell casing from each of the officer's weapons found at the scene confirm the officers' testimony about their location. A bullet was retrieved from Mr. Smith's brain which, according to the Medical Examiner, traveled in a right left to left direction; ATF analysis (as well as the analysis of defendants' forensic expert) shows that this bullet was fired by Detective Ciritella.

## DEFENDANTS' THEORY OF DEFENSE

The plaintiffs' theory, as set forth in their Amended Complaint and other papers they filed in this case, is that the officers shot Mr. Smith after the car was stopped and he was slumped unconscious over the wheel. The defense to this claim is that this never occurred.

Plaintiffs' theory is that the officers killed an unconscious Mr. Smith after the car stopped. According to the Amended Complaint:

> 28. Harry Smith, III was seen slumping over the car's steering wheel, apparently unconscious, helpless, unarmed, and non-threatening to himself or others.
>
> 29. Defendants John Ciritella, Thomas Dempsey, and Matthew Kurten continued shooting into the car.

To support this, plaintiffs filed the affidavit of David Gwyn, a local resident who swore that:

> I then saw a Wilmington Police Department officer walk over to the side of this police car and fire shots into the body of the man slumped over the steering wheel.

Defendants will prove this never occurred. According to plaintiffs, there were many neighbors outside who saw the events on Harrison Street, yet according to plaintiffs' interrogatory answers Mr. Gwyn is the only one who saw the officer walk up to the stopped car and shoot Mr. Smith. What Mr. Gwyn claims to have seen would have been remarkable indeed, yet his wife does not remember him telling her that story; nor did he tell it to a News-Journal reporter when he was interviewed the following day.

Importantly, the physical evidence is inconsistent with Mr. Gwyn's and the plaintiffs' versions. If, as Mr. Gwyn swears, a police officer walked up to the car, stuck his weapon in the car, and shot Mr. Smith, the following would have occurred:

- There would have been gunshot residue in the car;
- There would have been soot, searing or stippling on Mr. Smith's head.

None of these were found. Perhaps that most obvious inconsistency between Mr. Gwyn's testimony and the physical evidence is the location of the head wound. Mr. Gwyn described the police officer in his deposition as shooting in the driver's side of the car; the wound was from the passenger's side.

The physical evidence likewise contradicts the plaintiffs' claims that Mr. Smith was unconscious, slumped over the wheel and the car was stopped yet the officers continued to shoot. Defendants' forensic expert, Jon Nordby, Ph.D., will testify that the paths of the bullets striking Mr. Smith are consistent with him sitting upright, not slumped over.

7

They physical evidence also shows that the car was still moving when Mr. Smith was shot in the head by Detective Ciritella. The path of the bullet shows that it was traveling from the 2:30 or 3:00 position (with the front of the police car being at the 12:00 position). Detective Ciritella's weapon ejects shell casings up, to the right and slightly to the rear. All of this means that if the car was stopped when Detective Ciritella fired from the 2:30 or 3:00 position with the car stopped, Detective Ciritella's shell casing would have been found to the front of the stopped police car's position. Instead the shell casings were found behind the stopped car's position, proving the car was moving and continued to move after Detective Ciritella fired the fatal shot.

The constitutional parameters for the use of deadly force and why the reasons defendants' conduct falls well within those parameters are set forth in Defendants' Opening Brief in Support of their Motion for Summary Judgment. Likewise, their defenses to plaintiffs' claims brought pursuant to 42 U.S.C. §§ 1985, 1986 and plaintiffs' state law abuse of corpse claims are set forth in defendants' summary judgment brief. Defendants will not burden the Court with a repetition of these here. Insofar as the state law claims are concerned, the defenses are also set forth in the defendants' summary judgment brief. Suffice it to say that the defendants' conduct was justified by 11 *Del. C.* § 467, and they are immune by virtue of 10 *Del. C.* § 4011.

Finally, with respect to damages, defendants have sought to exclude the testimony of plaintiffs' economic expert. If he is allowed to testify, they will challenge the validity of his assumptions.

|  |  |
|---|---|
| OF COUNSEL.: | /s/ John A. Parkins, Jr.<br>John A. Parkins, Jr. (#859)<br>K. Tyler O'Connell (#4514) |
| Rosamaria Tassone<br>City of Wilmington Law Department<br>City/County Building, 9th Floor<br>800 N. French Street<br>Wilmington, Delaware 19801<br>302-576-2175 | Richards, Layton & Finger<br>One Rodney Square<br>P. O. Box 551<br>Wilmington, Delaware 19899<br>302-651-7700<br>Parkins@rlf.com<br>Oconnell@rlf.com |
| Dated: September 25, 2006 | Attorneys for Defendants |

9

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

    Kester I.H. Crosse, Esquire
    Williams & Crosse
    1214 King Street
    Suite 300
    Wilmington, DE 19801

I hereby certify that I will send on September 26, 2006, by U.S. Regular Mail, the foregoing document to the following non-registered participants:

    Anne T. Sulton, Esquire
    Post Office Box 2763
    Olympia, WA 98507

                                                   /s/ K. Tyler O'Connell
                                                   K. Tyler O'Connell (#859)
                                                   Richards, Layton & Finger, P.A.
                                                   One Rodney Square
                                                   P.O. Box 551
                                                   Wilmington, Delaware 19899
                                                   (302) 651-7700
                                                   oconnell@rlf.com

RLF1-2884836-1