# TAB A

# EXPERT TESTIMONY REPORT
## By JOSEPH J. STINE

### QUALIFICATIONS

I am the former Police Chief of New Britain Township Pennsylvania (1990 – 2000). I am the former executive officer of the Police Training Bureau for the City of Philadelphia. In my 25 years with the Philadelphia Police Department I served in every rank from Patrolman through Inspector. I was a Detective for three years and the night command Captain in charge of the Detective Bureau for 2 years. I was a patrol district supervisor at the ranks of Sergeant, Lieutenant and Captain for 12 years. I am the former School Director for the Philadelphia Police Recruit Training Academy. I am currently certified as an instructor for Police training for the Commonwealth of Pennsylvania. I have been retained by the Southeast Pennsylvania Transportation Authority Police Department to develop and deliver training to its officers.

I have been an adjunct faculty member in Criminal Justice Departments at Temple University, Holy Family College. Delaware Valley College and Philadelphia Community College.

I am a graduate of the Federal Bureau of Investigation National Academy and the Police Executive Research Forum. I graduated from St. Joseph University with a Master of Science in Administration of Criminal Justice. I am a life member of the International Association of Chiefs of Police where I served on the Education and Training Committee from 1991 through 2003.

I have been recognized as an expert in the training, practices and procedures utilized by the police in the performance of their duties. My expertise in these areas has been accepted in the Commonwealths of Pennsylvania and Virginia, the States of Maryland and Connecticut and Federal Courts in numerous jurisdictions.

A copy of my curriculum vitae has been previously provided.

I have been retained by Attorney Anne T. Sulton. Ph.D , Esq. to review the case of and pertinent documents and materials relating to Estate of Harry Smith v. Wilmington Police Department, et al.

I now render my expert opinion, to a reasonable degree of professional certainty, on the practices and procedures utilized. This opinion is based upon the review of the

1

materials and information made available to me. In rendering this opinion I have utilized my education and experience in law enforcement and academia.

I reserve the right to change or modify this opinion should additional facts, documents or evidence become available to me.

## MATERIALS AND DOCUMENTS REVIEWED:

1. Plaintiff's Amended Complaint;
2. Depositions:
   A. John F. Ciritella;
   B. Johnny Whitehead;
   C. Clifton Dempsey;
   D. Matthew Kurten;
   E. David Gwyn;
3. Affidavit of Catronia Bungy;
4. Delaware State Attorney General's Office Report Re: The shooting of Harry Smith III;
5. Recorded Interviews:
   A. Johnny Whitehead;
   B. Clifton Dempsey;
   C. Mathew Kurten
   D. Harry Smith Jr.
6. Recording of Police Radio Calls re: this incident;
7. Photographs of Crime Scene, vehicles and hospital;
8. Autopsy Report;
9. Sgt. Browns report ;
10. City Solicitors report;
11. Office of Professional Standards report and investigative file;

2

## Factual Background

On September 13, 2003 members of the Wilmington Police Department (WPD) shot and killed Harry Smith III. At the time of this shooting Mr. Smith was being pursued by the police for driving a WPD marked police cruiser that he was operating without the consent of the Wilmington Police Department.

Prior to the fatal shooting numerous WPD personnel engaged in a pursuit of Mr. Smith. A "caravan" of both marked and unmarked police cars, with lights and sirens activated, pursued Mr. Smith through the streets of Wilmington.

Detective Ciritella, Officer Kurten and Sgt. Dempsey broke away from the pursuit and paralleled Mr. Smith. At the intersection of 5th and Harrison Detective Ciritella and Officer Kurten used their WPD vehicles to barricade the intersection.

When Mr. Smith approached the barricaded intersection Detective Ciritella, who was in plain clothes and pointing his .40 Caliber pistol at Mr. Smith, entered the street in front of the moving vehicle operated by Mr. Smith and began to approach the marked police car. Detective Ciritella ordered Mr. Smith to turn off and exit the vehicle. All of the windows of the marked unit, operated by Mr. Smith, were closed and the police vehicles that were in front of Mr. Smith and behind him had their sirens activated. Mr. Smith did not heed Detective Ciritella's orders. Mr. Smith continued driving the marked police cruiser forward, in the direction of Detective Ciritella, the detective fired 2 or 3 shots at Mr. Smith.

After Mr. Smith had passed Detective Ciritella the detective, Officer Kurten and Sgt. Dempsey fired a total of between 28 and 29 shots from their department issued .40 caliber Smith & Wesson semi automatic pistols. These shots were fired as they walked behind and abreast of the marked police cruiser as it slowly traveled up Harrison Street. The officers stated that their intention was to kill Mr. Smith. During this fusillade several bullets struck the homes along Harrison Street and a woman who was on the corner was shot in the leg.

3

**Opinions**

It should be noted that all of the ensuing opinions are preliminary and are based on the limited materials available to me. I reserve the right to modify and/or change these opinions when additional materials are in my possession.

#1.

The WPD and its personnel failed to act in accordance with generally accepted practices and procedures for professional police departments during the pursuit of Mr. Smith. These failure included the following:

   A.  Failure of the officers who had their vehicle taken without their permission to provide adequate information.

   B.  Failure of the Police Communications facility to request the proper and pertinent information.

   C.  Failure of the officers and supervisors involved in the pursuit to ascertain the pertinent information regarding the necessity of a pursuit.

   D.  violation of numerous generally accepted practices and procedures for conducting a police pursuit ( this includes but is not limited to the policies of the WPD).

   E.  Failure of the on duty supervisors, many of whom were actively participating in the pursuit, to exercise their supervisory authority to direct control and terminate the pursuit.

   F.  Utilization of a Blockade;

   G.  Failure to consider the ramifications of forcing an encounter in a highly congested residential neighborhood;

   H.  Failure to consider the ramifications of shooting at a moving vehicle.

4

05/27/2006 16:23 3154918527

Case 1:04-cv-01254-GMS    Document 156-2    Filed 10/06/2006    Page 6 of 33
#2.

Detective Ciritella, Officer Kurten and Sgt. Dempsey utilized excessive and unreasonable deadly force. The following is the sequence of shots fired by the officers at the scene on Hamilton Street:

A. The first 2 or 3 shots by Detective Ciritella-

He was in plain clothes. He voluntarily and deliberately placed himself in unwarranted and unnecessary danger when he stepped into the street in front of the moving vehicle operated by Mr. Smith. Detective Ciritella placed himself in the untenable position of being directly in the path of the marked police vehicle. By doing this he created the danger that he would later use to justify shooting at Mr. Smith. In any case this shooting on his part was not a valid option because it could only have the effect of increasing the danger to all who were present. This is true for all of the shots that were fired by all of the officers on Harrison Street.

B. The next 10 or 11 shots by Detective Ciritella-

He states these shots were fired with the intent to kill Mr. Smith and stop the threat he represented. These shots were fired after the danger to the Detective had passed. There is nothing that was known to Detective Ciritella that would have justified the use of deadly force against a person who was operating a vehicle without the consent of the owner. There were no exigent circumstances or emergencies that warranted this unreasonable and excessive use of deadly force in the successful attempt to kill Mr. Smith.

C. The first 2 or 3 shots by Officer Kurten-

He fired these shots because Detective Ciritella fired. Officer Kurten stated that he believed that Detective Ciritella had made it back to the corner line of the building when he, Kurten, fired those 2 or 3 shots. It is never a justification, to use deadly force on a person, because some other officer is using it. Because it was Officer Kurten's perception that Detective Ciritella had reached the safety of the corner line of the building there could not have been any threat to Detective Ciritella. The use of deadly force under these circumstances would have been unreasonable and excessive.

D. The next 2 or 3 shots fired by Officer Kurten-

These shots were fired into the rear of a vehicle that was proceeding at a slow speed and in a direction away from Officer Kurten. There was no additional

5

information known to Officer Kurten that would justify the use of deadly force. There were no emergencies or exigent circumstances that required the use of deadly force and therefore it was unreasonable and excessive. It is contrary to generally accepted police practice and procedure to shoot at a fleeing vehicle.

E.  The 13 shots fired by Sgt. Dempsey-

These shots were fired as the marked police cruiser was passing Detective Ciritella and after the car was traveling slowly up the street. The majority of these shots were fired as Sgt. Dempsey walked along side of the drivers side of the car. There was no additional information known to Sgt. Dempsey that would justify the use of deadly force. There were no emergencies or exigent circumstances that required the use of deadly force and therefore it was unreasonable and excessive. It is contrary to generally accepted police practice and procedure to shoot at a fleeing vehicle

#3

Detective Ciritella, Officer Kurten and Sgt. Dempsey acted in a manner contrary to generally accepted police practice procedures when they fired a total of 31 shots in a congested and densely populated residential area.

#4.

It is my opinion that the entire focus of the follow up investigations into the deliberate killing of Mr. Smith was to find someway to justify the actions of the officers who killed him. The record is replete with examples of that attempt.

## Concluding Opinion

The use of deadly force by police cannot be justified when the reasons for using that force are uncertain in the mind of the officers and when those reasons are based on supposition. The use of a blockade to stop a fleeing vehicle is tantamount to deadly force. The only information available to the officers at 5th and Harrison when they decided to blockade the street, in a densely populated neighborhood, was that a vehicle was being operated without the owners consent. That is a misdemeanor.

6

Detective Ciritella created a dangerous situation and then used deadly force to extricate himself from that situation. In any event that threat had passed and Detective Ciritella was no longer in any danger from Mr. Smith when approximately 30 shots were fired.

All of the shots fired after the vehicle passed Detective Ciritella and he was no longer in danger were intended to kill Mr. Smith. The reasons given by the officers for summarily executing Mr. Smith were that there had been a report that shots had been fired. That he was operating a marked police car and wouldn't stop and there was a possibility that there might have been a shotgun in the car.

The officers who killed Mr. Smith did not know who had fired these shots. They did not know who, if anyone, these shots were supposed have been fired at. They did not know why these shots had been fired. They did not even know if the person in the police car had anything all to do with these alleged shots.

It is never acceptable to use deadly force to stop a stolen car even if that car happens to be a police car. It is certainly not permissible to summarily execute a person for operating a vehicle without the owners consent.

The officers who killed Mr. Smith did not know if there was in fact a shotgun in the police car. None of them ever saw the shotgun, they couldn't because it was locked in the trunk. There is no information that Mr. Smith was even aware that a shotgun might have been in the car. Mr. Smith never touched or in any way controlled the shotgun that was stored safely in the trunk of the car.

The rational for this justification is nonsensical. The shotgun might or might not be in the car. If it was in the car you would have to then assume that the person operating the car would have to know it was there and be so familiar with the car that he would know how to gain access. You would then have to assume that this person might remove the gun from that trunk, of course assuming that he knew it was there. Then you would have to make the assumption that this person would use the gun in some unknown manner. It is contrary to the generally accepted practices, procedures and training utilized by professional police officers to utilize deadly force under these circumstances.

There are witnesses to this execution who state that the officers continued firing after the vehicle was stopped and the police deny that allegation. It is not my place or intention to opine on the credibility of any witness in this matter. I can opine that since it

7

was the officers' intention to kill Mr. Smith, continuing to shoot after the car was stopped would have been consistent with that goal.

All of the opinions I have offered in this report are to a reasonable degree of professional certainty. Those opinions are based on the data listed in the Materials and Documents Reviewed section of this report. In forming these opinions I have also relied on the knowledge and experience that I have garnered in 40 years as a police officer, police supervisor and police trainer. In addition I have utilized my education and training in the field of law enforcement to guide me in the formation of these opinions.

Joseph J. Stine, June 27, 2006

8

June 26, 2006

To Whom It May Concern:

My current fee schedule is $225.00 per hour for all time spent working on the
case and expert opinion report preparation
The fee for deposition days is $2,000.00 per day and for court days $2,500.00 per
day. All fees are plus expenses.

Very truly yours,

Joseph J. Stine

Joseph J Stine Publications

June 2001 The Police Chief Magazine – A Ballistic Vest Against Law Suits: Protecting
yourself and your department against civil liability.

March 2002- Guest column in Philadelphia Inquirer re: recent problems in the Catholic
Church

April 2002- Guest column in Philadelphia Inquirer re: Crime Victimization in the
African American Community.

June 2002- Guest column in Philadelphia Inquirer re: Difficulties of being a police officer
in Pennsylvania.

May 2006- Guest column in Philadelphia Inquirer re: The Death of Former Police
Commissioner Solomon.

Trial cases involving court testimony & or depositions

for Joseph J. Stine

(Per amended Rule 26 of Federal Rules of Civil Procedure
concerning testifying experts)

Debbie L. Florence, Administratrix, et al. v. Town of Plainfield, et al.
State of Connecticut Superior Court Complex Litigation Docket,
Judicial District of Toland Case # X07 CV-03-0084216
Attorney: Charles A. Deluca, Stamford Ct.
Case review and Consultation with opinion report and Deposition.

Juanita Reed, et al. v. District of Columbia. et al,
U.S.D.C. for the District of Columbia Case No. 1:03-CV-01085
Attorney: Walter Blair, College Park MD.
Case review and Consultation with opinion report and Deposition.

Shane Bucherl v. Allen County Sheriff's Department, et al.
U.S.D.C. For the Northern District of Ohio Western Division Case No. 3:04CV7303
Attorney: Elliot Richardson, Chicago Il.
Case review and Consultation with opinion report and Deposition.

Amanda Morrison, et al. v. Board of Trustees of Green Township, et. al.
U.S.D.C. For Southern District of Ohio Western Division No. 1-03-755, Attorney:
Tabatha Justice, Dayton Oh.
Case review and Consultation with opinion report and Deposition.

John Kennedy v. Lower Southampton Township, et al.
U.S.D.C. For Eastern Pennsylvania No.04-CV-1195, Attorney: Robert P. Di Domenicis
Media Pa.
Case review and Consultation with opinion report and Court testimony.

Patricia Deemer v. Borough of West Chester, et al.
U.S.D.C. For Eastern Pennsylvania No.03-CV-6536, Attorney Janelle Fulton,
Philadelphia Pa.
Case review and Consultation with opinion report and Daubert Hearing and Court
testimony.

Chester A. Tschappat v. Schuylkill Haven Police Department, et al.
U.S.D.C. For Middle Pennsylvania 3:CV-01-2279, Attorney: Gerald Hanchulak,
Scranton Pa.
Case review and Consultation with opinion report and Court testimony.

Daniel Claeys v. Town of Brookfield, et al.
U.S.D.C. for Northern Illinois 02-C-3676, Attorney: Amanda Antholt Chicago IL.
Case review and Consultation with opinion report and Deposition.

Madeline Cruz v. Pennridge Regional Police Department, et al.
U.S.D.C. For Eastern Pennsylvania 02-CV-4372, Attorney: Malissa Sill, Philadelphia Pa.
Case review & Consultation with opinion report and Court testimony.

John Sterling v. City of Erie et al.
U.S.D.C. For Western Pennsylvania C.A. No. 02-34 Erie, Attorney: Richard A. Lanzillo,
Erie Pa.
Case review and Consultation with opinion report and Court testimony.

Estate of David Cotton v. Windsor Locks, et al.
U.S.D.C for Connecticut Civil Action No.: 3: 01CV01203 (AVC), Attorney: John
Radshaw, III, Hartford CT.
Case review and Consultation with opinion report and Deposition.

Floyd B Moore et al. v. Borough of Darby, et al.
U.S.D.C. For Eastern Pennsylvania 01-CV-7707, Attorney: Robert P Di Domenicis
Media Pa.
Case review and Consultation with opinion report and Court testimony

Eric Freeman, et al v. City of Easton, et al.
U.S.D.C Eastern District of Pennsylvania, 01-CV-4058, Attorney: Daniel Dugan
Philadelphia Pa.,
Case review and Consultation with opinion report and Court testimony.

Michael Martin v. Norwood Borough, et al.
Pennsylvania Court of Common Pleas, Delaware County CCP No. 97-16555, Attorney:
Andrew Adair, Media Pa
Case review and Consultation with opinion report and Court testimony.

Joseph R. Parrish Personal Representative of Tony Marcel Lee Deceased v.
Commonwealth of Va., et al.
U.S.D C. Eastern District of Virginia. CIV #02-582-A, Attorney: Fairfax County
Attorney's Office, Alexandria Va.,
Case review and Consultation with opinion report and Deposition.

John Briggs v. Cpl. Anthony Mileo, Prince George's County Md., et al.
Maryland Circuit Court, Prince George's, CAL 01-12434, Attorney: Timothy McCrone,
Ellicott City Md.,
Case review and Consultation and Court Testimony

2

Ronald Parks & The Epilepsy Foundation of Southeastern Pennsylvania v. Borough of
Darby, et al.
U.S.D.C. For Eastern Pennsylvania 99-CV-3810, Attorney: Robert P. Di Domenicis
Media Pa.
Case review and Consultation with opinion report and Court testimony.

Donald Lasoski v. Luzerne Borough, et al.
Pennsylvania Court of Common Pleas Luzerne County No.: "782-C of 1997, Attorney:
Bruce L. Coyer, Scranton Pa.
Case review and Consultation with opinion report and Court Testimony.

Richard Tarlecki, et al. v. Darby Borough, et al.
U.S.D.C. Eastern District of Pennsylvania, 01-CV-1347, Attorney: Paola Tripodi-
Kaczynski Media Pa.,
Case review and Consultation with report and Court Testimony.

Harry S. Faust v. Middletown Township, et al.
U.S.D.C. Eastern District of Pennsylvania 99-CV-4080, Attorney: John Gonzales,
Norristown Pa
Case review and Consultation with opinion report and Court Testimony.

Francis X. Walker V. Upper Darby Township, et al.
U.S.D.C Eastern District of Pennsylvania 00-CV-0452, Attorney: Robert Di Domenicis,
Media Pa.,
Case review and Consultation with opinion report and Court Testimony.

James R. Bagley, et al. v. Nether Providence Township, et al.
U.S.D.C. Eastern District of Pennsylvania 98-CV-2238, Attorney: David J. MacMain,
Philadelphia Pa.
Case review and Consultation with opinion report and Court Testimony.

Randolph Hooks v. Ridley Township, et al.
U.S.D.C Eastern District of Pennsylvania 97-CV-4385, Attorney: Thomas C. Gallagher,
Media Pa.
Case review and Consultation with opinion report and Court Testimony.

Nathan Banks Jr., et al. v. City of York, et al.
U.S.D.C. Middle District of Pennsylvania 95-CV-2157, Attorney: Tracy M. Mack
Philadelphia Pa.
Case review and Consultation with opinion report, deposition and Court Testimony.

**CURRICULUM VITAE**
**JOSEPH J. STINE**

1. Professional Experience:

| | | |
|---|---|---|
| 2004-2006 | Content Area Specialist | Temple University Criminal Justice Training Programs |
| 1990-2003 | Education and Training Committee | International Association of Chiefs of Police |
| 1990-2000 | Chief of Police | New Britain Township Police |
| 1988-1990 | Inspector | Executive Officer, Philadelphia Police Training Bureau |
| 1986-1988 | Captain | C O, Recruit Training Phila. Police Academy |
| 1984-1986 | Captain | C O, 12th Police District |
| 1982-1984 | Captain | C O, 5th Police District |
| 1981-1982 | Captain | C O, Detective Night Command |
| 1977-1981 | Lieutenant | Shift Commander, Patrol District |
| 1972-1977 | Sergeant | Platoon Leader, Patrol District |
| 1970-1972 | Detective | Homicide Division |
| 1968-1970 | Detective | Northwest Detective Division |
| 1966-1968 | Police Officer | 7th Patrol District |

CURRICULUM VITAE
JOSEPH J. STINE

2. Teaching:

| | |
|---|---|
| 1992-Present | Commonwealth of Pennsylvania Mandatory in Service Training Instructor & Basic Training Instructor |
| 1992- Present | Temple University Law Enforcement Training Consultant |
| 2003- 2005 | Pennsylvania Liquor Control Board Training Instructor for police |
| 2001 | Southeast Pennsylvania Transportation Authority Police Department Course Development and Presenter |
| 1993-2000 | Delaware Valley College, Adjunct Faculty Criminal Justice Curriculum |
| 1988-1997 | Philadelphia Police Academy Basic Training Instructor |
| 1986- 1992 | Philadelphia Community College, Adjunct Faculty Criminal Justice Curriculum |
| 1987- 1990 | Philadelphia Police Academy, School Director |
| 1986-1994 | Holy Family College Adjunct Faculty Criminal Justice Curriculum |

3. Organizations:

| | | |
|---|---|---|
| 1965-Present | Member | Fraternal Order of Police |
| 1980-Present | Member | Southeast Pennsylvania Chiefs Association |
| 1986-Present | Member | Delaware Valley Association of Professional Police Officials |

2

**CURRICULUM VITAE**
**JOSEPH J. STINE**

| | | |
|---|---|---|
| 1986-Present | Member | Federal Bureau of Investigation National Academy Associates |
| 1986- Present | Life Member | International Association of Chiefs of Police |
| 1988-2002 | Member | Pennsylvania Chiefs of Police |
| 1990-2002 | Member | Bucks County Chiefs of Police |
| 1996- 2000 | Charter Member | Bucks County Commission On Human Relations |

4. Education:

| | |
|---|---|
| St. Joseph's University | MS, Administration Of Criminal Justice |
| Temple University | BA, Social Science Summa cum Laude |
| Philadelphia Community College | A.A.S., Criminal Justice Magna Cum Laude |
| Police Executive Research Forum | 1988 Completed Senior Management Institute |
| Federal Bureau of Investigation | 1986 Completed National Academy |

3

# TAB B

# ELBERT WATERS
## EXPERT WITNESS REPORT

To:     Attorney Anne T. Sulton

Date:   June 29, 2006

Re:     Shooting of Harry Smith, III

From 1976 to 1991, I worked as a patrol officer for the Chicago Police Department. For five years, I served as a tactical officer, wearing plain clothes. During my sixteen years service as a Chicago police officer, I responded to thousands of calls for assistance. Based upon my training, knowledge and experience, I am familiar with what a reasonable police officer on the scene should do when faced with a car theft situation, including the theft of a police car, after hearing radio transmissions containing words such as "officer needs assistance" and "shots fired" and after observing the stolen car drive through densely populated streets erratically at speeds exceeding posted limits.

**Documents Reviewed:**

1) Amended complaint

2) Wilmington, Delaware Police Department policies

3) Delaware Statutes

4) Depositions of Gwyn, Whitehead, Ciritella, Dempsey, and Kurten

5) Affidavit of Bungy

6) Photos

7) Delaware Attorney General Report on shooting of Harry Smith

These are the types of documents reasonably relied upon by experts in the field when trying to determine whether the force used by police officers was excessive.

1

**Facts Assumed True:**

1) Lighting is not an issue because the incident happened on the street and it still was daylight. There were no impairments to visibility complicating this situation.

2) Only one suspect in a stolen vehicle.

3) The potential escape routes are limited by the configuration of the city streets

4) An adequate number of police officers responded for control and containment, and all were in close proximity to the stolen vehicle at all times, either directly behind it, in front of it, or paralleling its movements on adjacent streets. Responding officers were aware of this.

5) At no time were responding officers advised they were pursuing a known felon or a violent person (felony or misdemeanor)

6) There was an "officer needs assistance" call from officers Whitehead and Saunders on Washington Street, indicating their car was stolen. There was no call of "officer down" or any other call indicating an officer or citizen had been injured in any way

7) Smith was not familiar with the police car because he left the emergency lights flashing while he operated the vehicle.

8) Some, if not all, of the responding officers also heard shots had been fired on Washington Street. The responding police officers did not know whether Smith or police officers fired these shots.

9) Responding police officers saw this stolen car traveling through the narrow streets of Wilmington with police emergency lights flashing.

10) Police joining the pursuit also had their lights and sirens on, alerting citizens and motorists a police action was occurring.

11) Smith led at least six police cars on a reckless chase through the city, wherein speeds exceeded the posted limits, but no injuries to citizens or property damage occurred during this two or three minute pursuit running about one mile.

12) Responding officers believed there might be a loaded shotgun in the driver's compartment of the stolen patrol car, which they also believed was securely locked into place, requiring a key to unlock and remove.

13) Ciritella used his unmarked patrol car to block the intersection of 5th and Harrison Street, which he knew was in a densely populated neighborhood.

2

14) While dressed in plain clothes, Ciritella got out of his unmarked car, drew his gun, and took cover at the corner of a building.

15) Ciritella observed Smith and other police cars approach the intersection of 5th and Harrison, and when Smith was a half block away he stopped.

16) Ciritella then left his position of cover and walked a few steps into the street and shouted directions to Smith.

17) While Ciritella was shouting directions to Smith, there were sirens from other police cars wailing and the windows were up on the stolen police car driven by Smith.

18) Smith could not hear Ciritella's directions because he was too far away, the sirens were wailing, and the car windows were up.

19) Smith might not have seen Ciritella, who was in plains clothes, because of the ½ block distance between them, the flashing lights behind and in front of both Smith and Ciritella, and the number of people on the street, including police and citizens.

20) Smith drove the stolen police car in the direction of the intersection, where the road block and three defendant officers were located. Whether Smith saw these men is unclear, as are his intentions (one cannot assume the mental state or condition of Smith was such that he had the "intent" to kill Ciritella).

21) At that moment, the window of opportunity for Ciritella to use deadly force **opened** because it is reasonable to assume that an officer in his position feared for his life.

22) Ciritella fired several shots at this moving vehicle, backed up and took cover at the corner of the building.

23) At this moment, the window of opportunity for all three defendant police officers to use deadly force **closed** because none of them were in danger, they claim they saw no citizens on the street, and they knew other police were in the very near vicinity, making it extremely unlikely Smith would travel beyond that immediate area or escape, in part, because he was driving a marked police car with the emergency lights flashing and had been shot by Ciritella.

24) Smith drove the stolen car across a portion of the sidewalk in order to avoid a barricade consisting of a marked and an unmarked police car.

25) At this time, Ciritella was close enough to clearly see into the vehicle. He could clearly see his target (Smith) and that his target did not have a weapon in his hands.

26) Although he no longer was in any danger, because the car was passing and moving away from him, and he claims he did not see any citizens in the immediate vicinity, Ciritella fired additional shots, breaking the glass on the passenger side window, and likely hitting Smith several times because of Ciritella's close proximity to the vehicle – just a few feet at most from it.

27) Smith crashed the stolen car into a parked Jeep, pushing it aside while attempting to avoid being shot by Ciritella and the other two officers.

28) After pushing the Jeep aside, the stolen car very slowly continued to travel about a half block the wrong way up the one-way street in the 500 block of Harrison Street.

29) During this time, Ciritella was walking on the sidewalk for a few feet, parallel to the stolen car, and then stepped into the street and fired additional shots into the car. He had a very clear and unobstructed view of his target because the window now was missing. He could see Smith did not have a weapon in his hands. The car was moving very slowly at this time because Ciritella was able to walk to keep up with it.

30) Demsey and Kurten also fired numerous shots from the rear and/or opposite side of the stolen car, while the stolen car was moving away from them. They too were walking, so we know the stolen car is moving away from them very slowly.

31) Ciritella, Dempsey and Kurten claim they were not aware of any citizens on the street.

32) Ciritella, Dempsey and Kurten claim they were not aware of the precise locations or positions of other police responding to the call for assistance.

33) Ciritella, Dempsey and Kurten did not want Smith to leave the 500 block of Harrison Street.

34) Two officers stopped firing when their bullet clips were empty. The third officer stopped firing when the other two stopped.

35) The three officers' fired to kill Smith and stopped when they believed their goal was accomplished.

4

**Guiding Principles:**

Wilmington Police Department (WPD) policies guide officers in vehicle pursuits and the use of deadly force. Delaware statutes also provide guidance. There also are generally accepted police practices that guide officers

Delaware identifies this type of car theft as a misdemeanor. Consistent with this definition, WPD policies direct officers to discontinue active vehicle pursuits if it is likely citizens might be injured. Thus, even when a police officer believes a person evading the police might escape, the officer may be required to discontinue the pursuit.

WPD policies also emphasize communication between and among responding police officers and dispatch is key in all situations. The policies state the dispatcher will provide responding officers with information about the presence of potential danger. This assumes dispatch will make certain it obtains this information so that the information may be transmitted to responding police officers. Calls are prioritized, with those not indicating bodily injury assigned lower priority. The goal is apprehension, not punishment of the suspect.

The policies direct officer actions when they stop a fleeing traffic violator. They are told that if the violator is alone in the vehicle then they should maintain a position of cover, order the driver out of the car, and await the arrival of other units.

WPD policies caution the officers in boxing in or cutting off pursued vehicles, because this may constitute the use of deadly force. The policy, Directive 6.8, states: "Consequently, boxing in, cutting off . . . or other force to stop a pursued vehicle should only be used in exceptional circumstances when no other reasonable means exist to apprehend the suspect." When ever an officer is involved in a pursuit, he must complete a written report.

WPD policies indicate a police officer may use deadly force if the officer has a reasonable belief there is an imminent threat of serious physical harm to himself or others. He also may use deadly force to prevent the escape of a fleeing felon. However, WPD officers are directed not to fire their weapons at a moving vehicle, except under exigent, life threatening circumstances or when it appears likely an innocent bystander might be injured. This is similar to the policies used throughout the nation by police departments in New York, Los Angeles, Boston, Portland, St. Louis, Cincinnati, Alexandria, and Tempe. It is generally recognized that shooting at vehicles places police

5

officers and the public at risk because a bullet will not stop a 3,500 pound car and an injured driver likely will lose control of the car

WPD policies define reasonable belief as: "The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances." It also notes that the continuum of force should be followed, suggesting WPD uses the linear model. There also is a circular model, sometimes referred to as the Ontario model. Both models are similar in that they call for escalation and de-escalation of force as fluid circumstances warrant. Some refer to this as the "opening" and "closing" of the window of opportunity to use deadly force. WPD policies also require police officers using deadly force to write a report.

### Opinions:

This report is preliminary. I reserve the right to change, alter or supplement my opinions should other facts come to my attention that bear upon the question posed, i.e., was it objectively reasonable in light of the facts and circumstances for police to shoot Harry Smith, III.

To a reasonable degree of professional certainty, based upon my review of the above noted documents and my training, knowledge and experience, it is my opinion Wilmington police officers shooting Harry Smith on September 13, 2003 violated clearly established statutory and constitutional rights of which a reasonable police officer would have known. It would be clear to a reasonable police officer on the scene that his conduct in shooting Smith, after he passed Ciritella, was unlawful in the situation he confronted. The actions of the police officers were not objectively reasonable in light of the facts and circumstances confronting them. The shooting of Smith was an excessive and unreasonable use of force. The shooting officers knowingly and flagrantly violated generally accepted practices for the use of force and their own departmental policies for vehicle pursuits and use of deadly force.

Prior to this shooting incident, it was clearly established by departmental policy and Delaware law that it was not appropriate to shoot a non-felon (car theft suspect), not necessarily set on avoiding capture through vehicular flight (because he is driving a marked police car with emergency lights flashing), when the officers knew they were not in danger and believed there are no persons in the immediate area at risk from that flight.

6

The crimes here were manufactured or caused by the numerous blunders of the police, who were plainly incompetent and knowingly violated the law and their own departmental policies.

Among the factors I have considered in making a determination of reasonableness include the severity of the crime at issue, whether Smith posed an immediate threat to the safety of the police officers or others, whether he actively resisted arrest or attempted to evade arrest by flight, the duration of the incident, the possibility Smith might have been armed, the number of police officers responding to the incident, the number of persons with whom the police officers had to contend, and the information the officers had and/or should have had available to them at the time they used deadly force.

The nature and extent of the blunders of the police in this case are stunning. First, Whitehead violates departmental policy at the beginning of his shift by placing his shotgun into the trunk. He then approaches Smith, whom Whitehead has reason to believe is mentally ill, in a manner allowing Smith to enter and take his patrol car, which Whitehead left running with the car door open. Whitehead then fails to alert dispatch and responding officers that he is the shooter and his shotgun is in the trunk of the car.

As officers respond, all they know is that they are chasing a stolen police car (which is a misdemeanor), with a shotgun under lock and key, and no one has been injured. Inexplicably, and in clear violation of departmental policies, Ciritella blocks the road in a densely populated neighborhood, jumps out of his car without contacting dispatch to assess the nature of the threat (putting himself at risk), and steps into the street and shoots at a person in a car as it back away from him (not giving proper warning and again putting himself at risk). As the stolen car begins to move, Ciritella begins firing, and as he removes himself from danger he continues to shoot while now knowing the suspect is not armed and is injured. Whether Ciritella knew other innocent bystanders or other police officers were potentially in his line of fire is unclear, but he should have known. He was trained to make certain he had a "clear backdrop" before discharging his weapon. He did know other police officers responded and were very near by, making it highly unlikely, if not impossible, for Smith to escape beyond the 500 block of Harrison Street.

Inexplicably, the other two officers shoot at Smith while the vehicle is very slowly moving away from them. Like Ciritella, they too knew or should have known the location of each other and innocent bystanders and that other officers were near by.

As a result of these numerous and serious blunders and violations of clearly established departmental policies based upon constitutional and statutory laws, an innocent bystander is shot in the leg, bullets hit neighbors' homes, citizens on the street are jumping out of the way to avoid being shot, and a car thief is killed.

It is unreasonable for an officer to seize an unarmed non-dangerous suspect by shooting him dead. There is no reasonable misapprehension of the law governing the circumstances these officers confronted. They had fair notice this type of conduct is not appropriate because of the departmental policies in place. A reasonable officer in these circumstances could not believe shooting Smith until he was dead was justified. A reasonable officer would not have believed Smith posed a threat of serious physical harm to officers or others or that he would escape given the number of responding officers. Therefore, it was unreasonable to use deadly force to prevent Smith's escape, assuming that is what he was doing as the car moved toward the road block and/or very slowly up the hill on Harrison Street.

When viewing these facts in a light most favorable to police, it is my opinion that these police officers were plainly incompetent and knowingly violated the law. These officers did not have probable cause to suspect Smith posed a threat of serious physical harm to themselves, citizens in the immediate area, or other citizens in Wilmington. They had no information he harmed any person or caused any property damage. They could not have reasonably believed that Smith's flight posed a risk of harm to themselves or others because he was surrounded by other officers very nearby and they had no information other than he stole a police car. They knew or should have known Smith could not escape – there were adequate numbers of police present to prevent his escape.

The defendant police officers manufactured or created the situation, which they then later use to justify their shooting of Smith. These officers had plenty of time to plan a strategy to capture or apprehend Smith. They were not forced to make a split second decision. Instead, they intentionally positioned themselves to use deadly force to kill a person having stolen a police car. No reasonable officer would have emptied his gun at a vehicle moving away from him in a densely populated neighborhood, particularly when he knows that should the chase continue there are other nearby police officers readily available to apprehend the car theft suspect driving a marked police car with flashing emergency lights.

8

The explanations offered by these officers for their actions is questionable.
Unfortunately, the police department's handling of the investigation was inconsistent with established and generally accepted police practices and their own departmental policies. After the shooting, all of the defendant police officers were placed in a single room for several hours. They did not write a report on their actions, in violation of written departmental policies. Their only interview lasted just a few minutes.

### My Personal Information:

I served for sixteen years as a police officer for the Chicago Police Department, retiring in 1991. I currently reside in Memphis, Tennessee and work for the Memphis City Schools.

I have not testified as an expert. I have no publications. For my services, I charge $200 per hour for consultation with counsel and report writing, four hour or $800 minimum for depositions, and $1,600 minimum for trial appearances, plus expenses.

All of the opinions offered in his report are to a reasonable degree of professional certainty, and are based upon the documents I reviewed and listed herein. In forming my opinions, I have relied upon my training, knowledge and experience obtained in 16 years as a police officer with the Chicago Police Department.

Dated this 29th day of June 2006

Elbert M Waters H

Elbert Waters

10

# **TAB C**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III, )
HARRY SMITH, JR., and ROSLYN )
WOODARD SMITH, )
                     )
         Plaintiffs, )
                     ) Civil Action
     v. ) No. 04-1254
                     )   (GMS)
WILMINGTON POLICE DEPARTMENT, )
MICHAEL SZCZERBA and ONE OR )
MORE JOHN DOES, )
                     )
        Defendants. )

        Deposition of THOMAS CLIFTON DEMPSEY taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Tuesday, May 9, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        ANNE T. SULTON, PH.D., ESQUIRE
         P.O. Box 2763
         Olympia, Washington   98507
         for the Plaintiffs

        JOHN A. PARKINS, JR., ESQUIRE
        K. TYLER O'CONNELL, ESQUIRE
        RICHARDS, LAYTON & FINGER
         One Rodney Square - Third Floor
         Wilmington, Delaware  19899
         for the Defendants Wilmington Police
         Department and Michael Szczerba

------------------------------------------------
          WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
           (302) 655-0477
           www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



1    there were any police cars?

2        A.    My concentration was on Mr. Smith in that

3    police vehicle and Officer Ciritella.  Other than

4    that, no.

5        Q.    Is it fair to say that you were totally focused

6    on killing Mr. Smith?

7        A.    No.  I was focused on effecting the arrest with

8    the reasonable -- the most reasonable force necessary

9    to effect the arrest.

10       Q.    Did you really think that shooting 13 shots was

11   going to result in something less than death?

12       A.    No.  It was probably going to result in that.

13   We don't shoot to wound.  We shoot to kill.

14       Q.    So it's fair to say that you were totally

15   focused on killing Mr. Smith?

16       A.    I was focused on effecting the arrest, using

17   the most reasonable force necessary.

18       Q.    In your view, that was for what purpose?  For

19   what purpose did you need to shoot what you knew was a

20   car thief?

21       A.    I didn't know -- I didn't know he was a car

22   thief.  He was a car thief along with a lot of other

23   things.  With the lack of knowledge I had, I did not

24   know if he had shot -- I know that he had a weapon on

1    him.    That's -- you know, he was escaped with a police

2    car.    Not a normal, everyday vehicle.    And he was also

3    in possession of a shotgun to my knowledge.

4        Q.    Who told you that, that he had a shotgun?

5        A.    All police cars have shotguns in them that

6    patrol officers take out.

7        Q.    I'm sorry.    I don't want to be argumentative.

8    I really don't.    I apologize if I have been.

9              Who told you he had a shotgun?

10       A.    No one has to tell me that.    I'm a supervisor

11   for the City of Wilmington for the street that those

12   officers were on.    They all take shotguns out to their

13   vehicles.

14       Q.    So is it fair, sir, no one told you he had a

15   shotgun; correct?

16       A.    I am -- I'm aware that my patrol officers have

17   shotguns in their vehicles or they are not properly

18   equipped.

19       Q.    I'm not disagreeing with you that the proper

20   equipment for a police vehicle might be a shotgun.

21             My question simply is:    Isn't it true that

22   at no time did someone tell you --

23       A.    They didn't have to tell me that.

24       Q.    You walked up to the car after Mr. Smith was

1    shot; correct?

2    A.   Yes, I did.

3    Q.   Did you see a shotgun in the car?

4    A.   No, I did not.

5    Q.   So he didn't have a shotgun, did he?

6         MR. PARKINS:  Objection to the form.

7         You can answer.

8    A.   I don't know that.  He was supposed to have a

9    shotgun.  That vehicle is supposed to have a shotgun.

10   Put it that way.

11   Q.   So assume as true there was not a shotgun in

12   that car.

13   A.   I don't know, ma'am.

14   Q.   Okay.

15   A.   I did not search the vehicle.  I did not even

16   get a chance to even go inside the vehicle.  I did not

17   get a chance -- other than touching the lock on the

18   door handle, that's the closest I got to that vehicle.

19   Q.   Did you, sir, ever see the attorney general's

20   report, the city solicitor's report, or the police

21   department report on this incident?

22   A.   I might have several -- once, if not a year

23   ago.  And to be honest with you, I read it maybe one

24   time.

1    Q.    There's no report that indicates a shotgun was

2    found in that car?

3    A.    I don't recall that.  I don't know.

4    Q.    Well, then I want you to assume it's true for

5    the purpose of this next question that there was no

6    shotgun in that car with Mr. Smith.

7    A.    I'm sorry.  Was that a question?

8    Q.    I want you to assume it's true that there was

9    no shotgun in that car with Mr. Smith.  Does that

10   change anything about your testimony as it relates to

11   reasonable force?

12   A.    In reference to this case?

13   Q.    Does it change your discussion of whether or

14   not 13 shots was reasonable force given the fact that

15   there wasn't a shotgun in that car?

16   A.    I still don't know if he -- who had been shot

17   at 14th and Washington, who did the shooting.  I

18   wasn't even aware if he had his own weapon because I

19   was not advised if he did or not.  I know that someone

20   was shot.  I don't know who it was, and also I noticed

21   the fact he has a police car and to my knowledge he

22   had a shotgun.  Even if you are telling me to assume

23   the fact he doesn't, I can't -- I'm not going to

24   imagine this on that situation.  It's not the case.