## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARRY SMITH, JR. and ROSLYN WOODARD SMITH, Individually and as Administrators of THE ESTATE OF HARRY SMITH, III | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.  04-1254-GMS |
| v. | ) ) ) | |
| CITY OF WILMINGTON, JOHN CIRITELLA, THOMAS DEMPSEY, and MATHEW KURTEN, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS'
## SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Rosemaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware  19801
302-576-2175

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
fineman@rlf.com
Attorneys for Defendants

Dated:  February 21, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS .................................................................1

STATEMENT OF FACTS .................................................................................................1

SUMMARY OF ARGUMENT .........................................................................................13

ARGUMENT ................................................................................................................14

INTRODUCTION ..........................................................................................................14

I.    AS A MATTER OF LAW THERE WERE NO CONSTITUTIONAL
      DEPRIVATIONS BECAUSE THE POLICE OFFICERS REASONABLY
      BELIEVED THAT SMITH POSED A THREAT TO THEMSELVES AND
      TO THE PUBLIC. ...................................................................................................14

      A.    Phase-1: Plaintiffs Do Not Assert A Claim And None Of The Defendants
            Were Involved. ..............................................................................................16

      B.    Phase-2:  The Officers Acted Reasonably When Smith Tried To Run
            Over Detective Ciritella. .................................................................................17

      C.    Phase-3: The Officers Reasonably Believed That Smith Posed A Serious
            Threat To The Safety Of Others And Were Justified In Using Deadly
            Force To Prevent His Escape. ...........................................................................18

            1.    Plaintiffs Cannot Recover For The 3A Shots Because Defendants
                  Reasonably Believed That Smith Was A Fleeing Felon Who Posed A
                  Risk To Others. .....................................................................................18

                  (a)  The Shots Fired During Phase-3A Were Constitutional. ..................18

                  (b)  The Unrebutted Evidence Shows That The Fatal Shot Was Fired
                       During Phase-3A. ........................................................................21

            2.    The Disputed Facts Relating To Phase 3B Are Not Material. ....................24

                  (a)  Even Assuming The Truth Of Mr. Gwyn's Testimony, Plaintiffs
                       Cannot Establish A Constitutional Claim. ......................................24

                  (b)  As A Matter Of Law The Shots Allegedly Fired From Behind
                       After The Car Stopped Did Not Cause Smith Any Injury. .................25

II.  THE RECORD IS DEVOID OF ANY EVIDENCE TO SUPPORT PLAINTIFFS' MONELL CLAIMS ............................................................................26

  A.  This Court Should Not Consider The Monell Claims Because Plaintiffs Have Failed To Show An Underlying Constitutional Deprivation ...........................26

      1.  Training Police Officers It Is Acceptable To Shoot At A Moving Vehicle Does Not Violate A Constitutional Right....................................................28

      2.  There Is No Evidence To Support The Claim That Officers Are Not Trained On The Proper Use Of Their Weapons ..........................................29

  B.  There Is No Evidence To Support Plaintiffs' Failure To Investigate And Discipline Claims.........................................................................................30

CONCLUSION.........................................................................................................33

RLF1-3116876-3

## TABLE OF AUTHORITIES

### CASES

*Bornstad v. Honey Brook Township,*
___ F.3d ___, 2007 U.S. App. LEXIS 218 (3d Cir. Jan. 5, 2007).................................26

*Brown v. Shaner,*
172 F.3d 927 (6th Cir. 1999) ............................................................................................31

*Carswell v. Borough of Homestead,*
381 F.3d 235 (3d Cir. 2004).................................................................................28, 29, 30

*City of Canton v. Harris,*
489 U.S. 378 (1989)......................................................................................................27, 28

*City of Los Angeles v. Heller,*
475 U.S. 796 (1986)...............................................................................................................26

*Colburn v. Upper Darby Township,*
946 F.2d 1017 (3d Cir. 1991)........................................................................................27, 29

*Cole v. Bone,*
993 F.2d 1328 (8th Cir. 1993) ...........................................................................................28

*Collins v. City of Harker Heights,*
503 U.S. 115 (1992).............................................................................................................26

*Couden v. Duffy,*
446 F.3d 483 (3d Cir. 2006)...............................................................................................15

*Cruise v. Marino,*
404 F. Supp. 2d 656 (M.D. Pa. 2005)................................................................................29

*Davis v. Southeastern Penn. Transp. Auth.,*
2001 WL 1632142 (E.D. Pa. Dec. 20, 2001)....................................................................20

*Dudley v. Eden,*
260 F.3d 722 (6th Cir. 2001) .......................................................................................20, 24

*Fraire v. City of Arlington,*
957 F.2d 1268 (5th Cir. 1992) ...........................................................................................28

*Graham v. Connor,*
490 U.S. 386 (1989)......................................................................................................14, 15

*Groman v. Township of Manalapan*,
47 F.3d 628 (3d Cir. 1995)..................................................................................................31

*Kneipp v. Tedder*,
95 F.3d 1199 (3d Cir. 1996)................................................................................................26

*Magee v. Rose*,
405 A.2d 143 (Del. Super. Ct. 1979) ..................................................................................25

*Monell. See Whitfield v. Melendez-Rivera*,
431 F.3d 1 (1st Cir. 2005)...................................................................................................27

*Monell v. New York City Dept. of Social Services*,
436 U.S. 658 (1978)............................................................................................................26

*Moor v. County of Alameda*,
411 U.S. 693 (1973)............................................................................................................25

*Oklahoma City v. Tuttle*,
471 U.S. 808 (1985).....................................................................................................30, 31

*Pace v. Capobianco*,
283 F.3d 1275 (11th Cir. 2002) ....................................................................................24, 28

*Puglise v. Cobb County, Ga*,
4 F. Supp. 2d 1172 (N.D. Ga. 1998) .............................................................................17, 24

*Ramsey v. Harley*,
2002 WL 32349129 (E.D. Pa. Mar. 8, 2002)......................................................................17

*Reid v. Ford*,
2005 WL 2898058 (M.D.N.C. Mar. 11, 2005) ........................................................20, 21, 22

*Reitz v. County of Bucks*,
125 F.3d 139 (3d Cir. 1997)................................................................................................27

*Roberts v. City of Shreveport*,
397 F.3d 287 (5th Cir. 2005) ..............................................................................................29

*Robertson v. Wegmann*,
436 U.S. 584 (1978)............................................................................................................25

RLF1-3116876-3

*Scott v. Edinburg,*
346 F.3d 752 (7th Cir. 2003) .................................................................................17, 20, 28

*Smith v. Freland,*
954 F.2d 343 (6th Cir. 1992) ................................................................................ *passim*

*Tennessee v. Garner,*
471 U.S. 1 (1985).................................................................................................14, 17, 19

*Whitfield v. Melendez-Ribera,*
431 F.3d 1 (1st Cir. 2005)..........................................................................................28

*Williams v. City of Grosse Pointe Park,*
2005 WL 2173686 (E.D. Mich. Sept. 6, 2005)...........................................................20

## STATUTES AND OTHER AUTHORITIES

*F.R.A.P.* 32.1 ...........................................................................................................27

## NATURE AND STAGE OF THE PROCEEDINGS

This is a civil rights action arising from the death of Harry Smith III, who was shot by Wilmington police after leading them on a chase through the city in a stolen police car. Defendants timely moved for summary judgment and briefing was completed on that motion. After defendants moved for summary judgment plaintiffs moved for leave to amend their complaint for the second time, this time "so as to conform to the evidence." This Court granted that motion in part and denied it in part.

In its order granting in part plaintiffs' motion for leave to amend, the Court granted defendants leave to file a supplemental motion for summary judgment addressing plaintiffs' amended excessive force claim and their new *Monell* claims. (Counts I and III). This is defendants' opening brief in support of their supplemental motion for summary judgment. Needless to say, defendants do not abandon the remaining arguments (including without limitation their argument on official immunity) contained in their opening and reply briefs in support of their original motion for summary judgment.

## STATEMENT OF FACTS

Sometime on Thursday, September 11, 2003, 25 year old Harry Smith, III ("Smith") complained to his mother that he was hearing voices. (A68, A70-71).[1] His mother became concerned and late that Thursday she concluded her son should seek medical attention. Because she had recently broken her ankle, Mrs. Smith was unable to take her son to the hospital, so she called her former husband, Harry Smith, Jr., who agreed to take their son to the hospital.

---

[1] Harry Smith, Jr. -- father of the decedent -- suffered a stroke after the filing of this lawsuit and so far has been unable to give his deposition.

1

Mr. Smith, Jr. drove his son to the Emergency Room of the Wilmington Hospital. The hospital records show that Smith was triaged in the early hours on Friday, September 12, 2003. (A102).[2] According to a psych evaluation in the emergency room:

> Pt. admits to smoking some weed a few days ago and doesn't know what was in it. Has been paranoid since.

(A103). A physician report from that night contains the notation "Pt. senses that voices or sounds reflect that someone will hurt patient," and the clinical impression drawn by the physician was "new onset paranoia." Smith was given 2 mg. of Haldol and sent home along with instructions to return if his symptoms got worse. (A102-06).

The following day, September 13, Smith's symptoms seemed to worsen. Around 1:30 in the afternoon Mr. Smith, Jr. again took his son to the Wilmington Hospital. (A75-76). When he arrived the younger Smith stated he was no longer hearing voices and he did not enter the building. (Id. at A76-77). By late in the afternoon Smith was again hearing voices, and his father again drove him a third time to the Wilmington Hospital Emergency Room where, according to hospital records, he was triaged at 6:05 p.m. (A80-82; A107). The elder Mr. Smith told a nurse that his son was hearing voices and was no better than before. A psychiatric nurse was promptly summoned and Smith was placed in Treatment Room 24, where he was accompanied by his father. (A108). While in the treatment room, Smith opened a cabinet and removed a surgical kit containing a scalpel. A struggle ensued as the father attempted to subdue his son; either during the struggle or immediately thereafter, Smith stabbed himself at least once in the chest with the scalpel. He then ran out of the hospital toward Washington Street holding the scalpel. (A108, A109).

---

[2] References to "A__," "B__" and "C__" refer to the appendices filed in connection with the original motion for summary judgment. Reference to "SA__" refers to the appendix filed with this brief in support of the supplemental motion for summary judgment.

\*   \*   \*

William Stevenson had just seated himself at the bar at the Washington Street Ale House, waiting to watch a University of Delaware football game on television with a friend, when the bartender suggested he would get a ticket if he did not move his car. Leaving his beer untouched, Stevenson left to move his car. Just as he finished pulling into a new space and was getting out, Stevenson saw a large man running toward him. (A85 at 5). At first he thought the man had been the victim of a robbery because he had a large bloodstain on the tee-shirt he was wearing. His thoughts soon changed, as the man ran toward him yelling "Get out of my way. I'm going to steal your f ___ ing car." (*Id.* at 5-6). Mr. Stevenson immediately started to get back into his car. There followed a tug of war, with Mr. Stevenson trying to pull the door closed and Smith trying to pull it open. Stevenson thought he was in a life and death struggle. Eventually he got the door closed whereupon Smith began banging on the roof of the car and on the window with the scalpel and his fist. Mr. Stevenson was now certain that his assailant would break the car window. (*Id.* at 6-7).

\*   \*   \*

Uniformed Officers Johnny Saunders and Johnny Whitehead were driving southbound on Washington Street in marked patrol car 1180 on September 13 when they saw a heavyset man in a white tee-shirt running southbound on the west sidewalk of Washington Street who then ran across Washington Street toward a car parked near the Washington Street Ale House. The man appeared to be attempting to carjack the automobile, so Officers Saunders and Whitehead turned on their flashing lights and siren and pulled up to the scene. (A97 at 15-17; A85 at 8). They got out of the car, unholstered their pistols and approached the apparent carjacker, who appeared to have some sort of weapon in his hand. They shouted to drop the weapon and get down, but the

3

suspect ignored them, acting as if the police officers were not even there. (A96 at 8, A100 at 34-35; A85-86 at 8-9).

Finally, Smith turned and began walking toward the officers still holding the scalpel. The officers retreated, and as they did so, Smith made a quick turn and jumped into patrol car 1180, whose engine was still running. (A100 at 35-36; A86 at 10). Officer Whitehead grabbed hold of Smith's tee shirt and tried to pull him out of the car while Smith tried to get the car in gear. (A86 at 10). Fearing for his safety (Smith was still holding the scalpel), Officer Whitehead backed away and shot Smith once in the leg. (A100 at 35-36). Smith managed to get the car in gear and sped away heading southbound on Washington Street. A witness described Smith as driving like "a bat out of hell." (A56 at 11). The victim, Mr. Stevenson, held his breath fearing for the worst as he watched Smith run the red light at 12th and Washington Street. (A86 at 11-12).

*   *   *

As the events were unfolding on Washington Street, Officer Saunders made an important series of radio transmissions: "16 Charles (Saunder's and Whitehead's identifying code). Officer needs assistance," followed by "He's got the car; he's got the car," and then "shots fired!"

*   *   *

Sergeant Deborah Donohue was heading southbound in her marked car on Washington Street when a passing motorist told her of police activity behind her. (Donohue Aff. ¶ 2 (D.I. 104)). She made a u-turn at 11th Street and headed northbound on Washington Street toward the scene when she heard the radio transmission from 16-Charles. Donohue saw the speeding stolen police car heading southbound on Washington Street, and she made another u-turn on Washington Street to follow. She broadcast the route of the pursuit over the radio. (*Id.* ¶ 4).

4

\*   \*   \*

Detective John Ciritella was sitting at his desk at the Central police station on Fourth and Walnut Street doing paperwork when he heard 16-Charles's radio broadcast. Detective Ciritella grabbed his portable radio and ran downstairs to the parking lot which contained his and other police vehicles. (A2 at 27-29).

Officer Thomas Dempsey had just arrived for work at Central when he too heard 16 Charles's broadcast. Like Detective Ciritella he ran to his police car in the parking lot. Detective Ciritella turned left and headed west on Fourth Street; he was followed by Officer Dempsey. (A28 at 39).

Officer Matthew Kurten was in the process of making an arrest for a minor crime when he heard 16 Charles's broadcast. The officer released the suspect and immediately went to his patrol car to respond. (A47 at 32-33).

\*   \*   \*

Smith, followed by Sergeant Donohue, sped south on Washington Street until he took a right turn onto 7th Street and headed westbound on 7th Street -- the wrong way on a narrow one-way street. (Donohue Aff. ¶ 5 (D.I. 104)). Officer Donohue noticed that three on-coming cars were forced to pull over to avoid the stolen police car driven by Smith. (*Id* ¶ 5).

Detective Michael Lawson, accompanied by Detective Donna DiClemente, was driving in a tan detectives' car when they heard 16 Charles's radio transmission and the subsequent radio description of the route taken by the suspect. (DiClemente Aff. ¶ 2 (D.I. 105); Lawson Aff. ¶ 2 (D.I. 103)). They drove south on Monroe Street to parallel the pursuit and were on Monroe Street at the intersection of 7th when they saw the stolen police car make a left turn off of 7th and onto Monroe Street heading south. The stolen car barely negotiated the turn and narrowly

avoided hitting parked cars at the corner. (DiClemente Aff. ¶ 3 (D.I. 105); Lawson Aff. ¶ 4 (D.I. 103)).

Lawson and DiClemente now became the first cars in the pursuit as they followed Smith south on Monroe Street. (Lawson Aff. ¶ 5 (D.I. 103); Donohue Aff. ¶ 7 (D.I. 104)). Smith was driving erratically from side to side and ran stop signs. At the intersection with Fourth Street, Smith ran a red light and turned right onto Fourth Street. (DiClemente Aff. ¶ 4 (D.I. 105); Donohue Aff. ¶ 7 (D.I. 104)). Smith was followed onto Fourth Street by the Lawson/DiClemente car. At this time Detective Ciritella and Officer Dempsey were approaching on Fourth from the east. Sergeant Donohue slowed to allow the police cars approaching from the east to pass before she made the turn onto Fourth Street. (DiClemente Aff. ¶ 5 (D.I. 105); Donohue Aff. ¶ 6 (D.I. 104)).

Smith drove west on Fourth Street. Officer Donald Dempsey (not to be confused with defendant Thomas Dempsey) was on southbound Jackson Street where it intersects with Fourth Street when the stolen police car passed him. A gap had opened between the stolen car driven by Smith and the lead car (Lawson/DiClemente) so Donald Dempsey took a right onto Fourth Street and became the lead car in the pursuit. (D. Dempsey Aff. ¶¶ 3-4 (D.I. 102); Lawson Aff. ¶ 7 (D.I. 103)). Behind Thomas Dempsey on Jackson was defendant Officer Matthew Kurten. Officer Kurten joined the chase pulling in behind defendant Ciritella. (A49 at 40).

Smith took a right turn off of Fourth Street onto VanBuren. He was followed by Donald Dempsey, Lawson/DiClemente and others. (D. Dempsey Aff. ¶¶ 4-5 (D.I. 102); DiClemente Aff. ¶ 7 (D.I. 105); Lawson Aff. ¶ 8 (D.I. 103)). Detective Ciritella decided to parallel the chase and perhaps block Smith at some point, so he continued one block farther on Fourth Street and

6

turned right onto Harrison Street. (A4 at 39-40). He was followed by Kurten and Thomas Dempsey. (A49 at 40; A29 at 42-43).

Smith's next move was a left onto Fifth Street. (D. Dempsey Aff. ¶ 5 (D.I. 102); Lawson Aff. ¶ 9 (D.I. 103)). Hearing that the stolen police car was heading west on Fifth Street, Detective Ciritella (now on Harrison) stopped his car at 5th and Harrison, blocking the northern half of Fifth Street; Officer Kurten pulled in behind Detective Ciritella, blocking the other half of Fifth. (A5 at 52; A43 at 10; Lawson Aff. ¶ 10 (D.I. 103)). Officer Thomas Dempsey stopped his car on Harrison just south of the intersection so as to avoid hitting Ciritella and Kurten who were getting out of their cars. (A29 at 43). Detective Ciritella, took cover behind a building on the northeast corner of the 5th and Harrison intersection, while Officer Kurten walked eastward on the southern side of 5th Street, using parked cars as cover. (A6 at 55, 57; A10 at 89; A50 at 43; A51 at 46). Thomas Dempsey positioned himself on Harrison with Ciritella's and Kurten's cars between him and the oncoming Smith.

As Smith approached the 5th and Harrison intersection, the defendant police officers:

- Knew there had been an officer-needs-assistance call from 16 Charles;

- Knew that a shot or shots had been fired. They did not know whether Smith or the officer had fired the shots;

- Knew that Smith had stolen a police car; and

- Knew that Smith had ignored police sirens and lights and had led police on a chase in the City.

Not surprisingly, therefore, the defendant officers at 5th and Harrison unholstered their pistols.

*    *    *

7

As Smith drove down 5th Street he slowed as he approached Harrison and appeared to be stopping. Officer Donald Dempsey, in the first car behind Smith, stopped his car and started to get out. Lawson slowed his car also and Detective DiClemente also began to get out. Detective Ciritella came around the building, identified himself as a police officer and shouted to Smith to get out of the car. Officer Kurten, who was in uniform, shouted the same instructions to Smith. (A6 at 55-56, A8 at 80; A50 at 44-45; Lawson Aff. ¶ 10 (D.I. 103); D. Dempsey Aff. ¶ 8 (D.I. 102); DiClemente Aff. ¶ 8 (D.I. 105)).

Just as it appeared this incident was winding down, Smith gunned the car and drove straight at Detective Ciritella who had just stepped off the sidewalk onto the edge of the street. In an effort to save his own life, Detective Ciritella -- for the first and only time in his career -- used his weapon at someplace other than a practice range; he fired three or four shots into the on-rushing stolen police car and jumped back. Fearing for Ciritella's life, Officer Kurten -- also using his gun for the first time in his career -- fired at least one round into the car from his position near the southeast corner of Fifth and Harrison Streets. (A6 at 55-56, A9 at 82-85, A10 at 88, A11 at 90-93; A43 at 10; A29 at 45; D. Dempsey Aff. ¶ 9 (D.I. 102); Lawson Aff. ¶ 11 (D.I. 103)).

The shots apparently did not phase Smith, who kept going. He avoided the blockade by driving on the sidewalk, and struck a Jeep Cherokee parked on Harrison Street, spinning it nearly 180 degrees. (A44 at 20-21; D. Dempsey Aff. ¶ 10 (D.I. 102)). The wheels of the stolen police car squealed and the smell of burning rubber permeated the air as Smith plowed through the Jeep and made the turn onto Harrison Street. (In their brief on the first motion for summary judgment plaintiffs speculated that the crash into the Jeep must have been at slow speed because the airbags on the stolen police car did not deploy. Defendants' forensic expert noted that the front

quarter of the stolen police car rammed the Jeep Cherokee and the police car's airbag sensor -- which is located near the center of the car, was not impacted. Consequently the failure of the airbags to deploy had nothing to do with the car's speed. He further observed that the forensic evidence showed that Smith was accelerating.) (Nordby Declaration, Exhibit 2 at 2; 5-8)[3]. (July 15, 2006 Supplemental at 2; 5-8). Smith was now in the open as there were no police cars ahead of him. (A6 at 56, A12 at 97, A13 at 98; A30 at 46; A51 at 47).

It was apparent to Detective Ciritella and Officers Thomas Dempsey and Kurten that Smith was now in the open and in danger of escaping. (A15 at 109; A29 at 45, A30 at 46, A51 at 47; D. Dempsey Aff. ¶ 13 (D.I. 102)). Fearing for the safety of the citizens of Wilmington, each of the officers concluded it was necessary and appropriate to use deadly force to prevent his escape. Ciritella proceeded on foot up the eastern side of Harrison Street (which would have been on Smith's right) and Thomas Dempsey and Kurten proceeded up the other side of Harrison as they shot at Smith. They stopped firing once the stolen police car appeared to stop. (A14 at 103-105, A15 at 106, A15 at 109; A29 at 45, A30 at 46-47, A32 at 67, A34 at 78, A42 at 9, A43 at 10, A44 at 21, A45 at 22-23).

Ciritella fired 13 rounds (including those he fired at Smith as Smith tried to run him down). (A15 at 109). Kurten fired five times (including the shot or shots he fired at Smith when he was trying to run down Detective Ciritella). (A42 at 9). Officer Thomas Dempsey, who, like Ciritella and Kurten, had never used his weapon other than on the practice range, fired 13 shots. (A2 at 27; A41 at 3; A24 at 25, A27 at 34). The shooting lasted only a few seconds. Officer Donald Dempsey and Detectives Lawson and DiClemente ran toward Harrison, but none of them fired their weapons as the stolen police car had stopped. (A14 at 105, A15 at 106-07; A30 at 46-

---

[3] The Declaration of Jon J. Nordby, Ph.D. is being filed contemporaneously herewith.

9

47; A46 at 28-29; D. Dempsey Aff. ¶ 11 (D.I. 102); Lawson Aff. ¶ 12 (D.I. 103); DiClemente Aff. ¶ 8 (D.I. 105)).

The stolen police car was still drifting as the officers approached. Detective Ciritella approached the passenger's side of the car and, after ascertaining he was safe, reached in and put the car in park. (A15 at 106-107, A19 at 145, A20 at 46; D. Dempsey Aff. ¶ 12 (D.I. 102); Lawson Aff. ¶ 12 (D.I. 103)). Detective DiClemente ran up behind Ciritella, satisfied herself he was unhurt, then went behind the stolen police car to the driver's side. She assisted Detective Lawson in removing Smith from the car. Detective DiClemente, who saw that Smith was not responsive and did not appear to be breathing, checked for a pulse and found none. She immediately began chest compressions and continued her efforts until New Castle County paramedics arrived. (DiClemente Aff. ¶ 9 (D.I. 105)).

*   *   *

Assistant Medical Examiner Jennie Vershvovsky performed an autopsy. Her report lists the cause of Smith's death as a "Gunshot wound to head." (A110). The bullet entered Smith's head above his right ear, went through the right parietal lobe of his brain and ended up in his left parietal lobe near the border with the occipital lobe. In other words, it traveled in a generally right to left direction. The bullet was retrieved from his brain and submitted to the police. (A112). All of the retrieved bullets, along with the shell casings and the officers' weapons, were submitted to the Bureau of Alcohol Firearms and Tobacco for analysis. ATF found that the bullet retrieved from Mr. Smith's brain was fired from a Smith and Wesson pistol bearing serial number SAF0327 -- Detective Ciritella's weapon. (D.I. 106).

*   *   *

10

Since the filing of the defendants' initial motion for summary judgment, defendants timely produced an expert report from Jon Nordby, Ph.D, a nationally renown forensic scientist. Plaintiffs elected not to depose Dr. Nordby nor did they provide an expert forensic report of their own.  Consequently, the opinions and conclusions expressed in Dr. Nordby's report are unrebutted.

Dr. Nordby performed extensive tests on patrol car 1180, including laser beams to track the path of the officers' bullets. He also analyzed the site of the incident, conducted tests on the clothing worn by Mr. Smith at the time of the incident and performed a chemical analysis of the interior of car 1180.  In addition he performed an independent analysis of the handguns used by the defendants that night, which tests confirmed ATF's conclusion that the fatal bullet was fired by Detective Ciritella.  Dr. Nordby also performed ejection tests on Detective Ciritella's weapon, measuring the direction and distance that handgun ejected shell casings.

Dr. Nordby made several key conclusions, some of which are summarized below:

- The forensic evidence is consistent with Smith driving at Detective Ciritella and narrowly missing him on Fifth Street.

- Smith accelerated the stolen police car after striking the Jeep on Harrison Street. The airbags did not deploy on the stolen police car because the crash did not impact the police car's airbag sensors.

- Smith was in an upright position when he was struck by the officers' bullets.

- Detective Ciritella was at the 2 or 3 o'clock position relative to the stolen police car (with the front of the car pointed at 12:00) when he fired the fatal shot which struck Smith on the right side of his head.

- The police car was still moving when Detective Ciritella fired this shot.

11

- After being struck in the head, Smith slumped to the right toward the passenger seat. (Nordby Declaration, Exhibit 2 at 1-8).

## SUMMARY OF ARGUMENT

1.   The unrebutted evidence shows that the defendant police officers reasonably believed that Smith presented a threat of death or serious injury to themselves and others.  It was therefore constitutional for them to use deadly force.

2.   There is absolutely no evidence in the record supporting plaintiffs' vague *Monell* claims.

13

**ARGUMENT**

**INTRODUCTION**

In their reply brief in support of their original motion for summary judgment, defendants pointed out that many of the "facts" stated by the plaintiffs in their answering brief were simply manufactured with no support in the record. Plaintiffs' proclivity to tell the Court whatever they feel will help their case continues. Plaintiffs allege in their Second Amended Complaint that "supervisory individuals ... continue to teach and train City of Wilmington Police officers that it is acceptable to shoot at a moving vehicle ...." (Second Amended Complaint, ¶ 74(e).) But plaintiffs have represented to this Court that the polar opposite is true -- in their brief in opposition to defendants' initial motion for summary judgment plaintiffs told this Court that "WPD trained these defendants *not* to shoot at moving vehicles ...." (Pl. Ans. Br. 12, ¶ 57; D.I. 116) (emphasis added). It is against this backdrop of plaintiffs' made-up facts and ever shifting representations to the Court that defendants supplement their motion for summary judgment.

**I.    AS A MATTER OF LAW THERE WERE NO CONSTITUTIONAL DEPRIVATIONS BECAUSE THE POLICE OFFICERS REASONABLY BELIEVED THAT SMITH POSED A THREAT TO THEMSELVES AND TO THE PUBLIC.**

This Court has previously ruled that the plaintiffs' constitutional claims must be evaluated under the Fourth Amendment. (D.I. 78). The Fourth Amendment prohibits police officers from seizing a suspect through the use of force that is "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). But the Supreme Court has made clear that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Pertinent factors include (i) the severity of the suspected crimes; (ii) whether the suspect poses an immediate

14

threat to the safety of the officer or others; and (iii) whether the suspect is actively trying to

evade arrest by flight. *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006). The test of objective

reasonableness recognizes that "police officers are often forced to make split-second judgments-

in circumstances that are tense, uncertain, and rapidly evolving ...." *Graham*, 490 U.S. at 397.

This test does not use "the 20/20 vision of hindsight," but rather considers the "perspective of a

reasonable officer on the scene." *Couden*, 446 F.3d at 497 (*quoting Graham*, 490 U.S. at 396).

An opinion from the 6th Circuit provides considerable guidance to this Court because of

the marked similarity of the facts to this case. In *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992)

a police officer attempted to pull over a suspect for speeding. Rather than comply, the suspect

sped away and led the officer on a high speed chase. At one point in the chase (after pulling into

a field) the suspect drove toward the officer's car, whereupon the officer reported by radio that

the suspect was wanted for assault on a police officer. Later in the chase the officer cornered the

suspect's car, at which time the officer got out of his car to remove the suspect. Suddenly the

suspect smashed his car into the officer's cruiser, backed up and zoomed around the officer. The

defendant policeman fired one shot into the suspect's car as it drove past, killing the suspect.

Both the district court and the court of appeals held that, as a matter of law, there was no

constitutional deprivation. Defendants are reluctant to present this Court with long quotations,

but the reasoning of the Sixth Circuit is dispositive of the instant plaintiffs' claim and thus

warrants extended quotation:

> In light of these cases, and after a careful scrutiny of the facts, we
> are convinced that summary judgment should be granted to Officer
> Schulcz. After a dramatic chase, Officer Schulcz appeared to have
> trapped his man at the end of a dark street. Suddenly Mr. Smith
> freed his car and began speeding down the street. In an instant
> Officer Schulcz had to decide whether to allow his suspect to
> escape. He decided to stop him, and no rational jury could say he
> acted unreasonably. Even if there were a roadblock at the end of

15

Woodbine Avenue, Officer Schulcz could reasonably believe that Mr. Smith could escape the roadblock, as he had escaped several times previously. In any event, Mr. Smith had freed his car from Officer Schulcz's attempted blockade, and was undoubtedly going to escape from Officer Schulcz, if not the entire police force. Had he proceeded unmolested down Woodbine Avenue, he posed [**14] a major threat to the officers manning the roadblock. Even unarmed, he was not harmless; a car can be a deadly weapon. Finally, rather than confronting the roadblock, he could have stopped his car and entered one of the neighboring houses, hoping to take hostages. Mr. Smith had proven he would do almost anything to avoid capture; Officer Schulcz could certainly assume he would not stop at threatening others.

954 F.2d at 347 (citation omitted). There is nothing to distinguish the facts and reasoning in

*Smith v. Freeland* from the instant matter.

Defendants now turn to the application of these principles to the instant record. For

purposes of this analysis defendants have divided the shootings into three phases: (1) Phase-1

consists of the shot fired at Smith on Washington Street; (2) Phase-2 consists of the shots fired at

Smith at 5th and Harrison Streets as he drove the stolen police car at Detective Ciritella; and (3)

Phase-3 consists of the shots fired at Smith as he attempted to flee on Harrison Street. In light of

the Second Amended Complaint, defendants have subdivided Phase-3 into Phases 3A and 3B.

Phase 3A addresses the shots fired at the fleeing Smith before the car stopped; Phase 3B

addresses the shots allegedly fired after the car stopped.

## A. Phase-1: Plaintiffs Do Not Assert A Claim And None Of The Defendants Were Involved.

Plaintiffs do not allege that the shot fired at Smith when he was stealing the police car on

Washington Street amounts to a constitutional deprivation. Moreover, there is no claim or

evidence that the individual defendants were present on Washington Street. Indeed, it is

undisputed that the Washington Street shot was fired by Officer Johnny Whitehead, who is not a

defendant in this case.

16

**B.    Phase-2:  The Officers Acted Reasonably When Smith Tried To Run Over Detective Ciritella.**

As a matter of law, the officers acted reasonably in shooting at Smith during Phase-2.  It is uncontested[4] that Smith accelerated the police car at Detective Ciritella and circumvented the barricade by driving on the sidewalk and plowing through a Jeep Cherokee parked on Harrison Street.  There is no dispute that, after first slowing or stopping the stolen police car on Fifth Street before the roadblock, Smith suddenly accelerated directly at Detective Ciritella, who quickly retreated and moved to his left to avoid being run over.  The Phase-2 shots were fired in response to the officers' reasonable perception that Smith had begun to use the car as a deadly weapon against Detective Ciritella.  *See, e.g., Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) (suspect who drove vehicle at officer used it as a deadly weapon, justifying use of deadly force); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.), *cert. denied*, 504 U.S. 915 (1992).  The officers had more than the "probable cause" needed to suspect that Smith posed a "threat of serious physical harm[,]" which suffices as a matter of law to justify their use of deadly force. *Garner*, 471 U.S. at 11; *see also Ramsey v. Harley*, 2002 WL 32349129, at *2 (E.D. Pa. Mar. 8, 2002) (granting defendants summary judgment on Fourth Amendment grounds where plaintiff-suspect drove in direction of officer, which prompted officers to shoot at suspect); *Puglise v. Cobb County, Ga*, 4 F. Supp. 2d 1172, 1180 (N.D. Ga. 1998) (same).

---

[4] All of the police officers who observed this event agree that Smith drove directly at Ciritella after he appeared to be stopping.  The record contains testimony of only one other person aside from these police officers -- David Gwyn.  But Mr. Gwyn did not observe the events on Fifth Street -- he did not see the stolen police car until after it turned the corner and hit the Jeep Cherokee.  (SA4-5).

17

**C.    Phase-3:  The Officers Reasonably Believed That Smith Posed A Serious Threat To The Safety Of Others And Were Justified In Using Deadly Force To Prevent His Escape.**

In light of the Second Amended Complaint, defendants will divide the shots into two categories:  3A are those shots fired at Smith before the car stopped; 3B are those shots allegedly fired after the car stopped.  The uncontradicted evidence shows that the fatal shot was fired during Phase 3A and that it was constitutional for the officers to fire the 3A shots.  Finally, plaintiffs cannot recover for the injuries inflicted by the alleged Phase 3B shots because -- according to at least five separate paragraphs of the Second Amended Complaint -- Smith was unconscious when they struck him.

**1.    Plaintiffs Cannot Recover For The 3A Shots Because Defendants Reasonably Believed That Smith Was A Fleeing Felon Who Posed A Risk To Others.**

At the time they fired the Phase-3 shots defendants reasonably believed that Smith had just tried to kill Detective Ciritella, that moments before Smith had been involved with police in an incident in which shots were fired, that Smith would take whatever steps were necessary to avoid capture and that once he turned the corner onto Harrison Street Smith had an open field ahead of him.  Therefore, as a matter of law it was constitutional for the officers to use deadly force to prevent Smith's escape.  The evidence also shows that the fatal shot was fired during Phase-3A.

**(a)    The Shots Fired During Phase-3A Were Constitutional.**

It is uncontested that by the time Smith made the turn onto Harrison Street -- and was now in the open field -- the officers reasonably believed the following:

- There had been an officer-needs-assistance call from Officers Whitehead and Saunders on Washington Street;

18

- A shot or shots had been fired on Washington Street. The officers did not know whether the suspect or a police officer had fired shots;

- The suspect stole a police car;

- The suspect led the police on a reckless chase through the City;

- The suspect had accelerated the stolen police car directly at defendant Ciritella in an apparent attempt to kill him;

- The suspect had recklessly driven the stolen police car on the sidewalk in order to avoid a barricade consisting of a marked and unmarked police car;

- The suspect crashed the stolen police car into a parked Jeep Cherokee and pushed it aside while accelerating the stolen police car in an effort to escape;

- Smith was now proceeding the wrong way on one-way Harrison Street; and

- There were no police cars blocking the suspect's path once he turned onto Harrison Street.[5]

For these reasons, each of the officers reasonably believed that Smith's continued flight through the City would threaten the lives of citizens of Wilmington. (A15 at 109, A18 at 131; A43 at 10, A52 at 51-52; A30 at 46, A34 at 79, A35 at 82).

*Garner's* standard, which only required that the officers have "probable cause" to believe that Smith posed "a threat of serious physical harm" to others, is plainly satisfied here. 471 U.S. at 11. Even viewed in the light most favorable to plaintiffs, the facts show that Smith had just

---

[5] In their Second Amended Complaint plaintiffs allege that "Wilmington Police Officers were informed Harry Smith III was experiencing mental health problems." (Second Amended Complaint, ¶ 18). It is true that Louise Traux a nurse at the Wilmington Hospital called the police department to advise them of Smith's elopement from the Emergency Room and told the officer on the phone that Smith was "crazy." There is not a shred of evidence, however, that defendants knew of this before the shooting. If anything, it would have heightened their fears that Smith presented a dangerous threat to others.

19

attempted to kill a police officer and posed an immediate threat to the safety of others sufficient to justify the officers in preventing his further flight. *Scott*, 346 F.3d at 759 (affirming summary judgment in favor of officer because it was reasonable to use deadly force to seize car theft suspect who had driven recklessly, nearly running over officer, in attempt to escape); *Dudley v. Eden*, 260 F.3d 722, 726 (6th Cir. 2001) (affirming grant of summary judgment in favor of officer who shot to prevent the escape of a robbery suspect who had driven recklessly away from another officer in a shots fired incident); *Reid v. Ford*, 2005 WL 2898058, at *4 (M.D.N.C. Mar. 11, 2005), *aff'd*, 2005 WL 1725705 (M.D.N.C. Apr. 22, 2005) (granting summary judgment to officers who shot to prevent escape of armed robbery suspect who drove recklessly in attempt to escape officers); *Davis v. Southeastern Penn. Transp. Auth.*, 2001 WL 1632142, at *5 (E.D. Pa. Dec. 20, 2001) (granting summary judgment to officers who shot at fleeing suspect where officers had reason to believe suspect committed armed robbery and car jacking with a gun, even if the suspect actually had no gun).

It is clear that Smith was attempting to flee from the police and would (and did) go through anything or anyone in his path of escape. *Scott*, 346 F.3d at 759 (suspect who drove at officer and then attempted to flee posed immediate threat to bystanders); *Dudley*, 260 F.3d at 727 (suspect's "bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving" made it objectively reasonable to view him as a threat to other motorists); *Freeland*, 954 F.2d at 347 (suspect's reckless driving in an attempt to escape "had proven he would do almost anything to avoid capture" and the officer could reasonably believe the suspect "would not stop at threatening others"); *Williams v. City of Grosse Pointe Park*, 2005 WL 2173686, at *5 (E.D. Mich. Sept. 6, 2005) (granting officers summary judgment where suspect's objective conduct "showed that he was not intimidated by

20

the police presence, would not hesitate to deliberately use the vehicle as a weapon, and was intent on fleeing from the police, which in turn posed a threat to the public traveling on a major [city] thoroughfare."); *Reid*, 2005 WL 2898058, at *4 (granting summary judgment where suspect's driving showed he "clearly posed a threat to the [officers'] safety, other drivers' safety, and the safety of the residents of the neighborhood that he was driving wildly through.").

### (b)    The Unrebutted Evidence Shows That The Fatal Shot Was Fired During Phase-3A.

It is unquestioned that Detective Ciritella fired the fatal shot to Smith's head. According to the Second Amended Complaint, Smith "was killed by a bullet wound to the head, but all bullet wounds hitting him contributed to his death." (Second Amended Complaint, ¶ 31). Further, plaintiffs allege that "the medial examiner reports the cause of death was a bullet wound to the head." (*Id.*, ¶ 41). There is no dispute that this shot was fired by Detective Ciritella. (Pl. Ans. Brf., 14 ¶ 67) ("At the moment Ciritella fires the bullet hitting Harry's head"). The bullet removed from Smith's head during the autopsy was sent to ATF for analysis. That agency concluded that it had been fired from Detective Ciritella's weapon. Defendants' forensic expert, Jon Nordby Ph.D., conducted an independent analysis of the same bullet and came to the same conclusion.

Detective Ciritella testified that he initially proceeded up the eastern sidewalk on Harrison Street and then stepped off onto the eastern side of that street as Smith drove up Harrison Street.[6] (This would have been the passenger side of the stolen police vehicle). His final shots were shots straight on from the side which would have gone from Smith's right to his left. The location of Ciritella's shell casings confirm that he was on the side of the car when he

---

[6] Plaintiffs do not dispute this. In their earlier Answering Brief, plaintiffs told this Court "Ciritella continues walking on the sidewalk for a few yards and then steps into the street." (Pl. Ans. Br. 13, ¶ 65). They likewise agree that Ciritella was on the passenger side of the stolen police car. (*Id.*, ¶ 63).

fired. The medical examiner confirmed that the shot striking Smith in the head as well as a bullet striking him in the shoulder (both fired by Detective Ciritella) traveled from Smith's right to his left. (SA17). Finally, Dr. Nordby opined that Ciritella was at about the 3 o'clock position when he fired the shots which struck Smith in the head and shoulder. (Nordby Declaration, Exhibit 2 at 7-9). Plaintiffs have not developed any evidence that places Detective Ciritella at any location other than roughly even with the car on the passenger's side.

The car was heading northbound on Harrison, meaning it was going from Ciritella's left to his right as he faced the car. The shell casings were ejected to Ciritella's right. If, as plaintiffs theorize, the car had come to a stop before Ciritella fired these rounds, the shell casings would have been to the front of the car, or at least even with it. But the shell casings were found behind the car, thus meaning that the car continued to move after Ciritella fired his final rounds.

Plaintiffs allege that "Harry Smith III was seen slumping over the car's steering wheel, apparently unconscious ...." (Second Amended Complaint, ¶ 28). They claim that the defendants continued to shoot at him after this occurred and theorize that this violated Smith's constitutional rights. The only witness identified by plaintiffs to have seen this is David Gwyn. Notably, however, Mr. Gwyn never saw Ciritella and never saw him shooting after the car stopped. Even assuming Mr. Gwyn's testimony is true, there is no evidence in the record that Detective Ciritella fired this shot after Mr. Smith was allegedly "seen slumping over the wheel, apparently unconscious" because it is manifest from Mr. Gwyn's testimony that he never saw Detective Ciritella:

- Mr. Gwyn testified he saw three officers all of whom were in uniform. None, according to Mr. Gwyn, were in plain clothes:

    Q:    Were all three of the police officers in police uniforms or were some of them in plain clothes?

*    *    *

    A:     They were in uniforms, all three of them. (SA19).

- Detective Ciritella, however, was dressed "in plain street clothes." (Second Amended Complaint ¶ 21).

- This is not simply a matter where Mr. Gwyn was mistaken about the clothes the defendants were wearing. He placed the officers he saw behind the stolen police car and to the driver's side of the car. He never placed any officers to the passenger side of the car. (SA9-12; SA19).

- Mr. Gwyn did not see any officer shooting in the passenger side. Rather he testified he saw the officers shooting at the back of the car. In response to questioning by plaintiffs' counsel, Mr. Gwyn testified as follows:

    Q:     Where were the officers? Were they behind the car? On the side of the car? In front of the car? Where were the police officers?

    A:     Behind the car. (SA12).

    Q:     When that car first stopped, the officers were still firing their weapons, correct?

    A:     Yes.

    Q:     Where were those officers? Were they behind the car?

    A:     They was in back of the car.

    (*Id.*)

- When asked about police officers shooting from the side of the police car Mr. Gwyn testified he was "cloudy" on that. (SA6). He never testified he saw an officer shooting at the car from the passenger side, much less after the car had stopped.

23

In short, plaintiffs can proffer no evidence in the record that Detective Ciritella fired at the car after it had stopped.

### 2.    The Disputed Facts Relating To Phase 3B Are Not Material.

Plaintiffs' Second Amended Complaint contains repeated allegations that defendants continued to shoot at Smith after he "was seen slumping over the car's steering wheel, *apparently unconscious* ..." (Second Amended Complaint ¶¶ 28, 51, 53, 55, 58) (emphasis added). They will undoubtedly cite to David Gwyn's testimony as the only support for this proposition because the record is devoid of any evidence supporting it. Defendants vehemently deny they shot at the car after it stopped. But even assuming the truth of Mr. Gwyn's testimony, plaintiffs have failed to make out a constitutional claim. Further, plaintiffs as a matter of law cannot recover for wounds occurring after Smith was unconscious.

### (a)    Even Assuming The Truth Of Mr. Gwyn's Testimony, Plaintiffs Cannot Establish A Constitutional Claim.

Given the danger created by Smith's reckless flight and the split-second nature of the decisions the officers had to make, their conduct was not objectively unreasonable even if (as the plaintiffs contend) one or more shots were fired after the fleeing car had stopped. *See, e.g., Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (reversing denial of officers' motion for summary judgment and reasoning that, even if two shots were fired after chase ended, the suspect's "car was stopped for, at most, a very few seconds when shots were fired: no cooling time had passed for the officers in hot pursuit"); *Dudley v. Eden*, 260 F.3d 722, 727 (6th Cir. 2001) (affirming summary judgment in favor of officer who shot and killed suspect after collision ending chase and reasoning that suspect could have decided to continue to flee and officer could have reasonably feared suspect could use a weapon against the officer); *Puglise v. Cobb County, Ga.*, 4 F. Supp. 2d 1172 (N.D. Ga. 1998) (granting summary judgment in favor of

24

officers who shot into a truck which was "stopped, blocked in by other patrol cars" where suspect had repeatedly escaped from officers by driving recklessly). The plaintiffs cannot point to evidence sufficient to create a material factual dispute that the officers' use of deadly force to prevent Smith's continued reckless flight during Phase-3 was unreasonable under the Fourth Amendment.

      **(b)**    **As A Matter Of Law The Shots Allegedly Fired From Behind After The Car Stopped Did Not Cause Smith Any Injury.**

Defendants Kurten and Dempsey adamantly deny Gwyn's testimony that they shot at the car after it stopped. Nonetheless, for present purposes they will assume his testimony is accurate. But even making that assumption, Delaware's survival act statute precludes plaintiffs from recovering for any shots wounding the unconscious Smith.

Section 1983 does not contain any provision authorizing an action brought by the estate of a deceased person. *Moor v. County of Alameda*, 411 U.S. 693, 702 n.14 (1973). Thus, under 42 U.S.C. §1988, federal courts look to state law to fashion a remedy for alleged civil rights violations when the plaintiff has died. *Robertson v. Wegmann*, 436 U.S. 584 (1978). Delaware's survival statute is 10 *Del. C.* §3701. Under that statute "the plaintiff has the burden of proving the existence of conscious pain and suffering" *Magee v. Rose*, 405 A.2d 143, 146 (Del. Super. Ct. 1979). Here there is no evidence that Smith incurred conscious pain and suffering. To the contrary, plaintiffs allege on at least five different occasions that Smith was "apparently unconscious" when the car stopped. (Second Amended Complaint, ¶¶ 28, 51, 53, 55, 58). Consequently, as a matter of law plaintiffs cannot recover for the shots Mr. Gwyn claims to have seen fired from the rear of the car after it stopped.

25

## II.    THE RECORD IS DEVOID OF ANY EVIDENCE TO SUPPORT PLAINTIFFS' *MONELL* CLAIMS.

Relying upon *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), Plaintiffs raise two failure to train claims and a broad claim which can be properly characterized as a claim that the City failed to investigate alleged uses of excessive force and discipline those officers who may have been found to have used excessive force. There is a complete absence of evidence to support these claims.

### A.    This Court Should Not Consider The *Monell* Claims Because Plaintiffs Have Failed To Show An Underlying Constitutional Deprivation.

A requisite to a *Monell* claim is that the plaintiffs establish an underlying constitutional deprivation. In *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (per curiam) the Court held:

> But this was an action for damages, and neither *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

(475 U.S. at 499); *accord Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) ("proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation ...."); *Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996) ("Of course, had there not been an underlying constitutional violation in the first instance, plaintiff's 'failure to train' claim against the City would not stand.") Here the individual defendants are entitled to summary judgment on the excessive force claims against them and therefore this Court should not reach plaintiffs' *Monell* claims. *Bornstad v. Honey Brook Township*, ___ F.3d ___, 2007 U.S. App. LEXIS 218 (3d Cir.

Jan. 5, 2007)[7] (Upholding summary judgment in favor of municipality on *Monell* claims because summary judgment was entered in favor of defendant police officers on underlying excessive force claim.)

The Third Circuit has observed that "[e]stablishing municipal liability on a failure to train claim under § 1983 is difficult." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). It is not enough to allege a general "failure to train," rather the plaintiffs must first identify and prove specific training which was not given to Wilmington police officers. "A § 1983 plaintiff pressing a [failure to train] claim of this kind must identify a failure to provide specific training ...." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991); *Reitz, supra* at 145 (plaintiff must prove "a failure to provide specific training."). Next, plaintiffs must prove that the failure to provide this training "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted); *Colburn, supra*. Finally, plaintiffs must also prove that the alleged failure to train caused the underlying constitutional deprivation. The record is devoid of evidence satisfying each of these elements.

Plaintiffs allege two failure to train claims. First, they allege that the police "continue to teach and train ... police officers it is acceptable to shoot at a moving vehicle ...." (Second Amended Complaint ¶74(e)). Second, they claim that the police "do not provide proper training to police officers to ensure the proper use of their guns ...." *Id.*, ¶74(f). The reasons why these claims fail are discussed below.

---

[7] Both published and non-published opinions issued on or after January 1, 2007 can be cited as precedent. *F.R.A.P.* 32.1.

1.    **Training Police Officers It Is Acceptable To Shoot At A Moving Vehicle Does Not Violate A Constitutional Right.**

This claim fails because there is no *per se* constitutional prohibition against shooting at a moving vehicle. The Wilmington Police Department's policy provides that "[p]olice officers shall not fire their weapons at, or from a moving vehicle except under exigent, life-threatening circumstances." (B47). When questioned about this policy, each of the defendants fairly described it. (SA23; SA29; SA34).

As noted above, plaintiffs must prove that the alleged failure to train police officers not to shoot resulted in a constitutional violation. "In addition to proving deliberate indifference, a plaintiff must also demonstrate that the inadequate training caused a constitutional violation." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004), *reh'g denied*, 126 S.Ct. 236 (2005). Indeed, the Supreme Court has held "our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v Harris*, 489 U.S. 378, 385 (1989). Research has revealed no case holding that shooting at a moving vehicle is itself a constitutional tort. To the contrary, there are many cases holding that police officers did not use constitutionally unreasonable force when they shot at a moving vehicle. *E.g., Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993); *Pace v Capobianco*, 283 F.3d 1275 (11th Cir. 2002); *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003). It follows, therefore, that the alleged training of police officers that it is permissible to shoot at moving vehicles does not itself establish a claim under *Monell. See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 10 n.7 (1st Cir. 2005) (sustaining policy similar to Wilmington's); *Fraire v. City of Arlington*, 957 F.2d 1268, 1280 (5th Cir. 1992), *cert. denied*, 507 U.S. 973 (1992) (same).

28

**2.    There Is No Evidence To Support The Claim That Officers Are Not Trained On The Proper Use Of Their Weapons.**

Plaintiffs allege in conclusory fashion that "[s]upervisory officials ... do not provide proper training to police officers to ensure proper use of their guns ...." (Second Amended Complaint, ¶74(f)). This allegation, of course, provides not even the slightest hint as to what training should have been provided, but was not. For this reason alone this claim should be dismissed. *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991) (plaintiff must identify specific training not provided); *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) ("for liability to attach based on an 'inadequate training' claim, plaintiff must allege with specificity how a particular training program is defective."); *Cruise v. Marino*, 404 F.Supp. 2d 656, 674 (M.D. Pa. 2005) ("generic claims of inadequate training are not enough; the plaintiff must identify the *specific training* that the defendant municipality did not give") (emphasis in original).

There is a second reason why plaintiffs' claim fails -- as a matter of law the City's weapons training satisfies the constitution. Wilmington police officers are required to take at least 16 hours of additional training each year. More importantly for present purposes, in addition to the 16 hours, officers are required to qualify with their weapon three times each year at the range. At least one of these qualifications involves retraining on the use of deadly force. Further, officers are also required to attend once a year instruction on legal developments presented by the City Solicitor's office. (Mulrine Dec., ¶ 2-4).[8] This training exceeds that which was found by the Third Circuit to be constitutionally sufficient. In *Carswell v. Borough of Homestead*, 381 F.3d 235 (3d Cir. 2004) the court was faced with a claim that the defendant municipality failed to train its officers in the constitutional use of deadly force. The record in

---

[8] The Declaration of Bruce E. Mulrine, Jr. is being filed contemporaneously herewith.

29

that case showed that officers attended annual in-service courses where they studied, among other things, relevant court opinions. Officers were also required to review the department manual, which contained a use-of-force continuum. The *Carswell* court concluded that this evidence "did not establish a lack of training on the use of deadly force that amounted to a deliberate indifference." 381 F.2d at 245. Thus, as a matter of law, the City of Wilmington's training, which requires even more than that in *Carswell*, does not constitute deliberate indifference.

**B.    There Is No Evidence To Support Plaintiffs' Failure To Investigate And Discipline Claims.**

Plaintiffs claim that Wilmington failed to investigate alleged acts of excessive force and discipline officers who used excessive force. (Second Amended Complaint, ¶¶ 74(a)-(d), 75). From this, they theorize that Wilmington police officers feel they will not be held accountable if they use excessive force. This claim is solely the creation of plaintiffs' imagination, for there is absolutely no evidence in the record about claims of prior use of excessive force by other officers, investigations of those claims or about discipline of officers found to have used excessive force. Likewise, the record is completely devoid of any evidence that the individual defendants believed they would not be held accountable if they used excessive force.

Plaintiffs have developed no evidence about past allegations of excessive force or the investigations of any such allegations. The only evidence about *any* investigation is the investigation about the instant case. But one investigation, even if faulty, does not establish the requisite deliberate indifference. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-4 (1985) ("a simple incident of unconstitutional activity is not sufficient to impose liability under Monell ….").[9] The

---

[9] The only ostensible flaw in the investigation of the Smith shooting alleged by plaintiffs is that the Wilmington Police "even instructed the defendants not to write a report." (Second Amended Complaint, ¶ 74(c)). This overlooks that each of the defendants was questioned under

30

Third Circuit's language in *Groman v. Township of Manalapan*, 47 F.3d 628 (3d Cir. 1995) in which it upheld the dismissal of a failure to investigate claim, could well have been written for the instant case.

> It is clear that plaintiffs' claim against the municipality is unsubstantiated. Plaintiffs assert two bases for their claim of liability based on municipal policy. First, they make vague assertions about the police department's failure to investigate other wrongdoings, and second, they point to the incident in this case. Plaintiffs' allegations about the Township's failure to investigate have virtually no evidentiary support in the record, and this case standing alone does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983. The record will not support a reasonable jury finding of a municipal policy or custom of "negligent supervision" which rises to the level of deliberate indifference required for § 1983 liability.

(47 F.3d at 637) (citation omitted). *See also*, *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (where there is no evidence that the City failed to investigate excessive force claims or discipline officers was the type the Supreme Court had in mind in *Leatherman*).

There is a second reason why this claim must be dismissed. As discussed in connection with the plaintiffs' failure to train claims, plaintiff must show that "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Here there is no evidence at all that the defendants were inclined to shoot Smith because they knew they would not be held accountable. In fact, the opposite is true. It is unrebutted that this is the first and only time that any of these officers used their weapons outside of the firing range. (SA24; SA27; SA32). Moreover, there was never a single substantiated claim of excessive force against any of these officers. (SA22; SA27; SA32). Accordingly, there is simply no evidence upon which a reasonable trier of fact

---

oath by the investigating officer the night of the shooting. Videotapes of that questioning were produced to plaintiffs during discovery.

could conclude that these officers were prone to shoot Smith because they knew they would not

be held accountable.

## CONCLUSION

For the foregoing reasons and for the reasons stated in connection with Defendants' [First] Motion for Summary Judgment, summary judgment should be entered dismissing all claims against the defendants.

OF COUNSEL:

Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

Dated: February 21, 2007

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
302-651-7700
Parkins@rlf.com
Fineman@rlf.com
Attorneys for Defendants

33

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Kester I.H. Crosse, Esquire
Williams & Crosse
1214 King Street
Suite 300
Wilmington, DE 19801

I hereby certify that on February 21, 2007, I have sent by U.S. Regular Mail, the

foregoing document to the following non-registered participants:

Anne T. Sulton, Esquire
Post Office Box 2763
Olympia, WA 98507

John A. Parkins, Jr. (#859)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Parkins@rlf.com