IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARRY SMITH, JR. and ROSLYN WOODARD SMITH, Individually and as Administrators of THE ESTATE OF HARRY SMITH, III | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 04-1254-GMS |
| v. | ) ) | |
| CITY OF WILMINGTON, JOHN CIRITELLA, THOMAS DEMPSEY, and MATHEW KURTEN, | ) ) ) ) | |
| Defendants. | ) ) | |

**APPENDIX TO
OPENING BRIEF IN SUPPORT OF DEFENDANTS'
SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Rosemaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
302-651-7700
Parkins@rlf.com
fineman@rlf.com
Attorneys for Defendants

Dated: February 21, 2007

## TABLE OF CONTENTS

TAB

Excerpts from the deposition of David Gwyn dated August 24, 2005 ........................................ SA1

Excerpts from the deposition of Jennie Vershvovsky, M.D. dated May 30, 2006 ................... SA14

Drawing by David Gwyn (Gwyn Deposition Exhibit 4) ................................................. SA19

Excerpts from the deposition of John Ciritella dated May 8, 2006 ................................. SA20

Excerpts from the deposition of Matthew Kurten dated May 10, 2006 ................................. SA25

Excerpts from the deposition of Thomas Dempsey dated May 9, 2006 ................................. SA30

i



**WILCOX & FETZER LTD.**

In the Matter Of:

# Estate of Harry Smith, III, et al.
# v.
# Wilmington Police Department, et al.

## C.A. # 04-1254-GMS

Transcript of:

David Nathaniel Gwyn

August 24, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

SA1

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 4 of 37
Estate of Harry Smith, III, et al.                    v.          Wilmington Police Department, et al.
David Nathaniel Gwyn                         C.A. # 04-1254-GMS                    August 24, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,      )
HARRY SMITH, JR., and            )
ROSLYN WOODARD SMITH,            )
                                 )
            Plaintiffs,          )
                                 )   Civil Action No.
v.                               )    04-1254-GMS
                                 )
WILMINGTON POLICE DEPARTMENT,    )
MICHAEL SZCZERBA and ONE OR      )
MORE JOHN DOES,                  )
                                 )
            Defendants.          )

            Videotape deposition of DAVID NATHANIEL GWYN
taken pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:34 a.m. on
Wednesday, August 24, 2005, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
               P.O. Box 2763
               Olympia, Washington   98507
               for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            RICHARDS, LAYTON & FINGER
               One Rodney Square - Third Floor
               Wilmington, Delaware  19899
               for the Defendants Wilmington Police
               Department and Michael Szczerba

    ------------------------------------------------
                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

SA2

Estate of Harry Smith, III, et al.
David Nathaniel Gwyn

v.

Wilmington Police Department, et al.

C.A. # 04-1254-GMS

August 24, 2005

Page 2

```
1   ALSO PRESENT:
2       HARRY SMITH, JR.
3       ROSLYN WOODARD SMITH
4       KEITH R. BOOKER, NAACP
5       CHARLES E. BRITTINGHAM, NAACP
6       CAROL FEELEY, Videographer
7       - - - - -
8           (Gwyn Exhibit 1 was marked for
9   identification.)
10          THE VIDEOGRAPHER:  This is the videotape
11  deposition of David Nathaniel Gwyn taken by the defendant
12  in the matter of Estate of Harry Smith, III, Harry Smith,
13  Jr., and Roslyn Woodard Smith vs. The Wilmington Police
14  Department, Michael Szczerba, and One or More John Does,
15  Civil Action No. 04-1254-GMS, held in the office of
16  Richards, Layton & Finger, Wilmington, Delaware, on
17  August 24th, 2005, at approximately 10:34 a.m.
18          The court reporter is Kathy White Palmer
19  from the firm of Wilcox & Fetzer.  My name is Carol
20  Feeley, a video specialist from Discovery Video Services
21  in association with Wilcox & Fetzer.
22          Counsel will introduce themselves and the
23  reporter will swear in the witness.
24          MS. SULTON:  Attorney Anne Sulton appears
```

Page 3

```
1   on behalf of the plaintiffs.
2           And the plaintiffs, Harry Smith, Jr., and
3   Roslyn Woodard Smith, appear in person.
4           MR. PARKINS:  I'm John Parkins.  I
5   represent the defendants.
6       - - - - -
7           DAVID NATHANIEL GWYN,
8       the witness herein, having first been
9       duly sworn on oath, was examined and
10      testified as follows:
11  BY MR. PARKINS:
12      Q.  Mr. Gwyn, we've met briefly before the
13  deposition.  My name is John Parkins.  I represent the
14  defendants in the lawsuit that has been filed by the
15  estate of Harry Smith, III, and Mr. Smith's parents.  I'm
16  about to ask you a series of questions.
17          Do you understand that your answers are
18  under oath?
19      A.  Mm-hmm.
20      Q.  Do you understand, sir, that the Court and
21  perhaps the jury may rely upon what you have to say
22  today?
23      A.  Mm-hmm.
24      Q.  You need to say yes for the court reporter.
```

Page 4

```
1       A.  Yes, yes.
2       Q.  Are you taking any medications which would make
3   it difficult for you to hear me or to understand my
4   questions?
5       A.  No.
6       Q.  Do you suffer from any hearing difficulties?
7       A.  No.
8       Q.  Are you suffering from any illnesses today that
9   would make it difficult for you to give your deposition?
10      A.  No.
11      Q.  At any time during your deposition if I ask you
12  a question which is unclear to you, will you agree that
13  you will ask me to clarify it?
14      A.  Mm-hmm, yes.
15      Q.  And at any time during your deposition you would
16  like to take a break, would you agree that you'll ask me
17  to do so and we'll be happy to accommodate you?
18      A.  Yes.
19      Q.  Mr. Smith, where do you live -- Mr. Gwyn, where
20  do you live?
21      A.  507 North Harrison Street.
22      Q.  Did you live at 507 North Harrison Street on
23  September 13, 2003?
24      A.  Yes, I did.
```

Page 5

```
1       Q.  Would you tell me what you observed on
2   September 13, 2003?
3           MS. SULTON:  Objection.  If you could be
4   more specific as to the time of the day.
5       Q.  Tell me about what you observed on the evening
6   of September 13, 2003.
7       A.  About what time?
8       Q.  Well, why don't you tell me and we'll start at
9   5:00 what you remember seeing until we get to the point
10  that's important?
11      A.  At 5:00?
12      Q.  Yes.
13      A.  I can't recall what I saw at 5:00.
14      Q.  Beg your pardon?
15      A.  I can't recall what I saw at 5:00.
16      Q.  What's the first thing you remember seeing on
17  September 13, 2003?
18      A.  Well, you got me a little bit confused.  Where
19  you starting from?
20      Q.  It doesn't matter.  I'm just trying to figure
21  out.  You observed some events that occurred on
22  September 13th, 2003, that allegedly give rise to this
23  lawsuit.  I'm trying to see what you remember having
24  seen.  So tell me what you remember about September 13th,
```

2 (Pages 2 to 5)

SA3

Case 1:04-cv-01254-GMS     Document 164     Filed 02/21/2007     Page 6 of 37
Estate of Harry Smith, III, et al.                    v.                Wilmington Police Department, et al.
David Nathaniel Gwyn                        C.A. # 04-1254-GMS                            August 24, 2005

Page 6

```
1   2003.
2        A.  So you are referring to this?  That's what I'm
3   trying to --
4        Q.  Yes.
5        A.  Oh, okay.
6        Q.  Sure.  I'm sorry.
7        A.  Okay.  You had me a little bit confused there.
8        Q.  That's all right.
9        A.  Well, it was a warm, nice evening and just about
10  all the neighbors were sitting outside.  Me and my wife,
11  we had brought chairs out and we were sitting out in
12  front of our house.
13           And the first thing that I saw was a police
14  car shooting down Harrison Street going the wrong way and
15  it was flying.  And it turned a corner on 4th Street.
16  And I heard some commotion on 5th Street.
17           So I said to my wife, I said, "Something
18  must be going on around the corner."  So I gets up and I
19  start walking towards the corner.  And I saw this police
20  car turn the corner on 5th Street up Harrison Street,
21  which Harrison is a one-way street, and it was a -- it
22  was a -- not a van -- it was a jeep sitting on the
23  corner.  And the police car struck the jeep -- I mean hit
24  the jeep and started up from Harrison Street.
```

Page 7

```
1           Well, about that time I was about, I'd say,
2   halfway down the block.  And then I saw three polices
3   come running and they started shooting.  So everybody
4   started running, I mean, for cover.  I couldn't make it
5   back to my house, so I jumped on my neighbor's porch.
6   And the police, there was three of them, start shooting,
7   pop, pop, pop, pop, pop, pop, pop, pop, pop.  And I stood
8   on my neighbor's porch there.  I didn't move.  With all
9   the shots, I was afraid to move.  I was afraid to go
10  anywhere.  And my wife, she ran inside the house.
11           And as the car -- I mean, it was moving up
12  Harrison Street, the three polices just kept shooting,
13  pop, pop, pop, pop, pop, pop, pop.
14           And then the car came to a stop.  I saw the
15  man -- I mean, the man had slumped over and the police
16  was -- just kept on shooting, pop, pop, pop, pop, pop.
17  And then the car stopped.  And I saw the police that was
18  on the left, on the side where I was, grab the door and
19  opened the door and pulled the man out.
20       Q.  Do you remember anything else?
21       A.  Well, I remember, I mean, quite a bit.  I mean,
22  I saw everything.  And I'm standing there looking at the
23  body and everything.
24       Q.  Let me ask you some specific questions and maybe
```

Page 8

```
1   that will prompt some further recollections on your part.
2        A.  Sure.
3        Q.  You told me it was a nice, warm evening.  Do you
4   recall about what time of day it was?
5        A.  It was about -- I would say 7, 7 p.m.
6        Q.  Had the sun gone down?
7        A.  That I can't --
8        Q.  You said you were sitting outside with your wife
9   in chairs.
10       A.  Mm-hmm, yes.
11       Q.  Were you in front of your house?
12       A.  Yes.
13       Q.  Were you on the sidewalk or were you on the
14  porch or were you on the street?
15       A.  I was on the sidewalk in front of my house.
16       Q.  You say you saw a police car going down Harrison
17  Street.  I think that's the words you used.  Does that
18  mean southbound on Harrison Street -- excuse me -- yeah,
19  Harrison Street?
20       A.  Yeah.  Harrison Street comes up and the car was
21  going down.
22       Q.  All right.  Was it going towards 4th Street?
23       A.  Mm-hmm.
24       Q.  You need to say yes for the court reporter.
```

Page 9

```
1        A.  Yes, yes.  I'm sorry.
2        Q.  It's an easy mistake to make.
3        A.  I'm just used to it.
4        Q.  That's okay.
5           Harrison Street is one way; is that
6   correct?
7        A.  Yes.
8        Q.  Was the police car going in the correct
9   direction when you saw it, the one that came down
10  Harrison Street?
11       A.  No.  It come down the one way.
12       Q.  It was coming down the wrong way?
13       A.  Mm-hmm.
14       Q.  You need to say yes again for the reporter.
15       A.  Yes.
16       Q.  Which way does Harrison Street run?  Does it run
17  towards --
18       A.  Fourth.
19       Q.  -- 4th Street?
20       A.  Mm-hmm.
21       Q.  This police car that you saw coming down
22  Harrison Street, the first police car, was it going
23  towards 4th Street?
24       A.  Mm-hmm.  The first car, yeah.
```

3 (Pages 6 to 9)

Estate of Harry Smith, III, et al.                                           Wilmington Police Department, et al.
David Nathaniel Gwyn                         v.
                                    C.A. # 04-1254-GMS                                    August 24, 2005

Page 10

1    Q.  Yes.  And so the first police car that you saw
2  was going in the correct direction on 4th -- on Harrison
3  Street; is that correct?
4    A.  Yes.
5    Q.  You say you saw it go down to 4th Street and
6  then turn around?
7    A.  Mm-mmm.  Make a left.
8    Q.  Made a left onto 4th Street?
9    A.  Yeah.
10   Q.  Okay.  Did it go down 4th Street then?
11   A.  Yes.
12   Q.  Did you see that police car again?
13   A.  I can't say I saw that one.
14   Q.  The next police car you saw was coming off of
15 5th Street; is that correct?
16   A.  Yes.
17   Q.  Okay.  You said that there was a commotion down
18 at 5th Street.  What do you mean by a "commotion"?
19   A.  I just heard some noise like something was going
20 on.
21   Q.  What sort of noise did you hear?
22   A.  It was just like a commotion noise.
23   Q.  Were they human beings or were they people
24 shouting or were they cars or what?

Page 11

1    A.  Well, it was like -- it was like people -- like
2  hollering, like.
3    Q.  You say you walked down towards 5th Street to
4  see what was happening?
5    A.  Mm-hmm.
6    Q.  You need to say yes for the reporter.
7    A.  Yes, yes, yes.
8    Q.  All right.  And how far did you get when you
9  were walking down towards 5th Street?
10   A.  About halfway.  I didn't get all the way down.
11   Q.  When you mean halfway, do you mean halfway from
12 the distance between your house and the corner?
13   A.  Yes.
14   Q.  Were you on the west side of Harrison Street or
15 the east side?
16   A.  (No response.)
17   Q.  Let me help you out a little bit.
18        Is your house at 507 on the west side of
19 Harrison Street?
20   A.  It's on the right-hand side going down.
21   Q.  If you're going down the hill, it's on the
22 right-hand side?
23   A.  Yes.
24   Q.  All right.  Now, were you on the same right-hand

Page 12

1  side when you walked down towards 5th Street?
2    A.  Yes.
3    Q.  All right.  And then I gather that the next
4  thing you saw was a police car turning the corner?
5    A.  Mm-hmm.
6    Q.  You need to say yes for --
7    A.  Yes, yes, yes, yes.
8    Q.  It's hard.  I understand.
9    A.  Yes.
10   Q.  And it hit a white jeep or a jeep?
11   A.  Yeah.  It was a white jeep.
12   Q.  White jeep?
13   A.  Mm-hmm.
14   Q.  Was the jeep parked?
15   A.  Yes.
16   Q.  Did the jeep spin around when it was hit?
17   A.  It knocked it out some.
18   Q.  All right.
19   A.  I won't say spin it around, but it knocked it
20 out some.
21   Q.  Do you know if there was anyone in the jeep when
22 it was hit?
23   A.  It was empty.
24   Q.  Okay.  Did the -- did the police car that hit it

Page 13

1  have anyone in it other than the driver?
2    A.  No.
3    Q.  Did the police car that hit it drive on the
4  sidewalk or did it -- was it on the street when it hit
5  the jeep?
6    A.  When it hit the jeep was it on the sidewalk?
7    Q.  Let me back up.
8        Did you notice any police cars or any other
9  cars blocking 5th Street at the intersection with
10 Harrison?
11   A.  I didn't see none.
12   Q.  Okay.  Did you see the police car turn the
13 corner from Harrison -- from 5th Street onto Harrison?
14   A.  Mm-hmm.
15   Q.  You need to say?
16   A.  Yes, yes, yes.
17   Q.  Okay.  Was the police car in the street when it
18 turned the corner?
19   A.  When it turned the corner was it in the street?
20   Q.  Was it in the street or did it go on the
21 sidewalk?
22   A.  No, it didn't go on the sidewalk.
23   Q.  All right.  So it was in the street and it
24 turned the corner in the street and then hit the jeep?

4 (Pages 10 to 13)

Estate of Harry Smith, III, et al.    v.    Wilmington Police Department, et al.
David Nathaniel Gwyn    C.A. # 04-1254-GMS    August 24, 2005

Page 18

1    A. Yeah. They were together.
2    Q. All three together?
3    A. Mm-hmm.
4    Q. How far apart were they?
5    A. Well, they were close together. I can't
6    say how -- I mean, I can't --
7    Q. Okay.
8    A. I can't say how far.
9    Q. But they were standing near the intersection of
10   5th and Harrison Street when they started shooting at the
11   police car?
12   A. They weren't standing. They were running.
13   Q. They were running?
14   A. Mm-hmm.
15   Q. How far away from you were they?
16   A. I made it down to about half a way the block.
17   Q. Okay. Why don't you put a "2" there so we
18   know what --
19   A. Okay.
20   Q. That describes where you were standing.
21       And how far away were the police officers
22   from you when they started shooting?
23   A. Here's one house -- you say how far from me?
24   Q. Yes.

Page 19

1    A. Oh, okay. I can't recall feet if that's what
2    you want. I can't.
3    Q. Okay. Can you estimate for me how far apart
4    they were -- how far away they were from you? Were they
5    ten feet away? Were they 50 feet away?
6    A. I -- I can't...
7    Q. All right. Did you see all three of the police
8    officers firing their weapons?
9    A. Yes, sir.
10   Q. Were all three of the police officers in police
11   uniforms or were some of them in plain clothes? Or how
12   were they dressed?
13   A. They were in uniforms, all three of them.
14   Q. Did any of them have like a jacket that said
15   "Police" on it, or were they all in their regular blue
16   uniforms?
17   A. They were in police -- police uniforms.
18   Q. In their regular blue uniforms; is that correct?
19   A. Police uniforms, yes.
20   Q. Yes.
21   A. They were.
22   Q. Did you see the police running after the car or
23   walking after the car?
24   A. They was running.

Page 20

1    Q. Were they running in the same direction as the
2    police car was going?
3    A. Mm-hmm, yeah.
4    Q. You need to say yes.
5    A. Yes.
6    Q. How many shots did you see the police officers
7    fire?
8    A. How many?
9    Q. Yes.
10   A. I just heard this here pop, pop, pop, pop, pop,
11   pop, pop.
12   Q. Well, how many is that?
13   A. I can't say how many because they was -- just
14   started shooting. I can't -- I can't say how many.
15   Q. How close to the police car were they when they
16   were shooting?
17   A. From the time the police car turned the corner,
18   after it hit the jeep, they started running behind the
19   police car shooting. I mean, I can't say how many times.
20   Q. How far away were they, though, from the police
21   car?
22       MS. SULTON: Objection. At what point in
23   time?
24       MR. PARKINS: At any time.

Page 21

1        MS. SULTON: I'm going to object to the
2    form of the question because he said they were running.
3    That's why I'm trying to get you to be more specific.
4        MR. PARKINS: That's a fair question --
5    objection.
6    BY MR. PARKINS:
7    Q. How close did the police get while they were
8    still firing?
9    A. Well, they got right up on the car.
10   Q. How far away from the car?
11   A. I can't -- I mean, I can't recall, I mean, no
12   feet or nothing like that.
13   Q. I'm sorry?
14   A. I can't recall no feet or nothing like that.
15   Q. Were they ten feet away? Were they five feet
16   away? Were they closer?
17   A. I can't recall, I mean, how many feet. I can't.
18   Q. Were they shooting at the back of the car or the
19   front of the car or the side of the car?
20   A. No. They started out shooting at the back of
21   the car.
22   Q. Did they end up shooting at other parts of the
23   car?
24   A. When they -- one officer, and that's the one on

6 (Pages 18 to 21)

SA5A

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 9 of 37

Estate of Harry Smith, III, et al.    v.    Wilmington Police Department, et al.
David Nathaniel Gwyn    C.A. # 04-1254-GMS    August 24, 2005

Page 34

1    Q. Okay.
2    A. Well, she didn't live across the street. I mean
3    her mother, her mother did.
4    Q. Now, would you take a look at paragraph 6?
5    A. Mm-hmm.
6    Q. "After this police car hit the parked car, I saw
7    what appeared to be an African American male slumped over
8    the steering wheel of the car."
9        How long after the police car hit the
10    parked car was it before you saw Mr. Smith slumped over
11    the wheel of the car?
12    A. Before it came to a stop.
13    Q. Okay. Did you at any time after the car --
14    after the police car hit the parked car see him when he
15    wasn't slumped over the wheel?
16    A. Say it again now.
17    Q. Let me back up.
18        Was Mr. Smith slumped over the wheel of the
19    police car when it hit the parked car?
20    A. Not when it hit the parked car, no. No.
21    Q. So he was able -- he was sitting upright at that
22    time?
23    A. When it hit the parked car, I can't really --
24    that's when I first looked and saw it, but I can't recall

Page 35

1    at that time, I mean, how he was.
2    Q. Okay. You said the man appeared to be
3    unconscious and helpless and unarmed and unthreatening.
4    How do you know he was unarmed?
5    A. Well, when they pulled him out and I was
6    standing there looking, I never saw nothing, so --
7    Q. Okay.
8    A. I never saw no weapon or nothing.
9    Q. You then say in paragraph 7: "I then saw a
10    Wilmington Police Department officer walk over to the
11    side of this police car and fire shots into the body of
12    the man slumped over the steering wheel."
13        I think today you told me you don't
14    remember whether they fired from the back or the side; is
15    that correct?
16    A. And I said here that I saw --
17    Q. Paragraph 7.
18    A. I don't know who written this.
19    Q. You don't remember that? Do you think that
20    paragraph 7 is not accurate?
21    A. I don't know who written it.
22    Q. Beg your pardon?
23    A. I don't know who written that.
24    Q. You don't remember that? I'm sorry. Do you

Page 36

1    remember what you said -- strike that.
2        Do you remember a police officer walking
3    over to the side of the car and firing shots into
4    Mr. Smith's body?
5    A. Firing shots into his body?
6    Q. Yes.
7    A. (No response.)
8    Q. From the side of the car.
9    A. They was firing from behind the car just like I
10    said. And all the way up until the car stopped, they
11    just kept shooting.
12    Q. I understand that. But do you remember a police
13    officer walking up to the side of the car and firing
14    shots into Mr. Smith's body?
15    A. Now, repeat your question one more time. You
16    say --
17    Q. Do you remember a police officer walking up to
18    the side of the police car and firing shots into
19    Mr. Smith's body?
20    A. I didn't see none of them walking. They was
21    running.
22    Q. Did you see them run up to the side of the
23    police car and fire shots into Mr. Smith's body?
24    A. I'm cloudy on that.

Page 37

1    Q. The next I'd like you to take a look at
2    paragraph 9. About halfway through that paragraph you
3    say: "The man's bloody body laid on the street for
4    hours, uncovered by any sheet or other material, and in
5    full view of myself and other neighborhood residents."
6        I thought you told me earlier, sir, that
7    after the police tried CPR and Mr. Smith was pronounced
8    dead they covered his body with a sheet.
9    A. I don't know how long it was. I don't -- I
10    mean, I don't know exactly how long it was.
11    Q. Was it for hours?
12    A. I don't know how long he laid there before -- I
13    know the body was -- I mean, the body was out there for
14    hours and hours and hours. I don't know how long it took
15    them to cover it.
16    Q. Okay.
17    A. I mean cover him up. I don't --
18        MR. PARKINS: I have nothing further.
19        MS. SULTON: I have just a couple of
20    clarifying questions.
21    BY MS. SULTON:
22    Q. I want to make certain that we're clear about
23    the sequence of events, Mr. Gwyn. I'm going to draw a
24    rough street intersection.

10 (Pages 34 to 37)

SA6

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 10 of 37
Estate of Harry Smith, III, et al.    v.    Wilmington Police Department, et al.
David Nathaniel Gwyn    C.A. # 04-1254-GMS    August 24, 2005

Page 38

1    If we assume that your house is here at 507
2    Harrison, how many houses are there between your house
3    and the end of the block — and this would be 5th Street
4    here?
5    A. Yes.
6    Q. Okay. And the street runs down the hill;
7    correct, toward 5th Street?
8    A. Yeah. That's Harrison.
9    Q. So if your house is at 507, how many houses are
10    there between your house and the end of the block?
11    A. 505 is my neighbor and then it's 503 and then
12    there's like a garage just like this. So it's only
13    two houses, but right beside the last house it's a
14    garage that goes like that.
15    Q. Are there any buildings between the garage and
16    the end of the block at 5th Street, any buildings of any
17    kind between the garage and the 5th Street?
18    A. Now, this is the last house and the garage
19    connect like that.
20    Q. Between this garage that connects to this house
21    that is one over from your house, are there any buildings
22    between that garage and 5th Street? Any buildings at
23    all? Or is this building the last thing right before you
24    get to the street, to 5th Street?

Page 39

1    A. Yeah. The garage is.
2    Q. Okay. So the garage is — where you placed the
3    garage, it appears as though there is some distance
4    between the end of the garage and the beginning of 5th
5    Street; is that correct?
6    A. Wait. Let me get you straight now. Now say it
7    again.
8    Q. Okay. So you live at 507?
9    A. Right.
10    Q. There's one house that would be to the right of
11    your house if I'm heading down the hill toward 5th
12    Street?
13    A. Yes. That's the porch I jumped on.
14    Q. All right. So you jumped on the porch of the
15    house next to you.
16    A. Mm-hmm.
17    Q. Then there's another house and attached to that
18    is a long garage; is that correct?
19    A. Yeah, but the garage don't go this way. It
20    goes -- see? This is the end of it and then it goes up
21    5th Street.
22    Q. Okay.
23    A. I mean, it's about -- it's about eight garages
24    there. But they don't go like this way. They go on 5th

Page 40

1    Street.
2    Q. Okay. So if I'm at the -- if I am standing on
3    5th Street, the first thing I would see as I looked down
4    Harrison Street towards your home is this set of garages,
5    the first building I would see?
6    A. The first building?
7    Q. Yes. If I'm standing here on 5th Street, I'm
8    going to put a little X here, assuming I'm standing where
9    this X is on 5th Street, if I'm looking down — if I'm
10    coming up to Harrison and looking down Harrison towards
11    your house, the first thing I'd see are the garages;
12    correct?
13    A. Not -- no. If you are here, you are facing the
14    garages. But, see the -- but, see, they come down just
15    like this and the last house is -- the last house is --
16    how can I explain this good?
17    All right. All right. These are the
18    garages and at the end of the garage, that's where the
19    last house is.
20    Q. Okay.
21    A. That's the best way I can put it.
22    Q. Okay. If we assume -- I'm going to do another
23    schematic. I'm trying to make certain we have one that's
24    clean when we finish. So here we have your house. I'm

Page 41

1    going to make that the circle and that's 507.
2    A. Mm-hmm.
3    Q. We then have another house. What address is
4    that?
5    A. 505.
6    Q. 505. Then there's another house, that's 503?
7    A. Mm-hmm.
8    Q. And then we have this bank of garages; correct?
9    A. Mm-hmm.
10    Q. Then I have 5th Street?
11    A. Yeah, right, right, right.
12    (Charles E. Brittingham is now present in
13    the deposition room.)
14    BY MR. PARKINS:
15    Q. I have Harrison Street that runs down the hill?
16    A. Right.
17    Q. At the point at which you heard the commotion,
18    you were standing on your porch at 507?
19    A. I wasn't standing. We were sitting outside.
20    Q. At the point that you heard the commotion, you
21    were sitting on your porch at 507 Harrison?
22    A. I wasn't sitting on my porch. I was sitting
23    outside on the sidewalk. I wasn't sitting on my porch.
24    Q. You were sitting outside on the sidewalk in

11 (Pages 38 to 41)

SA7

Estate of Harry Smith, III, et al.                          Wilmington Police Department, et al.
David Nathaniel Gwyn                    C.A. # 04-1254-GMS                August 24, 2005

Page 42

1  front of your home at 507?
2    A.  Mm-hmm.
3    Q.  You heard a commotion and then you got up and
4  you went toward the sound of the commotion?
5    A.  I started down.  I was walking on my sidewalk --
6  well, not my sidewalk, but the side that I live on.  I
7  didn't turn the corner, nothing like that.  I didn't even
8  make it down to the corner.
9    Q.  Okay
10       MR. PARKINS:  Anne, could I interrupt you
11  for a second?  We are almost out of tape.  Do you want to
12  switch tape?
13       MS. SULTON:  Yes.
14       THE VIDEOGRAPHER:  Going off the record at
15  11:31 a.m.
16       (A recess was taken at this time.)
17       THE VIDEOGRAPHER:  Going back on the record
18  at 11:43 a.m.
19  BY MS. SULTON:
20    Q.  Okay.  Now I want to just make certain that
21  we're clear.
22       So you live at 507.  At the time that
23  the -- at the time that you began noticing the incident,
24  you are sitting in front of your home.  There is another

Page 43

1  house at 505?
2    A.  505.
3    Q.  There's another one at 503, and then there's a
4  bank of garages to which the house at 503 is attached?
5    A.  Mm-hmm.
6    Q.  Where -- could you mark on this piece of paper
7  with an X where the first police officer that you noticed
8  was at the point that you first noticed that officer?
9       MR. PARKINS:  Anne, before he does this, it
10  strikes me that I neglected to have the drawing marked as
11  an exhibit and, likewise, this one hasn't been marked.
12       It would probably be easier if we were to
13  ask the court reporter to first mark as Gwyn Exhibit 3
14  the drawing that Mr. Gwyn did for me, and then mark yours
15  as Gwyn Exhibit 4 so that when we read the transcript,
16  we'll know what we are talking about.
17       MS. SULTON:  Very good.  I agree.
18       (Gwyn Exhibits 3 and 4 were marked for
19  identification.)
20  BY MS. SULTON:
21    Q.  Now referring to Gwyn Exhibit Number 4, can you
22  tell me where, with marking by a small X, the first
23  police officer was when you first saw him or her?
24    A.  Yeah, but -- which officers are you talking

Page 44

1  about?
2    Q.  How many officers did you see that day?
3    A.  You mean the three?  Is that what you are
4  talking about?
5    Q.  Well, let me back up.
6       How many police officers did you see that
7  day?
8       MR. PARKINS:  Objection to the form.  Are
9  you going to ask him before the shooting or afterwards?
10       THE WITNESS:  Yeah.  That's --
11  BY MS. SULTON:
12    Q.  Before -- before you heard a shot fired, how
13  many police officers did you see?
14    A.  Before the shots?
15    Q.  Before you heard a shot fired, how many police
16  officers did you see?
17    A.  I saw the one going down by the house driving
18  the car.
19    Q.  Okay.  That's one.
20    A.  And you say before, before the shots?
21    Q.  Before you remember hearing any shots fired, how
22  many police officers did you see?  We counted the one who
23  was driving the car past your house.
24    A.  Mm-hmm.

Page 45

1    Q.  Did you see any other police officer before you
2  heard shots fired?
3    A.  I didn't see no more.
4    Q.  Okay.  You heard a commotion?
5    A.  Yeah.  I heard some noise.
6    Q.  Did you see any police officers, other than the
7  officer driving the car down Harrison Street, did you see
8  any other police officers before you heard the commotion?
9    A.  No, I can't.
10    Q.  Between the time that you heard the commotion
11  and you heard the shots fired, how many police officers
12  do you remember seeing?
13    A.  Before -- after -- after the commotion?
14    Q.  Right, which alerted you to some problem was
15  going on.
16    A.  And before the shots.
17    Q.  And before the shots were fired, how many police
18  did you see?  And we'll count the one, the one who was
19  driving, we've already got him counted, the one who was
20  driving down Harrison Street in the car.  How many other
21  police did you see?
22    A.  None.
23    Q.  None.  So the first time you saw any police
24  officers was when you heard shots fired?

12 (Pages 42 to 45)

Page 46

1    A.   Not counting the one that was going down the
2    street?
3    Q.   Correct.  So if we take out the officer who was
4    driving the patrol car down Harrison Street, if we take
5    him out, is it fair to say that you saw no police
6    officers until you heard shots being fired?
7    A.   Yeah.
8    Q.   Once you heard shots being fired, how many
9    officers did you see?
10    A.   Three.
11    Q.   Only three?
12    A.   Mm-hmm.
13    Q.   And you saw those three where?  Put an X where
14   you first saw those three officers.
15    A.   And this is 5th Street; right?
16    Q.   Yeah, that's 5th Street.
17    A.   (Complies.)
18    Q.   All right.  So where you put that X is where you
19   saw those three officers, and at the time that you first
20   spotted them, they were firing their weapons; is that
21   correct?
22    A.   Yes.
23    Q.   Okay.  I'm going to give you a red pen.
24        At the time you first saw those officers

Page 47

1    where you put that X, put a red X where you physically
2    were standing.
3        MR. PARKINS:  Can I make a suggestion?  The
4    red is never going to show up differently on the
5    photocopies.  Maybe we could use a Y or something like
6    that instead.
7        MS. SULTON:  No.  I want a red X.  Thank
8    you.
9        MR. PARKINS:  All right.
10        MS. SULTON:  We'll attach the original to
11    the deposition.
12        MR. PARKINS:  It won't be on mine.  That's
13    the problem.
14        MS. SULTON:  Then you can have it if you
15    feel comfortable with it, but I want it in red.
16        MR. PARKINS:  Okay.
17   BY MS. SULTON:
18    Q.   So put a red X where you were standing.
19    A.   When I first --
20    Q.   When you first saw these three officers firing
21   their shots, where were you standing?
22    A.   Okay.  I left my house.  I had got by 505 --
23    Q.   Was there anything between you and the three
24   officers that you saw, a tree, a car, a building, a

Page 48

1    person, anything that blocked your view from seeing those
2    three officers?
3    A.   No.
4    Q.   So you had an unobstructed view of those three
5    officers; is that correct?
6    A.   I could see clearly.
7    Q.   Okay.
8    A.   Is that what you mean?
9    Q.   Well, there wasn't anything --
10    A.   No, no, no.
11    Q.   -- that was blocking your view?
12    A.   No, no.
13        Man, I'm getting chilly now.
14    Q.   Blue.  I'm going to give you a blue pen.  With
15   this blue pen, mark on this Gwyn Deposition
16   Exhibit Number 4 where the police car in which Harry
17   Smith, III, was riding stopped with an X.
18    A.   With an X?
19    Q.   Yes.  Just make an X right over that.
20    A.   (Complies.)
21    Q.   So the car that Harry Smith, III, was driving
22   was a police car and it stopped in front of your house?
23    A.   Mm-hmm.
24    Q.   Was there anything obstructing your view, was

Page 49

1    there anything between you and that car, a tree, another
2    car, a person that blocked your view, anything at all?
3    A.   Mm-mmm.
4    Q.   When this car stopped as you've marked the X in
5    front of your house, where were you physically standing?
6    Were you still where you marked the first red X or had
7    you physically moved?
8    A.   Mm-mmm.
9    Q.   All right.  So we're going to mark this first
10   red X, we are going to put that as our X1.  So what I
11   want you to do on this piece of paper is put an X, a
12   second X where you were when you saw this police car that
13   Harry Smith, III, was in stopped.  So put another X on
14   there where you physically were when you saw that car
15   stop.
16    A.   I was on the porch at 505.
17    Q.   Okay.  Well, put an X as best you can.
18    A.   At 505?
19    Q.   Okay.  All right.  So you were actually on the
20   porch at 505.  So we'll call that X2.  Okay.  I'll put a
21   little "2" next to that.  So that's X2.
22        So X1 you are actually on the sidewalk?
23    A.   Mm-hmm.
24    Q.   All right.  So I'm just going to make a legend

13 (Pages 46 to 49)

SA9

Estate of Harry Smith, III, et al.                                      Wilmington Police Department, et al.
David Nathaniel Gwyn                          C.A. # 04-1254-GMS                 August 24, 2005

Page 50

1  here. X1 equals Gwyn on sidewalk. X2 equals Quinn on
2  porch.
3          So X1 is equal to Gwyn on sidewalk in front
4  of 505, and X2 is Gwyn on porch of 505; is that correct?
5      A.  One --
6      Q.  Okay. X1 is where you were standing on the
7  sidewalk when you first saw the police officers; correct?
8      A.  Yes, yes, yes.
9      Q.  And you were on the sidewalk; is that right?
10     A.  There I go again. Yes.
11     Q.  Okay. And then X2 is when you saw that car come
12 to a stop in front of your house, you were actually on
13 the porch at 505; is that correct?
14     A.  Yes.
15     Q.  At any time during -- from the point at which
16 you saw these police officers, these three police
17 officers reflected in this black X, and let me just
18 complete our legend here, so the black X equals three
19 police officers; correct?
20     A.  (No response.)
21     Q.  When first seen; correct?
22     A.  (No response.)
23     Q.  If I'm not correct, tell me so I can correct it.
24     A.  No, no.

Page 51

1      Q.  This black X here reflects --
2      A.  Oh, okay.
3      Q.  -- the three police officers when you first saw
4  them?
5      A.  Yes.
6      Q.  All right. So I'm going to say the black X
7  equals three police officers when first seen; correct?
8      A.  Mm-hmm.
9      Q.  All right. And then the blue X equals -- the
10 blue X is where car stopped; correct?
11     A.  Mm-hmm.
12     Q.  Is that correct?
13     A.  Mm-hmm.
14     Q.  You have to say yes.
15     A.  Yes, yes.
16     Q.  That's all right.
17         At any time, Mr. Gwyn, between the time
18 that you first saw the three police officers and you saw
19 the car come to rest in front of your home, was your view
20 ever blocked by anything, trees, cars, other people?
21     A.  No.
22     Q.  Never?
23     A.  Never.
24     Q.  Was it dark outside or was it still some

Page 52

1  daylight left?
2      A.  It was daylight. It wasn't dark. It was
3  daylight.
4      Q.  So you wear glasses. Did you have your glasses
5  on that day?
6      A.  I wear them all the time.
7      Q.  You wear them all the time?
8      A.  Mm-hmm.
9      Q.  Did the police officers come running past you?
10     A.  Yes.
11     Q.  So the police officers would have -- we are
12 going to stay with black for the police officers and I'm
13 going to do like a little dot, dot, dot.
14         So the police officers came running past
15 you up Harrison Street; is that correct, toward the car?
16     A.  Yes.
17     Q.  And at no point was your view blocked; is that
18 right?
19     A.  Yes.
20     Q.  And all the while as the officers were moving
21 from 5th Street to in front of your house where that car
22 was stopped, they were firing their guns?
23     A.  Yes.
24     Q.  The entire time?

Page 53

1      A.  Yes.
2      Q.  At what point did they stop firing their guns?
3      A.  When they got -- excuse me. When they got all
4  the way -- all the way in back of the car and that car
5  had stopped, the car had stopped and they fired all the
6  way up into the back of the car.
7      Q.  So they fired -- they fired their guns even
8  after the car stopped?
9          MR. PARKINS:  Objection to the form.
10         MS. SULTON:  I'll withdraw the question.
11 BY MS. SULTON:
12     Q.  Had the -- were the officers still firing their
13 car --
14     A.  Their guns.
15     Q.  -- their guns, were the officers still firing
16 their guns after the car had stopped?
17     A.  Yeah. Wait a minute. Now, say it again.
18     Q.  Were the officers still firing their guns after
19 the car stopped?
20     A.  Yes.
21     Q.  Using the blue pen to represent the car, the
22 blue represents the car, where was the car when you first
23 saw it? When you first noticed that car, where was it?
24     A.  The police car?

14 (Pages 50 to 53)

SA10

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 14 of 37
Estate of Harry Smith, III, et al.                                    Wilmington Police Department, et al.
David Nathaniel Gwyn                    v.                              August 24, 2005
                              C.A. # 04-1254-GMS

Page 54

1    Q. Yes. Put an X where you first saw that car.
2    A. (Complies.)
3    Q. Okay. We are going to mark that as X1. So X1
4    equals where car first seen.
5        And if I were to do a dot, dot, dot line,
6    is it fair to say that the car went from this corner over
7    directly in front of your house, kind of at a straight
8    diagonal, or did it weave around as you were observing
9    it?
10    A. Now, wait a minute now.
11    Q. Okay. So this is where the car was when you
12    first saw it; right?
13    A. Mm-hmm.
14    Q. And then it ended up in front of your house?
15    A. Mm-hmm.
16    Q. So can you do a dot, dot, dot to kind of show
17    how that car moved? Did it go in a straight line, or did
18    it kind of weave around before it came to a stop as best
19    you can recall the path of the car?
20    A. Now -- (complies.)
21    Q. So let me make sure I'm asking the question
22    clearly.
23        So the car was here when you first saw it;
24    correct, at the corner of Harrison and 5th Street?

Page 55

1    A. Mm-hmm.
2        MR. CROSSE: Yes or no?
3        THE WITNESS: Oh, yes. Yes.
4    BY MS. SULTON:
5    Q. Okay. So we are going to call that X1. Okay?
6        And did the car then make a — what was the
7    path the car took before it got to your house? Did it
8    come this way and go straight down the street and then
9    come back, or did it go straight in front of —
10    A. No, it didn't come back at all.
11    Q. Okay. So which direction did it head? What was
12    that path?
13    A. First it hit that jeep right here.
14    Q. Okay. So it hit that jeep.
15    A. And it came out sort of like this and then
16    turned up --
17    Q. And it came to rest right in front of your
18    house?
19    A. Yes.
20    Q. Okay. So should this X here be on the other
21    side of the street, or did the car end up right in front
22    of your home?
23    A. Well, it was like in the middle of the street.
24    Q. In the middle of the street. Okay.

Page 56

1        So we are going to then say that -- we want
2    to make a notation. I'm going to do a little line here
3    that X equals car stopped. And you said kind of in the
4    middle of the street?
5    A. Yeah.
6    Q. Okay.
7    A. Yeah.
8    Q. I'll say kind of in middle.
9    A. I didn't forget that time, said mm-hmm.
10    Q. Okay. So the officers were still firing when
11    the car came to a stop; is that correct?
12    A. Yeah.
13        MR. PARKINS: Objection to the form.
14    Q. You were able to see Mr. Smith in the car?
15        MR. PARKINS: Same objection.
16        MS. SULTON: I'll withdraw that question.
17    BY MS. SULTON:
18    Q. At the time that you first saw the police car
19    that we've marked as X1, were you able to see Mr. Smith
20    in the vehicle?
21    A. From the time we marked --
22    Q. So don't mark on here yet.
23        So when you first saw the --
24    A. I'm not going to mark it, but I'm just pointing.

Page 57

1    Q. Right. So when you first saw the car, were you
2    able to see Mr. Smith in the car?
3    A. (No response.)
4    Q. Did you notice the driver at all?
5    A. Not at that point.
6    Q. At what point did you notice that the car had a
7    driver?
8    A. When he turned up Harrison Street.
9    Q. Okay. So when you first noticed that the car
10    had a driver, was that driver sitting upright in that
11    car? When you first noticed that the car had a driver,
12    was the driver sitting upright?
13    A. When I first saw him, yes, but then he slumped
14    over.
15    Q. Okay.
16    A. But not when I first saw him.
17    Q. At what point when you saw this car that you now
18    realized had a driver, at what point did you notice that
19    driver slump over? Can you put an X — and let's use
20    blue. We're going to make this our X2. So put an X
21    where you first noticed that driver was slumped over in
22    that car.
23    A. (Complies.)
24    Q. Okay. So we're going to call that X2 continuing

15 (Pages 54 to 57)

SA11

Estate of Harry Smith, III, et al.                                    Wilmington Police Department, et al.
David Nathaniel Gwyn            C.A. # 04-1254-GMS                          August 24, 2005

Page 58

1    with our little legend.  X2 equals first noticed driver
2    slumped over.
3            Was he slumped over the steering wheel or
4    how was he slumped?  Over the back of the seat?  On the
5    side of the seat?  How did you see the driver slumped?
6    A.  No.  When I first saw him, he was like this.  He
7    was slumped over like that.
8    Q.  Was he slumped over the steering wheel or --
9    A.  From my -- I mean, from my recollection, he
10   wasn't right straight like that, but he was -- he was
11   sort of like that.  Not -- not all the way down.
12   Q.  Okay.
13   A.  No.
14   Q.  The driver was slumped over toward the front.
15   Toward the windshield or toward the steering wheel?
16   A.  Steering wheel.
17   Q.  All right.  So slumped over toward steering
18   wheel?
19   A.  Mm-hmm.
20   Q.  Is that -- is that what you remember seeing?
21   A.  Mm-hmm.
22   Q.  And you're under oath now.  So don't let me put
23   words in your mouth.  If I got something wrong, you tell
24   me.

Page 59

1    A.  All right.
2    Q.  Because we work just with the truth.  Just
3    whatever the facts are.  That's all I can work with.
4            MR. PARKINS:  Objection.
5            MS. SULTON:  Withdrawn.  That wasn't a
6    question.
7    BY MS. SULTON:
8    Q.  All right.  So at the point that you first saw
9    Mr. Smith slumped over toward the steering wheel, were
10   the police officers still firing their guns?
11   A.  Yes.
12   Q.  Where were the police officers?  Were they
13   behind the car?  On the side of the car?  In front of the
14   car?  Where were the police officers?
15   A.  Behind the car.
16   Q.  Behind the car.
17         How long after that, if you can recall, did
18   the car come to a stop?
19   A.  From the time it started shooting?
20   Q.  No.  From -- I'm sorry.  The question was poorly
21   framed.
22         From the time that you first noticed him
23   slumped over toward the steering wheel to the time that
24   the car stopped, how much time do you think passed?

Page 60

1    A.  That's hard to --
2    Q.  Just a moment?  A half an hour?  Seconds?
3    A.  It couldn't have been no half an hour.  That's
4    for sure.  If -- I -- I would say -- I would say within
5    seconds.  I can't say.
6    Q.  Okay.
7    A.  I can't say ten seconds, 15 seconds, nothing
8    like that.  But it wasn't -- if wasn't long.
9    Q.  Okay.  Between the time that you first noticed
10   Mr. Smith slumped over toward the steering wheel and the
11   car came to a stop, were the officers still firing their
12   weapons?
13   A.  Say that again.
14   Q.  Okay.  Between the time that you first noticed
15   Mr. Smith slumped over toward the steering wheel and the
16   time that the car stopped, were the officers still firing
17   their weapons?
18   A.  Yes.
19   Q.  After that car came to a stop, were the officers
20   still firing their weapons?
21   A.  Yes.
22   Q.  Were they behind the car?  On the side of the
23   car?  In front of the car?  Where were the officers?
24   After that car stopped and they were still firing their

Page 61

1    weapons, where were those officers?
2    A.  At no time did I see them in front of the car.
3    At no time.
4    Q.  When that car first stopped, the officers were
5    still firing their weapons; correct?
6    A.  Yes.
7    Q.  Where were those officers?  Were they behind the
8    car?
9    A.  They was in the back of the car.
10   Q.  All right.  They were in the back of the car?
11   A.  Mm-hmm.
12   Q.  Was Mr. Smith slumped over the steering wheel at
13   the time that that car was stopped?  When you first
14   noticed that car stopped, was Mr. Smith still slumped
15   over or toward the steering wheel?
16   A.  Yes.
17   Q.  And were those officers still shooting?
18   A.  Yes.
19         MS. SULTON:  Nothing further.
20         MR. PARKINS:  No redirect.
21         (Discussion off the record.)
22         MR. PARKINS:  Do you want to go off the
23   record?
24         MS. SULTON:  I was going to make a quip.

16 (Pages 58 to 61)

Estate of Harry Smith, III, et al.
David Nathaniel Gwyn
C.A. # 04-1254-GMS
Wilmington Police Department, et al.
August 24, 2005

Page 62

1  Counsel, I'm sure you have a color copier in this office
2  good enough to pick that up.
3        MR. PARKINS:  Well, I don't think we do.
4  That's why --
5        MS. SULTON:  But if we don't, you are more
6  than welcome to hang on --
7        MR. PARKINS:  Thank you.  I will.
8        MS. SULTON:  To it.  And just mark for the
9  record that Deposition Exhibit Number 4, the original
10  copy here, will be in the safekeeping of counsel for the
11  defense.
12        MR. PARKINS:  Okay.
13        THE VIDEOGRAPHER:  Going off the record at
14  12:11 p.m.
15        (The deposition was then concluded at
16  12:11 p.m.)
17           - - - - -
18
19
20
21
22
23
24

Page 63

1           INDEX TO TESTIMONY
2
3
4  DAVID NATHANIEL GWYN                   PAGE
5  Examination by Mr. Parkins              3
   Examination by Ms. Sulton             37
6
7           - - - - -
8
           INDEX TO EXHIBITS
9
10  GWYN EXHIBIT NO.:                      PAGE
11
    1  A four-page copy of the Filing Original Copy
12     of Affidavit of David Gwyn document      2
13  2  A two-page copy of a News Journal article   29
14  3  A drawing                             43
15  4  A drawing                             43
16
17           - - - - -
18
19
20
21
22
23
24

Page 64

1
2
3
4
5
6
7
8        REPLACE THIS PAGE
9
10       WITH THE ERRATA SHEET
11
12       AFTER IT HAS BEEN
13
14       COMPLETED AND SIGNED
15
16       BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 65

1  State of Delaware )
2               )
3  New Castle County )
4
5        CERTIFICATE OF REPORTER
6
7        I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 24th day of August, 2005, the
   deponent herein, DAVID NATHANIEL GWYN, who was duly sworn
9  by me and thereafter examined by counsel for the
   respective parties; that the questions asked of said
10  deponent and the answers given were taken down by me in
   Stenotype notes and thereafter transcribed into
11  typewriting under my direction.
12        I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13  said examination of said witness.
14        I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19        Kathleen White Palmer, RPR, RMR
           Certification No. 149-RPR
20         (Expires January 31, 2008)
21
   DATED:  August 25, 2005
22
23
24

17 (Pages 62 to 65)

SA13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and ROSLYN          )
WOODARD SMITH, individually and      )
as Administrators of the ESTATE      )
OF HARRY SMITH, III,                 )
                                     )
          Plaintiffs,                )
                                     ) Civil Action
v.                                   ) No. 04-1254-GMS
                                     )
CITY OF WILMINGTON, JOHN             )
CIRITELLA, THOMAS DEMPSEY and        )
MATTHEW KURTEN,                      )
                                     )
          Defendants.                )

          Deposition of JENNIE VERSHVOVSKY, M.D.
taken pursuant to notice at the law offices of
Richards, Layton & Finger, One Rodney Square, Third
Floor, Wilmington, Delaware, beginning at 2:10 p.m. on
Tuesday, May 30, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          ANNE T. SULTON, ESQ. (Via teleconference)
          SULTON LAW OFFICES
            Post Office Box 2763
            Olympia, Washington  98507
            For the Plaintiffs

          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

                    SA14



WILCOX & FETZER LTD.
Registered Professional Reporters



1    APPEARANCES:  (Cont'd)

2            JOHN A. PARKINS, JR., ESQ.
         RICHARDS LAYTON & FINGER
3            One Rodney Square - Third Floor
           Wilmington, Delaware  19801
4                  - and -
         ROSAMARIA TASSONE, ESQ.
5        CITY OF WILMINGTON LAW DEPARTMENT
           City/County Building - 9th Floor
6            Wilmington, Delaware  19801
           For the Defendants

7

8                   -   -   -   -   -

9               JENNIE VERSHVOVSKY, M.D.,

10      the deponent herein, having first been

11      duly sworn on oath, was examined and

12      testified as follows:

13                      EXAMINATION

14    BY MR. PARKINS:

15      Q.   Dr. Vershvovsky, I'm about to ask you a series

16    of questions concerning an autopsy that you performed

17    on or about September 14th, 2003 on Harry J. Smith,

18    III.

19            I'm afraid that I am not well-versed in

20    medical technology -- excuse me -- in medical parlance

21    so I may misspeak.  And if I ask you anything which is

22    unclear to you, please don't hesitate to tell me that

23    and I will attempt to rephrase my question.

24      A.   Okay.

1    midline.

2       Q.    So if we're looking at somebody from head on,

3    it would sort of be a line that would run from the

4    nose let's say up over the top of the head in the

5    middle and down the back of the head?

6       A.    And it would go like down the spine, so this

7    would be the posterior midline.

8       Q.    In this particular instance the bullet was, the

9    entrance wound was about 4-3/4 inches from the

10   posterior midline.  Am I correct?

11      A.    Yes.

12      Q.    The bullet was found inside Mr. Smith's brain,

13   was it not?

14      A.    Yes.

15      Q.    Is it unusual for a 40 caliber bullet to enter

16   the side of a head and not exit the other side?

17      A.    It depends.  Bullets have no rules.

18      Q.    You found no significance to that?

19      A.    No.

20      Q.    Did you trace the path of the bullet once it

21   entered his head?

22      A.    Yes.

23      Q.    Now, am I correct then it entered, that the

24   first part of the brain which it made contact with was

Jennie Vershvovsky, M.D.

1   (indicating), and occipital is in this area.  So it

2   was on the margin of the parietal and occipital, so

3   it's very slightly backward.

4           That's what I indicate in my report.

5   Q.   I am going to show you if I could a schematic

6   of a brain.  This won't work.

7           It's a coronal view, a coronal section,

8   but that won't help us.

9   A.   This will help (indicating).

10  Q.   All right.

11  A.   So if we're looking at this diagram, this

12  (indicating) is the back or posterior side of the

13  brain.  This is anterior part of the brain.

14  Q.   Yes.

15  A.   So this is frontal lobe, this (indicating)

16  area.  And the mid is parietal.  At the very back is

17  occipital.  The temporal is kind of on the inferior

18  surface of the brain.  And that cerebellum is this

19  area (indicating).

20  Q.   In the --

21  A.   And the brainstem we can't see because it's

22  kind of hidden here (indicating).

23          So where we recovered the bullet it was,

24  if you can look here, this is the occipital area and



$X_2$ = First Notice driver slumped over toward steering wheel

$X$ = car stopped kinda in middle of street

$X_1$ = where car First seen

Harrison

SOS 503

X = car stopped
X = 3 police officers when First seen
$X_1$ = Gwyn on sidewalk in front of SOS
$X_2$ = Gwyn on porch of SOS

DEPOSITION EXHIBIT
Gwin 4
Kup P-24-05

PENGAD 800-631-6989

SA19



**WILCOX & FETZER LTD.**

In the Matter Of:

# Estate of Harry Smith, III, et al.
## v.
# Wilmington Police Department

## C.A. # 04-1254 (GMS)

---

Transcript of:

John F. Ciritella

May 8, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 23 of 37
Estate of Harry Smith, III, et al.                    Wilmington Police Department
John F. Ciritella                  C.A. # 04-1254 (GMS)                May 8, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,     )
HARRY SMITH, JR., and ROSLYN    )
WOODARD SMITH,                  )
                                )
            Plaintiffs,         )
                                )   Civil Action
        v.                      )   No. 04-1254
                                )       (GMS)
WILMINGTON POLICE DEPARTMENT,   )
MICHAEL SZCZERBA and ONE OR     )
MORE JOHN DOES,                 )
                                )
            Defendants.         )

            Deposition of JOHN F. CIRITELLA taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Monday, May 8, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
               P.O. Box 2763
               Olympia, Washington    98507
               for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            K. TYLER O'CONNELL, ESQUIRE
            RICHARDS, LAYTON & FINGER
               One Rodney Square - Third Floor
               Wilmington, Delaware  19899
               for the Defendants Wilmington Police
            Department and Michael Szczerba
------------------------------------------------
            WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com

Case 1:04-cv-01254-GMS   Document 164   Filed 02/21/2007   Page 24 of 37

Estate of Harry Smith, III, et al.                                    Wilmington Police Department
John F. Ciritella                    C.A. # 04-1254 (GMS)                        May 8, 2006

Page 2

1   ALSO PRESENT:
2
3       THOMAS CLIFTON DEMPSEY
        MATTHEW WAYNE KURTEN
4           - - - - -
5       JOHN F. CIRITELLA,
6   the witness herein, having first been
7   duly sworn on oath, was examined and
8   testified as follows:
9   BY MS. SULTON:
10  Q.   Would you state your name and spell your last
11  name for the record, please?
12  A.   First name is John, J-o-h-n, middle initial F,
13  last name is Ciritella, C-i-r-i-t-e-l-l-a.
14  Q.   Have you ever given a deposition before?
15  A.   Yes, I have.
16  Q.   On how many occasions have you so done?
17  A.   Maybe two.
18  Q.   What cases were those?
19  A.   Accidents, traffic accidents.
20  Q.   Have you ever been sued before?
21  A.   I don't believe so.
22  Q.   Have you ever filed a lawsuit against anyone?
23  A.   Have I?  No.
24  Q.   Have you ever had any complaints filed against

Page 3

1   you by citizens other than this current lawsuit?
2   A.   I believe so, yes.
3   Q.   Can you tell me about those complaints?
4   A.   It was just one incident.  It was a use of
5   force and it was -- never went to court.
6   Q.   When was that use-of-force complaint filed?
7   A.   I can't tell you.  It's been awhile.  At least
8   ten years ago.
9   Q.   Were you a member of the Wilmington Police
10  Department at that time?
11  A.   I was, yes.
12  Q.   Do you recall the name of the citizen who
13  complained?
14  A.   No, I do not.
15  Q.   Did the citizen file a lawsuit?
16  A.   I believe he did, yes.
17  Q.   Do you know where that lawsuit was filed?
18  A.   Federal court.
19  Q.   Here in Wilmington?
20  A.   That's correct.
21  Q.   Do you know what happened to that lawsuit?
22  A.   I believe it was dropped.  Never came to court.
23  It was unsubstantiated, I guess.
24  Q.   So it was dismissed by the court?

Page 4

1   A.   Again, I know I didn't have to show up and it
2   was dropped, so I'm not sure the exact reasons for it.
3   Q.   Was your deposition taken in that case?
4   A.   I don't believe so.
5   Q.   How long have you been a police officer?
6   A.   Nineteen plus years.
7   Q.   All with the Wilmington Police Department?
8   A.   That's correct.
9   Q.   When was the last time you received training in
10  the area of the use of force?
11  A.   Probably maybe last year when I received my
12  Taser training was my last use of force -- it
13  coincided with the use of force.
14  Q.   Can you tell me about that training?
15  A.   A member of the SWAT team, SWAT team members
16  were issued maybe 15 to 20 Tasers for a -- I guess
17  it's just a pilot program and through that we were
18  issued the Tasers, some guys in the patrol division,
19  some guys in detective where I'm assigned were issued
20  the Tasers and through that we go through some
21  use-of-force policy.
22  Q.   The training was specifically designed to
23  familiarize you with the Taser instrument itself?
24  A.   Yeah, the majority of that training was, yes.

Page 5

1   Q.   Are you using the type of Taser that shoots out
2   darts?
3   A.   That's correct.
4   Q.   That are extended by wires?
5   A.   That's correct.
6   Q.   The Taser that you are using, how long are the
7   wires on that one?
8   A.   I believe mine is 21 feet.
9   Q.   As a part of your training in the Taser that
10  covered the use of force, can you tell me about the
11  training you received?  Other than the actual
12  manipulation of the Taser instrument, can you tell me
13  about the use-of-force training you received?
14  A.   It was just, I think, pretty much just going
15  over our use-of-force policy through the City of
16  Wilmington, our police department and what guidelines,
17  where does it fit in there, I guess, use-of-force
18  ladder, so to speak, when and when not to use it, what
19  we can use it against, different incidents, when it
20  can be deployed.
21  Q.   Do you use a use-of-force ladder or a
22  use-of-force continuum?
23  A.   I guess -- continuum, I guess, would be a
24  better word for it.

2 (Pages 2 to 5)

Estate of Harry Smith, III, et al.                    Wilmington Police Department
John F. Ciritella                    v.    C.A. # 04-1254 (GMS)    May 8, 2006

**Page 10**

1 requested.)
2 A. We have a use-of-force policy. I think it's,
3 you know, maybe ten plus pages. And again, it goes
4 over each piece of equipment that you're given or
5 assigned and it goes over times that, I guess, when
6 you can deploy it. It gives examples of when you can
7 and cannot use that equipment.
8 BY MS. SULTON:
9 Q. Correct me if I'm wrong. So there's a
10 use-of-force policy in Wilmington that says this is
11 when you can use a baton?
12 A. Can and cannot use a baton.
13 Q. There's a policy that says this is when you can
14 or cannot use a gun?
15 A. That's correct.
16 Q. Tell me about what the policy says as it
17 relates to when you can and cannot use a gun.
18 A. I'm sorry. What was the last part? Can and
19 cannot use --
20 Q. A gun.
21 A. A gun? You can't fire warning shots. That's a
22 cannot. You can if you feel there's a substantial
23 risk of death to me, citizens of Wilmington, possibly
24 a partner.

**Page 11**

1 Q. Do you have a policy that says you can shot at
2 a moving vehicle?
3 A. I believe the policy, I'm not exactly sure what
4 it says on verbatim, whether to shoot or not shoot at
5 a moving vehicle.
6 Q. How were you trained?
7 A. How was I trained?
8 Q. Yes.
9 A. In --
10 Q. How were you trained as it relates to whether
11 you can or cannot shot at a moving vehicle?
12 A. I think if there's a threat there, you can
13 shot. If you feel that your life is in danger, you
14 can shot.
15 Q. Is there a policy that specifically addresses
16 when you should or should not or cannot or can shot at
17 a moving vehicle?
18 A. I don't know that verbatim, no. I don't know
19 that, so I can't answer that.
20 Q. So based on your 19 years experience, you're
21 not certain as you sit here today whether there is a
22 specific policy on shooting at moving vehicles?
23 A. No, I'm not sure.
24 Q. Do you recall at any point during your 19 years

**Page 12**

1 of service receiving any training that specifically
2 addressed shooting or not shooting at a moving
3 vehicle?
4 A. It's been addressed shooting or not shooting at
5 a moving vehicle, yes.
6 Q. What did they tell you you should or should not
7 do?
8 A. Again, through most of, I guess, the last, I
9 guess, recent — I think it was maybe an in-service
10 training, I'm not sure of the date, it might be within
11 the last five years, we covered certain types of
12 incidents that would cover that, moving or not --
13 shooting or not shooting at a vehicle.
14 And again, all it is is, again, it really
15 comes down to the determination of that officer that's
16 present at the scene at the time of that incident. It
17 doesn't necessarily say that you can or cannot shot.
18 If you feel your life is in danger, then if that
19 officer feels he has to shot, then that's his
20 judgment.
21 Q. So the training that you receive at some point
22 within the last five years as it related to shooting
23 at a moving vehicle did not provide you with a
24 guideline as to when you do shot or don't shot?

**Page 13**

1 A. I'm not saying that. There may be a guideline.
2 I just don't know verbatim.
3 Q. Do you recall the name of your instructor for
4 that course or class that you took that covered the
5 issue of when you should or should not shot at a
6 moving vehicle?
7 A. That I don't know.
8 Q. Would it be in your personnel file the
9 use-of-force training that you've completed in, say,
10 the last ten years?
11 A. Could be.
12 Q. If I were to look in your personnel file, would
13 it tell me who the instructors are for the various
14 courses that you've completed for the department in,
15 say, the last ten years?
16 A. I believe it should.
17 Q. Did you ever receive any training on how to
18 deal with people who are mentally challenged?
19 A. In my 19 plus years? I believe I've had some
20 training in it, yes.
21 Q. Can you tell me what kind of training you've
22 received in, say, the last five years?
23 A. Five years? I don't think any.
24 Q. Well, tell me what training you have received

4 (Pages 10 to 13)

Estate of Harry Smith, III, et al.                    Wilmington Police Department
John F. Ciritella                 C.A. # 04-1254 (GMS)              May 8, 2006

Page 26

1  Q.  When I say "whole week," 40 hours of time?
2  A.  Yes, ma'am.
3  Q.  Just learning how to use that particular
4  weapon?
5  A.  Yes, ma'am.
6  Q.  I assume that the instruction that you received
7  concerned not just use of it, but how to clean it and
8  so forth; correct?
9  A.  Yes, ma'am.
10  Q.  Every day of that week did you go down to the
11  range and discharge the weapon?
12  A.  I believe so, yes.
13  Q.  You were qualified with that weapon; correct?
14  A.  That's correct.
15  Q.  Between the time that you first became
16  qualified with that weapon, I assume they gave you
17  some certificate or something indicating that you are
18  qualified with the new weapon; is that correct?
19  A.  I don't know how that's handled. I mean,
20  again, if it were just qualified, I guess that's kept
21  through our human resources, so no one told you you
22  weren't qualified.
23  A.  That's correct.
24  Q.  From the time that you began carrying that

Page 27

1  weapon and up until September 13, 2003, had you ever
2  discharged that weapon at another person?
3  A.  No, ma'am.
4  Q.  Prior to September 13, 2003, had you ever shot
5  anybody?
6  A.  No, ma'am.
7  Q.  So this was your first shooting incident, that
8  of Harry Smith?
9  A.  That's correct.
10  Q.  So in the 19 years you've been on the force
11  here in Wilmington, you've only had one shooting
12  incident?
13  A.  That's correct.
14  Q.  Never shot at a dog or anything?
15  A.  No, ma'am.
16  Q.  Tell me what happened on September 13, 2003, as
17  best you can recall.
18  A.  As best I can recall?
19  Q.  Yes.
20  A.  I was working an on-call weekend, which meant I
21  was in detectives at the time, plain clothes
22  assignment working. I guess it would be 1600 to 2400,
23  4 p.m. till 12 midnight. Sitting at my desk typing a
24  report. I heard a call for assistance.

Page 28

1  Q.  So let me stop you there for just a second.
2  And I'll stop you from time to time, so I will
3  appreciate your indulgence as I do that.
4        So you're in the police station?
5  A.  That's correct. Detective division.
6  Q.  When were you promoted to detective?
7  A.  It's not a promotion. It's just a transfer.
8  Q.  So what is your rank?
9  A.  Master corporal.
10  Q.  Master corporal. But you were working in plain
11  clothes --
12  A.  As a detective.
13  Q.  -- on September 13, 2003?
14  A.  That's correct.
15  Q.  You're writing a report; correct?
16  A.  Typing a report.
17  Q.  You hear a call come in; correct?
18  A.  A call for assistance came across our radio.
19  Q.  What do you recall the call for assistance
20  saying? What was the content of that?
21  A.  Well, the content was that it appeared that one
22  of the officers was, I guess, yelling or screaming on
23  the radio. Could not make it out. What I could tell,
24  it was not your normal conversation over the radio,

Page 29

1  meaning that in my years of experience, I could tell
2  that something was going on. Heard that chatter.
3  Then I heard they need another car or need assistance
4  and they were able to give, I believe, a location
5  somewhere on Washington Street.
6        At that particular time I exited my desk.
7  I have to go down other steps, I guess, floor to where
8  my vehicle is. And as I exited the, I guess, the
9  police department, I heard that again, another call
10  for assistance. Shots fired. Police car taken.
11  Q.  It's just those words, call for assistance,
12  shot fired, car taken?
13  A.  They were the strongest words I heard.
14  Q.  So there may have been other words stated?
15  A.  There may have been.
16  Q.  Your car is an unmarked police car?
17  A.  That's correct.
18  Q.  So you're in civilian clothes and getting into
19  an unmarked police car; correct?
20  A.  That's correct.
21  Q.  Did you have any lights or sirens in that
22  unmarked car?
23  A.  Yes, I did.
24  Q.  So you get into your car. Then what do you do?

8 (Pages 26 to 29)

SA24



**WILCOX & FETZER LTD.**

In the Matter Of:

# Estate of Harry Smith, III, et al.

## v.

# Wilmington Police Department

## C.A. # 04-1254 (GMS)

---

Transcript of:

Matthew W. Kurten

May 10, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 28 of 37

Estate of Harry Smith, III, et al.                     Wilmington Police Department
Matthew W. Kurten               v.                              May 10, 2006
                            C.A. # 04-1254 (GMS)

                                                                    Page 1

                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE
ESTATE OF HARRY SMITH, III,    )
HARRY SMITH, JR., and ROSLYN   )
WOODARD SMITH,                 )
                               )
               Plaintiffs,     )
                               )  Civil Action
        v.                     )  No. 04-1254
                               )    (GMS)
WILMINGTON POLICE DEPARTMENT,  )
MICHAEL SZCZERBA and ONE OR    )
MORE JOHN DOES,                )
                               )
               Defendants.     )


            Deposition of MATTHEW W. KURTEN taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Wednesday, May 10, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
              P.O. Box 2763
              Olympia, Washington   98507
              for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            K. TYLER O'CONNELL, ESQUIRE
            RICHARDS, LAYTON & FINGER
              One Rodney Square - Third Floor
              Wilmington, Delaware  19899
              for the Defendants Wilmington Police
            Department and Michael Szczerba
-----------------------------------------------------
            WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com                SA26

Estate of Harry Smith, III, et al.
Matthew W. Kurten

v.

C.A. # 04-1254 (GMS)

Wilmington Police Department
May 10, 2006

Page 2

1  APPEARANCES:
2      ROSAMARIA TASSONE, ESQUIRE
       CITY OF WILMINGTON LAW DEPARTMENT
3      City/County Building - 9th Floor
       Wilmington, Delaware 19801-3537
4      for the Defendants
5          - - - - -
6          MATTHEW W. KURTEN,
7      the witness herein, having first been
8      duly sworn on oath, was examined and
9      testified as follows:
10 BY MS. SULTON:
11   Q.  Would you be kind enough to spell your first
12 and last name for the record, please?
13   A.  Sure.  First name is Matthew, M-a-t-t-h-e-w,
14 last name is Kurten, K-u-r-t-e-n.
15   Q.  Your first name is misspelled on the complaint.
16 You are the same Matthew Kurten that is spelled as
17 M-a-t-h-e-w; correct?
18   A.  I believe so.
19   Q.  Before I ask you a question —
20      MS. SULTON:  Let me just put on the record
21 that I did receive this morning — and thank you,
22 John — the videotape of Harry Smith and the letter
23 concerning Sergeant Dempsey's former complaints
24 indicating that those are routinely purged from an

Page 3

1  officer's file after five years.
2      MR. PARKINS:  Well, not complaints, but
3  unsubstantiated complaints.
4      MS. SULTON:  Okay.  Thank you.  That helps
5  to clear the discussion from his deposition.  I
6  appreciate that.
7  BY MS. SULTON:
8    Q.  How long have you been a police officer,
9  Mr. Kurten?
10   A.  Almost seven years.  This June will be seven
11 years.
12   Q.  What is your current rank?
13   A.  I'm sergeant.
14   Q.  What was your rank on September 13, 2003?
15   A.  Corporal.
16   Q.  Prior to or since the incident on September 13,
17 2003, have you ever been involved in a shooting
18 incident?
19   A.  No.
20   Q.  Have you ever discharged your weapon as a
21 police officer outside of practicing at a range or
22 qualifying with the use of your weapon?
23   A.  No.
24   Q.  Have you ever had any complaints filed against

Page 4

1  you ever?
2    A.  There may have been some filed, yes.
3    Q.  When?
4    A.  I couldn't give you the exact dates.  There's
5  only one substantiated complaint in my file.
6    Q.  Can you tell me about that, please?
7    A.  It's for failing to do a prearrest felony
8  intake.
9    Q.  What does that mean?
10   A.  I did not do a felony intake on somebody who I
11 had assigned felony charges for, signed warrants for.
12   Q.  That was in connection with your job as a
13 Wilmington police officer?
14   A.  That's correct.
15   Q.  Have you ever had anyone file any complaints
16 about you ever, whether or not you were a police
17 officer?
18   A.  They may have spoke with somebody.  As far as
19 formal complaints, no, not to my knowledge.
20   Q.  Are you aware of any informal complaints?
21   A.  Again, if somebody had spoken with the
22 supervisor in an informal fashion and everything was
23 taken care of, if there was something that they didn't
24 like or whatnot, then that would have been handled.  I

Page 5

1  couldn't say for sure if I would have been made aware
2  of that.
3    Q.  When did you go through the police training
4  academy in connection with your job with the
5  Wilmington Police Department?
6    A.  Started June 14th, 1999.
7    Q.  Were you given a psychological test before or
8  as a part of your academy?
9    A.  Yes.  It's a prerequisite.
10   Q.  Do you have a college degree?
11   A.  Yes, ma'am.
12   Q.  From where?
13   A.  University of Delaware.
14   Q.  What was your major?
15   A.  Criminal justice.
16   Q.  You graduated in what year?
17   A.  1995.
18   Q.  Prior to joining the Wilmington Police
19 Department, how were you employed?
20   A.  I did two years as a probation and parole
21 officer for State of Delaware.
22   Q.  Prior to that, how were you employed?
23   A.  My father had his own business.  I worked for
24 him.

2 (Pages 2 to 5)

Estate of Harry Smith, III, et al.                v.                Wilmington Police Department
Matthew W. Kurten                          C.A. # 04-1254 (GMS)                   May 10, 2006

Page 6

1   Q.   What kind of business was it?
2   A.   Wallpapering and painting and the like.
3   Q.   I would like to talk with you about your
4   training, both in the academy and since.
5        Did you receive use-of-force training
6   during the academy?
7   A.   Yes.
8   Q.   What kind of training did you receive?
9   A.   Use-of-force training would be as far as one of
10  our directives in the Wilmington police officer's
11  manual, directive 6.7, governs our use of force as
12  Wilmington police officers. Also defensive tactics.
13  I believe they go hand in hand. Defensive tactics
14  course.
15  Q.   What did they teach you about use of force?
16  A.   Basically there's guidelines as far as --
17  there's use-of-force continuum and they went through
18  the different steps and when to escalate, de-escalate
19  the best you can. Use the minimum force necessary to
20  effect an arrest.
21  Q.   As a part of your training on the use of deadly
22  force, in particular, what were you taught were the
23  guidelines you should follow?
24  A.   There are certain criteria to be followed to

Page 7

1   use deadly -- when to use deadly force.
2        For instance, if my life was in danger,
3   another officer, another citizen, if there was a
4   fleeing felon who was armed and we believed there
5   would be a great harm or danger to the public.
6   Q.   Any other guidelines that you recall being
7   taught either in the police training academy or
8   subsequent thereto?
9   A.   I believe those are the standard ones, the main
10  ones.
11  Q.   What other criteria are you to consider before
12  using deadly force based upon your training?
13  A.   What type of deadly force are you referring to?
14  Q.   Use of the service weapon, gun, shotgun,
15  handgun.
16  A.   Certainly you need to be aware of what's in
17  your surrounding area, what's in your backdrop. For
18  example, children, if there's children playing in a
19  playground, you certainly don't want to discharge your
20  weapon for fear of accidentally striking one of them.
21  So...
22  Q.   Any other guidelines?
23  A.   Certainly you wouldn't take -- you want to take
24  your lighting into account. You want to make sure you

Page 8

1   have your intended target in your line of fire as
2   intended, so -- weather is -- there's certainly a
3   whole bunch -- whole bunch of things to take into
4   account.
5   Q.   Anything else you should take into account
6   based upon your training? And take your time as you
7   reflect on that question, please.
8   A.   Sure. You just have to, I guess, have a good
9   faith and reason to believe that deadly force is
10  necessary.
11  Q.   Anything else that you should consider based on
12  your training?
13  A.   Not off the top of my head.
14  Q.   On or before September 13, 2003, did you
15  supervise any other officers?
16  A.   No.
17  Q.   Who was your supervisor?
18  A.   Ronald Fioravanti. I can spell the last.
19  F-i-o-r-a-v-a-n-t-i.
20  Q.   Do you recall the names of any of the people
21  who served as your training officers either in the
22  academy or subsequent thereto?
23  A.   I'm sure there's a multitude of people. Any
24  specific courses or --

Page 9

1   Q.   Yes. And thank you for focusing the question.
2   As it relates to use of force, deadly force, in
3   particular.
4   A.   No, not who taught that particular agenda for
5   use of deadly force. I know the range master, which
6   is still as of this date, is Sergeant Scott Sowden.
7   So he would have to do as far as application of the
8   firearms, usage of firearms down at the range. But as
9   far as who taught directive 6.7, no.
10  Q.   I'd like to focus your attention on
11  September 13, 2003. What kind of handgun were you
12  carrying at that time?
13  A.   Smith & Wesson 40-caliber semiautomatic.
14  Q.   That holds 13 bullets, 12 in the clip and one
15  in the chamber?
16  A.   Yes.
17  Q.   How many shots did you discharge from your
18  weapon on that day?
19  A.   Five, I believe.
20  Q.   Why did you discharge those five bullets from
21  your weapon?
22  A.   I was in fear that Detective Ciritella would be
23  injured and/or killed, seriously injured and/or
24  killed.

3 (Pages 6 to 9)

Page 50

1  A.  As part of our basic officer's course in the
2  police academy, there's, I believe -- I'm not sure if
3  it's defensive driving or a pursuit driving course
4  where we actually physically go out and try the
5  vehicles and maneuver.  So if that's what you're
6  looking for, yes.  Other than that, I can't say that I
7  have.
8  Q.  Have you received any training in shooting at
9  moving vehicles?
10  A.  No.
11  Q.  Have you ever received any guidelines,
12  directives, or policy statements or any kind of
13  training whatsoever as it relates to whether or not
14  you should or should not shoot at a moving vehicle?
15  A.  I don't think should or should not -- to answer
16  your question, no, in that terminology, should or
17  should not.
18  Q.  Have you ever received any guidance at all in
19  terms of whether you should or should not shoot at a
20  moving vehicle?
21      MR. PARKINS:  It's been asked and answered.
22      You can answer again.
23  A.  Certainly shooting at a motor vehicle, no.
24  There is a section with our pursuit policy and

Page 51

1  use-of-force policy as far as exigent circumstances.
2  Q.  What is your understanding of what you should
3  or should not do as it relates to moving at a shooting
4  vehicle?
5  A.  Moving at a shooting vehicle?
6  Q.  Yes.  Shooting at a moving vehicle.
7  A.  I don't think -- there's nothing in black and
8  white saying that.  Certainly if a threat is
9  perceived, as I mentioned before, to myself and
10  another officer, citizen, then certainly exigent
11  circumstances allow or permit for the use of deadly
12  force.
13  Q.  That includes shooting at a moving vehicle?
14  A.  That would certainly include it.
15  Q.  Have you received any training in reference to
16  using your -- well, let me ask the question this way
17  first:  When you parked your car at the intersection
18  of 5th and Harrison, why did you park it in the
19  fashion that you did as depicted in the photograph we
20  previously marked?
21  A.  In the best interest of public safety.
22  Q.  Tell me:  What do you mean by that?
23  A.  At that point, in that certain block, if we
24  could end this pursuit, end this matter, hopefully in

Page 52

1  a peaceful manner, by my parking the vehicle there,
2  then I believe the exigent circumstances existed and I
3  was just in doing so.
4  Q.  I'm sorry.  I'm not being clear in my question.
5  Let me try again.
6  A.  Okay.
7  Q.  Did you park your vehicle in that manner
8  because you were using it as a blockade or barricade
9  to stop the progression of the stolen vehicle up
10  5th Street?
11  A.  Certainly that was my hope so no other lives of
12  citizens would be in danger.
13  Q.  So you were using your vehicle as a barricade;
14  correct?
15  A.  Yes.  I guess you could say that.
16  Q.  Have you received any training that says you
17  should use your police vehicle as a barricade in a car
18  pursuit or car chase situation?
19  A.  Again, I can't say that happened, but certainly
20  my discretion, I believe it was warranted.
21  Q.  Is there anything in your policy manual that
22  authorizes you to use your police vehicle as a
23  blockade or barricade in a car chase situation?
24  A.  I'm not 100 percent sure if there is or is not

Page 53

1  at this point in time.
2  Q.  Were you dressed in your uniform on
3  September 13, 2003?
4  A.  Actually, I was in a bicycle uniform, but, yes,
5  it was marked with Wilmington police decals and had a
6  badge on it, yes.
7  Q.  Have you ever received any training as it
8  relates to shooting at moving targets or at targets
9  that are moving?
10  A.  I want to say that I have at probation and
11  parole some type of device or some type of object that
12  they had fixed that would move on you or flip a turn.
13  And also doing shoot or no shoot, which is a simulated
14  shooting where you would decipher between your --
15  between your targets whether to shoot or not shoot,
16  and certainly they would be moving at the time.
17  Q.  Was that a video simulation --
18  A.  Yes.
19  Q.  -- shooting sideways --
20  A.  That would be.
21  Q.  -- where you go into a room and they put a
22  video up and they show you a film and you're standing
23  there with either real or looks real handgun and they
24  have people pop up and you are kind of trained whether

14 (Pages 50 to 53)



WILCOX & FETZER LTD.

In the Matter Of:

# Estate of Harry Smith, III, et al.

## v.

# Wilmington Police Department

## C.A. # 04-1254 (GMS)

———————————————

## Transcript of:

## Thomas Clifton Dempsey

## May 9, 2006

———————————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

SA30

Estate of Harry Smith, III, et al.                                Wilmington Police Department
Thomas Clifton Dempsey                    v.                      May 9, 2006
                                   C.A. # 04-1254 (GMS)

Page 1

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE

ESTATE OF HARRY SMITH, III,          )
HARRY SMITH, JR., and ROSLYN         )
WOODARD SMITH,                       )
                                     )
            Plaintiffs,              )
                                     )    Civil Action
       v.                            )    No. 04-1254
                                     )      (GMS)
WILMINGTON POLICE DEPARTMENT,        )
MICHAEL SZCZERBA and ONE OR          )
MORE JOHN DOES,                      )
                                     )
            Defendants.              )

            Deposition of THOMAS CLIFTON DEMPSEY taken
pursuant to notice at the law offices of Richards,
Layton & Finger, One Rodney Square, Third Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Tuesday, May 9, 2006, before Kathleen White Palmer,
Registered Professional Reporter and Notary Public.
APPEARANCES:

            ANNE T. SULTON, PH.D., ESQUIRE
              P.O. Box 2763
              Olympia, Washington    98507
              for the Plaintiffs
            JOHN A. PARKINS, JR., ESQUIRE
            K. TYLER O'CONNELL, ESQUIRE
            RICHARDS, LAYTON & FINGER
              One Rodney Square - Third Floor
              Wilmington, Delaware  19899
              for the Defendants Wilmington Police
            Department and Michael Szczerba
-----------------------------------------------
            WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com                    SA31

Estate of Harry Smith, III, et al.                    v.                    Wilmington Police Department
Thomas Clifton Dempsey                    C.A. # 04-1254 (GMS)                    May 9, 2006

Page 22

1  not.
2  BY MS. SULTON:
3      Q.  Did you receive anything subsequent to the
4  academy?
5      A.  We continue to update our policies and
6  procedures, and all I can say is that when we do that,
7  that's when we are trained on the additions or, you
8  know, whatever the updating is.  And other than that,
9  no, I can't recall any other type of training.
10     Q.  Did you ever receive any training in how to
11 recognize and to deal with people who may be suffering
12 from mental illnesses?
13     A.  Again, in the academy we have individuals that
14 come in from either crisis management, mental illness
15 facilities, and they will discuss different mental
16 illnesses, stuff of that nature, but they do not go
17 great in-depth to them.  It's basically just to give
18 us an overview on what may be out there and what to
19 look for when we do, you know, meet up with these
20 individuals.  And maybe how to, you know, talk to
21 them.  But it's not extensive in any way.
22         We basically -- the main thing that we are
23 trained in when it comes to, you know, trying to
24 identify what the problem is is:  Is the person in

Page 23

1  danger of themselves or endangering someone else?
2  That's what we, as police officers, look for.  That's
3  what we mainly are trained for.
4          We are not trained to identify what a
5  mental illness -- what the mental illness is if the
6  person is mentally ill.  The person could be, you
7  know, intoxicated or something of that nature.  We
8  don't determine that.  We have doctors and
9  psychiatrists that determine that.  We do not
10 determine that as police officers.  We determine if
11 they are a danger to themselves or endangering someone
12 else, at which time we act accordingly to take them to
13 the proper facility to be properly looked after.
14     Q.  That's training that you received in the
15 academy or as in-service training?
16     A.  Both.
17     Q.  Do you know how recently you received any
18 training in responding to situations involving mental
19 health issues?
20     A.  I cannot give you an exact date.  The last
21 training that I am aware of was dealt with our
22 transportation policy being a little bit revamped on
23 how -- who are we going to take to Delaware State
24 Hospital or the Wilmington Hospital.  Other than that,

Page 24

1  I can't recall any other training.
2      Q.  Since completing the academy, have you received
3  any in-service training on the law?
4      A.  In the law?
5      Q.  Law, l-a-w.
6      A.  Updates on Supreme Court rulings.  That's about
7  the only thing I can think of that we've had any other
8  updates on or that we've had any other training on.
9      Q.  Have you been involved in any other shooting
10 incidents other than this one involving the death of
11 Harry Smith?
12     A.  No.
13     Q.  In your service to the Wilmington Police
14 Department, have you ever shot anyone before?
15     A.  No.
16     Q.  Or since?
17     A.  No.
18         MR. PARKINS:  Would you read back, Kathy,
19 the last question and answer, please?
20         (The reporter read from the record as
21 requested.)
22         MR. PARKINS:  Okay.  Thank you.
23 BY MS. SULTON:
24     Q.  Have you ever discharged your weapon before as

Page 25

1  a Wilmington police officer?
2          MR. PARKINS:  Other than at practice?
3      Q.  Have you ever discharged your weapon other than
4  at Harry Smith in your service to the Wilmington
5  Police Department?
6      A.  At the range three times a year.
7      Q.  Never at an animal?
8      A.  No.
9      Q.  Has anyone ever filed a complaint against you?
10     A.  In reference to --
11     Q.  Any kind of complaint ever.
12     A.  Yes.
13     Q.  Okay.  Tell me about them.
14     A.  I -- they are very numerous.  I've had several
15 complaints of use of force.  I've had several
16 complaints of improper language, all of which have
17 been unsubstantiated.
18     Q.  Let's talk about the use of force.
19     A.  I can't recall them all.
20     Q.  How many have there been?
21     A.  I can't recall.
22     Q.  More than ten?
23     A.  I can't recall.
24     Q.  As best you can recollect while sitting here

7 (Pages 22 to 25)

Estate of Harry Smith, III, et al.                    v.                    Wilmington Police Department
Thomas Clifton Dempsey                    C.A. # 04-1254 (GMS)                    May 9, 2006

Page 26

1  today, do you think it's less than ten complaints of
2  relating to improper use of force?
3       MR. PARKINS: Objection to the form.
4  A.  I can't recall.
5  Q.  I asked for a complete copy of your personnel
6  file, sir.  Have you given it to me?
7  A.  Me?
8  Q.  Yes, sir.
9  A.  You are asking me?
10  Q.  Yes, sir.
11  A.  I didn't -- I haven't given you anything.
12  Q.  I don't have a complete copy of your personnel
13  file.
14  A.  Can I go back?  I don't ever remember you ever
15  asking me for anything, so it's --
16  Q.  I have to go through counsel.
17  A.  Okay.
18  Q.  But given the answer that you gave me that you
19  have numerous complaints of use of force against you,
20  I know now I don't have your complete personnel file
21  because I haven't seen numerous complaints against you
22  in the documents your lawyer sent me and I'm really
23  concerned about that.
24  A.  I don't believe you would have seen it in my

Page 27

1  personnel file.
2  Q.  I'm going to conclude this deposition and I'm
3  going to reserve the right to come back and depose you
4  because I have a right to depose you on the basis of
5  having a complete copy of your personnel file.
6       MR. PARKINS: Counselor, you if you do
7  conclude the deposition now --
8       MS. SULTON: Are you saying I have all of
9  them?  Are you representing that I was sent all of the
10  numerous use-of-force complaints about which he just
11  testified?  That if you're saying I have them all
12  based upon what you believe to be true, then I will
13  continue with this deposition.
14       But I have not, and I'm telling you the
15  honest to goodness truth, John, I have not seen in the
16  file, his personnel file you sent to me, numerous
17  complaints of use of force against him or any other
18  officer, not numerous.
19       MR. PARKINS: Counselor, may I speak
20  without being interrupted?
21       MS. SULTON: You may, Counsel, but I want
22  to make it clear that I flew here from Seattle,
23  Washington, to take this man's deposition on the
24  assumption that I had a complete copy of his personnel

Page 28

1  file that would include all of the use-of-force
2  complaints against him so that I could question him
3  about those.
4       And when he just said "numerous," that term
5  is not consistent with what I believe I have seen.  So
6  I've made my record.
7       Why don't you make your record and then
8  we'll continue the deposition.
9       MR. PARKINS: Counselor, I did provide you
10  with his entire personnel file.  If you decide to
11  adjourn the deposition --
12       MS. SULTON: I'm not going to adjourn it.
13  I'm not going to adjourn it.  I'm going to continue.
14  I'll just file a motion to compel as necessary.  I'm
15  not going to adjourn it because I came here from
16  Seattle, Washington and I'm not coming back here again to see this
17  man until trial.
18       So let's continue unless you want to make a
19  further statement on the record.
20       MR. PARKINS: Since you interrupted me
21  again, I won't bother.
22       MS. SULTON: Okay.  Good.  Let's go.
23  BY MS. SULTON:
24  Q.  Since September 13th, 2003, has anybody filed a

Page 29

1  complaint against you alleging that you use too much
2  force?
3  A.  No.
4  Q.  Prior to September 13, 2003, in the year of
5  2003, did anybody file a complaint against you about
6  using too much force?
7  A.  No.
8  Q.  What about in the year 2002?
9  A.  No.
10  Q.  2001?
11  A.  No.
12  Q.  2000?
13  A.  I can't recall.
14  Q.  1999?
15  A.  I can't recall anything other than past 2000.
16  I know that nothing was done after 2000.  The reason I
17  know that is that's when I was promoted and I haven't
18  been in that situation since then.
19  Q.  So in 1999, do you don't think that anyone
20  filed a complaint against you?
21  A.  I can't answer that.  I don't know.
22  Q.  What about 1998?
23  A.  Like I just said, I don't know anything after
24  2000.  I know that there were complaints made of me

8 (Pages 26 to 29)

Case 1:04-cv-01254-GMS    Document 164    Filed 02/21/2007    Page 36 of 37

Estate of Harry Smith, III, et al.                    v.                    Wilmington Police Department
Thomas Clifton Dempsey                    C.A. # 04-1254 (GMS)                    May 9, 2006

Page 50

1    A.  I was escorted to the detective conference room
2    or we were told to go to the detective conference
3    room.  Lieutenant Mulrine took us up there and pretty
4    much at that point along we were in there awaiting our
5    interviews.  And that's pretty much all we did.  We
6    just sat in there awaiting our interviews.
7    Q.  Your interview occurred about 1:00 in the
8    morning?
9    A.  I can't give you -- I know it was after one,
10    but I can't give you exact time.
11    Q.  Now, you do realize we are not alleging in this
12    suit any issues pertaining to race?
13    A.  I don't know what you are alleging.
14    Q.  Have you seen the lawsuit?
15    A.  Yeah, I've read over it.
16    Q.  You didn't see any allegations of race in
17    there, did you?
18    A.  No.
19    Q.  Race doesn't matter in this case.
20        Let me go through a couple of issues with
21    you, if I could
22        Have you received any training, whether you
23    were in the academy or in-service training, related to any
24    or seen any policy statements or any directives or any

Page 51

1    guidelines relating to whether or not you should or
2    should not shoot at a moving vehicle?
3    A.  We have a policy in our use-of-force continuum
4    that states that we are not supposed to shoot at a
5    moving vehicle unless it's exigent circumstances and
6    of a life-threatening situation.
7    Q.  That's in the use-of-force policy?
8    A.  Yes.
9    Q.  Do you know the number?
10    A.  The exact number of the directive?
11    Q.  Yes.
12    A.  It would be in Chapter 6, but no, I don't have
13    the exact number of the directive.  It's a very small,
14    two-line paragraph.
15    Q.  Is it in your standards manual?
16    A.  It's in our police officer's manual, what we
17    call The White Book because it's in a white book.
18        MS. SULTON:  I didn't get that.  I asked
19    for it.
20        MR. PARKINS:  You received the police
21    officer's manual.
22        MS. SULTON:  Right.  So let me do it as a
23    question.
24

Page 52

1    BY MS. SULTON:
2    Q.  I requested all of the documents, guidelines,
3    policies, and so forth on use of force and I received
4    a police officer's manual that's a couple of inches,
5    maybe three inches thick?
6    A.  Four inches, actually.
7    Q.  Four inches?  Yes, I would agree with you.
8    It's about four inches thick.  I did not see a
9    specific policy on --
10    A.  It is something you must search for, ma'am.  It
11    is on the use-of-force policies, Chapter 6.  I cannot
12    recall what the exact directive it is, but it is in
13    there.
14    Q.  So the policy, then, is in Chapter 6?
15    A.  I can't give it to you verbatim, but pretty
16    much it's what I said.
17    Q.  Other than the policy statement that says
18    generally you're not supposed to shot at a moving
19    vehicle, have you received any specific training on
20    what you should do vis-a-vis a moving vehicle if
21    you're trying to stop it?
22    A.  I can't recall what training I've had.  I have
23    observed videos during -- it wouldn't be specific
24    training on that specific item.  It probably would

Page 53

1    have been either a use of force or more likely a
2    weapons qualification type of training where they
3    would have shown us -- I recall on my 19 years of
4    seeing videos of different weapons being utilized on
5    vehicles moving and not moving and what they do to it
6    and what they don't do to them.
7        Other than that, I can't give you a date
8    and time.  I can't give you what the training was.
9    But I do recall having that type of information given
10    to me through videos and some type -- like I said, I
11    don't know what actual training it was.  I know I've
12    never had training on something saying training on
13    shooting at a moving vehicle.  There's never been
14    anything dealing with that.  It would have been
15    encompassed in some other type of training, you know.
16    Q.  Would it have been In-service versus academy?
17    A.  I've had a lot of training in-service and out
18    and -- other agencies.  So I don't know when it would
19    have been or what type of training it would have been.
20    Q.  So what other agencies have provided you with
21    training?  Have you gone to like the FBI training
22    academy in Quantico, Virginia?
23    A.  I've been trained -- I'm an expert in
24    electronic surveillance.  I've been trained by the

14 (Pages 50 to 53)

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

>    Kester I.H. Crosse, Esquire
>    Williams & Crosse
>    1214 King Street
>    Suite 300
>    Wilmington, DE  19801

I hereby certify that on February 21, 2007, I have sent by U.S. Regular Mail, the

foregoing document to the following non-registered participants:

>    Anne T. Sulton, Esquire
>    Post Office Box 2763
>    Olympia, WA 98507

>    John A. Parkins, Jr. (#859)
>    Richards, Layton & Finger, P.A.
>    One Rodney Square
>    P.O. Box 551
>    Wilmington, Delaware 19899
>    (302) 651-7700
>    Parkins@rlf.com

RLF1-3116876-3