**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HARRY SMITH, JR. and
ROSLYN WOODARD SMITH,
Individually and as Administrators of
The ESTATE OF HARRY SMITH, III,

      Plaintiffs,

v.                                  CIVIL ACTION NO. 04-1254-GMS

CITY OF WILMINGTON,

JOHN CIRITELLA, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

THOMAS DEMPSEY, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department, and

MATTHEW KURTEN, in his individual capacity
and in his official capacity as a police officer of
the Wilmington Police Department,

      Defendants.

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

---

**Plaintiffs' Attorneys**

Anne T. Sulton                     Kester I.H. Crosse [Bar I.D. 638]
Post Office Box 2763             1214 King Street, Suite 300
Olympia, WA 98507              Wilmington, DE 19801
Telephone: (609) 468-6029       Telephone: (302) 652-3141
E-Mail: annesulton@comcast.net    E-Mail: kesterih@aol.com

Dated this 7th day of March 2007

## TABLE OF CONTENTS

Page

I.       Table of Citations                                        3

II.      Nature and Stage of Proceeding                            4

III.     Statement of Facts                                        5

IV.      Summary of Argument                                       26

V.       Argument                                                  27

VI.      Conclusion                                                34

VII.     B - Appendix / Attachments

**Please note: Two of these exhibits are being sent to the Court under seal, because defendants marked them confidential during discovery.**

| **Page(s)** | **Exhibit** |
| --- | --- |
| 177- 186 | William Browne Report Excerpts [Filed Under Seal] |
| 187-210 | Elbert Waters Deposition Excerpts |
| 211-213 | Roslyn Smith Deposition Excerpts |
| 214-221 | Johnny Whitehead Deposition Excerpts |
| 222-230 | *Smith, et al. v. Cupp, et al.* (6th Cir. 2005) |
| 231-246 | *Scott v. Edinburg* (7th Cir. 2003) |
|  | Videotape / Defendants' Interviews [Filed Under Seal] |

# I.  TABLE OF CITATIONS

Page

**Cases:**

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999)                    28

*Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000)            29

*Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 392 (3d Cir. 1998)        27

*Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006)                 27, 29

*Curley v. Klem,* 298 F.3d 271 (3d Cir. 2002)                  27

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*,

     442 F.3d 812, 820 (3d Cir. 2006)              27

*Ellis v. Wynalda,* 999 F. 2d 243 (7th Cir. 1993)               28

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)          29

*Scott v. Edinburg,* 346 F. 3d 752, at 756 (7th Cir. 2003)            27

*Smith, et al. v. Cupp, et al.,* 430 F.3d 766, 772 (6th Cir. 2005)         28

*Smith v. Freland,* 954 F.2d 343 (6th Cir. 1992)                28

*Tennessee v. Garner*, 471 U.S. 1, at 11 (1985)                28


**Statutes and Other Authorities:**

Delaware Code, Title 11, Section 467(c)                    31

Federal Rules of Civil Procedure, Rule 56(c )                27

## II.  Nature and Stage of Proceeding

**Nature:**

On September 13, 2003, Mr. Harry Smith, III was shot to death by three Wilmington police officers.  Plaintiffs filed suit, alleging excessive force was used.

**Stage of Proceeding:**

On February 21, 2007, Defendants filed a supplemental motion for summary judgment on Plaintiffs' amended excessive force claim and new *Monell* claim.

Discovery is complete.

Defense counsel recently advised Plaintiffs' counsel that Dr. Jon Nordby, a key defense witness, is not able to travel to Wilmington for the trial (for the same reasons previously discussed with the Court).  Defense counsel indicated their intention to depose Dr. Nordby in Seattle prior to trial.  Plaintiffs do not object, as long as same is approved by the Court.

The case currently is set for a five-day jury trial on April 9, 2007.  Plaintiffs currently anticipate it will take three full days to put in their case in chief.  Counsel will submit an updated final pretrial report, consistent with the Court's 2/9/2007 revised Final Pretrial Order that is posted on the Court's website.

### III. Statement of Facts

1.      Harry Smith, III was an accomplished musician and college student.  He was 25 years old and had a twin brother.  Smith's vision was impaired, requiring he wear eye glasses. [B-211 to 213]

2.      On September 13, 2003, around 6:00 PM, Smith goes to a local hospital, complaining of mental health related ailments. He is accompanied by his father, plaintiff Harry Smith, Jr. [B-177]

3.      Before receiving treatment for his diagnosed ailment, Smith leaves the hospital. There is no evidence Smith is wearing his eye glasses. [B-177; B-179 to 182]

4.      It now is about 7:00 PM, and there still is daylight.

5.      Smith approaches a Wilmington Police Department marked squad car, driven by police officer Johnny Whitehead.  The car has emergency flashing lights on, engine running, and driver's side door open. [B-1; B-111 to 112]

6.      Without permission, Smith enters this car and drives off, with the emergency flashing lights on. [B-112]

7.       A Wilmington police officer shoots Smith, hitting him in the leg.  Smith then drives off.  [B-112]

8.      Whitehead, on foot, chases Smith in the car for about two blocks.  No other police officer checks on Whitehead's well-being or even offers him a ride. Whitehead subsequently gets a ride from a private citizen.  [B-214 to 221]

9.      Other Wilmington police officers are alerted to this unauthorized use of the car and also commence pursuit.  About two dozen police officers are involved in the pursuit.  Some are driving marked police cars; others are driving un-marked police cars.  They have emergency lights flashing and sirens wailing.  At least six police cars are traveling immediately behind the stolen car; others are traveling on parallel or intersecting streets. Among the Wilmington police officers involved in the pursuit are: defendant Ciritella, defendant Kurten, defendant Dempsey, Sgt. Debra Donohue, Det. Michael Lawson (took video out of stolen car), Sgt. William Browne, Officer Donald Dempsey, Det. Donna DiClemete (parked in 1100 block of West 5th Street), Officer Crawford, Officer Rentz, Officer Knoll (paralleled chase and stopped at 4th and Harrison), Officer Moody, Fiorvanti (stopped north of scene and says saw several other police cars), Draper, Gearhart (took up a traffic post at West 5th and Franklin Streets), Vega, Maggitti, Buhrman, Lenhardt, Gordon (was at 5th and Harrison Streets), Lucas, Gifford (helped take Smith out of car), Harvey, Frank, Villaverde (was at 6th and Harrison), H. Brown (was in 600 block of Harrison and says saw stolen car slowly roll to a stop), and Det. Stephen Misetic. [B-8; B-178]

10.     Police officer Whitehead believes one of the responding officers, Sgt. Donohue, radios in "shots fired".  [B-220]

11.     There is no radio or other communication saying an attempted car-jacking might have occurred.  [B-147]

12.     There is no radio or other communication saying an officer is down or injured. [B-147]

13. There is no radio or other communication saying anyone is injured or any property damaged. [B-147]

14. The pursuit lasts a few minutes and runs about one mile. [B-155]

15. The pursuit ends mid-way the 1100 block of West 5th Street, which is about ½ city block from the intersection of West 5th and Harrison Streets. Smith slows the car. The emergency lights on the stolen car still are flashing. [B-178.]

16. At this time, there are many privately-owned cars parked along both sides of 5th Street and both sides of Harrison Street. These are fairly narrow streets, allowing for parking on both sides of the street and one-way traffic. When cars are parked on both sides of the street, about three feet or so of space remains on either side of a car traveling down the middle of the street. The homes on these streets vary in structural components, some have brick faces. Others appear to be primarily wooden structure. All have windows facing the street, on both top and lower levels. [B-3]

17. The intersection of 5th and Harrison Streets is a densely populated low to moderate income neighborhood. [B-156]

18. At this time, there are many neighborhood residents on their porches and on the sidewalks near their homes, including, but not limited to: Marilyn Garcia, David Gwyn, Betty Gwyn, Carlos Maldonado, Jr., Elizabeth Maldanado, Bernard Thompson, Benesa Thomas, Manual Clinton, Carmen Garcia, Dwinghtnett Wright, Bernard Thompson, Flora Wallace, Dionne Lawds, Alberto Rivera, James Ford, Ernell Hudson, and Gladys Hines. [B-14; B-113 to 122]

19.     According to WPD Sgt. William Browne's Supplemental Report, Ciritella and Kurten pull their vehicles across the end of the 1100 block of West 5th Street, blocking the intersection of West 5th and Harrison Streets. They exit their vehicles and begin to approach Smith. [B-178]

20.     It is contrary to Wilmington Police Department (WPD) policies 6.7 and 6.8 for Ciritella and Kurten to use their police vehicles to block the intersection of 5th and Harrison Streets. [B-45 to 78]

21.     It is contrary to WPD policies 6.7 and 6.8 for Ciritella and Kurten to exit their police vehicles and approach a suspect without getting additional information from dispatch about the nature of the threat.  [B-45 to 78]

22.     At this intersection, there is a stop sign which is located a few feet from the corner of the brick home, where Marilyn Garcia is sitting on the front steps.  On the other side of this stop sign is Ciritella's parked un-marked police car.  There is a space of several feet between the front of Ciritella's parked car and the curb.  There is enough space between the stop sign and the front of Ciritella's car for another car to pass without striking Ciritella's car or the stop sign.  However, to pass likely would require driving diagonally over the curb of the sidewalk.  There is not enough space between the stop sign and the corner of the brick home for a car to pass. [B-4]

23.     According to Sgt. William Browne's Supplemental Report, Ciritella tells Smith to exit the car.  At this time, "Ciritella was located on the sidewalk" and then "suddenly" Smith "accelerated and drove directly at Det. Ciritella on the sidewalk." [B-178.]

24.    According to Ciritella, with his gun drawn, he takes cover at the corner of the brick building located at the intersection of West 5th and Harrison Streets, then leaves his position of cover, then takes a few steps into West 5th Street, then yells for Smith to exit the stolen vehicle, then sees Smith accelerate the stolen car toward him in an attempt to run him over, then backs up and fires about three shots.  [B-4, B-28, B-109, B-110, B-157, B-158]

25.    According to the Delaware Attorney General's report, Ciritella says he is not certain Smith even sees him. [B-204]

26.    Three bullets go through the windshield at an angle on the passenger side of the stolen car, showing the stolen car was passing Ciritella when he fired his first three or so shots.  [B-2 and 84]

27.    Ciritella says as he fires he has his target in sight and a clear backdrop, and he knows he hits Smith in the right arm. [B-158]

28.    When interviewed on September 13, 2003, Ciritella says he runs after the car and continues shooting. [Videotape of this interview being sent to the Court under seal.]  In his Answer to the Complaint, Ciritella also says he was running.

29.    During his deposition, Ciritella says he is walking on the sidewalk of Harrison Street for a few yards and then steps into Harrison Street, all the while continuing to shoot at Smith until all 13 bullets are fired from his gun.  [B-159]

30.    According to Sgt. William Browne's Supplemental Report: "When Det. Ciritella gained a clear line of fire, he fired additional rounds … During this time Det. Ciritella was aware of the other officers firing."

31.    During his deposition Ciritella said:

**Page 107**

**17    Q. Was there ever a time where you became aware**

**18    that there were people on the street and on the**

**19    porches?**

**22    A. I never saw any people. The only person that I**

**23    saw was Sergeant Dempsey, Tom Dempsey, and he would**

**24    have been in this area. He's the only person that I**

**Page 108**

**1.    saw.**

**15    Q. So as you're walking up the sidewalk, you saw**

**16    Mr. Dempsey, as well?**

**17    A. No. Again, I think this is my only visual of**

**18    him.**

**19    Q. Did you see any other police officers --**

**20    A. No, ma'am.**

**Page 115**

**7    Q. So my question is: Did you see Officer Dempsey**

**8    at any point between the corner of 5th and Harrison**

**9    and the point at which you put the car in park? Do**

**10    you recall seeing Officer Dempsey between those two**

**11    points?**

12      A. Other than the first time I saw him, no.

**Page 116**

7       Q. Now let me ask you about Sergeant Kurten. When

8       did you first see him?

9       A. Never saw him.

10      Q. Never saw him?

11      A. No, ma'am.

32.     According to Dempsey, during a March 8, 2004 interview: "I feel I'm in a good shooting position where I'm not endangering Officer Ciritella and I could not see that anyone else was in front of me. . . . I observed from my peripheral vision that Officer Ciritella was doing the exact same thing I was doing. He had locked back his weapon also, was reloading it the exact same time and also started on a tactical to the vehicle on the drivers, on the passenger side of the car. Uh I know we both made eye contact and we were looking you know make sure we you know knew what both of us were doing."

33.     According to Sgt. William Browne's Supplemental Report, Kurten "fearing for Det. Ciritella, fired at" Smith. [B-178.]

34.     During his deposition, Kurten admits he starts firing after any perceived danger to Ciritella passed. [B-162]

**Page 16**

20      Q. So at the point at which you fired two or three

21    **shots, where was Officer Ciritella then standing?**

22    **A. I believe he was back or at the corner of the**

23    **building, 5th and Harrison, northeast corner.**

### Page 23

8    **Q. When you fired the second two or three shots,**

9    **how far do you think you were from the car?**

10    **A. From the rear of the car or from where**

11    **Mr. Smith sat or what point are you looking at?**

12    **Q. From the rear bumper of the car.**

13    **A. Rear bumper?**

14    **Q. Yes, sir.**

15    **A. I'd say anywhere from 12 to 17 feet.**

35.    Kurten stops firing when Ciritella and Dempsey stop firing.  [B-163]

36.    According to Sgt. William Browne's Supplemental Report, "At that time Officer Kurten was aware that there was an officer to his left and due to the defendant's [Smith's] actions, he was in fear for the officers safety as well as for the safety of civilians in the area." [B-183.]

37.    During his deposition, Kurten said [B-162 and 163]:

### Page 30

14    **Q. Did you see Officer Dempsey prior to the point**

15    **at which you fired your first two or three rounds?**

16    **A. I do not believe so.**

12

38.    According to Sgt. William Browne's Supplemental Report, Dempsey "observed Officer Kurten and Det. Ciritella approaching the defendant [Smith] with their weapons drawn.  …  he observed Det. Ciritella and Officer engage the defendant [Smith] and began firing." [B-184.]

39.    During his deposition, Dempsey said:

**Page 70**

**5    Q. Did you see Defendant Ciritella run up the**

**6    hill?**

**7    A. No.**

**8    Q. Did you see Defendant Kurten run up the hill?**

**9    A. I didn't see Kurten.**

40.    According to Sgt. William Browne's Supplemental Report, defendant Dempsey "began to fire … fearing for other officers as well as civilians in the area." [B-178.]

41.    During his deposition, Dempsey said, at page 44, lines 20 and 21: "I observed that several officers were starting to get out of their vehicles behind the suspect car." At page 46, lines 15 to 21, Dempsey states: "I waited, actually, a second because of a crossfire situation between myself and several officers down the block.  Once he started to pass me and I had a better backdrop of buildings and nobody was in the area, I started -- proceeded to fire my handgun at the driver's side window of the vehicle shattering same." [B-168]

42.     As the car rounds the corner, Dempsey sees Smith's hands turn the steering wheel.  Thus, Dempsey knows Smith does not have a gun in his hand. [B-170]

43.     Dempsey walks to keep up with the car as it slowly moves away from him. As the car is moving away from him, Dempsey fires until all 13 bullets from his gun are discharged, and then he stops to re-load, dropping his first bullet clip on the ground.  [B-171]

44.     Ciritella, Kurten and Dempsey claim they shot at Smith to protect civilians in the area.  [B-178]

45.     During his deposition, Ciritella said:

### Page 110

**2       Q. You saw no citizens, no civilians at all?**

**3       A. No, ma'am.**

45.     During his deposition, Kurten said [B-162 and 163]:

### Page 30

**9       Q. Did you see any citizens not involved in this**

**10      incident on the street or on their porches in the 500**

**11      block of Harrison Street when you discharged any of**

**12      the five shots?**

**13      A. No.**

46.     Dempsey said: "Once he started to pass me and I had a better backdrop of buildings and nobody was in the area, I started -- proceeded to fire my handgun at the driver's side window of the vehicle shattering same." [B-168]

47.    During his deposition, David Gwyn, a neighborhood resident, testified [B-113 to 117]:

60

14    Q.  Okay.  Between the time that you first noticed

15    Mr. Smith slumped over toward the steering wheel and the

16    time that the car stopped, were the officers still firing

17    their weapons?

18    A.  Yes.

19    Q.  After that car came to a stop, were the officers

20    still firing their weapons?

21    A.  Yes.

22    Q.  Were they behind the car?  On the side of the

23    car?  In front of the car?  Where were the officers?

24    After that car stopped and they were still firing their

61

1    weapons, where were those officers?

2    A.  At no time did I see them in front of the car.

3    At no time.

4    Q.  When that car first stopped, the officers were

5    still firing their weapons; correct?

6    A.  Yes.

7    Q.  Where were those officers?  Were they behind the

8      car?

9      A.  They was in the back of the car.

10     Q.  All right.  They were in the back of the car?

11     A.  Mm-hmm.

12     Q.  Was Mr. Smith slumped over the steering wheel at

13     the time that that car was stopped?  When you first

14     noticed that car stopped, was Mr. Smith still slumped

15     over or toward the steering wheel?

16     A.  Yes.

17     Q.  And were those officers still shooting?

18     A.  Yes.


48.     Marilyn Garcia, a neighborhood resident, was shot in the leg by one of the defendant police officers.

49.     According to Sgt. William Browne's Supplemental Report, "From interviewing each officer … none of them was aware that Ms. Garcia was on the corner and none of them reported seeing her." [B-186.]

50.     The shotgun was found in the trunk of the police car, where Wilmington police officers frequently place their shotguns.  [B-216]

51.     According to the coroner, Dr. Jennie Vershvovsky, all shots fired contributed to Smith's death.  During her deposition, the coroner testified [B-79]:

**10  Q. Were the other wounds, I mean I'm excluding the**

**11  gunshot wound to the head, either singularly or in**

**12  combination fatal?**

**13  A. I considered all the gunshot wounds which he**

**14  received equally attributing to his death.**

**15  Q. So the gunshot wounds, for example, to his**

**16  wrist contributed to his death?**

**17  A. Yes. We don't separate one wound from another.**

**18  We look at them as an aggregate.**

52.    After the shooting incident, all four shooting police officers are placed together in a single room for several hours before their brief interviews, lasting about ten minutes or less each.  During these brief interviews, Sgt. Browne can be heard coaching the officers on what they should say to explain their conduct.  [B-172; Videotape being sent to Court]

53.    None of the four shooting officers is directed to write a report.

54.    At page 26 of Kurten's deposition, he states [B-164]:

**3  Q. Is there any other situation involving a**

**4  serious police matter in which you did not write a**

**5  report?**

**6  A. No.**

**7  Q. Were you told why it was not necessary for you**

**8  to write a report in this case?**

**9  A. No, I wasn't told.**

55.     Wilmington Police Department policies 6.7 and 6.8 require Ciritella, Kurten and Dempsey to write reports.  [B-45 to 78]

56.     The photos of the police car, showing the trajectory of bullets, establishes that all of the 31 shots fired were fired while the defendant police officers were on the side of the stolen car or behind it. [B-2, 5 and 6]

57.     WPD trained these defendants not to shoot at moving vehicles, not to shoot if a citizen likely will be hit, not to use their vehicles as barricades, and to discontinue a vehicle pursuit if it appears likely a citizen will be injured. [B-139 to 141]

58.     According to Whitehead [B-139 to 149]:

### Page 31

20     Q.  In fact, you have been trained that you can't

21     use deadly force for a car theft?

22     A.  That is correct.

### Page 32

15     Q.  Did you get any training on whether or not you

16     can use your patrol vehicle as a barrier or a block to

17     block a street to stop a car chase?  Did you get any

18     training in that area?

19     A.  Now, see, I know we did, but I don't know if it

20     was after that incident.  The Attorney General's

21     Office said that you don't put yourself or your

22     vehicle to form a roadblock to prevent someone from

23   stealing a vehicle.

24     Q.   And you don't recall the exact time frame, but

### Page 33

1   is it fair to say that before the shooting incident no

2   one had specifically told you yeah, go ahead and put

3   your patrol car out there as a barrier?

4     A.   That's correct.   I don't think anyone would

5   condone that.

6     Q.   Have you ever heard of that before, somebody

7   using their car as a barrier in the city?

8     A.   Well, I'm pretty sure that there are those who

9   have done that, but that is not, that is not proper

10   protocol.

### Page 41

5     Q.   Is it your understanding that if someone steals

6   a police car then the police may use deadly force?

7     A.   Not for just stealing a police car, no.

### Page 50

1     Q.   Were you trained that if there's citizens on

2   the street and somebody else could get hit so,

3   therefore, you don't have a clear backdrop that you're

4     not supposed to shoot your gun?

5     A.  Yes.

### Page 58

8     Q.  Are you trained that it's okay to shoot at a

9     moving vehicle?

10     A.  It is not.

11     Q.  Say again?

12     A.  It is not.

13     Q.  It is not okay to shoot at a moving vehicle?

14     A.  Yes.

15     Q.  That's how you were trained?

16     A.  Yes.

### Page 60

21     Q.  Are the police vehicles ever checked by the

22     shift supervisor before you guys go out after roll

23     call?

24     A.  Seldomly.

### Page 61

1     Q.  Are they supposed to check them?

2     A.  I believe so, yes.

3     Q.  Did anyone check your vehicle on 9-13-03?

4     A.  No.

59. The videotape from the stolen police car's camera recently was produced, and is blank.

60.     According to Sgt. William Browne's Supplemental Report, "Each officer that fired in this incident acted in a manner consistent with departmental training and within guidelines of the force continuum.  … Their actions were also in accordance with departmental rules and regulations as specified in the Police Officers Manual section 6.7 V. sub-section A. paragraphs 1, 2, 3 and 4." [B-185 and 186.]

61.     Plaintiffs retained the services of two expert police witnesses.  Plaintiffs believe the Court will qualify them as experts at trial, given their training, knowledge and experience.  Plaintiffs' previously filed a copy of an expert report written by Mr. Elbert Waters, a former Chicago police officer.  According to Waters, all of the 31 shots fired by the defendant police officers are excessive force because it was not objectively reasonable for an officer to believe Smith posed a threat; the defendant officers had not exhausted all available means of apprehension; and their credibility is at issue because their stories are not plausible. [B-187 to 210]

62.     During his deposition, Waters said [B-187 to 210]:

**16   Q.   Okay.  And so you believe that there was an**

**17   unauthorized use of a vehicle and that they had no**

**18   right to shoot after the car passed?**

**19   A.   Yes.**

10   Q.   Okay.  But you told us earlier do not fault

11   Ciritella for the firing of the first shot or

12   shots?

13   A.   No, what I said was in the position that he

14   was in, he had the right to shoot, but he shot

15   after the car had passed him because the evidence

16   shows that the bullets came in from the side and

17   not the front of the vehicle.

18   Q.   Oh, okay.  So you believe that he did not

19   shoot when he had a right to do so?

20   A.   That's exactly what I'm saying.


11   Q.   Now, do you have an opinion as to whether

12   Mr. Smith posed a threat of significant injury or

13   death to others?

14   A.   I do not; I do not.

15   Q.   One way or another?

16   A.   He did not pose a threat to anyone.


9   Q.   Now, having reviewed the report at some

10   additional length, are there other items that

11   you'd like to point to which you believe to be

12  deficient?

13  A.    Well, in Ciritella's statement he says

14  that -- let's see.  Yes, here on Ciritella's

15  statement in the State's -- the Attorney General's

16  statement it says that the victim then accelerated

17  the stolen police vehicle toward Detective

18  Ciritella, who was standing on the side of the

19  street near the curb, but in Ciritella's statement

20  it says as the vehicle stopped, I gave verbal

21  commands for him to turn the car off, step out of

22  the vehicle, I know at which point again as I'm

23  fearing he doesn't see me.

24        And the conflict I see is here he's

25  saying that he was in a situation where he didn't


1  think the offender even saw him, and here it says

2  that he was on the curb in danger of getting hit.

3  Q.    Would you tell me what page of the

4  deposition of Ciritella you're reading from?

5  A.    That is on page 55, 13 to 24.

6  Q.    Okay.  And what page of the Attorney

7  General's report are you . . .

8  A.    Page 2, a little bit more than halfway down

9  the page.


12  Q.   Is it fair to say in your opinion that these

13  defendant officers were not forced to make a

14  split-second decision?

15  A.   I agree to that.  They did not have to make

16  a split sec -- a split-second decision to use

17  deadly force.


20  Q.   Are there any of the shots fired -- there

21  were 31 shots fired at the intersection and on the

22  street of Fifth and Harrison.  Are there any of

23  those shots fired of the 31 that you think were

24  appropriate for police officers to fire?

25  A.    From what I read in the documents and my


1  pictures of the dowel rods in the squad car, I see

2  no justifiable shots.


23  And let me take your back to paragraph

24  27 of your report on page 4.  Is there anything

25   that you have reviewed that leads to believe that

1   Mr. Smith was attempting to evade arrest by flight

2   once Detective Ciritella began firing his gun?

3   A.   No, I believe at that point he was trying to

4   escape pain.

## IV.  Summary of Argument

Defendants are not entitled to summary judgment.  The three defendant police officers did not reasonably believe Mr. Smith presented an imminent threat of death or serious injury to themselves or others in the immediate vicinity when they fired 31 bullets at Mr. Smith. Therefore, it was unconstitutional for them to use deadly force.  By failing to properly investigate allegations of excessive force and failing to discipline police officers when they use excessive force, the City of Wilmington created a custom, usage, or unwritten policy that allows City of Wilmington police officers to engage in acts of excessive force, which results in the death of civilians.  The custom, usage or unwritten policy demonstrates a deliberate indifference, on the part of policymakers of defendant City of Wilmington, to the clearly established constitutional rights of persons within the city, and was the cause of the violations of Mr. Smith's clearly established rights as alleged herein.

## V.  Argument

### A.  Standard of Review

Summary judgment is appropriate only when the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party.  Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 392 (3d Cir. 1998).   In deciding the motion, the Court must construe all facts and inferences in the light most favorable to the non-moving party. *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006).

The Court should not resolve credibility issues or weigh evidence on a motion for summary judgment.   *See Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006) ("A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."). If "disputed historical facts pertinent to determining objective reasonableness" of defendants' conduct exist, then "a decision on qualified immunity will be premature" and the matter must be submitted to a jury.  "A jury can evaluate objective reasonableness when relevant factual issues are in dispute." *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002).

A police officer may use deadly force if he reasonably believes "the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury".   *Scott  v. Edinburg,* 346 F. 3d 752, at 756 (7th Cir. 2003). For the Court's convenience, a complete copy of this decision is attached to the

Appendix, as pages B-231 to 246, in part, because Defendants' summary of this case is incorrect.

However, when "an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity". In other words, a police officer may not use deadly force after the threat expires. *Ellis v. Wynalda,* 999 F. 2d 243 (7th Cir. 1993); *Abraham v. Raso*, 183 F.3d 279 (3rd Cir. 1999).

Furthermore, a police officer may not use deadly force just because he believes the suspect is fleeing. "[W]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, at 11 (1985).

In their brief, Defendants extensively cite *Smith v. Freland,* 954 F.2d 343 (6th Cir. 1992), arguing this Sixth Circuit decision is dispositive of Plaintiffs' claims. However, 13 years later, on December 2, 2005, the Sixth Circuit, in the case of *Gabrielle Smith, et al v. John Cupp, et al.*, 430 F.3d 766, 772 (6th Cir. 2005), held it was not objectively reasonable for police to shoot and kill a man stealing a police cruiser when the evidence shows the shots were fired as the car was passing the police officer. The police officer claimed the man was trying to run him over and this is why he shot the man. The evidence showed the man was shot as he was "trying to flee in the cruiser". The court said: "Dunn shot Smith after the police cruiser was past Dunn and there was no immediate danger to anyone in the vicinity.

… Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force." This case is directly on point. For the Court's convenience, the entire decision is attached in the Appendix, at pages B-222 to 230.

When considering whether deadly force is appropriate, the Court should consider the number of police officers available to apprehend the suspect or "the ratio of officers to suspects". *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006).

A municipality is liable for acts pursuant to an unconstitutional policy, custom or practice. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). In *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000), the court held that a municipality is liable when a plaintiff shows his injury was caused by municipal action that was taken with deliberate indifference as to its known or obvious consequences.

### B. Defendant Police Officers' Belief Not Reasonable

Genuine issues of material fact are in dispute. Resolution of these facts requires credibility determinations. This is the province of a jury.

A reasonable jury could conclude the defendant police officers did not reasonably believe Mr. Smith posed an imminent threat of death or serious injury to the police officers or other persons in the immediate vicinity because they claim they did not see the neighborhood residents on their porches or sidewalks, including Ms. Garcia who was within inches of Ciritella and was shot by one of the defendants. The defendant police officers claim they did not see other police officers in front of

Smith.  They even claim they did not see each other as they walked up Harrison Street while shooting at Smith.

A reasonable jury could conclude the defendant police officers were not objectively reasonable in their actions because all 31 shots they fired were fired as Smith either was passing them or after he had passed them.   A reasonable jury could conclude the defendant police officers were close enough to see and did see Smith was not armed, was severely injured, and other non-lethal means to apprehend Smith were available and had not been exhausted, particularly given that there was a sufficient number of police officers in the vicinity (over 20) that would have prevented Smith's escape beyond the intersection 6th and Harrison Streets (which was ½ block away) because other police officers were at that intersection and Smith was driving a marked police car with lights flashing during daylight.

A reasonable jury could conclude the defendant police officers were not objectively reasonable in their actions because they violated numerous written Wilmington Police Department policies, including, but not limited to, using their cars as barriers [which WPD policy 6.8 (12) indicates is a show of deadly force], failing to get necessary information about the suspect before exiting their cars and approaching him, shooting at a moving vehicle, and shooting 31 .40 caliber hollow point bullets (among the most deadly used in civilian law enforcement) when they knew or should have known neighborhood residents (both those on the street and those inside their homes) might get hit.

A reasonable jury could conclude the defendant police officers were not objectively reasonable in their actions because they violated Delaware state law. Section 467(c) of Title 11 of the Delaware Code refers to law enforcement officials' use of deadly force. It states: "The use of deadly force is justifiable under this section if all other reasonable means of apprehension have been exhausted, and: (1) The defendant believes the arrest is for any crime involving physical injury or threat thereof, and the deadly force is directed at a vehicle to disable it for the purpose of effecting the arrest, or the defendant believes the arrest is for a felony involving physical injury or threat thereof; (2) The defendant believes that the force employed creates no substantial risk of injury to innocent persons; and (3) The defendant believes that there is a substantial risk that the person to be arrested will cause death or serious physical injury, or will never be captured if apprehension is delayed." The **"and"** is in the original. Because the **"and"** is there, all **four** of the conditions must be present before the defendant police officers reasonably can use deadly force.

There must be an **imminent** threat of death or serious injury before the defendant police officers reasonably can use deadly force. Wilmington Police Department Policy 6.7 states: "V. Procedure: A. Parameters for use of deadly force: … 3. An officer is authorized to use deadly force if the officer has probable cause to believe that the suspect poses an imminent threat of serious physical harm to the officer or others."

A reasonable jury could conclude the defendant police officers' version of the events cannot be believed because they claim they shot Smith because they knew a

31

shotgun was in the driver's portion of the car. The evidence shows the WPD policy specifically requires the shotgun be placed in the trunk of the car, and this was routinely done by WPD officers.

Because there are genuine issues of material fact in dispute, which a jury must decide, summary judgment is not appropriate.

### C. Defendant City of Wilmington Was Deliberately Indifferent

A reasonable jury could conclude the City of Wilmington was deliberately indifferent to the constitutional rights of persons within the city and was a cause of the violations of Smith's clearly established rights because it had a custom, usage or policy of not properly investigating allegations of excessive force and not disciplining officers using excessive force.

The City of Wilmington did not require the defendant police officers to write any reports on this incident. It only spent about 10 minutes interviewing each officer, as the videotaped interviews clearly show. [The videotape is being sent to the Court.] The investigation the City conducted was so inadequate that it did not even determine which of the defendant police officers shot Marilyn Garcia.

The City of Wilmington did not discipline police officers or take proper remedial action when they previously used their patrol cars as barricades. Whitehead testified that he was "pretty sure" other WPD officers had used their patrol cars as barriers. The custom was to condone this type of conduct. According to WPD written policies, using a patrol car as a barrier or blockade is considered a show of deadly force. WPD policy 6.8 (12) says: "a police officer must always remember

that attempting to stop the pursued vehicle by boxing-in, cutting off, ramming, or other force may constitute the use of deadly force and such attempts to stop the pursued vehicle are governed by the standards listed in the policy directive dealing with the authorized use of firearms, 6.7."

Furthermore, the City of Wilmington did not discipline the defendant police officers, despite its knowledge that they violated numerous WPD written policies and state laws pertaining to the use of deadly force.

The custom, practice and policy of the City of Wilmington permits and/or makes it likely or conducive that City of Wilmington police officers, including the defendant police officers, will engage in acts of excessive force, which cause or result in the type of conduct that occurred in this case and as alleged in this complaint.

## VI. Conclusion

Plaintiffs respectfully request that this Honorable Court deny Defendants' motion and supplemental motion for summary judgment. They request oral argument.

March 7, 2007.

s/ Anne T. Sulton
Anne T. Sulton
Admitted: Pro Hac Vice

Sulton Law Offices
Post Office Box 2763
Olympia, WA  98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**LOCAL COUNSEL:**

Kester I.H. Crosse
Delaware State Bar I.D. #638
1214 King Street
Wilmington, DE  19801
Telephone: (302) 658-3488
E-Mail: kesterih@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2007, I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Attorney John Parkins     E-mail Parkins@rlf.com

I also am sending via FedEx to the Court and Attorney John Parkins documents/videotape filed under seal.

s/ Anne T. Sulton
Anne T. Sulton