IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

HARRY SMITH, JR., and ROSLYN

WOODARD SMITH, individually and as

Administrators of the ESTATE OF HARRY

SMITH, III,

    Plaintiffs,

VS.           C.A. NO. 04-1254-GMS

CITY OF WILMINGTON, JOHN

CIRITELLA, THOMAS DEMPSEY and

MATTHEW KURTEN,

    Defendants.

_____

VIDEOTAPE DEPOSITION

OF

ELBERT WATERS

September 14, 2006

ALPHA REPORTING CORPORATION

236 Adams Avenue

Memphis, Tennessee 38103

(901) 523-8974

www.alphareporting.com

Please note:  The page numbers might differ from the printed version of the original transcript.  This is an electronic version, sent via E-mail.

21          ELBERT WATERS,

22   having been first duly sworn, was examined and

23   testified as follows:

6

19   Q.   When were you first contacted to serve as an

20   expert in this case?

21   A.   Approximately three months ago.

22   Q.   What were you asked to do?

23   A.   I was asked to render an opinion on a police

24   event that involved what appeared to be excessive

25   force and a death.

19

1   Q.   Did you write a report?

2   A.   Yes, I did.

3   Q.   Was -- did you write a report -- only one

4   report or did you write more than one?

5   A.   I just wrote one.

6          MR. PARKINS:  I'm going to ask

7   the court reporter to mark this as Waters Exhibit

8   1, and then I'll ask you to take a look at it.

9               (WHEREUPON, THE

10   ABOVE-MENTIONED DOCUMENT WAS MARKED AS EXHIBIT NO.

11   1 TO THE TESTIMONY OF THE WITNESS, AND IS ATTACHED

12   HERETO.)

13   BY MR. PARKINS:

14   Q.   Would you -- now that you have Waters

15   Exhibit 1 in front of you, would you, first of

16   all, satisfy yourself that this is the report that

17   you wrote and then also tell me if there is

18   anything that you feel should be changed in this

19   report or anything which should be added to this

20   report since you've written it?

21   A.   May I have a minute, please?

22   Q.   Certainly.

20

6   BY MR. PARKINS:

7   Q.   Mr. Waters, do you feel you've had enough

8   time to review the report?

9   A.   Yes.

10   Q.   The first question I had for you, in fact,

11   is this your report?

12   A.   Yes, this is.

13   Q.   And the second question I had for you is, is

14   there anything that you want to change or add to

15   the report?

16   A.   No, there is not.

54

13   Q.   Yeah.  Now, at some point in time if they

14   viewed Mr. Smith as stopping the car, what should

15   the officers have done?

16   A.   Proceeded to walk to him with the weapons in

17   their holsters.  Nobody said he had a gun; nobody

18   said he had any kind of weapon that could hurt

19   them other than a scalpel, which was not put on

20   the air, so at this point they had nothing but a

21   stolen car.

22 Q.   How do you know it was not put on the air?

23 A.   Well, it's based on testimony because in the

24 depositions each one was asked what were you

25 responding to, and each one said a police officer

55

1 had been taken, officer needed help.

2 Q.   Well, now, the officers on the scene,

3 Ciritella and?

4 A.   Uh-huh (affirmative response).

5 Q.   -- knew that shots had been fired; is that

6 correct?

7 A.   Yes.

8 Q.   And they did not know who fired the shots?

9 A.   That's correct.

10 Q.   Wouldn't it be reasonable for a police

11 officer under those circumstances to have his

12 weapon unholstered?

13 A.   As a matter of fact, quite to the contrary

14 because as a police -- professional police

15 officer, if you're involved with the decision of

16 taking somebody's life, which is the ultimate

17 decision a person can make, you have to have and

18 work on knowledge of facts, not assumptions.


14 A.   Well, here's the problem:  We're -- there's

15 a critical event that we're overlooking, and that

16 is as he approached the blockade, he all of a

17 sudden received a barrage of gunfire.

18  Q.   Who's he?

19  A.   Smith.

20  Q.   Okay.

21  A.   As he was driving.  It would seem reasonable

22  to expect that his actions weren't so much to get

23  away, but probably trying to get away from being

24  shot again as opposed to running the blockade at

25  that point; they didn't even give him a chance to

                          57

1  stop.


20  Q.   Okay.  Is it your understanding that the car

21  came to stop also on Fifth Street?

22  A.   It slowed down.

23  Q.   When the car began to slow down, what should

24  the officers have done?

25  A.   They should have then tried to stop the car

                          59

1  with the same technique of just halt at the car.

2  See, the timing of the event is such that the car

3  is slowing down.  All of a sudden there's a

4  barrage of fire, and the car picks up.  He may

5  have wanted to give up at that point, but they

6  didn't give him an opportunity.

7  Q.   Okay.  What was, in fact, Detective

8  Ciritella doing?

9  A.   In fact, what he was doing was standing on

10  the curb waiting for the car to come by so he

11  could shoot him to make him stop.  At no point in

12  his testimony did he say -- except when the car

13  was about a half block away, he ordered the car to

14  stop.  How could the driver possibly hear with the

15  commotion going on?  So this is what I'm saying,

16  the unreasonableness of the actions right there.

17  Q.    Okay.  Now, do you agree that when the car

18  began to accelerate -- let's assume for the moment

19  that Detective Ciritella said he thought the car

20  was driving at him.

21  A.   Yes.

22  Q.    Do you agree at that moment that Detective

23  Ciritella had the right to use deadly force?

24  A.   Yes.

25  Q.    So if the jury were to believe that the

61

1  first shot that was fired at Fifth and Harrison

2  Street was fired as the car was apparently

3  approaching Detective Ciritella, you would not

4  fault the police officers for that?

5  A.    No, but what happened is he also shot after

6  the car passed.

7  Q.    So what you are telling me then is you are

8  not faulting the police officers for initially

9  shooting but only are faulting the police officers

10  for shooting at him after the car passed?

11  A.    What I'm saying is this:  Ciritella was in

12  the right in the initial shot to protect himself

13  even though he put himself in danger, but once the

14  car passed, he still had nothing but an

15  unauthorized use of a vehicle.

16  Q.   Okay.  And so you believe that there was an

17  unauthorized use of a vehicle and that they had no

18  right to shoot after the car passed?

19  A.   Yes.

20  Q.   All right.  Now, what is the basis for your

21  testimony that the only crime that had been

22  committed was the unauthorized use of the vehicle?

23  A.   The testimonies that they had starting with

24  Whitehead's testimony from the hospital.  At no

25  point did they ever say there was a carjacking, a

                              62

1  person shot.

2  Q.   All right.  What else?

3  A.   Basically that's it.

4  Q.   Well, let's assume for the moment that the

5  jury were to conclude that Mr. Smith was driving

6  in an attempt to hit Detective Ciritella.

7  A.   Yes.

8  Q.   Assuming that to be the case.

9  A.   Yes.

10  Q.   Would you believe that there was more than

11  the unauthorized use of the vehicle?

12  A.   Well, Ciritella put himself in danger.  He

13  didn't have to stand in front of the car.  That

14   was his choice.  Just as Mr. Smith had the choice

15   of not stopping at the barricade, he had the

16   choice of not putting himself in the line of

17   danger.  It's one thing to be in a situation where

18   you have an offender, they jump in the car and run

19   you over.

20        It's another thing to see a car coming

21   a block away.  You put yourself in the middle of

22   the street.  You shout to stop knowing they can't

23   hear it, and then you step to the side so that you

24   can shoot into the car.


23  Q.   Would you take a look at item No. 3,

24   potential escape routes are limited by the

25   configuration of the city streets?

68

1  A.   Yes.

2  Q.    What is the basis for that opinion?

3  A.    The basis for that opinion was looking at

4   the map of the area that was involved, and as I

5   looked at the map from where it began and where it

6   ended, I see that Wilmington is an old city,

7   narrow streets, and I can tell because there are

8   so many one-ways.  In most urban districts when

9   you get in the city they're pretty much two-way

10   streets unless it's too narrow or like downtown in

11   the flat out downtown area.

12        As I look the map, I see from the

13  hospital to the conclusion of the event there is

14  nothing but one-way streets, and the problem is

15  that one way is blocked off because you have the

16  expressway so there wasn't too much he could do

17  because of the blockage of the expressway the

18  distance of the expressway.


11  Q.   Looking again at Waters Exhibit No. 1 -- and

12  again we're still on page 2 -- item 4, you recite

13  that an adequate number of police officers

14  responded for control and containment and all were

15  in close proximity to the stolen vehicle at all

16  times, either directly behind it, in front of it,

17  or paralleling in movements on adjacent streets.

18  Responding officers were aware of this.

19        How many police officers responded?

20  A.   As I remember, it was somewhere in the

21  vicinity of 22 to 24 police officers.


8  Q.   Now, if the police officer assumed for the

9  moment that the suspect fired the shots, wouldn't

10  it be fair to assume that the suspect was violent?

11  A.   The problem is we're basing this on an

12  assumption.  Police officers cannot -- when you're

13  involving deadly force -- assume anything.  You

14  have to work on facts, known facts.

20  Q.   Okay.

21  A.   What I'm trying to explain here is when it

22  comes to the use of deadly force, you can't act on

23  just the assumption that a shot has been fired.  A

24  police officer could be pulling his gun out of his

25  holster to threaten to stop somebody and the gun

                            81

1  could go off.  Somebody a block away responding

2  can say, wow, I heard a gun shot, shots fired.

1  Q.   Did you read any testimony about there was a

2  button on a console that will release the shotgun?

3  A.   No, but I did read this.

4  Q.   Can you just identify the document?  You

5  don't have to read it again unless you want to.

6  A.   I didn't see it in here, but every police

7  department that I know secures weapons that are

8  not on a police officer.  It's just standard

9  practice.

                            87

10  Q.   Okay.  But you told us earlier do not fault

11  Ciritella for the firing of the first shot or

12  shots?

13  A.   No, what I said was in the position that he

14  was in, he had the right to shoot, but he shot

15  after the car had passed him because the evidence

16  shows that the bullets came in from the side and

17  not the front of the vehicle.

18  Q.   Oh, okay.  So you believe that he did not

19  shoot when he had a right to do so?

20  A.   That's exactly what I'm saying.

18  Q.   And what does the Attorney General's report

19  say about that?

20  A.   Let's see.  It says the stolen police car

21  stopped accelerating and came to a complete stop

22  on Harrison Street approximately 116 feet north of

23  the intersection of Fifth Street.

24  Q.   Does it say earlier in that report it was

25  accelerating up Fifth Street -- up Harrison

                           98

1  Street?

2  A.   Okay.  It says, he continued on and

3  accelerated north on Harrison Street.

4  Q.   So you disagree with the Attorney General's

5  report?

6  A.   I thought we were talking at the point of

7  the roadblock.

8  Q.   No, we're talking about what happened when

9  he hit the parked car.

10  A.   All right.  The stolen police vehicle slowed

11  down as if to stop near the corner of Fifth and

12  North Harrison, so he's slowing down,

13  deaccelerating (sic) at Harrison and Fifth.

14        The officers approached the vehicle

15  with their service weapons drawn and ordered the

16  victim out of the vehicle.  It is at this moment

17  where they started shooting.

18      The victim then accelerated the stolen

19   police vehicle toward Detective Ciritella, who was

20   standing on the side of the street near the curb.

21   Detective Ciritella fired his weapon at the victim

22   and leaped onto the sidewalk.

23      Now, they say that he was slowing down

24   as he was approaching the officers.

25   Q.    My question is was he accelerating after he

99

1   hit the parked car?

2   A.    Okay.  When he -- this is what it says:  The

3   victim continued to drive onto the sidewalk, and

4   in an effort to drive to the police roadblock, he

5   rammed a parked Jeep on the corner of Fifth and

6   Harrison Streets.  He continued on and accelerated

7   north on Harrison Street.

8   Q.    So after he hit the car, according to that

9   report, he accelerated; is that correct?

10   A.    He accelerated.

118

4   Q.    What does the Supreme Court say about that?

5      A.    Well, here's some things that they've said.

6   The Court -- the Supreme Court concluded that the

7   government's interest in effective law enforcement

8   was insufficient to justify killing fleeing felons

9   who did not pose a significant threat of death or

10   serious injury to anyone.

11   Q.    Now, do you have an opinion as to whether

12   Mr. Smith posed a threat of significant injury or

13   death to others?

14   A.   I do not; I do not.

15   Q.    One way or another?

16   A.    He did not pose a threat to anyone.

17   Q.   Oh, I'm sorry.  All right.  Now, would you

18   take a look -- what leads you to the conclusion

19   that he did not pose a threat to anyone?

20   A.    Because in the -- during the entire chase,

21   which as I looked back, took not 30 minutes, but

22   more like five minutes.

23   Q.    Are you changing your testimony?

24   A.   I am because as I went back and looked at

25   his testimony, it didn't last but about five

119

1   minutes.  In that time -- in that five-minute

2   span, he ran over no one.  He didn't have any

3   crashes.

4         Now, that doesn't say he wasn't

5   reckless, but nevertheless no one got hurt.  The

6   one time somebody almost got hurt was when

7   Detective Ciritella stepped in front of the car.

8   That was the only time anyone ever said someone

9   was in danger.  And by the fact -- and you

10   previously asked me about does the length of a

11   chase make a difference, and it doesn't, but in a

12   case where a chase only lasts five minutes, that's

13   significant in the sense that it didn't last long

14   enough to pose threats to too much of anybody.

24   Q.   Now, you indicate on page -- looks like page

25   9 of your report that the explanations offered by

125

1   these officers for their actions is questionable.

2   What explanations are questionable?

3   A.   The explanations as to why they fired so

4   many shots.  The unlikelihood of some of the

5   circumstances as they evolved.  Detective

6   Ciritella states that he was in front of the car,

7   and he was telling the man the stop.  But yet he

8   also said he was beside the building taking

9   cover.

10        Now, if the car was going to run into

11   him, surely he would have hit the building.  You

12   know, if I'm standing beside a building as a

13   police officer, and then somebody coming at me,

14   they have a choice to hit the building or go some

15   -- a different direction.  That's one part.

16        The fact that when the officers were

17   shooting from behind, they couldn't even see in

18   the car because there's a partition that keeps

19   offenders in the back and the police in the front,

20   but when you're behind the car outside, you can't

21   see.  You can barely see through a police car.

22   You can hardly see the driver because that's where

23   usually there's a metal or some type of

24   reinforcement.

25  Q.   So if that's the case and if Mr. Smith were

                               126

1   slumped over and unconscious, they wouldn't be

2   able to see that, would they?

3   A.   If they were close, which they stated they

4   were within feet.

5   Q.   Oh, then they could see in the car?

6   A.   Yes.

7   Q.   Oh, well, then why were you telling me about

8   this -- something about the partition?

9   A.   Because -- it's important because we have --

10   you asked me about the plausibility of what they

11   said.  You're asking me -- here I said that the

12   explanations offered by these officers for their

13   actions is questionable.

14        Now, I did not see anything from any of

15   them that justified shooting the number of times

16   they did.  They didn't see a target, obviously,

17   but they said they did.  This is where I'm talking

18   about their actions are questionable, and as a

19   police officer who was involved in and witnessed

20   many controversial situations, it tells me that,

21   you know, it was possibly an attempt to legitimize

22   an illegitimate action.

23  Q.   Do you find fault with the fact that they

24   did not write a report on their actions?

25  A.   I do.

127

1  Q.   Why is that?

2  A.   Because every police shooting that I've ever

3  been involved in or witnessed, the police officers

4  had to give an account of their story.  That's the

5  fundamental basis of the investigation.


12  Q.   Keep going.  What other deficiencies are

13  there beside the two you've mentioned so far?

14  A.   Middle -- middle ways to -- well, really --

15  let's see, what line?  It says here -- where we're

16  talking about Ciritella, it said that the stolen

17  police vehicle slowed down as if to stop near the

18  corner of Fifth and North Harrison Streets.  The

19  officers approached the vehicle with their service

20  weapons drawn and ordered the victim out of the

21  vehicle.

22       Then here's the deficient part:  The

23  victim then accelerated the stolen police vehicle

24  toward Detective Ciritella, who was standing on

25  the side of the street near the curb.

141

1       Now, what I see deficient in that is

2  this:  How can a man be standing on the curb and

3  have his life in danger by being in the street?

4  This report says that he was on the curb.

5  Q.   All right.  So there's a discrepancy because

6  in the report says he's on the curb and Ciritella

7   said he's in the street?

8   A.   Right.

9   Q.   Now, you have told me repeatedly that

10   Ciritella was in the middle of the street.

11   A.    That's what he said he was in -- I -- I said

12   middle.  You keep saying I said middle.  If I said

13   middle, I said in the street --

14   Q.   Okay.

15   A.    -- he didn't say middle.

16   Q.   You don't know where in the street he was?

17   A.   I don't know, but he did say he was in the

18   street.  This says he was on the curb.

19   Q.    All right.  So if he were one foot from the

20   curb, would that be a material difference between

21   what he said and what the report says?

22   A.    Absolutely because if he was one foot off

23   the curb -- well, no, it wouldn't make a

24   difference because if he was one foot off the

25   curb, he'd still be in front of a parked car.

142

1   Q.   Okay.  All right.

2   A.   So he wouldn't be in danger.

3   Q.    What other discrepancies or deficiencies are

4   there in this report?

5   A.   That's pretty much the ones that I see.

-

9   Q.   Now, having reviewed the report at some

10   additional length, are there other items that

11  you'd like to point to which you believe to be

12  deficient?

13  A.   Well, in Ciritella's statement he says

14  that -- let's see.  Yes, here on Ciritella's

15  statement in the State's -- the Attorney General's

16  statement it says that the victim then accelerated

17  the stolen police vehicle toward Detective

18  Ciritella, who was standing on the side of the

19  street near the curb, but in Ciritella's statement

20  it says as the vehicle stopped, I gave verbal

21  commands for him to turn the car off, step out of

22  the vehicle, I know at which point again as I'm

23  fearing he doesn't see me.

24        And the conflict I see is here he's

25  saying that he was in a situation where he didn't

                              144

1  think the offender even saw him, and here it says

2  that he was on the curb in danger of getting hit.

3  Q.   Would you tell me what page of the

4  deposition of Ciritella you're reading from?

5  A.   That is on page 55, 13 to 24.

6  Q.   Okay.  And what page of the Attorney

7  General's report are you . . .

8  A.   Page 2, a little bit more than halfway down

9  the page.

                              159

8  materials whether Marilyn Garcia was hit directly

9  or by ricochet.

10  A.   I'm not an expert on ballistics, but one

11  thing we did learn in the Academy and in my

12  training with weapons is that the hollow-point

13  bullets don't ricochet.

14  Q.   Never?

15  A.   I can't say never, but we were told that the

16  difference between the regular bullet and the

17  hollow point is that the hollow point explodes on

18  impact, the bullet continues its path.


19  Q.   Is it fair to say that the event lasted a

20  mile or that the length in terms of distance and

21  the length in terms of time was determined by the

22  defendant police officers' decision rather than

23  anything that was independently done by Harry

24  Smith?

25  A.   It was their decision.

169

1  Q.   Is it fair to say that the defendant

2  officers could have selected a different place and

3  a different time to establish a roadblock?

4  A.   This is what I referred to when I was

5  responding to his question was there something

6  else that they could do.  They -- if that one

7  didn't work, they could have tried it again.

8  Q.   Is it your opinion that a second roadblock

9  may have been more effective because Harry Smith

10  was shot multiple times at the first roadblock?

11  A.   That's certainly a valid consideration.

12  Q.   Is it fair to say in your opinion that these

13  defendant officers were not forced to make a

14  split-second decision?

15  A.   I agree to that.  They did not have to make

16  a split sec -- a split-second decision to use

17  deadly force.


13  Q.   Would the -- in your experience and in your

14  opinion, would the responding officers, based upon

15  the information provided about shots fired --

16  would they seek additional information before

17  making the decision that they're going to use

18  deadly force?

19  A.   Yes.

20  Q.   And how is that -- can you explain your

21  response?

22  A.   Yes, a responding unit would normally ask

23  what do we have here, squad?  What are we chasing

24  this guy for?  Does he have a weapon?  Who has

25  been shot?

174

1       These are the normal, natural questions

2  that come over the radio to guide the police to

3  keep them from making a mistake.

4  Q.   Do you know of any situation where a call

5  for shots fired or officer needs assistance is

6  made and there not being additional information

7   before officers get out and use deadly force, not

8   be additional information about the condition of

9   the officer or officers making the call like

10  officer injured or office officer down or

11  something of that nature?

12  A.   No.

13  Q.   In the absence of hearing officer down,

14  officer injured, what would a reasonable police

15  officer assume had occurred?

16  A.   That it wasn't the offender that had the

17  shot, that did the shooting because if they had,

18  you would have heard officer down, shots fired at

19  an officer, those things, and, see, what I'm

20  trying to explain is this is like a marriage day.

21  You don't forget what happened on your marriage

22  day.

23        When you're involved with a shooting,

24  you make sure that you know everything that's

25  going on and everything that's happened.  You're

175

1   going to make sure that you know that a police

2   officer has been hurt or not been hurt because

3   that's going to determine your personal response

4   as you enter the conflict.

20  Q.   Are there any of the shots fired -- there

21  were 31 shots fired at the intersection and on the

22  street of Fifth and Harrison.  Are there any of

23  those shots fired of the 31 that you think were

24  appropriate for police officers to fire?

25  A.   From what I read in the documents and my

176

1  pictures of the dowel rods in the squad car, I see

2  no justifiable shots.

9            MR. PARKINS:  It would be

10  Exhibit 6.

11            MS. SULTON:  No, we have a

12  couple of other pictures here that have not yet

13  been marked, and you mentioned pictures in plural,

14  so take a look at this one photo that hasn't been

15  marked -- oops -- and see if -- you're also basing

16  your opinion on that, so we'll mark that.

17  A.   Well, what this tells me is that by the fact

18  that these bullet markings show that they were

19  shooting at a car that was going away from them,

20  not necessarily coming at them.

21  Q.   So none of the 341 shots in your opinion

22  were -- well, let me put it this way:  Were all of

23  the 31 shots fired an excessive use of force?

24  A.   Yes.

179

10  Q.   And are you referring to policy 6.3?

11  A.   Yes, I am.

12  Q.   So as you sit here today, it's your

13  understanding that the shotgun was supposed to be

14   placed in the trunk?

15   A.   Yes.


23        And let me take your back to paragraph

24   27 of your report on page 4.  Is there anything

25    that you have reviewed that leads to believe that

                           180

1   Mr. Smith was attempting to evade arrest by flight

2   once Detective Ciritella began firing his gun?

3   A.    No, I believe at that point he was trying to

4   escape pain.

                           182

1        C E R T I F I C A T E

2   STATE OF TENNESSEE:

   COUNTY OF SHELBY:

3

        I, DANA MAY WEBB, Court Reporter and

4    Notary Public, Shelby County, Tennessee, CERTIFY:

5

        The foregoing proceedings were taken

6   before me at the time and place stated in the

   foregoing styled cause with the appearances as

7    noted.

8

        Being a Court Reporter, I then reported

9   the proceedings in Stenotype, and the foregoing

   pages contain a true and correct transcript of my

10   said Stenotype notes then and there taken.

11

I am not in the employ of and am not
related to any of the parties or their counsel,
and I have no interest in the matter involved.

13

14        I further certify that in order for this
document to be considered a true and correct copy,
it must bear my signature seal, and that any
reproduction in whole or in part of this document
is not authorized and not to be considered
authentic.

17

18        Witness my signature this, the 29th day
of September, 2006.

19

20        _____

DANA MAY WEBB, Court Reporter

21

22   Notary Public at Large
For the State of Tennessee

23

My Commission Expires:

24                May 28, 2008