**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HARRY SMITH, JR. and ROSLYN | ) | |
| WOODARD SMITH, Individually and as | ) | |
| Administrators of THE ESTATE OF | ) | |
| HARRY SMITH, III | ) | |
| | ) | |
|      Plaintiffs, | ) | Case No. 04-1254-GMS |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF WILMINGTON, JOHN | ) | |
| CIRITELLA, THOMAS DEMPSEY, and | ) | |
| MATHEW KURTEN, | ) | |
| | ) | |
|      Defendants. | ) | |

**APPENDIX OF EXHIBITS TO**
**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR**
**SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Rosemaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
302-651-7700
parkins@rlf.com
fineman@rlf.com
Attorneys for Defendants

Dated: March 14, 2007

## TABLE OF CONTENTS

**PAGE**

Excerpts from the deposition of Joseph J. Stine ........................................................... SC1

Production page W0017 ............................................................................................ SC9

Production page W0030 ............................................................................................ SC10

Production page W0031 ............................................................................................ SC11

Excerpts from the deposition of Jennie Vershvovsky, M.D. ...................................... SC12

Excerpts from the deposition of Elbert Waters ......................................................... SC24

i

Smith, et al.
Joseph J. Stine

v.

C.A. # 04-1254-GMS

City of Wilmington, et al.
October 5, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR., and ROSLYN )
WODDARD SMITH, Individually and as)
Administrators of the ESTATE OF )
HARRY SMITH, III, )
 )
      Plaintiffs )
 )   Civil Action
v. )  No. 04-1254-GMS
 )
CITY OF WILMINGTON, JOHN )
CIRITELLA, THOMAS DEMPSEY and )
MATTHEW KURTEN, )
 )
     Defendants )

     Deposition of Joseph J. Stine taken
pursuant to notice at the law offices of Richards,
Layton & Finger, Esquires, One Rodney Square, Third
Floor, Wilmington, Delaware, beginning at 10:13 a.m.
on Thursday, October 5, 2006, before Christina M.
Vitale, Certified Shorthand Reporter and Notary
Public.

APPEARANCES:
     KESTER I. H. CROSSE, ESQUIRE (Not Present)
     WILLIAMS & CROSSE, ESQUIRES
       1214 King Street - Suite 300
       Wilmington, Delaware  19801

            - and -

     ANNE T. SULTON, ESQUIRE (Via Phone)
     SULTON LAW OFFICES
       Post Office Box 2763
       Olympia, Washington  98507
       For the Plaintiffs

     JOHN A. PARKINS, ESQUIRE
     TYLER O'CONNELL, ESQUIRE
     RICHARDS, LAYTON & FINGER, ESQUIRES
       One Rodney Square
       Wilmington, Delaware
       For the Defendants

**SC1**

Case 1:04-cv-01254-GMS    Document 172    Filed 03/14/2007    Page 4 of 29

Smith, et al.                                    v.                        City of Wilmington, et al.
Joseph J. Stine                        C.A. # 04-1254-GMS                  October 5, 2006

Page 106

1    Q.   Do you know of any others?
2    A.   None that come to mind at this moment.
3    Q.   So far and I don't want to put words into your
4    mouth, but I need to get a list, you have told me,
5    number one, you don't have more than one car with
6    lights and siren on because it's disorienting for the
7    other police officers; and, number two, you told me
8    that it's difficult to talk on the radio if there is a
9    siren going on, is that right?
10   A.   Right.
11   Q.   Is there any other reason?
12   A.   Yes, safety, safety for the officers involved.
13   If something is going on in front of the pursuit, you
14   have got half a dozen other cars kind of following
15   along with their lights and sirens on, there is a good
16   chance that they're not going to be aware of what is
17   happening up in front and they're going to wind up --
18   you are going to have one of those movie-type pile-ups
19   where you have six or seven police officers piled up
20   and they're seriously injured.
21       So, it's a safety factor for the police,
22   it's a safety factor for the citizenry.  One car with
23   lights and siren on driving through city streets in
24   pursuit is enough of a risk, you don't need more than

Page 107

1    that.
2    Q.   What evidence have you seen that police
3    officers were disoriented because there was more than
4    one siren and lights on?
5    A.   These are universally accepted precautions to
6    make sure these things don't happen.  Just because
7    somebody is lucky enough and something doesn't happen
8    doesn't mean you shouldn't take the precautions.
9    Q.   My question was --
10   A.   I don't see any evidence of anybody who was
11   disoriented specifically.
12   Q.   And you told me about it was difficult for
13   radio talk over the siren because there was sirens on,
14   am I right?
15   A.   Yes.
16   Q.   If one car had its siren on, wouldn't that be a
17   problem?
18   A.   It would be -- it would be -- it would be a
19   problem.  It's amplified the more cars you have
20   involved and especially the communications car, the
21   car that is relaying the route and talking to the
22   radio room, it becomes more difficult for them to get
23   information.
24   Q.   You said that another reason is the safety of

Page 108

1    the officers involved.  In this particular instance
2    did you see any injuries or problems for the officers
3    involved because of multiple use of sirens and lights?
4    A.   Nothing -- if you are asking me as an end
5    result did something happen, no, nothing did.
6    Q.   And your final factor was safety factors for
7    the citizenry.  I understand how you contend that the
8    citizens or at least one citizen was injured by the
9    shooting, but my question is a little bit narrower
10   here and, that is, did you see any evidence that the
11   citizens of the city were injured by reason of the
12   multiple lights and sirens?
13   A.   Not that they were actually injured, but
14   certainly that they were placed at risk of injury.
15   Q.   Now, on -- go down to the fourth item that you
16   gave me, that is, the continuing pursuit of Mr. Smith.
17   Mr. Stine, you have told me this already and I'm not
18   trying to badger, I have just forgotten what you have
19   said and I apologize to you.
20   A.   Okay.
21   Q.   When do you believe that the pursuit should
22   have been abandoned?
23   A.   Within a couple of blocks of the initiation of
24   it.

Page 109

1    Q.   Now, would that have been before or after Mr.
2    Smith turned off of Washington Street onto Seventh
3    Street?
4    A.   It would have been -- it should have been
5    terminated after he showed that he was not inclined to
6    stop and that he was making -- committing motor
7    vehicle violations that were placing people at risk.
8    Once that became evident, and that became evident
9    relatively quickly, then the police -- then the
10   pursuit became more dangerous than terminating it.
11   Q.   Is it fair to say that once Mr. Smith drove --
12   at the time Mr. Smith was driving the wrong way on
13   Seventh Street he was putting citizens at risk?
14   A.   Yes.
15   Q.   And he may or may not have done so even before
16   that event, am I correct?
17   A.   Yes.
18   Q.   We talked about the barricade a little bit and
19   I understand you to say that it was a violation of
20   standard police practices to use a barricade, am I
21   correct?
22   A.   Yes.
23   Q.   Is it always a violation of standard police
24   practices to use a barricade?

**SC2**

28 (Pages 106 to 109)

Case 1:04-cv-01254-GMS   Document 172   Filed 03/14/2007   Page 5 of 29

Smith, et al.                                    v.                      City of Wilmington, et al.
Joseph J. Stine                          C.A. # 04-1254-GMS                     October 5, 2006

Page 110

1    A. I'm trying to think of a time when it's
2  justified or when it's okay and I'm hard-pressed to
3  come up with any. It is so universally condemned and
4  so universally rejected as a viable tatic that it's
5  just not something that police officers do anymore.
6  It's not something that professional police officers
7  do when they're trying to stop a car that is fleeing.
8    Q. And I gather that's because it poses a risk to
9  the officers?
10   A. All the factors we talked about before, risk to
11 the officers, the person they're chasing, the
12 citizenry in general, overwhelming damage to property.
13   Q. And we have talked about Detective Ciritella
14 stepping out in front of the car as one of the other
15 numerous generally accepted practices, am I correct?
16   A. Yes.
17   Q. And I think we have already discussed that.
18 Why don't we move on to the next item on Page Four,
19 which is E, "Failure of on-duty supervisors, many of
20 whom were actively participating in the pursuit, to
21 exercise their supervisory authority to direct,
22 control and terminate the pursuit." Who were the
23 supervising officers here?
24   A. I don't know specifically by name, but I know

Page 111

1  that there were sergeants involved, I know there was a
2  lieutenant involved. I don't know if there were any
3  higher ranking people involved and that doesn't really
4  matter. Any police supervisor who is on the air has
5  the authority to terminate a pursuit because it's just
6  so widely acknowledged in the police profession how
7  dangerous these things are and that they really need
8  to be stopped, you don't let them go on, and that's
9  why you give the sergeants the authority to do it.
10   Q. Does this relate to the defendants in this
11 case, E?
12   A. Well, Sergeant Dempsey was on the air so he
13 could have terminated it. Actually, any police
14 officer could get on the air and say, You know what,
15 this is too dangerous, we have to stop. So, Detective
16 Ciritella could have done it. Officer Kurten could
17 have done it.
18   Q. Is it your testimony then that Officer Kurten
19 could have instructed the other officers, including
20 sergeants, to call off the pursuit?
21   A. That is what we strive for in police work, that
22 if somebody, anybody, has a clearer perception of what
23 is going on, whether that person be a cop and he is
24 telling the police chief that this is dangerous and we

Page 112

1  should stop, that that should be done.
2      MR. PARKINS: Why don't we take a break
3  It's five minutes left on the tape. Ann, do you want
4  to call us back in ten minutes?
5      MS. SULTON: I will, thank you.
6      THE VIDEOGRAPHER: We are going off the
7  record at approximately 2:28 p.m.
8      (Brief recess.)
9      THE VIDEOGRAPHER: We are back on the
10 record at approximately 2:43 p.m.
11   Q. If we continue on Page Four of your report in
12 Part G it says, "Failure to consider the ramifications
13 of forcing an encounter in a highly congested
14 residential neighborhood." Do you know whether the
15 defendants considered the ramifications and decided
16 that the benefits exceeded the risks?
17   A. What I do know -- I don't know for sure what
18 they considered. What I do know is what I can -- the
19 de facto evidence is where they chose to do this and I
20 do know that police officers are trained to try to
21 pick the best spot to make a regular vehicle stop, any
22 kind of a vehicle stop. When you have a vehicle stop
23 like this where you are going to use these kind of
24 tatics of barricades, you really should try to pick a

Page 113

1  spot that is more conducive.
2    Q. "Failure to consider the ramifications of
3  shooting at a moving vehicle", which is Part H, do you
4  see that?
5    A. Yes, sir.
6    Q. Is it your view that it is always a departure
7  from the standard of care of police officers to shoot
8  at a moving vehicle?
9    A. Only in extremely rare situations could a
10 shooting -- is a shooting at a moving vehicle
11 justified.
12   Q. So, these police officers when they were there
13 would have understood that in extremely rare occasions
14 it's okay to shoot at a moving vehicle?
15   A. Yes. If there was a child laying in the street
16 in the direct path of the car that was coming at it
17 and there was no way that that child could move and
18 the officer's only possible option was to shoot at the
19 moving vehicle, it would be a terrible option because
20 it probably wouldn't work, but at least he would be
21 able to try something.
22   Q. I would like to talk just a little bit more
23 about the paralleling of the chase and I believe you
24 told us that's one of the items that you fault the

29 (Pages 110 to 113)

SC3

Case 1:04-cv-01254-GMS    Document 172    Filed 03/14/2007    Page 6 of 29

Smith, et al.                                    v.                    City of Wilmington, et al.
Joseph J. Stine                          C.A. # 04-1254-GMS                    October 5, 2006

Page 126

1  Q.  And would you assume that the tire tracks
2  probably came from that?
3  A.  Yes, that's -- my speculation would be since he
4  was engaged with that car pushing it that the vehicle
5  is not equipped to do that and was having trouble with
6  traction.
7  Q.  Okay.  And I assume that you would -- strike
8  that.  Would you assume that he was flooring the car
9  and that's why the car was spinning?
10  A.  I couldn't make that assumption.  I don't know
11  what he was doing, but.
12  Q.  Is there any mention made of either the tires
13  screaming and the rubber smelling and all of that in
14  your report?
15  A.  No.
16  Q.  Is there any reason why you omitted that from
17  your report?
18  A.  I didn't think -- it was just further evidence
19  that he was trying to -- that he was pulling away from
20  the scene and I didn't think it was that -- I didn't
21  think it was that important.  I didn't think it was
22  reason to shoot him.
23  Q.  But was it important in your view to explain
24  why it wasn't important?  Does that make sense?

Page 127

1  A.  I didn't think it added anything to the
2  officer's justification or attempted justification for
3  shooting him.
4  Q.  There has been a theory floated about in this
5  case that Mr. Smith was simply trying to evade the
6  gunfire when he ran up over the curb and hit the
7  parked Jeep Cherokee and turned up Harrison Street.
8  Are you familiar with the fact that there is such a
9  theory?
10  A.  Yes.
11  Q.  Are you in a position to testify as to whether
12  that theory is valid or not valid or you have no
13  position?
14  A.  Well, I mean, I know that people generally
15  don't like to be shot at and people generally take
16  actions to avoid being shot at.  When I've been shot
17  at I duck, I get out of the way and most police
18  officers do, most people do.  When you know somebody
19  is shooting at you, you take evasive action.  So, it
20  wouldn't be beyond the pale to assume that one of the
21  motivations of Mr. Smith at that time was to try to
22  get away from the gunfire.
23  Q.  Is that the case or is it equally possible that
24  he was simply trying to evade police gunfire or not?

Page 128

1  A.  I put a comma in that sentence where you didn't
2  mean one.  Was trying to evade police gunfire or not?
3  He appeared to have been trying to evade the police by
4  his actions up until the barricade.  He continued to
5  be appearing to try to avoid them.  Whether he was
6  more motivated to avoid them because he was being shot
7  at?  I know I would be.  So, I don't know.  I can't
8  answer that question specifically, but I think it's
9  very possible that being shot at would have made him
10  even more motivated to try to get away from the
11  police.
12  Q.  If you assume that he turned the car in the
13  direction of Defendant Ciritella before gunshots were
14  fired, would you conclude that at least at that point
15  in time he was simply trying to evade the police and
16  not avoid gunfire?
17  A.  See, he had already been shot by a policeman
18  and so I don't know.  It is possible in his mind he
19  was afraid he was going to get shot again.  So, I
20  mean, that could have been the motivation for him
21  trying to avoid the police.  He could have been trying
22  to get to someplace safe where the police weren't
23  going to shoot him, somewhere where he could
24  surrender.  That's a possibility.

Page 129

1  I'm not saying exactly this is what
2  happened, but I am saying it is a possibility, it is
3  likely that he was trying to avoid the police by going
4  up on that curb to get around that barricade.  Why?  I
5  don't know.
6  Q.  I'm afraid that we are coming to the point in
7  time where we are going to have some do some artwork.
8  A.  Artwork, okay.
9  Q.  Let me get you some plain pieces of paper.  We
10  are going to get some unlined pieces of paper and
11  what I'm going to do is to ask you, if you could, in
12  the first instance draw a diagram of Fifth and
13  Harrison Street and indicate on the diagram where you
14  understand the cars, the two barricade cars, were and
15  where you understand the police officers were at the
16  time that Mr. Smith was driving down Fifth Street and
17  approaching the barricade.
18  MR. PARKINS:  John, for the record would
19  you mark that as a deposition exhibit, please?
20  MR. PARKINS:  Oh, certainly, Anne.
21  Q.  I'll explain this to you once the paper comes
22  so that you don't have to remember this.
23  MR. PARKINS:  Can we go off the record for
24  a minute?

33 (Pages 126 to 129)

Smith, et al.                                    v.                          City of Wilmington, et al.
Joseph J. Stine                          C.A. # 04-1254-GMS                      October 5, 2006

Page 142

1   Q.  Have you seen any contrary evidence to dispute
2   in this case the identification by the ATF as to which
3   shell casings came from which weapon?
4   A.  Not yet, no.
5   Q.  When you reviewed Delaware law, did you look at
6   statutes, Delaware statutes?
7   A.  Yes.
8   Q.  Were these given to you by Ms. Sulton or were
9   these statutes that you independently obtained?
10  A.  I independently obtained.
11  Q.  Did you consider what possible crime Mr. Smith
12  was guilty of if the jury concluded that he tried to
13  run over Detective Ciritella on Fifth Street?
14  A.  If the jury came to the conclusion that what he
15  was trying to do was drive over the detective, there
16  could be an aggravated assault.  I actually don't
17  recall the specific phrasiology used for these crimes
18  in Delaware law.
19      I understand the concept of them,
20  aggravated assault being a more serious assault,
21  felonious assault or it could also have been judged to
22  be a simple assault.
23  Q.  My question was a little bit different.  Did
24  you attempt to determine what crime Mr. Smith would

Page 143

1   have been guilty of if the jury concludes he was
2   attempting to run down Detective Ciritella?
3   A.  Either an aggravated assault or a simple
4   assault.
5   Q.  You did attempt to do so, is that correct?
6   A.  Yes.
7   Q.  You did attempt to determine that?  What is the
8   crime if an individual recklessly kills a police
9   officer while the officer is in the performance of his
10  duties?
11  A.  What is the crime?
12  Q.  Yes.
13  A.  It's a homicide.
14  Q.  In what degree?  Do you know?
15  A.  I don't know the degree.
16  Q.  Assume for the moment that that were -- that it
17  is murder in the first degree to recklessly kill a
18  police officer during the performance of his duties,
19  what would an attempt to do so be?
20  A.  I'm not certain under Delaware law.  In many
21  places it would be the same, it would be a felony.
22  Q.  And would it be attempted murder?
23  A.  Yes.
24  Q.  Can we agree that at this point in time

Page 144

1   Detective Ciritella was a police officer?
2   A.  Yes.
3   Q.  And can we agree he was in the performance of
4   his duties?
5   A.  Yes.
6   Q.  Have you studied the constitutional parameters
7   of deadly force to prevent an escape?
8   A.  Yes.
9   Q.  Tell me your understanding of them.
10  A.  A police officer is justified in the use of
11  deadly force to prevent the escape of a fleeing felon
12  who has committed a forcible felony who is either
13  armed or possesses a weapon that could be used against
14  another person for commission of an additional felony
15  or that the officer feels that he -- there is no way
16  of him catching him, no reasonable way of him catching
17  him.  I believe that's the -- they're the requirements
18  or they're the standards.
19  Q.  Do you believe that a police officer is
20  justified under the constitution in using deadly force
21  to apprehend a fleeing felon if the officer believes
22  that there is a risk of harm to himself or other
23  citizens if the felon escapes?
24  A.  A reasonable belief, yes.

Page 145

1   Q.  If the jury concludes that in all likelihood
2   Mr. Smith was trying to run down Detective Ciritella,
3   would you agree with me that under those circumstances
4   it would be fair to consider him a felon?
5   A.  Not necessarily.
6   Q.  Is there something -- we are talking about a
7   police officer on the scene, is it reasonable if
8   somebody tried to run him down that they would
9   consider him a felon?
10  A.  It would depend on whether they thought -- some
11  juries sometimes would characterize that as a simple
12  assault and not an aggravated assault.  In that case
13  it wouldn't be a felon.
14  Q.  I asked you to assume that the jury tried to
15  run him down and kill him -- I didn't say that --
16  tried to run over and kill him.  Would you agree with
17  me under those circumstances that it was reasonable
18  for the police officers to then believe he was a
19  felon?
20  A.  Yes.
21  Q.  And we have already discussed the fact that
22  it's reasonable for the police officers to have
23  believed at that time that he was attempting to evade
24  police when he drove around the barricade?

37 (Pages 142 to 145)

SC5

Smith, et al.                                    v.                    City of Wilmington, et al.
Joseph J. Stine                        C.A. # 04-1254-GMS                      October 5, 2006

Page 146

1    A.   Yes.
2    Q.   And so, therefore, it would be reasonable for
3    the police officers to conclude that he was attempting
4    to escape?
5    A.   Yes. Yes.
6    Q.   So, then the issue becomes whether the police
7    officers believed that there was a threat of --
8    reasonably believed there was a threat to the safety
9    of the citizens of Wilmington if he were allowed to
10   escape, is that correct?
11   A.   Well, a greater threat than the threat that
12   they would impose by firing those shots in that
13   circumstance.
14   Q.   Let's now review what was known to the police
15   officers at this time.  Number one, they knew, did
16   they not, that Mr. Smith had been involved in some
17   event on Washington Street where the police officers
18   called -- on Washington Street called for back-up?
19   A.   Yes.
20   Q.   Is it correct to say the police officers
21   generally call for back-up when there is a potentially
22   dangerous situation?
23   A.   No.
24   Q.   Did -- what other circumstances would they call

Page 147

1    for back-up?
2    A.   Traffic control, they need some advice on how
3    to fill out a specific report, crowd control, and
4    included in that list would be if they felt there was
5    some sort of danger to them.
6    Q.   You told me at the beginning of your deposition
7    today that one of the advantages of listening to an
8    audiotape is to hear the inflection of the person
9    saying something, is that right?
10   A.   Yes.
11   Q.   Suppose for the moment that Detective Ciritella
12   were to testify that he heard over the radio the
13   officer on Washington Street call for back-up and he
14   could tell from the officer's tone of voice that this
15   was not an ordinary thing like a traffic control or
16   something of that nature, but that there was trouble.
17   Would that be something that police officers can
18   instinctively and reasonably do?
19   A.   Yes. You wouldn't know what kind of trouble,
20   you wouldn't know if it was trouble that it was
21   overwhelmed by traffic there, if there is a serious
22   motor vehicle accident, if somebody had fallen and
23   hurt themself, if his partner had just taken a heart
24   attack. I mean, you wouldn't know -- you would --

Page 148

1    from the tone of voice we -- police officers get to
2    know that there is a routine kind of asking for help
3    and then there is something that is a little
4    extraordinary.
5    Q.   So, you wouldn't disbelieve Detective Ciritella
6    if he were to testify, I heard the radio call from 16
7    Charles and I knew immediately something was wrong?
8    A.   No, I wouldn't contest that at all.
9    Q.   Then, the police officers including Detective
10   Ciritella knew that shots had been fired, is that
11   correct?
12   A.   Well, that was what the broadcast said, yes.
13   Actually it turns out it was incorrect.
14   Q.   But at the time on the street Detective
15   Ciritella had heard, "Shots fired"?
16   A.   Yes.
17   Q.   And we -- is it fair to say that Detective
18   Ciritella knew that the suspect had the police car?
19   A.   It's fair to say that he knew someone had the
20   police car, someone had the police car without the
21   permission of the officers or the police department.
22   Q.   We'll refer to him as a suspect just to make
23   life easy.
24   A.   Yes, but I don't want to -- I want to make it

Page 149

1    clear it wouldn't have been fair to say that he knew
2    that the fact that a person now had control of that
3    police car had any direct relationship to the shots
4    fired or direct relationship to the call for
5    assistance.
6    Q.   Would it be reasonable for Detective Ciritella
7    to have believed that having heard in the same
8    sentence essentially, Shots fired, shots fired, he is
9    in the car, that the firing of the shots had something
10   to do with the person in the car?
11   A.   It would be a leap.  It could be something that
12   you can infer from that, but it's certainly not a
13   given.
14   Q.   Then, would it be fair for Detective Ciritella
15   to have believed that whoever was in the stolen police
16   car had led the police on a chase?
17   A.   Yes.
18   Q.   And would it be fair for Detective Ciritella to
19   have believed that during this chase the stolen police
20   car went the wrong way on Seventh Street?
21   A.   Yes, but I just want to actually as far as the
22   question before you said led the police on a chase.
23   That's the whole problem with this.  We don't want to
24   allow criminals or someone who has taken a police car

38 (Pages 146 to 149)

SC6

Case 1:04-cv-01254-GMS    Document 172    Filed 03/14/2007    Page 9 of 29

Smith, et al.                                    v.                    City of Wilmington, et al.
Joseph J. Stine                         C.A. # 04-1254-GMS                 October 5, 2006

Page 178

1  for the officers on Fifth Street to believe that the
2  situation was coming to a close?
3  **A.  It was unreasonable, foolhardy and extremely**
4  **poor police tatics.**
5  Q.  Are you saying it was unreasonable for them to
6  believe that the situation was coming to a close?  Put
7  aside whether it was good police tatics or foolhardy
8  --
9  **A.  Yes, it was unreasonable.**
10  Q.  The next item you told me about that you
11  faulted was Smith was driving at Ciritella, which
12  caused him to use deadly force or words to that
13  effect?
14  **A.  It was the probable cause reason to use deadly**
15  **force.**
16  Q.  Okay, probable cause to use deadly force.  If
17  this jury were to conclude that Mr. Smith accelerated
18  the car and drove directly at Ciritella, would you
19  believe -- would you agree under those circumstances
20  that Ciritella had probable cause to believe his life
21  was in danger?  Would you like me to rephrase that?
22  **A.  Yes, please.**
23  Q.  Let's divorce this from the report for a
24  second.  If this jury is to conclude that Detective --

Page 179

1  that Mr. Smith accelerated the car, turned it in the
2  direction of Detective Ciritella, was it reasonable
3  under those circumstances for Detective Ciritella to
4  believe his life was in danger?
5  **A.  Possible, not definitively because he was able**
6  **to rather easily sidestep the car.  He had ready cover**
7  **available in the corner of the building, which he**
8  **abandoned.  So, whether that was a reasonable belief**
9  **that's part of the crux of this whole thing and it's**
10  **one of the things that I would have expected an**
11  **investigation that was not focused -- I know we are**
12  **not supposed to be talking about this now, but --**
13  Q.  Talk about whatever you want.
14  **A.  Since we started on that it's one of the things**
15  **I would have expected an investigation that was not**
16  **trying to justify these officers' actions to look**
17  **into, to examine.**
18  Q.  What is the basis for your testimony that
19  Detective Ciritella rather easily sidestepped the car?
20  **A.  Because he wasn't hit by it, he took two steps**
21  **to the side, the car passed him.  So, he was able to**
22  **do it.**
23  Q.  What do you mean by "easily", though?  Does the
24  fact that he accomplished it means it was easy?

Page 180

1  **A.  There were only a few seconds, which you talked**
2  **about, it only took a few seconds, and the fact that**
3  **he accomplished it means it was one of the options.**
4  Q.  How far did the car go -- pass by?
5  **A.  A foot or two, I believe.**
6  Q.  You are prepared to tell this jury -- this is
7  divorced from the report -- you are prepared to tell
8  this jury that as the car accelerated and turned in
9  the direction of Detective Ciritella it was
10  unreasonable for him to believe his life was in
11  danger?
12  **A.  Well, obviously by jumping out of the way you**
13  **are taking a step to preclude yourself from a danger,**
14  **what you think is going to hurt you, but what we are**
15  **talking about here is the shooting, the probable cause**
16  **for shooting this person, probable cause for firing**
17  **shots at this person.  So, yes, it was reasonable to**
18  **assume that if he got hit by this car, it was going to**
19  **hurt him and, yes, it was reasonable for him to take**
20  **some action to make sure that that didn't happen; and,**
21  **he did, he jumped out of the way.**
22  Q.  Now, once the officer was placed in danger if
23  he reasonably assumed that his life was in danger, do
24  you have probable cause to use deadly force in an

Page 181

1  attempt to save his life?  Let me rephrase that for
2  you.  Let's assume that the jury concludes that
3  Detective Ciritella reasonably believed that his life
4  was in danger when the car started to drive at him.
5  Under those circumstances do you believe he had
6  probable cause to use deadly force and I understand
7  your contention that he didn't reasonably believe his
8  life was in danger?
9  **A.  No, that's not my contention because he took a**
10  **step to get out of it.  What I'm saying is that the**
11  **use of deadly force was not a reasonable -- the use of**
12  **that deadly force in that circumstance was not a**
13  **reasonable response on the part of the officer because**
14  **it was not going to have the desired effect.  It was**
15  **not going to stop that car.  What he needed to do was**
16  **what he did, was jump out of the way.  He needed to**
17  **remove himself out of danger.**
18  **What I say is that, yes, there was a**
19  **reasonable belief on his part that he was in danger**
20  **and he took a reasonable step to avoid that danger by**
21  **jumping out of the way.  I don't think the reaction of**
22  **shooting the car was reasonable.**
23  Q.  You indicated that there was no reasonable
24  belief that Mr. Smith was armed.  Tell me what is your

46 (Pages 178 to 181)

Case 1:04-cv-01254-GMS    Document 172    Filed 03/14/2007    Page 10 of 29

Smith, et al.                                      v.                    City of Wilmington, et al.
Joseph J. Stine                          C.A. # 04-1254-GMS                      October 5, 2006

Page 182

1  understanding as to what the officers knew or at least
2  believed about the possibility of a shotgun in the
3  car.
4      A.  That the officers -- well, from pretty much
5  from the time the car had left -- the car was almost
6  -- my understanding is that the car was almost always
7  under observation of the police after it fled the
8  scene.  So, there wasn't any chance for Mr. Smith to
9  stop the car, go in the trunk and get the shotgun out
10 of the trunk.
11      My reading of Wilmington Police Department
12 directives says that the shotgun is to be stored in
13 the trunk and later on after this was eventually
14 discovered police officers in their depositions said
15 that that's where the shotgun was and that's where it
16 usually was and that's where they expected it to be
17 and, in fact, that's where it was.
18      So, there is no reason in my mind, my
19 opinion, there is no reason to believe that any
20 reasonable officer could have thought that Mr. Smith
21 had access to that shotgun, actual physical access to
22 the shotgun.  There was no broadcast about the knife,
23 that he had been armed with a knife, and there was no
24 indication there were any other weapons available.

Page 183

1      Q.  You say later on once this had been discovered,
2  what are you referring to?
3      A.  Well, early on, and in the reports by the
4  inspector general, by the city solicitor, by the city
5  -- by the police department internal affairs everybody
6  refers to the fact that one of the reasons they had to
7  use deadly force was because there was a shotgun in
8  the car, there was a shotgun in the car.  Nobody
9  mentioned that that shotgun was, in fact, in the
10 truck.  Everybody knew that that was in the room.
11 Everybody in the police department knew it, but nobody
12 mentioned it.
13      Q.  Did Ciritella know that when he was on the
14 corner of Fifth and Harrison Street?
15      A.  He should.  It was part -- it was the
16 departmental procedure, departmental policy.  He was a
17 member of that police department.
18      Q.  Well, let me ask you this.  That policy was
19 written, just trust me on this, in 1995, all right?
20      A.  Okay.
21      Q.  At the time in 1995 police cars did not have
22 gun racks that were purchased by the City of
23 Wilmington, did not have gun racks in the front
24 compartment.  Under those circumstances would you

Page 184

1  believe it would be reasonable to place the shotgun in
2  the trunk?
3      A.  Yeah, sure, sure.
4      Q.  You have been in patrol cars that have gun
5  racks in the front, haven't you?
6      A.  Yes.
7      Q.  And they're placed there to hold what?
8      A.  The shotgun.
9      Q.  And you have been in patrol cars that have had
10 shotguns in the front, haven't you?
11      A.  Yes.
12      Q.  It's not unusual?
13      A.  Not in Wilmington, yes.
14      Q.  Have you ever been in a Wilmington police car?
15      A.  Yeah, actually I have, a long time ago.
16      Q.  A long time ago before 1995?
17      A.  Yes.
18      Q.  And at the time there was no gun rack in the
19 car, was there?
20      A.  I don't think so.
21      Q.  Now, sometime after 1995 City of Wilmington
22 starts purchasing Crown Victoria police intercepters
23 which have gun racks in the front, all right?  Will
24 you just assume that to be the case?  And the police

Page 185

1  officers, did they not, testify that it was common
2  practice to carry the shotgun in the gun rack in the
3  front and it was simply a case where people neglected
4  or forgot or failed to modify the procedure that was
5  in place in the days when they purchased police cars
6  without gun racks?
7      A.  I don't know who testified to that.  I never
8  saw that testimony.
9      Q.  Did you see testimony that it was common
10 practice to place a shotgun in the front in the gun
11 rack?
12      A.  My recollection of what I read was that it was
13 common practice to put them in the trunk.
14      Q.  I will show this to you, but I want to read it
15 into the record first so that we have something and
16 then I'll let you take a look at it here, okay?
17 Rather than belabor this I'll ask you to look at this
18 late, butassuming for the moment that the jury
19 believes that Mr. Smith -- excuse me -- that the
20 officers reasonably believed there was a shotgun in
21 the front, and I know you don't believe that to be the
22 case, but would it be fair for them to conclude that
23 the officer was reasonable in believing that Mr. Smith
24 was armed or could be armed?

47 (Pages 182 to 185)

| Page: 1 | Report Date: 09/14/2003 | Agency: Wi...gton PD | | Complaint: 30-03-094484 |
|---|---|---|---|---|

## Supplemental Report - #7

| Occurrence Dates and Times: 09/13/2003  1849 | | Grid 222-222 | Sector 16 |
|---|---|---|---|

Original Location:
L1300  Block of North Washington ST    Wilmington, DE 19801

## Original Victim Information

| Victim Number 001 | Name STEVENSON, WILLIAM | | | | | |
|---|---|---|---|---|---|---|
| Type Individual | Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age 55 | D.O.B 07/13/1948 |
| Address 1313 Idlewood RD Wilmington, DE 19805 | | Resident Status Non Resident | Home Telephone (302) 636-0907 | Employer/School | | Work Telephone |
| Reporting Person? ☒Yes ☐No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments | | | |

## Original Suspect/Defendant Information

| Sequence 001 | Type Suspect | SBI Number | Name SMITH, HARRY J | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| Sex Male | Race Black | | Ethnic Origin Non-Hispanic | Age 25 | D.O.B 01/04/1978 | Height 5' 08" | Weight 255 | Skin Tone | Eye Color |

| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Address 18 PAYNTER ST Bear, DE 19701 | | Home Telephone (302) 654-3602 | Employer/School | Work Telephone |
|---|---|---|---|---|
| Arrest Number | Suspect's Clothing Description | | | |

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0836:00a4:F:B | Crime Description Carjacking First Degree Takes Possession Motor Vehicle Displays What Appears to be a Deadly Weapon or Represents by word or conduct that he or she is in Possession or Control of a Deadly Weapon |
|---|---|---|---|

| Type ...way/Roadway/Alley | Status Pending-Active | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 12233A - Robbery/Other Weapon Street/Alley/Highway | | |
| Burglary Force Involved ☐Yes ☐No | Weapon/Force Used Knife/Cutting Instrument | | |

## Investigative Narrative

This writer responded to the 500 block of N. Harrison Street in reference to a police vehicle pursuit involving shots fired. Upon arrival, this writer exited my police vehicle north of the crime scene, where I observed a black and white marked police vehicle with a black male driver. stopped in the middle of the block. The vehicle had what appeared to be several bullet holes about the vehicle. This writer observed several officers approach the vehicle and physically remove the black male driver from the vehicle placeing him on the ground and handcuff him. The black male did not utter any words. This writer also observed a white jeep facing north bound south of the black and white police vehicle, stopped in the east lane of the 500 block of N. Harrison. This vehicle had fresh front end damage and several bullet holes in its rear window. This writer also observed a black female sitting on the east sidewalk approximately 30 feet north of 5th Street, being attended to by several police officers. It appeared that this female had sustained a leg wound. This writer observed CID officers on the scene activly investigating the incident. This writer observed several other police vehicles and officers arriving on the scene and positioned them in such a way as to secure the crime scene. Additional officers were also positioned to provide crowd control. While at the scene this writer was approached by Officer Matthew Kurten who advised that he had discharged his departmental weapon. This writer took control of Officer Kurten's weapon and ammo. Upon notifying Capt. Maggitti of Officer Kurten's discharge, he advised that it was no longer necessary to secure his weapon and that it could be returned to him. This writer immediately returned officer Kurten's weapon and ammo to him. This writer did not check officer Kurten's weapon to determine the number of rounds remaining in his weapon. This writer remained on the scene for approximately two hours before turning the scene over to Sgt. Ciotti.

**SC9**

**W0017**

| Reporting Officer SGT FIORAVANTI  - 5895 | | Pending Supervisory Review | | |
|---|---|---|---|---|
| Solvability Factors | ☐Witness ☐Suspect... | ☐M O ☐S... | ☐Trace Stolen Property | ☐Suspect Named | Status |

| Page: 1 | Report Date: 09/15/2003 | Agency: W  ington PD | | Complaint: 30-03-094484 |
|---|---|---|---|---|

## Supplemental Report - #16

| Original Occurrence Dates and Times: 09/13/2003  1849 | | Grid 222-222 | Sector 16 |
|---|---|---|---|

Original Location:
1300   Block of North Washington ST   Wilmington, DE 19801

## Original Victim Information

| Victim Number 001 | Name STEVENSON, WILLIAM | | | | | | |
|---|---|---|---|---|---|---|---|
| Type Individual | Sex Male | Race White | | Ethnic Origin Non-Hispanic | | Age 55 | D.O.B 07/13/1948 |

| Address 1313 Idlewood RD Wilmington, DE 19805 | Resident Status Non Resident | Home Telephone (302) 636-0907 | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☒Yes ☐No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

## Original Suspect/Defendant Information

| Sequence 001 | Type Suspect | SBI Number | Name SMITH, HARRY J | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| Sex Male | Race Black | Ethnic Origin Non-Hispanic | Age 25 | D.O.B. 01/04/1978 | Height 5' 08" | Weight 255 | Skin Tone | Eye Color |

| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Address 18 PAYNTER ST Bear, DE 19701 | Home Telephone (302) 654-3602 | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0836:00a4:F:B | Crime Description Carjacking First Degree Takes Possession Motor Vehicle Displays What Appears to be a Deadly Weapon or Represents by word or conduct that he or she is in Possession or Control of a Deadly Weapon |
|---|---|---|---|

| Location Type ...way/Roadway/Alley | Status Pending-Active | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 12233A - Robbery/Other Weapon Street/Alley/Highway |
|---|---|

| Burglary Force Involved ☐Yes ☐No | Weapon/Force Used Knife/Cutting Instrument |
|---|---|

## Investigative Narrative

ON 13 SEP 03 THIS OFFICER (H. BROWN) RESPONDED TO THE CALL OF OFFICERS NEEDING ASSISTANCE AND SHOTS FIRED ON WASHINGTON STREET. AS THIS OFFICER WAS RESPONDING A VEHICLE CHASE BEGAN WHICH WAS TRAVELING TOWARD THIS OFFICER'S LOCATION. THIS OFFICER RESPONDED TO THE 500 BLOCK OF NORTH HARRISON FROM 6TH STREET AT WHICH TIME A PATROL VEHICLE WAS SLOWLY ROLLING TO A STOP AND A SUSPECT WAS TAKEN OUT OF THE VEHICLE AND PLACED ON THE GROUND INTO POLICE CUSTODY. AT THIS TIME THIS OFFICER OBSERVED A VERY LARGE GROUP OF DISORDERLY SUBJECTS AND ONLOOKERS AT THE INTERSECTION OF 6TH AND HARRISON. THIS OFFICER ALONG WITH PTLM. M. RENTZ IMMEDIATELY PLACED CRIME SCENE TAPE ACROSS HARRISON STREET AT 6TH STREET AND STOPPED ALL TRAFFIC AND PEDESTRIAN TRAFFIC FROM COMING INTO THE 500 BLOCK OF N. HARRISON FROM 6TH STREET. THIS OFFICER HELD THIS LOCATION FROM APPROXIMATELY 1900 HOURS TO 0200 HOURS ON 14 SEP 03, UNTIL BEING RELIEVED BY OFFICER GARCIA AT 0200 HOURS.

**SC10**

**W0030**

| Reporting Officer PTLW BROWN  - 7230 | Pending Supervisory Review |
|---|---|
| Solvability Factors | ☐Witness |

| Page: 1 | Report Date: 09/16/2003 | Agency: Wilmington PD | Complaint: 30-03-094484 |
|---|---|---|---|

## Supplemental Report - #17

| Occurrence Dates and Times: 09/13/2003  1849 | Gnd 222-222 | Sector 16 |
|---|---|---|

Location:
1300  Block of North Washington ST    Wilmington, DE 19801

## Original Victim Information

| Victim Number 001 | Name STEVENSON, WILLIAM | | | | |
|---|---|---|---|---|---|
| Type Individual | Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age 55 | D O B 07/13/1948 |

| Address 1313 Idlewood RD Wilmington, DE 19805 | Resident Status Non Resident | Home Telephone (302) 636-0907 | Employer/School | | Work Telephone |
|---|---|---|---|---|---|

| Reporting Person? ☒Yes ☐No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

## Original Suspect/Defendant Information

| Sequence 001 | Type Suspect | SBI Number | Name SMITH, HARRY J | | Nick Name |
|---|---|---|---|---|---|

| Sex Male | Race Black | Ethnic Origin Non-Hispanic | Age 25 | D.O.B. 01/04/1978 | Height 5' 08" | Weight 255 | Skin Tone | Eye Color |
|---|---|---|---|---|---|---|---|---|

| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Address 18 PAYNTER ST Bear, DE 19701 | Home Telephone (302) 654-3602 | Employer/School | | Work Telephone |
|---|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0836:00a4:F:B | Crime Description Carjacking First Degree Takes Possession Motor Vehicle Displays What Appears to be a Deadly Weapon or Represents by word or conduct that he or she is in Possession or Control of a Deadly Weapon |
|---|---|---|---|

| Type way/Roadway/Alley | Status Pending-Active | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 12233A - Robbery/Other Weapon Street/Alley/Highway | | |
| Burglary Force Involved ☐Yes ☐No | Weapon/Force Used Knife/Cutting Instrument | | |

## Investigative Narrative

In regards to this original incident, this officer, 13F (Villaverde) responded to the area of the 500 block of N Harrison St to assist. Upon arrival, this officer assisted by keeping a large crowd away from the crime scene. After the area was secured, this officer assisted with locating shell casings on the scene. Once all evidence had been secured, this officer was then assigned to a fixed traffic post at the intersection of W 6th and N Harrison St and was responsible for diverting pedestrian and vehicular traffic. This officer was then assigned to a fixed traffic post at the intersection of W 5th and N Van Buren St to block all vehicular traffic until relief arrived at approximately 0130hrs.

**SC11**

W0031

| Reporting Officer CPL VILLAVERDE  - 7068 | Pending Supervisory Review |
|---|---|
| Solvability Factors | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


HARRY SMITH, JR. and ROSLYN          )
WOODARD SMITH, individually and      )
as Administrators of the ESTATE      )
OF HARRY SMITH, III,                 )
                                     )
          Plaintiffs,                )
                                     )  Civil Action
v.                                   )  No. 04-1254-GMS
                                     )
CITY OF WILMINGTON, JOHN             )
CIRITELLA, THOMAS DEMPSEY and        )
MATTHEW KURTEN,                      )
                                     )
          Defendants.                )


          Deposition of JENNIE VERSHVOVSKY, M.D.
taken pursuant to notice at the law offices of
Richards, Layton & Finger, One Rodney Square, Third
Floor, Wilmington, Delaware, beginning at 2:10 p.m. on
Tuesday, May 30, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

          ANNE T. SULTON, ESQ. (Via teleconference)
          SULTON LAW OFFICES
            Post Office Box 2763
            Olympia, Washington  98507
            For the Plaintiffs




                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

                                        **SC12**



**WILCOX & FETZER LTD.**
Registered Professional Reporters



```
1    APPEARANCES:  (Cont'd)

2              JOHN A. PARKINS, JR., ESQ.
             RICHARDS LAYTON & FINGER
3               One Rodney Square - Third Floor
                Wilmington, Delaware  19801
4                  - and -
             ROSAMARIA TASSONE, ESQ.
5            CITY OF WILMINGTON LAW DEPARTMENT
                City/County Building - 9th Floor
6               Wilmington, Delaware  19801
                For the Defendants

7

8                      -   -   -   -   -

9                JENNIE VERSHVOVSKY, M.D.,

10        the deponent herein, having first been

11        duly sworn on oath, was examined and

12        testified as follows:

13                       EXAMINATION

14   BY MR. PARKINS:

15     Q.    Dr. Vershvovsky, I'm about to ask you a series

16   of questions concerning an autopsy that you performed

17   on or about September 14th, 2003 on Harry J. Smith,

18   III.

19            I'm afraid that I am not well-versed in

20   medical technology -- excuse me -- in medical parlance

21   so I may misspeak.  And if I ask you anything which is

22   unclear to you, please don't hesitate to tell me that

23   and I will attempt to rephrase my question.

24     A.    Okay.
```

1    Q.   Let me draw this for you.

2    A.   The bullet can't come from the left.  The

3    bullet has to come from the right or Mr. Smith's head

4    has to be turned to the right, to the side from where

5    the bullet was coming.

6    Q.   Now, assume for the moment that Mr. Smith were

7    sitting in the driver's seat of the car and he had

8    turned his head slightly to look at, say, if we think

9    of this as a clock with front ahead as being 12:00

10   o'clock and if he had turned his head slightly to,

11   say, look at 2:00 o'clock, could the bullet have come

12   from the right rear?

13   A.   From right, the bullet can come from right.

14   Q.   Yes.  In your view, if there were testimony

15   that he was being shot at from the left, it's not

16   likely that those shooters would have fired this

17   projectile?

18   A.   No.

19   Q.   Now let's take a look, if we could, at

20   paragraph numbered 13.  There's reference to a round

21   gunshot wound.  The previous one was a stellate wound.

22          Is there any significance to the fact that

23   this is round as opposed to stellate?

24   A.   Wounds have different appearance on the head

Jennie Vershvovsky, M.D.                    25

1    than on the body because on the head, as I explained,

2    we have a bone.  That is why we have a stellate wound

3    more often on the head.

4              On the body because we have skin,

5    underlying soft tissue bullets most common have round

6    entrance wounds.

7    Q.    Now, this particular wound entered Mr. Smith's

8    left upper back?

9    A.    Yes.

10   Q.    And do you have a photograph here?

11   A.    Yes.

12   Q.    This is wound number 2?

13   A.    Yes.

14   Q.    Did we recover a bullet for wound number 2?

15   A.    Yes, we did.

16   Q.    Now, did the wound number 2 strike the spinal

17   cord?

18   A.    No.

19   Q.    Did it strike any major arteries or organs?

20   A.    I didn't perform a dissection of the whole path

21   of the wound, so I can't tell you about the vessels,

22   but it didn't strike major organs.

23   Q.    The direction of the wounding is from back to

24   front.  Am I correct?

1    A.    Yes.

2    Q.    Assuming for the moment that Mr. Smith were

3    seated facing straight ahead in a police car, could

4    this wounding have come directly from his right?

5    Excuse me.  Directly from his left?

6    A.    This wound mostly come from the shooting, from

7    behind, from the back.

8    Q.    What was the path of the bullet once it entered

9    his body?  Did it go straight through or did it take

10   an angle?

11   A.    It went from back to front.  I recovered it in

12   the soft tissue of the chest.

13              I'll show you the X-ray of the bullet.

14   Q.    You're showing me what is --

15   A.    It's an X-ray of the bullet in the body intact,

16   before I took them out.

17   Q.    The round item is the bullet itself?

18   A.    Yes.

19   Q.    There appears to be sort of a --

20   A.    It's for us to orient how to find the bullet on

21   X-ray.  We put a metal object.

22   Q.    That's not anything to do with the bullet?

23   A.    (Witness shakes head).

24   Q.    I thought that.



Jennie Vershvovsky, M.D.                    31

```
 1      Q.    Let's take a look at numbered paragraph 16
 2   which is wound number 5.
 3      A.    16 will be wounds 8 and 9.
 4      Q.    And where were they?
 5      A.    Let me see.  This was a wound in the forearm,
 6   in this area (indicating).
 7      Q.    Near the elbow?
 8      A.    Yes.
 9      Q.    And which direction was this wound traveling?
10      A.    This wound was traveling right to left and
11   almost straight.
12      Q.    So, again, as with the shot to the head, this
13   could not have come from the left?
14      A.    This came from the right.
15      Q.    Was this what I sometimes refer to as a through
16   and through wound?
17      A.    Yes.
18      Q.    And you recovered no bullet?
19      A.    No bullets were recovered from both wounds
20   which we discussed.
21      Q.    By through and through that means to you that
22   it entered the body and left the body?
23      A.    Yes.
24      Q.    Do you know if this -- obviously it did not
```



SC17

1    intercept any major organs since it was in his arm.

2              Do you know if it interrupted any major

3    vessels?

4      A.   I didn't dissect the vessels.

5      Q.   Let's take a look, if we could, at paragraph

6    17, which is wound number 6.

7              You recovered a bullet for this, did you

8    not?

9      A.   Yes.

10     Q.   Where did this particular bullet strike

11   Mr. Smith?

12     A.   This bullet was recovered from the right leg.

13   Let me see if I can show you that.

14              I don't have a photograph of the entrance

15   wound, but I have a photograph of the place where I

16   recovered the bullet.  And if you look at the diagram

17   I gave you, it will show you where the entrance was.

18     Q.   May I take time out to make a photocopy of this

19   document?

20     A.   It's yours, yes.  It's your copy.

21              MR. PARKINS:  Mr. Fetzer, will you please

22   mark this as I guess number 2?

23              (Vershvovsky Deposition Exhibit No. 2 was

24   marked for identification.)

```
 1              (Discussion off the record.)

 2    BY MR. PARKINS:

 3       Q.    Doctor, on this chart it looks as if bullet

 4    wound number --

 5       A.    I don't have 5 here.

 6       Q.    Okay.  What number is 5?

 7       A.    5 will be -- I just had a photograph that I can

 8    show you.  The entrance I labeled number 6.  It was

 9    medial aspect of the knee.

10       Q.    And that means sort of right below or at the

11    knee on the right leg.  Is that correct?

12       A.    Yes.

13       Q.    And did this bullet remain in Mr. Smith?

14       A.    Yes.

15       Q.    Where did you find it or where was its path?

16       A.    We recovered this bullet in the soft tissue of

17    the posterior surface of the leg.  You can see on the

18    photographs the leg is turned.

19       Q.    Which paragraph, numbered paragraph does this

20    wound correspond to on the report?

21       A.    This is paragraph, my paragraph number 7.

22       Q.    7.

23              In the photograph it looks as if the

24    bullet is found near the surface on his right calf or
```

1    in that area.  Am I correct?

2    A.    Yes, in the soft tissue.

3    Q.    And it entered his leg near the knee.  Am I

4    correct?

5    A.    Yes.

6    Q.    Does that mean it was going in a somewhat

7    downward trajectory?

8    A.    It was going from front to back and it was

9    going down because here I was able to measure how far

10   from the top of the head was the entrance wound and

11   the place where I recovered the bullet.

12   Q.    This would have been consistent with perhaps

13   Mr. Smith sitting down and somebody standing up and

14   shooting into his knee?

15   A.    It's consistent.

16   Q.    Now, I need to be sure I understand something

17   here.  This is photographed as number 5.  Am I

18   correct?

19   A.    Yes.

20   Q.    But it relates, does it not, to paragraph

21   number 7 in your report?

22   A.    Yes.

23   Q.    What I need to do is figure out which bullets

24   relate to which paragraphs of your report.

1          Now, we have here a photograph of bullet

2    number 5.

3     A.    Yes.

4     Q.    Is that the one that was recovered from his

5    right leg?

6     A.    Yes.

7     Q.    So bullet number 5 relates to paragraph number

8    7 in your report?

9     A.    Yes.

10    Q.    Which bullet relates to paragraph number 6 in

11   your report?

12    A.    My paragraph 6?

13    Q.    Your paragraph 6.

14    A.    Number 7.  It says on the diagram number 7.

15    Q.    All right.  I see that now.

16          Where did number 7 strike Mr. Smith?

17    A.    This was a bullet with an entrance located on

18   the right upper arm and a bullet which went through

19   the skin and soft tissue of the upper arm and chest.

20   The bullet was recovered in the soft tissue of the

21   chest on the right side.  And I showed you the X-ray

22   there were two bullets.  This was one of the bullets.

23    Q.    So far as you can tell, it did not traverse any

24   major organs?

```
 1      A.    No organs.  But, again, I didn't dissect the
 2   vessels to see if there was damage to them.
 3      Q.    I'm sorry, Doctor, and this is me, not you,
 4   trust me.  But on wound number 7 I thought you told me
 5   it corresponds to bullet number 5, but the report says
 6   number 6.
 7      A.    Yes.  That's my -- I didn't put here the
 8   entrance wound.  It was 5 and 6.  I just forgot to add
 9   it in the report so it would be easier.
10      Q.    That's fine.
11            So number 5 is the bullet for item 7?
12      A.    Item 6.  5 and 6.  7 --
13      Q.    No.  But for number 5 is the bullet that
14   corresponds to wound number 7 on your report?  Am I
15   correct?
16      A.    The number of the bullets which you have on
17   this photograph correspond to how the bullet was
18   numbered here (indicating), not to the photograph
19   number.  The paragraph numbers have nothing to do with
20   it.
21      Q.    I understand that.  But what I am trying to be
22   sure I understand is that bullet number 7, which you
23   happened to have a photograph of in your hand at this
24   moment --
```

1      A.    Is the bullet from the shoulder.

2      Q.    From the shoulder which relates to injury

3   number 6 on your report?

4      A.    Number 5.

5      Q.    Number 5.

6      A.    I'm sorry.  Yes, number 6.  Paragraph number 6.

7      Q.    And I want to go back and make sure I have this

8   correct and, again, it's me, not you.

9           The head injury which is injury number 1

10  relates to bullet number 1?

11     A.    Number 1.

12     Q.    Injury number 2 relates to bullet number 2?

13     A.    Yes, the one which was recovered in the left

14  chest.

15     Q.    Yes.  Injury number 3, does that relate to

16  bullet number 3?

17     A.    Yes.

18     Q.    For injury number 4 no bullet was recovered?

19     A.    No.

20     Q.    Injury number 5 no bullet was recovered?

21     A.    Number 5, this was the place where I recovered

22  the bullet from the leg.

23     Q.    No.  I'm sorry.  It looks to me on your report

24  as injury number 5 is undetermined range perforating

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

HARRY SMITH, JR., and ROSLYN
WOODARD SMITH, individually and as
Administrators of the ESTATE OF HARRY
SMITH, III,

     Plaintiffs,

VS.                                    C.A. NO. 04-1254-GMS


CITY OF WILMINGTON, JOHN
CIRITELLA, THOMAS DEMPSEY and
MATTHEW KURTEN,

     Defendants.

---

VIDEOTAPE DEPOSITION

OF

ELBERT WATERS

September 14, 2006



ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, Tennessee 38103
(901) 523-8974
www.alphareporting.com

Page 122

1  Q.    What after that?
2  A.    After he drove away, then they should have
3  tried it again.  They should have pulled out the
4  strips that put holes in tires.
5  Q.    Do you know whether the officers had those?
6  A.    I don't.
7  Q.    Okay.  So let's assume for the moment that
8  there's no evidence that they did.  What should
9  they have done?
10  A.    Tried another blockade.
11  Q.    And is there any reason to believe it would
12  work better than the first one?
13  A.    Certainly.
14  Q.    Why?
15  A.    Circumstance of opportunity situation.
16  Another officer could have gotten in front of the
17  vehicle.
18  Q.    Which one?
19  A.    They could of -- one that was not involved.
20  Q.    Who?
21  A.    There are many names that were involved.
22  Q.    But who was in a position to get in front of
23  him?
24  A.    I don't know all the people who were around
25  in the area --

Page 123

1  Q.    Okay.
2  A.    -- at that location.
3  Q.    Did -- is there any evidence that either
4  Ciritella, Dempsey, or Kurten knew anybody that
5  was in the position to get ahead of them?
6  A.    Well, I can't speak to what they know, but
7  as a police officer who has plenty of experience
8  on the street, I know this:  When a police
9  activity of that magnitude occurs, everybody is
10  talking that needs to know what needs to be going
11  on.
12  Q.    Is it your answer you don't know of any
13  evidence that any of those three individual
14  officers were aware who -- or knew that somebody
15  was ahead of them that could have cut off
16  Mr. Smith again?
17  A.    Well, we're going back -- I don't know what
18  they knew, but I know as a police officer who did
19  16 years in the street listening to a radio every
20  day, I know that when you have a event of this
21  magnitude, everybody is listening and waiting for
22  direction from the sergeant because it's the
23  sergeant or the lieutenant's call to determine
24  whether the chase should be continued, whether the
25  chase should be discontinued, whether there should

Page 124

1  be deployment at this intersection.
2  Q.    Incidentally, you keep referring to your 16
3  years of experience as a police officer, and I
4  certainly don't wish to demean that in any way --
5  A.    Uh-huh (affirmative response).
6  Q.    -- but do you know whether the officers in
7  this event had more or less experience than you?
8  A.    Well, one had 19 years and another had, I
9  think, seven years, and the point is the time on
10  the job is of no material value in this
11  situation.  The fact of the matter is the
12  situation as it develops, either you can use
13  deadly force whether you've been on the force for
14  five year or 20 years or you can't.
15  Q.    Well, these individuals, is it correct, were
16  forced to make split-second decisions on the
17  corner of Fifth and Harrison Street?
18  A.    Yes.
19  Q.    So your view as to the plan that they could
20  have made would have been to try to head off
21  Mr. Smith again and see if he ran another
22  blockade; is that correct?
23  A.    That's correct.
24  Q.    Now, you indicate on page -- looks like page
25  9 of your report that the explanations offered by

Page 125

1  these officers for their actions is questionable.
2  What explanations are questionable?
3  A.    The explanations as to why they fired so
4  many shots.  The unlikelihood of some of the
5  circumstances as they evolved.  Detective
6  Ciritella states that he was in front of the car,
7  and he was telling the man the stop.  But yet he
8  also said he was beside the building taking
9  cover.
10       Now, if the car was going to run into
11  him, surely he would have hit the building.  You
12  know, if I'm standing beside a building as a
13  police officer, and then somebody coming at me,
14  they have a choice to hit the building or go some
15  -- a different direction.  That's one part.
16       The fact that when the officers were
17  shooting from behind, they couldn't even see in
18  the car because there's a partition that keeps
19  offenders in the back and the police in the front,
20  but when you're behind the car outside, you can't
21  see.  You can barely see through a police car.
22  You can hardly see the driver because that's where
23  usually there's a metal or some type of
24  reinforcement.
25  Q.    So if that's the case and if Mr. Smith were

Alpha Reporting Corporation
901.523.8974

**SC25**

Page 126

1  slumped over and unconscious, they wouldn't be
2  able to see that, would they?
3  A.    If they were close, which they stated they
4  were within feet.
5  Q.    Oh, then they could see in the car?
6  A.    Yes.
7  Q.    Oh, well, then why were you telling me about
8  this -- something about the partition?
9  A.    Because -- it's important because we have --
10  you asked me about the plausibility of what they
11  said. You're asking me -- here I said that the
12  explanations offered by these officers for their
13  actions is questionable.
14       Now, I did not see anything from any of
15  them that justified shooting the number of times
16  they did. They didn't see a target, obviously,
17  but they said they did. This is where I'm talking
18  about their actions are questionable, and as a
19  police officer who was involved in and witnessed
20  many controversial situations, it tells me that,
21  you know, it was possibly an attempt to legitimize
22  an illegitimate action.
23  Q.    Do you find fault with the fact that they
24  did not write a report on their actions?
25  A.    I do.

Page 127

1  Q.    Why is that?
2  A.    Because every police shooting that I've ever
3  been involved in or witnessed, the police officers
4  had to give an account of their story. That's the
5  fundamental basis of the investigation.
6  Q.    Didn't they give a statement that very
7  evening?
8  A.    They did to an officer.
9  Q.    What purpose would a written statement have
10  done that was not done on the videotaped
11  statement?
12  A.    I guess you could say that it was the same.
13  Q.    So what difference does it make whether they
14  gave a written statement?
15  A.    The technicality that here's what I'm
16  telling happened in my own writing.
17  Q.    Wouldn't that be the same whether it was an
18  oral statement or a written one?
19  A.    Well, in an oral statement the thought flow
20  is guided. What happened? What happened here?
21  If you ask me to write a report on what happened,
22  I write in an unguided fashion, and you get a
23  clearer picture of what I perceived to have
24  happened as opposed to guiding me to what
25  happened.

Page 128

1  Q.    Do you -- are you saying that the questioner
2  guided these individuals as to what happened?
3  A.    I'm saying that's a possibility.
4  Q.    Did you listen to the interviews?
5  A.    I did not.
6  Q.    Did you know that there were interviews?
7  A.    I'm sure there were, but I haven't seen
8  those.
9  Q.    Did you ask to see them?
10  A.    No.
11  Q.    Wouldn't that have been important?
12  A.    That would have been important for --
13  Q.    Okay -- go ahead.
14  A.    That would have been important. What I was
15  doing was giving an opinion on the basic facts as
16  they were presented.
17  Q.    But you criticize the officers for not
18  writing a report, and you also criticize them for
19  questionable explanations --
20  A.    Well --
21  Q.    -- let me finish, please --
22  A.    Yeah, okay.
23  Q.    -- and you tell me it would have been
24  important to listen to those interviews. Why
25  didn't you ask?

Page 129

1  A.    Let's see. I didn't ask because at the time
2  I didn't think it would be germane to the basic
3  testimonies that I was reading.
4  Q.    But you're criticizing them right here for
5  not writing the report?
6  A.    Yeah, because -- let me see. I have
7  something about the files, and I'll show you where
8  I got to that and why I came up with that.
9       On directive 6.7-DI officers are
10  required to immediately report to their immediate
11  supervisor or, if this is not possible, the house
12  sergeant whenever they draw or exhibit their
13  weapon when off duty and submit a written report
14  of the circumstances as soon as possible.
15  Q.    So off duty?
16  A.    And there was also the same thing, okay?
17  Q.    Please answer my question --
18  A.    Yes.
19  Q.    -- was that off duty?
20  A.    Yes, you're right.
21       All right. Let's go to directive
22  6.7-6-4. When a police officer discharges a
23  weapon and a person is either injured or killed --
24  and this is on duty -- that officer will complete
25  his preliminary report of the incident and then he

33 (Pages 126 to 129)

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**


## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

    Kester I.H. Crosse, Esquire
    Williams & Crosse
    1214 King Street
    Suite 300
    Wilmington, DE  19801

I hereby certify that on March 14, 2007, I have sent by U.S. Regular Mail, the foregoing

document to the following non-registered participants:

    Anne T. Sulton, Esquire
    Post Office Box 2763
    Olympia, WA 98507

                    John A. Parkins, Jr. (#859)
                    Richards, Layton & Finger, P.A.
                    One Rodney Square
                    P.O. Box 551
                    Wilmington, Delaware 19899
                    (302) 651-7700
                    parkins@rlf.com