IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF HARRY SMITH, III, ) <br> HARRY SMITH, JR., AND ROSLYN ) <br> WOODARD SMITH, ) <br>  ) <br>  Plaintiffs ) <br>  ) <br>  v. ) <br>  ) <br> CITY OF WILMINGTON, JOHN ) <br> CIRITELLA, THOMAS DEMPSEY, and ) <br> MATTHEW KURTEN, ) <br>  ) <br>  Defendants. ) <br> ) | C.A. No.  04-1254 GMS |

## MEMORANDUM

## I.     INTRODUCTION

Harry Smith, Jr. and Roslyn Woodard Smith (collectively, the "plaintiffs") filed the above captioned suit on their own behalf, and as representatives of Harry Smith, III ("Smith"). The plaintiffs allege that the defendants violated Smith's civil and constitutional rights, during a September 13, 2003 incident with police in which he was shot and killed.  In addition, the plaintiffs allege violations of Delaware constitutional provisions, a state wrongful death claim, and a state law claim for abuse of a corpse.

Presently before the court is a motion for summary judgment filed by John Ciritella ("Ciritella"), the City of Wilmington ("City"), Thomas Dempsey ("Dempsey"), and Matthew Kurten ("Kurten") (collectively, the "defendants").  (D.I. 108.)  For the following reasons, the court will grant the motion in part and deny the motion in part.

II.     **BACKGROUND**

    A.     **Procedural Background**

The original complaint was filed on September 13, 2004, against the Wilmington Police

Department ("WPD"), Michael Szczerba ("Szczerba"), One or more John Does-1 and One or

more John Does-2.  (D.I. 1.)  The WPD, Szczerba, and the John Doe defendants were

subsequently dismissed from the case.  The plaintiffs then filed an amended complaint against

the City and Wilmington police officers Ciritella, Dempsey, and Kurten.  (D.I. 39.)  The

amended complaint contains four counts.  Count I is brought against Ciritella, Dempsey, and

Kurten  pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, and alleges that the defendants violated

Smith's rights under the Eighth and Fourteenth Amendments to be free from unreasonable

seizure of his person, and cruel and unusual punishment.  Count II alleges violations of the

Delaware Constitution Article 1, Sections 6 and 11.  Count III raises a wrongful death claim

under Delaware law.  Count IV is brought against the City for abuse of a corpse.

On April 5, 2006, the court dismissed the Fourteenth Amendment claim alleged by the

plaintiffs, and indicated that any excessive force claim asserted by Smith's estate was properly

analyzed under the Fourth Amendment.  (D.I. 78.)   Subsequently, the plaintiffs moved to file a

seconded amended complaint.  (D.I. 98.)  In the meantime, the defendants filed the pending

motion for summary judgment with a supporting brief.  (D.I. 108, 109.)  Next, the plaintiffs

voluntarily dismissed the § 1985 and § 1986 claims raised in Count I of the amended complaint.

(D.I. 158.)  On February 7, 2007, the court granted the motion to file the second amended

complaint, except as to proposed count II.  (D.I.  160.)  The second amended complaint contains

most of the same factual allegations and claims, but now raises a 42 U.S.C. § 1983 claim for

excessive, unreasonable, and unjustifiable force against Smith in violation of the Fourth

Amendment, and also raises a claim against the City under *Monell v. Department of Soc. Serv.*,

436 U.S. 658 (1978) for alleged unconstitutional action.  The defendants were given leave to file

a supplemental motion for summary judgment on the newly added claims of excessive force

under the Fourth Amendment and the alleged *Monell* violation, which they filed on February 21,

2007.[1]

### B.    Factual Background

These following facts are taken from the parties' submissions and do not constitute

findings of fact.  Early on September 12, 2003, Smith complained to his mother that he was

hearing voices.  (D.I. 110, at A68, A70.)  His father drove him to Wilmington Hospital where he

was treated and released.  (Id. at A71.)  Smith continued to hear voices, his symptoms worsened,

and he became agitated, so he returned to the hospital late the next afternoon, on September 13,

2003.  (Id. at A81-A82.)  However, according to the nursing assessment sheet, Smith became

agitated, some type of struggle ensued, and he ran out of the hospital without receiving

treatment.  (Id. at A107-08.)  The hospital notified the WPD that a patient had escaped, and

dispatch put out a call to officers on patrol.  (Id. at A96.)

Police officer Johnny Whitehead ("Whitehead") heard over the police radio that a patient

had run away from the hospital.  (D.I. 118, at 133.)  Whitehead responded to the call, and

observed a male in what appeared to be a hospital gown, but the individual did not match the

---

[1] The defendants' supplemental motion for summary judgment on the excessive force
claims sets forth an almost identical analysis to that contained in their original summary
judgment motion and cites the same authorities.  Accordingly, the court will treat them as one
motion for purposes of its discussion.

description of the person described over the radio.  (D.I. 110, at A97; D.I. 118, at 133.)
Whitehead decided to further observe the man and proceeded to make a left turn onto
Washington Street, where he saw the man pause, then run in a southeastern direction directly
toward a gray Mercedes-Benz.  (D.I. 110, at A97.)

During this time, William Stevenson ("Stevenson"), the owner of the Mercedes-Benz,
was at the Washington Street Ale House, which is in close proximity to Wilmington Hospital.
(D.I. 100, at A85.)  He testified that he was in his parked car and started to open the door when
he saw Smith across the street.  (Id.)  Smith was wearing a white T-shirt covered with blood and
carrying a weapon in his hand.  (Id.)  According to Stevenson, Smith screamed at him to get out
of the way, because Smith was going to take the car.  (Id.)  Smith then attempted to take the car
from Stevenson, but Stevenson held onto the car door.  (Id.)  Stevenson put his car in gear and
drove slowly away from Smith.  (Id.)  Smith slammed on the Mercedes' windows as Stevenson
drove away from him.  (Id.)

Whitehead observed Smith trying to open the door of the Mercedes and believed that an
auto theft was in progress.  (D.I. 110, at A97; D.I. 118, at 136.)  Whitehead turned on his police
car's flashing warning lights and drove up behind Smith.  (D.I. 118, at 137.)  Smith was
breathing hard and there was blood on his shirt.  (Id. at 142.)  Whitehead saw something in
Smith's hand, which he thought was a needle but, actually, was a scalpel that Smith had taken
from the hospital.  (Id. at A96.)  Whitehead and his partner exited their car, left the car door
open, and ordered Smith to drop the weapon, but he did not follow the order.  (Id. at A85; D.I.
118, at 132-33.)  Whitehead then drew his own weapon and ordered Smith to drop the scalpel.
(D.I. 110, at A100.)  Smith was unresponsive to the weapon and ignored Whitehead's order.

4

(Id.)  Smith then began walking toward Whitehead, who began backing up while telling Smith to drop the weapon.  (Id.)  Whitehead backed up until he was at the rear driver's side door of the vehicle (Id.)  Smith then suddenly backed up and jumped into the police car.  (Id.)  Whitehead tried to pull Smith out of the car, but Smith still had the scalpel, and the two of them struggled.  (Id.)  Whitehead let go of Smith, fired one shot into the car, and saw Smith wince.  (Id.)  The door then shut, Smith revved the engine, placed the police car in gear, and drove off.   (D.I. 110, at A56, A101.)  Smith drove southbound, followed by Whitehead, who was on foot.  (Id. at A101.)  Smith drove past a witness, at full throttle, and ran through a red light at the intersection of Twelfth and Washington Streets.  (D.I. 110, at A56, A88.)  Whitehead's partner called the car theft into the station for other units to respond.  (D.I. 118, at 143.)

     Sergeant Donohue ("Donohue"), who was on patrol in the area, began pursuing Smith's car and gave its location over her radio.  (D.I. 110, at A3; D.I. 118, at 143.)  She further announced over her radio that shots were fired.  (D.I. 118, at 145.)

     On the day of the incident, Ciritella was on a plain clothes assignment and, while working at his desk, heard a call over the radio, "shots fired.  Police car taken."  (D.I. 110, at A2.)  Ciritella left the station in an unmarked police car.  (Id.)  Dempsey had just arrived for work at the central police station when he heard Donohue's broadcast.  (Id. at A28.)  He ran to his police car and followed Ciritella.  (Id.)  Kurten also joined in the pursuit, after hearing the radio broadcast.  (D.I. 119, at 165.)  A total of six police cars, including those driven by officers Ciritella, Dempsey, and Kurten, eventually caught up to the chase and pursued the car that Smith was driving.  (D.I. 119, at 155; D.I. 110 at A4, A28, A47.)

Ciritella, Dempsey, and Kurten were traveling westbound on Fourth Street, with Dempsey last in the line. (D.I. 110, at A4, A29.) Smith, traveling down other streets first, but eventually ending up driving westbound on Fourth Street, turned the stolen police car right onto VanBuren Street, and two marked police cars followed it, along with two detective units. (Id.) Ciritella continued westbound on Fourth Street to Harrison Street in order to parallel the chase. (Id.) Dempsey and Kurten followed Ciritella. (Id. at A29, A49.) Ciritella turned right onto Harrison, and heard that the chase was proceeding westbound on Fifth Street. (Id. at A5.) Ciritella reached the intersection of Fifth and Harrison Streets, parked his car in the intersection, and exited. (Id.) Kurten also parked his car at the intersection and exited. (Id. at A29, A43.) Dempsey stopped short of the intersection and exited his car. (Id.)

From his location on the sidewalk on northeast corner of Fifth and Harrison Streets, Ciritella observed that the stolen police car had come to a stop. (Id. at A6, A43.) Dempsey and Kurten were on the south side of the intersection, just east of Harrison Street, when Smith initially stopped. (D.I. 110, at A43, A50.) Dempsey observed that Smith's car stopped for a short amount of time. (D.I. 119, at 168.) Dempsey believed that Smith had nowhere to go, because two police vehicles were blocking the intersection behind him. (Id.)

According to Ciritella, he gave Smith three verbal commands to turn off the car and step out of the vehicle. (D.I. 110, at A6.) Kurten heard Ciritella issue his verbal commands. (Id. at A2, A50.) Dempsey also heard the command to "stop, police." (D.I. 116, at 126.) Kurten stated that he believed he heard sirens at the time Ciritella gave Smith the verbal commands. (D.I. 110, at A51.) Ciritella stated that he did not know if the sirens were on in the stolen car, or in the other police cars involved in the incident. (D.I. 110, at A8.) However, he recalled that both

6

passenger windows of the stolen police car were up.  (Id.)

After Ciritella gave the verbal commands, the stolen police car accelerated toward him, so he began walking backward.  (Id. at A6, A9.)  The car continued toward Ciritella and, as it neared him, Ciritella discharged his weapon.  (Id. at A6; D.I. 119, at 158.)  Ciritella fired between two to four shots into the windshield.  (D.I. 110, at A6, A7, A11.)  When he fired the first shot, the stolen police car was approximately one car length away.  (D.I. 119, at 150.)  As the car passed by, Ciritella, now on the sidewalk, fired shots into the passenger side window.  (Id. at 158.)  Ciritella knew that he hit Smith twice in the arm region.  (Id. at 158-59.)  Kurten, who was still standing on the southeast corner, fired two to three rounds from his weapon after Ciritella fired.  (Id. at A43-44, A51.)

Once Ciritella and Kurten fired their weapons, the stolen police car veered, struck a parked Jeep, and made a 180 degree spin.   (D.I. 116, at 124; D.I. 110, at A6, A14, A44.)  The car then began to turn onto the 500 block of North Harrison Street. (D.I. 116, at 126.)  At this point in time, the car was three to four feet away from Dempsey, who aimed his weapon at it, but did not shoot because he saw Ciritella on the opposite side of the car.  (Id.)  Dempsey was aware that shots were fired, but was not exactly sure who had fired them.  (Id.)  The car continued to move and, when Dempsey felt he was in a good shooting position, he fired three to four rounds, which blew out the rear driver's side window and the driver's window.  (Id.)  Dempsey observed that his rounds penetrated the back of the seat.  (Id.)  The car continued to move, however, and Dempsey began walking toward the car, continuing to fire shots at it with each he step he took.  (Id.)  He fired thirteen shots without pausing, until the car finally stopped.  (D.I. 119, at 173.)  Dempsey continued to fire shots, because the car Smith was driving continued to move.  (Id.)

7

When the car was in the 500 block of North Harrison Street and, as it passed by him, Ciritella stepped into the street and fired shots into the passenger's side front window.  (D.I. 110, at A6, A11.)  According to Ciritella, he believed a shot struck Smith in the right temple area. (Id. at A14.)  Ciritella then noticed that Smith was slumped over, but the vehicle was still moving, so he reached in and placed the car in park.  (Id. at A15.)  Ciritella did not have any bullets remaining in the chamber of his clip.  (Id.)

Kurten stayed behind the vehicle and fired two or three more shots while he was moving toward it, aiming through the back window.  (D.I. 110, at A44-A45.)  Kurten did not run up the street while he was shooting his gun, but would say his pace was slightly faster than his normal walking pace.  (Id.)  When Kurten fired the second two or three shots, he was looking at the rear bumper.  (D.I. 119, at 162.)  He stopped shooting when he saw Smith slumped over to the right-hand side, because it appeared that Smith was incapacitated.  (D.I. 110, at A46; D.I. 119, at 163.) Kurten testified that no shots were fired after Ciritella placed the vehicle in park.  (Id.)

Dempsey began to move toward the vehicle when he felt that Smith was no longer a threat.  (D.I. 116, at 126.)  He saw Ciritella doing the same thing.  (Id.)  Dempsey unlocked the car door, but he did not remove Smith from the car.  (D.I. 110, at A32; D.I. 116, at 126.)  Kurten also did not move Smith from the car.  (Id. at A45.)  Two other detectives at the scene, who are not parties to this lawsuit, removed Smith from the car and tried to revive him.  (D.I. 105 ¶ 9.)

After the incident, Dempsey returned to the central station.  (D.I. 119, at 172.)  Dempsey did not write a report, because he was told not to write up the incident.  (Id. at 173.)  Ciritella did not write a report, and Kurten was not directed to write a report either.  (D.I. 110, at A7, A45.) All three officers gave interviewed statements regarding the events of the day.

8

David Nathaniel Gwyn ("Gwyn"), an eyewitness, gave a deposition in this case. He testified that he was sitting on his porch at 507 Harrison Street at the time of the shooting, and had an unobstructed view. (D.I. 118, at 113, 114.) He first saw the three uniformed police officers when the stolen police car came to rest in front of his home. (Id. at 114; D.I. 110, at A37.) He stated that the police officers started running behind the police car, and were shooting at the back of the car from the time it turned the corner onto Harrison Street until after it hit the Jeep. (D.I. 110, at A37.) He observed the police officers firing their guns the entire time they were moving from Fifth Street until they were in front of his house. (D.I. 118, at 115.) Gwyn further observed that one officer was on the left of the car and, when he got to the car, looked through the side window. (D.I. 110, at A38.) The other two officers were running behind the car, and all three were shooting through the back window. (Id.) According to Gwyn, the police officers were still firing their guns after the car had stopped. (D.I. 118, at 115.) Gwyn also stated that, when he first saw Smith slumped over towards the steering wheel, the police officers were still firing their guns, and they were behind the car. (Id. at 116.) At no time did Gwyn see the police officers in front of the car. (Id.) The car eventually stopped, and an officer ran up, opened the door, removed Smith from the vehicle, and tried to revive him. (D.I. 110, at A38.)

The Office of the Chief Medical Examiner reported a pathological diagnosis of multiple gunshot wounds, and a cause of death as a gunshot wound to head. (D.I. 110, at A110.) The autopsy report, signed by Jennie Vershvovsky, M.D. ("Dr. Vershvovsky"), states that Smith's injuries consisted of multiple gunshot wounds, and then chronicles the wounds. (Id. at A111.) Specifically, with respect to the gunshot wound to the head, Dr. Vershvovsky notes that the direction of the gunshot is from right to left. (Id. at A112.) The direction of two gunshot

wounds to the back are reported as being from back to front. (Id.) Three gunshot wounds to the right arm are described in the report as follows: (1) the bullet path of the wound to the right wrist is almost straight, from left to right; (2) the bullet path in the right arm area of the elbow is from right to left, and almost straight; and (3) the direction of the bullet wound to the upper arm is from back to front, and right to left. (D.I. 110, at A112, 113.) Dr. Vershvovsky also reports a gunshot wound to the right leg, having a direction from front to back. (Id. at A113.) Dr. Vershvovsky testified that, although the gunshot wound to the head is listed as the cause of death, she considered all of the gunshot wounds received as equally attributing to Smith's death. (D.I. 118, at 79.) That is, she did not consider one wound separate from another, but looked at the wounds as an aggregate. (Id.)

## III.    STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact –
meaning that no reasonable jury could find in the nonmoving party's favor based on the record
as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment.
Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly
supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 256-57 (citation omitted).
Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility,
the nonmoving party has presented no evidence or inferences that would allow a reasonable
mind to rule in its favor.  In this situation, it may be said that the record as a whole points in one
direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.,* 475 U.S. 574, 586 (1986).  However, the Third Circuit has advised that "[c]ases that turn
crucially on the credibility of witnesses' testimony in particular should not be resolved on
summary judgment." *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) (citing *Boyle v.
County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998)).

The defendants move for summary judgment, asserting that: the use of deadly force did
not amount to a constitutional deprivation and, if it did, they are entitled to qualified immunity;
the assumed constitutional deprivation was not the proximate cause of Smith's death; dismissal
of the Delaware Constitutional claims is appropriate for the same reasons that require dismissal
of the federal constitutional claims; the individual defendants are immune from suit for the state
wrongful death claim; the individual defendants were not involved in the abuse of the corpse
claim; and the City is immune from suit on that issue; and the record is devoid of evidence to

support the plaintiffs' *Monell* claims against the City.[2]

## IV.     DISCUSSION

### A.     The Plaintiffs' § 1983 Claims

In Count I of the amended complaint, the plaintiffs allege that the defendants used deadly force in violation of the Eighth and Fourteenth Amendments.[3]  (D.I. 39.)  Consequently, the defendants argue that summary judgment is appropriate under 42 U.S.C. § 1983 for three reasons: (1) they did not violate Smith's Fourth Amendment rights; (2) they are entitled to qualified immunity; and (3) the alleged Fourth Amendment violation could not have been the proximate case of Smith's death.  The court will address each of the defendants' arguments below.

#### 1.  Use of Deadly Force

"[C]laims of excessive force are to be judged under the Fourth Amendment's  'objective reasonableness' standard. . . ."  *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. at 397; *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir.

---

[2] The defendants also seek summary judgment on the 42 U.S.C. § 1985 and § 1986 claims.  This portion of the motion is moot, however, because the plaintiffs voluntarily dismissed these claims on  October 13, 2006.  (D.I. 158.)

[3] As previously discussed, the parties were advised by the court that an excessive force claim was to be analyzed under the Fourth Amendment.  On February 7, 2007, the court granted the plaintiffs leave to file their second amended complaint.  The second amended complaint properly alleges a § 1983 claim for violations of the Fourth Amendment under the same operative facts as the amended complaint.

2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996). A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

With regard to deadly force, it is unreasonable for an officer "'to seize an unarmed, nondangerous suspect by shooting him dead.'" *Brosseau*, 543 U.S. at 197 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). That is, deadly force will only be considered reasonable when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3 (applying a balancing approach and concluding that the government's interest in effective law enforcement is insufficient to justify killing a fleeing felon who does not pose a significant threat of death or serious injury to anyone). "[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story - the person shot dead - is unable to testify.'" *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) (citations omitted). "[T]he court may not simply accept what may be a self-serving account by the officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably." *Id.* (citations omitted).

For purposes of their analysis, the defendants divided the course of events on the day in question into three separate phases when the police officers used their weapons, as follows: Phase 1 - Whitehead fired a shot at Smith when he stole Whitehead's police car; Phase 2 - shots fired at Smith when he allegedly attempted to run over Ciritella; and Phase 3 - shots fired at Smith after the stolen vehicle he was driving had slowed (Phase 3A) and stopped (Phase 3B). The court will not analyze this matter under the defendants' "three phase theory," because the plaintiffs' civil rights §1983 claim is set forth in one count, that being Count I. In addition, it is clear in reading the second amended complaint that the plaintiffs aver a continuation of events and actions on September 13, 2003, all of which led to the alleged violation of Smith's constitutional rights.

The defendants make two arguments with respect to their assertion that the officers acted reasonably in shooting at Smith. First, the defendants argue that they were justified in using deadly force to prevent Smith's escape. Indeed, the defendants contend that they "knew that Smith's continued flight through the City of Wilmington would threaten the lives of citizens of Wilmington." (D.I. 109, at 19.) Second, the defendants argue that their actions were in response to their "reasonable perception that Smith had begun to use the car as a deadly weapon against Detective Ciritella." (Id. at 17.)

The plaintiffs counter both of the defendants' contentions by pointing to physical evidence and testimony that they contend contradict the defendants' version as to how the events in question transpired. For example, regarding the defendants' position that they acted reasonably in shooting at Smith for citizen safety, the plaintiffs point to the following testimony and evidence: (1) the defendant officers fired thirty-one shots at the stolen car as Smith was

moving away from them; (2) the officers did not see any citizens or civilians on the street at the time of the shooting; (3) the officers reloaded their weapons; (4) all shots were fired when the officers were on the sides or behind the stolen car; and (5) the car Smith was driving was moving slowly. (D.I. 116, at 36-38.) Thus, contrary to the defendants' argument, the plaintiffs contend that the above-described physical evidence and testimony of the officers demonstrate that no one was in danger when the officers fired their shots at Smith. (Id. at 38.)

Likewise, with respect to the defendants' argument that Smith was using the car as a deadly weapon, the plaintiffs point to photographs, which they contend establish that Smith was moving away from Ciritella to avoid gunfire. (D.I. 116 Exs. B-2, B-4.) The plaintiffs further assert that the photographs show that Ciritella was on the passenger side of the vehicle Smith was driving when he fired the shots into the windshield. (D.I. 16, at 35.) The plaintiffs also point to Ciritella's deposition to support their position that there is an issue of fact as to whether Smith was attempting to run over Ciritella. Specifically, the plaintiffs assert that Ciritella's testimony is contradictory, because he states that he was about a car length away from Smith when he first fired his weapon, but then states that Smith was attempting to run him down. (Id.)

Applying the summary judgment principles to the parties' contentions regarding the events surrounding Smith's shooting, and given the foregoing discussion, the court concludes that there is sufficient evidence supporting the plaintiffs' theory of the case. In other words, the plaintiffs have raised genuine issues of material fact with respect to the excessive force claim in Count I of the second amended complaint.

### 2. Qualified Immunity

The defendants argue that even if their actions did not comply with the Fourth Amendment, they are shielded from suit by reason of qualified immunity.  A two-part test is used to determine whether the official is entitled to qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 200-02 (2001).  First, the court must determine whether the official's conduct violated a constitutional right.  *Id.* at 201.  If no constitutional right is violated, there is no necessity for further inquiries concerning qualified immunity.  *Id.*  If a violation occurred, then the court's second task is to determine whether the constitutional right was clearly established at the time of the official's action.  *Id.*  This inquiry requires that "the contours of the right . . . be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 202 (internal citation omitted).  "That is, in the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?"  *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).  In other words, the doctrine of qualified immunity protects the officer from liability if "the officer's mistake as to what the law requires is reasonable."  *Saucier*, 533 U.S. at 205.

In the present case, because disputed issues of material fact exist regarding the constitutional violation alleged in Count I of the second amended complaint, the answer to the first question depends upon the resolution of those factual disputes.  Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established.

The defendants argue that Smith had no "clearly established" right to continue his flight without being subject to deadly force.  (D.I. 109 at 22.)  To support their argument the defendants cite *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004), for the proposition that, "as of February 21, 1999, a suspect did not have a 'clearly established' right to flee from police in a vehicle where officers could reasonably believe that [the] suspect's flight posed a risk of harm to others."  (D.I. 109, at 22.)  Essentially, the defendants argue that summary judgment on qualified immunity grounds is appropriate, because "a reasonable officer in the circumstances could believe [that] shooting at Smith . . . was justified," since he posed a risk of harm to others.  (Id. at 25.)

Conversely, the plaintiffs contend that "it was clear to a reasonable officer, on September 13, 2003, that he could not shoot a misdemeanor car theft offender fleeing in a vehicle after a police officer told the offender to surrender and the fleeing offender hit a parked car in the process of fleeing."  (D.I. 116, at 34.)  They further contend that, because the relevant facts pertinent to a determination of the defendants' objective reasonableness are disputed in this case, it is not appropriate for the court to grant summary judgment based on qualified immunity but, instead, to let the jury weigh and determine the operative facts.  (D.I. 116, at 34.)

The court agrees with the plaintiffs that material questions of fact exist as to whether the defendants could have reasonably believed that their conduct was not prohibited.  For example, the defendants contend that they reasonably believed Smith's flight posed a risk to others.  While a jury may ultimately accept this contention, it also may reject the defendants' version of the events and accept the plaintiffs' version, which is that Smith posed no risk to others.  A finding as to whether Smith posed a risk to others is necessary to determine whether the defendants acted

objectively reasonable.[4]  Thus, granting summary judgment on qualified immunity is premature

at this stage of the case and must wait for factual development at trial.  Given the foregoing, the

court will deny the motion for summary judgment on the issue of qualified immunity.

### 3.  Causation

The defendants next maintain that the core of the plaintiffs' constitutional violation claim

is that the police officers continued to fire at the stolen police car after it stopped, and that the

plaintiffs' witness, Gwyn, saw shots fired from the left side of the window.  The defendants

argue that the evidence, however, demonstrates that Smith's cause of death was a bullet wound

to the brain, shot from the right side, not the left side.  Thus, according to the defendants, the

alleged constitutional violation could not have been the proximate cause of Smith's injuries.

The court is not persuaded.  First, while the "core" of the plaintiffs' claim may be that the

defendants continued to fire at the stolen police car after it had stopped, it is clear from the

second amended complaint that the plaintiffs' claim involves more than the defendants continued

shooting.  Indeed, as previously discussed, the plaintiffs aver a continuation of events and

actions, all of which led to the alleged constitutional violation.  Moreover, it is undisputed that

Dr. Vershvovsky, who performed the autopsy, considered *all gunshot wounds received as*

*equally attributable to Smith's death*, not just the bullet wound to the head.  (D.I. 117-19, at 79)

(emphasis added).  For these reasons, the court declines to grant summary judgment for the

defendants on the issue of causation.   As such, the plaintiffs' section 1983 claim against the

defendants will proceed to trial.

---

[4] In making their arguments, the defendants presume that Smith posed a threat to others.
As previously discussed, however, the plaintiffs vigorously contest that assertion and point to
sufficient circumstantial evidence to support their theory of the case.

**B.        The Plaintiffs' Claims Pursuant to the Delaware Constitution**

The plaintiffs allege violations of the Delaware Constitution Article I, Sections 6 and 11. The defendants argue that they are entitled to summary judgment on the Section 6 claim for the same reasons that they are entitled to summary judgment on the § 1983 Fourth Amendment claim. They also argue they are entitled to summary judgment on the Section 11 cruel and unusual punishment claim. The court will address these two arguments in turn.

Under the Fourth Amendment to the United States Constitution, people have a right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. Likewise, the Delaware Constitution guarantees that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures. . . ." Del. Const. art. I, § 6. The Delaware Supreme Court has held that the Article I, Section 6 state constitutional provision is "substantially identical to its federal analog." *Rickards v. State*, 77 A.2d 199, 204 (Del. 1950). It has also held that "a violation of the latter is necessarily a violation of the former." *State v. Prouse*, 382 A.2d 1359, 1362 (Del. 1978); *see also State v. Phillips*, 366 A.2d 1203, 1207 (Del Super. Ct. 1976) (these analogous provisions "unquestionably" protect the same interests). Given the state of the law, the court will deny the defendants' motion for summary judgment as to the Article I, Section 6 claim, relying on its Fourth Amendment analysis in Section III. A., *supra*.

The defendants' motion for summary judgment as to the Article I, Section 11 claim, however, is well-taken. According to the Delaware Supreme Court, "the core concern of Article I, Section 11 and the Eighth Amendment is the same: '[to] express[ ] the revulsion of civilized man against barbarous acts – the "cry of horror" against man's inhumanity to his fellow man.'"

19

*Sanders v. State,* 585 A.2d 117, 144 (Del. 1990) (quoting *Robinson v. California*, 370 U.S. 660, 676 (1962)). The Delaware Supreme Court's "interpretation of Article I, Section 11 [of the Delaware Constitution] has been, and should be, guided by the same general principles that have guided the Supreme Court's interpretation of the Eighth Amendment." *Id.* (citations omitted.)

Courts apply an Eighth Amendment analysis to excessive force claims asserted by prisoners *after* conviction. *Graham*, 490 U.S. at 395 n.10. In the present case, the actions alleged by the plaintiffs occurred during a seizure, rather than after conviction. Thus, the plaintiffs' claims are properly analyzed under the Fourth Amendment. *See Id.* (noting that a seizure triggers the Fourth Amendment's protections). Moreover, the plaintiffs have amended the complaint to remove any reference to the Eighth Amendment from their asserted claims. For these reasons, the court will grant the defendants' motion for summary judgment as to the Article I, Section 11 claim.

### C.     The Plaintiffs' Wrongful Death Claims

The defendants argue that they are statutorily immune from suit for a wrongful death claim under Delaware law. In making this argument, the defendants essentially repeat their assertion that their conduct on the day in question was objectively reasonable under the Fourth Amendment. (D.I. 109, at 33.) Alternatively, the defendants argue that, even if they are not immune from suit, there is no evidence that the alleged acts challenged by the plaintiffs – an officer firing from the driver's side after the stolen police car stopped – could have caused Smith's death. Indeed, they argue the proximate cause of Smith's death was the sole bullet fired by Ciritella that struck Smith's head from the right and, therefore, could not have been fired by an officer from the driver's side of the car. (Id. at 34.) The plaintiffs offer a vague response,

referring to acts performed by city employees with wanton negligence, or willful and malicious intent.  (D.I.116, at 33-34.)

Under Delaware law, the Tort Claims Act (the "Act") provides that "except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." Del. Code Ann. tit. 10, § 4011(a).  It further provides for immunity in "the performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid." *Id.* at § 4011(b)(3).  The Act, however, does not completely shield government employees from suit, in that "an employee may be personally liable for acts and omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent."  Del. Code Ann. tit. 10, § 4011(c).

Under Delaware law, in order to find a defendant's conduct wanton, a plaintiff must show that the individual defendant acted with conscious indifference to his or her conduct, or with an "I don't care" attitude.  *Cloroben Chemical Corp. v. Comegys*, 464 A.2d 887, 891 (Del. 1963); *Eustice v. Rupert*, 460 A.2d 507, 509 (Del. 1983); *Foster v. Shropshire*, 375 A.2d 458, 461 (Del. 1977). Wanton conduct occurs when a person, with no intent to cause harm, performs an act so unreasonable and dangerous that he either knows, or should know, that there is an imminent likelihood of harm which can result.  *Yankanwich v. Wharton*, 460 A.2d 1326, 1331 (Del.1983).

Based upon the facts before it and the previous discussion concerning the defendants' contention that they acted objectively reasonable, the court cannot conclude at this stage of the litigation that the individual defendants acted with or without wanton negligence. The reasonable inferences that a jury might draw from the record, and from the demeanor of testifying witnesses, raise material factual issues and, therefore, preclude entry of summary judgment on the issue of immunity.

Further, the defendants' proximate cause argument fails for the same reasons previously discussed by the court in connection with its ruling on the defendants' proximate cause argument as to the plaintiffs' section 1983 claim. That is, the physician who performed the autopsy testified that she considered all gunshot wounds received as equally attributable to Smith's death, not just the bullet wound to the head. In addition, the record reflects that at least one bullet entered Smith's body from the left to the right, which could support the plaintiffs' theory that a police officer was on the driver's side of the stolen police car at some point during the incident. Accordingly, there remain genuine issues of material fact with respect to the plaintiffs' wrongful death claim that preclude the entry of summary judgment for the defendants.

### D.    The Plaintiffs' Abuse of a Corpse Claim

The defendants next seek summary judgment on the claim raised under Delaware law for abuse of a corpse. They argue that none of the named defendants played any role in removing Smith's body from the car, and they further argue that the City is statutorily immune from this claim. The plaintiffs do not respond to this claim in their answering brief.

Delaware law recognizes a cause of action for the mishandling or mistreatment of a corpse. *Boyle v. Chandler*, 138 A. 273 (Del. Super. Ct. 1927); *Nagle v. Riverview Cemetery Co.,*

Del. Super., 86C-MR-92, 1989 WL 16983 (Del. Super. Ct. Feb. 15, 1989) (unreported).  In order to recover, the plaintiffs must allege something more than negligent conduct.  *Boyle*, 138 A. at 274.

The evidence adduced by the defendants is that Ciritella, Dempsey, and Kurten returned to the Wilmington Police Department shortly after the shooting took place.  (D.I. 110, at A7, A45; D. I. 119 at 172-73.)  Moreover, the plaintiffs do not point to any evidence showing that these officers had anything to do with the remains of Smith.  Additionally, the record reflects that other officers on the scene removed Smith's body from the car and attempted to revive him.  (D.I. 105 ¶ 9.)  Accordingly, the officer defendants are entitled to summary judgment on this claim.

The defendants also are correct in their position that the City is statutorily immune from suit on the plaintiffs' abuse of a corpse claim.  "Except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages."  Del. Code Ann. tit. 10, § 4011(a).   The plaintiff does not respond to the defendants' argument regarding this issue, and there is no evidence before the court which shows that the City has waived its immunity from suit, or that any immunity exception applies.  Therefore, the court will grant the City's motion for summary judgment on the abuse of corpse claim.

### E.    The Plaintiffs' *Monell* Claims

Finally, the defendants argue that the record is devoid of any evidence to support the plaintiffs' *Monell* claims – two failure to train claims, and a claim that the City fails to investigate alleged uses of excessive force and fails to discipline officers that are accused of

using excessive force against an individual.  The plaintiffs' second amended complaint sets forth

their *Monell* claims against the City.  Specifically, the plaintiffs aver the following with respect

to the City's supervisory employees: (1) they fail to properly discipline police officers having

committed an act of excessive force against an individual; (2) they fail to properly investigate

complaints of excessive force perpetrated by police officers; (3) they fail to take proper remedial

action against police officers once it is determined that they have committed an act of excessive

force; (4) they continue to teach police officers that it is acceptable to shoot at a moving vehicle,

despite overwhelming evidence that so doing comprises an act of excessive force, often resulting

in wrongful death; and (5) they do not provide proper training to police officers to ensure the

proper use of their guns or other means of deadly force.  According to the plaintiffs, it is these

failures that allow City police officers to engage in acts of excessive force without being held

accountable.

"A municipality is liable under section 1983 when a plaintiff can demonstrate that the

municipality itself, through the implementation of a municipal policy or custom, causes a

constitutional violation."  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991)

(citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691-95 (1978)).  "Liability

will be imposed when the policy or custom itself violates the Constitution, or when the policy or

custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of

one of its employees."  *Id.* (citing *Polk County v. Dodson*, 454 U.S. 312 (1981)).  However, a

municipality cannot be held liable under section 1983 on a *respondeat superior* theory.  *Monell*,

436 U.S. at 691.

24

Here, the plaintiffs have alleged failure to train claims and a failure to investigate and discipline claim. In order to successfully prove a failure to train claim, the plaintiffs must establish that: (1) the failure to train amounts to deliberate indifference to the rights of persons with whom the municipal employees come into contact; and (2) the training deficiency actually caused the injury. *Nelson*, 60 F. Supp. 2d at 313 (citing *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)). The deliberate indifference standard applies to a plaintiff's allegations of failure to investigate. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995). Further, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).[5]

The defendants contend that there is no record evidence demonstrating that the City failed to properly train its police officers or failed to investigate and discipline police officers for prior claims of excessive force. With respect to the plaintiffs' allegations that the City's policy permits police officers to shoot at moving vehicles and does not provide proper training on the use of deadly force, the defendants point to the WPD policy and discuss the training they receive. Specifically, the WPD policy states that "[p]olice officers shall not fire their weapons at, or from a moving vehicle except under exigent, life-threatening circumstances." (D.I. 116, at B47.) Additionally, the defendants provide that City police officers are required to take at least

_____

[5] Prior to addressing the merits, the defendants contend that the court should not even consider the plaintiffs' *Monell* claims, because the plaintiffs have failed to show an underlying constitutional deprivation. The court can easily dispose of this contention, because it has already determined that the plaintiffs have made a sufficient showing to get to the factfinder on the issue of the defendants' alleged violation of Smith's Fourth Amendment rights.

16 hours of training each year and qualify, by receiving a minimum score, with their weapon 3 times each year at the range. (D.I. 166 ¶¶ 2-3.) The defendants note that at least one of the training qualifications involves retraining on the use of deadly force and, further, that City police officers are required to attend instruction on legal developments once each year. (Id.¶ 4.)

As to the failure to investigate and discipline claims, the defendants contend that the plaintiffs have not met their burden on summary judgment, because they have not adduced any evidence of the City's failure to investigate prior excessive force claims by its police officers, or its failure to discipline officers found to have used excessive force. According to the defendants, the plaintiffs' only evidence of any investigation by the City is the investigation surrounding the present case.

The plaintiffs respond by summarizing the investigation that the City allegedly conducted after Smith's death and restating, generally, their *Monell* claims.[6] The plaintiffs do not attempt to rebut the evidence set forth in the defendants' brief. Nor do they attempt to point the court to any record evidence tending to support their *Monell* claims.[7]

Here, the plaintiffs have failed to proffer any evidence or inferences that would allow a reasonable mind to rule in their favor. They have not even set forth a coherent and reasoned argument as to why the court should not dismiss their *Monell* claims. These failures prevent

---

[6] For example, the plaintiffs repeatedly argue that the City is deliberately indifferent to its citizens' constitutional rights and was a cause of the violations of Smith's clearly established rights because it had a custom, usage, or police of not properly investigating allegations of excessive force and not disciplining officers using excessive force.

[7] Indeed, the plaintiffs only address their *Monell* claim based on the City's failure to investigate and discipline its officers, seeming to abandon their claims that the City did not properly train its police officers, and that its policy dictates that officers may shoot at a moving vehicle.

them from meeting the burden that is necessary under the case law to substantiate their claims.

Accordingly, the court finds that the record as a whole points in the defendants' direction with

respect to the *Monell* claims, and the dispute over the City's alleged failures to train, investigate,

and discipline its police officers is not "genuine."  The defendants, therefore, are entitled to

summary judgment on this issue.


Dated: March 22, 2007                            /s/ Gregory M. Sleet_____
                                                 UNITED   STATES   DISTRICT   JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ESTATE OF HARRY SMITH, III, HARRY SMITH, JR., AND ROSLYN WOODARD SMITH, | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. No. 04-1254 GMS |
| CITY OF WILMINGTON, JOHN CIRITELLA, THOMAS DEMPSEY, and MATTHEW KURTEN, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

The defendants' Motion for Summary Judgment and Supplemental Motion for Summary

Judgment (D.I. 108, 161) is DENIED in part and GRANTED in part as follows:

1.    The Motion for Summary Judgment for the § 1983 claim is DENIED.

2.    The Motion for Summary Judgment for the § 1985 and § 1986 claims is DENIED as moot.

3.    The Motion for Summary Judgment for the Delaware Constitution Article I, Section 6 claim is DENIED.

4.    The Motion for Summary Judgment for the Delaware Constitution Article I, Section 11 claim is GRANTED.

5.     The Motion for Summary Judgment for the Delaware wrongful death claim is

DENIED.

6.     The Motion for Summary Judgment for the abuse of a corpse claim is

 GRANTED.

7.     The Motion for Summary Judgment for the *Monell* claims is GRANTED.


Dated:  March 22, 2007                    /s/ Gregory M. Sleet                    
                                          UNITED STATES DISTRICT JUDGE