IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and

ROSLYN WOODARD SMITH,

Individually and as Administrators of

The ESTATE OF HARRY SMITH, III,

        Plaintiffs,

v.                                                                                      CIVIL ACTION NO. 04-1254-GMS

JOHN CIRITELLA,

THOMAS DEMPSEY,

and

MATTHEW KURTEN,

        Defendants.

---

**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY**

**OF DEFENSE EXPERT DR. JON NORDBY**

---

Come now the Plaintiffs, by their attorney Anne T. Sulton, and hereby move the Court for an order excluding the testimony of defense expert Dr. Jon Nordby. At defendants' request, Dr. Nordby's deposition was taken yesterday in University City, Washington. Attorney Sulton and attorney John Parkins appeared in person at this deposition. A rough draft copy of Dr. Nordby's deposition is attached hereto, marked Exhibit 1.

Plaintiffs rely upon the Federal Rules of Evidence (Rules 702, 703 and 704), and the decisions of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals* (509 U.S. at 592) and *Kumho Tire v. Carmichael* (526 U.S. at 147).

A. **Dr. Nordby is not qualified** to offer an opinion about the manner and cause of death, or the physical injuries sustained by Harry Smith, III. During the separate *voir dire* deposition of Dr. Nordby, he testified that he is not an expert in biomechanics. He is not a medical doctor. He never attended medical school. All of his degrees are in philosophy. When he retired in 2001, he was the chairperson of the Department of Philosophy at Pacific Lutheran University. During his deposition he testified:

Page 76

```
15 Q. Your bachelor's degree is -- is it a B.S. or
16 B.A.?
17 A. It's a B.A.
18 Q. And that is a Bachelor of Arts, correct?
19 A. That's correct.
20 Q. And your master's is an M.A., correct?
21 A. That's correct.
22 Q. That's a Master of Arts?
23 A. That's correct.
24 Q. And your doctorate degree is a doctorate of
25 philosophy?
```

Page 77

```
1 A. That's correct.
2 Q. In the field of philosophy?
3 A. That's correct.
4 Q. And your dissertation title was?
5 A. Critical intelligence and its development."
6 Q. And you retired from Pacific Lutheran
7 University in the year 2001?
8 A. I believe it -- I'm not sure how they count
9 that. I last taught in 1997. I'm not sure how the -- how
10 that works.
```

11 Q. And you retired from the department of
12 philosophy, correct?
13 A. That's correct.

In addition to the Federal Rules of Evidence and controlling federal case law, the Delaware Code and Delaware case law provide guidance about expert witness qualifications. For example, Delaware Code Section 6853 requires, even before a medical doctor can file an affidavit in support of a claim, the medical expert must "be licensed to practice medicine," be current in the field of medicine, and be board certified in the same or similar field of medicine.

Dr. Nordby opines as follows:

Page 39

21 Q. Do you have an opinion as to whether
22 Mr. Smith was sitting upright or slumped forward over the
23 steering wheel when he was struck by these two bullets?
24 MS. SULTON: I want to again reiterate my
25 standing objection to any testimony being offered by this

Page 40

1 particular witness because he is not qualified to render
2 testimony about the cause or manner of death. Thank you,
3 Counsel.
4 THE WITNESS: Repeat.
5 MR. PARKINS: Would you read it back, please,
6 Ron.
7 (Record read.)
8 THE WITNESS: The evidence shows that he was
9 upright given the trajectories and the wound path described
10 by the pathologist.
11 Q. BY MR. PARKINS: And what do you mean by the
12 trajectories?
13 A. The trajectories meaning the incoming rounds
14 through the vehicle, the angles at which all of those
15 potential bullets had to take in order to reach the occupied
16 space.
17 Q. Thank you.
18 Let's focus, if we could, on the shot that

19 struck Mr. Smith in the head. Do you have an opinion as to
20 what trajectory that bullet took?
21 A. Yes.
22 Q. What trajectory did that take?
23 A. Well, the bullet came in from the side. …

**B. Dr. Nordby does not have a sufficient factual basis for his conclusion.** During his

deposition he testified:

Page 24

7 Q. Based upon the information that you gleaned
8 from this undertaking, did you attempt to approximate the
9 trajectories of the bullets that were fired at the police
10 car?
11 A. Yes. Yes. And again, the -- the notion of
12 importance here is reliability to make determinations of
13 entrances and exits, not always precision or exacting
14 measurements, because the different materials according to
15 the research that I have done by firing suitable ammunition
16 through different types of materials have what are called
17 deflection angles, and those deflection angles can vary
18 with -- with the material, with the type of ammunition
19 that's used, and sometimes even with the environment, that
20 is, whether the surface is wet or not wet, and so on. So
21 the -- the effort is to -- to document each of those bits of
22 data and record the result.
23 Q. Is it possible to determine which shot was
24 fired first?
25 A. No.

Page 25

8 Q. Did you see any evidence that the car was
9 struck by anyone standing on the side of the car, on the
10 driver's side?
11 A. On the driver's side, no. All of the impacts
12 that were documented either came from behind -- from the
13 rear of the vehicle or toward the rear and to the right
14 side, that would be the passenger side of the vehicle, and
15 those opinions are based upon the damage to the vehicle and
16 the type of damage that we see to the vehicle.

Page 52

```
1 Q. How could you know the angles of bullets
2 going through the passenger side window if there is no glass
3 left in that window?
4 A. I never said anything about angles with
5 passenger side windows, and the answer is you can't. When
6 tempered glass is struck, sometimes the first shot will
7 remain and the window will checker, but traditionally radial
8 and concentric circles -- radial fractures and concentric
9 circles are used to establish the order of shots. Well,
10 that doesn't work with tempered glass and it doesn't work
   11  with safety glass. So you can't tell.
```

Dr. Nordby offers an opinion that Harry Smith, III was shot in the head as he was sitting up and facing forward. He says his opinion is based upon his analysis of the trajectory of the bullet. However, he concedes that it is not possible for him to determine the trajectory of a bullet unless you have a bullet hole in the window (which means you have to have the window) allowing you to establish the trajectory.

In this case, all of the driver's side and passenger's side window glass was gone because the windows had been shot out. Thus, there is not a sufficient factual basis to reach the conclusion that Harry Smith, III was sitting up and facing forward when shot in the head. It is not possible to know the trajectory of the bullet. Therefore, it is not possible to know the position of Harry Smith, III's body when he was shot in the head. Dr. Nordby should not be allowed to so testify because his opinion is based upon speculation, at best, and it will mislead the jury.

Dr. Nordby also opines that all shots were fired from a distance of three feet or more, because he did not find any gunshot residue materials in the car. But he then testified:

Page 64

17 Q. BY MS. SULTON: Now, you testified that all
18 Mr. Smith's gunshot wounds were fired from more than three
19 feet, 36 inches away. I'm now looking at Page 9 of your
20 report, sir, Paragraph 16.
21 What evidence do you have to support that?
22 A. The characteristic of the -- of the wounds
23 described by the pathologist, the lack of gunshot residue,
24 the lack of powder, stippling, anything that suggests a
25 closer or -- close-range gunshot, and the -- the deformation

Page 65

1 of the rounds having struck intermediate targets before they
2 struck Mr. Smith.

Page 67

14 Q. Did you look at the door panel on the
15 passenger side?
16 A. No.

Page 69

10 Q. Now, is it fair, then, to assume that the
11 point at which we find a shell casing on the ground might
12 not necessarily have a whole lot to do with where that --
13 where the shooter was standing when he or she fired a shot,
14 correct?
15 A. If you look at the -- the testing that I did,
16 and I made a chart, you know, to show the distances and so
17 forth, there's a wide variety of different distances, both
18 measured away from the side of the test pistol, and away
19 from the muzzle. So it can happen that -- and did, in fact,
20 in my experiments, that the ejected shell casing hit my

21 shoulder and that affected where it -- it went. So there is
22 a wide variety, and one also has to be cautious about
23 reaching too specific a conclusion other than talking about
24 general areas, where there's a location of these things.
25 But I think forensic science goes wrong if we try to be too
1 precise, because the -- the random nature of these events
2 has to be taken into consideration.

Page 74

16 Q. We can't then assume by looking at those
17 pictures that that's where the -- where the person was
18 standing when the shot was fired, all we know is that that's
19 a piece of evidence that's been marked?
20 A. That is correct. The way scenes are
21 processed, every effort is made or ought to be made to
22 document physical evidence and their presence -- its
23 presence, its location and so forth. But any interpretation
24 of that has to be subject to some sort of scientific
25 process. There may be many explanations for why certain

Page 75

1 things appear as they do, and we may not be in a position to
2 know what those are.

Dr. Nordby offers an opinion that no gun was shot in the car. However, he concedes that he not perform any tests on the car doors to determine whether or not gunshot residue materials might have been left thereon. Therefore, he does not know and cannot testify that no gunshot residue materials were in the car, which is the alleged basis for his opinion.

Dr. Nordby also testified his test firing of defendant Ciritella's gun shows bullet shells or casings from that gun will travel as far as 173 inches after the shell or casing is ejected from the

gun, indicating that there is no way to determine, therefore, the position or location of the shooter by looking at where the shell or casing eventually landed.

Page 81

20 Q. If I look at Test 1 on Page 14, I am reading
21 this table that says that the lateral distance from the
22 slide, meaning the side distance, could be, based on your
23 testing of -- of the Detective Ciritella's pistol, is as
24 great as 173 inches, and the distance back beyond one's --
25 or the back of the -- the slide of the gun, is 121 inches,

Page 82

1 correct?
2 A. Those are the maximums that I detected in my
3 experiments, yes.
4 Q. And then if I look at Test 2, when shooting
5 three shots from a single location, the greatest distance
6 that you found laterally or to the side is 98 inches, and
7 the greatest distance to the back of the slide of the gun is
8 96 inches.
9 A. Correct.
10 Q. So we're really talking about a broad pattern
11 that these shells can fly on their own, correct?
12 A. Now, that's a point that -- that needs to be
13 clarified too. These numbers don't represent the flight in
14 the air. They represent where it started and where it
15 ended. And that could be something like -- just for
16 example, the -- the cartridge case going straight into the
17 ground right where it was fired from and then bouncing,
18 rolling and tumbling and so forth until it reaches its final
19 terminus. So -- but not in the air flight. That's not what
20 we're talking about.

Page 46

Q. When you looked at the car it had already
4 been cut up by other -- I assume police investigators.
5 A. I saw evidence that prior processing had
6 occurred, yes.
7 Q. And it was extensive, correct?
8 A. Yes.
9 Q. And some of that processing included using
10 some kind of device to actually cut the metal off one of the
11 fenders, correct?
12 A. Yes, I believe the fender was cut in an
13 effort to find one of the projectiles, the bullets.

Given Dr. Norby's testimony, his opinions, which are based upon his examination of the car, are speculative. He examined the car during the summer of 2006; the incident occurred on September 13, 2003. Dr. Nordby testified he does not know how many people before him were in the car after the incident. Because the car was partially dismantled before he examined it, the data he collected is unreliable. Therefore, his opinions are unreliable. The jury would be confused, at best, and certainly misled.

## Conclusion

For all of the reasons stated herein, and on the basis of the record in this case, Plaintiffs respectfully request the Court enter an order excluding the testimony of Dr. Jon Nordby.

Dated this April 3, 2007.

s/ Anne T. Sulton
Attorney Anne T. Sulton
Attorney for Plaintiffs

**Mailing Address:**
Sulton Law Offices
Post Office Box 2763
Olympia, WA 98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**LOCAL COUNSEL:**

Kester I.H. Crosse

Delaware State Bar I.D. #638

1214 King Street, Wilmington, DE 19801

Telephone: (302) 658-3488

E-Mail: kesterih@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2007, I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Attorney John Parkins   E-mail Parkins@rlf.com

                                                    s/Anne T. Sulton
                                                  Anne T. Sulton