IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR., and ROSLYN )
WOODARD SMITH, individually and )
as Administrators of the ESTATE )
OF HARRY SMITH, III, )
                   )
    Plaintiffs, )
                   )
  v.          ) No. 04-1254-GMS
                   )
CITY OF WILMINGTON, JOHN )
CIRITELLA, THOMAS DEMPSEY and )
MATTHEW KURTEN, )
                   )
    Defendants. )

Videotape Deposition Upon Oral Examination

of

JON J. NORDBY, PH.D.

Taken at 3532 Soundview Drive West
University Place, Washington

DATE:  Monday, April 2, 2007
REPORTED BY:  Ronald L. Cook
          CCR, RMR, CRR

---

**APPEARANCES**

For the Plaintiffs:  ANNE T. SULTON
           Post Office Box 2763
           Olympia, Washington 98507
           609.468.6029
           annesulton@gmail.com

For the Defendants:  JOHN A. PARKINS, JR.
           Richards, Layton & Finger
           One Rodney Square
           P.O. Box 551
           Wilmington, Delaware 19899
           302.651.7624
           parkins@rlf.com

Also Present:  DANIEL FISHER, Videographer

---

**3**

1    UNIVERSITY PLACE, WASHINGTON; MONDAY, APRIL 2, 2007

2             1:14 P.M.

3             --o0o--

4

13:14  5        THE VIDEOGRAPHER:  This is the videotape

6    deposition of Jon J. Norby, Ph.D., Tape 1, Volume I, in the

7    case of Smith, et al., vs. City of Wilmington, et al., Case

8    No. 04-1254-GMS, in the United States District Court for the

9    Western District of Delaware.

13:14  10       Today's date is April 2nd, 2007, and the time

11   is 1:14 p.m.  This deposition is taking place at 3532

12   Soundview Drive West, University Place, Washington, and was

13   noticed by John A. Parkins.  The videographer is Dan Fisher,

14   for Premiere Realtime Reporting & Videography.  The court

13:14  15   reporter is Ron Cook, for Premiere Realtime Reporting.

16       Will counsel please announce their

17   appearances for the record, beginning on my right.

18       MS. SULTON:  Attorney Anne Sulton appears on

19   behalf of the plaintiffs.

13:14  20       MR. PARKINS:  I'm John Parkins.  I represent

21   the defendants.

22       THE VIDEOGRAPHER:  Will the reporter please

23   swear in the witness.

24

13:15  25   JON J. NORDBY, PH.D.,     deponent herein, being

---

**4**

13:15  1            first duly sworn on oath,

2            was examined and testified

3            as follows:

4

13:15  5          E X A M I N A T I O N

6    BY MR. PARKINS:

7        Q.  Dr. Nordby, would you please tell us what is

8    forensic science?

9        A.  Forensic science is a term that is used to

13:15  10   cover natural science as applied to the facts involved in

11   legal matters, so the word forensic literally means forum

12   or -- which means in the Latin I think something like for

13   public debate.  So it's the application, it's -- forensic

14   science are applied sciences.

13:15  15       Q.  Would you consider yourself to be a forensic

16   scientist?

17       A.  Yes.

18       Q.  Would you tell the jury what you were asked

19   to do in this particular case?

13:15  20       A.  In this case I was asked to do the following,

21   review all the documentation that was provided to me in

22   terms of police reports, in terms of autopsy report,

23   photographs, anything related to the physical evidence at

24   the -- involving the incident under -- under question.  And

13:16  25   I was asked to assess the physical evidence in the light of

Draft Copy

5

13:16    1    my areas of expertise and to attempt to -- insofar as the
         2    nature of the evidence permits, provide some type of a
         3    reconstruction of events, which is really at the heart of
         4    what applied forensic sciences do or strive to do.
13:16    5        Q.    Why don't you tell us what in your background
         6    enables you to do such work.
         7        A.    I've always been interested in puzzles and
         8    solving puzzles, and my father's a physician, my mother an
         9    artist, and I wanted to figure out how my dad could read an
13:17   10    x-ray and come up with a course of treatment by looking at
        11    these mysterious shadows, and -- and so I found that my
        12    interest was in the process of diagnosis or producing
        13    medical explanations rather than specifically anything to do
        14    with clinically treating patients.  So I pursued my interest
13:17   15    by studying philosophy of science and logic and philosophy
        16    of mathematics, with a twist to applied sciences.  So in the
        17    course of my education and training I pursued these -- these
        18    areas throughout my entire life and continue to do so at
        19    this point.  And much of the work in forensic science 30
13:18   20    years ago, when -- when I was involved in my formal
        21    education, comes from training and practical experience as
        22    opposed to specific courses of study, which they have today.
        23        Q.    So when you were in college were there
        24    frequent colleges with majors in forensic science?
13:18   25        A.    No.

6

13:18    1        Q.    Tell us a little bit about your employment
         2    experience insofar as it relates to forensic science.
         3        A.    I accepted a position at Pacific Lutheran
         4    University as a professor -- new professor at the rank of
13:18    5    assistant processor in 1977, knowing that Pierce County,
         6    which is the county where we -- we live and where the
         7    university is situated, is changing from a -- an old-time
         8    coroner system, which is an elected official involved in
         9    death investigation, to a medical examiner system, which is
13:19   10    a system which requires board certified forensic
        11    pathologists, and I thought it would be interesting to be
        12    involved in -- in the development of an -- an office.
        13             My teaching duties included making
        14    connections between law enforcement and the academic world.
13:19   15    I set up courses in critical thinking and writing, which is
        16    one of the areas that I covered in my study of the
        17    production and defense of scientific explanations.
        18        Q.    Did you play any role in investigation of
        19    deaths in Pierce County?
13:19   20        A.    Yes.  As Part my training I did what's called
        21    a preceptorship in forensic medicine with Dr. Emanuel
        22    Lacsina, who was then chief medical examiner in Pierce
        23    County, and I -- I pursued this course of study for six
        24    years, and essentially while pursuing that I was involved in
13:20   25    investigations of deaths in Pierce County.

7

13:20    1        Q.    Have you worked for any other governmental
         2    agencies other than Pierce County?
         3        A.    Yes.  Worked for King County, which is
         4    Seattle, doing medicolegal death investigations.  I was also
13:20    5    in both areas heavily involved in writing training materials
         6    for investigators, for pathologists.  I also taught at the
         7    Washington State criminal justice training commission, where
         8    I provided training for medical examiners and deputy medical
         9    examiners in how to process crime scenes, how to collect,
13:21   10    process and store evidence, especially blood-related
        11    evidence.
        12        Q.    Have you done any consulting work for
        13    governmental agencies?
        14        A.    Yes.  I -- I currently am a member of what's
13:21   15    called SWGSTAIN, which is the scientific working group in
        16    blood stain pattern analysis, and that's with the FBI lab
        17    in -- in Washington, D.C.  I've been a member of the group
        18    and my -- my job is to write protocols for the scientific
        19    approach to crime scenes involving blood-stained pattern
13:21   20    analysis, and the physics of understanding mechanisms of
        21    injury that produce blood at crime scenes.
        22        Q.    Have you ever done any work in connection
        23    with September 11th?
        24        A.    Yes.  I'm a member of D more the team 1010 --
13:22   25        Q.    Would you explain what D more the 10 is?

8

13:22    1        A.    D more the is -- at the time when it was
         2    started was part of a national disaster medical service, and
         3    it since became under the guise of Homeland Security.  I am
         4    a founding member of the department of Homeland Security,
13:22    5    which is an honor that was given to those of us who worked
         6    at the 911 twin towers.  My job was autopsy examination of
         7    human remains, and specifically to find medical appliances,
         8    remove them and look for serial numbers, for example, in any
         9    medical device that might be among the remains.  Also to
13:23   10    catalog and organize the remains so that we might apply
        11    various techniques to help identify the victims.
        12             I also removed various specimens for forensic
        13    odontologists, who are dentists who were charged with
        14    comparing postmortem dental records with any anti more item
13:23   15    records that were available, in the hope of identifying
        16    victims.
        17        Q.    By antemortem, you mean before the victims
        18    died?
        19        A.    Before the death occurred, yes.
13:23   20        Q.    Have you had occasion to deliver any lectures
        21    on forensic science issues?
        22        A.    Yes, for many years, since the focus of my
        23    intellectual work was medical diagnosis and the problems
        24    associated with inference, which is a branch of logic, I
13:24   25    brought that to my training and my experience with forensic

9

```
13:24   1    science and forensic medicine, both formally and informally
        2    in terms of my work experience.  But I -- I was able to
        3    teach courses which I was to develop for Pacific Lutheran
        4    University, I -- I set up courses in which I lectured,
13:24   5    obviously.  I also gave many presentations in areas of my
        6    research and areas of my work to various forensic science
        7    on, which are peer reviewed, and I've published papers,
        8    chapters of books, two of my own books, one edited with a
        9    colleague, which is a textbook in forensic science and
13:25  10    medicine, and my own book on the process of the logical and
       11    philosophical foundations of forensic science involving the
       12    production and defense of explanations.  That's called dead
       13    reckoning, the art of forensic detection.
       14        Q.   When were your books published?
13:25  15        A.   My first book was published in 1999.  My
       16    second -- first edition of my second was in 2002, I believe,
       17    or -- I -- I'm not sure.
       18        Q.   Is there any board which certifies forensic
       19    scientists?
13:25  20        A.   The -- the answer is somewhat complex,
       21    meaning that there are several parts to it.  Some areas have
       22    developed board certification processes in an attempt to
       23    standardize practice and protocols in the forensic sciences,
       24    to avoid the sort of hit and miss kind of lapses in training
13:26  25    and preparation that one can find in medical examiner --
```

10

```
13:26   1    examiners' offices, coroners' offices, or in sheriff's
        2    departments, police departments and so forth.  The most
        3    obvious is in forensic medicine, forensic pathology, is a
        4    specialization which has a board certification much like any
13:26   5    other specialty, such as internal medicine or radiology or
        6    psychiatry or other -- other branches, but that wasn't
        7    established until 1959 in the United States, so -- other
        8    forensic sciences have followed.  There are various
        9    accrediting agencies, some of which require certain number
13:27  10    of hours of experience and some which focus on training and
       11    so on.
       12        Q.   Are you board certified?
       13        A.   Yes.
       14        Q.   By whom are you board certified?
13:27  15        A.   The American Board of Medicolegal Death
       16    Investigators is a -- an organization that was started with
       17    an effort to help provide some standards for death
       18    investigation in the United States.  There were prior to
       19    this organization no certifications, no training
13:27  20    requirements and so forth to become a medicolegal death
       21    investigator.  And this problem was addressed by members of
       22    the American academy of forensic sciences.  I've been a
       23    board member in that organization, I've been a member for
       24    many years, and was on their ethics committee for 10 years.
13:28  25        Q.   So you're a member of the American academy of
```

11

```
13:28   1    forensic sciences?
        2        A.   Yes, that's correct.
        3        Q.   And you're a board member?
        4        A.   I was a board member, yes.
13:28   5        Q.   Tell me what is involved when you were
        6    certified by the American Board of Medicolegal Death
        7    Investigators.
        8        A.   We have both a practical requirement and a --
        9    an academic requirement.  The practical requirement involves
13:28  10    a certain number of hours of supervision doing medicolegal
       11    death investigation, which involves examining decedents at
       12    scenes of sudden or violent death or unexpected death,
       13    unattended deaths, hospital deaths in some cases, so there's
       14    a wide range of -- of different cases that fall under the
13:29  15    jurisdiction of the medical examiner.  So the duties are --
       16    are varied.  So we wanted a practical component to require a
       17    certain number of hours and certain number of quality of
       18    level of participation in death investigation.
       19            Then, since this is also involves an academic
13:29  20    area a specialization that requires some medical knowledge
       21    as well as practical training, there is a written
       22    examination as well as a practical examination that -- that
       23    one has to complete.
       24            In addition, to remain current and maintain
13:29  25    board certification, there are continuing medical education
```

12

```
13:29   1    credits which have to be earned, and those are earned by
        2    attending courses which the American Board of Medicolegal
        3    Death Investigators approves and gives certain number of
        4    hours credits for.
13:30   5            For example, in my involvement with the FBI
        6    in SWGSTAIN, we meet twice a year for a week to conduct
        7    research to do work to advance the forensic science of
        8    blood-stained pattern analysis, and those hours would be
        9    applicable for continuing medical education for the board.
13:30  10    So those are the components necessary.
       11        Q.   Dr. Nordby, as you wrote a written report for
       12    me at my request, did you not?
       13        A.   Yes.
       14        Q.   And did you attach to your written report a
13:31  15    curriculum vitae?
       16        A.   Yes, I did.
       17        Q.   I'm going to ask you -- I'm going to show you
       18    what I believe to be your curriculum vitae and ask you if
       19    this is what you prepared for me.
13:31  20        A.   Yes.
       21        Q.   Does this reasonably and fairly summarize
       22    your professional accomplishments in the field?
       23        A.   Yes.
       24        Q.   I'd like to have the court reporter mark this
13:31  25    as Exhibit 1, Nordby Exhibit 1, please.
```

13

13:31 1           (Deposition Exhibit 1 was marked

2           for identification.)

3    Q.   BY MR. PARKINS:  Dr. Nordby, have you ever

4 been qualified by a court as an expert witness in the fields

13:32 5 of forensic science?

6    A.   Yes.

7    Q.   Tell me how often that has occurred.

8    A.   I'd have to look at my record.  I don't --

9 it's been enough times that I can't remember.

13:32 10    Q.   If I were to hand you a document which you

11 attached to your report, is this the record that you had to

12 look at?

13    A.   Yes, and I always try to put a date at the

14 top of both my vita and my court experience, indicating that

13:32 15 it's current through that date, because an additional case

16 may come and need to be added.  But yes.

17    Q.   Without bothering to count the number of

18 times, can you estimate for us the number of times that you

19 have been qualified by a court to give expert testimony?

13:33 20    A.   25 or 26 times.

21    Q.   And these are various courts around the

22 country?

23    A.   Yes, sir.  They are various jurisdictions in

24 the United States and in Canada.  They're both federal court

13:33 25 and state court.

14

13:33 1    Q.   Dr. Nordby, let's take a quick look at your

2 role as an expert in this particular case.  Are you being

3 compensated for your time by the defendants?

4    A.   Yes.

13:34 5    Q.   Would you please tell the jury how much you

6 are charging the defendants for your time.

7    A.   My time is billed at $275 an hour.  For long

8 days, many involving more than 12 hours, I bill a flat rate

9 of $3,000 a day.  For courtroom testimony I bill at the rate

13:34 10 of $500 per hour.  Much of that is to account for the

11 overhead of our laboratory, which is quite an expensive

12 operation to run.

13    Q.   Is your compensation in this case in any way

14 dependent upon the outcome of the case?

13:34 15    A.   No, not at all.  In fact, the -- the way that

16 I conduct my consulting practice is that I provide a letter

17 of engagement, which states basically that as a forensic

18 scientist my job is to develop physical evidence, to assess

19 that evidence within the limitations of my own experience

20 and expertise in the relevant science, and to provide an

21 explanation of why if we are unable to do any inferences --

22 to support any inferences from the data, why -- why that's

23 the case.  I am bound to the best methods of forensic

24 science and medicine that I can maintain to come up with

13:35 25 what the facts show.  In that sense, my role is not one of

15

13:35 1 an advocate for any particular side.  The results of my

2 scientific endeavors would be the same whether I was working

3 for the plaintiff or the defendant.  There would be no

4 difference.  And I indicate that in this letter of

13:36 5 engagement, which I ask my prospective clients to sign

6 before I begin any work in -- on the data.

7    Q.   Have you ever worked for me or my law firm

8 before?

9    A.   No, sir.

13:36 10    Q.   Have you ever worked for the Wilmington

11 Police Department before?

12    A.   No, sir.

13    Q.   You're -- this deposition is being taken in

14 your offices and laboratory in Washington state; is that

13:36 15 correct?

16    A.   That's correct.

17    Q.   Is it fair to say that last fall you were

18 diagnosed with a serious illness?

19    A.   Yes.

13:36 20    Q.   Does that -- your illness allow you to travel

21 across the country to testify live before the jury in this

22 matter?

23    A.   No.

24    Q.   Do you understand that your deposition today

13:37 25 is being conducted in lieu of your live testimony before the

16

13:37 1 jury?

2    A.   Yes.

3    Q.   Let's focus again, if we could, on your

4 assignment.  What did you do to analyze the evidence in this

13:37 5 case?

6    A.   Well, the first step is to assemble the

7 available evidence and to understand the scope and nature of

8 the questions that might be posed to that evidence, so

9 police reports, anything that involves the collection

13:37 10 process and documentation of physical evidence would be

11 something I need to see, as well as that physical evidence

12 itself.

13    Q.   Did you ask me for any documents or

14 information that I refused to give you?

13:37 15    A.   No.

16    Q.   Did you visit the scene of this incident?

17    A.   Yes, I did.

18    Q.   Did you examine the automobile which

19 Mr. Smith was driving at the time of this incident?

13:38 20    A.   Yes, I did.

21    Q.   How long did you spend examining the

22 automobile with -- that Mr. Smith was driving?

23    A.   Approximately a week.  We analyzed the damage

24 to the vehicle, trying to document anything that involved

13:38 25 the shooting, we tried to examine everything relating to the

17

13:38  1   blood shed and the incident that occurred, fractures of
2   glass and the nature of the damage to the vehicle.
3       Q.  Did you test fire any weapons that were
4   involved that evening?
13:38  5       A.  Yes.
6       Q.  Did you examine any materials for gunshot
7   residue?
8       A.  Yes.
9       Q.  I'm going to show you a few photographs that
13:39 10   you have previously submitted to us and we have shared with
11   the -- with Ms. Sulton, and before we do that, I'm going to
12   ask the court reporter to mark them one by one, and I'm
13   going to ask you in connection with each photograph to just
14   tell the jury briefly what is happening in these photos.
13:39 15       Let's ask the court reporter to please mark
16   as the first exhibit, I guess it would be No. 2.
17       (Deposition Exhibit 2 was marked
18       for identification.)
19       Q.  BY MR. PARKINS:  Incidentally, Dr. Nordby,
13:40 20   did you take these photographs?
21       A.  Yes, I did.
22       Q.  Can you estimate for us how many photographs
23   you took as part of your investigation?
24       A.  It would be very difficult to estimate, but
13:40 25   hundreds.

18

13:40  1       Q.  Okay.
2       A.  Including photomicrographs.
3       Q.  What are photomicrographs?
4       A.  Photomicrographs are images that are taken
13:40  5   through a microscope.  Sometimes they are incorrectly
6   referred to as microphotographs, which would be very, very
7   small pictures.  These indeed are images that are taken
8   through a microscope.
9       Q.  Would you take a look at the first one, which
13:40 10   is on I believe Page 1, that the court reporter has been
11   kind enough to mark.
12       A.  Yes.
13       Q.  Would you please tell the jury what is
14   happening in the upper photograph in -- in this collection.
13:41 15       A.  Yes.  This is documenting the process that I
16   used to provide information about bullet entrances and exits
17   in the vehicle.  This top photograph shows the plum bob and
18   a laser level and angle determining dial, which we use to
19   document three dimensions of the impact of a bullet with the
13:41 20   vehicle.  We essentially treat the vehicle as if it were on
21   an XYZ axis, which is a way of giving numbers running across
22   the front of the vehicle, numbers running the length of the
23   vehicle, and then numbers running the height of the vehicle.
24   And the photographs here depict that process of setting up
13:42 25   the measuring devices to accomplish this examination.

19

13:42  1       Q.  Incidentally, so that we can make this
2   absolutely clear, the vehicle in this photograph is the
3   vehicle which Mr. Smith was driving at the time of this
4   incident?
13:42  5       A.  That's my understanding, that's correct.
6   It's Patrol Car 1180.
7       Q.  Would you do me a favor, please, and turn to
8   Page I believe it's 38, which I believe is clipped.
9       A.  37?
13:42 10       Q.  38.
11       A.  Okay.
12       Q.  Would you hand that to the court reporter,
13   and I'll ask him to mark this as Exhibit 3.
14       (Deposition Exhibit 3 was marked
13:42 15       for identification.)
16       THE WITNESS:  Okay.
17       Q.  BY MR. PARKINS:  Tell the jury what this
18   photograph depicts.
19       A.  The top photograph shows how we determine
13:43 20   the -- what's called the -- the Z axis, the point in space
21   in the air vertically where a particular bullet entry or
22   exit, depending, has occurred, and we use lasers to
23   accomplish this, and this process involves setting up the
24   equipment, determining angles and measuring those angles
13:44 25   using lasers.  Since the development of the Ruby laser it's

20

13:44  1   become much easier to accomplish these measurements at -- at
2   various crime scenes, and it becomes much easier to
3   understand the dynamics of a shooting when you can
4   understand where the exits and entries occur.
13:44  5       The hope is to provide a map of the shooting
6   sequence, not with the ability, necessarily, to tell which
7   shot came first and second but to help understand the
8   patterns that the shots in this case must conform to and the
9   physical description of their trajectories.
13:44 10       Q.  Why not use plastic dowels or metal dowels to
11   do the same thing?
12       A.  There are several different methods that are
13   suitable.  The difficulty with metal dowels, and again, the
14   difficulty with any measurement technique, is that it
13:45 15   requires an understanding of the materials involved in the
16   shooting.  In this case a car as very complex collection of
17   glass, different types of glass, safety glass and tempered
18   glass, then metals of different types, plastics, rubber,
19   cloth, and each of those materials will respond slightly
13:45 20   differently to the passage of a bullet, and it also depends
21   on the type of ammunition.  So what we're -- what we're
22   trying to do is to appreciate the fact that bullets, while
23   for the most part they travel in straight lines, when they
24   hit a target they -- there is a deflection or some sort of
13:46 25   change in the direction of that projectile.

21

13:46  1     Metal rods traditionally have been used and
2  put together to accomplish this approximation of a
3  trajectory, but sometimes it becomes potentially misleading.
4  If we think that because it's -- demonstrates a straight
13:46  5  line with a -- with a trajectory rod, that that was the path
6  of the bullet.  The laser allows us a higher degree of
7  control over the angle and the measurement so that we can
8  appreciate deflections more easily.  Also, there isn't the
9  need to touch or damage potentially change the entrance or
13:46  10  exits of the projectiles hen we use a laser, since light
11  simply passes through.
12     Q.   How could you see, by the way, the path of
13  the laser beam?
14     A.   What we do is we examine the vehicle, in this
13:47  15  case in a confined controlled environment, where we
16  introduce fog or smoke.  It's a particular benign sort of
17  particulate that is suspended in the air, and the laser
18  simply shows on those suspended particles.
19     Q.   So you put the vehicle in a closed garage and
13:47  20  fill it with smoke or fog and then take the photographs?
21     A.   Yes.
22     Q.   Would you take a look, please, at Page 41.
23  And I'm going to ask that ask you to hand
24  that to Ron and have him mark it as -- Exhibit 4, is it?
13:48  25     THE REPORTER:  Yes.

22

13:48  1     (Deposition Exhibit 4 was marked
2     for identification.)
3     THE WITNESS:  I need to get some water.
4     MR. PARKINS:  Let's take a short break,
13:48  5  please.
6     THE VIDEOGRAPHER:  We're going off the
7  record.  The time is 1:48 p.m.  Please stand by.
8     (Short recess.)
9     THE VIDEOGRAPHER:  We're back on the record.
14:00  10  The time is 2:00 p.m.
11     Q.   BY MR. PARKINS:  What does 41 depict?
12     A.   The -- top photograph shows the
13  orientation of a bullet crease and it is size and place in
14  three-dimensional space.  We also use at least three
14:00  15  different applications of method where possible to produce a
16  measurement.  Because there are factors that can influence
17  one method over another, such as error rates or other issues
18  of more technical scientific sort, I will use trajectory rod
19  and a laser and simple mathematics to determine what we can
14:01  20  from a particular bullet impact in this case, and that's
21  what that depicts.  It shows the plum bob orienting vertical
22  space and it shows the angle of impact with the trajectory
23  rod, and then a suitable measuring device, which gives us a
24  scale for the whole process.
14:01  25     Q.   Thank you.

23

14:01  1     May I see the book for a second, please?
2     A.   Yes.
3     MR. PARKINS:  I'm going to ask the reporter
4  to please mark as Exhibit 5 Page 48.
14:02  5     (Deposition Exhibit 5 was marked
6     for identification.)
7     Q.   BY MR. PARKINS:  Does Exhibit 5 depict a
8  similar effort as you just described to us in connection
9  with 41?
14:02  10     A.   Yes.
11     Q.   Okay.  Can we take -- let's see this book for
12  a second.
13     Can I ask the court reporter to mark as
14  Exhibit No. 6 Page 91.
14:03  15     (Deposition Exhibit 6 was marked
16     for identification.)
17     Q.   BY MR. PARKINS:  What does Page -- Exhibit
18  No. 6 show?
19     A.   This is -- represents the documentation and
14:03  20  measurements that were -- were done for the shots that came
21  through the rear window of Patrol Car 1180 and also instruct
22  Plexiglas slider between the rear passenger compartment and
23  the front of the -- front seat of the vehicle.  The numbers
24  and letters are used to help us orient our -- and document
14:04  25  each of the particular bits of damage.  A commonly, although

24

14:04  1  not always, is an entrance, B is an exit, although not
2  always, it's not a hard-and-fast rule, but as long as we
3  understand that part of the effort is to understand
4  entrances and exits, fracture patterns as they apply or
14:04  5  don't apply, and what -- whatever else the physical evidence
6  here can show us about each of those sets of impacts.
7     Q.   Based upon the information that you gleaned
8  from this undertaking, did you attempt to approximate the
9  trajectories of the bullets that were fired at the police
14:05  10  car?
11     A.   Yes.  Yes.  And again, the -- notion of
12  importance here is reliability to make determinations of
13  entrances and exits, not always precision or exacting
14  measurements, because the different materials according to
14:05  15  the research that I have done by firing suitable ammunition
16  through different types of materials have what are called
17  deflection angles, and those deflection angles can vary
18  with -- with the material, with the type of ammunition
19  that's used, and sometimes even with the environment, that
14:05  20  is, whether the surface is wet or not wet, and so on.  So
21  the -- the effort is to -- to document each of those bits of
22  data and record the result.
23     Q.   Is possible to determine which shot was
24  fired first?
14:06  25     A.   No.

25

14:06 1     Q.   Based upon your examination, do you have any

2 conclusions as to whether your findings are consistent or

3 inconsistent with the positions of the defendant police

4 officers as they've described them in their depositions?

14:06 5     A.   Without recalling every detail, it certainly

6 is consistent with the story that was provided to me in

7 those depositions.

8     Q.   Did you see any evidence that the car was

9 struck by anyone standing on the side of the car, on the

14:07 10 driver's side?

11     A.   On the driver's side, no. All of the impacts

12 that were documented either came from behind -- from the

13 rear of the vehicle or toward the rear and to the right

14 side, that would be the passenger side of the vehicle, and

14:07 15 those opinions are based upon the damage to the vehicle and

16 the type of damage that we see to the vehicle.

17     Q.   May I see the photos for a second, please.

18        I'm going to ask the court reporter to mark

19 as Exhibits 6 and 7 two photographs that appear in Appendix

14:07 20 Part 3, Pages 1 and 3.

21        THE REPORTER: Counsel, this is 7 and 8.

22        MR. PARKINS: Thank you.

23        (Deposition Exhibit 7 was marked

24         for identification.)

14:09 25     Q.   BY MR. PARKINS: Dr. Nordby, would you take a

26

14:09 1 look at Exhibits 7 and 8 and tell us if you took these

2 photographs.

3     A.   Yes, I did.

4     Q.   Briefly, what do they depict?

14:09 5     A.   These are comparisons of test-fired bullets

6 from a particular pistol, with a serial number SAF0327, and

7 they're compared with the bullet recovered by the medical

8 examiner from the decedent, Mr. Harry Smith the 3rd, and

9 these photographs were taken with a comparison microscope

14:10 10 and documented showing the -- the physical features of each.

11     Q.   In your opinion does the -- bullet which

12 was retrieved from Mr. Smith match the test bullet that --

13 that you fired?

14     A.   Yes, both class and individual

14:10 15 characteristics show that the bullet recovered from

16 Mr. Harry Smith the 3rd was fired through that particular

17 pistol.

18     Q.   Do you have an understanding who that pistol

19 was used by?

14:10 20     A.   Yes. I was told that it was Officer

21 Ciritella's pistol.

22     Q.   Thank you.

23        Was this the bullet that was retrieved from

24 Mr. Smith's brain?

14:11 25     A.   Yes, I believe so.

27

14:11 1     Q.   Okay.

2        Would you take a look at Page 8 and tell us

3 briefly what is there.

4     A.   Excuse me. Exhibit 8?

14:11 5     Q.   Exhibit 8. I'm sorry.

6     A.   Yes. This, again, shows two -- two

7 photographs. The top photograph compares a known with an

8 unknown -- a known cartridge case fired through this

9 particular pistol, Officer Ciritella's pistol, and an

14:11 10 unknown item from Harrison Street, found at the scene. And

11 again, these are firing pin impressions in the primer of the

12 cartridge, and the firing pin on a pistol will leave

13 characteristic impressions that can be analyzed in terms of

14 their class as well as individual characteristics.

14:12 15     Q.   Do you have an opinion as to whether the same

16 weapon fired both of -- used -- excuse me. Do you have an

17 opinion as to whether the shell casings were both fired from

18 the same weapon?

19     A.   Yes, they were.

14:12 20     Q.   Okay.

21        One last photograph to look at, please.

22        I'm going to ask the reporter to mark as

23 Exhibits 9, I believe, Page 4 from Part 7 of the appendix.

24        (Deposition Exhibit 9 was marked

14:12 25         for identification.)

28

14:13 1        MR. PARKINS: Is that 9?

2        THE REPORTER: Yes.

3     Q.   BY MR. PARKINS: Without any detailed

4 scientific explanation, can you just briefly tell us what

14:13 5 Exhibit 9 represents?

6     A.   This is a graph, which represents spectra

7 from x-ray fluorescence analysis of particular items. In

8 this case it's the headliner from the driver's side of

9 Patrol Car 1180. And what -- what this does is x-ray

14:14 10 fluorescence is a -- a scientific technique that we use to

11 determine the elements that are present in a particular

12 sample, and x-ray fluorescence works particularly well on

13 melts.

14     Q.   Were you looking for any particular elements

14:14 15 in -- in this study?

16     A.   Yes. When a -- cartridge is fired in a

17 pistol such as Officer Ciritella's pistol a primer is

18 struck by the firing pin and that primer initiates the burn

19 for the gunpowder to fire the bullet through the pistol, and

14:14 20 characteristically there's antimony, barium and lead in most

21 primers, and one indicator of the proximity of a -- the

22 discharge of a firearm to a particular target is the

23 presence of antimony, barium and lead fused as one particle.

24     Q.   Did you find any evidence of antimony, barium

14:15 25 and lead in the headliner of the car?

29

14:15    1    A.   No.

2    Q.   Did you similarly analyze the clothing worn

3 by Mr. Smith at the time of this event?

4    A.   Yes, I did.

14:15    5    Q.   Did you find any antimony, barium or lead on

6 his clothing?

7    A.   No, I did not.

8    Q.   What does the absence of such a finding tell

9 you?

14:15    10    A.   Well, one has to be careful whenever one

11 infers from the absence of something, but certainly in this

12 case, considering other factors, as well, that -- the

13 conclusion is that we can't say that any of those items,

14 whether it be headliner or clothing, was within three feet

14:15    15 of the discharge of a -- of a firearm.

16    Q.   If someone had stuck a firearm into the car

17 to shoot Mr. Smith, would you have expected to find those

18 elements in the materials you tested?

19    A.   Yes, I would expect to find them.

14:16    20    Q.   Let's move on to your conclusions for a few

21 minutes. And I'd like to focus your attention first on the

22 events on 5th Street. The plaintiffs in this case I believe

23 contend that Mr. Smith was trying to drive away from

24 Detective Ciritella on 5th Street and the defendants contend

14:16    25 that Mr. Smith was driving towards Detective Ciritella on

30

14:16    1 the 5th street. What does the physical evidence tell us

2 about what happened at that time?

3    A.   The physical evidence indicates that Patrol

4 Car 1180 was going toward the position that Officer

14:17    5 Ciritella had taken at the corner and was going toward and

6 past him.

7    Q.   And what physical evidence tells us that?

8    A.   There are several factors. One is the

9 presence of glass on the corner. The glass is from the side

14:17    10 window, at least it is typical of side window glass from

11 the -- from the properly car. It is tempered glass. Then

12 also there are two cartridge cases that were fired through

13 over Ciritella's pistol that were found, one in the vehicle

14 itself in the front seat of the -- of the properly car, and

14:17    15 one found in the windshield wiper well of the vehicle, and

16 the other factor are -- involves tire impressions and tire

17 marks, and the impact between the properly car and a parked

18 vehicle, which was a white Jeep.

19    Q.   Let's -- let's focus for a moment on the

14:18    20 shell casings, one of which was found in the car and one on

21 the -- in the windshield wiper well. Did you test Detective

22 Ciritella's weapon to see how it ejected shell casings?

23    A.   Yes. I fired the weapon over a flat concrete

24 surface so we could understand the characteristic patterns

14:18    25 if there are characteristic patterns that result from firing

31

14:18    1 the same type of ammunition with the same amount of powder,

2 the same general configuration and design as those used by

3 the Wilmington Police Department at the time of this

4 shooting.

14:19    5    The measurements were taken showing the --

6 the location that ejected cartridge cases would fall when

7 discharged from the weapon, and there's a wide variety, as

8 one would expect, of distances which were documented and put

9 together in a chart.

14:19    10    Q.   Did you use the same kind of ammunition as

11 Detective Ciritella was using that night?

12    A.   Yes.

13    Q.   What general conclusions can you reach as to

14 the pattern of ejection of the shells -- shell casings?

14:19    15    A.   That the particular pistol discharges its

16 spent cartridge cases slightly backward and to the right,

17 which is the design of the weapon. Also, depending on the

18 particular location that the shooter holds the weapon, it's

19 possible and it happened several times that the ejected

14:20    20 cartridge casing hit the shooter, and sometimes went higher,

21 sometimes went lower, but the cartridge cases seemed to spin

22 and stay in the air for some period of time rather than just

23 go straight down.

24    Q.   What does the fact that there was one of

14:20    25 Detective Ciritella's shell casings found in the car tell

32

14:20    1 you?

2    A.   Well, that tells me given the testing that

3 we -- we did -- that I did with -- with respect to the

4 ejection patterns -- that tells me that within a range of

14:21    5 distances we -- we -- we can put that cartridge case and

6 its -- the fact that it's a spent cartridge case in

7 proximity with that squad car, so that in order for that

8 cartridge case to be in the front seat along the center

9 console area of the squad car, the squad car and the ejected

14:21    10 cartridge case had to be very close to each other in -- in

11 space and time.

12    Q.   Would that suggest the direction in which the

13 squad car was driving?

14    A.   It -- it would. It would suggest that the

14:21    15 car was moving -- if we're facing at direct -- sideways,

16 facing the passenger door, that it was moving from -- from

17 left to right, and that since the pistol ejects cartridge

18 cases also to the -- to the right and slightly backward and

19 upward, that the cartridge case came through the window of

14:22    20 the -- of the squad car while it was still in the air,

21 meaning that -- that the car was fairly close.

22    Q.   Does that suggest whether the car was driving

23 toward -- behind Mr. Ciritella?

24    A.   I'm sorry. Could --

14:22    25    Q.   Was driving left to right; am I correct?

33

| | | |
|---|---|---|
| 14:22 | 1 | A.   Yes. |
| | 2 | Q.   Was it also moving in a -- towards his rear? |
| | 3 | A.   No, it would be moving away, toward -- |
| | 4 | Q.   Was the car moving away from Detective |
| 14:22 | 5 | Ciritella when he was shooting? |
| | 6 | A.   No.  It would be coming right up to him. |
| | 7 | Q.   Right. |
| | 8 | A.   So -- |
| | 9 | Q.   I'm sorry. |
| 14:23 | 10 | A.   I'm not sure I understood. |
| | 11 | Q.   No. |
| | 12 | You -- you also made reference to glass. |
| | 13 | A.   Yes. |
| | 14 | Q.   I'm going to show you a photograph which you |
| 14:23 | 15 | reproduced in part of your report at Page -- supplemental |
| | 16 | report at Page 4. |
| | 17 | Would we have the court reporter mark that as |
| | 18 | I believe Exhibit 9. |
| | 19 | THE REPORTER:  10, Counsel.  10. |
| 14:23 | 20 | MR. PARKINS:  10.  Sorry. |
| | 21 | (Deposition Exhibit 10 was marked |
| | 22 | for identification.) |
| | 23 | MR. PARKINS:  Anne, for purposes of the |
| | 24 | record, the only portion of Exhibit 10 is the photograph and |
| 14:23 | 25 | not the accompanying text, and not the report. |

34

| | | |
|---|---|---|
| 14:23 | 1 | Q.   What does this photograph depict, Dr. Nordby? |
| | 2 | A.   It shows a police officer pointing to glass |
| | 3 | from a tempered glass side window on the corner of 5th and |
| | 4 | Harrison. |
| 14:24 | 5 | Q.   BY MR. PARKINS:  Is this the glass to which |
| | 6 | you earlier referred when you were telling us about the |
| | 7 | proximity of the motor vehicle? |
| | 8 | A.   Yes. |
| | 9 | Q.   Okay.  Thank you. |
| 14:24 | 10 | Dr. Nordby, I'd like to now focus on what |
| | 11 | happened as the properly car turned the corner.  I believe |
| | 12 | it's conceded that it struck a -- a Jeep Cherokee. |
| | 13 | A.   Yes. |
| | 14 | Q.   Can you tell us anything about whether the |
| 14:24 | 15 | car was -- the stolen car was accelerating or decelerating? |
| | 16 | A.   Yes.  The evidence at the scene indicates |
| | 17 | that the car was accelerating.  The -- the vehicle left |
| | 18 | rubber trail tread impressions from this acceleration.  The |
| | 19 | 2002 Ford vehicle is designed to grip one side if the other |
| 14:25 | 20 | side slips, in a type of traction control, and that left |
| | 21 | side wheel, the driver's side wheel, was -- was probably |
| | 22 | spinning and producing a lot of smoke and the other wheel |
| | 23 | was maintaining traction. |
| | 24 | Q.   I'm going to show you a photograph on Page 7 |
| 14:25 | 25 | of your supplemental report.  And this will be Exhibit 11? |

35

| | | |
|---|---|---|
| 14:25 | 1 | THE REPORTER:  Yes. |
| | 2 | (Deposition Exhibit 11 was marked |
| | 3 | for identification.) |
| | 4 | Q.   BY MR. PARKINS:  The photograph to which I'm |
| 14:26 | 5 | referring, Dr. Nordby, is the lower of the two photographs. |
| | 6 | A.   Yes. |
| | 7 | Q.   What does that depict? |
| | 8 | A.   It shows that the white Jeep had a antitheft |
| | 9 | device in place, called the Club, and that had locked the |
| 14:26 | 10 | steering wheel in -- in position, and it also appears to |
| | 11 | have had a -- another standard safety lock mechanism, which |
| | 12 | kept the wheels from turning. |
| | 13 | Also, one can see the damage to the -- to the |
| | 14 | white Jeep as well as the tire tracks left by Patrol Car |
| 14:27 | 15 | 1180. |
| | 16 | Q.   Detective Ciritella will testify that as the |
| | 17 | car turned the corner he could hear tires screaming and |
| | 18 | smell rubber burning.  Based upon the evidence that you have |
| | 19 | seen, do you believe that to be accurate? |
| 14:27 | 20 | A.   Yes. |
| | 21 | Q.   There has been some suggestion that this was |
| | 22 | a low-speed crash because the air bags on the properly car |
| | 23 | did not deploy.  Where are -- what causes an airbag to |
| | 24 | deploy on a car? |
| 14:27 | 25 | A.   Well, in the design of this police |

36

| | | |
|---|---|---|
| 14:27 | 1 | interceptor the frame rails have the sensors which trigger |
| | 2 | the airbag, and most modern cars are designed to protect the |
| | 3 | passengers and occupants, drivers, as well, from injury |
| | 4 | during any impact.  This particular impact damaged the right |
| 14:28 | 5 | front fender of Patrol Car 1180 and that damage did not |
| | 6 | directly strike the front bumper with sufficient force to |
| | 7 | deploy the air bags.  The failure of the bags to deploy is |
| | 8 | actually a design feature because the vehicle crumpled on |
| | 9 | the right side the way it was designed to do. |
| 14:28 | 10 | Q.   I'm going to show you a photograph, which |
| | 11 | I'll ask the reporter to mark as Exhibit 12. |
| | 12 | (Deposition Exhibit 12 was marked |
| | 13 | for identification.) |
| | 14 | Q.   BY MR. PARKINS:  It's the upper photograph to |
| 14:29 | 15 | which I would like you to refer.  Does this photograph |
| | 16 | depict the damage to the properly car? |
| | 17 | A.   Yes.  This shows the crumple zone on the |
| | 18 | right front. |
| | 19 | Q.   Were the airbag sensors on this 2002 Crown |
| 14:29 | 20 | Victoria police interceptor impacted? |
| | 21 | A.   No. |
| | 22 | Q.   Does the absence of airbag deployment in this |
| | 23 | particular incident tell us anything at all about the speed |
| | 24 | at which the -- the properly car was going when it hit the |
| 14:29 | 25 | Jeep? |

37

```
14:29   1      A.   No.
        2      Q.   Were you able to make any determination as to
        3   what likely happened to Mr. Smith as the properly car hit
        4   the Jeep Cherokee?
14:30   5      A.   Yes, my examination of the windshield showed
        6   in the upper left-hand corner of that windshield that there
        7   was an impression typical of a blow from a forehead to
        8   the -- to the glass, and that -- that was documented
        9   photographically and examined.  So in -- in my opinion when
14:30  10   the vehicle struck the Jeep Mr. Smith bumped his head on the
       11   front of the windshield.
       12          MS. SULTON:  I'm going to object and ask that
       13   that testimony be stricken because Dr. Nordby is not a
       14   biomechanical expert.
14:30  15          MR. PARKINS:  Okay.
       16      Q.   Dr. Nordby, did you find any residual
       17   material on the inside of the windshield at the point where
       18   that impact took place?
       19      A.   Yes, as I recall, there was some grease and a
14:31  20   pattern impression and I -- I can't recall what else we
       21   found.
       22      Q.   Do you recall whether the autopsy report made
       23   any in -- suggestion as to whether there had been --
       24      A.   Yes.
14:31  25      Q.   -- some impact involving Mr. Smith's
```

38

```
14:31   1   forehead?
        2      A.   Yes, the pathologist reported a contusion in
        3   the area that I believe hit the windshield.
        4      Q.   Thank you.
14:31   5          Let's move on.  The medical examiner's report
        6   indicates that two shots struck Mr. Smith from the rear.
        7   Did you make any determination as to whether any of these
        8   bullets struck anything before hitting Mr. Smith?
        9      A.   Yes.
14:32  10          MS. SULTON:  I'm going to object to this
       11   entire line of questioning about any injuries, the cause
       12   and/or manner of death of Mr. Smith, because Dr. Nordby is
       13   not qualified to render an opinion about physical injuries.
       14   He is not a medical doctor, has no education in the field of
14:32  15   medicine, and is not board certified as a pathologist.  So I
       16   will leave that as a continuing objection.
       17          MR. PARKINS:  That's fine.
       18          MS. SULTON:  Thank you, Counsel.
       19          MR. PARKINS:  Would you like the question
14:32  20   reread?
       21          THE WITNESS:  Please.
       22          MR. PARKINS:  Ron, would you do that for me,
       23   please.
       24          (Record read.)
14:33  25          THE WITNESS:  Yes.  We did a number of --
```

39

```
14:33   1   made a number of observations.  The -- one pallet had
        2   instruct headrest and the other bullet had to go through
        3   Plexiglas in order to reach that area of the -- of the car
        4   occupied by the decedent.
14:33   5      Q.   The flex glass meaning the barrier between
        6   the front and back seats?
        7      A.   Yes, that's correct.
        8      Q.   Did the car which -- the bullet which struck
        9   the headrest also have to hit the Plexiglas first?
14:33  10      A.   Yes.
       11      Q.   What happens when bullets hit Plexiglas?
       12      A.   There is a -- in this particular case the --
       13   the jacketed hall owe point a ammunition will expand, and it's
       14   designed to expand in -- in size.  Also, Plexiglas in the
14:34  15   experiments that I've done in the pass by shooting
       16   ammunition through Flex J glass indicate that there's a
       17   slight downward deflection when a projectile strikes that,
       18   because obviously when that projectile is going at a certain
       19   rate and it slows markedly when it strikes the object such
14:34  20   as Flex glass.
       21      Q.   Do you have an opinion as to whether
       22   Mr. Smith was sitting upright or slumped forward over the
       23   steering wheel when he was struck by these two bullets?
       24          MS. SULTON:  I want to again reiterate my
14:34  25   standing objection to any testimony being offered by this
```

40

```
14:35   1   particular witness because he is not qualified to render
        2   testimony about the cause or manner of death.  Thank you,
        3   Counsel.
        4          THE WITNESS:  Repeat.
14:35   5          MR. PARKINS:  Would you read it back, please,
        6   Ron.
        7          (Record read.)
        8          THE WITNESS:  The evidence shows that he was
        9   upright given the trajectories and the wound path described
14:35  10   by the pathologist.
       11      Q.   BY MR. PARKINS:  And what do you mean by the
       12   trajectories?
       13      A.   The trajectories meaning the incoming rounds
       14   through the vehicle, the angles at which all of those
14:35  15   potential bullets had to take in order to reach the occupied
       16   space.
       17      Q.   Thank you.
       18          Let's focus, if we could, on the shot that
       19   struck Mr. Smith in the head.  Do you have an opinion as to
14:36  20   what trajectory that bullet took?
       21      A.   Yes.
       22      Q.   What trajectory did that take?
       23      A.   Well, the bullet came in from the side.  One
       24   has to be cautious in -- in putting together shooting
14:36  25   scenarios in this sense because heads obviously move, but
```

Draft Copy

41

14:36  1    when we put together the information we have from the squad
       2    car itself and damage to the vehicle, the bloodstain pattern
       3    evidence which is present inside the vehicle, the medical
       4    examiner's account of the direction of the bullet impact
14:37  5    through the decedent's head, we can come up with a
       6    trajectory, as you put it, that the bullet came from the
       7    right side or the passenger side of the car, and that the
       8    decedent was upright in the -- in the vehicle when this
       9    bullet struck his head.
14:37  10   Q.    The plaintiffs have alleged in this case that
       11   Mr. -- that the defendant officers shot Mr. Smith after the
       12   police car had come to a stop.  Do you have any opinion as
       13   to whether the car was still moving when the shot which hit
       14   him in the head was fired?
14:38  15   A.    The movement of the vehicle is not something
       16   that is captured by an analysis of an impact or an injury or
       17   damage to the -- to the vehicle itself.  It occurs to me
       18   that we have to consider the -- the scene, as well, the
       19   glass, the fractures of different types of glass, in
14:38  20   striking the Jeep and the movement of the Jeep, as well, and
       21   the fact that for that bullet to have struck the decedent in
       22   the head, that there had to be a relationship between --
       23   between him and the vehicle.  And that's what we can look at
       24   the bloodstain patterns to tell us.
14:39  25   Q.    Is it your understanding that when the car

42

14:39  1    was on Harrison Street it was moving northbound?
       2    A.    My understanding is that it was moving
       3    northbound.
       4    Q.    Where were detective Ciritella's shell
14:39  5    casings found vis-a-vis the end point of the -- of the trip,
       6    the car?
       7    A.    They were found toward the back end of the
       8    car, if I'm understanding your question correctly.
       9    Q.    Were they found south of the front of the
14:39  10   car?
       11   A.    South of the front of the car, that's
       12   correct.
       13   Q.    If the car had been stopped and Detective
14:39  14   Ciritella had fired his weapon, where would you have
       15   expected to find them?
       16   A.    I would have expected to find them either in
       17   the same area as the car or north of the car.
       18   Q.    What does the fact that they were found south
       19   of that area tell you?
14:40  20   A.    Tells me that the car was moving and
       21   continued to move after those shots were fired.
       22   Q.    Okay.
       23         The plaintiffs in this case allege that
       24   Mr. Smith was slumped over the driving -- over the steering
14:40  25   wheel.  The defendants will testify -- or the police

43

14:40  1    officers will testify that when they arrived at the stopped
       2    car he was slumped to the right.  What does the physical
       3    evidence tell you about what happened?
       4    A.    The physical evidence indicates that when the
14:40  5    bullet struck the decedent's head his head was upright, and
       6    we can determine that by looking at the bloodstain patterns
       7    on the clipboard that are between the passenger and driver's
       8    seat in the front seat of the squad car, that allows us to
       9    form a point of origin for those -- for those blood -- blood
14:41  10   stains.  And the second feature is that there's projected
       11   blood, which can only come from a compromised artery, for
       12   example, and that blood is projected behind and to the right
       13   side of the driver's backrest, and that would place the
       14   decedent slumped to the right at the time those projected
14:41  15   stains struck the partition.
       16   Q.    The plaintiffs in this case allege that
       17   Mr. Smith on 5th Street was trying to drive away from
       18   Detective Ciritella and that Detective Ciritella was never
       19   in danger.  The plaintiffs further allege, as I've
14:42  20   mentioned, that the detectives -- the defendants, excuse me,
       21   shot and wounded Mr. Smith after the car had stopped.  The
       22   plaintiffs -- excuse me.  The defendants claim that
       23   Mr. Smith narrowly missed Detective Ciritella as he drove in
       24   his direction.  He accelerated around the corner, and that
14:42  25   the defendants never fired at the car -- at the car after

44

14:42  1    the car was stopped.  Which version does the physical
       2    evidence support?
       3    A.    The physical evidence clearly supports the
       4    latter version.
14:42  5    Q.    You have expressed a number of opinions today
       6    about the most likely event based on the physical evidence.
       7    Have those opinions been expressed to a reasonable degree of
       8    scientific probability?
       9    A.    Yes.
14:43  10         MR. PARKINS:  Thank you.  I have nothing
       11   further.
       12         Do you want to take a short break?
       13         MS. SULTON:  If the doctor would like to.
       14         THE WITNESS:  Yeah, short.  I'm not feeling
14:43  15   very good.
       16         MS. SULTON:  Off the record.
       17         THE VIDEOGRAPHER:  We're going off the
       18   record.  The time is 2:43 p.m.  Please stand by.
       19         (Short recess.)
14:49  20         THE VIDEOGRAPHER:  We're back on the record.
       21   The time is 2:49 p.m.
       22   Q.    BY MS. SULTON:  Good morning, Dr. Nord -- or
       23   good afternoon, I should say.
       24   A.    Mm-hmm.
14:49  25   Q.    I am reserving all of the objections I've

45

14:49  1  made prior to the point at which we began your deposition.
2  Wanted to go through just a couple of issues with you, if I
3  may.
14:49  4        Do you know whether or not Mr. Ciritella is
5  right- or left-handed?
6        A.   No.  Not off the top of my head.
7        Q.   When did you look at Patrol Car 1180?
8        A.   It was in I believe June of 2006.
9        Q.   And this incident occurred September 13th of
14:50  10  2003?
11        A.   That's correct.
12        Q.   Do you have any idea of how many people were
13  inside that car before you saw it in the summer of 2006?
14        A.   Just from the photographs that were supplied
14:50  15  to me showing the work that had been done, but -- but the
16  exact number I'm not sure, but I would -- I would venture to
17  say that several people had been in there.
18        Q.   When you looked at the car did you see the
19  car as it was -- the state of the -- the physical state of
14:51  20  the car as it was on September 13th, 2003, within hours of
21  the shooting?
22        A.   No one would be in that position unless they
23  were at the scene of the shooting and able to look at the
24  vehicle at that time.
14:51  25        Q.   I'm sorry, Doctor.  Let me try to sharpen my

46

14:51  1  question a bit, if I could.
2        A.   Sure.
3        Q.   When you looked at the car it had already
4  been cut up by other -- I assume police investigators.
14:51  5        A.   I saw evidence that prior processing had
6  occurred, yes.
7        Q.   And it was extensive, correct?
8        A.   Yes.
9        Q.   And some of that processing included using
14:51  10  some kind of device to actually cut the metal off one of the
11  fenders, correct?
12        A.   Yes, I believe the fender was cut in an
13  effort to find one of the projectiles, the bullets.
14        Q.   And the same thing had happened to at least
14:52  15  one of the doors on the car, as well, where they had taken
16  the -- taken the -- part of the -- well, had taken the door
17  apart to look at the inside of the car between
18  where you have the -- what I call the creature comfort part
19  of the door and the mechanical inner workers of the door for
14:52  20  the window and so forth?
21        A.   Yes, I think the -- there was at least one of
22  the rear doors, maybe both rear doors, where the -- the
23  panel -- interior panel was -- was removed and was loose in
24  the back see the area.
14:52  25        Q.   And prior to you looking at the car in the

47

14:52  1  summer of 2006 did you see any of the photographs that the
2  police officers or someone working on behalf of the police
3  officers had taken of the car showing the trajectory stakes
4  that some refer to as dowel sticks that had been put through
14:53  5  the car and so forth?
6        A.   Yes, I did see some of those photographs.
7        Q.   And -- and did you see the photographs where
8  someone had taken a piece of paper and tape and stuck it on
9  top of the headliner and wrote on the word Headliner?
14:53  10        A.   It's not ringing any bells for me, but I
11  might have.  I don't recall.
12        Q.   You don't deny that there might be some
13  photographs in existence that show someone placing what
14  appears to be kind of a clear tape kind of like a masking --
14:53  15  kind of like a mailing tape and using that against the
16  headliner and kind of sticking pieces of paper up there to
17  mark certain parts of the headliner?
18        A.   I -- I don't recall that, but it's certainly
19  possible.
14:53  20        Q.   Now, is it fair to say that when someone
21  takes a wood dowel to try to visually show the trajectory of
22  a bullet they are going to -- although minutely,
23  they're going to change the configuration of the holes
24  through which they stick those wooden dowels?
14:54  25        A.   The answer is it depends on the material, and

48

14:54  1  to the extent that one was doing a microanalysis, for
2  example, of changes or effects on the margin of an entrance
3  wound, for example, or an entrance to a vehicle, it might
4  affect the -- deposit of trace materials that were
14:54  5  available only to the aided eye microscopically, but the
6  presence of trajectory rods through metal bullet holes in
7  cars through glass, Plexiglas and so forth doesn't alter the
8  hole in any significant way.
9        Q.   Is it true, Doctor, that you can't tell when
14:55  10  each of the 31 shots were fired at the intersection of 5th
11  and Harrison Street?
12        A.   Yes, that's correct.
13        Q.   So you don't know when the shot was fired
14  that actually left a bullet lodged in Mr. Smith's brain?
14:55  15        A.   I'm not sure I understand your question.
16        Q.   There were -- you know there were 31 shots
17  that were fired at the intersection of 5th and Harrison
18  Street.
19        A.   Yes.
14:55  20        Q.   You can't tell which of those 31 shots were
21  fired at any particular point in time or the sequence of
22  those shots, correct?
23        A.   Only -- only in general terms.  We can't --
24  and the reason I -- I want to be -- be clear here is that
14:56  25  the -- factors that involve moving the vehicle's

Draft Copy

---

**49**

14:56  1  movement, the fact of the bloodstain pattern, the impact
2  staining and the arterial spurt deposition, would indicate
3  that at the time after that shot was fired the decedent
4  went -- fell over to his right, but I couldn't be -- you
14:56  5  couldn't tell whether the 14A or 11A through the Plexiglas,
6  for example, came first.
7      Q.   You don't know when out of 31 shots, which
8  one of those 31 shots in terms of the timing sequence --
9  which one of those 31 shots is the one that was shot into
14:56  10  Mr. Smith's head?
11      A.   Well, again, forgive me if I'm not being
12  responsive, but there is a certain inference, and again,
13  it's an inference based on the total -- total evidence is,
14  that if that shot to his head was the first one that struck,
14:57  15  then you would expect to see the scene appear quite
16  differently than it does.
17      Q.   How?
18      A.   I guess that's -- that's what I'm --
19      Q.   How?
14:57  20      A.   Well, for example, if the shot incapacitated
21  him immediately, then one would expect the car to be in a
22  different position.  There wouldn't be the trail of broken
23  glass here and the position of the car further north.  So
24  the -- the vehicle kept moving.
14:57  25      Q.   Let me ask you briefly if I could about the

---

**50**

14:57  1  broken glass.  You were asked to refer to an exhibit that
2  shows a police officer pointing at what appears to be some
3  broken glass on the street.
4      A.   Yes.
14:57  5      Q.   Can you pull that out and tell us what
6  exhibit number that is, sir.
7      A.   It's Exhibit 10.
8      Q.   Thank you.
9          So when looking at Exhibit 10, did you talk
14:58  10  to that police officer during your work on this case?
11      A.   I spoke with -- I'm trying to remember.  Was
12  it --
13          MR. PARKINS:  Should I help the witness or
14  not?
14:58  15          MS. SULTON:  No.
16          THE WITNESS:  Ciritella and Brown and I
17  believe -- can't recall, but there are some other
18  photographs that were part of this set that showed the --
19  the glass more -- in a close-up.
14:58  20      Q.   BY MS. SULTON:  Let me repeat the question.
21  Did you speak with the officer who is pictured in
22  Exhibit 10?
23      A.   I -- I don't recognize him from the
24  photograph.
14:58  25      Q.   How do you know what kind of glass that is,

---

**51**

14:59  1  where it came from, when it got there?  How do you know
2  that?
3      A.   The volume of the glass -- again, the answer
4  is it's an inference.  The volume and the shape of the glass
14:59  5  shows that it's tempered glass.  Tempered glass breaks into
6  little squares.
7      Q.   What do you -- what evidence do you have
8  other than that Photograph No. 10 that shows that that is
9  the Plexiglas -- I'm sorry -- the tempered glass to which
14:59  10  you refer?
11      A.   Nothing other than visual identification.
12      Q.   Visual through photographs?
13      A.   Correct.
14      Q.   You are assuming, and correct me if I'm
14:59  15  wrong, that that is the tempered glass that came from the
16  window on the passenger side of the vehicle?
17      A.   I think the answer is yes, because the -- of
18  the orientation of the vehicle to the -- to the glass at the
19  side.
15:00  20      Q.   Given the volume of glass that you're looking
21  at Exhibit No. 10, do you know how much glass was left in
22  the window of the car?
23      A.   I looked at the -- each of the windows of the
24  vehicle as part of my examination, and there -- there was
15:00  25  very little if any glass left in that passenger side window.

---

**52**

15:00  1      Q.   How could you know the angles of bullets
2  going through the passenger side window if there is no glass
3  left in that window?
4      A.   I never said anything about angles with
15:01  5  passenger side windows, and the answer is you can't.  When
6  tempered glass is struck, sometimes the first shot will
7  remain and the window will checker, but traditionally radial
8  and concentric circles -- radial fractures and concentric
9  circles are used to establish the order of shots.  Well,
15:01  10  that doesn't work with tempered glass and it doesn't work
11  with safety glass.  So you can't tell.
12      Q.   Can you tell whether or not the projected
13  blood about which you testified came from Mr. Smith's head,
14  his arm, his wrist, or any other place where she was shot?
15:01  15      A.   Yes.
16      Q.   How can you do that?
17      A.   Under the microscope I observed brain tissue
18  and soft tissues associated with brain material.
19      Q.   In the projected blood?
15:02  20      A.   Yes.
21      Q.   Let me ask you about the bullet casing that
22  was found inside the car.  You testified that
23  Mr. Ciritella's gun would discharge a shell back and toward
24  the right, correct?
15:02  25      A.   Correct.

---

53

15:02  1      Q.  Do you know whether or not Mr. Ciritella
2  shoots with one hand or two hands?
3      A.  I don't know how any of these shots were
4  accomplished.  I mean, I don't.
15:03  5      Q.  Assuming that the car was close enough to
6  Mr. Ciritella at the point at which his shell casing ended
7  up in the middle of the car, would the window have been down
8  or up at that point?
9      A.  From -- from looking at the glass in the
15:03  10  window channel when I examined the vehicle, the glass would
11  have to be gone.
12      Q.  So is it fair to say, then, Dr. Nordby, that
13  the first bullet shot by Mr. Ciritella shattered the glass?
14      A.  I couldn't speculate on which bullet
15:03  15  shattered the glass.
16      Q.  But it's fair to say that the first bullet,
17  since the window was up, would not have resulted in that
18  shell casing being inside the car, correct?
19      A.  That's correct.
15:04  20      Q.  Can you tell whether or not Mr. Ciritella was
21  walking or running when he was firing his gun?
22      A.  No.
23      Q.  Does it make a difference as to the shell
24  pattern or the -- or the placement of the shell casings on
15:04  25  the pavement?

54

15:04  1      A.  Only a theoretical difference.  If -- if
2  someone is running, let's say, in a specific direction, and
3  one is running in the same direction that one is firing,
4  then regardless of where the cartridge case, let's say, is
15:05  5  ejected, the motion of the gun and -- through space relative
6  to the ground will carry over to that shell casing.  But our
7  ability to measure that is negligible in this case.
8      Q.  Do you know how many times Patrol Car 1180
9  was moved prior to the point at which you examined the car?
15:05  10      A.  No, I don't.
11      Q.  Is it correct, Doctor, that in -- as a matter
12  of principle, that in science you cannot prove a thing true?
13      A.  I -- I don't understand your question.
14      Q.  Can science prove a fact true?
15:06  15      A.  If -- if something is a fact, then it is
16  true.
17      Q.  Can the scientific method prove something
18  true?
19      A.  I must say I don't understand your question.
15:06  20  I mean --
21      Q.  Science is a -- science is a method of
22  inquiry, correct?
23      A.  I think it's a little more complicated.  The
24  scientific method is a way of disciplining our inferences so
15:07  25  that they obey established logical laws and help us discover

55

15:07  1  and apply physical laws.  So --
2      Q.  That science as a method can help us prove
3  something false, correct?
4      A.  It -- it's certainly easier to prove
15:07  5  something is not true than it is to prove that something is
6  true.  However, if you prove something is not true, you've
7  just proved that something is true.  There's the par docks.
8      Q.  You would agree with me that no
9  reconstruction can explain every element of an event,
15:08  10  correct?
11      A.  That is correct, yes.
12      Q.  And you would agree with me that when using
13  the scientific method the facts and data considered as you
14  reach your conclusion -- in other words, in reaching your
15:08  15  conclusion when using a scientific method, your conclusion
16  is only as good as the facts and data you have considered?
17      A.  That's correct.
18      Q.  So if the information you considered is
19  incorrect, then your conclusion is incorrect?
15:08  20      A.  Well, that doesn't follow.
21      Q.  Why is that?
22      A.  Because we could get the correct answer for
23  completely accidental reasons.  We can -- we can use faulty
24  method and incredible errors and still come up coincidently
15:08  25  with a true conclusion.  So what's interesting in science is

56

15:08  1  the reliability of an inference, not whether or not the
2  conclusion is true all the time.
3      Q.  Well, at Page 7 of your report, Doctor, you
4  assume as true that Mr. Ciritella was about two feet away as
15:09  5  Mr. Smith drove by him.  Assuming that that fact is not
6  true, does that change the conclusion that you have reached?
7      A.  Could you show me where that is again so I
8  can respond properly?
9      Q.  Yes, sir.  It is at Page 7 in the first full
15:09  10  paragraph.
11      A.  Which report, the supplemental or the --
12      Q.  The original report, sir.
13      A.  Okay.  Thank you.
14      Q.  You're welcome.
15:09  15      So if you go to -- in your original report --
16      A.  Yes.
17      Q.  The top of Page 7, the second line from the
18  bottom of the first full paragraph.  You'll see it's -- it
19  says, "about two feet away as Smith drove by him."
15:09  20      A.  You're -- you're above the summary opinions
21  and conclusions?
22      Q.  Yes, sir.
23      A.  Okay.
24      Q.  Yeah, that if you come up to that first
15:10  25  paragraph there.

57

15:10   1    A.    Okay.

2    Q.    And then come down to the second line?

3    A.    I'm sorry, I -- what am I looking for, again?

4    I'm having trouble finding it.  Show me in there.

15:10   5    Q.    I put just a little black mark in the margin.

6    A.    Great.  Thank you.

7    Q.    You're welcome.  Thank you.

8    A.    Oh, right.

9    Q.    Okay.

15:10   10   A.    Okay.

11   Q.    So is it fair to say, Doctor, that I read

12   that correctly, that you -- you're assuming that

13   Mr. Ciritella was about two feet away as Mr. Smith drove by

14   him?

15:10   15   A.    No, because the section of the report that

16   you refer to is a -- is entitled a brief summary of reported

17   events, and that's what I was told.

18   Q.    Okay.  So I'm saying --

19   A.    So --

15:11   20   Q.    So my question is that if that fact is not

21   correct, does that change your opinion?  In other words, if

22   Mr. Ciritella is further away or closer to the car, does it

23   change your opinion in any way?

24   A.    Well, I guess the answer is that the my

15:11   25   opinion has to correspond with what the physical evidence

58

15:11   1    shows, and regardless of who's telling the story or giving

2    me the scenario of what happened, what I can testify to is

3    that the presence, for example, of the cartridge case in the

4    vehicle has certain implications, meaning that there had to

15:11   5    be some proximity of the weapon discharging the cartridge

6    case and the -- the vehicle.  But I don't assume that he was

7    two feet, 10 feet or 20 feet away.  I'm trying to interpret

8    the behavior of the pistol, how the pistol actually

9    functions, how -- what has to be true for a cartridge case

15:12   10   to go into the front seat of the car.  I mean, there --

11   there can't be glass in the way or it would bounce off.  So

12   we can start whittling down what's -- what has to be so,

13   even though we may not know exactly what is so.

14   Q.    Did you see the cartridge in the car when you

15:12   15   looked at the car or did you just see a photograph?

16   A.    I just saw a photograph.

17   Q.    So you never saw the cartridge in the car?

18   A.    No.

19   Q.    And you don't know when that photograph was

15:12   20   taken?

21   A.    Well, I was told when it was taken.  Whether

22   that's true or not depends on --

23   Q.    When were you told it was taken?

24   A.    I'd have to look at my notes.  I don't -- I

15:12   25   don't know.

59

15:12   1    Q.    Do you know whether the photograph was taken

2    at the scene, before the car was moved, or whether it was

3    taken at a garage somewhere?

4    A.    I believe that it's part of a set of

15:13   5    photographs that was taken at the scene, then my belief

6    is -- is based on the fact that other photographs in that

7    sequence of photographs show images of things at the scene.

8    So it's an inference again.  I mean, I wasn't there and I

9    don't know, but the only reasonable way that I could try to

15:13   10   tell would be to look at the images that came before and

11   came after.  So I -- I don't know.

12   Q.    If I could ask you to stay on Page 7 of your

13   report for a moment, Dr. Nordby.

14   A.    Sure.

15:13   15   Q.    Look right above where you have in bold type

16   "Summary: Opinions and Conclusions" and the lines right

17   in -- right ahead of that.  I see the word "handcuffed" and

18   "began CPR."

19   A.    Correct.

15:14   20   Q.    Is it possible to do CPR if someone is

21   handcuffed with their hands behind them?

22   A.    Sure.

23   Q.    And how would one do that?

24   A.    Well, I -- I mean, it depends on the

15:14   25   technique, but mouth to mouth is certainly possible, chest

60

15:14   1    compressions are possible.  I'm not sure I'm following your

2    question.

3    Q.    Do you know of any cases where someone has

4    been able to do effective CPR when the person is handcuffed

15:14   5    with their hands behind their back?

6    A.    I don't know of any cases either way, I

7    guess.  By the time I arrive they're -- they're usually

8    dead, so I don't know if resuscitative efforts were -- were

9    accomplished unless -- or tried unless they're documented.

15:15   10   Q.    Do you know of any literature that suggests

11   that a proper way to do CPR when is a person's hands are

12   cuffed behind their back?

13   A.    Well, I would -- I would think that that's

14   not part of the course offered by the Red Cross, but I

15:15   15   don't -- I don't see anything that would -- would prevent it

16   from occurring.  It would certainly be more challenging.

17   Q.    I want to show you what has been marked,

18   although not yet admitted, but what has been marked as

19   Plaintiff's Exhibit No. 4.  And we're going to mark it for

15:15   20   the purposes of this Deposition Exhibit No. 13.

21   (Deposition Exhibit 13 was marked

22   for identification.)

23   BY MS. SULTON:  So Doctor, you're being

24   handed Exhibit No. 13.

15:16   25   A.    Yes.

61

15:16  1   Q.  Do you have it right side up?
2   A.  (No audible response.)
3   Q.  Have you seen that exhibit before?
4   A.  Yes, I believe I have.
15:16  5   Q.  Have you used that exhibit as a basis for the
6   opinions that you have reached?
7   A.  No.
8   Q.  Can you tell me about the -- the two
9   bullet -- so you see two holes in his back, correct?
15:16  10  A.  That's correct.
11  Q.  And how did you reach your opinion about the
12  bullet wounds to Mr. Smith's back if you didn't use that
13  exhibit in forming your basis of your opinion?
14  A.  Well, I used the description provided by the
15:17  15  autopsy, describing the position of the bullets as being
16  approximately 11 inches from the top of the head,
17  approximately inch and a quarter, two inches from midline,
18  so on.  And what that does for me is that the description of
19  their location in space is what I'm interested in, and --
15:17  20  and my -- my particular role is to try to make correlations
21  between injuries here that are described by a pathologist
22  and the physical damage to the vehicle.  If Mr. Smith is in
23  the driver's seat of the vehicle, then these bullet -- these
24  are, in fact, bullet entries as described by the
15:17  25  pathologist, and if -- if they were inflicted on the -- the

62

15:18  1   decedent when he was driving this car, then they had to
2   somehow go through the windows of the car or the body of the
3   car or some other components of the car in order to strike
4   at this position.  So I didn't rely on any photographs to --
15:18  5   to look at the physical status of the squad car.
6   Q.  So take a look at the back of his head.  Do
7   you know what that is?
8   A.  No.
9   Q.  It appears to be some kind of injury, doesn't
15:18  10  it?
11  A.  It could be.
12  Q.  Is that a bullet hole injury, can you tell?
13  A.  I certainly can't tell from a photograph.
14  Q.  So you don't know if that's an entry or exit
15:18  15  point for -- for the bullet, correct?
16  A.  For -- for what bullet?
17  Q.  For the bullet that went into his brain.
18  A.  No.
19  Q.  You don't know, do you?
15:18  20  A.  It was -- it was not a perforating wound, it
21  was described as a penetrating wound with the bullet
22  recovered.
23  Q.  So how do you know Mr. Smith wasn't shot in
24  the back of the head versus on the side of the head?
15:19  25  A.  Well, 1st all, the wound described by the

63

15:19  1   pathologist is a wound of entrance and that -- of the
2   photographs that I have seen of Mr. Smith's head
3   certainly support the view that that's a wound of entrance.
4   Up here.
15:19  5   Q.  Well, since you have opined about the wound
6   to his forehead, are you in a position to opine about the
7   wound on the back of his head?
8   A.  Well, I -- I opined about the wound to the
9   forehead based on a description by the pathologist and my
15:19  10  observation of the windshield of the -- of the police car.
11  I don't have any -- any such basis to talk about anything on
12  the back without -- without referring to what the
13  pathologist said.
14  Q.  Now, you don't talk in your report, unless I
15:20  15  missed it, about the bullets shot by Mr. Dempsey and
16  Mr. Kurten.  Do you know whether or not Mr. Dempsey or
17  Mr. Kurten was the one who shot Mr. Smith in the back?
18  A.  No.
19  Q.  Why don't you know?
15:20  20  A.  I was not provided with either of their
21  weapons to do any kind of comparison or any kind of testing
22  with.  The issues of -- of those injuries I was not asked
23  to -- to address, so I -- I didn't address them.
24  Q.  Well, isn't it important to know who shot
15:20  25  Mr. Smith in the back?

64

15:20  1   MR. PARKINS:  Objection.
2   You can answer.
3   THE WITNESS:  Given -- given the issues that
4   were put to me, the answer would be not as significant as
15:21  5   knowing or not significant in the sense that we only need to
6   know they came from behind and from the rear and they were
7   nonfatal, according to the pathologist.
8   Q.  BY MS. SULTON:  But that's not what the
9   pathologist said.  The pathologist said that all bullets
15:21  10  shot contributed to his death.  She aggravated them -- she
11  ago -- aggregated them?
12  MR. PARKINS:  Objection to the form, but you
13  can answer.
14  THE WITNESS:  Yeah.  I mean, that's very
15:21  15  speculative.  I wouldn't have any way of responding.  I
16  don't know what to say about that.
17  Q.  BY MS. SULTON:  Now, you testified that all
18  Mr. Smith's gunshot wounds were fired from more than three
19  feet, 36 inches away.  I'm now looking at Page 9 of your
15:21  20  report, sir, Paragraph 16.
21  What evidence do you have to support that?
22  A.  The characteristic of the -- of the wounds
23  described by the pathologist, the lack of gunshot residue,
24  the lack of powder, stippling, anything that suggests a
15:22  25  closer or -- close-range gunshot, and the -- the deformation

65

15:22   1   of the rounds having struck intermediate targets before they
        2   struck Mr. Smith.
        3       Q.   But again, that's based upon you looking at a
        4   car two and a half years after the incident, correct?
15:22   5       A.   That's correct.
        6       Q.   And is it fair to say that when you talk
        7   about all Mr. Smith's gunshot wounds were fired from more
        8   than 30 -- from three feet, 36 inches away, you're not
        9   talking about the gunshot wound to his leg?
15:22  10       A.   That's correct.  I -- I didn't consider that.
       11       Q.   And if there is videotape -- if there's a
       12   videotape showing that Mr. Smith was shot by Officer
       13   Whitehead while Mr. Smith was in the car before the car door
       14   closed, does that change your opinion about the absence of
15:23  15   these metallic substances that help you identify the
       16   distance from which a shot is fired?
       17       A.   Well, in my report I also describe factors
       18   that influence the deposition of those materials, and
       19   without looking at -- at the particular weapon and knowing
15:23  20   that ammunition, which -- which I believe is the same
       21   ammunition, it would be very difficult to -- to make an
       22   opinion about it, since that, you know, various different
       23   environmental factors, the -- the angle at which the gun is
       24   held, the proximity to the -- to the target and so forth.
15:24  25   But generally on the outside of a vehicle I wouldn't expect

66

15:24   1   to find the primer residues on the headliner inside the
        2   vehicle unless the gun itself was inside the vehicle.
        3       Q.   Well, what I'm saying is that -- and maybe I
        4   didn't state the question clearly enough.  There is a
15:24   5   videotape that we have that is going to be admitted into
        6   evidence.  That shows Harry Smith getting into the car,
        7   Officer Whitehead shoots him, and then the car door closes.
        8   So we know that there is a shot in the car.  We know that.
        9   So my question is that since we know that to be true, the
15:25  10   absence of finding any of this gunshot residue material that
       11   you testified about doesn't necessarily mean, therefore,
       12   that there was no gunshot in that car, since we know that
       13   there was at least one shot.
       14       A.   I think --
15:25  15           MR. PARKINS:  Before you answer, objection to
       16   the form of the question, but you can answer.
       17           THE WITNESS:  The -- the difficulty I'm
       18   having understanding your question is shot in the car.  Does
       19   that mean that the gun itself is inside the vehicle?
15:25  20       Q.   BY MS. SULTON:  Yes, sir.
       21       A.   Or does it mean that the shot went into the
       22   vehicle and -- and what is the orientation of the slide to
       23   the discharge of the weapon?  In other words --
       24       Q.   I want you to assume, sir, that the videotape
15:25  25   confirms that Mr. Whitehead was within three feet for sure

67

15:26   1   of Mr. Smith and discharged his weapon inside that car
        2   before that car door closed.
        3       A.   Then I would expect to find -- on a pair of
        4   long pants I would expect to find perhaps traces of
15:26   5   antimony, barium and lead.  If we looked at the sill -- the
        6   door sill on the -- on the vehicle, there might be trace
        7   evidence there.  So -- so that would certainly -- again,
        8   depending on how much blood and so forth, that can affect
        9   the success or the failure to find something.  But again, I
15:26  10   looked for gunshot residue on the decedent's clothing and
       11   they were short pants, not long pants.  And I also looked in
       12   the headliner and the visor, sun visors, for gunshot
       13   residue, but I did not look at the door panel down below.
       14       Q.   Did you look at the door panel on the
15:27  15   passenger side?
       16       A.   No.
       17       Q.   And when we talk about short pants, we're
       18   talking about short pants as young men wear them, so they
       19   actually come below the knee, correct?
15:27  20       A.   Some even further than about.
       21       Q.   But I'm talking about the pants that
       22   Mr. Smith had on at the time of the shooting --
       23       A.   Right.
       24       Q.   Were -- although we do call them short pants,
15:27  25   they're actually pants that come beyond the knee, correct?

68

15:27   1       A.   Yes.  Yeah, and I don't know what position
        2   those garments were in when the shot was fired.
        3       Q.   I want to ask you something about -- and let
        4   me know whenever you need to take a break, Doctor.
15:27   5       A.   Thank you.
        6       Q.   We will certainly work with your schedule,
        7   sir.
        8       I want to ask you something about the
        9   behavior or conduct of bullets.  You testified that when
15:28  10   testing Mr. Ciritella's gun, the shell casing would
       11   spin in the air, be in the air for a while, and then gravity
       12   would pull it down, correct?
       13       A.   Can happen that way, yes.
       14       Q.   That -- we know the surface on which the
15:28  15   bullets fell was either concrete or asphalt, correct?
       16       A.   Correct.
       17       Q.   Does the surface on which the shell casings
       18   fell in this case make a difference as to the behavior of
       19   that shell casing upon impact with the ground?
15:28  20       A.   The -- the answer is yes, different surfaces
       21   can behave differently when brass cartridge cases hit those
       22   surfaces, and -- and to really appreciate those -- those
       23   differences one would have to shoot a whole lot of
       24   ammunition and compare, let's say, concrete with asphalt,
15:29  25   with different surfaces, and at different angles, as well.

69

| | |
|---|---|
| 15:29 | 1 |

Q.    Is it fair to say that a brass shell
casing -- and I'm now talking about this case -- hitting the
kind of surfaces that we know are present in this case,
there's cement, there may be asphalt, as well, but we know
there's cement.  Is it fair to say that the shell casing
upon impact with the ground would bounce and perhaps roll?

A.    Could -- it could do, yes.

Q.    Could do both, correct?

A.    Yes, could.

Q.    Now, is it fair, then, to assume that the
point at which we find a shell casing on the ground might
not necessarily have a whole lot to do with where that --
where the shooter was standing when he or she fired a shot,
correct?

A.    If you look at the -- the testing that I did,
and I made a chart, you know, to show the distances and so
forth, there's a wide variety of different distances, both
measured away from the side of the test pistol, and away
from the muzzle.  So it can happen that -- and did, in fact,
in my experiments, that the ejected shell casing hit my
shoulder and that affected where it -- it went.  So there is
a wide variety, and one also has to be cautious about
reaching too specific a conclusion other than talking about
general areas, where there's a location of these things.
But I think forensic science goes wrong if we try to be too

(15:29 at lines 1, 5, 10, 15; 15:30 at lines 20, 25)

70

precise, because the -- the random nature of these events
has to be taken into consideration.

Q.    Before we switch tape in about two minutes,
Dr. Nordby, you reference your report.  Am I correct to look
at Pages 14 and 15, when you talk about the wide variety of
distances, or is there another place in your report to which
you can direct me?

A.    Yeah, I believe it's 14 and 15.

Q.    So to make certain that I am correctly
reading the data that you have here, sir --

A.    Mm-hmm.

Q.    Can you tell us what this wide difference of
distance is?

A.    Well, in -- in each case I moved six inches
after each shot.  Okay?  Just to -- to give us a -- an
increasing measurement.  So in some cases the lateral
distance from the slide, for example, No. 3, is 114 inches,
and it went backward zero inches.

Q.    Okay, so let me stop you for a second.  How
much time do we have on the tape?

Let us take a break so we can switch tapes.

A.    Okay.

MS. SULTON:  Thank you.

THE VIDEOGRAPHER:  This marks the end of Tape
No. 1, Volume 1, in the deposition of Jon J. Norby, Ph.D.

(15:30 at lines 1, 5; 15:31 at lines 5, 10, 15; 15:32 at lines 20, 25)

71

We're going off the record.  The time is 3:32 p.m.  Please
stand by.

(Short recess.)

THE VIDEOGRAPHER:  This marks the beginning
of Tape No. 2, Volume I, in the deposition of Jon J. Norby,
B pH.  Did he are back on the record. The time is 3:38 p.m.

MS. SULTON:  Thank you, sir.

Q.    So Mr. -- I'm sorry, Dr. Nordby, we're at
Page 14.  I believe you were pointing me to your Test 1
Line 3.

A.    Yes.

Q.    It says "Lateral Distance from Slide,
114 inches," then "Distance to Back or Front of Slide,
0 inches."  Tell me what that means.

A.    Well, that means that when we measured the --
I established a fixed location, if you look at the appendix
you can see the setup documented, but it would be 114 inches
lateral distance.  That is, going from the side of the
pistol.  It -- it's 114 inches that way.  And then zero
degrees either to the back, to the front, or zero means it
just went straight out.  And what influenced the travel of
the -- of the cartridge case could be that it -- it struck
the shooter's arm, it struck me, it struck my shoulder, came
back, ricocheted, and then ended up, and in this case I
recall the shot, the cartridge case came backward and hit my

(15:32 at line 1; 15:38 at lines 5, 10; 15:39 at lines 15, 20, 25)

72

shoulder and then continued its path that way, so it ended
up 114 inches away right straight, even though it didn't
actually go straight.

Q.    So if the gun is pointing straight head -- so
let's assume that the shooter's arm is straight and the --
the barrel of the pistol is pointing forward, if I'm looking
at Test 1 Line 3, the 114 inches --

A.    Mm-hmm.

Q.    -- that shell casing would kick out to the
side 114 inches?

A.    Mm-hmm.

Q.    And then the lowest number was 69 inches.

A.    That's correct.

Q.    And then let me take you to Test 2.  Those
distances are -- are different.  Can you -- pick whichever
round you'd like and explain to me why Test 2 results are so
different from test 1.

A.    The difference is that the three shots are
fired from a single location as quickly as you can squeeze a
trigger, and the -- the function of the pistol slide and its
ejection mechanism, the volume of the gases that -- that
function to move the slide, to reload the next cartridge and
to eject the spent cartridge case will be different because
you're introducing new explosions or detonations as -- as
the other ones are still leaving some effect.  So there can

(15:39 at lines 1, 15; 15:40 at lines 5, 10, 15; 15:41 at lines 20, 25)

Draft Copy

73

15:41  1  be some dis -- difference in the way multiple shots interact

2  with one another.  It also can be the case that the

3  cartridge cases hit each other.

4  Q.  Okay.

15:42  5  So if I look at, say, Round No. 2, I'm now in

6  Test 2 at the top of Page 15.

7  A.  Mm-hmm.

8  Q.  Am I correct -- am I reading the table

9  correctly assuming that my arm is out straight in front of

15:42  10  me, the pistol muzzle is pointing straight --

11  A.  Mm-hmm.

12  Q.  That the shell kicked out 96 inches behind me

13  and then 38 inches to the side?

14  A.  Well, what -- what this data tells you is not

15:42  15  exactly as you phrased it, but it tells you that where --

16  where it -- in reference to where it started where it ended

17  up.  It doesn't tell you how it got there.  You see what I

18  mean?

19  Q.  Ah.  Okay.

15:42  20  A.  It -- it -- it could have hit, rolled and

21  bounced, it could -- and did, in fact, and most of these

22  things, they -- they travel -- they roll, they spin, and the

23  variability -- why we have to be so cautious in reaching

24  conclusions about the position of cartridge cases is because

15:43  25  you can't isolate a single cartridge case and make any

74

15:43  1  meaningful estimate about anything other than the general

2  area where someone might have been, because of that

3  variability.  Not only just the surface but the random

4  nature of some of these events interacting.  So it can be

15:43  5  one hitting another when more than one round is -- is fired

6  in quick succession, it can be rolling and spinning, and it

7  may depend on if the cartridge case is -- has a rotational

8  force, then depending on whether it lands on its top, it's

9  bottom or its side can influence where it goes.

15:44  10  Q.  Well, let me -- so is it fair, then, to

11  assume that when we look at some of the pictures that I know

12  that you've seen that were taken by the police department,

13  where they have shell casings circled and then there's a

14  little number marker --

15:44  15  A.  Mm-hmm.

16  Q.  We can't then assume by looking at those

17  pictures that that's where the -- where the person was

18  standing when the shot was fired, all we know is that that's

19  a piece of evidence that's been marked?

15:44  20  A.  That is correct.  The way scenes are

21  processed, every effort is made or ought to be made to

22  document physical evidence and their presence -- its

23  presence, its location and so forth.  But any interpretation

24  of that has to be subject to some sort of scientific

15:44  25  process.  There may be many explanations for why certain

75

15:44  1  things appear as they do, and we may not be in a position to

2  know what those are.

3  Q.  I am almost done, Doctor.  Let me just review

4  my notes here.

15:45  5  A.  Okay.

6  Q.  Quickly.

7  I wanted to ask you as a follow-up to a

8  question asked by Attorney Parkins, what is the total amount

9  that you have been paid for your testimony in this case?

15:45  10  MR. PARKINS:  Objection to the form.

11  THE WITNESS:  Yeah, I haven't been paid

12  anything for my testimony.

13  Q.  BY MS. SULTON:  I'm sorry.  Let me rephrase

14  it.  How much have you been paid for your work on this case?

15:45  15  A.  I think the expenses included total about

16  $75,000.

17  Q.  And at this point is it over 80,000?

18  A.  I -- I don't know.

19  Q.  And you spent one week in Wilmington,

15:46  20  Delaware, looking at the car, correct?

21  A.  With my lab assistant, yes.

22  Q.  And then you've written reports and done the

23  consultation with the defense, correct?

24  A.  A lot of experiments, laboratory work,

15:46  25  firearms, setting up targets, et cetera.

76

15:46  1  Q.  In the last five years, Doctor, is it fair to

2  say that you have earned -- the primary source of your

3  income has been from testifying as a professional witness?

4  A.  No.  I'm not a professional witness, I'm a

15:46  5  scientist.

6  Q.  Let me rephrase that, sir.

7  Is it fair to say in the last five years that

8  the primary source of your income has been from serving as a

9  expert in cases that are being litigated?

15:47  10  A.  Yes.

11  Q.  And your education, your bachelor's degree,

12  your master's degree and your doctorate degree are in the

13  field of philosophy?

14  A.  Philosophy of science, yes, that's correct.

15:47  15  Q.  Your bachelor's degree is -- is it a B.S. or

16  B.A.?

17  A.  It's a B.A.

18  Q.  And that is a Bachelor of Arts, correct?

19  A.  That's correct.

15:47  20  Q.  And your master's is an M.A., correct?

21  A.  That's correct.

22  Q.  That's a Master of Arts?

23  A.  That's correct.

24  Q.  And your doctorate degree is a doctorate of

15:47  25  philosophy?

77

15:47  1   A.   That's correct.

2   Q.   In the field of philosophy?

3   A.   That's correct.

4   Q.   And your dissertation title was?

15:47  5   A.   Critical intelligence and its development."

6   Q.   And you retired from Pacific Lutheran

7   University in the year 2001?

8   A.   I believe it -- I'm not sure how they count

9   that.  I last taught in 1997.  I'm not sure how the -- how

15:48  10  that works.

11  Q.   And you retired from the department of

12  philosophy, correct?

13  A.   That's correct.

14  Q.   Just one moment.  I'm almost done reviewing

15:49  15  my notes, Doctor.  I appreciate your patience.

16  A.   No problem.

17  Q.   Doctor, do you farm out some of your lab work

18  to other labs or other professionals who do forensic work?

19  A.   Only if it is an area that I develop evidence

15:49  20  about that I don't work in.  For example, DNA, I don't do

21  DNA work.  I don't do fingerprint analysis.  So those would

22  be put off to others.  But in most cases I -- I take on

23  cases that apply to my set of skills and training and

24  experience.

15:50  25  Q.   Did you farm out any of the work in this case

78

15:50  1   in --

2   A.   No.

3   Q.   You did all the work yourself?

4   A.   I have a lab assistant who helps, but . . .

15:50  5   MS. SULTON:  I am done.  Thank you, Doctor.

6   THE WITNESS:  Thank you.

7   MR. PARKINS:  I have just a few questions in

8   redirect.

9   Q.   Let's follow up on your -- your work as

15:51  10  consulting for attorneys.  Do you consult with attorneys for

11  both plaintiffs and defendants?

12  A.   Yes.

13  Q.   Do you limit your practice in any way in that

14  regard?

15:51  15  A.   No.

16  Q.   Have you ever had occasion to tell an

17  attorney that you cannot assist him or her?

18  A.   Yes.

19  Q.   What causes you to do that?

15:51  20  A.   Well, several things might.  First would be

21  if I don't think that my training applies to the issues that

22  they recognize as relevant to their case.  Secondly, if

23  their request is that I become an advocate for a particular

24  position and I can tell sometimes when I'm asked to print X,

15:51  25  Y or Z and I will not do that, or if in some cases there --

79

15:52  1   there's a question that can actually be made to go away,

2   that there really isn't a scientific question there at all

3   that needs to be answered and if I can point that out to the

4   attorney, then they don't need an expert of any kind.

15:52  5   Q.   Did you ever -- were you ever asked in this

6   case to be an advocate on behalf of any position?

7   A.   No.

8   Q.   Let's focus a little bit on the chart in your

9   report, on Pages 14 and 15.

15:52  10  A.   Yes.

11  Q.   The chart there indicates lateral distance

12  from the slide.

13  A.   Yes.

14  Q.   [[Do you recall that?

15:52  15  A.   Yes.

16  Q.   Were these distances to the right of the

17  weapon?

18  A.   Yes.

19  Q.   Did any of the shells eject or end up to the

15:52  20  left of the weapon?

21  A.   No.

22  Q.   Did you -- in your opinion that the properly

23  car was still moving, did you consider the possibility that

24  the shell casings may have ended up north of the properly

15:53  25  car and simply rolled downhill?

80

15:53  1   A.   Yes, I -- I considered that.  Part of the

2   caveat or caution that we have in doing any kind of ejection

3   pattern testing is making sure that you're dealing with

4   broad areas as opposed to, you know, making too much about

15:53  5   one cartridge case being in a specific position.  So -- so

6   that I went to the scene and I measured the slope, which was

7   approximately seven degrees, I considered that.  I

8   considered the broad areas that these cartridge cases were

9   documented to be found, and compared them with what my

15:53  10  results were, and I found none that would indicate that

11  there's a -- a cartridge case to the north of the front of

12  the squad car.

13  Q.   Did you -- you were asked some questions

14  about the condition of the car at the time you examined it.

15:54  15  Do you have any reason to believe that the previous work

16  done on the car by the Wilmington Police Department and the

17  subsequent movement of the car after this incident in any

18  way affects your conclusions?

19  A.   No, it doesn't.  The fact of the matter is

15:54  20  that in -- in almost every case there is some issue about

21  handling the evidence, preserving, collecting and storing

22  the evidence.  That's a given that we work with.

23  The question to address from the scientific

24  point of view is does anything in the way the evidence was

15:55  25  collected, handled or stored affect the examinations that

81

15:55  1  are being conducted. In the case of -- of bullet holes, for
2  example, the issue is quite different than if it were the --
3  the presence of sperm heads in -- in a -- in cells. So --
4  so the -- the appropriate caution has to be applied. If --
15:55  5  if it looks like the evidence has been contaminated in an
6  irretrievable sense, then documenting that will be the
7  extent of the scientific report that would be produced. But
8  in this case the bullet holes remain unaffected by storage,
9  the removal of the door panels, while it certainly could
15:56 10  mitigate against any gunshot residue testing that -- that
11  might, you know, be done, the blood stains and so forth are
12  not affected by the way this evidence was kept.
13  MR. PARKINS: Thank you.
14  MS. SULTON: Just a couple of follow-up
15:56 15  questions, Doctor, and thank you for your patience. I will
16  be brief. First let me take you back to Page 14 and 15, if
17  I could. I just want to make certain that given the
18  redirect, that I understand these tables correctly.
19  THE WITNESS: Okay.
15:56 20  **Q.  If I look at Test 1 on Page 14, I am reading**
21  **this table that says that the lateral distance from the**
22  **slide, meaning the side distance, could be, based on your**
23  **testing of -- of the Detective Ciritella's pistol, is as**
24  **great as 173 inches, and the distance back beyond one's --**
15:57 25  **or the back of the -- the slide of the gun, is 121 inches,**

82

15:57  1  **correct?**
2  A.  Those are the maximums that I detected in my
3  experiments, yes.
4  **Q.  And then if I look at Test 2, when shooting**
15:57  5  **three shots from a single location, the greatest distance**
6  **that you found laterally or to the side is 98 inches, and**
7  **the greatest distance to the back of the slide of the gun is**
8  **96 inches.**
9  A.  Correct.
15:57 10  **Q.  So we're really talking about a broad pattern**
11  **that these shells can fly on their own, correct?**
12  A.  Now, that's a point that -- that needs to be
13  clarified too. These numbers don't represent the flight in
14  the air. They represent where it started and where it
15:57 15  ended. And that could be something like -- just for
16  example, the -- the cartridge case going straight into the
17  ground right where it was fired from and then bouncing,
18  rolling and tumbling and so forth until it reaches its final
19  terminus. So -- but not in the air flight. That's not what
15:58 20  we're talking about.
21  **Q.  Okay.**
22  **And then my final question, Doctor, is prior**
23  **to this case have you done any -- have you testified in any**
24  **case about bullets shot at a moving vehicle?**
15:58 25  A.  Yes.

83

15:58  1  **Q.  And what case was that?**
2  A.  That was -- I'm trying to think.
3  There was a -- an Arizona case. It should be
4  on my list.
15:58  5  **Q.  Would you mind taking a moment to take a look**
6  **at the list you provided us?**
7  A.  There --
8  **Q.  I think it starts at Page 30 --**
9  A.  I don't have that.
15:58 10  **Q.  31?**
11  A.  The other involved a moving train.
12  **Q.  Was it a car or train?**
13  A.  A train.
14  **Q.  All right. So you have done a case involving**
15:59 15  **shooting at a moving train?**
16  A.  Right.
17  **Q.  But you haven't done a prior case shooting at**
18  **a moving car?**
19  A.  I've -- I've worked the case but not
15:59 20  testified on the case.
21  **Q.  And is that case listed here?**
22  A.  Those are -- the cases that are listed there
23  are cases for which I've given testimony.
24  **Q.  Yes, sir.**
15:59 25  A.  And the cases that I've worked and written

84

15:59  1  reports for is quite a large number that happen doesn't
2  include the testimony. So the Arizona case I'm referring to
3  is a case that I did the work for and produced a report for
4  but I think it -- there is yet to be a deposition if there
15:59  5  is one. The other one had settled, they pled, essentially,
6  so there's no testimony.
7  **Q.  And so --**
8  A.  But I do have -- have worked those cases.
9  **Q.  Okay. I'm sorry. Was it the Arizona case**
16:00 10  **with the train or was it the Arizona case with the moving**
11  **car?**
12  A.  Moving car, Arizona.
13  **Q.  And when you did the case with the moving**
14  **car, was that a case in -- with shots being fired by police**
16:00 15  **officers at a moving vehicle?**
16  A.  No.
17  MS. SULTON: Thank you, Doctor, for your
18  time. I appreciate your patience.
19  THE WITNESS: Thank you.
16:00 20  MR. PARKINS: Thank you. Nothing further.
21  THE WITNESS: Thank you.
22  THE VIDEOGRAPHER: This concludes the
23  videotape deposition of Jon J. Norby, Ph.D. This is Case 1,
24  Volume I -- or Tape 2, Volume I. We are going off the
16:00 25  record. The time is 4:00 p.m.

85

16:00   1       Stand by.

2       (The videotape deposition of Jon J.

3       Nordby, Ph.D., was concluded at

4       4:00 p.m.)

16:00   5          ---o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Draft Copy