## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR. and ROSLYN )
WOODARD SMITH, Individually and as )
Administrators of THE ESTATE OF )
HARRY SMITH, III )
)
      Plaintiffs, )    Case No. 04-1254-GMS
)
v. )
)
JOHN CIRITELLA, THOMAS DEMPSEY, )
and MATTHEW KURTEN, )
)
      Defendants. )

## DEFENDANTS' ANSWERING BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A NEW TRIAL

                             John A. Parkins, Jr. (#859)
                             Steven J. Fineman (#4025)
                             Richards, Layton & Finger
                             One Rodney Square
                             P. O. Box 551
                             Wilmington, Delaware 19899
                             302-651-7700
                             Parkins@rlf.com

OF COUNSEL:                      Fineman@rlf.com
Rosamaria Tassone             Attorneys for Defendants
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware 19801
302-576-2175

Dated: July 9, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

NATURE AND STAGE OF THE PROCEEDING ........................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 2

STATEMENT OF FACTS .............................................................................................. 5

    A.    Mr. Smith Steals Patrol Car 1180 On Washington Street. ............................. 5

    B.    Officers Pursue Mr. Smith In The Stolen Car 1180 As Mr. Smith Leads Police On A Dangerous High Speed Chase Through The City Of Wilmington ................................................................................................... 6

    C.    Officers Ciritella, Kurten And Dempsey Attempt To Contain The Fleeing Mr. Smith ......................................................................................... 8

    D.    The Police Officers Attempt To Take Mr. Smith Into Custody, But Mr. Smith Flees Again And Nearly Kills Officer Ciritella. ................................. 10

    E.    Other Police Officers Arrive On The Scene. ............................................... 13

    F.    Plaintiffs Produce Two Civilian Witnesses Who Tell Contradictory Stories. ............ 14

        1.    Reverend Thompson's Testimony. ........................................................ 14

        2.    David Gwyn's Testimony. ................................................................... 15

    G.    The Assistant Medical Examiner Confirms That The Fatal Shot Was Fired From The Passenger Side Of The Vehicle. ................................................... 16

ARGUMENT ............................................................................................................... 17

I.    THE JURY DID NOT IGNORE THE LAW. .................................................... 17

    A.    As A Matter Of Law The Alleged Violation Of WPD Regulations Is Irrelevant To Determining Whether There Was A Deprivation Of Mr. Smith's Constitutional Rights. ................................................................... 18

    B.    Assuming For The Sake Of Argument That Police Regulations Are Material To Whether There Has Been A Constitutional Deprivation, The Alleged Violations Relied Upon By Plaintiffs Do Not Support Their Contentions ..................................................................................................... 19

1.  Neither The WPD Regulations Nor The Constitution Require That Persons "In The Immediate Vicinity" Be At Risk Before An Officer Can Use Deadly Force. ................................................................................20

    a.   No WPD Rule Requires That Persons "In The Immediate Vicinity" Be At Risk Before Police Officers Can Use Deadly Force. ......................................20

    b.   The Fourth Amendment Does Not Require Persons "In The Immediate Vicinity" To Be At Risk Before Police Officers Can Use Deadly Force. ................................................................................22

2.  The Court Has Already Ruled That The Use Of Deadly Force Where Bystanders Were Allegedly Present Is Not Relevant To Whether Mr. Smith's Constitutional Rights Were Violated. ................................................23

II.   THE COURT DID NOT ERR IN ADMITTING CERTAIN EVIDENCE. .....................24

   A.   The Court Did Not Err in Admitting the Testimony of William Stevenson. ...............24

      1.   The Court Did Not Err In Finding That Mr. Stevenson's Testimony Was Relevant To Show Context. ................................................................................24

      2.   The Court Took Appropriate Steps To Prevent The Unfair Prejudice Claimed By Plaintiffs At Trial. ................................................................................27

   B.   The Court Properly Admitted The Testimony Of Dr. Nordby Because There Was Ample Evidence It Was Reliable. ................................................................30

III.  THE COURT DID NOT ERR IN DECLINING TO GIVE CERTAIN INSTRUCTIONS. ................................................................................34

   A.   The Court Did Not Err In Giving The Requested State-Created Danger Because (1) That Claim Was Never Alleged and (2) Plaintiffs' Claim Fails as a Matter of Law. ................................................................................34

      1.   Plaintiffs Never Pled A Claim For State-Created Danger. ........................................34

      2.   The State-Created Danger Claim Fails As A Matter Of Law. ....................................35

   B.   There Is No Evidence In The Record To Support A Spoliation Instruction. ................37

      1.   There Is No Evidence That The MVR Tape Was Spoliated. ....................................38

      2.   There Is No Evidence Of Spoliation Or That Plaintiffs Were Prejudiced By The Absence Of A Written Statement From Defendants. ...................................38

CONCLUSION......................................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Abraham v. Raso,*
    183 F.3d 279 (3d Cir. 1999)............................................................................25, 36

*Bright v. Westmoreland County,*
    443 F.3d 276 (3d Cir. 2006)............................................................................35, 36

*Grazier ex rel. White v. City of Philadelphia,*
    328 F.3d 120 (3d Cir. 2003)............................................................................19, 36

*Hahm v. Wis. Bell, Inc.,*
    983 F. Supp. 807 (E.D. Wis. 1997).......................................................................28

*In re Hechinger Investment Company of Delaware, Inc.,*
    C.A. Nos. 06-2166 and 06-2229, 2007 U.S. App. LEXIS 13155 (3d Cir. 2007)..............39

*Morse v. Lower Merion School District,*
    132 F.3d 902 (3d Cir. 1997)....................................................................................34

*Murphy v. City of Flagler Beach,*
    761 F.2d 622 (11th Cir. 1985) .................................................................................28

*Myers v. Gregory,*
    2003 WL 1872973 (D. Del. Apr. 9, 2003)..............................................................17

*Oregon v. Hass,*
    420 U.S. 714 (1975)..................................................................................................22

*Pyles v. Raisor,*
    60 F.3d 1211 (6th Cir. 1995) ....................................................................................22

*Rivas v. City of Passaic,*
    365 F.3d 181 (3d Cir. 2004)......................................................................................24

*Rowland v. Perry,*
    41 F.3d 167 (4th Cir. 1994) ......................................................................................25

*Scott v. Harris,*
    C.A. No. 05-1631, 2007 U.S. LEXIS 4748 (Apr. 30, 2007) ...................................22

*Estate of Smith v. Marasco,*
    430 F.3d 140 (3d Cir. 2005).......................................................................................34

*Tanberg v. Sholtis,*
　　401 F.3d 1151 (10th Cir. 2005) ...................................................................................18

*Thompson v. City of Chicago,*
　　472 F.3d 444 (7th Cir. 2006) .................................................................................18, 19

*U.S. v. Gibbs,*
　　739 F.2d 838 (3d Cir. 1984)..........................................................................................28

*U.S. v. Spiller,*
　　261 F.3d 683 (7th Cir. 2001) ....................................................................................28, 31

*U.S. v. Swan,*
　　486 F.3d 260 (7th Cir. 2007) ........................................................................................28

*U.S. v. Taylor,*
　　800 F.2d 1012 (10th Cir. 1986) ...................................................................................28

*In re Wechsler,*
　　121 F. Supp. 2d 404 (D. Del. 2000)..............................................................................37

*Whren v. United States,*
　　517 U.S. 806 (1996)......................................................................................................18

*Williamson v. Consolidated Rail Corp.,*
　　926 F.2d 1344 (3d Cir. 1991)........................................................................................17

## STATUTES AND OTHER AUTHORITIES

10 *Del. C.* § 4011 ..............................................................................................................23

Fed. R. of Civ. P. 59(a) ......................................................................................................17

S. Saltzburg, *Federal Rules of Evidence Manual*, § 103.02[1].........................................28

## NATURE AND STAGE OF THE PROCEEDING

This is post-trial briefing following a jury verdict in favor of Defendants. After the verdict, Plaintiffs filed their first motion for a new trial alleging possible jury irregularities because of the ostensibly premature publication of a news article regarding the verdict by a local newspaper. Thereafter the Court conducted a teleconference, at which time it ordered there be no briefing on the jury issue unless directed by the Court.

Following the filing of their first motion for a new trial, Plaintiffs filed a second motion for new trial, this time alleging grounds other than the possible jury irregularities. The second motion was accompanied by a brief which the Court struck *sua sponte* on May 2. In that Order the Court directed that the parties submit an approved briefing schedule before briefing the second post-trial motion. Also, as part of its May 2 Order, the Court summarily denied Plaintiffs' request for a judgment as a matter of law because Plaintiffs failed to request such a judgment before the close of the evidence.

The parties entered into a briefing schedule that has been approved by the Court, and Plaintiffs filed a new opening brief. This is Defendants' answering brief.

1

## SUMMARY OF ARGUMENT

1.      Plaintiffs argue that the jury necessarily ignored the law because, in their view, the jury was required to find that Defendants violated Wilmington police regulations.  This argument fails for a number of reasons.  First, as a matter of law, a violation of police regulations is (in the words of one Court of Appeals) "completely immaterial" to the determination of whether there has been a constitutional deprivation.

Second, although Plaintiffs argue that Defendants violated an unidentified WPD rule requiring that persons "in the immediate vicinity" be in danger before police can fire their weapons -- there is no such rule.  Third, Plaintiffs assert that Defendants violated a WPD rule prohibiting the use of deadly force when it is likely innocent bystanders will be injured.  They fail to mention, much less reconcile, a pretrial ruling by this Court that the risk of harm to third parties is not relevant to whether Mr. Smith's constitutional rights have been violated.

2.      Plaintiffs argue that this Court erred in allowing William Stevenson to testify because, they contend, his testimony about events on Washington Street was irrelevant and unfairly prejudicial.  They are wrong on both counts.  First, as the Court ruled, his testimony was relevant to provide context for the events that followed.  Further, Plaintiffs are estopped from claiming that the events on Washington Street are irrelevant given that they introduced considerable evidence of their own about those events, including (1) a videotape of Harry Smith, Jr. (the father) describing the younger Mr. Smith stabbing himself while in the Wilmington Hospital Emergency Room, which took place before the events on Washington Street; (2) witnesses of their own who testified about the events on Washington Street; and (3) a Downtown Visions video of the confrontation between Mr. Smith and the police on Washington Street.

Nor is the evidence so unfairly prejudicial as to substantially outweigh its probative value.  During the pretrial conference, Plaintiffs told the Court they would be unfairly prejudiced

2

because they would ostensibly have to "try a carjacking case." The Court addressed Plaintiffs' concern by ordering the parties not to refer to the events on Washington Street as a "carjacking." Plaintiffs disregarded this order and referred to those events as a "carjacking" in their opening statement. Now they have changed their claim of unfair prejudice, which after-the-fact change is barred by the rules of evidence. In their latest iteration of "unfair prejudice," Plaintiffs assert that Mr. Stevenson's testimony cast Mr. Smith as a "wildly violent" man. But Mr. Stevenson's testimony added nothing to this characterization already provided by Plaintiffs that Mr. Smith was hallucinating and stabbed himself in the chest.

Plaintiffs next argue this Court erroneously admitted certain testimony from Defendants' forensic expert, Jon Nordby, Ph.D. They contend that Dr. Nordby's testimony that Mr. Smith was sitting upright at the time he was shot was "not reliable." The essential premise of this argument (which is unsupported by any citation to Dr. Nordby's testimony) is that Dr. Nordby ostensibly admitted he could not tell the trajectory of the bullet striking Mr. Smith's head because the passenger-side window glass was gone. Plaintiffs are incorrect. Dr. Nordby did not need holes in the passenger window to estimate the trajectory of the bullet; rather he testified he used the trajectory of the bullet in Mr. Smith's head, as described by the Medical Examiner. Thus the underlying premise of Plaintiffs' argument is false.

3.    Plaintiffs argue this Court erred in declining to give their requested instruction on state-created danger. But Plaintiffs never pled a claim for state-created danger in any of their three complaints. Moreover, as the Court correctly held, the facts of this case do not support a state-created danger claim. Plaintiffs argue that the conduct of Officer Whitehead in allowing Mr. Smith access to patrol car 1180 supports such a claim. Needless to say, Officer Whitehead is not a defendant. They also argue that Detective Ciritella put himself in danger when he stepped

3

out from behind the building. This misses the point entirely -- the issue in state-created danger cases is not whether the defendant put himself in danger, but whether the defendant put the plaintiff in danger.

Plaintiffs argue the Court erred in declining to give a spoliation instruction concerning the tape from the Mobile Video Recorder in patrol car 1180. There is no evidence, however, that the tape was spoliated or that Defendants had any access to it. Plaintiffs also contend that the Court should have given a spoliation instruction with respect to the fact that Defendants never made written statements. This argument fails, among other reasons, because Plaintiffs fail to show how they were prejudiced by the absence of written statements, given that they have interviews of Defendants conducted the same night as the shooting.

4

## STATEMENT OF FACTS

### A.    Mr. Smith Steals Patrol Car 1180 On Washington Street.

On September 13, 2003, Officer Whitehead and Officer Saunders were on patrol in the City of Wilmington.  (Whitehead Tr. 142, B-14).[1]  While on Washington Street, near the Wilmington Hospital, they observed Mr. Smith running southbound on the west side of Washington Street.  (Whitehead Tr. 143, B-14).  Mr. Smith abruptly ran across the street to the side of a Mercedes and attempted to open the door.  (Whitehead Tr. 144, B-14).  The car was occupied by its owner, William Stevenson, and a tug of war ensued between them, with Mr. Stevenson trying to keep the door closed and Mr. Smith trying to pull it open.  (Stephenson Tr. 703, B-58).

At this time, Officer Whitehead activated his overhead lights and pulled patrol car 1180 ("Car 1180") directly behind Mr. Smith.  (Whitehead Tr. 145, B-15)  Officers Whitehead and Saunders quickly exited their patrol car, leaving the doors open and the motor running.  When they pulled up they saw Mr. Smith had blood on the front of his shirt, was breathing heavily, and was armed with a scalpel.  (Whitehead Tr. 145, 146, B-15).  Sensing trouble, the officers drew their weapons after they got out of their car.  (Whitehead Tr. 144, B-14).    Officer Whitehead, who was approximately one foot away from Mr. Smith, repeatedly ordered Mr. Smith to "drop the knife."  (Whitehead Tr. 146, B-15).  Mr. Smith ignored the commands and advanced toward Officer Whitehead, who retreated.  (Whitehead Tr. 146-48, B-15).

---

[1] On April 12, the trial transcript covered pages 607-790.  The trial transcript for April 13 began on page 691 instead of page 791.  As a result, there are approximately 100 pages of the trial transcript with duplicate page numbers (691-790).  To avoid confusion, Defendants have attached the transcript pages referenced in the brief to the appendix filed contemporaneously herewith, and have identified the testifying witness together with the transcript citation.

Suddenly, Mr. Smith jumped into the driver's seat of Car 1180, attempted to place Car 1180 into gear, and stomped on the accelerator. (Whitehead Tr. 149-50, B-16; Bungy Tr. 98, B-12). Officer Whitehead tried to pull Mr. Smith from Car 1180 and repeatedly told Mr. Smith to "get out of the car, get out of the car, I don't want to shoot, get out of the car." (Whitehead Tr. 150, B-16). Mr. Smith and Officer Whitehead "tussled" inside Car 1180, and ultimately Officer Whitehead shot Mr. Smith in the leg. (Whitehead Tr. 150-1, 179, B-16). Mr. Smith finally got the patrol car in gear, shut the door to Car 1180, and accelerated southbound on Washington Street at a high rate of speed. (Whitehead Tr. 152, 166, 170, B-16, B-18, B-19).

As these events unfolded, Officer Saunders made a series of important radio transmissions: "16 Charles. Send backup," followed by, "he's got the car; he's got the car," and then, "shots fired."[2] (DX 42).

## B. Officers Pursue Mr. Smith In The Stolen Car 1180 As Mr. Smith Leads Police On A Dangerous High Speed Chase Through The City Of Wilmington.

Sergeant Donohue was traveling southbound on Washington Street when she was advised by a passing motorist that there was an incident involving two police officers at 14th and Washington Street. (Donohue Tr. 197, B-21). She made a u-turn and headed north on Washington toward 14th. (Donohue Tr. 197, B-21). As Officer Donohue approached 12th Street, she heard a radio call that the police car had been taken and shots had been fired. (Donohue Tr. 198, B-21). Officer Donohue observed Car 1180 traveling southbound on Washington Street, and made another u-turn and began her pursuit of Mr. Smith southbound on

---

[2] On September 13, 2003, "16 Charles" was Officer Saunders and Whitehead's call sign. (Dempsey Tr. 523, B-37). The call sign indicates that Officers Saunders and Whitehead were members of C Platoon and that they were patrolling the 16th district of the City of Wilmington. (*Id.*).

Washington. Mr. Smith turned west on 7th Street -- the wrong way on a narrow one-way street. (Donohue Tr. 207, B-22). A couple of cars were required to pull over to avoid Car 1180. (*Id.*). Mr. Smith was traveling above the speed limit, and proceeded through traffic lights and stop signs. (Donohue Tr. 200, B-21). At 7th and Monroe Street, Officer Donohue dropped back and a car driven by Detective Michael Lawson took over as the lead car.

Officer Lawson, accompanied by Detective Donna DiClemente, was conducting a follow-up investigation in an unrelated matter at the 600 block of Van Buren Street when he heard Officer Saunder's radio transmission. (Lawson Tr. 713, B-61). Officer Lawson recalls hearing a call for assistance at 14th and Washington Streets, that shots had been fired, and that the subject had a knife. (*Id.*). Detective DiClemente testified that she heard that a suspect had stolen a police car and was armed with a knife. (DiClemente Tr. 377, B-32). The radio transmission was not an ordinary transmission -- the officer on the radio seemed to be in a near-panic and stressful situation. (Lawson Tr. 713, B-61). Officers Lawson and DiClemente immediately went to their police vehicle and joined the pursuit. After hearing over the radio that Car 1180 was traveling the wrong way on 7th Street, Officer Lawson proceeded south on Monroe Street from West 9th Street. (Lawson Tr. 714, B-61). Officer Lawson then witnessed Car 1180 proceeding south on Monroe Street at a high rate of speed. (*Id.*). Mr. Smith was driving erratically, swerving and disregarding stop signs. (Lawson Tr. 715, B-61).

Mr. Smith continued until he reached the corner of 4th and Monroe Streets where he disregarded a red traffic light and turned west on 4th Street. (Lawson Tr. 715, B-61). Near the intersection of 4th and Jackson Streets, another police vehicle turned behind Mr. Smith from Jackson Street and became the lead car in the pursuit -- the Lawson/DiClemente car became the

7

second car in pursuit. (Lawson Tr. 716, B-62). Mr. Smith turned north on Van Buren Street, and then turned west on 5th Street. (*Id.*).

### C.    Officers Ciritella, Kurten And Dempsey Attempt To Contain The Fleeing Mr. Smith.

On September 13, 2003, Detective John Ciritella was working a 4:00 p.m. to 12:00 a.m. shift with the Criminal Investigations Unit. (Ciritella Tr. 710, B-75). Detective Ciritella was sitting at his desk typing a report when he heard a radio transmission on his handheld radio seeking backup, which Detective Ciritella understood to be a call for assistance due to the officer's (Saunders) tone of voice. (Ciritella Tr. 710, B-75). Detective Ciritella grabbed his radio, picked up his keys, and proceeded down two flights of stairs to the back parking lot of the police station. (Ciritella Tr. 711, B-75). As Detective Ciritella was in the parking lot heading toward his police vehicle, he heard a radio transmission of "shots fired, shots fired" followed by a transmission that the police car had been taken. (Ciritella Tr. 711-12, B-75-76). Detective Ciritella drove out of the parking lot at 4th and Poplar Street and proceeded westbound on 4th Street. He first saw the stolen Car 1180 when it turned left onto 4th Street from Monroe Street. (Ciritella Tr. 712-13, B-76).

\*    \*    \*

Officer Thomas Dempsey had been granted three hours of "comp" time by his supervisor to attend a family reunion. (Dempsey Tr. 522, B-36). As a result, he had just arrived for work at 300 Walnut Street as the events on 14th and Washington Streets commenced. (Dempsey Tr. 522-23, B-36-37). Officer Dempsey was stationed at his desk on the first floor of the Wilmington Police Department, preparing to review reports and handle certain administrative tasks, when he heard Officer Saunders transmit "16 Charles" over the radio. (Dempsey Tr. 523, B-37). Officer Dempsey had worked with Officer Saunders for two years and knew him to have

a calm demeanor. (Dempsey Tr. 525, B-37). From the inflection in Officer Saunders' voice, Officer Dempsey immediately knew something was wrong. (*Id.*). After determining that he needed to "hit the street" and follow-up on Officer Saunders' radio transmission, Officer Dempsey began searching for his keys when he heard Officer Saunders again transmit over the radio. (Dempsey Tr. 525-26, B-37). This time Officer Saunders shouted, "Get out, get out" followed by, "Shots fired." (Dempsey Tr. 526, B-37). Without taking any equipment other than what he had on his person, Officer Dempsey ran out of the building, obtained a police vehicle, and joined the pursuit of Mr. Smith. (*Id.*). Officer Dempsey left the parking lot and proceeded west on 4th Street.

\* \* \*

Officer Matthew Kurten was working a 6:00 p.m. to 2:00 a.m. shift and was assigned to the Community Policing Unit working the Hilltop area of the City of Wilmington. (Kurten Tr. 277, B-28). He had detained a suspect and was attempting to identify the suspect when he heard 16 Charles' radio transmission: "Send back up." (Kurten Tr. 277, B-28). Officer Kurten confirmed the identity of the suspect, released him and immediately responded to 16 Charles' request for assistance. (Kurten Tr. 277, B-28). Officer Kurten made his way to Jackson Street, where he made visual contact with Car 1180 on 4th Street approaching Jackson. (Kurten Tr. 277, B-28).

\* \* \*

Because several police cars were following the stolen police car as it approached Harrison on 4th, Detective Ciritella decided to parallel the chase when the stolen car turned onto VanBuren. He continued on 4th Street and turned northbound on Harrison Street. (Ciritella Tr. 717, B-77). Officer Kurten was directly behind Detective Ciritella's red, unmarked police car in

the chase, and he followed Detective Ciritella northbound on Harrison Street. (Kurten Tr. 278, B-28). Officer Dempsey, believing that Detective Ciritella's decision to parallel the chase was a good idea, followed Detective Ciritella and Officer Kurten north on Harrison Street. (Dempsey Tr. 527, B-38).

As Detective Ciritella reached 5th and Harrison Streets, he heard a radio transmission indicating that Car 1180 was heading west on 5th Street. (Ciritella Tr. 718, B-77). Detective Ciritella looked to his right and observed the oncoming Car 1180. (Ciritella Tr. 718, B-77). Detective Ciritella positioned his vehicle across 5th Street in an effort to slow down the chase and de-escalate the events. (Ciritella Tr. 719-20, B-77-78). Officer Kurten pulled in behind Detective Ciritella at the intersection of 5th and Harrison Streets. (Kurten Tr. 278-79, B-28). Officer Dempsey parked his vehicle on Harrison Street short of the intersection of 5th and Harrison Streets because he observed Detective Ciritella and Officer Kurten exiting their vehicles and did not want to risk hitting them. (Dempsey Tr. 528, B-38).

With Car 1180 approaching, Detective Ciritella moved behind a building on the northeast corner of 5th and Harrison Streets. (Ciritella Tr. 719, B-77). At the same time, Officer Kurten was walking east on the south sidewalk of 5th Street, using parked cars as cover. (Kurten Tr. 280, B-28; Dempsey Tr. 529, B-38). Officer Dempsey exited his vehicle on Harrison Street and positioned himself behind Detective Ciritella's and Officer Kurten's vehicles in the intersection of 5th and Harrison Street. (Dempsey Tr. 529-531, B-38-39).

### D. The Police Officers Attempt To Take Mr. Smith Into Custody, But Mr. Smith Flees Again And Nearly Kills Officer Ciritella.

As he approached the intersection of 5th and Harrison Streets, where Detective Ciritella's and Officer Kurten's cars were blocking the street, Mr. Smith brought Car 1180 to a stop. (Lawson Tr. 717, B-62; Kurten Tr. 281, B-29; Ciritella Tr. 720, B-78; Dempsey Tr. 530, B-38;

10

Browne Tr. 740, B-68). At that point, Officer Donald Dempsey (not to be confused with Defendant Thomas Dempsey) and Detective Lawson exited their vehicles in an effort to apprehend Mr. Smith. (Lawson Tr. 717, B-62). Officer Donald Dempsey "ran up to the driver's side of the stolen police vehicle." (Lawson Tr. 717, B-62).

After Car 1180 came to a stop, Detective Ciritella stepped out from the northeast corner of 5th and Harrison Streets, identified himself as a Wilmington police officer, and ordered Mr. Smith to "Turn off the car and get out of the vehicle." (Ciritella Tr. 720, B-78). Detective Ciritella was wearing a shirt with a Wilmington Police Department logo on the chest, and had his badge visibly clipped to the right side of his belt line. (Ciritella Tr. 733-34, B-80). Mr. Smith made eye contact with Detective Ciritella. (Ciritella Tr. 721, B-78). At this juncture, both Detective Ciritella and Officer Dempsey believed that the situation was coming to an end and that Mr. Smith would be placed into custody. (Ciritella Tr. 721, B-78; Dempsey Tr. 531, B-39).

Suddenly and without warning, Mr. Smith turned the car and accelerated directly at Officer Ciritella. (Lawson Tr. 718, B-62; Ciritella Tr. 721-2, B-78; Dempsey Tr. 532, B-39; Browne Tr. 740-41, B-68). The acceleration was so pronounced that Officer Lawson could hear the engine revving and the tires squeal as Mr. Smith accelerated. (Lawson Tr. 717-18, B-62). All of the police officers feared for Detective Ciritella's life. (Kurten Tr. 282, B-29; Dempsey Tr. 533, B-39; Ciritella Tr. 723-24, B-78-79; Lawson Tr. 718, B-62; Browne Tr. 741, B-68). Although Plaintiffs claim the streets were crowded with citizens, they produced no witnesses to dispute that Mr. Smith was accelerating directly toward Detective Ciritella. Dr. Jon Nordby, Defendants' forensic expert, testified that the physical evidence is consistent with Mr. Smith driving at Detective Ciritella. (Nordby Dep. 32-3; B-101-102).

Detective Ciritella began to backpedal. (Ciritella Tr. 723, B-78; Kurten Tr. 282, B-29; Dempsey Tr. 533, B-39). As Car 1180 was bearing down on Detective Ciritella, in an effort to save his own life, Detective Ciritella fired his weapon for the first and only time in his career at someplace other than the firing range. (Ciritella Tr. 709, 723, B-75, B-78). Officer Kurten, fearing for Detective Ciritella's life, also fired his weapon. (Kurten Tr. 257-58, 282, B-27, B-29). No shots were fired at Mr. Smith until he drove at Detective Ciritella. (Lawson Tr. 719, B-62).

Car 1180 passed within an arm's length of Detective Ciritella. (Ciritella Tr. 723-24, B-78-79). After Mr. Smith passed Detective Ciritella, Mr. Smith struck a white Jeep Cherokee that was parked on Harrison Street. (Kurten Tr. 283, B-29; Dempsey Tr. 535, B-40; Ciritella Tr. 724, B-79). Mr. Smith collided with the Jeep Cherokee with such force that the Jeep Cherokee spun nearly 180 degrees. (Kurten Tr. 283, B-29; Dempsey Tr. 535, B-40, Ciritella Tr. 724, B-79). After impact, Mr. Smith continued to accelerate north on Harrison -- the smell of burning rubber, the squeal of tires and the sound of Car 1180's engine accelerating filled the air. (Ciritella Tr. 725, B-79). At this point, Mr. Smith, if apprehended, would have been arrested for attempted murder in the first degree. (Ciritella Tr. 726, B-79).

Mr. Smith was now in the open and in danger of escaping. Fearing for the safety of the citizens of the City of Wilmington, Officer Kurten, Officer Dempsey and Detective Ciritella each determined that is was necessary and appropriate to use deadly force to prevent his escape. (Kurten Tr. 287, B-30; Dempsey Tr. 538, B-40; Ciritella Tr. 759, B-84). Officer Kurten repositioned himself towards the northwest corner of 5th and Harrison Streets, and fired two or three shots at Car 1180. (Kurten Tr. 284, B-29). Officer Dempsey also fired his weapon as Car 1180 was moving north on Harrison Street with the intent to stop the vehicle and suspect from

leaving the area. (Dempsey Tr. 537, B-40). He believed that "if [Mr. Smith] left this area, he had the potential to cause bodily, dangerous serious physical injury to citizens of the City of Wilmington and possible death." (Dempsey Tr. 538, B-40). Officer Dempsey did not see any police cars north of Car 1180 on Harrison Street or anywhere else. (*Id.*). Detective Ciritella proceeded up the hill on Harrison Street and fired his final shots. (Ciritella Tr. 738-39, B-81). When the car stopped, Detective Ciritella carefully approached and placed Car 1180 into park, as it was beginning to drift. (DiClemente Tr. 383-85, B-33). No shots were fired after Car 1180 stopped. (Ciritella Tr. 749, B-83). Dr. Nordby testified that the physical evidence shows that Car 1180 was still moving when Detective Ciritella fired the fatal shot. (Nordby Dep. 45-6, B-104). The entire shooting incident lasted no longer than 10 seconds. (Lawson Tr. 723, B-63; Browne Tr. 742, B-68).

### E. Other Police Officers Arrive On The Scene.

After the shooting was over, other police offers began to arrive at Harrison Street. First, the officers who were parked behind Car 1180 on 5th Street turned the corner onto Harrison Street. Detective Lawson turned the corner on Harrison Street and observed Car 1180 slowly proceeding up Harrison Street. (Lawson Tr. 719-20, B-62-63). At that time, Detective Lawson did not see any police cars on Harrison Street facing south. (Lawson Tr. 720, B-63).

Then officers from other locales arrived. Officers Pierson and Gifford were eating dinner at Grotto's when the call for assistance from 16 Charles was transmitted. They were the first police officers to arrive at 6th and Harrison Streets. (Gifford Tr. 404, B-34). By the time they arrived, the shooting had stopped. (Pierson Tr. 217, B-23; Gifford Tr. 404, B-34). Neither Officer Pierson nor Officer Gifford heard or saw any shots fired. (Pierson Tr. 222, B-24; Gifford Tr. 404, B-34). By the time Officer Fioravanti also arrived, the shooting had stopped. (Fioravanti Tr. 226, 231-2, B-25, B-26).

13

Detective Lawson cautiously ran up to the driver's side of Car 1180, opened the door and placed Mr. Smith into custody. (Lawson Tr. 720, B-63). After the police officers removed Mr. Smith from Car 1180, they realized that he had been shot. (Lawson Tr. 720-21, B-63). The officers checked for vital signs, summoned an ambulance, and Detective DiClemente began chest compressions. (Lawson Tr. 721, B-63; DiClemente Tr. 384, B-33). One of the officers also requested that someone bring a defibrillator to the scene, but the ambulance had arrived by that time. (Lawson Tr. 721, B-63).

F.    **Plaintiffs Produce Two Civilian Witnesses Who Tell Contradictory Stories.**

As noted previously, Plaintiffs did not produce any witnesses to testify about what happened on 5th Street or to dispute that Mr. Smith accelerated directly at Detective Ciritella. They did, however, produce two witnesses who claimed to have seen events on Harrison Street -- Reverend Thompson and David Gwyn. Their testimony is contradictory.

1.    **Reverend Thompson's Testimony.**

According to Reverend Thompson, while located on the steps of his home near the corner of 6th and Harrison Streets, he witnessed two police cars traveling south on Harrison Street from 7th Street to 6th Street. (Thompson Tr. 664, B-49). Reverend Thompson went around the corner onto Harrison Street to see what was happening. After seeing shots being fired, he herded his grandchildren, who were on Harrison Street, to safety on his front steps on 6th Street. Reverend Thompson testified that, out of curiosity, he again went out onto Harrison Street while shots were still being fired. (Thompson Tr. 668-69, B-50).

Reverend Thompson testified that one of the police cars he saw heading down Harrison Street stopped only one-half to one car length in front of Car 1180. (Thompson Tr. 670-74, B-50-51). He told the jury that three uniformed police officers -- two on the passenger side and one on the driver's side -- were shooting at the stopped Car 1180. (Thompson Tr. 666, B-49). No

14

bullet strikes were found on the right side of the car consistent with where Thompson placed the shooters. (Browne Tr. 759, B-70). According to Reverend Thompson, these three uniformed officers were shooting at Car 1180 even though another Wilmington police car was only one-half to one car length in front of Car 1180. After the shooting stopped, according to Reverend Thompson, the police officers pulled Mr. Smith out of Car 1180 and started "high-fiving, like jubilation, laughing and grinning." (Thompson Tr. 666, B-49).

Even though there were lots of police officers at the scene after the shooting, including one known to Reverend Thompson as "Heather," he told no one about what he claims to have seen that night. (Thompson Tr. 675, B-51). It was not until months later that he called Sgt. Browne of the Wilmington police to arrange an interview. (Thompson Tr. 676-77, B-52).

### 2. David Gwyn's Testimony.

David Gwyn told markedly different stories about what he observed. At trial he testified he saw three uniformed police officers running behind and shooting into the rear of Car 1180. (D. Gwyn Tr. 638, B-44). He testified that they kept shooting until the car stopped at which time one of the officers ran up to the car and put it in park. (D. Gwyn Tr. 638-9; 652, B-44, B-47). When asked whether the police shot at the driver while he was slumped over, Mr. Gwyn gave two different versions at trial:

> The car was stopped. I won't say he was slumped over the wheel.
> But the car had stopped.

(D. Gwyn Tr. 652, B-47).

> To the best of my recollection, he was slumped over.

(D. Gwyn Tr. 652, B-47).

Prior to trial, Mr. Gwyn told different stories. The night of the incident he told Sgt. Browne that he saw one officer running behind the car, shooting five or six times. (Browne Tr.

755, B-69). The third version appears in an affidavit that Mr. Gwyn executed and that was filed by Plaintiffs. In this version Mr. Gwyn swore he saw a police officer go up to the side of the car and shoot into the body of the driver. (DX 51). When asked for details on this version, Mr. Gwyn responded, "I'm cloudy on that." (D. Gwyn Tr. at 656, B-48). Betty Gwyn, his wife, does not recall her husband ever telling her he saw a police officer go up to the car and shoot into the body of the driver. (B. Gwyn Tr. 625-6, B-43).

Finally, Mr. Gwyn gave no testimony about police officers laughing, joking and high-fiving when the shooting stopped. He remembered, instead, police administering CPR to Mr. Smith. (D. Gwyn Tr. 648, B-46).

### G.    The Assistant Medical Examiner Confirms That The Fatal Shot Was Fired From The Passenger Side Of The Vehicle.

Assistant Medical Examiner Jennie Vershvovsky, M.D. performed the autopsy on Mr. Smith. Her report lists Mt. Smith's cause of death as a "gunshot wound to head." (Vershvovsky Tr. 69, B-10). It was conclusively determined that the bullet that struck Mr. Smith in the head, and ultimately caused his death, was traveling from right to left. (Vershvovsky Tr. 78, B-11). It would not have been feasible for the bullet to have been fired from Mr. Smith's left-hand side (the driver's side of the vehicle). ATF found that the bullet retrieved from Mr. Smith's head was fired from a Smith and Wesson pistol bearing serial number SAF0327 -- Detective Ciritella's weapon. (Browne Tr. 753, B-69) (DX-19-23).[3]

---

[3]    These exhibits are the correspondence between ATF and the Wilmington P.D. and include ATF's report.

**ARGUMENT**

"A new trial may be granted to all or any of the parties and on all or part of the issues ...

in an action where there has been a trial by jury, for any of the reasons which new trials have

heretofore been granted in actions at law in the courts of the United States." *Myers v. Gregory*,

2003 WL 1872973, at *1 (D. Del. Apr. 9, 2003) (quoting Fed. R. of Civ. P. 59(a)). It is well-

settled that the decision to grant or deny a motion for a new trial is vested within the sound

discretion of the Court. *Id.* Here, Plaintiffs do not argue that the "weight of the evidence"

supported their position.[4] Instead, Plaintiffs argue only that (1) the jury did not understand or

ignored the jury instructions because a reasonable police officer would not have violated WPD

rules, and Defendants violated the rules; (2) the Court erred in allowing the testimony of William

Stephenson and certain testimony from Dr. Nordby; and (3) the Court erred in rejecting certain

of Plaintiff's proposed jury instructions. None of these arguments have merit.

**I.     THE JURY DID NOT IGNORE THE LAW.**

Plaintiffs argue that the jury ignored the law, claiming that Defendants violated local

police regulations and thus the jury was required to find that Defendants violated Mr. Smith's

constitutional rights. This argument fails for at least two reasons: (a) as a matter of law, the

---

[4] For example, although Plaintiffs refer in an off-hand manner to "glaring inconsistencies in Defendants' testimony, and that of other witnesses" (Pl. Br. 12) they do not explain what those inconsistencies were or provide record citations to them. Rather, their argument is based exclusively on the alleged violation of local police rules. In the event that Plaintiffs are somehow trying to construct a weight of the evidence argument, Defendants respectfully refer the Court to the overwhelming evidence that supports the jury's verdict, including the testimony summarized in the Statement of Facts and that of Defendants' experts Ronald Traenkle and Jon Nordby. As this Court has recognized, "[w]here a motion for a new trial is based primarily on the weight of the evidence, the court should grant such a motion 'only if the record shows that the jury's verdict resulted in a miscarriage of justice, or when the verdict, on the record, cries out to be overturned or shocks the conscience.'" *Id.* (citing *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)). Plaintiffs could not meet this high burden.

violation of police regulations is immaterial to the determination of whether there has been a Fourth Amendment violation; and (b) assuming for the sake of argument that the alleged violation of WPD regulations is material, the purported violations do not support Plaintiffs' contentions.

> **A.  As A Matter Of Law The Alleged Violation Of WPD Regulations Is Irrelevant To Determining Whether There Was A Deprivation Of Mr. Smith's Constitutional Rights.**

As a matter of law, the "violation of police regulations or even state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). In *Whren v. United States*, 517 U.S. 806 (1996) the Supreme Court rejected the notion that local police regulations can be used to determine the reasonableness of a search under the Fourth Amendment. The Court reasoned that police regulations can vary from locality to locality whereas the Fourth Amendment must have uniform application:

> While police manuals and standard procedures may sometimes provide objective assistance, ordinarily one would be reduced to speculating about the hypothetical reaction of a hypothetical constable -- an exercise that might be called virtual subjectivity.
>
> Moreover, police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable, and can be made to turn upon trivialities.

517 U.S. at 815 (citations omitted). Although *Whren* was a criminal case, there is no reason to believe that the Fourth Amendment means one thing in a criminal case and another in a civil rights matter. Indeed, courts have routinely applied the *Whren* principles in civil rights cases. *E.g. Tanberg v. Sholtis*, 401 F.3d 1151, 1159-60 (10th Cir. 2005) ("Even if it were clear that

Officer Sholtis had violated the [local police] SOPs, that violation could not transform an arrest supported by probable cause into an unconstitutional seizure[.]").

Even though *Whren* involved a search, the rationale of the *Whren* Court applies on its face to claims of excessive force in violation of the Fourth Amendment's prohibition on unreasonable seizures. The Seventh Circuit had no trouble applying *Whren* to a civil rights claim alleging the use of excessive force by a police officer:

> The [*Whren*] Court concluded that because police rules, practices and regulations vary from place to place and from time to time, they are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct. Although *Whren* involved the constitutionality of searches rather than excessive force, both inquiries -- whether a search is constitutional and whether the officer has used excessive force -- involve an evaluation of the "reasonableness" standard of an officer's conduct under a particular set of facts and circumstances. Accordingly, we are confident that, if confronted with the question of whether police manuals, guidelines or general orders are "reliable gauges" of the reasonableness of an officer's use of force, the Court would reach the same conclusion that it did in *Whren*.

*Thompson*, 472 F.3d at 455; *see also*, *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 127 (3d Cir. 2003) (dictum) ("Plaintiffs instead sought a charge that linked Fourth Amendment reasonableness to compliance with local police regulations and thus would have made constitutional standards vary from jurisdiction to jurisdiction.").

### B. Assuming For The Sake Of Argument That Police Regulations Are Material To Whether There Has Been A Constitutional Deprivation, The Alleged Violations Relied Upon By Plaintiffs Do Not Support Their Contentions.

In their brief, Plaintiffs point to only two rules allegedly broken by Defendants which, according to Plaintiffs, establish a constitutional violation. First, Plaintiffs claim Defendants allegedly violated a WPD rule purportedly prohibiting shooting when no one "in the immediate vicinity" is in danger. (Pl. Br. 13). They are wrong because (1) there is no such rule in the WPD policies and (2) as a matter of law the Fourth Amendment does not require that persons "in the

19

immediate vicinity" be in danger before a police officer can use deadly force. Second, Plaintiffs point to the alleged violation of a rule prohibiting police officers from using deadly force when it is likely bystanders may be injured. This argument fails because, as this Court previously ruled, the risk of harm to bystanders is not relevant to the determination of whether the police deprived Mr. Smith of his rights.

> **1.** **Neither The WPD Regulations Nor The Constitution Require That Persons "In The Immediate Vicinity" Be At Risk Before An Officer Can Use Deadly Force.**

Plaintiffs assert that Defendants violated a WPD rule by shooting at Mr. Smith when no one "in the immediate area" was at risk. No such rule exists. Their argument fails because the Supreme Court has made it abundantly clear that there is no such constitutional requirement.

> **a.** **No WPD Rule Requires That Persons "In The Immediate Vicinity" Be At Risk Before Police Officers Can Use Deadly Force.**

Although Plaintiffs claim that WPD regulations require that persons "in the immediate vicinity" be in danger before an officer uses deadly force, they fail to identify the rule upon which they rely. Instead, they merely write in their brief that the "rules prohibit shooting when no one in the immediate vicinity is in imminent danger -- as the Defendants so testified." (Pl. Br. 13). In addition to failing to identify the rule which they contend was broken, Plaintiffs do not cite where in the record "the Defendants so testified." Thus, they leave the Court and Defendants to guess where such a regulation can be found.

Plaintiffs' failure to identify a specific rule is perhaps explained by the fact that there is no rule requiring that persons "in the immediate vicinity" be in peril before an officer can use deadly force. The WPD rules governing when deadly force can be used are found in Directive 6.7(V)(A)(3), (4). This Directive provides in pertinent part that:

        3.         An officer is authorized to use deadly force if the officer had probable cause to believe that the suspect poses an imminent threat of serious physical harm to the officer or others.

        4.         An officer may use deadly force to prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.

(WPD Directive 6.7(V)(A)(3), (4)) (PX-12). Manifestly these rules say not a word about persons "in the immediate vicinity."

In their Statement of Facts (but not in their argument) Plaintiffs quote another portion of Directive 6.7 which provides that an officer "is authorized to unholster his pistol" whenever he has a "reasonable suspicion to believe that he or anyone in his immediate vicinity is in imminent danger. . . ." (Pl. Br. 6). The purpose of this reference in Plaintiffs' Statement of Facts is not clear, given that the unholstering of Defendants' weapons caused no harm to Mr. Smith. Out of an abundance of caution, Defendants will assume that this may be the "immediate vicinity" rule upon which plaintiffs rely. If so, Plaintiffs' reliance is misplaced. This portion of the Directive has nothing to do with the use of deadly force -- it concerns only when officer may unholster his weapon. Detective Ciritella explained why he unholstered his weapon:

> The initial "shots fired" call is a deadly force. I took that as at least I could unholster my weapon at that particular time.

(Ciritella Tr. 743; B-82). Notably, neither of Plaintiffs' experts criticized Defendants for doing so. Thus, whatever the purpose of Plaintiffs' reference to this Directive, it does nothing to advance their case.

b.    **The Fourth Amendment Does Not Require Persons "In The Immediate Vicinity" To Be At Risk Before Police Officers Can Use Deadly Force.**

The Fourth Amendment also does not require that persons "in the immediate vicinity" be in danger before a police officer can use deadly force. Recently, the Supreme Court held that an officer who forced a suspect off the road during a high speed chase did not use excessive force even though no one was in the immediate vicinity when the officer did so. *Scott v. Harris*, C.A. No. 05-1631, 2007 U.S. LEXIS 4748 (Apr. 30, 2007). The Court noted that "when Scott [the police officer] rammed respondent's vehicle it was not threatening any other vehicles or pedestrians (Undoubtedly Scott *waited* for the road to clear before executing his maneuver.)" 2007 U.S. LEXIS 4748, at * 6, n.7 (emphasis in original).

In the instant case, Plaintiffs seek to engraft upon the Fourth Amendment an "immediate vicinity" requirement -- a requirement the Supreme Court has declined to impose. Although a "State is free *as a matter of its own law* to impose greater restrictions on police activity than this Court holds to be necessary upon federal constitutional standards. But, of course, a State may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." *Oregon v. Hass*, 420 U.S. 714, 719 (1975) (emphasis supplied; citations omitted); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) ("While the states are, of course free to enact laws that are more protective of individual rights than the United States Constitution, a mere violation of such a state law will not establish a proper claim under § 1983.") (citations omitted). In short, the Fourth Amendment does not prohibit the use of deadly force merely because no one in the "immediate vicinity" is in danger. Thus, even if there were an "immediate vicinity" requirement in the WPD rules (which there is not), Defendants' alleged violation of that rule does not rise to the level of a constitutional violation. In other words, the jury did not ignore the law.

2.      **The Court Has Already Ruled That The Use Of Deadly Force Where Bystanders Were Allegedly Present Is Not Relevant To Whether Mr. Smith's Constitutional Rights Were Violated.**

The sole remaining WPD rule upon which Plaintiffs rely provides that "[f]irearms shall not be discharged when it appears likely that an innocent person may be injured." (PX-12, Directive 6.7(V)(6)(d)).[5]  This argument fails because, as this Court has already ruled in this matter, the risk of harm to third persons is not relevant to the determination of whether Defendants used excessive force.

Prior to trial, Defendants timely moved to exclude evidence or argument about the risk of harm to third persons.  Thereafter, the Court issued a written order in which it held that "[a]fter having considered the parties' submissions ... and relevant case law, the court concludes that argument and witness testimony regarding the potential harm to third parties is not relevant to the jury's determination of plaintiffs' excessive force claim." (D.I. 200)[6].  Nowhere in their post-trial brief do Plaintiffs even mention, much less challenge,[7] this order.  Thus, Defendants'

---

[5] Again, Plaintiffs do not specifically identify the rule.  They write only, without citation, that "[t]he rules prohibit shooting when innocent bystanders are likely to be shot -- as neighborhood residents so testified."

[6] The Court allowed evidence of the alleged violation of this police regulation for the limited purpose of showing that Defendants acted recklessly or wantonly and were therefore not entitled to state law immunity under 10 *Del. C.* § 4011. (D.I. 200).  Because the jury found that Defendants did not use excessive force, the jury did not have to consider the officer's state law immunity.

[7] In their motion *in limine*, defendants cited several cases directly supporting the proposition that risk of harm to third persons is not material to excessive force claims.  (D.I. 139).  Plaintiffs' response never addressed those cases and instead ruled only upon a Third Circuit Pattern Jury Instruction. (D.I. 142).  During the pretrial conference plaintiffs "you don't address the arguments that [defendants] advance and the authority they cite in support of those arguments." (Pretrial Conf. Tr. 42, B-3).  By their silence in their opening brief, they still have not.

23

purported violation of the rule prohibiting shooting when bystanders are present is not relevant to the excessive force claim and, consequently, the jury did not "ignore the law."

## II.    THE COURT DID NOT ERR IN ADMITTING CERTAIN EVIDENCE.

Plaintiffs argue that this Court committed error when (1) it allowed the testimony of William Stevenson and (2) when it declined to exclude certain testimony of Defendants' forensic expert, Dr. Nordby. They are wrong on both counts.

### A.    The Court Did Not Err in Admitting the Testimony of William Stevenson.

Plaintiffs contend that the Court erred in admitting the testimony of William Stevenson because, in their view, it was irrelevant. They also argue that it was unfairly prejudicial and should have been excluded under F.R.E. 403. Their argument fails in both respects. First, Mr. Stevenson's testimony was relevant because it provided the jury with necessary context for these events. Second, the Court acted to prevent the unfair prejudice claimed by Plaintiffs by prohibiting the parties from characterizing the events at Washington Street as a car jacking -- a protection Plaintiffs themselves intentionally violated during their opening statement. Plaintiffs now assert a new theory of unfair prejudice -- a theory which they failed to raise in a timely fashion and which is belied by their own exhibit.

### 1.    The Court Did Not Err In Finding That Mr. Stevenson's Testimony Was Relevant To Show Context.

Plaintiffs contend that evidence of the events on Washington Street has no probative value and should therefore have been excluded as irrelevant. This argument has no merit. Rather, as the Court correctly held, evidence about the events on Washington Street was necessary to provide context for the events at 5th and Harrison Streets.

It is settled in this jurisdiction that courts are free to consider all relevant facts and circumstances leading up to an allegedly constitutional seizure. *Rivas v. City of Passaic*, 365

24

F.3d 181, 198 (3d Cir. 2004) (this court has "considered all of the relevant facts and circumstances leading up to the time the officers allegedly used excessive force."). Indeed, the "better way to assess the objective reasonableness of force is to review it in full context ...." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994) cited with approval in *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999). The wisdom of allowing context is illustrated by this case. If as Plaintiffs urge, evidence was limited only to what Defendants knew, then Plaintiffs would not have been permitted to introduce evidence that it was not Mr. Smith who fired the shot prompting Officer Saunders' "shots fired" radio call.

The necessity for evidence about the events on Washington Street to show context can best be understood by working backwards chronologically from the events Plaintiffs concede are relevant. Plaintiffs do not dispute that it is relevant that Defendants heard officer Saunders broadcast from Washington Street "send backup" and "shots fired." It follows that if these radio calls were relevant, it was relevant to tell the jury why Officer Saunders made them, which, in turn, makes information about the confrontation between the police and Mr. Smith on Washington Street relevant. Once it is determined that the confrontation on Washington Street is relevant to provide context, it becomes readily apparent that the event which brought Officers Saunders and Whitehead in contact with Mr. Smith in the first place is relevant. All of these events, therefore, beginning with the confrontation between Mr. Stevenson and Mr. Smith, are part of an unbroken chain of events leading to the events on 5th and Harrison. It is impossible to understand any of these events without knowledge of what precipitated it. Thus, the Court correctly held that the confrontation between Mr. Smith and Mr. Stevenson was needed to provide the jury with necessary context.

Plaintiffs cannot now deny the relevance of the events on Washington Street because they introduced their own evidence of the events on Washington Street as well as the events occurring at the Wilmington Hospital.

- Plaintiffs introduced the videotaped interview of Harry Smith, Jr. (the father) conducted the night of the shooting. (Listed as PX-10 on D.I. 179). Indeed, Plaintiffs went so far as to file a motion *in limine* seeking admission of this videotape. (D.I. 137). In Plaintiffs' exhibit, the elder Mr. Smith told police investigators how his son stabbed himself in the chest with a scalpel and how his son overpowered him when the elder Mr. Smith attempted to subdue him.[8]

- During their Opening Statement, Plaintiffs told the jury about the struggle and the stabbing in the Emergency Room:

    While there, he was diagnosed with mental health ailments, suffering from hallucinations and other problems. And the nurse went to get him some medicine. And during that time, he obtained a scalpel that was sitting in an unlocked cabinet, and began stabbing himself in the chest .... His father was there with him, did everything he could to try to physically control his son, was not able to do that. His son overpowered him and ran out of the hospital. (Tr. 17).

- Plaintiffs called Officer Whitehead, who at Plaintiffs' behest, described events at Washington Street. (Tr. 141, *et seq.*)

- Plaintiffs also called Katrina Bungy, who also described events on Washington Street in response to Plaintiffs' questions. (Tr. 98-9).

---

[8] Plaintiffs sought, and obtained, admission of the entire tape including the elder Mr. Smith's description of the events at the Wilmington Hospital. They never sought to have that description redacted from the videotape.

- Plaintiffs introduced a copy of the Downtown Visions videotape showing part of the confrontation on Washington Street. (Listed as PX-22 on D.I. 179).

### 2. The Court Took Appropriate Steps To Prevent The Unfair Prejudice Claimed By Plaintiffs At Trial.

Plaintiffs also argue that the Mr. Stevenson's testimony should have been excluded under F.R.E. 403 because it was purportedly unfairly prejudicial. This argument is procedurally barred because it is different than the one made at trial. In support of their claim of unfair prejudice, Plaintiffs now assert that the testimony "cast Mr. Smith as a wildly violent man, requiring the use of deadly force to subdue." (Pl. Br. 15). This is a markedly different claim of unfair prejudice than the one Plaintiffs asserted prior to trial. When asked by the Court at the Pretrial Conference to explain why the testimony was unfairly prejudicial, Plaintiffs told the Court *only* that it would force them to try a carjacking case. (Pretrial Tr., 30-31, B-2).[9] They never advised the Court that, in their view, Mr. Stevenson (whose testimony was well known to Plaintiffs) would cast Mr. Smith as a wildly violent man.

---

[9] The following is the pertinent colloquy between the Court and plaintiffs' counsel at the Pretrial Conference:

> THE COURT: Well, it is probative. Let's talk about prejudice. It is probative. Why is it unfairly prejudicial?
>
> MS. SULTON: It means now I have to try inside this trial whether or not this man was involved in a carjacking, because that is what the Mercedes issue brings into the case. I know have to try a carjacking --
>
> THE COURT: No, you don't know.
>
> MS. SULTON: -- that the police officers at the scene weren't even aware of.

(Pretrial Conf. Tr. 30-31; B-2).

Federal Rule of Evidence 103 requires an objecting party to alert the Court to the specific grounds for objection. The rule provides in pertinent part:

> In case the ruling is one admitting evidence, a timely objection or motion to strike ... stating the specific ground of objection, if the specific ground was not apparent from the context.

F.R.E. 103(a)(1). The "purpose of the specificity requirement is to call the nature of the error to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take ... corrective measures." *U.S. v. Gibbs*, 739 F.2d 838, 849 (3d Cir. 1984) (citations omitted). The rule is intended "to give the trial judge a chance to correct errors which might otherwise require a new trial ...." *Murphy v. City of Flagler Beach*, 761 F.2d 622, 626 (11th Cir. 1985). The specific objection requirement "is not a mere formality." S. Saltzburg, *Federal Rules of Evidence Manual*, § 103.02[1]. Although the rule often arises in the context of an appeal, it has equal application in a motion for a new trial. *Hahm v. Wis. Bell, Inc.*, 983 F. Supp. 807, 811 (E.D. Wis. 1997) (applying Rule 103 and holding "Because Mr. Hahm failed to articulate this ground for objection at trial, he is barred from doing so now in a motion for a new trial.").

It is not enough that Plaintiffs made an objection prior to trial. Rather, the specific ground asserted in post-trial proceedings must be the same ground argued at trial. *U.S. v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007) (under Rule 103(a)(1) "the specific ground for reversal of an evidentiary ruling on appeal must be the same [ground] as that raised at trial."). *U.S. v. Taylor*, 800 F.2d 1012, 1017 (10th Cir. 1986); *see generally U.S. v. Spiller*, 261 F.3d 683 (7th Cir. 2001). Any other result would negate the purpose of Rule 103[10]. This point is well illustrated by what

---

[10] Plaintiffs cannot excuse their failure to bring their latest idea of unfair prejudice to the Court in a timely fashion. Mr. Stevenson was deposed, and there is no contention (nor could (Continued)

took place in this case. After Plaintiffs told the Court that they were unfairly prejudiced by having "to try a car jacking case," the Court acted at the Pretrial Conference to eliminate this claimed unfair prejudice by ordering that there be no characterization of the events on Washington Street as a "carjacking." (Pretrial Tr. 32, B-2). Plaintiffs violated this order the first chance they got -- in their opening statement -- and thus discarded the protections the Court tried to give them. Less than two transcript pages into the opening statement, Plaintiffs told the jury '[t]he gentleman in the gray Mercedes thought he was being carjacked." (Tr. 18, B-6). Similarly, Plaintiffs violated another court order designed to protect them when they mentioned Mr. Smith's hallucinations. (Tr. 17, 18, B-5-6). At a sidebar immediately following Plaintiffs' Opening Statement, Defendants contended that Plaintiffs violated the Court's orders and opened the door to these issues. Plaintiffs' counsel responded, "I did that intentionally, yes. I don't have a problem with them talking about it now." (Tr. 39, B-8).

Plaintiffs' claim -- that the trial was infected because Mr. Stevenson's testimony cast Mr. Smith as a "wildly violent man" -- makes little or no sense, given the evidence introduced by Plaintiffs. Even before the Court allowed Mr. Stevenson to testify, Plaintiffs sought the admission of a videotaped statement from Mr. Smith's father in which he described Mr. Smith stabbing himself in the chest and then overpowering his father. That same interview refers to Mr. Smith "hearing voices." Thus, the testimony of Mr. Stevenson added little not already present to Plaintiffs' perceived characterization of Mr. Smith as a "wildly violent man."

In an effort to make a showing of unfair prejudice, Plaintiffs tell this Court, without citation to the record, that "[a]t every turn, Defense counsel mentioned this information and

---

there be) that his testimony at trial differed in any material way from that in his deposition. His anticipated testimony was also described in some detail in earlier briefs filed before trial.

Plaintiffs' counsel was forced to address it." (Pl. Br. 16). This is untrue. During their opening statement Defendants mentioned Mr. Stevenson briefly,[11] and thereafter (with the exception of his brief[12] testimony) Defendants never made a single mention of him. Mr. Stevenson's name was never even mentioned by witnesses during their examination by Defendants' counsel. And not once during their closing argument did Defendants refer to his testimony or the attempted carjacking. Indeed, the sum total of Defendants' references in their closing to the events at Washington Street is the following:

> At Washington Street, you have heard the officers call "Send backup, send backup. Shots fired, shots fired. He has got the car, he has got the car." This is certainly not, as Joseph Stine seemed to describe it, a lark by Harry Smith, III.

(Tr. 1001, B-92).[13] Thus, the Stevenson testimony was used exactly for its stated purpose -- to provide context. It can hardly be said, as Plaintiffs contend, that Defendants raised it at every turn.

## B. The Court Properly Admitted The Testimony Of Dr. Nordby Because There Was Ample Evidence It Was Reliable.

Without any citation to pertinent testimony, Plaintiffs argue that a certain portion of the testimony of Defendants' forensic expert -- Dr. Nordby -- should have been excluded because it was ostensibly unreliable. They challenge Dr. Nordby's opinion that Mr. Smith was sitting upright when he was struck in the head. According to Plaintiffs, Dr. Nordby "used the bullet

---

[11] Defendants' discussion of the interaction between Mr. Smith and Mr. Stevenson consumed only one-half page of transcript. (Tr. 48, B-9).

[12] Mr. Stevenson's testimony consumed just 10 pages of transcript. (Tr. 700-10; B-58-60).

[13] In order that the Court may verify that Defendants did not refer to Mr. Stevenson's testimony, Defendants' entire closing is included in the Appendix. (Tr. 999-1028, B-92-99).

trajectory among the factors [he] considered." (Pl. Br. 16). They claim that Dr. Nordby "admitted he could not determine or calculate the bullet's trajectory without the [passenger-side] window glass" which had been shot out earlier, and conclude that Dr. Nordby "could not provide a reliable opinion about the bullet's trajectory because the glass was gone." (*Id.*).

Plaintiffs' argument mischaracterizes the testimony. Dr. Nordby did not rely upon holes in window glass to fix the trajectory of the bullet which struck Mr. Smith in the head. Instead, he relied upon the trajectory of the bullet inside Mr. Smith's head, as described by the Medical Examiner. According to Dr. Nordby:

> The evidence shows that he was upright, given the trajectories and the wound path described by the pathologist.
>
> Q    BY MR. PARKINS:    And what do you mean by the trajectories?
>
> A.    The trajectories meaning the incoming rounds through the vehicle, the angles at which all of those potential bullets had to take in order to reach the occupied space.
>
> Q.    Thank you. Let's focus, if we could, on the shot that struck Mr. Smith in the head. Do you have an opinion as to what trajectory that bullet took?
>
> A.    Yes.
>
> Q.    What trajectory did that take?
>
> A.    Well, the bullet came in from the side. One has to be cautious in -- in putting together shooting scenarios in this sense because heads obviously move, but when we put together the information we have from the squad car itself and damage to the vehicle, the bloodstain pattern evidence which is present inside the vehicle, *the medical examiner's account of the direction of the bullet impact through the decedent's head*, we can come up with a trajectory, as you put it, that the bullet came from the right side or the passenger side of the car, and that the decedent was upright in the -- in the vehicle when this bullet struck his head.

31

> Q.    The plaintiffs have alleged in this case that Mr. -- that the
> defendant officers shot Mr. Smith after the police car had
> come to a stop. Do you have any opinion as to whether the
> car was still moving when the shot which hit him in the
> head was fired?
>
> A.    The movement of the vehicle is not something that is
> captured by an analysis of an impact of an injury or damage
> to the -- to the vehicle itself. It occurs to me that we have
> to consider the -- the scene, as well, the glass, the fractures
> of different types of glass, the striking the Jeep and the
> movement of the Jeep, as well, and the fact that for that
> bullet to have struck the decedent in the head, that there
> had to be a relationship between -- between him and the
> vehicle. And that's what we can look at the bloodstain
> patterns to tell us.

(Nordby Dep. 43, B-104) (emphasis added).[14]    Consequently, the absence of passenger side

window glass had nothing to do with Dr. Nordby's opinion.

Plaintiffs include Dr. Nordby's testimony within their incantation that "at every turn

defendants brought this information up." (Pl. Br. 16).    Once again, this is not true.    The

challenged portion of Dr. Nordby's testimony was mentioned only once, and then only briefly, in

Defendants' closing argument. The sole reference to it being:

> You heard the testimony of John Nordby, the forensic scientist
> about the fact that the physical evidence shows that, number one,
> the car was moving and, number two, that Mr. Smith was sitting
> upright and looking ahead when he was shot in the head.

(Tr. 1011, B-95).    Following that sentence, Defendants reminded the jury why the evidence

shows that the car was moving when Detective Ciritella shot Mr. Smith in the head -- evidence

that Plaintiffs do not challenge in their brief. No further mention was made of the conclusion

that Mr. Smith was sitting upright.

---

[14] With the Court's permission, the video-taped deposition of Dr. Nordby was not
transcribed by the court reporter when the deposition was shown to the jury. (Tr. 728, B-65).
Consequently, the record citation in the text is to the transcript of Dr. Nordby's deposition.

The absence of any central role of this aspect of Dr. Nordby's testimony is understandable in light of the testimony presented by Plaintiffs' witness, David Gwyn. Dr. Nordby's testimony that Mr. Smith was seated upright at the time he was struck in the head was offered to rebut Mr. Gwyn's testimony, who stated in an affidavit that he saw a police officer walk up to the side of the stopped police car and shoot into the body of the slumped over driver. (DX-51). Even aside from Dr. Nordby's description of the physical evidence which contradicted Mr. Gwyn, there was substantial evidence which could cause the jury not to find Mr. Gwyn credible in this respect. At one point, Mr. Gwyn seemed to recant his testimony that the driver was slumped over the wheel. (Gwyn Tr. 652, B-47). He testified at trial that he never saw a plain clothes officer (Gwyn Tr. 647, B-45) and therefore he never saw the plain-clothed[15] Detective Ciritella shooting into an allegedly slumped-over Mr. Smith.[16] Thus the story he told in his affidavit took on comparatively little significance other than to demonstrate to the jury that Mr. Gwyn told different stories about what he had seen that night.[17] Dr. Nordby's challenged opinion, consequently, played only a small role in the trial.

---

[15] Detective Ciritella was in plain clothes that night. (Ciritella Tr. 720-2, B-28).

[16] There are many other reasons why the jury could well have not credited Mr. Gwyn's testimony. Not the least of these was his admission he was "cloudy" on the events of that evening. (Gwyn Tr. 656, B-48). Reasons why the jury could well have discredited his testimony are set forth in the Statement of Facts in this brief.

[17] As set forth in the Statement of Facts, Mr. Gwyn told police investigators that he saw the uniformed police officers shoot into the rear of the car. His wife does not recall him ever telling her that he saw an officer walk up to the side of the car and shoot into the window at the slumped over driver.

RLF1-3167962-3

## III.    THE COURT DID NOT ERR IN DECLINING TO GIVE CERTAIN INSTRUCTIONS.

With no citation to the record and no citation to any pertinent legal authorities, Plaintiffs argue that this Court committed error when it declined to give Plaintiffs' requested jury instructions on state-created danger and spoliation. The Court's rulings were correct in each instance.

### A.    The Court Did Not Err In Giving The Requested State-Created Danger Because (1) That Claim Was Never Alleged and (2) Plaintiffs' Claim Fails as a Matter of Law.

Without a single citation to pertinent authority Plaintiffs argue that this Court erred when it declined to give the state-created danger instruction they requested. Plaintiffs' argument is procedurally barred because they never alleged a claim for state-created danger. Further, there is no evidence in the record to support such an instruction. Indeed, plaintiffs have the doctrine backwards, as they argue that they were somehow entitled to the instruction because of "Defendant Ciritella *placing himself in danger* when he stepped into 5TH Street in front of car 1180." (Pl. Br. 17) (emphasis added).

### 1.    Plaintiffs Never Pled A Claim For State-Created Danger.

The state-created danger doctrine is a theory of recovery arising under the Fourteenth Amendment. *See Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005). Because it is a theory of recovery, Plaintiffs were required to plead the elements of that claim in their complaint. *Morse v. Lower Merion School District*, 132 F.3d 902 (3d Cir. 1997) (analyzing what "a plaintiff must plead in order to state a viable claim under the state-created danger theory"). The essential elements of a state-created danger claim are:

(1)   the harm ultimately caused was foreseeable and fairly direct;

(2)   a state actor acted with a degree of culpability that shocks the conscience;

34

> (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006), *cert. denied*, 127 S. Ct. 1483 (2007).

Plaintiffs have never timely presented this claim and it is therefore barred.[18]  Plaintiffs filed an original complaint and two later amendments, yet nowhere in those documents do they allege the facts necessary to set out a state-created danger claim.  Further, as noted above, the state-created danger doctrine arises under the Fourteenth Amendment.  Yet when Defendants moved to dismiss Plaintiffs' Fourteenth Amendment claims (D.I. 29, 30) (a motion this Court granted (D.I. 78), Plaintiffs made no mention whatsoever of a state-created danger claim in their opposition to that motion. (D.I. 36).  Indeed, it was not until Plaintiffs submitted proposed jury instructions that this claim first appeared.  According to Plaintiffs' counsel, they raised the issue because "we were trying to get the model instruction that we thought was closest to this case." (Tr. 892, B-91).  It therefore came far too late and is procedurally barred.

## 2.    The State-Created Danger Claim Fails As A Matter Of Law.

Plaintiffs argue that they were entitled to a state-created danger instruction because of "officer Whitehead's error in positioning himself so that Mr. Smith could gain control of car 1180 on Washington Street." (Pl. Br. 17).  This is easily dismissed, of course, because Officer

---

[18] Defendants raised this objection at trial to the proposed instruction, yet Plaintiffs have chosen to ignore it in their brief.

Whitehead was not a defendant and thus no claim could be asserted against him. They also argue that they were entitled to such an instruction because "Defendant Ciritella plac[ed] himself in danger when he stepped into 5th Street in front of car 1180." (*Id.*). Plaintiffs have the state-created doctrine backwards -- the question is not whether *the defendant* placed himself in danger, but rather whether *the plaintiff* was placed in danger. *Bright*, 443 F.3d at 281 (element of claim is whether "state actor ... created a danger to the citizen or rendered the citizen more vulnerable to the danger."). Hence, the proposition that Detective Ciritella placed himself in danger is meaningless within the context of the state-created danger doctrine.

In connection with their state-created danger argument Plaintiffs suggest that a "jury instruction also was needed to address evidence about the actions or omissions of Defendant Ciritella, in placing himself in danger and then using this as an excuse for using deadly force." (Pl. Br. 18). But they never submitted a proposed jury instruction to this effect. Rather their proposed jury instruction -- which they concede was taken from the instruction on state-created danger in the Third Circuit Model Jury Instructions -- merely outlines for the jury the elements Plaintiffs would have to prove in order for them to recover damages under that theory. The proposed instruction says not a word about a state actor placing himself in danger and then using that as an excuse to use deadly force. Thus, the absence of the "state-created excuse instruction" is reviewable only for plain error. As a matter of law it cannot be plain error not to give that instruction as the Third Circuit has expressly stated that it has never adopted the doctrine espoused by Plaintiffs. *Grazier*, 328 F.3d at 127 (3d Cir. 2003); *see also Abraham*, 183 F.3d at 295-6 (leaving for "another day" issue whether police officer who precipitates need for deadly force can use deadly force.)

**B.**    **There Is No Evidence In The Record To Support A Spoliation Instruction.**

At the prayer conference the Court told Plaintiffs that it had written a well-known opinion on spoliation and implicitly suggested that Plaintiffs might want to read it so that they could inform the Court what principles applied here. (Tr. 866, B-89).[19] Despite this, Plaintiffs fail to cite a single spoliation case in their argument and make no effort whatsoever to explain what legal principles entitle them to a spoliation instruction.[20]

There are three factors to be considered when determining to impose some sort of sanction for spoliation:

    (1)    the degree of fault and personal responsibility of the party who destroyed the evidence;

    (2)    the degree of prejudice suffered by the other party; and

    (3)    the availability of lesser sanctions which would avoid unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000).

---

[19] The following is an excerpt from a colloquy between the Court and Plaintiffs at the prayer conference:

> THE COURT: There are factors. I have written on it quite frankly, if you could look me up. I have written a fairly strong opinion on the issue of spoliation in a case that is fairly well-known around these parts.
>
> So there are considerations. There are factors. There are standards that guide most of what judges do. And certainly there are standards that guide this issue, should guide me on this issue as well.

(Tr. 866, B-89).

[20] Plaintiffs also fail to make a single citation to the record evidence in support of this argument.

37

1.    **There Is No Evidence That The MVR Tape Was Spoliated.**

Plaintiffs cannot even make the threshold showing that the MVR tape (listed on D.I. 179 as PX 21) was destroyed. Instead the evidence is that this particular MVR, like others, functioned only intermittently and simply did not record any events on September 13. Although Plaintiffs' counsel told the jury the tape was blank, (Tr. 30, B-7), it was not. There were intermittent images on the tape from September 10, 11, 12 and 9th (in that order). (Browne Tr. 761, 766, B-70.1-70.2). There were no images from September 13. The difficulties with this tape were not unusual. The Wilmington Police Department experienced frequent problems with the MVR System and concluded it was unreliable. (Browne Tr. 760, B-70.1). Indeed, on the tape introduced into evidence officers can be heard complaining on audio (with no video) that he cannot get the device to work. As a result of the system's recurrent problems, the WPD no longer uses MVRs. (Browne Tr. 760, B-70.1).

At the prayer conference the Court declined to give a spoliation instruction concerning the video tape because there was no evidence that Defendants had access to it and altered it. (Tr. 879-80, B-90). Plaintiffs still have not brought to the Court's attention any evidence that Defendants had access to the video tape.[21] Consequently, the Court did not err in declining to give the spoliation instruction.

2.    **There Is No Evidence Of Spoliation Or That Plaintiffs Were Prejudiced By The Absence Of A Written Statement From Defendants.**

Plaintiffs also argue that the Court erred in declining to give a spoliation instruction because Defendants did not make written statements after this event. Their argument ignores, of

---

[21] While in use, an MVR was located in a secure vault in a patrol car's trunk, to which officers had no access. (Browne Tr. 761, B-70.1).

course, that no evidence has been destroyed; in fact, as Defendant Dempsey testified, he was told by his superiors he did not have to write a report. (Dempsey Tr. 508, B-35). Instead Plaintiffs seem to argue that they are entitled to a spoliation instruction because Defendants failed *to create* evidence. They cite no case to support this novel twist on the doctrine of spoliation.

Plaintiffs' contention also fails because they cannot show any prejudice from the absence of written statements. Each of the Defendants was interviewed the night of the incident, and videotapes of those interviews were turned over to Plaintiffs early in this case. (Tr. 863-4, B-88). When asked by the Court what they thought would be included in a written statement that was not covered in the interviews, Plaintiffs' counsel responded, "We don't know." (Tr. 864, B-88). Pure speculation, such as that offered by Plaintiffs, does not suffice to establish the degree of prejudice required to give rise to a spoliation inference. In *In re Hechinger Investment Company of Delaware, Inc.*, C.A. Nos. 06-2166 and 06-2229, 2007 U.S. App. LEXIS 13155 (3d Cir. 2007), the Third Circuit upheld a Bankruptcy Court's refusal to draw a spoliation inference when the prejudice to the non-spoliating party was speculative:

> There is no evidence that Hechinger intentionally destroyed documents that it is new would be important or useful to UFP in defending against a preference action. In fact, there is no evidence that any of the documents destroyed would have been useful to UFP. There was also no showing that UFP was prejudiced because UFP did not identify any evidence that was destroyed by Hechinger that would have aided UFP. *Any finding that this conduct prejudiced UFP would be purely speculative.* Therefore, the Bankruptcy Court had little basis for granting UFP's spoliation motion and we will not disturb the Court's denial of that motion.

(*Id.* at *28 (emphasis added)). Here, Plaintiffs have not offered any reasoned basis why a spoliation instruction would have been appropriate. The Court properly denied Plaintiffs' request.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a new trial should be denied.

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
Fineman@rlf.com
Attorneys for Defendants

OF COUNSEL:
Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware  19801
302-576-2175

Dated: July 9, 2007

40

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

> Kester I.H. Crosse, Esquire
> Williams & Crosse
> 1214 King Street
> Suite 300
> Wilmington, DE  19801

I hereby certify that I will send on July 9, 2007, by Electronic Mail, the foregoing

document to the following non-registered participants:

> Anne T. Sulton, Esquire
> Post Office Box 2763
> Olympia, WA 98507

> John A. Parkins, Jr. (#859)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> parkins@rlf.com