**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HARRY SMITH, JR. and ROSLYN )
WOODARD SMITH, Individually and as )
Administrators of THE ESTATE OF )
HARRY SMITH, III )
 )
     Plaintiffs, )   Case No.  04-1254-GMS
 )
v. )
 )
JOHN CIRITELLA, THOMAS DEMPSEY, )
and MATTHEW KURTEN, )
 )
     Defendants. )

## APPENDIX TO DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A NEW TRIAL

John A. Parkins, Jr. (#859)
Steven J. Fineman (#4025)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
Fineman@rlf.com
Attorneys for Defendants

OF COUNSEL:
Rosamaria Tassone
City of Wilmington Law Department
City/County Building, 9th Floor
800 N. French Street
Wilmington, Delaware  19801
302-576-2175

Dated:  July 9, 2007

TABLE OF CONTENTS

Excerpts from Pretrial Conference...........................................................................B1 - B3

Excerpts from Trial Transcript..............................................................................B4 - B99

Excerpts from Deposition of J. Nordby, Ph.D. ...............................................B100 - B104

B1 - B38

1

```
 1              IN THE UNITES STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                    -   -   -

 4    HARRY SMITH JR., and      :    Civil Action
      ROSYLN WOODARD SMITH,     :
 5    Individually and as       :
      Adminstrators of The      :
 6    ESTATE OF HARRY SMITH, III :
                                :
 7             Plaintiffs,       :
                                :
 8        v.                     :
                                :
 9    CITY OF WILMINGTON,        :
      JOHN CIRITELLA, in his     :
10    individual capacity and in :
      his capacity as a police   :
11    officer of the Wilmington  :
      Police Department,         :
12    THOMAS DEMPSEY, in his     :
      individual capacity and in :
13    his capacity as a police   :
      Officer of the Wilmington  :
14    Police Department, and     :
      MATTHEW KURTEN in his      :
15    individual capacity and in :
      his capacity as a police   :
16    office of the Wilmington   :
      Police Department,         :
17                              :
               Defendants.      :    No. 04-1254-GMS
18
                    -   -   -
19
                Wilmington, Delaware
20             Thursday, March 22, 2007
                     10:35 a.m.
21                  In Chambers

22                    -   -   -

23    BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.

24

25
```

B-001

1  that he in fact was shot as he was driving away in that
2  police car, because I don't think they knew it.
3        THE COURT: It's reasonable, it seems to me,
4  that the jury be afforded the opportunity to be given
5  context, the opportunity to have context that is not unduly
6  prejudicial, to either side.
7        MS. SULTON: If he allegedly stole some other
8  car rather than the police car?
9        THE COURT: I don't know. It may be. Why were
10  they there? Why were the police there?
11        MS. SULTON: Officer Whitehead says in his
12  deposition he was on the way to the hospital to go to the
13  bathroom.
14        THE COURT: That's what Mr. Parkins just said.
15  And they saw the interaction between Mr. Smith and the
16  Mercedes, the owner of the Mercedes, and they responded to
17  that. And that response led to a further response, I think
18  is the point.
19        MS. SULTON: Then, I think it's overly, unduly
20  prejudicial and it's not probative of the issues before the
21  jury, Your Honor.
22        THE COURT: Well, it is probative. Let's talk
23  about prejudice. It is probative. Why is it unfairly
24  prejudicial?
25        MS. SULTON: It means now I have to try inside

1  this trial whether or not this man was involved in a
2  carjacking, because that is what the Mercedes issue brings
3  into the case. I now have to try a carjacking --
4        THE COURT: No, you don't know.
5        MS. SULTON: -- that the police officers at the
6  scene weren't even aware of.
7        THE COURT: Number one, it wasn't a carjacking,
8  as I understand it. Does the defense agree with that?
9        MR. PARKINS: No. It was -- Officer Whitehead
10  was asked for his legal opinion as to whether it was a
11  carjacking. I should also point out that we deposed the
12  victim, the owner of the Mercedes. Plaintiffs didn't even
13  appear at the deposition. Didn't take -- it was an ex parte
14  deposition, essentially, even though it was properly
15  noticed.
16        We deposed one other witness at that scene.
17  Again, the plaintiffs didn't appear. They had the
18  opportunity to develop the record that they might want to.
19  They chose not to.
20        THE COURT: So just to recapitulate, Mr.
21  Parkins, you contend that the jury should hear from
22  witnesses regarding a Mercedes..., carry it forward.
23        MR. PARKINS: Yes. Because it provides context
24  to the jury as to what happened on 5th and Harrison.
25  Otherwise, the jury will never understand why Mr. Smith was

1  in the police car in the first place. I believe that would
2  be a reasonable question the jury would want to have
3  answered.
4        MS. SULTON: Your Honor, I do not oppose the
5  jury receiving information that Mr. Smith was at a Mercedes
6  and that attracted the attention of Officer Whitehead. But
7  I strenuously oppose the jury being told that Mr. Smith
8  tried to carjack this Mercedes, that the police officers
9  responded, that this whole thing is a, not a violent
10  incident. It changes the context.
11        THE COURT: I don't necessarily disagree with
12  your thoughts on that.
13        Mr. Parkins, number one, I don't think it is
14  proper for -- as you pointed out, it is a legal opinion that
15  would be offered that it was not indeed a carjacking, the
16  one I read in the deposition. So for Officer Whitehead, in
17  any event, to characterize it as such would be
18  inappropriate.
19        MR. PARKINS: Right.
20        THE COURT: So what would the defense seek to
21  adduce evidence, from an evidentiary point of view, on this?
22        MR. PARKINS: The evidence that we seek to
23  adduce is, starting with why he was in the hospital in the
24  first place, that he was hearing voices.
25        THE COURT: Why is that relevant?

1        MR. PARKINS: Again, it provides context as to
2  why he was in the area in the first place. I am more
3  concerned and what is the most relevant is the
4  confrontation -- I use that word advisedly -- between the
5  police on 14th Street and Washington Street. You need to
6  understand that to understand why he had the car. And you
7  need to understand what precipitated the confrontation.
8        THE COURT: Fair enough. But in terms of
9  characterizing it.
10        MR. PARKINS: I will not characterize it as a
11  carjack for purposes of this at all. I am not going to
12  characterize it as anything. I just want people to explain
13  what happened.
14        MS. SULTON: And I do not, because I do not
15  believe it is relevant, Your Honor. I do not want it coming
16  in that he went to the hospital because he smoked some bad
17  marijuana and it freaked him out.
18        MR. PARKINS: I have no desire to put that in.
19        THE COURT: I also agree, I think, Mr. Parkins,
20  though it is not part of the motion in limine, that the fact
21  that he was hearing voices in the hospital, I am not
22  convinced that that is not unduly prejudicial.
23        MR. PARKINS: I will leave it out.
24        THE COURT: We will leave that out.
25        So then the gun is left, insofar as this is

**Page 42**

1  The last one is defendants' fifth motion in
2  limine to exclude evidence or argument regarding risk of
3  harm to third parties. This is the argument that defendant
4  makes, defendants make regarding the number of shots that
5  were fired in the area as having, based on Fourth Circuit,
6  principally, cases, their holding that that type of
7  testimony, if the force was not directed to the plaintiff,
8  is irrelevant. Let me hear from you.
9        MR. PARKINS: That's the case. There is, so far
10  as I know, not one case that holds that force directed to a
11  third party, or third parties being at risk, is relevant to
12  the issue as to whether there was excessive force used on
13  Mr. Smith.
14        The plaintiffs have not cited a single case that
15  says that the Court ought to take into consideration third
16  parties being put at risk.
17        THE COURT: And it is pointed out, Ms. Sulton,
18  by the defendants that you don't address the arguments that
19  they advance and the authority they cite in support of those
20  arguments. Can you do that today?
21        MS. SULTON: Yes, sir. I was relying on --
22        THE COURT: The instructions, Third Circuit
23  instructions.
24        MS. SULTON: Right.
25        THE COURT: Which have not been adopted yet, by

**Page 43**

1  the way.
2        MS. SULTON: They do put them on the website,
3  Your Honor.
4        THE COURT: I am on the criminal committee. We
5  are publishing those for inspection and comment. But the
6  Third Circuit has not yet adopted the civil instructions. I
7  do think they are well-considered and the product of the
8  work of some very smart people.
9        But I am not sure that they are by themselves
10  enough, that the fact that the committee felt it appropriate
11  to provide pattern instructions on this particular issue
12  really addresses the contentions made by the defendants.
13        MS. SULTON: There is the Third Circuit case of
14  Sarrar v. Felsing, the cite is 128 -- it is actually on Page
15  3 of my response, Your Honor. The site is 128 F.3rd 810.
16  And they talk about -- which is really the standard. It
17  says, Each case alleging excessive force must be evaluated
18  under the totality of circumstances.
19        Whether we are talking about the Abraham v.
20  Raso case, which I cite at Page 4 of my response, Your
21  Honor, the cite on that is 183 F.3rd 279, that is citing the
22  U.S. Court in Graham v. Connor, or if we are looking at our
23  old standard cases of Tennessee v. Garner, we look to the
24  totality of circumstances in our determination of whether or
25  not it is reasonable for an officer to discharge his weapon.

**Page 44**

1  So if we take into account the Delaware State
2  law as well as the Wilmington Police Department policies
3  that help provide additional guidance in addition to these
4  Federal Court cases on when an officer should or should not
5  shoot, then we get an even better, even clearer idea of what
6  the totality of the circumstances are in this particular
7  shooting.
8        What the Delaware State law says is that if it
9  is likely that an innocent bystander might be hit, then you
10  don't shoot.
11        So the fact that there were dozens of civilians
12  on the street and dozens of other officers in the same area,
13  that goes to the totality of circumstances, in our view.
14        The fact that the Wilmington Police Department
15  policy as well as the state law, and it's also reflected of
16  course in our cases, say that you shoot if you think someone
17  in the immediate vicinity is in imminent danger, so
18  therefore, if there are other people around, or if there are
19  not other people around, that is part of the totality of
20  circumstances that must be considered as we are trying to
21  determine whether or not the officers' conduct was
22  reasonable.
23        So I do think it is important for us to be
24  allowed to enter evidence saying that there were dozens of
25  other people on that street, not just police officers, but

**Page 45**

1  civilians, and given the large number of people in this
2  densely populated urban community, the officers should not
3  have been firing at Mr. Smith 31 times. It is excessive
4  force.
5        MR. PARKINS: The United States Supreme Court
6  as well as the Seventh Circuit, have held that state laws
7  and police procedures are irrelevant to a determination as
8  to whether there has been a Fourth Amendment violation.
9        THE COURT: Constitutional violation, yes.
10        MR. PARKINS: So we do away with that. And Ms
11  Sulton has yet to cite a single case that takes into account
12  the risk to third parties in determining whether the police
13  violated Mr. Smith's rights.
14        THE COURT: For instance, defense cites Elliot
15  v. Levitt, the parenthetic is, The number of shots by itself
16  cannot be determinative as to whether the force used was
17  reasonable. That multiple shots were fired does not sugges
18  the officers shot mindlessly as much as it indicates they
19  sought to insure the elimination of a deadly threat.
20        That is the kind of factual scenario that -- I
21  haven't had a chance to read that case, but it sounds like
22  it approximates -- that was being analyzed by the Fourth
23  Circuit and approximates what happened in this case or
24  allegedly happened in this case. It seems to me at least
25  the type of analysis we need to engage, or at least a

B-003

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -   --  --

4    HARRY SMITH JR., and         :     Civil Action
     ROSYLN WOODARD SMITH,        :
5    individually and as          :
     Adminstrators of The         :
6    ESTATE OF HARRY SMITH, III   :
                                  :
7              Plaintiffs,        :
                                  :
8         v.                      :
                                  :
9    CITY OF WILMINGTON,          :
     JOHN CIRITELLA, in his       :
10   individual capacity and in   :
     his capacity as a police     :
11   officer of the Wilmington    :
     Police Department,           :
12   THOMAS DEMPSEY, in his       :
     individual capacity and in   :
13   his capacity as a police     :
     Officer of the Wilmington    :
14   Police Department, and       :
     MATTHEW KURTEN, in his       :
15   individual capacity and in   :
     his capacity as a police     :
16   office of the Wilmington     :
     Police Department,           :
17                                :
               Defendants.        :     No. 04-1254-GMS
18
                         -   -   -
19
                    Wilmington, Delaware
20                Thursday, March 22, 2007
                       11:25 a.m
21                       -   -   -

22   BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.

23

24

25                                                    **B-004**

1 highlights of the trial. Above all, your memory should be
2 your greatest asset when it comes time to deliberate and
3 render a decision in this case. So if you do take notes,
4 you can leave them either in your seat or in the jury room
5 at the end of the day. That room will be locked. My deputy
6 will collect them if you leave them in your seats or they
7 will be protected under lock and key in the jury room.
8         Remember, ladies and gentlemen, your notes are
9 for your own personal use. I will give you detailed
10 instructions on the law at the end of the case and those
11 instructions will control your deliberation and verdict.
12         Let me say a quick word about how this trial
13 will proceed. Like most jury trials, this trial will
14 proceed in roughly seven phases. We have been through the
15 first phase, your selection as jurors.
16         The next phase is the preliminary instructions.
17         We will now soon hear openings statements, which
18 are intended to explain to you what each side intends to
19 prove and are offered help you follow the evidence. The
20 lawyers are not required to make opening statements at this
21 time or they may defer their opening statements until it is
22 their turn to present evidence. The presentation of the
23 evidence will then follow, which may include live witnesses
24 and may also include previously recorded testimony as well
25 as documents and other things. You will then hear my final

1 instructions, and then closing arguments of the lawyers,
2 which will be offered to help you make your determination.
3 And finally, your deliberations.
4         Please keep in mind that the evidence is
5 introduced in somewhat of a piecemeal fashion. So as it
6 comes in, please keep an open mind.
7         I have already indicated to you what the trial
8 schedule will be. I don't think it needs to be repeated at
9 this time.
10         We will now hear from plaintiffs' counsel.
11         Ms. Sulton.
12         MS. SULTAN: Excuse me, Your Honor. May we have
13 a sidebar?
14         (The following took place at sidebar.)
15         THE COURT: That was the wrong segment. But
16 that is all right.
17         MS. SULTON: I am fine with it, Your Honor.
18         Your Honor, I apologize, I forgot to mention
19 that counsel and I had discussed using my juror notebooks
20 during my opening statement. There are only three exhibits
21 we are going to pull out because we didn't have agreement on
22 those. I have them with me. I would like to pull out those
23 exhibits and hand them to the jury because I need them for
24 my opening.
25         THE COURT: You want to pull out the three

1 exhibits that are disputed.
2         MS. SULTON: Yes, sir, then give them the
3 notebooks during my opening.
4         THE COURT: Ms. Walker will assist you.
5         MS. SULTON: Thank you, sir.
6         (End of sidebar conference.)
7         THE COURT: Ladies and gentlemen, what is going
8 on is you will each be handed a book containing exhibits.
9 These are plaintiffs' exhibits. We are simply making sure
10 that you are receiving a book that contains the right
11 exhibits.
12         (Pause.)
13         MS. SULTON: With the permission of the Court...
14         THE COURT: You may proceed, Ms. Sulton.
15         MS. SULTON: Thank you, Your Honor. Ladies and
16 gentlemen of the jury, I promise that the evidence in this
17 case will prove that Detective Ciritella, Mr. Kurten and Mr.
18 Dempsey illegally killed Harry Smith, III on September 13th,
19 2003 at the intersection of Fifth and Harrison Street. They
20 shot him because he was driving a stolen police car.
21         I ask that during the course of this trial you
22 pay attention to the evidence that will come in. There are
23 two clues that seamlessly and silently tie together all of
24 the threads of this case that will show you that these
25 officers used excessive force and violated the Fourth

1 Amendment of the Constitution when they decided to fire 31
2 shots in a crowded urban neighborhood about a mile from this
3 courthouse in broad daylight, while elderly people,
4 children, middle-aged people, teenagers, families, were on
5 the street.
6         Now, the question that I am sure is in your mind
7 is how did Harry Smith, III get into a police car. He was
8 suffering some mental health problems on September 13th,
9 2003. He asked his father, Harry Smith, Jr., who is sitting
10 here in the cream-colored shirt and brown tie, he asked his
11 father to take him to Wilmington Hospital and help him get
12 some mental health assistance. While there, he was
13 diagnosed with mental health ailments, suffering from
14 hallucinations and other problems. And the nurse went to
15 get him some medicine. And during that time, he obtained a
16 scalpel that was sitting in an unlocked cabinet, and began
17 stabbing himself in the chest.
18         He had on a white T-shirt. He had on one of
19 those hospital bands, because he was about to be treated at
20 the hospital. His father was there with him, did everything
21 he could to try to physically control his son, was not able
22 to do that. His son overpowered him and ran out of the
23 hospital.
24         Harry Smith, III then ran up to a gentleman who
25 was in a Mercedes, a gray Mercedes, and was bamming on the

1 car door and pulling on the car door, as though he was
2 trying to enter that car.  He had moments before been
3 diagnosed as having hallucinations, mental health problems,
4 and they had already at the hospital proceeded to check him
5 in.
6         The gentleman in the gray Mercedes thought he
7 was being carjacked.  He was scared and he should have been.
8 He didn't have mace.  He didn't have a night stick.  He
9 didn't have a gun.  Here it is, about 6:50, 6:55 p.m. on a
10 Saturday.  It is still light outside.  He is out trying to
11 have a good time.  The next thing he knows, someone runs up
12 to the side of his car, with blood on his white T-shirt, and
13 it scared him.  And despite the fact that Mr. Stevenson was
14 afraid, he simply drove forward to try to move away from the
15 danger or the threat that he perceived.
16         During this time there were two police officers
17 in a police car with the number 1180 who were in the area
18 because, in part, they had heard that there was another
19 psychiatric patient who had eloped from the hospital.
20         So they were kind of looking for that person as
21 well.  And here comes Harry Smith.  Officer Whitehead, who
22 was driving Car 1180, says that he saw a man in a gown, and
23 he references Harry Smith, Jr. as though he is the man in
24 the gown.
25         From time to time people's recollection of the

1 events will be a bit fuzzy.  The incident happened some
2 three and a half years ago.  Harry Smith, Jr., the evidence
3 will show, or Harry Smith, III, the evidence will show, did
4 not have on a gown, but Mr. Whitehead indicated in his
5 deposition that he thought he did.
6         It is a minor detail.  As I mentioned, from time
7 to time people's recollections are a bit fuzzy.
8         In any event, Mr. Whitehead and his partner, Mr.
9 Saunders, are in this Car 1180.  And they see Harry walk up
10 to this gray Mercedes and start hitting on the door and
11 pulling on the door.
12         What they do is they, what we call in the
13 business, they bump their lights.  And so the emergency
14 flashing lights are now on on the top of Car 1180.  They are
15 flashing.  He doesn't turn on his siren, according to Mr.
16 Whitehead, he doesn't turn on the siren because he is so
17 close.  He is within a few feet of Harry at this time.
18         So what Officer Whitehead does, he has his
19 flashing lights on.  He gets out of the car on the driver's
20 side.  Mr. Saunders gets out of the car on the passenger
21 side.  And they both begin to approach Harry, who is in
22 front of them.  They leave the doors open, the lights
23 flashing, the engine running, and the keys in the ignition,
24 as they get out of the car.  So their car is just sitting
25 there, with the engine running, doors open.  And Harry now

1 begins to walk toward them.  He is hallucinating.  He is
2 mentally ill.  And the officers at first don't really know
3 what's going on.  And they think he has a needle in his
4 hand.  And after a little bit, Officer Whitehead realizes
5 what he has is a scalpel in his hand.
6         I have asked the defendants to bring the scalpel
7 to Court because I want you to see the scalpel.  It is about
8 the size of a pen.  But it is a cutting instrument and it
9 will cut you.  So he has a scalpel in his hand and Officer
10 Whitehead realizes that.  Officer Whitehead is armed with
11 mace, baton, gun.  He begins to back up.  And as he backs
12 up -- here is the driver's side door, the car engine is
13 running, the lights are on the top.  As he backs up, Harry
14 slides inside the car.  Now he is sitting in the police car.
15 And what do the police do?  They call for assistance.  Mr.
16 Whitehead says, and let me refer to my notes, Mr. Whitehead
17 says at Page 36 of his deposition, "Get out of the car, get
18 out of the car or I'll shoot."
19         Mr. Dempsey, Defendant Dempsey says he heard
20 that, at Page 40 of his deposition, he says, at Page 40, he
21 says, "I believe Officer Whitehead was screaming at someone
22 to get out, get out, at which time, obviously, you know, we
23 were needed on the street."
24         When you are trying to determine, as the Judge
25 told you in the preliminary instructions and will tell you

1 again at the end of the case when he gives you the jury
2 instructions, the question that you have to answer is was
3 the conduct of the officers objectively reasonable when they
4 decided to shoot and kill Harry Smith, III.  And in doing
5 that, you have to take into account what they knew at the
6 time that they fired their weapon.
7         So Officer Dempsey is saying that he hears
8 Officer Whitehead say, "Get out, get out or I'll shoot."
9         In any event, Harry is positioned in the car in
10 such a way, he is behind the driver's seat -- he is behind
11 the steering wheel, he is in the driver's seat.  Officer
12 Whitehead cannot extricate him from this car.  So he shoots him in the
13 want him to drive off in the car.  So he shoots him in the
14 leg, in the right leg, right below the knee, he shoots him.
15 He is right on top of him.  And he shoots him right in the
16 leg.  He could have shot him in the head and killed him, but
17 he knew that wasn't the right thing to do.  But he didn't
18 want him to take that car, so he shot him in the leg below
19 the knee.
20         Everybody has been to the doctor enough to know
21 when you are sitting down (indicating), one of the things
22 they ask you to do, they take some little rubber thing and
23 they hit your knee to see if you have got good...
24         When he shot him below that knee, he took off in
25 that car, and down the street he goes.  Officer Whitehead

1 to Page 5, this begins the policy, or the rules, on the use
2 of force in departmental weapons. As the evidence will
3 show, the officers violated this directive known as 6.8.
4 And there is a second directive included in Exhibit 12 --
5 they violated 6.7. And there is a second directive included
6 in Exhibit 12 that talks about pursuits and whether or not
7 pursuits should occur and when they should be cut off.
8         There is also a policy there on the mobile video
9 recorder, which is about halfway through Exhibit No. 12.
10 There was in this car, if you look at Exhibit 13, there was
11 a mobile recorder in this car. I asked that copies of the
12 video be sent to me. And it was. And this is it. And it
13 is blank. The videotape taken from that car, the one copy
14 sent to me, is blank.
15        The evidence will show that Mr. Whitehead, who
16 was operating the car before it was stolen, knows that there
17 was some audio problem with the videotape. But he did not
18 mention any problem with the video portion.
19        Let me take you to Exhibit No. 14. This is
20 Fifth Street. If you go to Exhibit No. 15, that is Harrison
21 Street. If you go to -- we mentioned Exhibit No. 16, that's
22 how it looked after Mr. Smith's death.
23        If we go to Exhibit No. 17, this is a photograph
24 of the police car after it is -- after it was removed from
25 the scene, and dowel rods were placed, showing the

1 trajectory of the bullets.
2         The evidence will show that Mr. Ciritella as
3 well as the other two defendants claim that they were
4 shooting at Mr. Smith because he was trying to run over Mr.
5 Ciritella. And Mr. Ciritella says that he fired shots
6 because he thought he was going to be run over. But if you
7 look at these dowel rods at Exhibit 17, they clearly
8 show that shots were fired from the side of the vehicle, if
9 you would go to Exhibit No. 18, there are additional --
10 there is a collage of photos there showing that additional
11 bullets were shot from the passenger side. If you continue
12 around that collage, you will see that bullets were shot
13 from the back as well as the driver's side.
14        If you go to Exhibit No. 19, you will see
15 additional dowel rod sticks that were placed there, as the
16 evidence will show, by the police department investigators
17 who were handling this matter, showing the trajectory or the
18 path of bullets as they are going through the vehicle. As
19 we mentioned, there were 31 bullets shot on Harrison and
20 Fifth Street that day.
21        If you go to Exhibit No. 20, you will see that
22 this is the top of the car with the number 1180 in the photo
23 on the right side, as the evidence will show, is a marking
24 of a bullet being shot even above the car itself.
25        If you go back to Exhibit No. 17, you can tell

1 from that photograph that there is the, looking through the
2 windshield, that there is the video recorder mentioned, that
3 is the mobile video recording unit about which I previously
4 mentioned.
5         Now, in addition to the claim that they had to
6 shoot Mr. Smith because he was a threat to Mr. Ciritella,
7 the evidence will show that the defendants claim that they
8 had to shoot Mr. Smith because he was a danger to the
9 community. The evidence will show that when asked, did you
10 see any neighborhood residents or any citizens, since you
11 said that you were sitting because of your fear for the
12 community, did you see anybody in the immediate vicinity?
13 They said no.
14        The evidence will show that a neighborhood
15 resident, because the streets were filled with neighborhood
16 residents, the evidence will show that a lady by the name of
17 Marilyn Garcia was shot by one of these police officers.
18        The evidence will also show that the officers
19 claim that they thought he would escape. But the evidence
20 will also show, if you would be kind enough to go back to
21 your Exhibit No. 6, if you look at the enlargement on the
22 right-hand side, the evidence will show that this entire
23 area was saturated with police. Again, this occurred during
24 daylight hours. Mr. Smith is driving a marked police car
25 with flashing lights. The area is saturated with police.

1         So the evidence will show that he could not
2 escape. And the evidence will also show, if you go to
3 Exhibit No. 16, this car stops about midway, the 500 block
4 of Harrison Street, the evidence will show that he could not
5 have gotten beyond the 600 block of Harrison Street because
6 there were so many police cars up there as well just a half
7 a block away.
8         The evidence will show that all these officers
9 knew when they decided to fire their gun was that Mr. Smith
10 had taken a police car and a shot had been fired. Some say
11 that they heard something about a scalpel. So the most that
12 they knew is Mr. Smith is in a police car, shots were fired,
13 there might be a scalpel.
14        There are two experts that I retained in the
15 case. I mentioned to you that we are bringing the coroner
16 in. But she is not a retained expert. She is your Delaware
17 coroner. But there are two experts that I retained to
18 assist the jury in understanding the facts of this case.
19        The first gentleman that I retained, his name is
20 Joseph Stine. And Mr. Stine is a former Philadelphia police
21 officer. He subsequently went on to become police chief of
22 a smaller police department, and served as a police officer
23 for about ten years. Mr. Stine does expert witness work
24 professionally. His fee is about $10,000, for me to have
25 him review this file, give me an opinion, and come to court

1 made upon proper bases.

2      MS. SULTON: Yes, sir.

3      THE COURT: My decided feeling at this point is

4 that you crossed way over into the area of argument rather

5 than opening statement. There is a decided difference

6 between the two. I am wanting to remind you of that, and

7 just urge you to comport yourself in accordance with that

8 thought.

9      MS. SULTON: Yes, sir.

10      THE COURT: I am not cutting you off. I am just

11 asking you to think about what I am saying.

12      MS. SULTON: I will, Your Honor. I respect the

13 rules of the Court. I don't in any way mean to do anything

14 to offend any of the rules.

15      THE COURT: I know you don't mean personally

16 offend. You mean to transgress the rules.

17      MS. SULTON: Yes, sir. I don't mean to do that.

18      THE COURT: Mr. Fineman.

19      MR. FINEMAN: Your Honor, I would like to bring

20 up two issues that occurred during opening. We thought it

21 best to wait until sidebar.

22      THE COURT: I think it best not to wait until

23 sidebar.

24      MR. PARKINS: This is not in the form of an

25 objection.

1      MR. FINEMAN: During Ms. Sulton's opening she

2 violated two of the Court's express orders, during the

3 pretrial conference and reiterated by Your Honor on

4 Thursday. She first mentioned carjacking, which Your Honor

5 had specifically excluded at her request. That door is now

6 wide open, in our view.

7      THE COURT: I think it is. I think it is

8 interesting, when I went and looked at the Delaware Code,

9 Title 11, the legislature decided to actually use that term,

10 which expressly I found inflammatory. But it is a term that

11 has been adopted by the General Assembly, for whatever

12 reason, it is.

13      So she has opened the door, I agree.

14      MR. FINEMAN: There was also a motion, Your

15 Honor, to preclude us from talking about hearing voices.

16 Your Honor, during her opening she referred to

17 hallucinations, mental problems, being in the hospital for

18 mental problems. Your Honor, we understood Your Honor's

19 ruling to prevent us from mentioning that. We prepared

20 accordingly. That door has been opened as well.

21      THE COURT: I think she agrees with you.

22      MS. SULTON: I did that intentionally, yes. I

23 don't have a problem with them talking about it now.

24      THE COURT: Okay.

25      MR. PARKINS: Thank you, Your Honor.

1      (Luncheon recess taken.)

2      THE COURT: Ms. Walker, please bring in the

3 jury.

4      (Jury enters courtroom at 2:19 p.m.)

5      THE COURT: Please be seated, ladies and

6 gentlemen. We will continue with the opening statement of

7 the plaintiff.

8      MS. SULTON: Thank you, Your Honor. I will be

9 fairly brief.

10      Ladies and gentlemen of the jury, thank you

11 again for your patience. It has taken us three and a half

12 long years to get here. We want to tell you everything.

13 But we cannot do it in this opening statement.

14      Let me be brief. There are a couple of

15 highlights or a couple of points I would like to make.

16      One is the evidence will show, after Mr. Smith

17 drives off, he is immediately followed by Officer Donohue.

18 Within a few seconds or so, Officer Donohue is joined in the

19 pursuit of the police vehicle by at least six other police

20 cars.

21      There are a total of around 20 officers or so

22 who are all involved in this police pursuit. And if you

23 look at the Exhibit No. 6, your satellite map, they converge

24 from various points in the city into this area at the

25 intersection of Fifth and Harrison Street.

1      We have Defendant Ciritella and Kurten using

2 their patrol cars to block the intersection. We eventually

3 have Mr. Ciritella firing all 13 shots from his gun, either

4 from the side or slightly behind on the passenger side of

5 the vehicle. I am going to use this board here just

6 briefly.

7      So if this is the police car here, this is the

8 passenger side, this is the driver's side, headlight, this

9 is the rear of the car, we have Officer Ciritella firing a

10 total of 13 shots from the passenger side. We have Officer

11 Dempsey firing a total of 13 shots from the driver's side

12 area of the car. He drops his clip and reloads. We have

13 Officer Kurten firing, according to his deposition

14 testimony, he fires from 12 to 17 feet behind the car. And

15 that is quite a distance, 12 to 17 feet from the rear of the

16 car. He fires a total of five shots.

17      So we have Officer Kurten firing five shots from

18 the rear, Officer Ciritella firing 13 shots from the

19 passenger side, and Officer Dempsey firing a total of 13

20 shots from the driver's side. The first three shots go in

21 at an angle, as depicted by one of the photographs that you

22 have in your binder.

23      The other shots are coming in through the

24 window, hitting the car here, many shots hitting the car

25 coming from the rear window, and shots coming in from this

1 tell you is that it is normal to feel sympathy for one side
2 or another, or perhaps even both sides, but that you should
3 not decide this case on the basis of sympathy, but, rather,
4 on the basis of the evidence.
5         Now, I have had an opportunity to meet Mrs.
6 Smith, I actually had an opportunity to take her deposition.
7 I can tell you that you will like her.  She is a very, very
8 nice lady.  And it is impossible not to feel sympathy for
9 someone who has lost a child.
10        I have not been able, because of an illness, to
11 take the deposition of Mr. Smith.  But we do have some
12 rather dramatic footage, which I am about to show you, to
13 show you the sort of sympathy that he deserves.  And we are
14 going to show you a videotape interview when he learns for
15 the first time that his son has died.
16        Daniel, could you please return that.
17        (Tape played.)
18        MR. PARKINS:  Like I said, every one of us in
19 this room will feel sympathy for Mr. and Mrs. Smith.  If
20 this case were to be decided on sympathy alone, we may not
21 be here.  But this case, as Judge Sleet will tell you, is to
22 be decided on the evidence.  And what I am here today to
23 talk to you about a little is some of the evidence you will
24 hear at trial.
25        I thought it might be useful if we could sort of

1 summarize things by beginning with a chronology of the
2 events that occurred on September 13th.
3         It is about 7:00 in the evening.  The University
4 of Delaware is about to play a football game in Newark, and
5 the game will be televised.  The weather is hazy and a
6 little bit humid.
7         In the Wilmington Police Department's main
8 office at Fourth and Locust Street, John Ciritella is
9 sitting at his desk doing what I am sure is the bane of all
10 police officers, paperwork.
11        Cliff Dempsey is just arriving to work.  He has
12 received permission from the Police Department to be a
13 little late for work today so that he could attend a family
14 function.  And Matt Kurten is somewhere in the western side
15 of the city in his patrol car, detaining someone to
16 question.
17        About this time, Harry Smith runs out of the
18 hospital.  You have heard about his encounter in the
19 hospital already.  He runs up Washington Street, and
20 approaches a man by the name of William Stevenson.  Mr.
21 Stevenson was in the Washington Street Ale House.  He was
22 told he better move his car because he might get a ticket.
23 So he was outside on Washington Street, moving his car, when
24 a large black male approaches him, according to Mr.
25 Stevenson, and he has a red stain on his white T-shirt.

1         Mr. Stevenson at the moment was trying to get
2 out of his car when the male yelled at him, "Get out of my
3 F'g way, I am going to steal your car."
4         There then ensued a tug of war between Mr.
5 Stevenson and the person who turns out to be Harry Smith, so
6 that Mr. Stevenson is trying to pull the door closed to
7 protect himself.
8         He succeeds in doing this.  And you will hear
9 Mr. Stevenson tell you that the next thing that Harry Smith
10 begins to do is to bang on the windows of his car and on the
11 roof of his car.  And Mr. Stevenson will tell you that he
12 thought there was a possibility he was going to die that
13 evening.
14        About this time, Officers John Whitehead and
15 Johnny Saunders fortuitously approached in Patrol Car 1180.
16 You heard about that.  They saw what appeared to be some
17 sort of altercation going on in front of the Washington
18 Street Ale House, so they pulled their car up, and Officer
19 Whitehead, who was driving, turned on the lights to the car.
20 They both got out of the car, leaving the engine running,
21 and leaving the doors open.
22        They both pulled their weapons from their
23 holster.  They saw that Mr. Smith had something that
24 appeared at first to be a needle, but they later ascertained
25 to be a knife or a scalpel.

1         Mr. Smith did not menace them in the sense of
2 coming at them.  But as Mr. Smith walked towards them, the
3 officers with their guns drawn retreated.  Suddenly, Mr.
4 Smith saw the open door to the car, spun and got in.
5         About this time, Officer Saunders is on the
6 radio, the kind that they have clipped on on.  And the first
7 thing he says to the dispatcher is, "Send backup."  John
8 Ciritella is in his office and he has his radio on.  Cliff
9 Dempsey has his radio on.  They hear Johnny Saunders saying
10 send backup.
11        They can tell by the tone of his voice that
12 something is wrong.  John Ciritella immediately grabs his
13 keys and runs out into the parking lot of the police station
14 to his police car.  And Cliff Dempsey does the same, as well
15 as some other police officers who were in that building at
16 that time.
17        The next thing that happens back on 14th and
18 Washington Street is that Johnny Whitehead tries to reach
19 into the car to pull out Mr. Smith.  But he thinks twice
20 about it, because Mr. Smith is holding the scalpel that he
21 had taken from the hospital.  And Officer Whitehead had no
22 desire to be stabbed by it.
23        So he backed away, and he shot Harry Smith once
24 in the leg.  The bullet hit him about here (indicating), and
25 went down this way.  Harry Smith in the meantime was gunning

Vershvovsky - direct

1 But I assume that someone who does an autopsy to say, okay,
2 well, did the bullet go here, did the bullet go there, it is
3 technically expert testimony.
4         THE COURT: My understanding — correct me if I
5 am wrong, counsel -- was she was going to be asked questions
6 like the cause or manner of death, which I don't think there
7 is any objection. She is perfectly qualified to render
8 opinions about that.
9         MS. SULTON: Correct.
10        THE COURT: So she is an opinion witness.
11        MS. SULTON: Yes.
12        MR. PARKINS: I think she says she is not an
13 expert witness because she equates expert with retained.
14        THE COURT: Okay. So perhaps I should say
15 something to the jury in this regard to notify them that she
16 will be permitted to express an opinion as an expert in her
17 field, albeit she has not been retained by either side.
18        MS. SULTON: Correct.
19        THE COURT: Okay. She is going to specifically
20 offer an opinion with regard to the manner and cause of
21 death. Is that fair?
22        MS. SULTON: She wants to make it clear and I
23 want to make clear that she is just a fact witness that is
24 an employee of the state.
25        THE COURT: She is more than a fact witness, is

Vershvovsky - direct

1 why I called you over here. I don't want the jury to be
2 confused about that. We are going to talk to the jury in
3 instructions about what experts do. She is an expert.
4 There is no objection. There is no controversy about that.
5         You nor I, Mr. Parkins, nor you, Ms. Sulton, can
6 sit on that witness stand and talk about the cause and
7 manner of death. We are not qualified to do that. We are
8 not by trained to do that by training and experience. She
9 is an expert.
10        (End of sidebar conference.)
11        THE COURT: Members of the jury: I need to
12 correct one perhaps minor point of confusion.
13        The Doctor is correct insofar as she has not
14 been retained as an expert witness by either side. But she
15 is quite clearly and decidedly an expert in her field. She
16 is going to be asked questions that will call upon her to
17 render an opinion in her field of expertise. She is
18 perfectly qualified to do that. For your purposes -- and I
19 am going to talk to you about this later on in my final
20 instructions -- she is an expert.
21        THE WITNESS: But I --
22        THE COURT: Please, no.
23 BY MS. SULTON:
24 Q.    So you have not been retained by my office to come and
25 provide testimony today. Correct, Doctor?

Vershvovsky - direct

1 A.    No. You invite me as a fact witness to report the
2 findings during the autopsy. Not to render any opinion on
3 my findings.
4 Q.    Let me ask you to take a look, Doctor, at Exhibits 2,
5 3 and 4 in front of you in that black binder. Have you seen
6 Exhibit 2 before?
7 A.    There is no Exhibit 2. It starts with -- yes.
8 Exhibit 2 is the autopsy report.
9 Q.    Is that the autopsy report that you completed, Doctor?
10 A.    Yes.
11 Q.    And if you would take a look at Exhibit No. 3?
12 A.    Yes.
13 Q.    Have you seen that document before?
14 A.    Yes.
15 Q.    And can you tell the Court what that is?
16 A.    This is a death certificate, which was issued by our
17 office and signed by me.
18 Q.    And can you take a look at Exhibit No. 4, please?
19 A.    No. 4?
20 Q.    Yes, please. Have you seen that exhibit before?
21 A.    I don't recall it. It's paramedic report. I know I
22 saw the records from the hospital. I am not sure I saw this
23 report.
24 Q.    In reference to Exhibit No. 2, which is the autopsy
25 report that you completed, does that document, Doctor,

Vershvovsky - direct

1 reflect the cause and manner of death of Harry Smith, III?
2 A.    Yes.
3 Q.    I would like to walk you through your report, if I
4 may, Doctor, briefly.
5 A.    Sure.
6 Q.    Did someone tell you prior to you completing that
7 record that Mr. Smith had been shot during an altercation
8 with police?
9 A.    Yes.
10 Q.    And do you recall the name of your investigator?
11 A.    No. I have to check the record again.
12 Q.    You indicate in your report, Doctor, that the cause of
13 death was a gunshot wound to the head. Did you say that?
14 A.    Yes.
15 Q.    Or, I am sorry, it may be on the death certificate?
16 A.    Yes.
17 Q.    Where you indicate a gunshot wound to the head?
18 A.    Yes.
19 Q.    Now, as you went through the autopsy process, you
20 found that there were other bullet wounds. Is that correct?
21 A.    Yes.
22 Q.    And as you were looking at the cause of death as you
23 are going through the autopsy process, did you isolate a
24 particular wound as being the cause of death or did you look
25 at all the wounds together as being the cause of death?

Vershvovsky - cross

1  wound in extremities because sometimes they look similar to
2  each other.
3  Q.   Incidentally, did you see any evidence that the police
4  in any way beat Mr. Smith?
5  A.   No, I didn't see any evidence of, no contusions, no
6  fractures.
7  Q.   There were fractures in his skull.  Am I correct?
8  A.   Yes.  But it was because of the gunshot wound to head.
9  Q.   And as I understand it, the way you determine the path
10 of a bullet when it goes into a body is by way of a
11 hemorrhagic path?
12 A.   Yes.  And we put a probe, we have a metal probe and we
13 try our best to estimate that track.
14 Q.   So it's possible, then, to determine the course in
15 which the bullet traveled once it entered the body?
16 A.   In most cases, it is possible.
17 Q.   Was it possible in this case to track the direction
18 the bullet took when it struck Mr. Smith in the head?
19 A.   I can give you the direction of the bullet in the
20 head, yes, in the body when was on the autopsy table.
21 Q.   That was from right to left?
22 A.   Yes.
23 Q.   Would it have been feasible, then, for that bullet to
24 have been shot from his left-hand side?
25 A.   No.

Vershvovsky - cross

1  Q.   What I want to do is focus for a moment on the bullets
2  other than the one that struck Mr. Smith in the head.
3       Can you say that, more likely than not, if Mr.
4  Smith had not been struck in the head he would have lived?
5  A.   I cannot answer this question.
6       MR. PARKINS:  Thank you.
7       THE COURT:  Ms. Sulton, redirect.
8            REDIRECT EXAMINATION
9  BY MS. SULTON:
10 Q.   So just briefly, Doctor, if someone's head is turned
11 to the right or their body is slightly turned and their head
12 is turned, is it possible for a shooter to be on their left
13 and still hit them in the head, or their left or rear?
14 A.   Your body have to be completely turned around in order
15 for the bullet to appear in this area.
16 Q.   It depends on the position of the body?
17 A.   And the position, yes, and the position.  If the
18 shooter is here, the bullet cannot be in this area if you
19 are looking straight.
20 Q.   But if the shooter is behind you --
21 A.   You would have to be completely sitting like this.  It
22 is very hard to imagine.
23 Q.   Thank you very much for your time.
24       THE COURT:  Doctor, you are excused.
25       (Witness excused.)

Page 79

Vershvovsky - cross

1  Q.   Now, would you tell the ladies and gentlemen of the
2  jury what it means to dissect a wound?
3  A.   In which term do you mean?
4  Q.   When you saw the wounds on Mr. Smith, did you make any
5  effort to determine whether the bullets perforated any major
6  vessels?
7  A.   No, we don't.
8  Q.   So you didn't determine whether any particular bullet
9  perforated an artery or a large vein?
10 A.   No.  We see the hemorrhage track and we do x-rays.
11 And on x-rays we can see where the bullet lodges.  So we go
12 to this area.  If it is in the skin, we do incision of skin
13 and we recover the bullet.
14 Q.   Now, Doctor, none of the bullets except for the one
15 that hit him in the head struck him in any organ.  Is that
16 correct?
17 A.   No organs, no.
18 Q.   So no organs, and we don't know whether any of the
19 other bullets perforated a major blood vessel?
20 A.   The bullets all caused hemorrhaging, so for sure they
21 ruptured some vessels.  There is no question about this.
22 Every single bullet causes hemorrhage along its path.  But I
23 can't tell you which vessel.
24 Q.   Can you tell us whether it was a major vessel or not?
25 A.   I can't tell.

Page 81

1       THE COURT:  Ladies and gentlemen, let's take our
2  afternoon break.
3       (Jury leaves courtroom at 3:35 p.m.)
4       MR. PARKINS:  Your Honor, this is the witness
5  who was subject to this morning's discussion about the
6  disclosures that were made about this witness.
7       THE COURT:  Let me see counsel.
8       (The following took place at sidebar.)
9       THE COURT:  This is?
10      MR. FINEMAN:  Sarah Richardson, I believe.
11      MS. SULTON:  Yes.
12      THE COURT:  We had not resolved the issues?
13      MR. PARKINS:  Ms. Sulton was going to check her
14 discovery responses at lunchtime.
15      THE COURT:  That's right.
16      MS. SULTON:  I did not do that at lunch.
17      THE COURT:  Remind me of the specifics.
18      MR. PARKINS:  Your Honor, we asked
19 interrogatories.  We asked interrogatories saying identify
20 all persons who claim to have witnessed the events at or
21 near Fifth and Harrison Streets.  Here is the list.  Her
22 name does not appear.
23      THE COURT:  Sarah Richardson.
24      MR. PARKINS:  Right.  Then we asked, identify
25 all persons who claim to have witnessed the pursuit of Harry

Bungy - direct

1 A.   Catrenia, C-A-T-R-E-N-I-A, B-u-n-g-y.

2 Q.   I would like to take you back to the afternoon of
3 December 13, 2003, to the area located near Wilmington
4 Hospital.

5        Do you recall seeing an incident occur on that
6 afternoon?

7 A.   Yes.

8 Q.   And can you tell the jury what you recall seeing?

9 A.   When I first noticed anything, I was sitting at a
10 light, I thought I was at a light. But I noticed Mr. Smith,
11 he had his hands up and I noticed the two police officers,
12 the police cruiser was in the middle of the street. The
13 door was open. And the police officers were telling him not
14 to come any closer, stay where he was, and he was taking
15 like little baby steps towards the car. But he had his
16 hands up the whole time. And when he got close to the
17 police car, he jumped in the car, and then I saw a shot
18 fired in the car, then the car took off.

19 Q.   So the shot was fired in the car before it took off?

20 A.   The shot was fired after he was in the car.

21 Q.   After he was in the car?

22 A.   But before the door was closed.

23 Q.   And did you see Mr. Smith drive off in the police car?

24 A.   Yes.

25 Q.   Prior to the point at which you saw him approach the

Bungy - direct

1 anyone. Please don't read anything about it or listen to
2 anything about it. I am going to direct you to avoid
3 newspapers until the conclusion of these proceedings. Don't
4 go on the Internet. You know there are news sources there
5 as well. Please travel safely. We will see you back here
6 tomorrow morning. 9:00 a.m. sharp.

7        (Jury leaves courtroom at 4:27 p.m.)

8        THE COURT: All right. We are in recess.

9        Counsel, we have a few things to discuss?

10        MS. SULTON: Your Honor, I have people --

11        THE COURT: We will take a short break while you
12 go dismiss your witness. Try to make arrangements.

13        MS. SULTON: Yes. And I would like to have the
14 Court continue those subpoenas because they were for today.

15        THE COURT: Absolutely.

16        MR. FINEMAN: Your Honor, we had several
17 officers who were supposed to be testifying today. There
18 were witnesses not scheduled today we put ahead of those
19 officers. What we would request, Your Honor, a list of
20 witnesses who will testify tomorrow and the order in which
21 they will call.

22        THE COURT: Fair enough. The request is
23 granted. So ordered.

24        About -- how long is it going to take you?

25        Let's take about five minutes.

Bungy - direct

1 police officers, did you see Mr. Smith interact with anyone
2 in a gray Mercedes or silver Mercedes?

3 A.   No, I didn't see that.

4 Q.   And what was your physical position vis-a-vis the
5 police car at the time that you saw Mr. Smith approach the
6 police vehicle?

7 A.   I was two cars behind the police car.

8 Q.   And what color is your car?

9 A.   Silver.

10 Q.   Did you see Mr. Smith do anything that was threatening
11 to the police officers?

12 A.   The only thing I saw him do was take steps. But he
13 had his hands up. He was taking steps towards the car.
14 That was it.

15        MS. SULTON: Nothing further. Thank you.

16        THE COURT: Mr. Parkins.

17        MR. PARKINS: No cross, Your Honor.

18        THE COURT: All right. Thank you, ma'am. You
19 are excused.

20        (Witness excused.)

21        THE COURT: Apparently there is such a thing as
22 a five-minute rule.

23        Ladies and gentlemen, we have come to the end of
24 our day. Let me remind you of my earlier instruction I gave
25 you, keep an open mind, do not discuss this case with

1        (Recess taken.)

2        THE COURT: We had some witness issues that we
3 need to discuss?

4        MR. PARKINS: I believe it was Sarah Richardson.

5        THE COURT: Remind me of the specific issue.

6        MR. PARKINS: Sarah Richardson is an individual
7 who apparently lives on the 500 block of VanBuren Street.
8 She was, when she was -- when we asked the plaintiff to
9 identify all persons who claimed to have seen any of the
10 events in or around Fifth and Harrison, she was not
11 identified.

12        THE COURT: Ms. Sulton was going to have Mr.
13 Crosse to look through to see whether she had been disclosed
14 in your initial disclosures.

15        MR. PARKINS: It is coming back to me. Yes.

16        THE COURT: Mr. Crosse, Ms. Sulton.

17        MR. CROSSE: Your Honor, I went through the pile
18 of papers from Ms. Sulton. We don't have it here. I think
19 it's in the hotel room. So we will have to do that after we
20 recess tonight.

21        MR. PARKINS: When this came up, Your Honor, we
22 looked to see if there was a report from Ms. Richardson or
23 about Ms. Richardson. We could not find any.

24        THE COURT: There was nothing reported to you as
25 far as your records reveal in the initial disclosures?

```
09:01:58
```

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                       -  -  -

4      HARRY SMITH JR., and        :      Civil Action
       ROSYLN WOODARD SMITH,       :
5      individually and as         :
       Adminstrators of The        :
6      ESTATE OF HARRY SMITH, III  :
                                   :
7              Plaintiffs,         :
                                   :
8          v.                      :
                                   :
9      CITY OF WILMINGTON,         :
       JOHN CIRITELLA, in his      :
10     individual capacity and in  :
       his capacity as a police    :
11     officer of the Wilmington   :
       Police Department,          :
12     THOMAS DEMPSEY, in his      :
       individual capacity and in  :
13     his capacity as a police    :
       Officer of the Wilmington   :
14     Police Department, and      :
       MATTHEW KURTEN, in his      :
15     individual capacity and in  :
       his capacity as a police    :
16     office of the Wilmington    :
       Police Department,          :
17                                 :
               Defendants.    :    No. 04-1254-GMS
18
                       -  -  -
19
                 Wilmington, Delaware
20             Tuesday, April 10, 2007
                      9:00 a.m.
21
                       -  -  -
22
       BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J,
23                                 and a jury

24
                   SECOND DAY OF TRIAL
25

B-013

141

1    We call Mr. Johnny Whitehead to the stand.

2    ... JOHNNY WHITEHEAD, having been duly sworn as

3    a witness, was examined and testified as follows ...

4    **DIRECT EXAMINATION**

5    BY MS. SULTON:

6    Q.    Could you state your name and spell your last name for

7    the record, please?

8    A.    Yes, ma'am. Johnny Whitehead, W-h-i-t-e-h-e-a-d.

9    Q.    How are you employed, Mr. Whitehead?

10   A.    I am employed by the Wilmington Department of Police,

11   Patrol Division.

12   Q.    Before you were employed by the Wilmington Police

13   Department, how were you employed?

14   A.    I worked at Temple University, Central Service

15   Supervisor.

16   Q.    In what capacity were you working?

17   A.    Just dealing with copies, providing documents for the

18   lawyers, things of that nature.

19   Q.    That was at Temple University?

20   A.    Temple University, yes.

21   Q.    What is your current rank with the Wilmington Police

22   Department?

23   A.    Patrolman.

24   Q.    Do you have any college degrees?

25   A.    No, ma'am.

142

1    Q.    Did you take any post-high school courses?

2    A.    Yes, at Temple University.

3    Q.    In what field?

4    A.    Criminal justice.

5    Q.    Did you go through the police training academy prior

6    to being assigned to patrol the streets of Wilmington?

7    A.    Yes, ma'am.

8    Q.    And did you get any training in the field of use of

9    force?

10   A.    Yes, ma'am.

11   Q.    Can you tell me what kind of training you received?

12   A.    During the academy, we are trained for approximately

13   six months. As far as use of force, we are told, or trained

14   that we must present ourselves in uniform, give verbal

15   commands, and then it will go from there.

16   Q.    I would like to take you to September 13th of 2003 in

17   the afternoon. Were you on patrol in the streets of

18   Wilmington?

19   A.    Yes, ma'am.

20   Q.    And was there a point at which you had contact with

21   Harry Smith, III?

22   A.    Yes, ma'am.

23   Q.    How did you come to have contact with Harry Smith,

24   III?

25   A.    Well, prior to having contact with Mr. Smith, we were

143

1    dispatched to a call, a patient had ran away from the

2    hospital. We conducted an area search, I believe it was

3    14th and Orange Street, in the park there, looking for a

4    tall, black, light-skinned male, bald head, with a gown. We

5    did not find him.

6    I was on my way to use the bathroom at Wilmington

7    Hospital.

8    Q.    You are using the term "we." Who is we?

9    A.    I was with a partner, Corporal Johnny Saunders.

10   Q.    And who was driving?

11   A.    I was.

12   Q.    So you are on your way to the hospital for personal

13   reasons?

14   A.    Yes.

15   Q.    How did you come upon Mr. Smith?

16   A.    I observed Mr. Smith running southbound on the west

17   side of the street. Initially, I believed that he had a

18   hospital gown on. But I saw the tape, and he actually had a

19   white, long white T-shirt on, with a hospital bracelet.

20   Q.    Did you see anything unusual about the T-shirt?

21   A.    Not at that time, no. Not when I first saw him, no.

22   Q.    Then what did you observe?

23   A.    Well, I said to my partner, it must be an epidemic,

24   because I just assumed that he was another patient running

25   from the hospital. But I didn't really pay too much

144

1    attention till I turned onto Washington Street and I

2    continued to watch him run, then he stopped. Then he ran

3    diagonally across my car in a southeastern direction towards

4    the Mercedes.

5    Q.    Was it your understanding that the patients who are

6    running from the hospital were running from the hospital

7    because of some mental illness?

8    A.    It could have been mental illness. It could have been

9    any reason. Dissatisfied with the service. But he didn't

10   match the description of the person we were looking for, so

11   I didn't really put too much into it at that time.

12   Q.    So you saw him run towards a Mercedes. Is that

13   correct?

14   A.    Yes, ma'am.

15   Q.    And what did you see him do?

16   A.    He ran up to the door of the Mercedes and it appeared

17   that he was trying to open the door to the Mercedes.

18   Q.    How far were you from the Mercedes at that time that

19   you made that observation?

20   A.    Approximately ten to 15 feet.

21   Q.    And then what did you observe?

22   A.    I observed the operator of the Mercedes actually was

23   holding onto the door, leaning inward, to try to prevent Mr.

24   Smith from gaining access.

25   Q.    Did Mr. Smith gain access?

**B-014**

145

1  A.    No.

2  Q.    Then what happened?

3  A.    Then I activated my overheads, and I pulled up right

4  behind Mr. Smith, who had his back to me at that time.

5  Q.    And what do you mean when you use the word overheads?

6  A.    The lights on top of my vehicle.

7  Q.    The emergency flashing lights?

8  A.    Yes, ma'am.

9  Q.    And what is the color spectrum that those lights have?

10  A.    Gosh, I believe it's white and blue, and red.

11  Q.    So you activated your overheads?

12  A.    Yes, ma'am.

13  Q.    And then what did you do?

14  A.    I pulled up behind Mr. Smith. He had his back to me.

15  Then he turned around. And I noticed he had blood on his

16  shirt. So at that time I thought that he was a victim of

17  some sort of assault. So I exited my car and I said, okay,

18  sir, just calm down. I will help you out.

19          And I noticed what I believed, I thought he had

20  a needle in his hand. I assumed that he was running from

21  the hospital. He had a hospital bracelet on, and he was

22  breathing heavy. I told him, I said, okay, just put the

23  needle down.

24  Q.    And then what did you observe?

25  A.    Well, he didn't put the needle down. Then I noticed

146

1  it wasn't a needle. I believe it was some type of knife or

2  scalpel that he had in his hand. Then that's when I drew my

3  weapon down on him. And then I ordered him repeatedly to

4  drop -- I said, "Drop the knife."

5  Q.    At the point that you realized he had a scalpel in his

6  hand rather than a needle, how far were you from him?

7  A.    I was maybe a foot, foot away from him.

8  Q.    And what did you do after you realized he had a

9  scalpel?

10  A.    I drew down my weapon on him and I began giving him

11  orders to surrender the weapon, or drop it.

12  Q.    Did you back up at all?

13  A.    Not initially, because he was -- he didn't respond to

14  my weapon at all, which scared me because usually, when I

15  point my gun at someone, it usually gets their attention.

16  It didn't get his attention at all. Then I kept on saying

17  to myself -- well, telling him, Drop the knife. I don't

18  want to shoot you. Drop the knife.

19          I kept on screaming it repeatedly.

20          Then he began to walk towards me, with the knife still

21  in his hand.

22  Q.    And you -- I think that we have that item?

23          MS. SULTON: Do we have that today, the scalpel?

24          MR. PARKINS: Yes.

25          MS. SULTON: If I may. Thank you.

147

1          Your Honor, if I may approach?

2          THE COURT: You may approach.

3  BY MS. SULTON:

4  Q.    I have now just handed you a bag. Can you describe

5  that for the record, please?

6  A.    It's a brown paper bag, white tape, marked Evidence,

7  red tag, Vial Hazard.

8  Q.    Have you ever seen that bag before?

9  A.    I believe I have seen it yesterday.

10  Q.    Would you open that bag, sir?

11  A.    Sure.

12          MR. PARKINS: Your Honor, could we -- the

13  witness might need gloves.

14          THE COURT: Do you have gloves?

15          MR. PARKINS: Unfortunately, no, I don't think

16  so.

17          MS. SULTON: I have none.

18          THE WITNESS: I have gloves.

19          THE COURT: Okay.

20          MS. SULTON: Your Honor, for the record, that is

21  Exhibit No. 26.

22          THE COURT: Is that Plaintiffs' Exhibit 26?

23          MS. SULTON: Yes, sir.

24  BY MS. SULTON:

25  Q.    Have you opened the bag, Mr. Whitehead?

148

1  A.    Yes, ma'am.

2  Q.    Would you remove the item enclosed therein?

3          (Witness complies.)

4  Q.    Can you identify that item, sir?

5  A.    It appears to be a sky-blue scalpel.

6  Q.    Can you hold that up so the jury can see that?

7          (Witness complies.)

8  Q.    Is that the scalpel that Mr. Smith had in his hand at

9  the time that you first encountered him?

10  A.    I believe so, ma'am, yes.

11  Q.    Thank you.

12  A.    You are welcome.

13  Q.    Now, after you observed that, Mr. Whitehead, you

14  indicated that you drew your weapon. Then what happened?

15  A.    Then he began to walk towards me. Then at that time I

16  began to walk backwards, affording him more time to put down

17  his weapon, just in case there was something wrong with him.

18  Q.    At that time did you believe that there was something

19  mentally wrong with him?

20  A.    I don't know if it was mental or not. I am not a

21  physician. But I do know that he displayed uncharacteristic

22  behavior.

23  Q.    When you say uncharacteristic behavior...

24  A.    Not normal behavior. Abnormal behavior, I should have

25  said.

**B-015**

149

1 Q. Was he swinging the scalpel at you, sir?

2 A. No, ma'am.

3 Q. Did he point it at you or make you feel that he was

4 going to at that time use it against you in any way?

5 A. No, not at that time, ma'am.

6 Q. So then what happened?

7 A. Well, he began to walk towards me. I began to back

8 up, still having my gun trained on him. He took his eyes

9 off me once -- he was looking at me the whole time. He took

10 his eyes off me once to look at my car door. And I thought

11 to myself, I know he is not going to jump in my car. In

12 fact, he did just that.

13 Q. Now, at the time that he jumped into your car, were

14 the emergency lights on the top --

15 A. They were still on, yes.

16 Q. They were still flashing?

17 A. Yes.

18 Q. Was the key in the ignition of the car?

19 A. Yes, ma'am.

20 Q. Was the engine running?

21 A. Yes.

22 Q. And the door was open?

23 A. The door was open.

24 Q. And so he got into your car?

25 A. Yes.

150

1 Q. And where is Officer Saunders at this time?

2 A. I don't know. I believe he was somewhere behind me.

3 I was more so focused on Mr. Smith.

4 Q. Then what happened after he got into your car?

5 A. He got into the car, and he attempted to put the car

6 in gear. And he was stomping on the accelerator. I ran

7 after him and I physically tried to snatch him out of the

8 car. I had my gun in my left hand, and with my right hand,

9 I had it on his wrist to try to pry his hand off the

10 accelerator.

11 Q. Are you left-handed --

12 A. I am sorry, the gearshift.

13 Q. Are you left-handed or right-handed?

14 A. I am right-handed.

15 Q. So you moved your gun from your right hand to your

16 left hand?

17 A. Yes.

18 Q. And then you tried to pull him out of the car?

19 A. Yes.

20 Q. And when that was not successful, what happened?

21 A. Well, I continued to try to pull him from the car.

22 And then I told him, again, repeatedly, Get out of the car,

23 get out of the car, I don't want to shoot, get out of the

24 car.

25   And then I shot him.

151

1 Q. Now, at the time that you are making this statement,

2 "Get out of the car, get out of the car" --

3 A. I am in the car with him. We are actually tussling

4 inside the car.

5 Q. And you are saying, Get out of the car, get out of the

6 car or I will shoot you, words to that effect?

7 A. "I don't want to shoot you. Get out of the car."

8 Q. "I don't want to shoot you"?

9 A. Yes.

10 Q. So at the time that you are making those statements,

11 is your radio on?

12 A. The radio inside the car?

13 Q. The radio that would broadcast to other officers who

14 might be on patrol or at the station.

15 A. Yes.

16 Q. So is it fair to say that anybody who is listening to

17 the police radio at that time, whether they are in the

18 police station or on patrol, that they would hear those

19 statements you were making, "Get out of the car, get out of

20 the car, I don't want to shoot you"?

21 A. Not from my radio, because I didn't key up. I was

22 more so focused on Mr. Smith.

23 Q. So how would anyone have heard, if they did, how would

24 anyone have heard other police officers not there, that you

25 were saying, Get out of the car, get out of the car or I

152

1 will shoot you?

2 A. Well, I don't know how other officers would have

3 heard. I know my partner, he called it in. He called the

4 stop in and advised the other officers that we had a plan

5 with a knife.

6 Q. Do you know whether or not your partner, Mr. Saunders

7 had made the call while you are still tussling with Mr.

8 Smith inside the car before you shoot him?

9 A. That I don't know.

10 Q. But it's your belief that Mr. Saunders made the call?

11 A. Initially, gave our location and said "Man with a

12 knife."

13 Q. Do you know whether or not Mr. Saunders called in,

14 "Shots fired"?

15 A. I believe he did.

16 Q. Why do you believe he did?

17 A. Well, I have listened to the audio, and observed the

18 video recently. And I heard, "Shots fired." I heard him

19 announce, "Shots fired."

20 Q. When did you review that, sir?

21 A. Saturday.

22 Q. And after that, what happened, Mr. Whitehead?

23 A. After I shot Mr. Smith, he appeared to have winced,

24 like winced, and the door shut, and he drove, took off

25 southbound.

B-016

153

1    Q.    And what did you do?

2    A.    I ran after the vehicle.

3    Q.    How many blocks did you run after your car?

4    A.    I would say maybe two, two blocks.

5    Q.    And why did you run after your car?

6    A.    Well, I was hoping that he would pass out and crash.

7    I didn't want him to leave the scene.

8    Q.    And you knew that you had hit him?

9    A.    Yes.

10   Q.    And that you have .40-caliber hollow-point bullets in

11   your gun?

12   A.    I believe so.

13   Q.    While you were tussling with Mr. Smith and trying to

14   get him out of the car, did he try to cut you with that

15   scalpel?

16   A.    No, he did not.  But that was my concern.

17   Q.    You were certainly close enough where he could have.

18   Correct?

19   A.    Easily, yes.

20   Q.    Did he ever say anything to you during this incident?

21   A.    Not a word.

22   Q.    Were you in any way injured in this incident?

23   A.    No, ma'am.

24   Q.    Was Mr. Saunders ever injured in any way in this

25   incident?

154

1    A.    No, ma'am.

2    Q.    Did he ever say anything to Mr. Saunders?

3    A.    No, ma'am.

4    Q.    After you ran after your car for a couple of blocks,

5    what did you then do?

6    A.    I returned to the scene, I believe the 1400 block of

7    Washington Street.

8    Q.    How did you get there?

9    A.    A passerby actually drove us, I believe it was a white

10   female in a red Neon, she brought us to the scene.

11   Q.    You say brought us?

12   A.    Myself and my partner.  He was behind me when I ran

13   after the vehicle.

14   Q.    So Mr. Saunders was running with you after the

15   vehicle?

16   A.    Yes.

17   Q.    While you are running after the vehicle, did you hear

18   Mr. Saunders talking on the radio?

19   A.    No.  I did not.  Not after we started running, no.

20   Q.    Were you running in front of or behind Mr. --

21   A.    I was in front of him.

22   Q.    You were running in front of Mr. Saunders?

23   A.    Yes, ma'am.

24   Q.    Is it fair to say, Mr. Whitehead, that what you first

25   saw when you saw Mr. Smith approach the gray Mercedes was a

155

1    car then in process?  What did you think you were seeing?

2    A.    Initially, I thought it was a carjacking in progress.

3    Q.    And then why -- you said initially.  Why did you

4    change your view that it was not a carjacking?

5    A.    Well, I mean, that is still my position.

6    Q.    That it was -- what you saw was a carjacking?

7    A.    That it was a carjacking.

8          MS. SULTON:  Your Honor, I believe that I have

9    Mr. Whitehead's deposition, if I may show it to him.

10         THE COURT:  Sure.  Do you want to refer to a

11   page and line?

12         MS. SULTON:  Yes.

13   BY MS. SULTON:

14   Q.    I am going to come back to the point momentarily, Mr.

15   Whitehead.

16   A.    Okay.

17   Q.    Now, Mr. Whitehead, was this the first time that you

18   had used this vehicle?

19   A.    No.

20   Q.    At the time that Mr. Smith took the car, were all of

21   the windows up?

22   A.    That I could not tell you.  I am not sure if the

23   windows were up or down.

24   Q.    If all of the windows were up -- let me ask the

25   question this way:  Have you operated the vehicle with all

156

1    of the windows up?

2    A.    Yes.

3    Q.    If all of the windows are up, is it possible for you

4    to hear someone speaking who is half a block away from you?

5    A.    It would be almost impossible.  It would be

6    impossible.

7    Q.    And in previously operating that vehicle, had you used

8    the videotape camera that the car was equipped with?

9    A.    Yes.

10   Q.    And do you know whether or not the camera was workin

11   on the day of September 13th, 2003?

12   A.    I don't know if the camera was working on that date.

13   I do know it was working a week prior to that date when I

14   used the same vehicle.

15   Q.    Was there any point, sir, at which you had any contact

16   with the driver of the gray Mercedes?

17   A.    No.

18   Q.    Was there a shotgun inside the passenger compartment

19   of that car?

20   A.    No, ma'am.

21   Q.    Where was the shotgun?

22   A.    The shotgun was in the trunk of the vehicle.

23   Q.    At any time did you tell anyone that the shotgun was

24   in the passenger compartment of the car?

25   A.    No.

B-017

BY MS. SULTON:

1  Q.  Have you seen that document before, Mr. Whitehead?

2  A.  Yes.

3  Q.  And from where does that document come?

4  A.  From our rules and regulations.

5  Q.  And can you identify it for the record, please?

6  A.  Yes. It's Directive 3.2, titled Traffic Division.

7  Q.  Would you take just a moment, please, Mr. Whitehead,

8  and compare that document I just handed you with the page,

9  the first page of what is the exhibit behind Tab No. 12.

10      Can you tell me whether or not the first page of

11  Tab No. 12 is the same as your finding in the exhibit I just

12  handed you, which is Directive 3.2?

13  A.  It seems to be the same, yes.

14  Q.  Could I ask you to take a look at No. 7, which is the

15  very first page of Tab 12. It has the Page No. 15 on it.

16  Correct?

17  A.  Yes, ma'am.

18  Q.  Can I ask you to take a look at Point No. 7. Do you

19  see where it says Roadblocks there?

20  A.  Yes.

21  Q.  Is it your understanding, sir, that the Wilmington

22  Police Department does not encourage the use of an officer's

23  patrol car to formulate a roadblock?

24  A.  Yes.

1  Q.  Have you ever used your car as a roadblock?

2  A.  No.

3  Q.  So it's your understanding that it is not proper

4  protocol for a police officer to use his vehicle as a

5  roadblock or a barrier. Correct?

6  A.  That is correct.

7  Q.  And if you go -- are you familiar with Directive 6.7

8  and 6.8?

9  A.  I have general knowledge of it.

10  Q.  On use of force and vehicle pursuits, are you familiar

11  with those parts of the police manual?

12  A.  Yes.

13  Q.  Are you aware, sir, that using one's patrol vehicle or

14  police vehicle as a roadblock is a show of deadly force?

15  A.  Yes.

16  Q.  There was a point at which, after your car was taken,

17  that other police cars helped to locate your vehicle.

18  Correct?

19  A.  Yes.

20  Q.  And can you tell us what happened as you were, you and

21  your partner, Mr. Saunders, were running after the vehicle,

22  can you tell us what you observed as it relates to other

23  police officers or police vehicles assisting you?

24  A.  I observed a stolen black-and-white vehicle traveling

25  southbound on Washington followed by a white-and-gold

1  Wilmington unit operated by Sergeant Donohue, until they

2  went out of sight.

3  Q.  How quickly did Sergeant Donohue and her vehicle

4  appear after your car was taken from you?

5  A.  Literally, she was in the block when the car was taken

6  taking off.

7  Q.  She was already in the same block?

8  A.  Yes. She was traveling to assist in our location.

9  Q.  Did you see any other police cars involved, or police

10  officers involved in the pursuit other than Sergeant

11  Donohue?

12  A.  No.

13  Q.  Do you know whether or not Sergeant Donohue activate

14  her lights and siren on her vehicle?

15  A.  I believe she did.

16  Q.  And she was in a marked vehicle?

17  A.  She was in a marked white-and-gold unit.

18  Q.  Is it white and gold for any particular reason?

19  A.  At that time we were changing design styles from the

20  white and gold to the black and white that we now have.

21  Q.  After your involvement in this incident, what did you

22  do after you got the ride from the citizen in the red Neon,

23  what did you do then?

24  A.  I responded back to the scene.

25  Q.  Okay. So you responded back to the scene, you are now

1  two blocks from where you were before. What did you then

2  do?

3  A.  I believe Mr. Smith, his father approached me, and he

4  asked about his son. And at that time I had said, I said,

5  well, he has stolen a police car, but I believe we got him.

6  And when I said that, I meant that he was in custody. I

7  didn't know at that time he had expired.

8  Q.  How soon after you responded back to the scene did you

9  interact with Mr. Smith, Jr.?

10  A.  Almost immediately. As soon as I got there.

11  Q.  Have you seen Mr. Smith since then?

12  A.  Yes.

13  Q.  And that was during your deposition in this case?

14  A.  Yes, ma'am.

15  Q.  After that, what did you do? After you had had some

16  interaction with Mr. Smith, what did you then do?

17  A.  I didn't know that he was his father. And after he

18  had said that he was his father, then everything just -- I

19  just went numb after that. I remember walking over to the

20  hospital. I got a drink of water and I sat on the curb.

21  And I just watched Washington Street.

22  Q.  Then what did you do after that?

23  A.  I believe officers started responding back, and they

24  asked if there is anyone I want to call. I didn't really

25  respond. Then I believe I was escorted back to the police

169

1  station.

2  Q.   By whom?

3  A.   I don't remember. I remember it was a high-ranking

4  officer. But I don't remember or recall who it was.

5  Q.   Did you have your radio with you then?

6  A.   Yes, I was in full uniform.

7  Q.   Were you listening to the interchange between or among

8  officers who were involved in the pursuit?

9  A.   I wasn't paying attention to it. You can hear it,

10  obviously. But I wasn't paying attention to the exact

11  details after that.

12  Q.   What were you hearing?

13  A.   Just, I mean, sirens, noise, things of that nature.

14  Q.   Were you hearing people talking in loud and excited or

15  anxious tones?

16  A.   Again, all I paid attention to was the sirens. That

17  was going to and from.

18  Q.   Were you hearing a lot of sirens?

19  A.   After the car was taken, yes. But after everything

20  had settled down, that was pretty much it. Officers

21  responding, that's what I heard.

22  Q.   Now, there was a point at which you observed the car

23  being driven by Mr. Smith at least two blocks or so?

24  A.   Yes.

25  Q.   And how would you characterize the way in which he was

170

1  operating the vehicle?

2  A.   Just driving southbound at a high rate of speed, maybe

3  40, 50 miles an hour.

4  Q.   You think he was going 40 or 50 miles an hour driving

5  away from you?

6  A.   Approximately.

7  Q.   Was he driving erratically?

8  A.   Not at that time, no. He was just driving straight.

9  Q.   Do you recall whether or not you observed him violate

10  any traffic rule other than the excess speed?

11  A.   I know that there was a traffic light. I wasn't

12  paying attention if he ran it or not. I was more focused

13  on -- I was running, watching the car. Actually the cars

14  travel southbound on Washington.

15  Q.   Then what did you do after you went back to the

16  hospital, sat down for a few minutes, then what did you

17  do -- I am sorry, you said you had gone with a high-ranking

18  officer to the station?

19  A.   Yes, back to the police station. There we were -- sat

20  in a room. I gave a statement. Then I went home.

21  Q.   Who is the "we" that sat in a room?

22  A.   The officers that were involved.

23  Q.   Do you know their names?

24  A.   Yes.

25  Q.   What are they?

171

1  A.   Sergeant Dempsey. Sergeant Kurten. Sergeant

2  Ciritella.

3  Q.   Was Officer Saunders with you?

4  A.   Officer Saunders, I believe so.

5  Q.   And you were in a -- what kind of room were you in?

6  A.   Just a standard room. There was a TV on, I believe

7  some sporting event was on. Everybody was pretty much to

8  themselves.

9  Q.   Did you discuss the incident with them?

10  A.   No.

11  Q.   Were there conversations among them?

12  A.   Not about the incident. Again, everyone was pretty

13  much to themselves.

14  Q.   And then after that at some point you were

15  interviewed?

16  A.   I was interviewed, yes.

17  Q.   Who interviewed you?

18  A.   It was Lieutenant Brown.

19  Q.   Do you recall approximately how long that interview

20  lasted?

21  A.   Maybe ten minutes.

22  Q.   Other than the interview with Sergeant Brown, did

23  anybody -- and I am not talking about any lawyers you may

24  have talked with subsequently about the case -- but did

25  anyone else who was conducting an initial investigation of

172

1  the matter interview you about what happened?

2  A.   No.

3  Q.   Other than the ten minutes?

4  A.   That was it.

5  Q.   That was it?

6  A.   That was it.

7  Q.   Did anyone ask you to write a report?

8  A.   No.

9  Q.   Did anyone tell you not to write a report?

10  A.   No, I don't recall anyone telling me not to write a

11  report.

12  Q.   Has there been any other situation in which you were

13  involved in a serious matter where you did not write a

14  report?

15  A.   Yes.

16  Q.   And what was that?

17  A.   I was involved in another shooting at Fifth and

18  Rodney, and the officer fired on the victim. I went

19  hands-on with the suspect -- I am sorry, I said victim, he

20  was a suspect. I went hands-on. And at that incident I

21  broke my hand.

22  Q.   You broke your hand on his head. Correct?

23  A.   Yes.                     **B-019**

24  Q.   You didn't bring a report?

25  A.   I did not write a report on that, either.

1  A.  Seldomly.

2  Q.  And they are supposed to check them. Correct?

3  A.  That's correct.

4  Q.  Every day. Right?

5  A.  I am not sure if they are supposed to do that every

6  day or not.

7  Q.  Now, there are guidelines within which an officer must

8  exercise his discretion. Correct?

9  A.  Yes.

10  Q.  And so an officer is not free to do whatever he wants

11  to do. Correct?

12  A.  That's correct.

13  Q.  And the guidelines in which the officer must exercise

14  his discretion are articulated or listed in the police

15  manual. Correct?

16  A.  Yes.

17  Q.  And the police manual is this document here. Correct?

18  Let me show it to you.

19      MS. SULTON: May I approach?

20      THE COURT: Yes.

21  BY MS. SULTON:

22  Q.  If you would take just a moment, Mr. Whitehead, and

23  flip through that and tell me whether or not you think that

24  is the police manual that you use in your work. I know it

25  is a bit thick.

1  A.  It appears to be.

2  Q.  It is a double-sided document. Correct?

3  A.  Yes.

4  Q.  And what do you call that when it's in a binder?

5  A.  Rules and regulations in the book.

6  Q.  Do you ever call it the white book?

7  A.  It is called the white book, yes.

8  Q.  And the manual or the white book is what you use to

9  identify what the parameters are of your conduct. Correct?

10  As a police officer on the street?

11  A.  Generally, yes.

12  Q.  And when you go through the academy, you are informed

13  of the contents of that book. Right?

14  A.  Yes, ma'am.

15  Q.  And as you continue your service, you are required to

16  be familiar with the contents of the book. Correct?

17  A.  Yes.

18  Q.  You are required to adhere to the policy statements

19  and so forth in the book. Yes?

20  A.  Yes.

21  Q.  And from time to time the information in the book is

22  updated. Correct?

23  A.  Yes.

24  Q.  And you are required to be familiar with all the

25  updates. Correct?

1  A.  Yes.

2  Q.  Now, you shot Mr. Smith in the leg. Correct?

3  A.  Yes.

4  Q.  And you were shooting to stop him or shooting to kill

5  him?

6  A.  I was shooting to stop him.

7  Q.  Do you know of any officer ever in your work with the

8  Wilmington Police Department who has been disciplined for

9  excessive use of force?

10      MR. PARKINS: Your Honor, it is irrelevant.

11      THE COURT: Sustained. That question, the

12  objection is sustained to that question.

13      MS. SULTON: Thank you, Your Honor.

14  BY MS. SULTON:

15  Q.  At the time that you shot Mr. Smith, the car was not

16  in motion, was it?

17  A.  No.

18      MS. SULTON: If I may have just a moment, Your

19  Honor?

20      (Pause.)

21      MS. SULTON: I am done, Your Honor. Appreciate

22  the patience of the Court. Thank you, Mr. Whitehead.

23      THE WITNESS: You are welcome.

24      THE COURT: Mr. Parkins.

25          CROSS-EXAMINATION

1  BY MR. PARKINS:

2  Q.  Officer, there were a lot of questions about what you

3  are trained to do as a police officer when you have a stolen

4  car. Did the officers on Fifth and Harrison have reason to

5  believe that this was simply a stolen car?

6  A.  No. They were armed with a little more information

7  than that.

8  Q.  And according to what you know, the officers would

9  have known, for example, that shots had been fired.

10  A.  Yes.

11  Q.  At 14th and Washington Streets?

12  A.  That's correct.

13  Q.  And they would have known, for example, that the

14  stolen police car went the wrong way on Seventh Street for a

15  period of several blocks. Is that correct?

16  A.  If that was relayed over the radio, yes, they would.

17  Q.  At the corner of Fifth and Harrison, assume for the

18  moment that the officers simply shouted to Mr. Smith, "Get

19  out of the car, get out of the car."

20      Would you believe that is in accordance with

21  your training?

22  A.  Yes.

23  Q.  Officers are allowed to shoot at a moving vehicle when

24  it is an emergency. Is that correct?

25  A.  That's correct.

B-020

197

1  equipment on for others' safety, other motorists.

2  Q.   Let me make certain that the record is clear on

3  sequence. You are behind the vehicle that was being

4  operated by Mr. Whitehead. Correct?

5  A.   No. I was in front of it. I was heading south on

6  Washington Street, at least a block and a half away from

7  him.

8  Q.   And you then heard something that made you turn

9  around?

10  A.   I was advised by a passing motorist, who was on my

11  right, advised me that there was something happening with

12  the officers behind me, with two officers who were back at

13  14th at Washington.

14  Q.   So you didn't hear anything come over the radio to

15  alert you?

16  A.   Not at that time, no.

17  Q.   So your initial information about the incident between

18  Mr. Smith and Mr. Whitehead came from a passing motorist?

19  A.   Correct.

20  Q.   And then you turn around, and as you are now heading

21  towards Mr. Whitehead's vehicle, you are facing the vehicle?

22  A.   I am facing them, yes.

23  Q.   And then what did you see as you are facing them?

24  A.   What I saw was like a struggle between the two

25  officers -- the officers were struggling with someone who I

198

1  couldn't identify, an un-uniformed person. As I got towards

2  12th Street, one of the officers came across the air and

3  said that he has got the car and shots were fired.

4  Q.   But you are facing them and you are seeing what's

5  going on. Correct?

6  A.   I am seeing the two officers. I am not seeing the

7  actual incident occur, no. I had to be aware of my

8  surroundings, also. So I was just listening.

9      My concern was getting to the scene after the

10  motorist had told me that something was going on.

11  Q.   So after the motorist tells you something is going on,

12  you do a quick U-turn and head back toward Officer

13  Whitehead's car?

14  A.   Correct.

15  Q.   You are now facing them. You see them interacting

16  with someone that is not uniformed. And you did not then

17  see Mr. Whitehead try to pull Mr. Smith from the car?

18  A.   No, I did not.

19  Q.   How far away were you from Mr. Whitehead's car?

20  A.   I was at least a half a block away. Now, there were

21  other cars in front of their vehicle. I am going this way

22  (indicating), and there was still traffic in front of me.

23  Q.   So your view was obstructed by other traffic?

24  A.   Yes.

25  Q.   So by the time the other traffic moves out of the way,

199

1  did you get a better view of what was going on with Mr.

2  Whitehead and Mr. Smith?

3  A.   By that time the subject was already in the car,

4  traveling southbound on Washington.

5  Q.   And so you then had to do another quick U?

6  A.   Correct.

7  Q.   And so now you are following this car. Is that

8  correct?

9  A.   Correct.

10  Q.   Before you made that quick U, that second quick U, did

11  you see Mr. Whitehead and/or Mr. Saunders running after th

12  car?

13  A.   I don't recall.

14  Q.   But you do a quick U, and you are able to very quickly

15  begin to tail Mr. Smith, who now is operating Mr.

16  Whitehead's car. Correct?

17  A.   Correct.

18  Q.   How far a distance were you from the point at which

19  you did that second U and you are following Mr. Smith? Wha

20  is the greatest distance that there was between your car and

21  Mr. Smith's car prior to the point at which any other police

22  officer joined the pursuit?

23  A.   I couldn't tell you. It wasn't a carlength. At one

24  point there could have been a carlength. At the rate of

25  speed that he was going, I was, you know, observing

200

1  everything else that was going on around me as I was

2  traveling.

3      But at some points there was a carlength.

4  Q.   Is it fair to say that you were pretty that you were

5  pretty much bumper to bumper?

6  A.   No.

7  Q.   But not more than a carlength?

8  A.   Not more than a carlength.

9  Q.   And you both have your lights on, the lights are on

10  the --

11  A.   Mine were on, yes.

12  Q.   Okay. And your sirens are on as well?

13  A.   Correct.

14  Q.   And you are going down the road and you are traveling

15  at above the speed limit. Correct?

16  A.   Correct.

17  Q.   And the speed limit in that area is 25 miles per hour.

18  Correct?                                B-021

19  A.   Correct.

20  Q.   And you are going through various traffic signals,

21  whether it is a stop sign or a stoplight. Correct?

22  A.   Yes.

23  Q.   And you are making turns on various streets, including

24  the turn on Fourth Street, a turn on Van Buren Street,

25  eventually a turn on Fifth Street. Correct?

205

1   Q.    That you saw?

2   A.    Yes, that I saw.

3   Q.    Did you see any citizens on the street, neighborhood

4   residents?

5   A.    Yes. And it was in the 400 block where I saw the

6   officers and they were trying to hold back the citizens from

7   going up the street.

8   Q.    And when we say citizens, we are talking about small

9   children?

10  A.    Neighborhood kids.

11  Q.    Elderly?

12  A.    Elderly. Everybody in the neighborhood.

13  Q.    Did you see people on, neighborhood residents on Fifth

14  Street -- I am sorry -- yes, on Fifth Street?

15  A.    No, I didn't make it up quite that far, no.

16  Q.    So you never -- but you can see up Harrison Street.

17  Correct?

18  A.    Correct.

19  Q.    Did you see any neighborhood residents on the street

20  in the 500 block of Harrison?

21  A.    I don't recall.

22  Q.    You don't recall?

23  A.    No.

24  Q.    But you saw quite a few that were in the 400 block?

25  A.    Yes.

206

1   Q.    Do you have any idea of how many neighborhood

2   residents you saw in the 400 block?

3   A.    No.

4   Q.    Was it more than ten?

5   A.    I don't recall.

6   Q.    You don't have a clue?

7   A.    No.

8   Q.    But you are sure you saw a mix of children, elderly,

9   teenagers and so forth?

10  A.    Yes.

11  Q.    Did you ever go back and interview any of the

12  neighborhood residents in connection with this

13  police-involved shooting?

14  A.    No.

15  Q.    Did you write a report on your involvement in this

16  pursuit?

17  A.    I believe there is a pursuit report, yes.

18  Q.    That you wrote?

19  A.    Yes.

20        MS. SULTON: Thank you.

21        THE COURT: All right. Mr. Parkins, you may

22  cross-examine.

23        MR. PARKINS: Thank you, Your Honor.

24        Mr. White, could we use the animation.

25             CROSS-EXAMINATION

207

1   BY MR. PARKINS:

2   Q.    Sergeant Donohue, I am going to show you an animatio

3   and ask you if this correctly depicts your route and

4   direction during the time in which you were the lead car in

5   the pursuit.

6         Are you oriented? This is Washington Street?

7   A.    Yes.

8   Q.    Is that you behind 1180?

9   A.    Yes.

10  Q.    What is happening here?

11        If you could stop for a second, Mr. White.

12        Where are you heading now?

13  A.    We are heading west on Seventh Street, which is the

14  wrong way -- we are traveling the wrong way. You see the

15  other cars going east on Seventh, which is the correct

16  direction.

17  Q.    While you were on Seventh Street, did the stolen

18  police car encounter any oncoming traffic?

19  A.    Yes. There was a couple cars that had pulled over to

20  get out of the way.

21  Q.    Thank you.

22        Could you continue, Mr. White, please.

23        MR. PARKINS: Could we stop for a second, Mr.

24  White.

25  BY MR. PARKINS:

208

1   Q.    This is North Monroe. Do you know who was in that

2   sort of tan or gold car?

3   A.    I didn't at the time, no.

4   Q.    Do you know now?

5   A.    I know now.

6   Q.    Was it Detective Lawson and Detective DiClemente?

7   A.    Yes.

8   Q.    Did you follow this car?

9   A.    I can't recall if I followed -- no, I didn't follow

10  the stolen police car.

11  Q.    No?

12  A.    The detective car, yes, I do believe I did.

13        MR. PARKINS: Could we continue, Mr. White,

14  please.

15  BY MR. PARKINS:

16  Q.    Is this still the correct order and route?

17  A.    Yes.

18        MR. PARKINS: Can we stop for a second, Mr.

19  White.

20  BY MR. PARKINS:

21  Q.    Did you allow traffic to come out, come from your left

22  on Fourth Street?

23  A.    Yes, I did.

24        MR. PARKINS: Could you pick it up again, Mr.

25  White, please.

B-022

217

1  Q.   But closer to Fifth. You were just right down from

2  Sixth. Correct?

3  A.   I believe so.

4  Q.   At the point at which you --

5        THE COURT: Does she need to stand here?

6        MS. SULTON: Oh, no. Thank you.

7        (Witness resumes stand.)

8  BY MS. SULTON:

9  Q.   At the point at which you exited the vehicle, had the

10 shooting stopped?

11 A.   Yes.

12 Q.   And how quickly after the shooting stopped had you

13 arrived at your position where you exited the vehicle?

14 A.   I never saw any shooting.

15 Q.   Do you know how quickly you arrived after the shooting

16 stopped?

17 A.   That I don't know.

18 Q.   Do you recall the route of your travel in the vehicle

19 in which you were riding?

20 A.   I don't remember exactly which road I took. I don't

21 remember if I took Broom or Harrison. I don't remember

22 exactly because I wasn't driving.

23 Q.   Were you at any point part of the caravan of cars that

24 were pursuing Mr. Smith?

25 A.   I was never pursuing him, no.

218

1  Q.   And so how did you come upon arriving at the scene

2  with the other two officers?

3  A.   I was far west of the location, and basically, the car

4  that I was in traveled towards the vehicle pursuit.

5  Q.   And you traveled toward the vehicle pursuit because

6  you heard something on the radio that alerted your attention

7  to the need for your assistance?

8  A.   Yes.

9  Q.   And what did you hear?

10 A.   I heard a call for shots fired, and then shortly after

11 a vehicle chase, at which point -- I was actually eating

12 dinner at Grotto's -- I jumped in the back of the nearest

13 police car, at which time we traveled towards the directions

14 that were being called out. And we basically arrived over

15 Sixth Street into the 500 block of Harrison.

16 Q.   So along your route did you see any other police cars

17 other than yours?

18 A.   I don't remember seeing any.

19 Q.   Do you recall after you exited the vehicle, or prior

20 to the point at which you exited the vehicle, do you recall

21 seeing any other officers on the street?

22 A.   I just remember seeing the one vehicle that was facing

23 me that Mr. Smith was in because it was facing the wrong way

24 on Harrison. I don't really remember seeing any other

25 officers except Officer Gifford was in my car. He and the

219

1  person from my vehicle both got out and I was locked in the

2  back of the car that I was in. They had to let me out.

3  Q.   At any point were you able to get out of the vehicle?

4  A.   After a few minutes, I was banging on the door trying

5  to get people to let me out.

6  Q.   Were either of the officers with whom you were riding,

7  were they involved in removing Mr. Smith from the vehicle?

8  A.   I believe Officer Gifford was the one who maybe helped

9  handcuff him and later do CPR. I believe that.

10 Q.   So you believe it was Officer Gifford who took Mr.

11 Smith out of the car and handcuffed him?

12 A.   I believe so.

13 Q.   And is it your understanding, base upon your

14 observations, Mr. Smith was immediately taken out of the car

15 after the car had stopped?

16 A.   I believe once people got down towards his area, yes.

17 Once we parked, and Officer Gifford and Officer Harvey, I

18 don't know where Officer Harvey went, but once Officer

19 Gifford got out of our vehicle, I saw him responding down to

20 that area, then going to the driver's side of that car. I

21 was trying to get out of the car at the same time. So I was

22 pounding on my window trying to get other officers from

23 behind me to let me out.

24        And I saw Gifford handcuff Mr. Smith. So it was

25 all happening at the same time, me trying to get out and

220

1  arriving at the same time.

2  Q.   How do you know officers were behind the car in which

3  you were riding?

4  A.   I was trying to get anyone behind me that was walking

5  by or anybody to let me out of the car.

6  Q.   So you saw police officers who were behind your car?

7  A.   I don't remember anyone specifically. I just remember

8  that there was somebody walking by and I was banging on th

9  window.

10 Q.   And the car in which you were riding was facing in the

11 correct direction of travel --

12 A.   Facing southbound, yes.

13 Q.   And you at no time were involved in moving Mr. Smith's

14 body or collecting any evidence out of the car or anything

15 of that sort. Correct?                    B-023

16 A.   No, I wasn't.

17 Q.   Did you see other police officers there other than the

18 two gentlemen with whom you were riding?

19 A.   Officer Rentz I saw, because he helped me to contain

20 the scene at Sixth Street. And I know my partner was there,

21 who was Villaverde that night. Other than that, I don't

22 really recall anyone specifically there because I was doing

23 my duty at the time, which was to hold the scene at Sixth

24 Street.

25 Q.   Now, when you first drove onto Harrison Street, so we

221

1   are now in the 500 block of Harrison Street, did you see any

2   citizens, any neighbors in the street, children, elderly?

3   A.   I don't recall that.

4   Q.   You don't recall seeing any people on the street?

5   A.   No.

6   Q.   None at all?

7   A.   No, I don't recall that.

8   Q.   I just want to be clear, I am sorry.  You are saying

9   you don't recall whether they were there, you are not saying

10  that they were not there?

11  A.   I just don't remember seeing anyone, no.

12  Q.   Thank you.

13          Where did Officer Rentz come from?

14  A.   To be honest, I don't know, because once I exited my

15  vehicle, I saw that there was a large crowd of people

16  brewing behind me at Sixth Street, so I immediately

17  responded to stop people from walking down into the block.

18  And Officer Rentz happened to already be there with crime

19  scene tape.  So he and I both together crime-scene-taped off

20  Sixth Street so nobody could come south onto Harrison.

21  Q.   Is it fair to say as soon as you were able to

22  extricate yourself from the back seat of the police car you

23  immediately went up to Sixth and Harrison?

24  A.   Yes, I did.

25  Q.   As soon as you got there you saw Officer Rentz?

222

1   A.   Yes.

2   Q.   When did you see Officer Villaverde?

3   A.   He later came back to my location, I don't know how he

4   got to the scene.  I happened to jump in someone else's

5   patrol car that was the closest car from where I came out,

6   where I came out of Grotto's that night.

7   Q.   When you got to the scene, did you see flashing lights

8   on other patrol cars that may have been out there?

9   A.   I believe so.

10  Q.   Do you recall hearing any sirens of cars while you

11  were out there?

12  A.   I don't remember.

13          MS. SULTON:  Thank you, Officer.

14          THE COURT:  Mr. Fineman, you may cross.

15          MR. FINEMAN:  Thank you, Your Honor.

16          CROSS-EXAMINATION

17  BY MR. FINEMAN:

18  Q.   When you arrived, did you see any shots?

19  A.   No, I didn't.

20  Q.   Did you hear any shots?

21  A.   No, I didn't.

22  Q.   Do you recall seeing any officers when you arrived?

23  A.   No, I really don't.

24          MR. FINEMAN:  No further questions, thank you.

25          THE COURT:  Anything else, Ms. Sulton?

223

1   MS. SULTON:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you, Officer.

3          (Witness excused.)

4          MS. SULTON:  The next witness, Your Honor, is

5   Ronald Fioravanti.

6          THE COURT:  Okay.

7          ... RONALD FIORAVANTI, having been duly

8   sworn as a witness, was examined and testified

9   as follows ...

10          DIRECT EXAMINATION

11  BY MS. SULTON:

12  Q.   Good afternoon.  How were you employed on Septembe

13  13th, 2003?

14  A.   I was employed by the City of Wilmington.

15  Q.   Did you respond to the scene of the police-involved

16  shooting at Fifth and Harrison Street?

17  A.   I did.

18  Q.   How did you get there, sir?

19  A.   I was a passenger in a police, a marked police

20  vehicle.

21  Q.   Who was driving?

22  A.   I do not recall.

23  Q.   A police officer?

24  A.   A police officer was driving, yes.

25  Q.   While you were traveling toward the scene, did you

224

1   have on the vehicle, if you recall, the emergency flashing

2   lights and/or siren?

3   A.   In our vehicle?

4   Q.   Yes, sir.

5   A.   Yes.

6   Q.   And did you and/or the person with whom you were

7   driving exit the vehicle in which you were riding?

8   A.   Yes.

9   Q.   And do you recall where you exited the vehicle?

10  A.   Yes.

11  Q.   What intersection or what street?

12  A.   We were on North Harrison Street in the 500 block.

13  Q.   The 500 block of North Harrison?

14  A.   Yes.

15  Q.   Were you ahead of Car 1180, the stolen patrol car?

16  A.   Our final resting point at that time was approximately

17  20 to 30 feet north of the vehicle in question.

18          MR. FINEMAN:  Your Honor, permission to see the

19  chart.

20          THE COURT:  Yes.

21          MS. SULTON:  If I could, with the permission of

22  the Court

23          THE COURT:  You may step down.

24          (Witness steps down from stand.)

25  BY MS. SULTON:

B-024

1  Q.    Thank you, sir.

2  A.    No problem.

3  Q.    I am going to draw just a little rough map of the

4  area. Let us assume that this is Sixth Street, going this

5  way. Let us assume this is Fifth Street, going this way.

6  Let us assume this is Fourth Street, going this way. And

7  let us assume that this is Harrison Street, going this way.

8        Would you take the marker and show us where you

9  exited your vehicle?

10  A.    I am a little confused by your drawing only because I

11  usually -- I don't understand your label. When you are

12  referring to Harrison Street going this way, is this

13  supposed to be Harrison Street? Or is this Harrison Street?

14  Q.    I am sorry. This is Harrison Street. So this is

15  Harrison, for the clarification, because Fifth Street would

16  actually run this way. Correct?

17  A.    Yes.

18  Q.    Thank you for your help.

19  A.    Okay. If the marked vehicle that was being pursued --

20  Q.    Okay. Let's use the black one for the stolen vehicle.

21  Can you show me where that one was?

22  A.    It was roughly a little bit more than midway through

23  the block, more towards the northern section of the block

24  than the southern section. So it came to rest pretty much

25  about this location. And our vehicle was in this position

---

1  Q.    And you saw that with your own eyes?

2  A.    Yes.

3  Q.    And when you got out of the car -- well, did you see

4  that before you exited, people taking him out of the car?

5  A.    No. I had gotten out of the car and was actually

6  moving towards the car when they approached the vehicle an

7  took the gentleman out of the car.

8  Q.    And when you were approaching that point, did you see

9  any citizens, neighborhood residents, on the street?

10  A.    No. They could have been there, but I was pretty

11  focused on the suspect and the actions that were happening.

12  Q.    Did you see any other police officers other than the

13  couple that you mentioned and yourself and the person with

14  whom you were riding?

15  A.    There were a number of officers there. My guess would

16  have been somewhere between eight to maybe 12 officers tha

17  were actually on the scene at that point. Who they were,

18  who all of them were, I don't really know. There were a few

19  that I recall seeing there, though.

20  Q.    And when we say the scene, we are talking about kind

21  of in the middle of the 500 block of Harrison?

22  A.    Within that block.

23  Q.    Within that block?

24  A.    Yes, ma'am.

25  Q.    If I could ask you to take a look at that black book

---

1  here. We were approximately maybe 20 feet, 20 feet south of

2  Sixth Street and approximately 20 feet, 20 to 30 feet north

3  of the vehicle in question.

4  Q.    Do you know how quickly you arrived at your position

5  prior to -- let me rephrase that.

6        Do you know how quickly you arrived at your

7  position after the shots were fired?

8  A.    No, because I don't know exactly when the shots were

9  fired. I can only tell you that when I arrived, no shots

10  took place when I was there.

11  Q.    Thank you. I will have you take your seat again,

12  Officer.

13        (Witness resumes stand.)

14        THE WITNESS: To better answer that question, I

15  would say it was not an extended period of time between when

16  the shots had occurred. They had only happened briefly

17  before my arrival.

18        So it would have been probably less than two

19  minutes from when those shots occurred and when my actual

20  arrival time was.

21  BY MS. SULTON:

22  Q.    Did you see anyone take Mr. Smith out of the stolen

23  vehicle?

24  A.    I did. There were a couple of officers who actually

25  did that.

---

1  in front of you. If you take a look at Exhibit No. 16.

2  Now, this incident happened during the day. Correct? There

3  was still daylight?

4  A.    Yes, ma'am. It was late afternoon, I believe. Early

5  evening, late afternoon.

6  Q.    It wasn't dark. Correct?

7  A.    No, ma'am.

8  Q.    The photo that you are looking at was taken in the

9  dark. Correct?

10  A.    I am not sure if I am looking at 15 or 16. Is it the

11  photograph after the 16th exhibit, or is it the

12  photograph --

13  Q.    If you use the tab and then whatever --

14  A.    Whatever follows is 16?

15  Q.    Yes, sir.

16        THE COURT: It should say the exhibit number in

17  the bottom right-hand corner. Do you see?

18        MS. SULTON: I am sorry, Your Honor. On that

19  copy it doesn't have it.

20        THE WITNESS: Ma'am, is this the photograph you

21  are asking me to look at?                    B-025

22  BY MS. SULTON:

23  Q.    Yes, sir, it is. Thank you so much.

24        You will see in this photograph that there is a

25  line of cars that appear on the left-hand side -- I guess it

229

1  would be going down the road, it would be on the right-hand
2  side. Do you see that there, sir?
3  A.  Yes, ma'am, I do.
4  Q.  Were any persons allowed to park or move their car out
5  of that area prior to the point that this photograph was
6  taken, if you know?
7  A.  I vaguely remember an issue where someone either was
8  requesting to park there or was requesting to move a car
9  from that location. To be honest with you, I don't recall
10  what the verdict was, what the final decision was, whether
11  or not we allowed them to park there or whether or not we
12  allowed them to move their vehicle. I do not recall
13  exactly. But I do remember a discussion taking place with a
14  civilian pertaining to a vehicle that was parked along that
15  right-hand side.
16  Q.  But as best you can recall, this whole 500 block of
17  Harrison Street was a crime scene and it was treated as
18  such. Correct?
19  A.  Yes, ma'am.
20  Q.  And you were trying to -- you were one of the officers
21  in charge of the scene. Yes?
22  A.  I actually just acted in an assisting capacity.
23  Sergeant Ciotti was actually in charge of the crime scene.
24  Now Lieutenant Brown was actually in charge of the actual
25  investigation that was ongoing.

230

1  Q.  Right. But I am talking about now the street here,
2  while you were out there in your assisting capacity, taking
3  control of this crime scene, you don't recall any instance
4  where anyone was allowed to disturb it before officers had
5  an opportunity to come in and mark the evidence and pick up
6  the evidence and so on and so forth. Correct?
7  A.  Again, I remember a discussion about a vehicle either
8  wanting to park in the block or wanting to be moved from the
9  block. But I do not recall what the actual final decision
10  was.
11      My responsibility was primarily handling the
12  crowd and establishing perimeter, officers in perimeter
13  locations in order to secure this crime scene so that we
14  didn't have anyone coming into or leaving the crime scene.
15  Q.  Just briefly. As best you can recall, Officer, and I
16  realize it was a long time ago, do you recall anybody trying
17  to get their car moved before the body of Harry Smith was
18  moved?
19  A.  Yeah. I believe that occurred during that time frame.
20  Q.  And do you recall whether or not you allowed anybody
21  to move any car while that body was still in the street?
22  A.  I do not recall whether or not the decision was to
23  allow it to move -- or to allow it to be parked.
24  Q.  As you were approaching the scene, before you exited
25  your vehicle, did you see other police cars who were in

231

1  other parts of the general area of Fifth and Harrison,
2  either at Seventh and Harrison or other intersections or
3  other hundred blocks in that general vicinity?
4  A.  There were a number of cars that were all responding
5  to the area.
6      At the time when I arrived there may have been
7  another car that had either just gotten there just prior to
8  our arrival, or just, you know, split-seconds after we got
9  there. And that was parked in the same area, within the
10  same hundred block of Harrison Street.
11  Q.  And finally, sir, is it the usual practice to maintain
12  the crime scene as it is until at least photographs and
13  evidence is collected?
14  A.  Usually anything that is related to the crime scene,
15  yes.
16  Q.  So you don't want it disturbed until at least you get
17  the photographs and so forth. Is that correct?
18  A.  Correct. Anything that is directly related to the
19  crime scene, yes.
20      MS. SULTON:  Thank you, sir.
21      THE COURT:  Mr. Fineman.
22      MR. FINEMAN:  Thank you, Your Honor.
23          CROSS-EXAMINATION
24  BY MR. FINEMAN:
25  Q.  Sergeant Fioravanti, did you see any shots at Fifth

232

1  and Harrison?
2  A.  I did not.
3  Q.  Did you hear any shots at Fifth and Harrison?
4  A.  I did not.
5  Q.  Did you ever at any point radio your position while
6  you were en route?
7  A.  No.
8  Q.  Why not?
9  A.  It's pretty much the practice of the department that
10  we leave the airwaves open so that we can monitor the
11  activity of the vehicle that is being pursued, and, you
12  know, obtain current information or updated information
13  regarding what is actually occurring with the pursuit.
14      MR. FINEMAN:  Thank you. No further questions.
15      THE COURT:  Redirect.
16          REDIRECT EXAMINATION
17  BY MS. SULTON:
18  Q.  Just briefly.
19      So you said that that is the usual practice
20  where you don't clog up the airwaves. Is that correct?
21  A.  Yes, ma'am.
22  Q.  Is it also the -- because it is your usual practice,
23  do other officers on the street know that just because they
24  don't hear a lot of chatter that there are other units that
25  are responding?

B-026

1  MR. PARKINS: Thank you.

2  BY MS. SULTON:

3  Q.   I am sorry, sir. Page 16, Line 20. Are you there?

4  A.   Yes, ma'am.

5  Q.   I asked you the question: "So at the point at which

6  you fired two or three shots, where was Officer Ciritella

7  then standing?"

8       Your answer then?

9  A.   "I believe he was back or at the corner of the

10  building of Fifth and Harrison, northeast corner."

11  Q.   If you would look in the black book that is there,

12  it's an exhibit book. If you would look at Exhibit 15. Are

13  you there?

14  A.   Yes, ma'am.

15  Q.   Do you see there are two photographs on Exhibit 15?

16  A.   Yes, ma'am.

17  Q.   In the lower photograph, is that the corner to

18  which -- or about which you were referring?

19  A.   Yes, ma'am. That would be the northeast corner, Fifth

20  and Harrison.

21  Q.   And that is where you saw Officer Ciritella when you

22  fired your first couple of shots. Is that correct?

23  A.   I believe he was in that vicinity, yes.

24  Q.   And why did you fire the first rounds at that time?

25  A.   I believed that Detective Ciritella's life was in

258

1  imminent risk -- I am sorry, that he was in imminent risk of

2  serious physical injury and/or death.

3  Q.   Had Officer Ciritella fired his weapon at that time?

4  A.   At which time, ma'am? In sequence?

5  Q.   Had Officer Ciritella fired his weapon before you

6  fired your weapon?

7  A.   Yes, ma'am.

8  Q.   So we then have Officer Ciritella standing at the

9  corner of that building, and he had already fired, and you

10  now are beginning to fire?

11  A.   Yes, ma'am.

12  Q.   Did you see Marilyn Garcia at that corner?

13  A.   No.

14  Q.   You are aware that Marilyn Garcia was sitting on those

15  steps right at that corner of Exhibit 15, the lower

16  photograph, where there is a white door to the left and

17  there are some stairs? Do you see that?

18  A.   Yes, ma'am.

19  Q.   Do you know, Marilyn Garcia was sitting right there

20  when she got shot? Did you know that?

21  A.   That is what I was told afterwards, yes, ma'am.

22  Q.   You did not see Marilyn Garcia sitting on those

23  stairs?

24  A.   No, ma'am.

25  Q.   Did you see anybody else, a resident or police officer

1  or anybody on that corner right there before you discharged

2  your weapon?

3  A.   No.

4  Q.   Now, your car at that time was already parked blocking

5  the intersection of Fifth and Harrison. Correct?

6  A.   Correct.

7  Q.   And you had parked just slightly behind Officer

8  Ciritella's unmarked car. Correct?

9  A.   Yes, ma'am.

10  Q.   You had the lights on your car. Correct?

11  A.   Yes, ma'am.

12  Q.   You also had the siren on?

13  A.   I believe I shut it off when I put it in park.

14  Q.   Did you see the lights on in the stolen vehicle,

15  Vehicle 180?

16  A.   To the best of my recollection, yes.

17  Q.   And there were police cars behind Vehicle 180 and they

18  too had their lights on. Correct?

19  A.   Yes, ma'am.

20  Q.   And Officer Ciritella's car, although unmarked, it had

21  its lights on, too. Correct?

22  A.   I do not recall at this time.

23  Q.   Do you recall hearing sirens?

24  A.   Yes, ma'am.

25  Q.   And you speak Spanish, don't you?

260

1  A.   A little bit, ma'am.

2  Q.   And where was the car at the point at which you fired

3  your first couple of shots, this is now after Mr. Ciritella

4  had fired, where was Car 1180?

5  A.   It was up on the sidewalk, driving right in the path

6  where Detective Ciritella was, heading straight for him,

7  ma'am.

8  Q.   I am sorry. I didn't mean to cut you off. Did you

9  finish your answer?

10  A.   That is fine.

11  Q.   So we have, then, in terms of the sequence of events,

12  we have Officer Ciritella standing at the corner of the

13  building, he has already fired his first shot, when the car

14  is coming up over the curb, you now are shooting at Car

15  1180?

16  A.   That would be correct.

17  Q.   When you fired your first shots had Car 1180 moved th

18  Jeep that was parked at the corner out of the way?

19  A.   No.

20  Q.   When you fired your first shots at Car 1180, where

21  were you standing?

22  A.   I was standing, Detective Ciritella's car, I was

23  standing off, a few feet off the front driver's side tire of

24  his vehicle, still giving myself a little bit of a space and

25  also protection with the engine block, so to speak, of his

1  evening. What was your assignment on that evening?

2  A.    On that evening I was working 6:00 p.m. to 2:00 a.m.

3  I was assigned to the Community Policing Unit working the

4  west side, the Hilltop area of the City of Wilmington.

5  Q.    When did you first hear about the incident that has

6  brought us all together?

7  A.    I first heard it over the radio broadcast when I was

8  in the 1300 block of West Fifth. I had a subject detained.

9  I was trying to identify him. And that's when I heard it on

10  the radio.

11  Q.    What did you hear?

12  A.    I heard, "Send back up. Officers need assistance."

13  Q.    What did you do?

14  A.    Immediately -- the subject was in handcuffs, so I

15  could confirm his identity. He was released from handcuffs

16  immediately. Sent on his way. And I activated my emergency

17  equipment and started responding to the area of the initial

18  incident.

19  Q.    What route did you take?

20  A.    I believe I went westbound on Fifth Street. I went

21  north on Broom Street. And then eastbound on Sixth Street

22  again.

23  Q.    Where did you first see the stolen police car?

24  A.    When I was at Fourth and Jackson Street facing

25  southbound, it proceeded westbound past me.

1  Q.    You have seen the animation at least twice that we

2  have shown to the jury.

3  A.    Correct.

4  Q.    Did you see your car pulling into the pursuit?

5  A.    I have.

6  Q.    Was that an accurate depiction of the route that you

7  took as you pulled into the pursuit?

8  A.    Yes.

9  Q.    What did you do after you fell into the pursuit?

10  A.    Several units, the stolen vehicle, then a couple other

11  units, I am not sure exactly how many, went north, followed

12  the stolen vehicle northbound on Van Buren Street. I was

13  behind a red or dark red unmarked police vehicle at that

14  time. Did not know who the officer was. That officer

15  proceeded westbound on Fourth Street, as did I.

16  Q.    Was there anyone behind you, do you know?

17  A.    Not a hundred-percent sure, sir.

18  Q.    What did you do after you went westbound on Fourth

19  Street?

20  A.    Went northbound on Harrison. Followed, again, the

21  other unmarked police vehicle northbound on Harrison Street.

22  At which time we heard a radio broadcast, saying that the

23  stolen vehicle was coming westbound in the 1100 block of

24  West Fifth.

25  Q.    What did you do then?

1  A.    Detective Ciritella, as it turns out, was in the

2  unmarked police car in front of me. I parked so as to block

3  the roadway. And I parked right behind him.

4  Q.    Officer, I would like you to come down here.

5        MR. PARKINS:  Is it all right if I move this a

6  little forward?

7        THE COURT:  Sure. You have permission.

8        THE WITNESS:  Thank you.

9        (Witness steps down from stand.)

10  BY MR. PARKINS:

11  Q.    Officer Kurten, I am going to ask you, is this a

12  reasonable depiction of the intersection of Fifth and

13  Harrison Street?

14  A.    Yes.

15        MR. PARKINS:  Your Honor and the ladies and

16  gentlemen of the jury, we don't know what cars are parked

17  here. We just depicted generic cars parked here, except for

18  this one.

19  BY MR. PARKINS:

20  Q.    Now, would you please take this red magnet and show u

21  where the red police car ahead of you stopped?

22  A.    It would have been somewhere in this vicinity.

23  Q.    What color was the car that you were driving?

24  A.    It was a white police car.

25  Q.    Would you take this one and place it where your car

1  stopped?

2  A.    It would have been right there, as such.

3  Q.    Would you take -- we will use this and assume for the

4  moment that this is Car 1180. Would you please put it where

5  you think it was when you first saw it?

6  A.    When I first saw it, middle of the block, maybe a hair

7  closer.

8  Q.    Was there a white Jeep Cherokee parked on Harrison

9  Street?

10  A.    Yes, sir.

11  Q.    Would you place it where you recall it having been

12  parked?

13        (Witness complies.)

14  Q.    Now, I am going to use this icon. If you would show

15  the jury where you first went when you got out of your car?

16  A.    When I first exited my patrol vehicle, I proceeded

17  around the back, went eastbound on the south sidewalk. I

18  would say around this area here is where I stopped.

19  Q.    Why were you on the sidewalk?

20  A.    My safety.

21  Q.    Do you know where Detective Ciritella was at that

22  time?

23  A.    Not at that point, no, I did not have a clear view of

24  him. I was paying attention to the suspect vehicle, stolen

25  vehicle.

B-028

281

1  Q.  Were you aware of where Sergeant Dempsey was at that
2  time?
3  A.  No.
4  Q.  What happened with the stolen vehicle next?
5  A.  After a few seconds of stopping, when it did stop, the
6  stolen vehicle began to accelerates, drive slowly.  I
7  proceeded --
8  Q.  You may have to pull that off.
9  A.  I proceeded to make my way back around to this area
10  right here (indicating).  The stolen vehicle proceeded up on
11  the sidewalk at some point in time.  The stop sign that you
12  see depicted here, as you can see, there is no other room --
13  no other avenue of escape for this stolen vehicle, it went
14  right through here, between the stop sign and the corner of
15  the building.
16  Q.  Where was the vehicle when you first heard shots fired
17  at it?
18  A.  When I first heard, again, I don't know if it was up
19  on the curb, but it was in this vicinity, fairly close to
20  Detective Ciritella.
21  Q.  Do you know where Detective Ciritella was at this
22  time?
23  A.  Again, when his first shots were fired, I believe, I
24  would say in this vicinity, retreating back to the corner
25  for cover.

282

1  Q.  Would you please place an icon where he was when you
2  first heard the shots fired?
3  A.  Where Detective Ciritella was?
4  Q.  Yes.
5  A.  Initially, I would say in that vicinity.
6  Q.  So is this an accurate representation, as far as you
7  can recall, as to the placement of the cars and you and
8  Detective Ciritella the first time you heard a shot fired?
9  A.  Yes, as far as I can recall.
10  Q.  At this moment in time, what did you think were the
11  prospects for Detective Ciritella?
12  A.  I certainly feared that either serious physical injury
13  and/or death would occur.
14  Q.  About how far away was he from the stolen police car?
15  A.  At that point in time, I couldn't tell you.  Maybe a
16  carlength away.
17  Q.  What happened next?
18  A.  Detective Ciritella retreated back to the corner line,
19  the vehicle proceeded past him, as I believe he moved over
20  to this side at that point in time for his safety.
21  Retreated.  And the -- I am sorry.  As he did, I was in this
22  position, as I stated before.  I fired either two or three
23  shots at the suspect vehicle, fearing for Detective
24  Ciritella's life.  He retreated.  The car kept coming.  At
25  which point in time I retreated back down this way, and the

283

1  stolen police cruiser struck the Jeep in that fashion.
2          THE COURT:  Mr. Parkins, it might be helpful
3  when he says this way, you indicate for the record what he
4  means.
5          MR. PARKINS:  I am sorry, Your Honor.
6  BY MR. PARKINS:
7  Q.  When you say this way, you mean sort of in a
8  southwesterly fashion?
9  A.  Back into the intersection, yes, sir.
10  Q.  Detective Ciritella was retreating sort of in a
11  northerly direction?
12  A.  North Harrison, the sidewalk.
13  Q.  You have at this point in time, the stolen police car,
14  the right front corner of the stolen police car impacting
15  with the middle of the front of the Jeep Cherokee?
16  A.  That is correct.
17  Q.  What happened after that?
18  A.  After the collision occurred, the force created by to
19  stolen police car turned this Jeep Cherokee almost 1800
20  degrees, as such, left it in the roadway.  Mr. Smith was
21  able to maneuver -- release himself from the two, the two
22  vehicles from each other and then proceeded northbound on
23  the 500 block of Harrison.
24  Q.  What did you do when this was occurring?
25  A.  I moved off into this area, I would say right down

284

1  here.
2  Q.  And what was Detective Ciritella doing, if you know?
3  A.  At this point in time, I was so focused on the car, I
4  am not sure in relation to the stolen vehicle exactly where
5  he was.
6  Q.  So we can have a clear record here, what you have just
7  shown us is that you have moved in a somewhat northwesterl
8  direction towards the northwest corner of Fifth and Harrison
9  Streets.  And the stolen police car is now a carlength or so
10  into North Harrison Street.  Is that correct?
11  A.  That would be correct, sir.
12  Q.  Did you fire any shots at this time?
13  A.  Yes, sir.
14  Q.  And how many did you fire at this time?
15  A.  At this point in time I fired my remaining either two
16  or three rounds.
17  Q.  So that we can be clear, how many shots did you fire
18  when you were shooting in this direction (indicating)?
19  A.  Again, I wish I could be more precise.  It's either
20  two or three here and the remaining two or three here.
21  Q.  How many did you fire total?
22  A.  Five total.
23  Q.  When did you become aware of Sergeant Dempsey's
24  presence?
25  A.  At some point in time, I saw Sergeant Dempsey -- as I

B-029

Case 1:04-cr-01254-CMS   Document 236   Filed 07/09/2007   Page 33 of 41

1  stated before, a blue uniform which had turned out to be
2  Sergeant Dempsey, somewhere -- I don't recall a hundred
3  percent if he was on the street or if he was on the
4  sidewalk. But off to my left, just enough in my peripheral
5  vision that I could see a uniform.
6  Q.    Why did you stop firing?
7  A.    It was deemed -- I deemed myself that there was no
8  further threat. I had seen the car slowing down as it
9  proceeded northbound. And I was just cautiously
10  approaching.
11  Q.    Why don't you resume your seat.
12       (Witness resumes stand.)
13  BY MR. PARKINS:
14  Q.    Now, Sergeant, during your direct examination by Mrs.
15  Sulton, you were asked a question about when did you see
16  Sergeant Dempsey. Do you recall roughly what your response
17  was?
18  A.    At some point in time after it had struck the white
19  Jeep going northbound on Harrison off to my left-hand side.
20  Q.    You were shown your deposition. Do you have it in
21  front of you now?
22  A.    I do.
23  Q.    Would you please turn to Page 30. Ms. Sulton read the
24  following question and answer, beginning at Line 14 to you:
25  "Did you see Officer Dempsey prior to the point at which you

1  fired your first two or three rounds?"
2       What was your response at your deposition?
3  A.    "I do not believe so."
4  Q.    Then she did not read the next question and answer.
5       "Did you see Officer Dempsey when you fired the
6  second two or three rounds as the car was going up the
7  hill?"
8       Would you please read for the jury your
9  response?
10  A.    My quote, "At some point in time I believe I saw,
11  which later turned out to be Mr. Dempsey, yes, or Sergeant
12  Dempsey, yes."
13  Q.    Sergeant Kurten, I want to ask you a little bit about
14  the equipment that you had available to you on that evening,
15  or that afternoon. Did you have what is commonly referred
16  to now as a taser?
17  A.    No, sir.
18  Q.    If you had had a taser would it be effective against
19  somebody in an automobile?
20  A.    No, sir.
21  Q.    Did you have a bean bag?
22  A.    No.
23  Q.    If you had one, would it have been effective against
24  someone in an automobile?
25  A.    I can't speak on that, sir. I am not a

1  hundred percent sure.
2  Q.    Did you have any like tire spikes available in your
3  car that you could have used to have to lay out in the road?
4  A.    No, sir.
5  Q.    Did you have any equipment available to stop Mr. Smith
6  other than your handgun?
7  A.    No, sir.
8  Q.    Why is it that you fired at Mr. Smith after he turned
9  the corner and after you were no longer in danger and after
10  Detective Ciritella was no longer in danger?
11  A.    I fired for the second time as he was proceeding
12  northbound because he was at that point a fleeing felon, his
13  reckless disregard for the City of Wilmington and the
14  citizens therein, as proven by his path and his vehicle
15  pursuit that he led us on, led me to believe that he created
16  a substantial risk of either serious physical injury or
17  death, had other citizens encountered him.
18  Q.    Did you believe that this was simply a matter of
19  shooting at a car thief?
20  A.    No, sir.
21  Q.    What did you think?
22  A.    I knew that there were shots fired. I knew there was
23  a stolen police cruiser trafficking recklessly through the
24  city. It was a grave situation.
25       MR. PARKINS: I have nothing further. Thank

1  you, Sergeant.
2       THE COURT: Thank you, Mr. Parkins. Ms. Sulton.
3            REDIRECT EXAMINATION
4  BY MS. SULTON:
5  Q.    Just one. Are you positive the car when you saw it
6  approach Mr. Ciritella and it passed and it was going to
7  where that Jeep was, are you positive it went on the left
8  side of the stop sign?
9  A.    I believe I said it went between the stop sign and the
10  corner of the building.
11       MS. SULTON: Thank you. Nothing else.
12       THE COURT: All right. A couple questions.
13  Sergeant. Right?
14       THE WITNESS: Yes, sir.
15       THE COURT: When you fired the second two or
16  three shots into the rear of the car, can you describe the
17  rate of speed at which the 1180 vehicle was moving? In
18  other words, was it accelerating?
19       THE WITNESS: It is hard to tell because of the
20  hill that we were on at that point in time, it was at the
21  base of the hill starting to move up. So the rate of speed,
22  I would say, maybe ten miles per hour, 15 miles per hour.
23       THE COURT: And when you say it was moving
24  slowly, is that the rate of speed?                **B-030**
25       THE WITNESS: That would be the equivalent of m

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                      -  -  -

 4    HARRY SMITH JR., and        :      Civil Action
      ROSYLN WOODARD SMITH,       :
 5    individually and as         :
      Adminstrators of The        :
 6    ESTATE OF HARRY SMITH, III  :
                                  :
 7              Plaintiffs,       :
                                  :
 8         v.                     :
                                  :
 9    CITY OF WILMINGTON,         :
      JOHN CIRITELLA, in his      :
10    individual capacity and in  :
      his capacity as a police    :
11    officer of the Wilmington   :
      Police Department,          :
12    THOMAS DEMPSEY, in his      :
      individual capacity and in  :
13    his capacity as a police    :
      officer of the Wilmington   :
14    Police Department, and      :
      MATTHEW KURTEN, in his      :
15    individual capacity and in  :
      his capacity as a police    :
16    office of the Wilmington    :
      Police Department,          :
17                                :
                Defendants.       :      No. 04-1254-GMS
18
                        -  -  -
19
                  Wilmington, Delaware
20             Wednesday, April 11, 2007
                       9:00 a.m.
21
                        -  -  -
22
      BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
23                                   and a jury

24

25
```

B-031

375

1  APPEARANCES:

2      KESTER I.H. CROSSE, ESQ.
           -and-
3      ANNE T. SULTON, ESQ.
       (Olympia, WA)

4
              Counsel for Plaintiffs
5
       JOHN A. PARKINS, ESQ., and
6      STEVEN J. FINEMAN, ESQ.
       Richards, Layton & Finger

7
              Counsel for Defendants
8
              - - -

9
10            THE COURT:  Good morning.  Please be seated.
11     I would like to see counsel at sidebar.
12            (The following took place at sidebar.)
13            THE COURT:  On the subject -- I gather Reverend
14     Thompson will be called today.
15            MS. SULTON:  I am not certain he will be called
16     today, Your Honor.
17            THE COURT:  He is going to be called at some
18     point?
19            MS. SULTON:  Yes, sir.
20            THE COURT:  I am going to permit him to be
21     cross-examined about the events that transpired during the
22     deposition.  I will give an instruction that the jury may
23     consider those events, and whether in their view he was
24     coached.  I will leave it to them to determine.  During the
25     delivery of my standard credibility instruction, I will add

376

1  that as an element, a factor, along with the demeanor and
2  affect.  I think that will satisfy the request that has been
3  made --
4            MR. PARKINS:  That does.
5            THE COURT:  -- by the defendant.  I think it
6  will give the jury the opportunity to fairly evaluate what
7  happened.
8            MR. PARKINS:  Thank you.
9            MR. FINEMAN:  Your Honor, we are pleased to tell
10 the Court that we have no issues to address.
11            THE COURT:  I know.  Ms. Walker told me.
12            MR. FINEMAN:  We did want to alert the Court
13 that our expert is in the courtroom and Mr. Sulton's two
14 experts are in the courtroom.
15            THE COURT:  It is agreed by the parties.
16            MS. SULTAN:  Yes.
17            (End of sidebar conference.)
18            THE COURT:  Let's bring in the jury.
19            (Jury enters courtroom at 9:05 a.m.)
20            THE COURT:  Good morning, members of the jury.
21 Please be seated.
22            Ms. Sulton, your next witness.
23            MS. SULTON:  Yes.  We call Officer DiClemente.
24            ... DONNA DiCLEMENTE, having been duly sworn as
25     a witness, was examined and testified as follows ...

377

1
2  BY MS. SULTON:
3      Q.    How were you employed as of September 13, 2003?
4      A.    I was employed as a detective with the Wilmington
5  Department of Police.
6      Q.    Did you respond to the scene of a police-involved
7  shooting at Fifth and Harrison Streets?
8      A.    Yes.
9      Q.    How did you arrive at that scene?
10     A.    A call for assistance to come in.  An initial call for
11 assistance had come in.  The call was relayed that a suspect
12 had stolen a police car, and was armed with a knife.  The
13 patrol car with the suspect in it had traveled through the
14 city, and at some point wound up coming the wrong way on
15 Seventh Street at Monroe Street.
16            Myself and my partner were at Seventh and Monro
17 when the suspect vehicle, if you will, had pulled out from
18 Seventh Street onto Monroe.
19     Q.    Who is your partner?
20     A.    Detective Michael Lawson.
21     Q.    Please continue.
22     A.    Okay.  At that point, when the suspect came -- he was
23 going the wrong way on West Seventh Street, came out onto
24 Monroe Street, myself and Detective Lawson were occupying
25 the same vehicle.  We proceeded with the pursuit.  We were

378

1  the first car behind the suspect vehicle at that point.
2            The suspect vehicle traveled southbound on
3  Monroe Street, went through two stop signs.  The first was
4  at Sixth and Monroe.  The second was at Fifth and Monroe.
5            He disregarded a red light at Fourth and Monroe,
6  and went westbound on Fourth Street.
7            At that point he continued to travel westbound
8  on Fourth Street.  And at Fourth and Jackson Street, a
9  marked police vehicle with Sergeant Dempsey -- I didn't know
10 who it was at the time, but later learned that Sergeant
11 Dempsey was occupying the marked police vehicle.  And he
12 actually was the first car at that point to get behind the
13 suspect car.
14            So now I am the second car behind the suspect
15 vehicle.  The suspect vehicle went through a traffic light
16 at Fourth and Adams Street, I guess that is technically
17 Adams Street right there, and went northbound on Van Buren
18 Street, westbound on Fourth Street.
19            At that point we are still the second car behind
20 the suspect vehicle.  The suspect vehicle had stopped at
21 some point in the -- on West Fifth.  I believe it is the
22 1100 block, I am not quite sure.  But he had stopped.
23            At that point I started to get out of the car I
24 was in and momentarily got distracted because I was trying
25 to get out of the car.  And at some point the suspect

383

1  A.   Correct.

2  Q.   Was he heading with the correct flow or direction of

3  traffic on Fifth?

4  A.   Yes.

5  Q.   At some point did the suspect vehicle come to a stop?

6  A.   Yes.

7  Q.   And at the point -- you personally observed this with

8  your own eyes?

9  A.   Yes.

10  Q.   At the point at which the vehicle stopped, were there

11  other police vehicles blocking the intersection of Fifth and

12  Harrison?

13  A.   Not from what I could see. He came to a stop, and

14  then he started to move again. So at that point I was

15  trying to get out of my car, initially, when he first came

16  to a stop. When he started to move again in the car, I

17  tried to get back in my car, because I believed the pursuit

18  was going to continue again. So at that point, while I was

19  trying to get out of the car and back in the car, my

20  attention was diverted for, I guess it would be seconds.

21  Q.   But at the point at which you saw him initially stop

22  in the 1100 block of Fifth Street, there were no other

23  police cars in the intersection of Fifth and Harrison?

24  A.   I couldn't see. So I don't know whether there were or

25  there weren't.

384

1  Q.   At some point did you exit your vehicle?

2  A.   Yes.

3  Q.   And at what point did you decide to exit your vehicle?

4  A.   I heard several shots at that point, and when I

5  came -- when I had exited the car, I believe I still heard

6  one or two shots. But when I came around the corner onto

7  Fifth Street, the shots had stopped as I came around the

8  corner.

9       When I came around the corner, I saw the suspect

10  car and officer -- or Detective Ciritella was in front of me

11  on the passenger side. He was on the passenger side putting

12  the car into park. I asked if he was okay. He said yes.

13  So I ran to the driver's side and assisted with getting the

14  suspect out of the car.

15  Q.   And you actually attempted to do some CPR?

16  A.   Correct.

17  Q.   So let me take you back just a step.

18       There is a point at which you exit your vehicle,

19  and then you run, or you walk from Fifth to Harrison Street,

20  and you talk about turning the corner. Are you talking

21  about going from Fifth Street to Harrison Street?

22  A.   Yes. We had parked on Fifth Street. We were around

23  the corner from Fifth Street. So when I got out of my car,

24  I had to run up Fifth Street and onto Harrison. So when I

25  turned the corner, the shots had already stopped at that

385

1  point. So the shooting was over. And when I came up,

2  Detective Ciritella was on the passenger side, putting it

3  into park, putting the car into park.

4       At that point I said, Are you okay? He said

5  yes. That's when I ran to the other side and assisted with

6  two other officers to get the suspect out of the car at that

7  point.

8  Q.   Do you know the identities of the other two officers

9  who assisted you with taking Mr. Smith out of the car?

10  A.   Yes.

11  Q.   Their names?

12  A.   Detective Lawson and Detective Gifford.

13  Q.   Detective Lawson was riding with you. Correct?

14  A.   Correct.

15  Q.   So he was running along with you down Fifth and made

16  that turn onto Harrison. Correct?

17  A.   I don't know that he was running with me. But he ran

18  in the same direction that I would have been running in,

19  yes.

20  Q.   Is it fair to say that he arrived at the car almost at

21  the same time you arrived at the car?

22  A.   I would say that that could be correct. I don't know.

23  I wasn't paying attention to him. I only knew what I was

24  doing at that point. I don't know if that was a matter of

25  having a little tunnel vision at that point, I don't know.

386

1  I actually -- I don't remember what he did. I know that he

2  went on the other side of the car as I went on the passenger

3  side. So at some point, right after that, I got on the same

4  side as he did and then assisted him.

5  Q.   And who handcuffed Mr. Smith?

6  A.   I am not sure who actually placed the handcuffs on. I

7  don't remember.

8  Q.   The handcuffs were on him prior to the point at which

9  you attempted to do CPR. Correct?

10  A.   Yes.

11  Q.   Did you ever see a knife in the car?

12  A.   No.

13  Q.   Did you ever see a gun in the passenger compartment?

14  A.   No. I didn't look in the car.

15  Q.   So you never looked in the car?

16  A.   No.

17  Q.   But you didn't notice any knife or gun in his pocket

18  or around his person as you were doing what you were doing

19  to assist?

20  A.   I did not look in the car, because that was part of

21  the crime scene, so I stayed away from the car. And I did

22  not look in his -- inside his pockets or anything like that,

23  no.

24  Q.   When you attempted to assist him, was it your belief

25  that he was still alive?

B-033

403

1  Q.    I am talking about the point at which you first exited
2  the vehicle.
3  A.    When I first exited the vehicle, ma'am, as I already
4  stated, I focused on that vehicle, the police vehicle the
5  suspect was in and that vehicle only.
6  Q.    After you took Mr. Smith out of the car and handcuffed
7  him, were you able to look down Harrison Street to the
8  intersection of Fifth and Harrison?
9  A.    Yes, ma'am.
10 Q.    And were you able to see even beyond there to the
11 intersection of Fourth and Harrison?
12 A.    I don't recall, ma'am.
13 Q.    As you looked down Harrison Street, did you see -- do
14 you recall how many police cars you saw there?
15 A.    I don't remember, ma'am.
16 Q.    Do you have any idea how many police officers you saw
17 after you exited your vehicle that were on the street or in
18 the general vicinity of Sixth and Harrison, Fifth and
19 Harrison?
20 A.    I can't put a number on that, ma'am, no.
21 Q.    Was it more than that?
22 A.    I can't remember, ma'am, no.
23 Q.    Did you write a report?
24 A.    Yes, ma'am, I did.
25        MS. SULTON:  Thank you, sir.

404

1        THE COURT:  Mr. Fineman.
2            CROSS-EXAMINATION
3  BY MR. FINEMAN:
4  Q.    Were you the first car to arrive from above Sixth
5  Street?
6  A.    Yes, sir.
7  Q.    Did you see any other cars in front of you on Harrison
8  Street between where you were and the suspect vehicle?
9  A.    I don't remember.  I focused, as I previously stated,
10 I focused on the suspect vehicle at that point in time, and
11 I dealt with that.
12 Q.    Do you recall seeing any police cars?
13 A.    Yes.  Afterwards.
14 Q.    When you arrived, did you see any police cars?
15 A.    I don't remember.  I just focused on the suspect
16 vehicle.
17        MR. FINEMAN:  No further questions.
18        Your Honor, may I have one moment?
19        THE COURT:  Sure.
20        (Counsel confer.)
21 BY MR. FINEMAN:
22 Q.    To be clear, when you arrived, did you hear any shots?
23 A.    No, sir.
24 Q.    Did you see any shots?
25 A.    No, sir.

405

1        MR. FINEMAN:  Thank you.
2        THE COURT:  Ms. Sulton, any additional
3  questions?
4        MS. SULTON:  No, Your Honor.
5        THE COURT:  Thank you, Detective.
6        THE WITNESS:  Thank you, Your Honor.
7        (Witness excused.)
8        MS. SULTON:  We call Dr. Boswell at this time,
9  Your Honor.
10       THE COURT:  Okay.
11       JERRY D. BOSWELL, having been duly
12 sworn as a witness, was examined and testified as
13 follows ...
14            DIRECT EXAMINATION
15 BY MS. SULTON:
16 Q.    Good morning, Dr. Boswell.
17 A.    Good morning.
18 Q.    Would you provide for the jury a summary of your
19 education?
20 A.    I have a Bachelor of Science in business
21 administration from Washington University.  A Master's in
22 business administration from Washington University,
23 Washington University in St. Louis, and a doctorate in
24 business administration from Indiana University at
25 Bloomington.

406

1        Those are my degrees.
2        I have a professional designation as a Chartered
3  Financial Analyst from the Institute of Chartered Financial
4  Analysts as well.
5  Q.    Is the doctorate in business administration the
6  terminal or the final degree that you can receive in that
7  field?
8  A.    Yes.  A doctorate in business administration, I have
9  five fields.
10 Q.    What are those?
11 A.    My major field was finance, I had a field in applied
12 economics, in international business, accounting and money
13 and banking.
14 Q.    And what is your current occupation, Dr. Boswell?
15 A.    I am semi-retired.  I retired from the university
16 teaching and administration.  And I spend my time as a
17 consultant, and also do a lot of volunteer work.
18 Q.    Prior to retiring, you were a professor at a college
19 in the Denver area?
20 A.    Yes, Metropolitan State College of Denver.
21 Q.    What were your duties there?
22 A.    I was a professor of finance, and I have been chair of
23 the Department of Finance at Metropolitan State.
24 Q.    For how many years were you working as a professor?
25 A.    Totally, about, at least 30, at various universities

507

1 there weren't any cars to take cover. You were on the
2 passenger side of the -- the driver's side --
3 A.    There were vehicles parked along the street. But they
4 are not vehicles where I could squeeze in quick enough to do
5 what I needed to do and also do my job as to stop the
6 suspect. So I thought at that time that it would behoove me
7 to just load my weapon as quickly as possible instead of
8 taking cover that I didn't have.
9         For me to take cover I would have had to run
10 down the street and get behind one of these vehicles. These
11 vehicles were rather closely parked together. I couldn't
12 squeeze in between them.
13 Q.    What did you mean when you said, "I stopped. I
14 actually quickly looked for cover, and there was none.
15 There was no parked cars"?
16 A.    That was an incorrect statement if that's what I said.
17 There were parked cars, obviously.
18 Q.    I wanted to take you to the very next page of Exhibit
19 21 of your statement, you say that, it says A-30, it appears
20 to be, your answer to Question 30. Do you see that?
21 A.    I see Question 30, yes.
22 Q.    And it says right in the middle of that paragraph,
23 this is your answer to the question, is that right, where it
24 says A-30?
25 A.    A-30. I gather it is, yes.

508

1 Q.    And it says, "'Cause it, you know, it was a very bad
2 impact."
3         Was it your understanding, sir, that that car
4 was very badly damaged?
5 A.    I thought it should be from the impact. I wasn't
6 aware, I didn't know if it was or was not. I thought that
7 it should be.
8 Q.    And so why, then, did you think that he was going to
9 escape and never be captured if he was driving in a marked
10 squad car with the lights flashing during daylight hours and
11 the car now is damaged?
12 A.    Because, obviously, it wasn't damaged enough for him
13 to stop because he continued to drive up the street until we
14 incapacitated him. And at that time, I felt, in my heart of
15 hearts, that he could escape that situation.
16 Q.    I have just a few more questions, Mr. Dempsey.
17         You did not write a report, did you?
18 A.    No, I did not.
19 Q.    You were told not to. Correct?
20 A.    Actually, I inquired if they wanted to, due to the
21 fact this is my first and only shooting, I was not sure what
22 I was supposed to do. So I asked and they said, no, you are
23 not.
24 Q.    Are there any other situations where you were told not
25 to write a report?

509

1 A.    Yes.
2 Q.    And when was that?
3 A.    As a supervisor for C Platoon, I believe -- I can't
4 give you an exact date, it was shortly before this
5 incident -- some of my officers in my squad were involved in
6 a shooting at Fifth and Rodney. Being their immediate
7 supervisor, I inquired, again, not ever being involved in it
8 myself, I inquired if I was supposed to write a use of force
9 report, which is a report that normally is written by a
10 Sergeant. And I was advised, no, that detectives would
11 handle all of that.
12 Q.    And when you were at the intersection of Fifth and
13 Harrison Street before Mr. Smith hit the Jeep, were there
14 other sirens on other vehicles that you could hear?
15 A.    I did hear other sirens, yes.
16         MS. SULTON: I don't have any additional
17 questions. Thank you.
18         THE COURT: I would like -- we are going to take
19 our lunch at this point. This would be a logical place to
20 stop for lunch. Be back at 2:00.
21         (Jury leaves courtroom at 12:55 p.m.)
22         (The following took place at sidebar.)
23         THE COURT: I saw a memo when we were talking
24 about 467. May I see that memo again?
25         MS. SULTON: We needed to just very briefly

510

1 address the issue of Sarah Richardson, Your Honor.
2         THE COURT: You had it out with the statute.
3 You had some highlights on the memo.
4         MS. SULTON: Yes.
5         THE COURT: I would like to see your copy.
6 There it is.
7         This is in evidence, I take it.
8         MR. PARKINS: No.
9         MS. SULTON: Then I would ask for these
10 exhibits, 9, 10 and 11, to be admitted.
11         THE COURT: Is there an objection?
12         MR. PARKINS: There is an objection because 9,
13 10 and 11 contain a lot of material, some of which is
14 admissible and some of which is not.
15         THE COURT: I am specifically interested in this
16 memo, Mr. Parkins. And most interested in the
17 highlighted -- well, the entire memo --
18         MR. PARKINS: I have no objection to this
19 document.                    B-035
20         THE COURT: This is now presently numbered what
21         MS. SULTON: That would be No. 11.
22         THE COURT: Now, this is a memo, for the record,
23 that is addressed to the chief of police at the time in
24 1986, it is dated December 24, Joseph M. Pennell, from P.
25 Kevin Smith, who was a patrol lieutenant, identified as a

519

1 THE COURT: You mean Reverend Thompson.

2 MS. SULTON: Yes, sir. Thank you.

3 THE COURT: You have a tendency to refer to

4 everybody as "Mister." I will leave that alone.

5 MS. SULTON: I try not to do that because I have

6 ministers in my family.

7 It is my understanding what Mr. Parkins will do

8 is both his cross and direct at the same time. And I wanted

9 to know if I then am procedurally able to go beyond the

10 scope of cross when I come back.

11 THE COURT: Yes.

12 MR. PARKINS: That is fine.

13 Likewise, Ms. Betty Gwyn might be testifying

14 this afternoon on behalf of the plaintiffs. Mr. Crosse and

15 I have agreed that I can go beyond the scope of direct,

16 because I have her under subpoena, also. I don't want to

17 bring her back.

18 THE COURT: Agreed.

19 MR. CROSSE: Fine.

20 THE COURT: Let's see if we can find out -- you

21 don't have one that I can --

22 MR. FINEMAN: I have a copy of the section here.

23 If they can make a copy -- that's what I did. I went back

24 and made a copy.

25 THE COURT: So I could look at it now. I would

520

1 like to compare it to the memo.

2 MR. PARKINS: 6.7.

3 THE COURT: Mr. Crosse, do you have the memo

4 here?

5 MR. FINEMAN: Your Honor, ours has the yellow

6 highlighting. But I don't believe that will show up in the

7 copy.

8 THE COURT: Have you had a chance to compare the

9 two?

10 MR. PARKINS: Yes. They are different.

11 THE COURT: Nevertheless, do we know the source

12 of the coded language in the 1986 memo?

13 MR. PARKINS: There is some discussion that it

14 applied to a former Directive 6.2.1, which is no longer --

15 THE COURT: It sounds like it might have come

16 from the Supreme Court. I am not sure it didn't come from

17 Graham or the Tennessee case. The memo is dated '86. I

18 think that is the approximate time of one of those or both

19 of those cases.

20 MR. PARKINS: I think both.

21 THE COURT: Let me take a look here.

22 MR. FINEMAN: No, no, Your Honor. That is ours.

23 MR. PARKINS: On the next page, Your Honor, that

24 is the deadly force policy.

25 THE COURT: Okay.

521

1 These are based on 467, it appears.

2 MR. PARKINS: Yes.

3 THE COURT: All right.

4 Mr. Crosse, did you have anything you wanted to

5 say?

6 MR. CROSSE: No.

7 THE COURT: Response?

8 MR. PARKINS: No.

9 MS. SULTON: No, sir.

10 THE COURT: You have completed your examination

11 MS. SULTON: I have.

12 (End of sidebar conference.)

13 (Jury enters courtroom at 2:14 p.m.)

14 THE COURT: Mr. Parkins.

15 MR. PARKINS: Thank you, Your Honor.

16 CROSS-EXAMINATION

17 BY MR. PARKINS:

18 Q.   Sergeant Dempsey, I would like to begin your

19 cross-examination by asking you, when did you get to work on

20 September 13th?

21 A.   Approximately 6:45 p.m.

22 Q.   Is that your normal reporting time?

23 A.   No, it is not.

24 Q.   Were you late?

25 A.   Yes, I was.

522

1 Q.   Please tell the jury why you were late?

2 A.   I had a family function, actually, a family reunion

3 was taking place. And I asked for comp time, which is time

4 that we have allotted that -- that we gain during our time

5 on service, to utilize approximately three hours of that

6 time to attend the function, which was granted to me by my

7 immediate supervisor.

8 Q.   Were the patrol officers on your shift already on the

9 street when you arrived?

10 A.   Yes, they were.

11 Q.   What did you do when you arrived at work?

12 A.   I immediately went to my desk and proceeded to --

13 normally what I normally do when I first get to work is

14 normally get my paperwork together and start reading reports

15 from the prior day, any of the administrative work that I

16 have to get done, so I can get that done and hit the street

17 as quickly as possible.

18 Q.   Would you please tell us where your desk is located?

19 Is it at the main police station?

20 A.   300 North Walnut, first floor.

21 Q.   Is that the corner --

22 A.   Of the Wilmington Police Department.

23 Q.   The corner of Fourth and Walnut, essentially?

24 A.   Correct.

25 Q.   When is it or how is it that you first became aware of

B-036

523

1  this incident.

2  A.    Shortly after I arrived, I would venture to say

3  approximately ten minutes or so, I can't give you an exact

4  time, I had just got in the building, and was settling down,

5  when I heard the radio come over, and all I heard was

6  Officer Saunders say "16 Charles."

7  Q.    What is 16 Charles?

8  A.    16 Charles is their designated call sign.  They were

9  part of the -- patrolling the 16th district of the City of

10  Wilmington.  That is their call sign.  Their platoon is

11  Charles platoon or C Platoon.  So their call sign is 16

12  Charles.

13  Q.    What did you hear next?

14  A.    I then heard, shortly after that the radio came back

15  on again, transmission came back on.  There was no actual

16  transmission from the officer itself, that used a radio, but

17  I heard in the background, "Get out, get out."

18        Then it shut down again.

19  Q.    I want to direct your attention for a moment to a

20  statement that was made by Ms. Sulton in her opening

21  statement, and ask you if this is accurate.

22        For the record, I am reading from Pages 20 and

23  21 of the trial transcript.

24        Ms. Sulton in her opening statement told the

25  jury:

524

1        "Mr. Dempsey, Defendant Dempsey says he heard

2  that, at Page 40 of his deposition, he says, at Page 40, he

3  says, 'I believe Officer Whitehead was screaming at someone

4  to get out, get out, at which time, obviously, you know, we

5  were needed on the street.'

6        "When you are trying to determine, as the Judge

7  told you in the preliminary instructions and will tell you

8  again at the end of the case when he gives you the jury

9  instructions, the question that you have to answer is was

10  the conduct of the officers objectively reasonable when they

11  decided to shoot and kill Harry Smith, III.  And in doing

12  that, you have to take into account what they knew at the

13  time that they fired their weapon."

14        MS. SULTON:  Objection, Your Honor.

15        THE COURT:  Sidebar.

16        (The following took place at sidebar.)

17        THE COURT:  What are you objecting to?

18        MS. SULTON:  The statements of counsel are not

19  evidence, it is my understanding, Your Honor.

20        THE COURT:  No, they are not.

21        MS. SULTON:  And that it would be appropriate

22  during closing argument for him to make such a statement.

23  But to pose it as a question to a witness, it's not

24  evidence.  I think that is improper.  I think it is

25  irrelevant.

525

1        MR. PARKINS:  I am going to ask if what she said

2  was true.

3        MR. CROSSE:  But it appears you are attempting

4  to discredit counsel.  These were statements made during

5  opening argument.

6        THE COURT:  I am going to sustain the objection.

7        (End of sidebar conference.)

8  BY MR. PARKINS:

9  Q.    Did you ever say that you heard Officer Whitehead say

10  "Get out, get out or I will shoot"?

11  A.    No, I never heard Officer Whitehead state that.

12  Q.    Did you ever say that in your deposition?

13  A.    No.

14  Q.    What did you do when you heard the radio transmission

15  from Officer Saunders?

16  A.    I am sorry.  When he first came over 16 Charles?

17  Q.    Yes.

18  A.    I immediately started to look for my key peg, which is

19  in my briefcase, because I felt, just by his inflection in

20  his voice, that something was bothering him.  Being with him

21  for two years now, I knew him to be pretty calm about

22  things.  And his voice did not seem calm at that point.

23        So I thought I needed to hit the street, and I was

24  sure I was going to probably have to hit the street, at

25  least to go see what was going on as a supervisor.  So I

526

1  looked for my key peg, that is how we access from our key

2  pegboard for our vehicles.  That's what I was doing at the

3  time the transmissions were coming over.

4  Q.    What did you do when you got your key?

5  A.    At the same time I got my key, actually obtained it

6  for the vehicle I had, it was about the same time that the

7  "Get out, get out" transmission came over, and then shortly

8  after that the transmission "Shots fired."

9        That's when I just had the key and I ran out.  I

10  didn't even take my equipment with me other than what I ha

11  on my person.

12  Q.    What kind of car were you driving that day?

13  A.    I believe it was a -- to be honest with you, I can't

14  recall right now if it was a white or black-and-white.  It

15  was one of our supervisor vehicles, which is usually the

16  older ones of the vehicles.  So I would venture to say it

17  was an older model car.

18  Q.    It was a marked police car?

19  A.    Yes, it was a marked police car.

20  Q.    Describe for us, please, the route that you took once

21  you left the parking lot?

22  A.    Once I left the parking lot, I went west on Fourth

23  Street from Poplar, and I traveled west on Fourth Street all

24  the way up to Harrison, at which time I turned south onto

25  Harrison into the 400 block.

B-037

1    Q.    Did you turn south?

2    A.    North into Harrison, into the 400 block.

3    Q.    Officer Dempsey, why didn't you follow the other

4    police cars that turned north on Van Buren?

5    A.    Actually, when the cars turned north onto Van Buren, I

6    observed Officer Ciritella continue to travel straight. I

7    actually said to myself out loud, I said, that's a good

8    idea, not to follow. There is too many cars following him.

9    I will stick with John. And that's why I continued on with

10   Officer Ciritella at that time.

11   Q.    Where was Sergeant Kurten when you proceeded on Fourth

12   Street past Van Buren?

13   A.    He was between me and Detective Ciritella.

14   Q.    Did you turn onto Harrison Street?

15   A.    Yes.

16   Q.    I am going to ask you if you could come down, with the

17   Court's permission?

18        THE COURT:  Yes.

19        (Witness steps down from stand.)

20   BY MR. PARKINS:

21   Q.    Sergeant, this is a depiction of the intersection of

22   Fifth and Harrison Street. I would like you to first, with

23   this car -- and Detective Ciritella was driving a red car?

24   A.    Correct.

25   Q.    Point out or place it where he ended up, his car.

1    This is Fifth?

2    A.    This is Fifth. Fourth would be up here.

3    Q.    Fourth is down here.

4         (Witness complies.)

5    Q.    If you use this to show us where Sergeant Kurten

6    parked?

7         (Witness complies.)

8    Q.    Now, we will use one of these black-and-whites to

9    depict your car. Will you show us where you parked?

10        (Witness complies.)

11   Q.    Tell the folks in the jury -- you might want to step

12   back so they can see that, if you don't mind. Tell the

13   folks in the jury why you stopped back here?

14   A.    I stopped back here because I observed that Officer

15   Ciritella and Officer Kurten were exiting their vehicles. I

16   did not want to enter the intersection not knowing where

17   they were running at the time. And I didn't want to strike

18   them with my vehicle. So I parked back here. It didn't

19   seem fit for me to go up that far.

20   Q.    Where was Detective Ciritella the first time you saw

21   him outside of his vehicle?

22   A.    He exited his driver's side door, and went to the

23   front of the vehicle.

24   Q.    Can we place him -- will you place him where you first

25   saw him?

1    A.    When I first saw him was when he was exiting.

2    Q.    Yes. And show us what he did after that?

3    A.    Then he traveled up in this area here and I lost sight

4    of him.

5    Q.    All right. Did you see Sergeant Kurten?

6    A.    Yes.

7         THE COURT:  When we say "this" area, where are

8    you talking about?

9         THE WITNESS:  I am sorry, sir. He traveled to

10   the northeast corner of Fifth and Harrison.

11   BY MR. PARKINS:

12   Q.    Would you place where Sergeant Kurten was when you

13   first saw him outside of the vehicle?

14   A.    He exited the driver's side of his vehicle, and then

15   he traveled between the vehicles, and I lost sight of him at

16   that time when he went into the block on Fifth Street.

17   Q.    So he went in front of his vehicle and then traveled

18   in an eastward direction on Fifth Street. Is that correct?

19   A.    Correct. And I lost sight of him at the time.

20   Q.    Would you place the last icon where you were when you

21   got out of your vehicle and what you did?

22   A.    I exited the vehicle, and I traveled in the northerly

23   direction right across the intersection. My intention was

24   to go to the northeast corner, also, of Fifth and Harrison,

25   and my intention was to take up cover in this area where

1    John's engine block would be, until I observed what was

2    going on.

3    Q.    Would you put another icon for us, and show us where

4    you understood or believed the stolen police car was at the

5    time that the three of you had taken these positions?

6    A.    By the time I was in my position in the intersection,

7    approximately here is the first time I actually was able to

8    look down the street, eastbound on Fifth Street, at which

9    time I observed the vehicle approximately here.

10   Q.    Okay. Would it be fair to say that that is about two

11   carlengths, roughly, past the crosswalk on the eastern side

12   of Harrison Street?

13   A.    Yes.

14   Q.    Would you tell us what the patrol car was doing at the

15   time that you saw it in that position?

16   A.    By the time I got to here, he had stopped at that

17   position.

18   Q.    Had he come to a complete stop?

19   A.    It appeared to me he had stopped at that position,

20   yes.

21   Q.    Were there police cars behind him?

22   A.    Yes, several.

23   Q.    Was the first car behind him a marked car, do you

24   recall?

25   A.    Yes.