B39 - B70

1 Q. Why isn't it 04 - 01254 - CMS - Doc. hand - hand hand 236 - 2

(Witness complies.)

3 Q. And you placed a black-and-white icon behind the

4 stolen police car. How close was that car?

5 A. It appeared to me to be very close.

6 Q. Were there other cars behind the black-and-white?

7 A. There were.

8 Q. What happened as the stolen car came to a halt?

9 A. At that time, I felt that the situation was going to

10 be finished because I felt that he didn't have anywhere to

11 go, in my opinion, at that time, he didn't have anywhere to

12 go. There was nowhere to go behind him. And I felt there

13 was nowhere to go in front of him.

14 At about the same time making those observations

15 and thinking about this, the car began to accelerate.

16 Q. And where was Detective Ciritella at this time?

17 A. I observed him around this area of the sidewalk,

18 approximately here.

19 Q. What was Detective Ciritella doing at that moment?

20 A. I couldn't exactly see, other than his head and stuff,

21 where he was located. I could hear him giving verbal

22 commands of "Stop, stop, stop."

23 THE COURT: Was Detective Ciritella at that time

24 right in front of the stop sign?

25 THE WITNESS: In that area, sir. He was around,

1 to my knowledge, he was around the front of the stop sign

2 area, yes.

3 BY MR. PARKINS:

4 Q. You told us that you began to see the car, the stolen

5 car accelerate?

6 A. Correct.

7 Q. In what direction was it traveling?

8 A. At first straight towards the cars in front, and then

9 he veered off towards Detective Ciritella.

10 Q. At the time that he was driving towards the Detective,

11 he was still on the sidewalk?

12 A. Yes.

13 Q. When did you first hear --

14 MR. CROSSE: Could you clear up "he," please.

15 He, the car, or he, sir?

16 BY MR. PARKINS:

17 Q. At the time the car was accelerating, was Detective

18 Ciritella on the sidewalk?

19 A. Yes, Detective Ciritella, to my knowledge, was on the

20 sidewalk.

21 Q. When did you first hear a shot fired?

22 A. About the same time I observed this vehicle going

23 towards Officer Ciritella.

24 Q. Was the vehicle on the street or on the sidewalk or

25 both at that time?

2 Q. What happened next?

3 A. The vehicle continued towards Ciritella. I started to

4 actually pull back a little bit because I wasn't really sure

5 what was going on in the situation. But I noticed that at

6 that point there was room, if that is what he was going to

7 do, to go this way.

8 I observed Detective Ciritella backpedaling,

9 backing up as quickly as he could towards the building area,

10 the northeast corner of Fifth and Harrison. And the car

11 continued at him.

12 I lost sight of Ciritella at one point because I

13 started to focus more on the vehicle than anything, so I

14 lost sight of where Ciritella went at that point, because I

15 was focusing totally on the vehicle. And I started to

16 maneuver myself over to this area here.

17 Q. When you say this area here, you have now maneuvered

18 yourself up to the crosswalk on the northern side of Fifth

19 Street?

20 A. Correct.

21 Q. At the time that you saw the stolen police car

22 accelerate towards Detective Ciritella, what did you think

23 of his prospects?

24 A. I thought he was going to be struck by the vehicle.

25 Q. Did you at any time see what Sergeant Kurten was doin

1 at this time?

2 A. No, I did not.

3 Q. So what happened after this?

4 A. I observed the vehicle continue. I heard a few shots

5 being fired. I already unholstered my weapon in this area

6 here.

7 Q. This area here meaning the middle of the intersection?

8 A. Yes, in the middle of the intersection. I observed

9 the vehicle continue. Again, I did not know at this point

10 where Ciritella was. I lost total sight of Ciritella. And

11 I was focusing on the vehicle trying to at least -- because

12 there was a vehicle here kind of blocking my view a little

13 bit, also.

14 Q. You say there was a vehicle here. You mean on the

15 northeast corner of Harrison --

16 A. Of the 500 block of Harrison.

17 Q. Was that a white Jeep Cherokee?

18 A. Yes, it was.

19 Q. Would you place it where you believe it was?

20 (Witness complies.)

21 Q. You have placed the icon there on the eastern side of

22 Harrison Street, just north of the intersection with Fifth?

23 A. Correct.

24 Q. All right. Continue, if you would, with telling us

25 what happened?

1    A.    Cause he continue to GWB towards the other
2    Cherokee. I maneuvered myself a little more towards the
3    northwest corner of Fifth and Harrison, again, hoping this
4    car was not going to be able to make it through this area, I
5    didn't think he would. But at which time he accelerated to
6    the point that he was able to strike this vehicle and spin
7    this vehicle around, which scared me because I wasn't really
8    sure where that vehicle was going to go. I went a little
9    closer to the northwest corner of Fifth and Harrison.
10          The vehicle continued and started to make a
11   turn. This vehicle was out of the way. It started to make
12   a turn northbound from the 500 block of Harrison.
13   Q.    Where were you when you fired your first shot --
14          THE COURT: Sergeant, when you say this vehicle,
15   you are talking about --
16          THE WITNESS: The 1180, sir. Vehicle 180.
17          THE COURT: The vehicle that got knocked out of
18   the way, was that the Jeep Cherokee?
19          THE WITNESS: Yes, sir.
20          THE COURT: Just so the record is clear.
21   BY MR. PARKINS:
22   Q.    Where were you when you fired your first shot?
23   A.    Here, sir (indicating).
24   Q.    You were roughly in the crosswalk on the western half
25   of Harrison Street?

1    A.    Correct, sir.
2    Q.    About how far were you from Vehicle 180 when you fired
3    your shot?
4    A.    I was approximately three to five feet away at that
5    point.
6    Q.    Up until this time, how long had you been a police
7    officer as of the time of this event?
8    A.    Sixteen years, sir.
9    Q.    How many times in the last 16 years did you fire your
10   weapon before this time, except on the range, of course?
11   A.    Except on range, never, sir.
12   Q.    First time ever in your career you fired your weapon?
13   A.    Yes, sir.
14   Q.    Aside from this incident, have you ever fired your
15   weapon since?
16   A.    No, sir.
17   Q.    What happened as the car turned the corner?
18   A.    The car -- like I said, I fired approximately three
19   rounds in this area right here. I can't give you an exact
20   number. It was more a continuous situation. I never really
21   stopped firing, so I can't say I fired three rounds and this
22   and this. It was continuous.
23   Q.    Could we interrupt for just a second. One thing we
24   haven't told the jury about, your weapon is a semiautomatic?
25   A.    Semi-automatic Smith & Wesson .40-caliber handgun,

1    yes, sir.
2    Q.    For those people who might not be familiar with such
3    weapons, what does semi-automatic mean?
4    A.    Semi-automatic basically means that if I continue,
5    while I continue to squeeze the trigger the weapon will
6    fire, where an automatic weapon is you squeeze the trigger
7    once and hold it back, it will continuously fire, where a
8    revolver, you have to squeeze and the cylinder has to turn.
9    In a semi-automatic weapon, as fast as you squeeze the
10   trigger, that is as fast as a bullet will leave the weapon.
11   Q.    So every time you fire on a semi-automatic, pull the
12   trigger, fires one, pull the trigger, fires another?
13   A.    Correct.
14   Q.    How many shots did you fire at this time, do you
15   believe?
16   A.    Approximately three. But like I said, it was a
17   continuous situation. As the vehicle was moving, my
18   intention was to stop that vehicle and that suspect from
19   leaving that area. I did not want him to leave that area.
20          So I continuously fired while he continued to
21   travel north on Harrison Street in the 500 block.
22          Ones he made the -- straightened out his vehicle
23   completely -- at this time I wasn't moving. There was no
24   need for me to move. I was close enough for what I needed
25   to do and it would benefit me not to move and fire. When he

1    started to gain ground on me, I started to use our training
2    and started to maneuver, walking and firing at the same
3    time, northbound in the 500 block toward the vehicle, aiming
4    basically for the driver-side window and the side passenger.
5    Q.    Did you see any other officers at that time?
6    A.    I observed Ciritella on this side.
7    Q.    Did you see Sergeant Kurten?
8    A.    No, not at all.
9          THE COURT: Officer Ciritella was on the
10   opposite side.
11          THE WITNESS: He was on the 500 block on the
12   east side of the street, sir, of North Harrison Street.
13   BY MR. PARKINS:
14   Q.    Sergeants Dempsey, did you see any police cars north
15   of the scene at Harrison Street or anywhere else at that
16   time?
17   A.    No.
18   Q.    What did you think would happen if Mr. Smith or the
19   stolen police car was not stopped in that block?
20   A.    In my view, this was a dangerous felon. That if he
21   left this area, he had the potential to cause bodily,
22   dangerous, serious physical injury to citizens of the City
23   of Wilmington and possible death. And I did not want that
24   to occur.
25   Q.    Did you see any citizens on the street or on their

B-040

1  doorways.
2  A.    No, sir, I did not.
3  Q.    Why not shoot at the tires?
4  A.    We are not trained to shoot at the tires, sir.
5         THE COURT:  Is he able to return to the stand
6  now?
7         MR. PARKINS:  I believe that's correct, Your
8  Honor.
9         (Witness resumes stand.)
10 BY MR. PARKINS:
11 Q.    Why not use a taser?
12 A.    One, I don't carry a taser.  I am not trained with a
13 taser.  Secondly, it wouldn't penetrate the vehicle.  It is
14 not utilized that way to my knowledge.  I am not trained
15 with a taser.  So I couldn't answer that.
16 Q.    How about a beanbag gun?
17 A.    I don't have a beanbag.
18 Q.    How about tire strips?
19 A.    Don't have tire strips, sir.
20 Q.    Is there any device that you could have used to stop
21 Mr. Smith other than your handgun?
22 A.    No, sir.
23 Q.    What was your other choice or what was the other
24 possibility?
25 A.    The only other choice I saw was to let a dangerous

540
1  felon leave the area.  And I wasn't going to let that
2  happen.
3  Q.    There have been questions about unauthorized use of a
4  motor vehicle or a stolen car.  Is that what you were
5  confronted with as the police car turned onto Harrison
6  Street?
7  A.    I was confronted with a dangerous felon who just stole
8  a police vehicle that had possession of a shotgun, and not
9  aware --
10 Q.    Did the events involving Mr. Ciritella play any role
11 in your decision whether to use deadly force?
12 A.    It played a role as a fact, just this subject
13 attempting to run over Ciritella, which gave me cause to
14 believe that he did not care at that time about anyone, in
15 particular himself.
16 Q.    You mentioned just a moment ago about a shotgun?
17 A.    Yes.
18 Q.    What did you think at that time about shotguns?
19 A.    That that car possessed one.
20 Q.    There has been a use of a policy written in 1995 about
21 locking shotguns in cars.
22 A.    Correct.
23 Q.    Was it the practice of the Wilmington Police
24 Department patrol cars to lock their shotguns in cars in
25 2003?

2  Q.    What was the practice about where the shotguns were t
3  be placed?
4  A.    We started to have it well before 2003, I can't give
5  you an exact year, it was a few years prior, we changed our
6  fleet over, and when we were changing our fleet over, we
7  purchased gun racks in the vehicle.  And that's where we
8  proceeded to place our shotguns.
9  Q.    In 1995 were there gun racks in the vehicles?
10 A.    No, there were not.
11 Q.    All right.  You are head of the training academy now.
12 Is that right?
13 A.    Yes, I am.
14 Q.    What are recruits taught about placement of a shotgun
15 today?
16 A.    They are taught to place them in the rack of the
17 police car in the front of the seat.
18 Q.    With respect to shotgun rack, how is it that one can
19 obtain the gun out of the rack?
20 A.    There is a button that they can push that will
21 unsecure the rack and then they can obtain the shotgun.
22 Q.    I would like to ask you to take a look at Directive
23 3.2, which has been discussed in earlier testimony.
24         MR. PARKINS:  May I read this into the record
25 first, Your Honor?

542
1         THE COURT:  Yes.
2  BY MR. PARKINS:
3  Q.    Directive 3.2, Part 7 is entitled Roadblocks.  And it
4  reads:
5         "It is the policy of the Department of Police to
6  neither implement nor participate in roadblocks of any
7  kind."
8         Do you have that in front of you?
9  A.    Yes, I do.
10 Q.    Would you please tell the jury what section of the
11 white book that is in?
12 A.    It's in Directive 3.2, is the Traffic Division,
13 basically protocol or SOP, you know, their plans on how they
14 do their job.
15 Q.    And what does the Traffic Division do?
16 A.    They handle funeral details, they handle races, bike
17 races, foot races throughout the city, a lot of different
18 operations throughout the city that's going to deal with the
19 city streets.  They deal with that and deal with organizing,
20 making sure everybody is safe and the traffic flow is at a
21 minimum or none at all for different functions.
22         They also handle all -- not all accidents, but
23 any serious or deadly accidents.  They also handle -- what
24 we have, a hit-and-run unit that handles hit-and-run
25 investigations and stuff of that nature.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -   -   -

 4     HARRY SMITH JR., and        :      Civil Action
       ROSYLN WOODARD SMITH,       :
 5     individually and as         :
       Administrators of the       :
 6     ESTATE OF HARRY SMITH, III,:
                                   :
 7              Plaintiffs,         :
                                   :
 8          v.                     :
                                   :
 9     CITY OF WILMINGTON,         :
       JOHN CIRITELLA, in his      :
10     individual capacity and in :
       his capacity as a police    :
11     officer of the Wilmington  :
       Police Department,          :
12     THOMAS DEMPSEY, in his      :
       individual capacity and in :
13     his capacity as a police    :
       officer of the Wilmington  :
14     Police Department, and      :
       MATTHEW KURTEN, in his      :
15     individual capacity and in :
       his capacity as a police    :
16     office of the Wilmington   :
       Police Department,          :
17                                 :
                Defendants.   :      No. 04-1254-GMS
18
                          -   -   -
19
                     Wilmington, Delaware
20                  Thursday, April 12, 2007
                         9:35 a.m.
21
                          -   -   -
22
       BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
23                                  and a jury

24
                      FOURTH DAY OF TRIAL
25
```

B-042

624

1    THE COURT: Mr. Parkins, you may cross-examine.

2    CROSS-EXAMINATION

3    BY MR. PARKINS:

4    Q.    Mrs. Gwyn, there were cars parked on your side of

5    Harrison Street that evening?

6    A.    Well, my car might have been out there, yes.

7    Q.    Were there other cars out on the street besides yours?

8    A.    Yes, there were.

9    Q.    Quite a few cars?

10   A.    I wouldn't say quite a few.  But I do know that I

11   remember seeing the man roll like, you know, on the side of

12   his car trying to get underneath his car, or down on the

13   side of his car.  And I know my car was out there.

14   Q.    When Mr. -- when the gentleman who was driving the

15   police car, which was stolen, was removed from the car and

16   handcuffed, did you see police officers trying to give him

17   CPR?

18   A.    I didn't see them give no CPR.

19   Q.    All right.  Am I correct that you didn't see any cars

20   blocking Fifth and Harrison Street?

21   A.    No.

22   Q.    Let me rephrase the question.  Did you see any cars

23   blocking Fifth and Harrison Street?

24   A.    No.

25   Q.    And is it true that you and your husband David Gwyn

625

1    talked about this event after it occurred?

2    A.    Oh, yes.  Definitely.

3    Q.    You would expect so.  Right?

4    A.    Yes.

5    Q.    Is it true that you don't remember your husband ever

6    saying that he saw someone run up to the side of the police

7    car and shoot at the man's body?

8    A.    Shoot at the man's body?  You are talking about in the

9    police cruiser?

10   Q.    Let me rephrase the question for you.

11   A.    Okay.

12   Q.    You don't remember your husband ever saying to you

13   that somebody, a policeman ran up to the side of the stolen

14   police car after it had stopped and shoot into the man's

15   body?

16   A.    No, I don't remember it.

17   Q.    You don't remember him, David Gwyn, ever telling you

18   that?

19   A.    Along the side?

20   Q.    Yes.

21   A.    Not alongside of the police car, I didn't hear that.

22   Q.    And you don't remember your husband ever saying to you

23   that he saw the police continue to shoot after the car had

24   stopped and the man was slumped over the wheel.  Am I right?

25   Would you like me to rephrase that for you?

626

1    A.    Yes, please.

2    Q.    Sure.  Do you remember your husband ever saying to yo

3    that he saw police shooting at the car after it had stopped,

4    and the man was slumped over the wheel?

5    A.    No.

6    MR. PARKINS:  Nothing further, Your Honor.

7    MS. SULTON:  None, Your Honor.

8    THE COURT:  Thank you, Ms. Gwyn.  You are

9    excused.

10   (Witness excused.)

11   MS. SULTON:  We call David Gwyn.

12   ... DAVID GWYN, having duly affirmed to tell the

13   truth, was examined and testified as follows ...

14   THE WITNESS:  How you doing?

15   THE COURT:  Good morning.

16   DIRECT EXAMINATION

17   BY MS. SULTON:

18   Q.    Good morning, Mr. Gwyn.

19   A.    Good morning.

20   Q.    Where do you live?

21   A.    507 North Harrison Street.

22   Q.    How long have you lived there, sir?

23   A.    Since 19 -- well, for 49 years.

24   Q.    And your wife is Betty Gwyn.  Correct?

25   A.    Yes.

627

1    Q.    I want to take you to the events of September 13,

2    2003.  Can you tell the jury where you were around about the

3    7:00 hour?

4    A.    To start out with?

5    Q.    Yes, sir.

6    A.    Me and my wife, we were sitting out in front of the

7    house, we put chairs out in front of our house.  We were

8    sitting out in front of our house.

9    Q.    Was there anything obstructing your view, like a tree

10   or truck or anything like that as you would, say, look

11   across the street or down the street one way or the other?

12   A.    No.

13   Q.    If you recall, if you were looking to your left, so

14   you are looking up towards Sixth and Harrison, did you see

15   any other people on their porches or on their sidewalks out?

16   A.    Yes.  I mean, just about everybody was out of their

17   house.  It was a nice evening.  And everybody was sitting

18   out, just about, children was on the street playing.

19   Q.    And if you looked to your right, going down toward

20   Fifth Street, were people on that side of the street as

21   well?                                            B-043

22   A.    Yes.

23   Q.    So if you looked, just staying on your side of the

24   street, how many people, you know, children, adults,

25   elderly, how many people do you think you saw outside, just

638

1  Q.    Now, where are the garages, if the garages represent
2  kind of the first structure on your street? Were you
3  standing almost even with the garages?
4  A.    I hadn't quite gotten down to the garages.
5  Q.    And then what did you see after you saw the police car
6  hit the Jeep, what did you see?
7  A.    The police car started up the hill, and I saw three
8  policemen come out from like this way, running behind the
9  police car, shooting, shooting through the back window.
10  Q.    And where was this police car at the point at which
11  you saw police officers running behind and shooting through
12  the back window? Was it still here at the corner or had it
13  moved somewhere else?
14  A.    It was like, I think like that (indicating).
15  Q.    Was the car moving fast or was it moving slow? I am
16  now talking about the police car?
17  A.    You are not talking about the police car?
18  Q.    I am talking about the police car. Was this car
19  moving fast or slow while you saw these officers shooting
20  through the back?
21  A.    No. It was going slow, because once it hit the
22  Cherokee Jeep, it was going slow.
23  Q.    All right.
24       THE COURT: Do you want to indicate for the
25  record, Ms. Sulton, the direction in which the gentleman

637

1  says he saw the police officers come? So that it is clear
2  for the record.
3       MS. SULTON: Yes. I believe Mr. Gwyn said that
4  he saw the police officers come from the west direction of
5  West Fifth, moving toward the north direction of North
6  Harrison.
7  BY MS. SULTON:
8  Q.    Is that correct, Mr. Gwyn?
9  A.    Yes, they came from here, which you say the west?
10  Q.    Assuming this is north, south -- and I know you look
11  at the street differently when you are out there because I
12  have been out there, So this is a little confusing.
13       Let's assume this is north and this is south and this
14  is east and that is west.
15  A.    So they came from the west.
16  Q.    So they came from the west?
17  A.    Yes.
18  Q.    Let me ask you one other question before we move.
19  After you saw the police officers shooting through the
20  window, did you move or were you still standing there? What
21  did you then do after you saw that?
22  A.    When I saw them shooting, I tried to run back to my
23  house. I mean, I couldn't make it. And I jumped on my
24  neighbor's porch. And that's where I stood at.
25  Q.    And could you see anything from the neighbor's porch

1  after that point?
2  A.    I stood there and watched them started shooting
3  through the back window, all three of them.
4  Q.    And was there any point at which the police car
5  stopped that you saw?
6  A.    Not until it got like in front of my house.
7  Q.    So if you would be kind enough to move it to where you
8  saw it when it stopped?
9  A.    Move this?
10  Q.    Yes, sir.
11       The record should reflect he is moving it in the
12  northerly direction of North Harrison Street.
13       North Harrison Street doesn't really move true
14  north and south, does it?
15  A.    Yes. We live on North Harrison.
16  Q.    Let me go forward.
17  A.    You are getting me a little confused.
18       THE COURT: Confused me, too.
19  BY MS. SULTON:
20  Q.    All right. So this is where you saw the police car
21  stop, almost right in front of your house, sir?
22  A.    Yes, ma'am.
23  Q.    And then what did you see?
24  A.    The officers were shooting all the way up to till the
25  car stopped. And then --

639

1  Q.    So they were shooting all the way up to the point at
2  which the car stopped?
3  A.    Yes, ma'am.
4  Q.    So let me stop here. We will put you back up on the
5  stand.
6       THE COURT: Mr. Gwyn, you can return to the
7  witness stand.
8       (Witness resumes stand.)
9  BY MS. SULTON:
10  Q.    So you are now standing on your neighbor's porch. The
11  car has stopped almost in front of your house. Then what do
12  you see, sir?
13  A.    The officer that was on the left --
14  Q.    When you say the left, the left of the car?
15  A.    Yes. On the side that we're out standing, he ran and
16  opened the door. And, I mean, he reached over. I presume
17  that he put the car in park because it didn't roll back.
18  And Harrison Street has a steep hill, and it didn't roll
19  back. And he reach over.
20       MR. PARKINS: Your Honor, I am having a little
21  trouble hearing the witness.                    B-044
22  BY MS. SULTON:
23  Q.    If you could speak up a little?
24  A.    I presume that he reach over and put it in park.
25  Q.    Yes, sir.

1  Q.    But you didn't see any police cars blocking the

2  street?

3  A.    No, sir.

4  Q.    So what you saw was the police car come, make a turn

5  on Fifth Street onto Harrison Street, and always staying in

6  the street.  Is that correct?

7  A.    Staying in the street?

8  Q.    Yes.

9  A.    What do you mean?

10  Q.    You told us a few moments ago that you saw a police

11  car come down Fifth Street and turn onto Harrison Street

12  right before it hit the Jeep Cherokee.  Do you remember

13  that?

14  A.    Yes, sir.

15  Q.    And when the police car made the turn onto Harrison

16  Street, you recall it staying in the street and not driving

17  on the sidewalk.  Is that right?

18  A.    Staying in the street.

19  Q.    And not driving on the sidewalk when it made the turn?

20  A.    Yes, sir.

21  Q.    Okay.  And you didn't hear any shooting up until that

22  time.  Is that right?

23  A.    No, I didn't.

24  Q.    All right.  Now, the next thing -- Mr. White, you can

25  take that down.

---

1  A.    They started shooting.

2  Q.    Were they running while they were shooting?

3  A.    Yes.

4  Q.    Did you see them walking at any time?

5  A.    They was running behind the car.

6  Q.    Now, when they were on Harrison Street, were they on,

7  as you were looking at the scene, on the left-hand side of

8  the road?  Let me help you.

9         MR. PARKINS:  Could I use this for a moment,

10  Your Honor?

11         THE COURT:  Yes.

12  BY MR. PARKINS:

13  Q.    Mr. Gwyn, are you able to see that from where you are

14  sitting?

15  A.    Yes.

16  Q.    Were the police officers on this side of the road or

17  this side of the road when you saw them running on Harrison

18  Street?

19  A.    No.  They were like in the middle.

20  Q.    They were in the middle?

21  A.    Yes.

22  Q.    Over here?

23  A.    Yes.

24  Q.    All right.  And they were all in uniform and they were

25  shooting at the back of the police car.  Is that correct?

---

1         The next thing that you saw is some police

2  officers, three of them -- is that right?

3  A.    Yes.

4  Q.    -- running down Fifth Street from the west.  Is that

5  right?

6  A.    Yes.

7  Q.    The opposite direction that the police car was

8  traveling when it was on Fifth Street.  Is that right?

9  A.    Yes.

10  Q.    Then, I didn't see them on this side of Fifth Street.

11  that correct?

12  A.    Yes.

13  Q.    And next you saw them running up Harrison Street?

14         THE COURT:  That wasn't his testimony, Mr.

15  Parkins.

16  BY MR. PARKINS:

17  Q.    What did you see next, sir?

18  A.    What did I see after?

19  Q.    You saw the police running down from Fifth Street on

20  the west side.  What did they do?

21  A.    Then, I didn't see them on this side of Fifth Street.

22  I saw them when they turned and started running up Harrison

23  Street.

24  Q.    So you saw them turn onto Harrison Street.  What did

25  they do next?

---

1  A.    Yes.

2  Q.    Did you see any plain-clothes officers that night?

3  A.    I didn't see no plain-clothes officers.  I just saw

4  the three.

5  Q.    Okay.  And were those three officers that you saw

6  running behind the car all together?

7  A.    Yes.

8  Q.    I am sorry?

9  A.    Yes.

10  Q.    Now, could we please put up begin Exhibit 3, Mr.

11  White.

12         Mr. Gwyn, this is the approach they took.  Do

13  you remember making this drawing at your deposition?

14         (Pause.)

15         THE COURT:  Do you remember making the drawing

16  Mr. Gwyn?

17         THE WITNESS:  Repeat that, now?

18         THE COURT:  That drawing.

19         THE WITNESS:  I can't remember.

20  BY MR. PARKINS:

21  Q.    We will move on.  Thanks.  You may take that down, Mr.

22  White.                        **B-045**

23         Am I correct, sir -- let me strike that.

24         Can you tell us how many shots you heard?

25  A.    No, I can't tell you how many shots I heard, no.

---

648

1  Q.   Can you estimate for us how far the police were from
2  the car when they were shooting?
3  A.   They was right behind the car.
4  Q.   How far away, though?
5  A.   I just said they was right behind the car. How far...
6  Q.   And, Mr. Gwyn, after the shooting stopped, you saw
7  police officers take what turns out to be Mr. Smith out of
8  the car. Is that correct?
9  A.   After they stopped, yes.
10 Q.   And you saw them attempt to give Mr. Smith CPR. Is
11 that correct?
12 A.   Yes. One of them was doing like that (indicating).
13 Q.   Chest compressions?
14 A.   I guess that's what you call it.
15 Q.   When you say one of them was doing like that, you were
16 pushing your hands up and down together?
17 A.   Yes.
18 Q.   Now, you executed an affidavit, did you not, about
19 this matter?
20 A.   About what?
21 Q.   Did you sign an affidavit --
22      THE COURT:  I want to see counsel at sidebar.
23      (The following took place at sidebar.)
24      THE COURT:  What is the affidavit?
25      MR. PARKINS:  It is a different story than what

649

1  he is telling today, and there is no objection to the
2  affidavit.
3       THE COURT:  I want to see it.
4       (Document handed to Court.)
5       (Pause.)
6       THE COURT:  I won't let you use it. He hasn't
7  testified to these facts today. You asked in an attempt to
8  preempt, anticipated testimony along these lines,
9  specifically, along the lines of that which I am assuming --
10 you correct me if I am wrong, Mr. Parkins. Which paragraph
11 is this? 7: "I then saw a Wilmington Police
12 officer walk over to the side of this police car and fire
13 shots into the body of the man slumped over the steering
14 weekly."
15      He hasn't given that testimony here today. What
16 is the purpose of the affidavit?
17      MR. PARKINS:  During my opening statement, in
18 reliance on the fact there was no objection to this
19 document, I told the jury that Mr. Gwyn had told three
20 different stories at three different times. This is one of
21 them.
22      THE COURT:  I will let you establish that, that
23 he has told different stories. And I will let you
24 establish -- that's fair.
25      MR. PARKINS:  Can I use this affidavit?

650

1       THE COURT:  I will let you do that.
2       Clearly, this affidavit was prepared by a
3  lawyer, not by Mr. Gwyn.
4       MR. PARKINS:  But you may recall, we had the
5  deposition --
6       THE COURT:  I agree.
7       (End of sidebar conference.)
8       THE COURT:  You may proceed.
9  BY MR. PARKINS:
10 Q.   Mr. Gwyn, I am going to hand you a copy of what is on
11 the board over there. I think you can probably also see it
12 on your computer screen right there. But I will hand you
13 this, too.
14      Mr. Gwyn, this on the board right now is
15 Defendants' Exhibit 51. Do you remember signing this
16 document?
17 A.   No, I don't remember.
18 Q.   Would you take a look at the back page? Do you see
19 down at the bottom the name David Gwyn, on the back page?
20 A.   Do I see it?
21 Q.   Yes.
22 A.   Yes.
23 Q.   And is that your signature there?
24 A.   Yes.
25      MR. PARKINS:  Could we go to the front page, Mr.

651

1  White?
2  BY MR. PARKINS:
3  Q.   Did you -- strike that.
4       Mr. Gwyn, would you look at Paragraph 7 to this
5  affidavit. Do you see that?
6  A.   Yes.
7  Q.   It says there, "I then saw a Wilmington Police
8  Department officer walk over to the side of this police car
9  and fire shots into the body of the man slumped over the
10 steering wheel."
11      You don't remember that happening now, do you?
12 A.   I can't -- now, you say?
13 Q.   Do you remember that happening?
14 A.   Yes, I think I can remember it.
15 Q.   You can. And tell us what happened then when this
16 occurred.
17 A.   The man opened the door and pulled him out.
18 Q.   But did he fire a shot into the man's body?
19 A.   Into where?
20 Q.   Did he fire a shot into the driver?
21 A.   Well, like I said, they was shooting all the way up
22 and the one on the left fired the last shot.
23 Q.   Did he fire a shot, did he walk or run up to the side
24 of the car, open the door and fire a shot?
25 A.   No. This was before he opened the door.

B-046

652

1  Q.  Did he run up to the side of the car and fire a shot
2 before he opened the door? Do you remember that?
3  A.  I can't recall today.
4  Q.  All right. So you don't recall anybody walk over to
5 the side of the car and fire shots into the body of the man
6 who was slumped over the wheel. Am I correct, sir?
7  A.  Repeat your question again.
8  Q.  Do you recall a Wilmington police officer walking over
9 to the side of the car and firing shots into the body of the
10 man who was the driver?
11  A.  What I said was the one that was on the left there, I
12 was saying, he ran up the side and he fired the last shot.
13 That's what I said.
14  Q.  I know that. What I am trying to get at, did he run
15 up to the side of the car and shoot at the driver who was
16 stopped and slumped over the wheel?
17  A.  I will repeat it again, sir. He went to the side of
18 the car, he fired the last shot.
19  Q.  Was the car stopped and the man slumped over the wheel
20 when that happened?
21  A.  The car had stopped. I won't say that he was slumped
22 over the wheel. But the car had stopped.
23  Q.  Now you recall that happening. Is that correct, sir?
24  A.  I just said it.
25  Q.  I am sorry?

653

1  A.  I just said it.
2  Q.  Okay.
3      MR. PARKINS: Can we please queue up for Mr.
4 Gwyn and the jury Page 35, Line 9 on the video.
5      "Question: You then say in Paragraph 7, "I
6 then saw a Wilmington Police Department officer walk over to
7 the side of this police car and fire shots into the body of
8 the man slumped over the steering wheel.
9      "I think today you told me you don't remember
10 whether they fired from the back or the side. Is that
11 correct?
12      "Answer: And I said here that I saw --
13      "Question: Paragraph 7.
14      "Answer: I don't remember who written this.
15      "Question: You don't remember that? Do you
16 think that Paragraph 7 is not accurate?
17      "Answer: I don't know who written it.
18      "Question: Beg your pardon?
19      "Answer: I don't know who written that.
20      "Question: You don't remember that? I'm
21 sorry. Do you remember what you said -- strike that.
22      "Do you remember a police officer walking over
23 to the side of the car and firing shots into Mr. Smith's
24 body?
25      "Answer: Firing shots into his body?

654

1      "Question: Yes. From the side of the car.
2      "Answer: They was firing from behind the car
3 just like I said. And all the way up until the car stopped,
4 they just kept shooting.
5      "Question: I understand that. But do you
6 remember a police officer walking up to the side of the car
7 and" --
8      THE COURT: Cut that off. I want to see
9 counsel.
10      (The following took place at sidebar.)
11      THE COURT: I am having difficulty with you --
12 not you fairly showing that different stories have been
13 told. I am not sure that he has told a different story. He
14 said I don't remember who written that, is what he was
15 saying. He was saying, I don't remember writing that.
16      MR. PARKINS: I understand. But he will later
17 say in about another line or two, "I am cloudy on that."
18      THE COURT: On Paragraph 7.
19      MR. PARKINS: Yes. I am not surprised because
20 he didn't write Paragraph 7. Did you write this affidavit,
21 Ms. Sulton?
22      MS. SULTON: I did write the affidavit, Your
23 Honor. But I had the affidavit sent to Attorney Kester
24 Crosse's office.
25      THE COURT: So you wrote the affidavit.

655

1      MS. SULTON: I did write the affidavit,
2 subsequent to a conversation that I had with him about what
3 happened.
4      THE COURT: Subsequent to a conversation you had
5 with Mr. Gwyn.
6      MS. SULTON: Yes, sir.
7      THE COURT: Your affidavit is based on this
8 conversation you had with Mr. Gwyn.
9      MR. PARKINS: Yes, sir.
10      THE COURT: Go ahead.
11      (End of sidebar conference.)
12      MR. PARKINS: Mr. White will have to replay the
13 whole thing. I am sorry about that.
14      "Question: You then say in Paragraph 7, I then
15 saw a Wilmington Police Department officer walk over to the
16 side of this police car and fire shots into the body of the
17 man slumped over the steering wheel. I think today you told
18 me you don't remember whether they fired from the back or
19 the side. Is that correct?    B-047
20      "Answer: And I said here that I saw --
21      "Question: Paragraph 7.
22      "Answer: I don't know who written this.
23      "Question: You don't remember that? Do you
24 think that Paragraph 7 is not accurate?
25      "Answer: I don't know who written it.

656

1    "Question: Beg your pardon?

2    "Answer: I don't remember who written that.

3    "Question: You don't remember that? I'm

4  sorry. Do you remember what you said -- strike that.

5    "Do you remember a police officer walking over

6  to the side of the car and firing shots into Mr. Smith's

7  body?

8    "Answer: Firing shots into his body?

9    "Question: Yes. From the side of the car.

10    "Answer: They was firing from behind the car

11  just like I said. And all the way up until the car stopped,

12  they just kept shooting.

13    "Question: I understand that. But do you

14  remember a police officer walking up to the side of the car

15  and firing shots into Mr. Smith's body?

16    "Answer: Now, repeat your question one more

17  time. You say --

18    "Question: Do you remember a police officer

19  walking up to the side of the police car and firing shots

20  into Mr. Smith's body?

21    "Answer: I didn't see none of them walking.

22  They was running.

23    "Question: Did you see them run up to the side

24  of the police car and fire shots into Mr. Smith's body?

25    "Answer: I'm cloudy on that."

657

1  BY MR. PARKINS:

2  Q.    Mr. Gwyn, did you also -- were you interviewed by the

3  Wilmington Police on the night of September 13, 2003?

4  A.    Some people came to my house. But I don't know who

5  they was.

6  Q.    Did you tell anyone that night that you saw police

7  fire five or six shots into the back of the car?

8  A.    I can't recall.

9  Q.    If police officers were to come in and testify that

10  you said that, would you disagree with them?

11  A.    No. I am not going to disagree with something, no.

12      MR. PARKINS: Nothing further, Your Honor.

13      THE COURT: All right. Redirect, Ms. Sulton.

14      MS. SULTON: Yes, Your Honor. Just briefly.

15      REDIRECT EXAMINATION

16  BY MS. SULTON:

17  Q.    Mr. Gwyn, do you still have your deposition in front

18  of you?

19  A.    Yes.

20  Q.    Do you recall during the deposition that there

21  were -- after Mr. Parkins finished talking with you, that I

22  talked with you at that same deposition? Correct?

23  A.    Yes, ma'am.

24  Q.    And do you remember me specifically asking you

25  questions after Mr. Parkins asked you about the affidavit

658

1  you had signed? Do you remember that?

2  A.    Yes, ma'am.

3  Q.    And do you remember that I asked you whether or not

4  Mr. Smith was slumped over the steering wheel at the time

5  that the car was stopped and you saw an officer shoot Mr.

6  Smith? Do you remember me asking you that at the

7  deposition?

8  A.    I think I do.

9  Q.    Do you remember what you told me at that deposition,

10  under oath, in Mr. Parkins' office?

11  A.    Do I remember?

12  Q.    Yes. Do you remember now what you said?

13      Let me just put this in context. I am going to

14  go back to the date of the deposition. The deposition was

15  August 24th of 2005, about a year and a half ago. Do you

16  remember what you said a year and a half ago?

17  A.    Sometimes there are some things I don't. I can't

18  remember everything I said.

19  Q.    Now, when you were taking this deposition, did anyone

20  ask you whether or not you were being treated for a serious

21  medical problem?

22  A.    Did anyone ask me that?

23  Q.    Yes.

24  A.    I can't recall.

25  Q.    You were just then recovering from having a heart

659

1  attack. Isn't that correct?

2  A.    Yes. Yes, ma'am.

3  Q.    And what kind of heart surgery had you had shortly

4  before this deposition was taken?

5  A.    What kind?

6  Q.    Yes. What kind of heart problem did you have?

7  A.    Oh, I had three stents.

8  Q.    And do you recall whether or not you were still taking

9  medications at the time that you gave this deposition for

10  that heart surgery that you had?

11  A.    Yes, ma'am. To the best of my knowledge, yes, ma'am.

12  Q.    Did anyone ask you whether or not you were confused o

13  affected in any way by the medication that you were taking?

14  A.    Not that I can recall.

15  Q.    Let me ask the question this way, Mr. Gwyn: As best

16  you can recall as you sit here today, did you see at any

17  time before the car stopped Mr. Smith slumped over, whether

18  it's over to the side or over the steering wheel, did you

19  see Mr. Smith slumped in any way prior to the point at which

20  that car came to a stop? I don't want you to guess. I want

21  your best recollection today.

22  A.    You mean as it was going up Harrison Street?

23  Q.    Right. As it was coming around that corner from Fifth

24  going up Harrison Street, and you saw officers firing, was

25  there any point after that that you saw Mr. Smith slumped

B-048

1 vehicles or sirens?

2 A.   Yes.  I was looking towards Seventh Street and I saw

3 these two police cars come down Harrison Street extremely

4 fast.  And I jumped up to go see, you know, where they were

5 going.

6 Q.   At that time had you heard any shots fired?

7 A.   No, I didn't hear any shots fired, no.

8 Q.   Before you saw those two cars had you heard any

9 sirens?

10 A.   I am sorry?

11 Q.   Before you saw those two police cars, had you heard

12 any police sirens?

13 A.   No.

14 Q.   Then what did you see those cars do?

15 A.   I went to the corner to see where the cops were going

16 as they come down Sixth Street.  And they kind of like

17 leaped over the hill.  Harrison Street is on a hill.  And

18 they come down and kind of, the cars kind of leaped.  And I

19 looked.  And then I saw another police car that was stopped

20 down Harrison Street.  But then --

21 Q.   When you say down Harrison Street, are you talking

22 about in the 500 block of Harrison Street?

23 A.   Yes.  In the 500 block, yes, I am sorry.  But it was

24 nearer to the corner of Fifth Street, rather than closer to

25 the Sixth Street corner.

---

1 Q.   Okay.  Then what did you see?

2 A.   I saw two policemen that would have been on the

3 south -- probably the south -- southeast corner, and another

4 policeman at the southeast corner.  They were on both sides

5 of the street.  One was on one side of the street, but in

6 the street.

7 Q.   Were they in uniform or were they in plain clothes?

8 A.   They were in uniform.

9 Q.   Okay.  Were the police cars located in the 500 block

10 of Harrison?

11 A.   They were behind the police car, running towards the

12 police car that had stopped.  They were on the corner

13 nearest Fifth Street.  The police car that was stopped was

14 running the wrong way, headed in the wrong direction up the

15 hill on Harrison Street.  It may have been about four houses

16 up the block from where they were.  They was about four,

17 maybe five houses behind it when I first saw.

18 Q.   Then what did you see?

19 A.   I saw them running towards it.  That's what kind of

20 struck me funny, because I couldn't figure out why, you

21 know, they were shooting at the police car.

22 Q.   At the time that you initially saw the officers

23 shooting, was the police car stopped?

24 A.   Yes.

25 Q.   And then what did you see?

---

1 they were shooting, and then they kind of like, two

2 went on the passenger side, and one was on the driver's

3 side.  They was just shooting into the car.

4 Q.   Were all of the officers shooting in uniform?

5 A.   Yes.

6 Q.   Then what did you see?

7 A.   After they kind of like -- after it kind of like

8 settled down, I don't know what he did.  One officer kind of

9 like reached inside, and then he kind of like pulled the guy

10 out on the ground.  And then they was, you know,

11 high-fiving, like jubilation, laughing and grinning, you

12 know.  And I was standing there, I was just -- it looked

13 like a movie, you know.  Like taking -- because I couldn't

14 imagine them shooting at a police car and then after

15 shooting at the police car pulling somebody, you know, out

16 on the ground.

17 Q.   At this time where were your grandchildren?

18 A.   They were kind of like around the house -- I couldn't

19 keep them back, but every time I saw one of them I chased

20 them back behind the front of the house, out of the way of

21 the shots.

22       But now the shooting had stopped.  And

23 everybody, all of them were out there.  They were looking at

24 the man in the street.  They wanted to know why he was in

25 the street.

---

1 Q.   At the time that you heard shots being fired, did you

2 see other people on the sidewalks or on their porches in the

3 500 block of Harrison Street?

4 A.   Yes.  On both sides of the street.

5 Q.   About how many neighborhood residents or other

6 civilians did you see?

7 A.   Listen, there was a mob of kids.  There was parents

8 out there.  There was everybody, you know, like it normally

9 is in the summertime.

10 Q.   Do you recall how many other police cars you may have

11 seen?

12 A.   I only saw up to then three.  The one that they were

13 shooting at, the two that come down the hill.

14 Q.   What two that came down the hill?

15 A.   I saw coming down the street that led me to follow it

16 to the corner.

17 Q.   So those cars were coming from Seventh Street down

18 Harrison Street?

19 A.   They was headed in a southerly direction down Harriso

20 Street.  Harrison Street runs south.

21 Q.   Did they stop at the intersection of Sixth and

22 Harrison?                    **B-049**

23 A.   No.  They stopped down the hill.

24 Q.   When you say down the hill, to what are you referring?

25 A.   Between Sixth and Fifth.

1  Q.    Okay. Thank you. Nothing further.

2         THE COURT: Mr. Parkins, you may cross-examine.

3              CROSS-EXAMINATION

4  BY MR. PARKINS:

5  Q.    Reverend Thompson, when you saw the -- you went out to

6  look down Harrison Street for the first time --

7  A.    What's that, now?

8  Q.    I am sorry, Reverend Thompson.

9  Q.    You said I went out. Is that what you are saying?

10  Q.    You were sitting on your step?

11  A.    Yes.

12  Q.    And you saw these police cars coming down Harrison

13  Street. Is that correct?

14  A.    Yes.

15  Q.    And you went around the corner to see what --

16  A.    No, I didn't go around. I just went to the corner.

17  Q.    And at that time you saw or heard some shooting?

18  A.    I looked down the street and saw it, yes.

19  Q.    And at that time you gathered or herded your

20  grandchildren back away from the corner?

21  A.    Not immediately, because I was kind of like shocked,

22  and then, you know, when I realized, then I moved them back,

23  yes.

24  Q.    After you safely herded them away from the corner, you

25  went back out around the corner?

1  Q.    How close did the police cars coming down

2  Harrison Street get to the police car that was being shot

3  at?

4  A.    In what, feet?

5  Q.    Carlengths: Feet, carlengths. Whatever you would

6  like?

7  A.    I couldn't say. Maybe a carlength.

8  Q.    So the police cars coming down Harrison Street were a

9  carlength in front of the police car that was being shot at.

10  Is that right?

11  A.    I believe so, yes.

12  Q.    And the police were shooting at this police car with

13  the other police car just a carlength away?

14  A.    I don't remember. When I was looking at it, I was

15  concentrating on the shooting. Wherever the police cars

16  went -- I believe that one may have went alongside or

17  towards the corner. I don't remember where the -- I

18  remember where one -- because he was on the same side of th

19  street as the parked police car. I don't know where the

20  other one was.

21  Q.    Reverend, I am going to hand you your deposition

22  transcript.

23         MR. PARKINS: May I approach, Your Honor?

24         THE COURT: Yes, you may.

25  BY MR. PARKINS:

1  A.    Yeah. We are talking about a matter of maybe six feet

2  from the corner to the end of the house.

3  Q.    After you herded them to safety, you went back out and

4  watched the rest of the gunfire?

5  A.    I was on the corner. The sidewalk, I moved them from

6  the sidewalk to the front of the house on Sixth Street, yes.

7  Q.    So you moved them back there and you feel they are

8  safe?

9  A.    Yes.

10  Q.    Then you turned around and went back to the corner --

11  A.    No, I stood right there on the corner, because, I

12  could see from where I had moved the kids beyond, from the

13  corner house, I was right there at the corner house.

14  Q.    You understood that by doing that you were putting

15  yourself at risk?

16  A.    Yes.

17  Q.    And you did that because you were curious about what

18  was happening down the street?

19  A.    I was amazed.

20  Q.    You were curious?

21  A.    Yeah.

22  Q.    Do you recall, we had a deposition together? Right?

23  A.    Yes.

24  Q.    And I want to focus for just a second, before we begin

25  that. You drew for -- strike that. I am sorry.

1  Q.    I have turned it to Page 14. I am going to read the

2  questions and answers that were asked there, and ask you

3  whether that is an accurate transcription of what you said.

4         I am going to begin at Line 25, which is at the

5  very bottom. Do you have it in front of you? Sir?

6  A.    I am sorry.

7  Q.    Do you have it so you can read along with me?

8  A.    Yes, I do.

9  Q.    The question is: "How far away from the police cars

10  were they?"

11  A.    Who are we talking about, they?

12  Q.    The police cars coming down Harrison Street. If you

13  would like, we will back up a little bit further.

14  A.    It says here "How far away from the police car were

15  they?

16         You know, what do you mean were they? Were they

17  who?

18  Q.    The police cars that came down Harrison Street.

19  A.    All right. You are asking me how far away from the

20  car that was stopped?

21  Q.    Reverend Thompson, let me tell you what I am trying to

22  do here.                    B-050

23  A.    I am only reading what you have here. I don't

24  understand.

25  Q.    What I would like to do is, I am going to read your

672

1  deposition, the questions that were asked, and read your
2  answers.
3  A.    I want to understand what you are asking.
4        THE COURT:  Reverend, he can't take both of you
5  at the same time. So you have to wait until Mr. Parkins
6  finishes speaking.
7        THE WITNESS: I am sorry.
8  BY MR. PARKINS:
9  Q.    We begin with Page 14. I am going to read, Reverend,
10  and you can read along:
11       "How far away from the police cars were they?"
12     The answer was:
13       "I couldn't give you the exact -- I don't know
14  how far they were. It was such pandemonium, I don't know."
15  A.    That's correct.
16  Q.    The next is, "Was it more than a carlength?"
17     And your answer is:
18     "I am sure it was."
19     The next question:
20       "How many carlengths?"
21     And then you said, "Maybe a half a carlength or
22  something."
23       "Half a carlength away."
24     And your answer was, "Yes.
25       "They were pretty close to the police car that

673

1  the police were shooting at?"
2        And your answer was: "Yes."
3        The next question is: "I want to make sure I
4  understand this. When you came around the second time, you
5  saw the two police cars that you had previously seen were
6  about a half a carlength in front of the other police car.
7  Am I right?"
8        Your answer was: Yes."
9        Then I asked: "And the police officers that you
10  saw were shooting at the police car that had stopped."
11       Your answer: Are you asking me about the
12  police car, the police officer that was in the rear, or the
13  ones that I saw on the corner going towards the car?"
14       My next question was, "the ones on the corner
15  that were still shooting at the police car" -- and you said,
16  "Yes" -- "when it stopped. And the other two police cars
17  were about a half a carlength away."
18       And you said, "Somewhere alongside of it,
19  because, listen, I did not pay any attention to where the
20  police cars were. I was more interested in why they were
21  shooting at a police car."
22       Was it your recollection when you gave your
23  deposition that the two police cars you saw driving down
24  Harrison Street were very close to the police car that was
25  being shot at?

674

1  A.    What I was trying to do -- I was not counting in feet
2  or carlengths. There was so much pandemonium going on, I am
3  giving you what I believe to have been the distance between.
4  I could not be exact. I did not have a tape measure to
5  measure it. I was just looking down the hill. With that
6  type of pandemonium going on, if they were a half a
7  carlength -- I know that they did not pass the police car.
8  Q.    You understood at the time of your deposition your
9  questions and answers were under oath. And your best
10  estimate was a half a carlength. Is that right?
11  A.    I was estimating that they were not on top of the car.
12  They was away from the other car, yes.
13  Q.    Now, that night, after this event, there was lots of
14  police officers around. Is that correct?
15  A.    Around --
16  Q.    Around the scene.
17  A.    There was a lot of police officers down in that area.
18  We weren't allowed to go down the hill.
19  Q.    And there were police officers up at Sixth and
20  Harrison controlling traffic. Is that right?
21  A.    There was one officer that I saw.
22  Q.    And there was a police officer who you believe her
23  first name is Heather?
24  A.    I thought it was Heather, yes.
25  Q.    She happened to be an individual who was waiting

675

1  outside of court on Monday, I believe, when you were first
2  here?
3  A.    Heather was outside, yes, sir.
4  Q.    And you recall having spoken to Heather that night,
5  September 13. Is that correct?
6  A.    Yes.
7  Q.    And you did not tell Heather about what you had seen
8  down the street?
9  A.    She was a police officer. Why would I have told her
10  that? No, I didn't. No. Heather was directing traffic and
11  keeping the people from going down Harrison Street in the
12  scene of what happened. She was so busy keeping the people
13  away. In fact, she had to make allowances for people that
14  lived in the 500 block to get to their house. Some she sent
15  around the corner because of the address closer to one
16  corner than the other. Also, she was telling people how to
17  drive their car.
18       There was not much time to be conversating.
19  Q.    Well, then --
20  A.    Then there was a lot of people that started --
21  Q.    Did you talk to any other police officer that night
22  and say, hey, listen, this is what I saw?
23  A.    No, I didn't. The only police officer -- because we
24  were not allowed to go in the area.
25  Q.    Well, the next day did you call the Police Department

676

1  and say, hey, you need to know what I saw?

2  A.    No, I didn't.

3  Q.    And, in fact, it was several months until you called

4  the police department, wasn't it?

5  A.    I was not aware of an investigation.  The police

6  officers didn't come as far as I am concerned and knock on

7  the door and ask us what did we see.  I found out that they

8  were taking depositions.  I called and got a Sergeant

9  Browne.  And he told me to come in and give a deposition.

10 Q.    It was several months after this event before you --

11 A.    I don't know.  It is not a thing that I want to

12 remember.  I don't know how long it was.

13 Q.    I am going to ask you to take a look at your

14 deposition again, Page 22.  Do you have 22 in front of you,

15 sir?

16 A.    Yes, I do.

17 Q.    Would you look about Line 6.  I am going to read a few

18 lines here for you.  Do you have it in front of you now?

19 You can read along.

20        "Question:  Did you tell any police officer

21 what you had seen?

22        "Answer:  No.

23        "Question:  Why not?

24        "Answer:  The only police officer I told what I

25 seen was Sergeant Browne at the time, or Lieutenant Browne.

677

1  He is the only one.

2        "Question:  When did you tell Lieutenant Browne

3  or Sergeant Browne?

4        "Answer:  Because I called, they were asking

5  anybody who had seen to come in and give a deposition.

6        "Question:  When did that take place?

7        "Answer:  I don't know.  Probably months after

8  the incident."

9        Was that your questions and answers asked at

10 your deposition?

11 A.    Yes.

12        THE COURT:  We will take our morning break at

13 this time.

14        Let me see counsel briefly.

15        (Jury sleeves courtroom at 11:30 a.m.)

16        (The following took place at sidebar.)

17        THE COURT:  Mr. Parkins, what was the

18 inconsistency?

19        MR. PARKINS:  He said he didn't remember how

20 long it was, he said he wasn't paying attention to it.  He

21 didn't know how long it was.  I was pointing out, he said

22 months after the incident --

23        THE COURT:  You are using that to refresh his

24 recollection?

25        MR. PARKINS:  Yes.

678

1        MS. SULTON:  Your Honor, does that open the door

2  for me to talk about this report, where he did go in and

3  tell them exactly what he is on the stand about seeing

4  people shoot into the car?

5        THE COURT:  You didn't have to wait for that to

6  redirect him in this regard.  He has been attacked, he has

7  been impeached to some degree.

8        MR. PARKINS:  I am not saying it is a totally

9  inconsistent story.  I am saying he waited four months.

10        THE COURT:  I understand the import of your

11 question.  I understand the import of your arguments, too.

12 They are arguments that you will have to make to the jury.

13 That is why we have advocates.

14        (End of sidebar conference.)

15        (Recess taken.)

16        THE COURT:  Bring in the jury, Ms. Walker.

17        (Jury enters courtroom at 11:47 a.m.)

18        THE COURT:  You may continue, Mr. Parkins.

19        MR. PARKINS:  Thank you, Your Honor.

20 BY MR. PARKINS:

21 Q.    Reverend Thompson, a few moments ago, I think you sai

22 you did not tell Heather, who was the officer on the scene

23 that night, about what had happened because she was too bus

24 to talk.  Is that correct?

25 A.    Yes.

679

1  Q.    But, in fact, you told us on Monday night in your

2  deposition that Heather was talking to another gentleman --

3  A.    Yes.  He was a police applicant.

4  Q.    So Heather wasn't too busy to talk at that time?

5  A.    He was walking back and forth across the street.  She

6  knew him.

7  Q.    Let's focus on your deposition a little bit, sir.

8        Do you recall during the course of your

9  deposition that I asked you to make a chart showing, or a

10 drawing, showing me where the police officers were as you

11 recall them shooting at the police car?

12 A.    Yes.

13        MR. PARKINS:  Mr. White, would you help me?  Put

14 this on the Elmo.

15 BY MR. PARKINS:

16 Q.    Now, the drawing that you did, the original, was on a

17 yellow legal tablet like this?

18 A.    Yes.

19 Q.    And as I recall, you told us where the police officers

20 were, and I asked you to put a 1 and a 2 and a 3 where they

21 were standing.  Is that correct?

22 A.    Yes.

23 Q.    And that was your best recollection as to where they

24 were?

25 A.    I saw them from the corner to there.

B-052

682

1   Q.   Yes. And then, the 3 is on the driver's side of the
2   car. Is that right?
3   A.   Yes.
4   Q.   And during the course of the deposition, we took a
5   break, didn't we?
6   A.   No. You just got up -- you got up and walked out.
7   Q.   So it was taking a break?
8   A.   Well, if that's what you calling it, yes.
9   Q.   And at that time, you were in the room with Ms.
10  Sulton. Is that right?
11  A.   Yes, I was.
12  Q.   And Ms. Sulton proceeded to draw these X's on the
13  drawing up there --
14  A.   No, she didn't do it. No. She drew the 2 at the
15  bottom.
16  Q.   She drew those X's. And she was telling you where the
17  police officers were, wasn't she?
18  A.   No, she didn't.
19  Q.   And did you talk -- you spoke with Ms. Sulton during
20  the break about the fact -- about the case. Is that right?
21  A.   No. What she said is she said that if there was
22  police officers here and here, why didn't they see all the
23  kids in the street?
24  Q.   Did you talk to Ms. Sulton about the facts of this
25  case during the break?

681

1   A.   No.
2   Q.   And did Ms. Sulton put those X's on where they don't
3   have numbers?
4   A.   She wanted to know how could two police officers --
5   there was three -- could have not seen the people in the
6   street from where they were.
7   Q.   Reverend, my question was a little bit simpler. And I
8   am sorry. Did she put the X's on the paper?
9   A.   Yes, she did.
10       MR. PARKINS: Nothing further.
11       THE COURT: Redirect.
12       MS. SULTON: Just briefly, Your Honor.
13           REDIRECT EXAMINATION
14  BY MS. SULTON:
15  Q.   I think on cross you indicated that you recall having
16  a conversation with a Sergeant Browne at the police station?
17  A.   Yes.
18  Q.   And did you tell him then that you observed three to
19  four uniformed officers firing their weapons at the police
20  vehicle and at one point observed officers standing on both
21  sides of the vehicle firing into it after it was stopped?
22  A.   They were the same officers. Yes.
23  Q.   Did you make that statement to Sergeant Browne?
24  A.   Yes.
25  Q.   And after you made that statement to Sergeant Browne,

683

1   what then occurred?
2   A.   Sergeant Browne wrote what he wanted, and he didn't
3   let me read or sign it. He just told me that was it.
4        MS. SULTON: Nothing further. Thank you.
5        THE COURT: All right. You are excused,
6   Reverend.
7        THE WITNESS: Thank you.
8        (Witness excused.)
9        THE COURT: Next witness.
10       MS. SULTON: Yes. Thomas Dore Smith.
11       ... THOMAS DORE SMITH, having been duly sworn a
12  a witness, was examined and testified as follows ...
13           DIRECT EXAMINATION
14  BY MS. SULTON:
15  Q.   You are the twin brother of Harry Smith. Isn't that
16  correct?
17  A.   Yes, I am.
18  Q.   What instrument, musical instrument did he play?
19  A.   Hear played the trombone.
20  Q.   What do you play?
21  A.   I play the saxophone.
22  Q.   So do people get you mixed up or did people get you
23  mixed up?
24  A.   Yes, very often.
25  Q.   I want to ask you very quickly about a company named

683

1   main. Did you work for am mean or did your brother work for
2   am mean?
3   A.   Both of us worked for Amin, Amin Construction. Not
4   Amin Plumbing & Construction.
5   Q.   Is it spelled the same, A-m-i-n?
6   A.   Yes, the same. They are brothers.
7   Q.   But they are different companies?
8   A.   Different companies.
9   Q.   And did you and your brother work for that company at
10  the same time?
11  A.   Yes, we did.
12  Q.   And do you recall when you worked for that company?
13  A.   We worked for the company in the summers, while we
14  were in school.
15  Q.   Are you in school now?
16  A.   Yes, I am.
17  Q.   And what year are you in college now?
18  A.   I am currently in my second year.
19  Q.   And what are you majoring in?
20  A.   Architectural engineering.          B-053
21  Q.   Now --
22       THE COURT: Where are you in school?
23       THE WITNESS: Delaware Tech.
24  BY MS. SULTON:
25  Q.   Is your mother college-educated?

686

1    A.    Yes, she is.

2    Q.    And what is her degree in?

3    A.    My mother's degree is in communications, with a minor

4    in speech pathology.

5    Q.    Is your father college-educated?

6    A.    Yes, he is.

7    Q.    What is his degree in?

8    A.    In business administration.

9    Q.    And at the time of your brother's death, was he

10   enrolled in or was he -- had he applied to enroll and been

11   accepted for enrollment in any school, to your knowledge?

12   A.    Yes.  It was Wilmington College.

13   Q.    And when was he to begin his studies there?

14   A.    He wanted to begin in the fall.

15   Q.    Of 2003?

16   A.    Yes.

17   Q.    I wanted to talk with you a little bit about his

18   musical career.  You sat through the testimony of Dr.

19   Boswell, and you heard him talk about how he was doing some

20   projection, assuming that your brother pursued a musical

21   career.

22          When did your brother begin playing a musical

23   instrument?

24   A.    We started playing in the fourth grade at Henry B.

25   DuPont Middle School.

685

1    Q.    And did you continue playing musical instruments

2    through all of your middle-school years?

3    A.    Yes, we did.

4    Q.    And did you play musical instruments in high school?

5    A.    Yes, we did.

6    Q.    How and what types of -- let me ask the question first

7    about whether you and your brother played musical

8    instruments together in the same unit or the same band or

9    the same orchestra?

10   A.    Yes, in the same marching band.

11   Q.    And you played in the high school marching band

12   together?

13   A.    Correct.

14   Q.    And what kinds of venues were you playing in with your

15   high school band?

16   A.    We played in all of the local Thanksgiving -- we

17   played in the Thanksgiving Parade in New York City, Macy's

18   Parade every year for four years.  We also traveled to

19   England, and to Ireland and played for the Saint Patrick's

20   Day Parade.  We also -- excuse me, Ireland.  In England we

21   played for Queen Elizabeth at half time of a soccer game.

22   And we've been to Canada twice.  We placed in a Rose Bowl

23   Parade.  And we played in the Tampa Bay Sugar Bowl.

24          That's all I can recall at this time.

25   Q.    And that was all in high school?

687

1    A.    Yes.  And we traveled at least to two or three venues

2    every year in high school.

3    Q.    Subsequent to high school, did your brother continue

4    to --

5          THE COURT:  Is that Brandywine?

6          THE WITNESS:  Alexis I. DuPont High School.

7          THE COURT:  Excuse me, I am very sorry about

8    that.

9    BY MS. SULTON:

10   Q.    Subsequent to high school, did your brother continue

11   his interest in music?

12   A.    Yes, he did.

13   Q.    What types of musical areas was he interested in?  Was

14   it classical or jazz?  What formats was he interested in?

15   A.    Mainly, it was jazz.

16   Q.    Mainly jazz?

17   A.    Yes.

18   Q.    Can you tell us something about your brother's zest

19   for life, to give us a feeling for who he is?  We can see

20   who he is by looking at you.  But if you could tell us

21   something about him.  Tell the jury something about your

22   brother.

23   A.    Okay.  Me and Harry was twins.  I was the oldest by

24   eight minutes, and always tried to be -- take the leadership

25   role, but Harry always wanted to be the leader.  He always

687

1    held the family together.  Very charismatic.  Always joking.

2    And when it was time to be serious, he was very serious.

3          Harry was the cornerstone of the family, held

4    everybody together.

5    Q.    I would like to talk with you about, not about how it

6    impacts you, but how it impacted your parents.  And perhaps

7    if we could talk about -- if you could talk about the first

8    Thanksgiving and the first Christmas after his death in the

9    year 2003?

10   A.    I would say it was very difficult for my mother and

11   father the first Thanksgiving, looking across the table and

12   not seeing him there was very difficult.  Christmas morning,

13   waking up and not giving him a hug, and not giving or

14   receiving gifts was also very difficult.

15          Our birthday is a week after Christmas, January

16   4th.  And every birthday, we really don't give out gifts.

17   All we do is give each other a high-five and a hug.  And

18   that was very difficult for the whole family, mother and

19   father.

20   Q.    Have you seen any other impacts of your brother's

21   death on your parents?                      B-054

22   A.    It's been very difficult on my father.  He was, I

23   would say he had a closer relationship to Harry than I did.

24   My father had a stroke that left him with a disability.  And

25   I had to step up and make sure that my dad was okay.  I was

1  with him constantly, every day.

2  Q.    Your father is here with us this morning?

3  A.    Yes, he is.

4  Q.    Can you identify your dad for us?

5  A.    Yes. Black sweatshirt.

6  Q.    And because of his stroke, does he have any impairment

7  of his speech?

8  A.    Yes, he has a speech impairment, and memory loss

9  sometimes.

10          MS. SULTON: I don't have any additional

11  questions, Your Honor. Thank you.

12          THE COURT: Mr. Parkins, Mr. Fineman?

13          MR. FINEMAN: Your Honor, we have no questions

14  of this witness.

15          THE COURT: Thank you, Mr. Smith. You may step

16  down.

17          (Witness excused.)

18          MS. SULTON: At this time I cal Roslyn Smith.

19          THE COURT: All right.

20          ROSLYN SMITH, having been duly sworn as a

21  witness, was examined and testified as follows ...

22          DIRECT EXAMINATION

23  BY MS. SULTON:

24  Q.    Good afternoon, Mrs. Smith. We talked about your

25  education through your son. I wanted to ask you, how are

---

689

1  you currently employed?

2  A.    I am the Executive Director for Hockessin Community

3  Center.

4  Q.    And in your capacity as the Executive Director, what

5  do you do?

6  A.    I pretty much oversee the operation of the community

7  services program. I administer the budget. I write

8  proposals to fund the operation. I supervise employees.

9  And I also provide the service.

10  Q.    How did you learn about your son's death? How did you

11  first learn?

12  A.    I first learned over the television on Channel Six

13  News.

14          (Witness crying.)

15  Q.    No one from the Police Department called you?

16  A.    No.

17  Q.    Did they say your son's name on the television?

18  A.    When I saw the news, I knew that the police had shot

19  and killed my son and was far -- I mean it was a barrage of

20  bullets and fire -- just a barrage of bullets, I knew. And

21  that's when I learned it was Harry, because he had ran out

22  of the hospital.

23  Q.    And at any point prior to the time that you buried

24  your son, did any police department official contact you?

25  A.    No.

---

1  Q.    To provide you with any explanation about what

2  occurred?

3  A.    No.

4  Q.    To this day, has any police department official

5  contacted you to provide you with an explanation of what

6  occurred?

7  A.    No.

8  Q.    What did you ask me to do when you retained my firm?

9  A.    To seek justice, because I felt that there could have

10  been other means in which they could have captured Harry,

11  knowing that he went to the hospital. The police officer

12  who shot him first knew that something was mentally wrong,

13  because it is strange that a person would actually get into

14  a police car. I mean, that's strange. And to see him with

15  the arm band on is letting them know that something is wron

16  with this person.

17          And at that time, with the time lapse, the

18  police who shot him could have said he is escaped from the

19  hospital.

20          And I was instrumental in setting the whole

21  situation up, as far as calling the hospital, letting them

22  know the state that he was in. And the policemen are

23  located at the hospital. So I was told to give the hospital

24  a head's up, which I did, that he was on his way for the

25  second time, to be on alert.

---

691

1          And with all of the communication between the

2  hospital and the police, I mean, there was another way I

3  feel that this particular situation could have been handled

4  and Harry's life would have been spared.

5          And after finding out his nature or problem, I

6  feel as though he would not have even served a day in jail

7  because of his mental condition, had it been handled

8  differently.

9          MS. SULTON: Your Honor, may we have a quick

10  sidebar, please?

11          (The following took place at sidebar.)

12          MS. SULTON: She mentioned the hospital. I

13  didn't want to go into anything about the pending complaint

14  that we have with the hospital, that now it's being reviewed

15  by the Delaware Insurance Commissioner's Office.

16          THE COURT: I am not aware of any complaint.

17          MS. SULTON: I anticipate, because she mentioned

18  something about the hospital, that the defense will bring up

19  that pending matter before the Delaware Insurance

20  Commissioner's Office. We have asked for a medical review

21  panel.                              B-055

22          THE COURT: What does that have to do with this

23  case?

24          MR. PARKINS: She filed suit in Superior Court

25  against the hospital and blamed the hospital for what

692

1  occurred.
2          MS. SULTON: That matter is now pending in front
3  of the Insurance Commissioner. In Delaware they have a
4  medical review panel.
5          THE COURT: I don't need all that information,
6  Ms. Sulton. What is it that you want to tell me?
7          MS. SULTON: I want to keep out information
8  about the other suit, the other complaint that is being
9  handled in the Delaware State Court system and Delaware
10  Insurance Commissioner's Office.
11          THE COURT: Mr. Parkins, do you intend to
12  inquire into it?
13          MR. PARKINS: I didn't intend to inquire of this
14  with the witness, but I intended to introduce the complaint
15  that was filed.
16          MS. SULTON: I would object.
17          THE COURT: What relevance has that?
18          MR. PARKINS: Because she blamed the problem on
19  the hospital and said because of what the hospital did, her
20  son became a police problem.
21          THE COURT: No. I won't let that in. That's
22  not relevant to these proceedings.
23          But it would be helpful, Ms. Sulton, if you
24  would give this jury some context. She said she set the
25  whole thing up. I have no idea with regard to how this

693

1  young man got to the hospital, why he was there. This jury
2  is at sea at this point.
3          MS. SULTON: I am not doing that through this
4  witness.
5          THE COURT: I thought she was the one that set
6  the wheels in motion.
7          MS. SULTON: Actually, the best explanation from
8  that is the father on the videotape, because he cannot
9  testify due to his speech impediment. I am going to play
10  the full videotape that Mr. Parkins showed a snippet of
11  during his opening, because he tells the whole history.
12          THE COURT: The father.
13          MS. SULTON: Yes.
14          THE COURT: I was left with the impression the
15  father had a speaking impediment.
16          MS. SULTON: That is why I am going to show the
17  video.
18          (End of sidebar conference.)
19  BY MS. SULTON:
20  Q.    I asked your son about the first Thanksgiving and the
21  first Christmas and the impact that it's had on you and
22  Harry Smith, Jr. Could you share with the jury about how
23  you and Harry Smith, Jr. have been handling this matter
24  since your son's death in September of 2003?
25  A.    Basically, it's been very, very painful for me, for

694

1  the past -- well, ever since this happened. I mean, on a
2  daily basis, I am struggling to keep the faith. If it
3  hadn't been for the Lord, I would not be able to maintain
4  and actually manage an organization and do all that I have
5  to do with the nonprofit, keep it operating and provide the
6  services to others that I have done.
7          So I stay busy. And I would say prayers got me
8  closer to the Lord, as far as Harry.
9          Harry, he has been dealing with his physical
10  ailments. And I was in good health prior to Harry's death.
11  But since then I have been diagnosed with cancer. And I
12  also have heart conditions, where I also had to get stents
13  to open up clogged arteries in my heart.
14          I am also dealing with antidepressants to keep
15  me together mentally. During the time after work, I go
16  straight home and rest for the next day. And I take
17  sleeping medicine to get a good night's sleep. Then I get
18  up and function and do what I have to do on my job.
19          I leave it up to Harry to take care of his,
20  because we are divorced, and that was another problem that
21  Harry had, because he was close to the family, the
22  separation and divorce, and the change of lifestyle from
23  living very comfortable to having to live with me and
24  continue his education. And I am the sole provider for both
25  of them. That really put a damper on his mental state.

695

1          And it also, like I said, had an effect on both
2  myself and his father physically.
3          MS. SULTON: Thank you. I don't have any
4  additional questions of this witness, Your Honor.
5          MR. PARKINS: No cross-examination, Your Honor.
6          THE COURT: Thank you, Ms. Smith. You are
7  excused.
8          (Witness excused.)
9          MS. SULTON: At this time we will call Reverend
10  Doctor Moyer.
11          ... MAURICE JEFFERSON MOYER, having been duly
12          sworn as a witness, was examined and testified as
13          follows ...
14              DIRECT EXAMINATION
15  BY MS. SULTON:
16  Q.    Would you tell us what your occupation is, sir?
17  A.    I am a retired minister.
18  Q.    And how long were you active as a minister?
19  A.    Over 50 years.          B-056
20  Q.    All in this community?
21  A.    Well, I did have a student pastory when I was at
22  Lincoln University down in Oxford, Pennsylvania, and then
23  for a brief term in York, Pennsylvania. But the rest of it
24  was here in Delaware, because they called me from the
25  seminary to start a Presbyterian church. And my wife and I

698

1  did just that.
2  Q.    Now, you carry the title of Reverend Doctor. Can you
3  explain to us what that means?
4  A.    Well, I first started at Lincoln, with an AB degree,
5  Bachelor of Arts. And then going into the seminary was a
6  Bachelor of Divinity, and a Master of Divinity. I did
7  graduate work at Princeton Theological Seminary. And it was
8  at Lincoln that out of, I guess, some of my work, they
9  bestowed upon me the Doctor of Laws.
10 Q.    As an honorary Doctor?
11 A.    As an honorary degree.
12 Q.    And that was awarded during a commencement ceremony?
13 A.    Yes, it was. Back in the seventies.
14 Q.    Now, you were the pastor of a church here before you
15 retired in 2003. Correct?
16 A.    Oh, yes. I retired in 1998.
17 Q.    But in 2000 -- well, what did you do for this family
18 in September of 2003?
19 A.    Okay. There was a development called Dunleith Estates
20 that was built specifically for African Americans. And this
21 was back in the sixties. And I lived on Morehouse Drive.
22 And down the street from me were the Woodards, Mr. Raymond
23 Woodard, who was an educator and a principal, along with his
24 family. And that family consisted of Raymond Woodard, Jr.,
25 Roslyn Woodard, and we have in the back there her sister,

697

1  Linda.
2  Q.    So when you say Roslyn Woodard, you are talking about
3  Roslyn --
4  A.    Smith.
5  Q.    Who has testified?
6  A.    Yes. But she was just a child then.
7         But, anyway, we were quite close together as a
8  family. And we intermingled even with our two sons. It was
9  just a knit.
10        Consequently, when things would happen, both
11 joyful as well as sorrowful, it had an effect on both of us.
12 We were -- after the marriage of Roslyn with Harry, and the
13 sons were born in 1978, that same year I christened them,
14 and watched them with a great deal of delight as they grew
15 up.
16        You have heard Thomas speak about their
17 background and the fact that really they just created a song
18 of their own, so that when this death came, the song ended,
19 but the melody lingered on. And that melody, as the mother
20 stated, had some pain in it. And I say it had some pain
21 because, as Christians, we must rely upon the fact that
22 faith is the substance of things hoped for and the evidence
23 of things not seen.
24        She has mentioned to you, she has not seen
25 completely that time of inner piece, because each time we

699

1  recount, or even reminisce, especially at that funeral, it
2  was most difficult for me to cause the people to not grieve,
3  but to understand that his walk through this life had given
4  it a very significant meaning, and would continue to be as
5  they flash back in memory. And this is only founded on the
6  faith of a Christian.
7         So that, in a kind of light mood, there was a
8  family going on vacation, and the children were in the back.
9  And you know how restless children are. However, they
10 continued to poke the shoulders of their parents. And asked
11 the question, "Are we there yet?"
12        And that is what happens to persons that
13 encounter situations like this. They are not there yet. I
14 am not there yet. Because when you have a relationship that
15 is broken, especially in a violent and a tragic manner, it's
16 hard to cope. It's hard to understand why we must be
17 forgiving giving and forgetting.
18        They have to be real, if you are a Christian.
19        But, as I said before, it's difficult.
20        MS. SULTON: Thank you, Reverend Doctor Moyer.
21 We close
22        THE COURT: Mr. Fineman, any questions?
23        MR. FINEMAN: No questions, Your Honor.
24        THE COURT: Reverend Moyer, do me a favor and
25 share with the jury your age?

1  THE WITNESS: Eighty-eight.
2  THE COURT: Thank you, sir.
3  (Witness excused.)
4  THE WITNESS: God's been good.
5  MS. SULTON: We are done.
6  THE COURT: Does that mean plaintiff rests?
7  MS. SULTON: Yes.
8  THE COURT: Mr. Fineman, are you going to start?
9  MR. FINEMAN: Yes, Your Honor. Defendants would
10 call William Stevenson.
11 MR. PARKINS: May we see the Court at sidebar
12 for one moment?
13 THE COURT: Yes.
14 (The following took place at sidebar.)
15 MR. PARKINS: I want to make sure we are not
16 forgetting something here. You said you were going to play
17 the tape of Harry Smith, Jr.
18 MS. SULTON: Yes. I decided to do that, because
19 I can't top that.       B-057
20 MR. PARKINS: That's fine.
21 (End of sidebar conference.
22 ... WILLIAM STEVENSON, III, having been duly
23 sworn as a witness, was examined and testified as
24 follows ...
25        DIRECT EXAMINATION

1  BY MR. FINEMAN:

2  Q.    Good afternoon, sir.

3        Do you recall the events of September 13, 2003?

4  A.    Yes, I did.

5  Q.    What were you doing that day?

6  A.    That day I was with my family on the back deck of our

7  home. And I was waiting to attend a University of Delaware

8  football game. It had just stopped raining.

9  Q.    Did you go to the game?

10  A.    No, I didn't. In the interim, not knowing how hard

11  the rain was going to be and that the game was going to be

12  on TV that night, versus Richmond, my college roommate

13  called me up and suggested, instead of going to the game,

14  being in the rain, that we go watch the game at the

15  Washington Street Ale House.

16  Q.    Is that what you did?

17  A.    That's what I did, yes, sir.

18  Q.    How did you get to the Washington Street Ale House?

19  A.    I left my home probably about a half an hour before

20  game time, and I drove to the Washington Street Ale House to

21  meet my friend, who was standing in front when I pulled up.

22  Q.    Where did you work park?

23  A.    I parked directly in front of the Washington Street

24  Ale House.

25  Q.    What did you do next?

1  A.    I got out of my car, said hi to my friend, and we

2  walked in the door. And there were two seats right in front

3  of the big TV. So we sat down, and I ordered a beer.

4  Q.    Did you start drinking that beer?

5  A.    No. While I was drinking the beer, the bartender,

6  Russell, said to me, Bill, is that your Mercedes Benz out

7  front? I said, Yes, it is.

8  Q.    What did you do next?

9  A.    He told me that there was construction and that the

10  traffic patterns had changed and they had removed the

11  meters. And I had noticed that the meters had been removed.

12  I just didn't know you weren't allowed to park there. He

13  said that I would get a ticket if I stayed there. And he

14  suggested I move my car. And that's what I did.

15  Q.    Did you go directly to your car?

16  A.    Yes, I did. I walked around the front of my car. I

17  opened the door, got into the car and started it.

18  Q.    Then what happened?

19  A.    At that point, right then, I don't know exactly what

20  caught my attention, but I saw a man across the street, and

21  he was walking. And I saw that he had blood on his T-shirt.

22  And I said, something is wrong here, and I opened my car

23  door.

24  Q.    Then what happened?

25  A.    I was standing between my car door looking at the man,

1  and then I don't know whether a car went by, because this

2  happened very quickly, I was standing there, just about

3  ready to step out to see if he needed help. Then all of a

4  sudden he started running at me.

5  Q.    What did you do?

6  A.    At first I didn't know what to do, because I didn't

7  know what had happened. And all of a sudden I realized tha

8  he was raising his hand and had a weapon in his hand. And I

9  knew I was in trouble.

10  Q.    Could you see what was in his hand?

11  A.    At that point, no. He screamed something, and I have

12  thought about it for these last three years exactly what he

13  said. And I don't know what I am exactly supposed to say

14  here, he said either Get the F out of my way or Get out of

15  my F'g away. Something along those lines he screamed. He

16  was about ten feet from me.

17  Q.    How did that make you feel?

18  A.    It scared me. But I knew I had to do something. I

19  realized I was in a pretty bad situation at that point right

20  now. Then I realized that maybe he wanted my car. By that

21  time he was right on me.

22  Q.    What did you do?

23  A.    I sort of stepped forward by the door to protect

24  myself with the door. I took my hand, and was more

25  concerned about what was in his hand while he was yelling t

1  get away from my car. I pushed him back. And at that point

2  right then, he sort of like hit the car door and the thing

3  came down and hit right over my shoulder. I couldn't

4  believe it missed me. And he lost his balance very

5  slightly. I pushed him to the left just enough -- all I

6  knew was I had to get back into my car. And I was just

7  trying to defend myself. I knew I had to protect myself.

8  Q.    What did you do next?

9  A.    When he slipped to the sideways, I tried to hold his

10  hand back. And all I wanted to do was get back into my car.

11  I am a big guy, as he is. He was a big guy. He was not as

12  tall as I am, but he was just a big gentleman. He sort of

13  had me pinned between the door and the car. I somehow go

14  back into my car. I don't even know until this day how I

15  got back in the car. And I truly don't know whether I

16  pushed the lock down, because he was trying to pull the door

17  open with his elbow. He had his hand sort of caught between

18  the door and the car. And all I know is, somehow, thank

19  God, I got the car door closed.

20  Q.    Were you scared?                    **B-058**

21  A.    I was scared to death. I thought I was going to die.

22  I said this is not the way I want my life to end.

23  Q.    What did you do?

24  A.    At that point right then, it's like a blur. I don't

25  know whether I put the car into gear or whether I got the

1  lock down. All I know is, I had my door -- I am in the
2  Senior Olympics. I throw the shotput. So I am strong.
3       Somehow I managed to get the door closed. I
4  literally was pulling for like a half a second. It looked
5  like he was going to step away. And then all of a sudden, I
6  realized I was in more trouble because he literally crashed
7  my window with his hand, with the weapon in his hand, and I
8  said, oh, my God, he is going to shatter this window and I
9  am stuck in my car.
10 Q.    What did you do after that?
11 A.    I looked around, I don't know whether, as I said, I
12 don't know whether I actually put it in gear or what
13 happened. But then out of the corner of my eye down the
14 street, I saw a police car pulling up to the light. And I
15 said, oh, my God, thank God.
16 Q.    Did you signal for the police car?
17 A.    No. There was nothing I could do. I actually, what I
18 decided to do was, I couldn't understand why they didn't see
19 what was going on, although it was quite a distance. It was
20 like 150 feet, maybe, I don't know. I don't know in yards,
21 50 yards, a hundred yards, whatever the distance is between
22 that light. I said to myself, if I pull out really quick, I
23 am going to run over him. And I didn't want that to happen
24 here. Then he crashed again against my car. And I said the
25 window, it was the side window, was going to break. He was

705

1  sort of leaning on my car and trying to bust my window. And
2  there was no place I could go. It is a Mercedes, there is
3  not a whole lot of room and there is bucket seats. I could
4  not even get out the other side of the car. I was trapped.
5       I literally started to pull forward slowly on an
6  angle down Washington Street. I don't know exactly when the
7  police officers saw me. But I am just so thankful that
8  they...
9       (Witness crying.)
10      THE WITNESS: I am really sorry. I didn't mean
11 to do this.
12      THE COURT: There is tissue right there.
13      THE WITNESS: I don't understand why they didn't
14 see me, what was going on at first. And then I started to
15 go down the hill. And I thought he would go off. I thought
16 something would happen. But he sort of had my door handle,
17 and he was smashing my window. And I said, oh, God, this
18 glass is going to break and then I am dead or hurt or
19 something. I didn't understand it.
20      I don't know exactly how long it happened when I
21 went down the hill, but he ran along the side of the car
22 with me. I couldn't take off. I think if the glass had
23 broken I might have taken off. I don't remember. And all
24 of a sudden, I heard (indicating by sound), from the police
25 car lights, the police car, it was like a siren type of

707

1  thing. And they ran through the light and they pulled up
2  literally next to me, like they were where you are and I am
3  here.
4       And very loudly, and I don't know whether they
5  were on a megaphone, I heard, "Drop the weapon. Drop the
6  weapon. Move away from the car."
7       They were shouting commands. And I said, he hit
8  the car again. And I said, oh, my God.
9  Q.    Did he drop the weapon?
10 A.    No, he did not.
11 Q.    What did he do?
12 A.    He hit the windshield again. And by this time I could
13 see the police officer jump out of the car, and they were
14 literally screaming at him to drop the weapon and move away
15 from the car.
16 Q.    After the police officers got out of the car and
17 screamed at him again, did he drop the weapon?
18 A.    No, he didn't. He turned, he sort of swung around.
19 They were literally, the one officer was standing right next
20 to him, the other officer was sort of standing behind them.
21 They were trying to get between him and me, and the car.
22 And I didn't understand, all of a sudden he swung around and
23 swung the weapon -- I am sorry, swung the weapon at them.
24 Q.    Were their guns drawn at the time?
25 A.    Yes, the one officer. I couldn't see the other

707

1  officer because he was sort of behind the gentleman. Their
2  guns were drawn. They were just yelling, "Get away from the
3  car. Get away from the car."
4       And then he turned around and sort of swung the
5  weapon at them and they moved sideways.
6  Q.    What happened next?
7  A.    The one officer got between him and the car. And the
8  other, the gentleman was like trying to swing at the other
9  officer. It looked like they were trying to move in on him.
10 And he was sort of going like this (indicating), watching
11 him. There was only about ten feet between the police
12 car -- I am between my car and the police car. The police
13 car door was open.
14      He was swinging at them. They kept yelling,
15 "Drop the weapon." And then he turned sideways a little
16 bit. And I said to myself, I can help. I opened up my car
17 door really quick. Then I realized that this might be a big
18 mistake. I don't know whether somebody yelled close the car
19 door or what. But he was between me and the police car. So
20 I pulled my car door back closed. And he just -- it was
21 like I had a picture of it. He kept swinging the thing at
22 them and sort of like trying to avoid them.
23 Q.    What was the next thing you saw?
24 A.    This was unbelievable. He backed away very quickly.
25 And I didn't even know what he was going to do. But all of

708

1  a sudden he jumped into the car. He got one hand on the
2  wheel. There was one of the police officers that was trying
3  to grab his leg, the other one was sort of like there
4  between us, I don't know exactly where he was to this day.
5  But the one officer was trying to grab his leg and pull him
6  out of the car. And I could see his one foot, and I could
7  hear it. This was the big thing. I could hear him revving
8  the engine. He was going (indicating with noise). And he
9  tried to get it into gear, and couldn't get it into gear.
10  And all I said to myself was please, God, don't let him get
11  that thing in gear.
12        Just then, it was like, I don't know whether he
13  got his foot on the brake or something, but the next thing
14  you know I got it in gear, and instead of revving, the car
15  lurched forward.
16  Q.  Did you watch the car move forward?
17  A.  Yes. Right at the same time I heard a shot.
18  Q.  Do you know if it was the police officer who fired?
19  A.  Yes.
20  Q.  Then what happened?
21  A.  Then it was sort of surreal. The car just took off.
22  And I am looking out the window, the car took off and went
23  right up the hill. And I said, oh, God, he is in the police
24  car. And I just said, please, don't hit anybody, don't run
25  the red light. He never let off the gas. He went right

709

1  through the red light right in front of the Washington
2  Street Ale House. I clearly remember, the engine just never
3  stopped.
4  Q.  How would you describe the speed at which he was
5  traveling?
6  A.  I don't know how fast the police cars are. But from
7  where we were in the intersection of 13th Street, by the
8  time he was going by the Washington Ale House, I had gotten
9  out of my car, and all I could think was there is going to
10  be a horrible accident.
11        And he just went right through, maybe, I don't
12  know how fast you can go, maybe 35, 40, and he ran the red
13  light.
14  Q.  What did you do at this point?
15  A.  I don't even remember what I was doing. I was in
16  shock. I was just saying, thank God I am alive, for one.
17  And I watched the police officers run up the street. And
18  then I watched him go continue up the street, and went right
19  through the next intersection. And then he was gone.
20  Q.  After you lost sight of him, what did you do?
21  A.  I stood there. Some people were talking to me, one
22  from the sidewalk, asking if I was okay. I observed the
23  officers jump into the back of a car. I don't know whether
24  it was a police car or anything else. The next thing I knew
25  they jumped into the back of the car. And I was standing

710

1  there. And nobody -- it was like there was nobody there.
2  The police car was gone. The police officers were running
3  up the street. And I was standing there next to my car.
4  Q.  What were your feelings about this incident?
5  A.  I just didn't want to get killed, was number one, or
6  hurt. And I just felt like, the fact that he didn't have an
7  accident was a good thing, too. And I can't really remember
8  my feelings. I just all of a sudden remember cars pulling
9  around me. I mean, they were like, here I am in the middle
10  of the road, people are standing all over the place. There
11  were people on the deck at the bar.
12        And the first thing I can remember was a lady
13  from about 15 feet away said, are you all right? And I'm
14  looking around, I go, Yeah, I'm okay.
15  Q.  During the time that you were struggling with this
16  man, did you fear for your life?
17  A.  I truly thought at one point that I was going to die.
18  I really did. I thought that the window was going to break.
19  I thought that initially he didn't stab me. I felt that --
20  I mean, I have relived this scene for years. And now
21  bringing it all up again brings all the emotions back again.
22  That is why I am embarrassed, I am upset, after all this
23  time, it just keeps coming back. I look at my family, I
24  look at my wife, I look at my grandfather, I look all around
25  me. If there is a positive thing, I look at them in a

711

1  different way because I am alive.
2        MR. FINEMAN: Thank you very much. I have no
3  further questions.
4        THE COURT: Ms. Sulton.
5        MS. SULTON: No questions.
6        THE COURT: Thank you, Mr. Stevenson. You are
7  excused.
8        THE WITNESS: I am sorry, Your Honor.
9        THE COURT: That is quite all right, Mr.
10  Stevenson.
11        (Witness excused.)
12        MR. FINEMAN: Your Honor, could we have a
13  sidebar for a moment, please?
14        MR. PARKINS: Scheduling.
15        (The following took place at sidebar.)
16        THE COURT: Yes.
17        MR. FINEMAN: We have Detective Lawson here. H
18  will be our next witness. We could call him now. I am not
19  sure we will finish the examination.
20        THE COURT: Counsel, I run this courtroom. Call
21  the witness. Let's get the witness on the stand.
22        MR. FINEMAN: Yes, Your Honor.
23        THE COURT: Why are we at sidebar?
24        MR. FINEMAN: Because we have an issue. I
25  phoned Ms. Walker. We are going to have an issue this

B-060

1  afternoon with the video tape. We wanted to bring that up
2  the Court would prefer to talk about it.
3          THE COURT: I don't care that my jury's time be
4  wasted, counsel, all of you. There has been a lot of waste
5  of this jury's time. Let's get on with the testimony.
6          MR. FINEMAN: Yes, sir.
7          (End of sidebar conference.)
8          MR. FINEMAN: Your Honor, defendants call
9  Michael Lawson.
10         ... MICHAEL LAWSON, having been duly sworn as a
11         witness, was examined and testified as follows ...
12                  DIRECT EXAMINATION
13  BY MR. FINEMAN:
14  Q.    Good afternoon.
15  A.    Good afternoon.
16  Q.    How are you employed?
17  A.    With the City of Wilmington Police Department.
18  Q.    What is your position?
19  A.    I am currently assigned to the Criminal Investigations
20  Division.
21  Q.    Are you a detective?
22  A.    Yes.
23  Q.    Is it fair to call you Detective Lawson?
24  A.    Sure.
25  Q.    Detective Lawson, do you recall the events of

1  September 13th, 2003?
2  A.    Yes, I do.
3  Q.    Where were you on that evening?
4  A.    I was actually in the 600 block of Van Buren Street,
5  doing a followup on an investigation that I was handling.
6  Q.    Are you aware of the incident that's being addressed
7  during this trial?
8  A.    Yes.
9  Q.    What alerted you to this incident?
10  A.    I heard a call on the police radio, officers calling
11  for assistance.
12  Q.    Do you recall what you heard?
13  A.    It was officers calling for assistance, 14th and
14  Washington Streets. Shots fired. And subject had a knife.
15  Q.    Do you remember anything about the tone of that call?
16  A.    Yes. The officer coming across the radio was almost
17  in a panic, sounded like a very stressful situation. It
18  wasn't your ordinary communication, just talking on the
19  radio.
20         There was a problem, it sounded like.
21  Q.    What did you do?
22  A.    Immediately went to my vehicle with my partner. And
23  we listened to what was going on.
24  Q.    What was going on?
25  A.    The vehicle actually went south on Washington Street

1  from Fourth Street. Officer Debbo continued actually observed
2  the vehicle. She began making transmissions as far as the
3  direction of travel that the police vehicle was going.
4  Q.    Did there come a point in time when you saw the
5  vehicle?
6  A.    Yes.
7  Q.    When was that?
8  A.    That was at Seventh and Monroe Streets. I had
9  actually crossed over from where we were, heading towards
10  center city. After hearing the transmission that the
11  vehicle was going the wrong way on Seventh Street, so I cut
12  across Monroe Street and I proceeded south on Monroe from
13  West Ninth Street.
14  Q.    Did you ever see the car?
15  A.    Yes.
16  Q.    What did you do when you saw the vehicle?
17  A.    We were actually positioned right towards the corner
18  of Seventh and Monroe Streets, and the vehicle came the
19  wrong way on Seventh, approaching Monroe Street, and drov
20  at a fast speed, going in a southerly direction onto Monroe
21  Street from Seventh. He just kind of cut the corner real
22  fast, at which time we pursued after it.
23  Q.    Why did you pursue the car at that time?
24  A.    I saw that it was a black male driver, driving the
25  vehicle, I knew that there were shots that had been fired,

1  and I thought that the suspect may have been armed himself
2  with some type of handgun. I knew he was in the stolen
3  police vehicle. So I pursued after it to try and stop it.
4  Q.    Where did the car go next?
5  A.    Continued south on Monroe Street from Seventh. He
6  disregarded several stop signs. It proceeded, Monroe Street
7  kind of like in a swerving pattern, kind of swerving back
8  and forth, just kind of driving erratically.
9          It finally got to the intersection, where there
10  is a red light at Fourth and Monroe Streets. The light was
11  red. It disregarded that light. And then it proceeded
12  westbound on Fourth Street.
13  Q.    At this point, were you the lead car?
14  A.    Yes.
15  Q.    Were you transmitting your position?
16  A.    Yes, I was.
17  Q.    Before you became the lead car, were you transmitting
18  your position?
19  A.    I don't believe so, no.           B-061
20  Q.    Why not?
21  A.    Because I was listening to see if any other officers
22  were transmitting. And I did not want to come across the
23  air and walk over someone else who may have information or
24  may have been directly behind the vehicle itself.
25  Q.    Did there come a time when you were no longer the lea

1  vehicle, to...

1  A.    Yes.

2  Q.    When was that?

3  A.    That was near the intersection of Fourth and Jackson

4  Streets. Fourth and Jackson is right where 95 is,

5  Interstate 95. The police car itself was actually traveling

6  westbound on West Fourth Street. And he actually was

7  weaving in and out of traffic, because there is a lot of

8  traffic that was backed up because there was a light. And

9  he actually proceeded around the cars. Once he passed the

10  vehicles, we continued after him.

11      And then another police car, there is a marked police

12  car coming south on Jackson Street, and he also got in front

13  of us because we had to slow up because of the amount of

14  traffic. So we weren't involved in any type of accident.

15  And he actually got in front of us and he pursued directly

16  behind the stolen police vehicle.

17  Q.    Did you continue the pursuit behind this vehicle?

18  A.    Yes, I did.

19  Q.    At this point, what car were you in line?

20  A.    We were the second car.

21  Q.    Where did the vehicle go next?

22  A.    He traveled north on Van Buren Street. Then he turned

23  westbound on Fifth Street.

24  Q.    Did you follow him?

25  Q.    Do you know why the suspect had come to a stop on

---

2  Q.    Do you know why the suspect had come to a stop on

3  Fifth Street?

4  A.    No.

5  Q.    Did there ever come a point in time when you

6  understood why he stopped?

7  A.    There was actually police vehicles that were parked at

8  the corner towards Fifth and Harrison Streets.

9  Q.    Did there come a point in time when you saw Detective

10  Ciritella?

11  A.    Yes.

12  Q.    When was that?

13  A.    After I had actually exited my vehicle, I noticed him

14  up towards the corner of Fifth and Harrison Streets towards

15  the northeast corner.

16  Q.    Could you tell what Detective Ciritella was doing?

17  A.    I saw him out there. He had his weapon drawn. And

18  the stolen police vehicle proceeded towards him, and then

19  immediately went towards his direction, where he was.

20  Q.    Did you ever lose sight of Detective Ciritella?

21  A.    At some point in time I did, yes.

22  Q.    What did you think had happened to him?

23  A.    I thought he was hit by the suspect's vehicle, the

24  stolen police vehicle.

25  Q.    Did you see Officer Dempsey?

---

1  A.    Yes.

2  Q.    What did you witness after he turned left on Fifth

3  Street?

4  A.    Once he turned westbound onto Fifth, he proceeded up

5  to the block, and he came to an abrupt stop. Once he

6  stopped, we proceeded to exit the vehicle, and then he took

7  off at a fast rate, going towards the intersection of Fifth

8  and Harrison Streets.

9  Q.    I want to back up a second.

10      Why did you get started out of your vehicle?

11  A.    The vehicle that was in front of me stopped, so I came

12  to a stop. And then we were going to try and, you know, get

13  out, exit and approach the vehicle and try to take the

14  suspect into custody.

15  Q.    Did you watch the officer in the car in front of you

16  exit his vehicle?

17  A.    Yes.

18  Q.    What was he doing?

19  A.    He exited his vehicle, and he actually ran up to the

20  driver's side of the stolen police vehicle, at which time

21  that vehicle took off.

22  Q.    How would you describe the acceleration of that

23  vehicle?

24  A.    It was at a high rate of speed. You could actually

25  hear the engine revving. He kind of squealed the wheels and

---

1  A.    No.

2  Q.    Did you see Officer Kurten?

3  A.    No.

4  Q.    Did you at some point hear or see shots fired?

5  A.    I actually saw Detective Ciritella shooting towards

6  the police car, yes.

7  Q.    Was that before or after the police car accelerated

8  toward him?

9  A.    It was after it accelerated toward him.

10  Q.    What did you do at this time?

11  A.    I ran up towards the corner, at which time I lost

12  sight of the stolen police vehicle. The shots had stopped.

13  I heard a loud crash. I ran up to the corner. At which

14  time I observed a Jeep that had been struck by the stolen

15  vehicle. And I observed the police vehicle still proceeding

16  up the street, up Harrison Street.

17  Q.    At the time that the vehicle was driving at Detective

18  Ciritella, did you believe his life was in danger?

19  A.    Absolutely, yes.

20  Q.    After you got to the corner, and you looked up the

21  street, what did you see?

22  A.    The vehicle was still proceeding north on Harrison

23  Street, and like I said, I observed a damaged vehicle, that

24  the vehicle apparently struck, and the suspect was still

25  behind the wheel of the police vehicle. And it was just

**720**

1   proceeding up the street. Maybe five to ten milliseconds.
2   Q.   Were there any shots fired at that point?
3   A.   No.
4   Q.   While the vehicle was traveling up the street, were
5   there any shots fired?
6   A.   I did not see any shots fired then, no.
7   Q.   Did you hear any shots fired?
8   A.   The shots stopped by the time I got to the corner.
9   Q.   Did you at some point go up Harrison Street?
10  A.   Yes.
11  Q.   Did you see any police cars on Harrison Street facing
12  you?
13  A.   No.
14  Q.   What did you do after you got around the corner?
15  A.   I ran up on the driver's side with my weapon pointed
16  towards the police vehicle, and proceeded cautiously towards
17  the driver's side. And then we were able to open up the
18  door and grab onto the suspect, and take him into custody.
19  Q.   Why did you approach the car cautiously?
20  A.   Because I wasn't sure what condition the suspect was
21  in. I am still thinking that he is armed. I know that he
22  just tried to run over a police officer. And he is still a
23  threat until he is stopped.
24  Q.   What did you do next?
25  A.   Once we got him out of the vehicle, I noticed he had

**722**

1   in imminent danger?
2   A.   Absolutely, yes.
3   Q.   Do you believe that the use of deadly force was
4   appropriate at that time?
5   A.   Most certainly.
6   Q.   If you had been --
7        MS. SULTON: I am going to object.
8        THE COURT: Sustained. Let me see counsel at
9   sidebar.
10       (The following took place at sidebar.)
11       THE COURT: Have you qualified him to render an
12  opinion?
13       MR. FINEMAN: No, Your Honor.
14       THE COURT: What are you doing?
15       MR. FINEMAN: As a lay witness who was on the
16  scene experiencing at the moment, under Rule 701 I am
17  adducing his understanding and if his determinations of fact
18  fit at the time.
19       THE COURT: Your response.
20       MS. SULTON: He hasn't put in anything about his
21  qualifications or training to make such a decision.
22       THE COURT: I am going to let you establish for
23  this jury how long this gentleman has been a police officer.
24  Then I will permit you to question him as a lay witness. It
25  is overruled.

**721**

1   been shot, he had fatal injuries, we checked for his vital
2   signs. He did not have any. We summoned for the ambulance,
3   my partner began chest compressions on him. And we also,
4   someone brought over the defibrillator, the AED. But by the
5   time we got that ready to be hooked up to shock him, the
6   ambulance had arrived.
7   Q.   Did you do any celebrating at that time?
8   A.   Celebrating?
9   Q.   Yes.
10  A.   No.
11  Q.   No high-fiving?
12  A.   No.
13  Q.   No jubilation?
14  A.   No.
15  Q.   I want to take you back to when you were on Fifth
16  Street. When you saw the vehicle go at Detective Ciritella,
17  is that the first time you heard shots?
18  A.   Yes.
19  Q.   Do you know who was firing at that time?
20  A.   I know Detective Ciritella was firing.
21  Q.   Did there come a time when you understood that
22  Officers Dempsey and Kurten were firing?
23  A.   Yes.
24  Q.   Based on your experience at that time, from what you
25  were observing, do you believe that Detective Ciritella was

**723**

1        (End of sidebar conference.)
2        THE COURT: Go ahead, Mr. Fineman.
3   BY MR. FINEMAN:
4   Q.   Detective, how long have you been on the Wilmington
5   Police force?
6   A.   This is my 18th year.
7   Q.   Have you been in law enforcement that entire time?
8   A.   Yes.
9   Q.   Have you had the training as a law enforcement
10  officer?
11  A.   Yes.
12  Q.   Have you been trained in the use of deadly force?
13  A.   Yes.
14  Q.   I am going to ask you again, at that time on Fifth and
15  Harrison Street, what you were witnessing, did you think
16  Officers Kurten, Ciritella and Dempsey were reasonable in
17  using deadly force?
18  A.   Absolutely, yes.
19  Q.   If you were in their position, based on what you
20  viewed at that time, would you have used deadly force?
21  A.   Yes.
22  Q.   From the time that that car accelerated at Detective
23  Ciritella until the time you heard the last shot, how much
24  time do you think elapsed?
25  A.   Less than ten seconds. Probably five, ten seconds.

1 Q.  Greet and do you believe the suspect in question
2 to be dangerous?
3 A.  Yes.
4 Q.  Who was he dangerous to?
5 A.  Myself, the citizens of Wilmington, and the other
6 police officers who were out there trying to stop him.
7 Q.  The entire time that you heard shots fired or saw
8 shots fired, did you believe that the suspect was a danger
9 to certain individuals?
10 A.  Yes.
11 Q.  Who were those individuals?
12 A.  Detective Ciritella, and also the other officers who
13 were close by within that proximity.
14 Q.  Do you believe that under those circumstances the use
15 of force, of deadly force by these officers was reasonable?
16 A.  Absolutely, yes.
17        MR. FINEMAN:  No further questions, Your Honor.
18        THE COURT:  We will have cross-examination after
19 lunch.
20        (Jury leaves courtroom at 12:58 p.m.)
21        (Luncheon recess taken.)
22        THE COURT:  Please be seated for a moment.
23        (The following took place at sidebar.)
24        THE COURT:  Over the lunch recess, I have had a
25 chance to think a little bit further about 701, that issue.

1        What I was just doing right now is looking at
2 the Detective's testimony right after the questions and his
3 responses right after the sidebar, where he offered -- and I
4 am paraphrasing -- that it was reasonable to use.
5        I think it was error for me to permit that
6 testimony from him as a lay individual.  We have testimony
7 on that issue from experts who were noticed pursuant to Rule
8 26.  I only exacerbated the problem, quite frankly, when I
9 had you question him -- you did it at my behest -- as to his
10 number of years of experience.
11        In looking at the rule and treatises and some of
12 the cases, it strikes me this is not the kind of evidence
13 that classically would be helpful to a jury, that is not
14 based on scientific, technical or other specialized
15 knowledge.  And that's what is contemplated.
16        I think the manner in which I permitted you to
17 question him was more along the lines of a 702 witness.  We
18 certainly have 702 witnesses on both sides of this issue.
19 Having said what I said, I do think it appropriate for the
20 defendants to discuss it and it may be appropriate for
21 Detective Lawson to say what he thought was necessary as
22 opposed to what he thought was reasonable.  That's what he
23 said -- that is an issue for the jury's determination based
24 upon proper evidence, such as 702 opinion.  Not the kind of
25 witness like Detective Lawson.  Albeit he probably could

1 have been qualified as an expert, he was not.
2        My question to you, Ms. Sulton, is whether you
3 want to cross-examine him or do you want me to -- on this
4 particular point as to whether the force was reasonable or
5 necessary.  Do you understand the distinction I am drawing?
6        MS. SULTON:  Yes, sir, I do.
7        THE COURT:  Whether you want me to instruct the
8 jury prior to your cross-examination or after at some point,
9 we can discuss that, that the Court permitted the gentleman
10 to offer an opinion as to the reasonableness of the force,
11 the use of deadly force, that this was error by the Court,
12 or the Court has reconsidered that ruling and advise you
13 that you are to disregard his opinion as to whether the
14 force was reasonable or not.
15        I may offer you the opportunity to redirect, to
16 ask him what I view as an appropriate question.
17        MR. FINEMAN:  Yes, Your Honor.
18        THE COURT:  Do you want a moment to think abou
19 that?
20        MS. SULTON:  Just a second, Your Honor.
21        Counsel confer.)
22        MS. SULTON:  Yes, Your Honor.  We would prefer
23 you to give the jury instruction before I begin my cross.
24        THE COURT:  Okay.
25        MR. FINEMAN:  Your Honor, I don't want to

1 reargue with Your Honor.  I want to state my position for
2 the record.
3        THE COURT:  And I know what you are position is.
4 You have stated your position.
5        MR. FINEMAN:  I wanted to make it clear.
6        THE COURT:  It is clear to me, especially after
7 looking at the testimony, as I did, that -- I don't think it
8 was reversible error, but I think error for me to permit
9 this witness to testify pursuant to your argument that you
10 made.  He is not a 701 lay witness, in my opinion.  That is
11 my decided opinion on that.
12        MR. FINEMAN:  Your Honor, I am more than happy
13 to ask this witness, in lieu of was it reasonable, was it
14 necessary.  I have no problem asking that question.
15        THE COURT:  I think that is especially
16 appropriate coming from the defendants, as to whether they
17 thought it was necessary, under the circumstances, because
18 it was the defendants who were responding, after all, its
19 the defendants' actions that this jury has to evaluate
20 against the backdrop of expert testimony that is offered to
21 help guide them, that will be helpful to them in guiding
22 them.                        B-064
23        Again, to repeat, this gentleman was not offered
24 as a 702 expert.  I have said what I have said.
25        MR. PARKINS:  I don't want to keep this jury any

728

1  longer. One quick thing.

2          This afternoon, we are likely to show a video of

3  the deposition. Ms. Sulton and I have agreed that it is not

4  necessary for Mr. Maurer to take down. We will just

5  substitute the deposition transcript.

6          THE COURT: Good. I am sure he appreciates

7  that.

8          MS. SULTON: We should mention, because they

9  weren't able to technically figure out how to extract that

10 picture from a portion of Dr. Nordby's testimony, we are

11 just going to black out and just the audio will run rather

12 than the video while the picture is shown.

13         MR. PARKINS: What happens is Ms. Sulton had

14 used at the deposition an autopsy photograph, which can be

15 seen on the video. The witness said he didn't rely on it.

16         Ms. Sulton, I think we are both in agreement,

17 you can't introduce it. What we are going to do for those

18 moments when it appears on the screen, we are just going to

19 have the audio version of the deposition rather than both

20 the video and audio.

21         THE COURT: Okay.

22         (End of sidebar conference.)

23         (Jury enters courtroom at 2:16 p.m.)

24         THE COURT: Please be seated, ladies and

25 gentlemen.

729

1          Ladies and gentlemen, before the break, you will

2  recall perhaps, hopefully, that I permitted some questions

3  to be posed to the Detective, Detective Lawson, regarding

4  his view, his opinion as to whether the use of deadly force

5  was reasonable. You are to disregard his responses to that

6  testimony. You have heard evidence from witnesses that have

7  been identified by the parties, and you will hear additional

8  evidence from experts in the field who will be permitted,

9  pursuant to the Rules of Evidence and the Rules of Civil

10 Procedure, to offer that opinion as to the reasonableness of

11 the force.

12         You have already heard from two witnesses from

13 the plaintiff. You will hear from witnesses from the

14 defense as well on this subject. These are the witnesses

15 whose opinions you may listen to as to whether the force was

16 reasonable. And that is my instruction to you. Therefore,

17 you should disregard the Detective's opinion as to that

18 issue alone. Okay.

19         CROSS-EXAMINATION

20 BY MS. SULTON:

21 Q.   Good afternoon, sir.

22 A.   Good afternoon.

23 Q.   Are you familiar with the Wilmington Police

24 Department's use of force policies at 6.7 and 6.8?

25 A.   Yes.

730

1  Q.   Could you define for me immediate vicinity as that

2  term is used therein?

3  A.   Within the area.

4  Q.   What does that mean, within the area? Could you be

5  more precise? Am I talking about a block? Am I talking

6  about a mile? Am I talking about the city limits?

7  A.   Within a close proximity.

8  Q.   If I could ask you, sir -- let me get some exhibits.

9          If I could ask you, sir, to please turn to

10 Exhibit No. 6. Are you there?

11 A.   Yes, ma'am.

12 Q.   I am going to represent to you as true that these are

13 Google satellite images of portions of the City of

14 Wilmington, Delaware. Are you familiar, can you determine

15 based on your experience of over a decade of patrolling the

16 streets whether or not Exhibit 6 accurately portrays the

17 general area of the 500 block of Harrison Street and Fifth

18 Street?

19 A.   Yes, it is.

20 Q.   Thank you, sir.

21         Now, Exhibit 6 is a two-page exhibit. If you

22 would look at the page that is on your right, you will see

23 there in white lettering it says 507 North Harrison,

24 Wilmington, Delaware, and it has a Zip Code. Do you see

25 that?

731

1  A.   Yes, ma'am.

2  Q.   And then it has a little red mark to try to

3  approximate exactly where that is.

4          When using the term immediate vicinity, I handed

5  to you an orange marker, could you mark a circle to indicate

6  what you would consider the immediate vicinity? And just

7  mark it right there on the page, sir, if you would, please,

8  or the photograph of the satellite image.

9  A.   Can I just circle it?

10 Q.   Sure.

11         MS. SULTON: If I may approach the witness, Your

12 Honor?

13         THE COURT: You may.

14         MS. SULTON: Thank you, sir.

15 BY MS. SULTON:

16 Q.   If you would be kind enough to write your name on the

17 bottom so I remember who made that mark.

18         MS. SULTON: With the Court's permission, may I

19 simply show this to the jury.

20         THE COURT: Show it to defense counsel first.

21         MS. SULTON: Thank you, Ms. Walker.

22 BY MS. SULTON:

23 Q.   Mr. Lawson, while you were in the vicinity --

24         THE COURT: Ms. Sulton, why don't you wait just

25 a second. Do you want to have this published to each of the

**Page 732**

1 jurors before you begin questioning while you were
2 questioning?
3     MS. SULTON: May it be published before, Your
4 Honor?
5     THE COURT: Thank you, Ms. Walker.
6     MS. SULTON: Thank you.
7 BY MS. SULTON:
8 Q.    While you were at the scene of the incident either at
9 Fifth Street or North Harrison Street, did you observe any
10 civilians or neighbors, elderly, children, in the immediate
11 vicinity within the orange circle that you made on Exhibit
12 No. 6?
13 A.    There were police officers, and there were also
14 civilians in that area, yes.
15 Q.    At what point did you see civilians? Did you see them
16 immediately after exiting your vehicle on Fifth Street or
17 did you see them when you ran up on Harrison Street?
18 A.    After I had run up on Harrison Street and after the
19 incident was secure.
20 Q.    Did you hear shots fired?
21 A.    Yes.
22 Q.    Did you see civilians in the immediate vicinity within
23 the area that you circled at the time that shots were being
24 fired?
25 A.    No.

**Page 733**

1 Q.    Did you see Officer Ciritella almost get hit by Car
2 1180?
3 A.    I am not sure what the vehicle number was. But it was
4 a vehicle being driven by the suspect, yes.
5 Q.    Where was Officer Ciritella standing at the time that
6 you saw him almost hit by the suspect vehicle?
7 A.    He was towards the sidewalk on the northeast corner of
8 Fifth and Harrison Streets.
9 Q.    Was he in the street or on the sidewalk?
10 A.    Closer to the sidewalk.
11 Q.    Is he in the street or on the sidewalk?
12 A.    I don't know.
13 Q.    Did you observe the suspect vehicle strike the white
14 Jeep?
15 A.    No.
16 Q.    Did you write a report?
17 A.    Yes.
18 Q.    Did you review your report before coming to court
19 today?
20 A.    Yes.
21 Q.    Do you have a copy of your report with you?
22 A.    No.
23     MS. SULTON: If I may approach the witness, Your
24 Honor?
25     THE COURT: You may.

**Page 734**

1 BY MS. SULTON:
2 Q.    Would you please review that and see if that is the
3 report that you wrote on this incident, sir?
4 A.    Yes, it is.
5 Q.    And you see that I have highlighted with orange ink a
6 portion of your report. Correct?
7 A.    Yes.
8 Q.    In your report you say that you saw Detective
9 Ciritella crouched in a tactical position. Is that correct?
10 A.    Correct.
11 Q.    If Detective Ciritella says he was not crouched in a
12 tactical position, would you be wrong?
13     (Pause.)
14 A.    No, because what I observed was Detective Ciritella
15 with his arms out in a tactical position, and he wasn't
16 standing straight up. He was crouched down. That's what I
17 observed.
18 Q.    If he says he never crouched in a tactical position,
19 would you be wrong?
20 A.    No.
21 Q.    Are you the person that took the videotape, the MVR
22 tape, out of the suspect vehicle?
23 A.    It was hand-delivered to me and then I delivered it to
24 Detective Sergeant Browne.
25 Q.    Who gave you the video?

**Page 735**

1 A.    I believe it was Sergeant Greg Ciotti gave it to
2 another officer, and in turn it was given to me.
3 Q.    Do you know why that video is blank?
4 A.    Probably the video was not working.
5     MR. FINEMAN: Your Honor, I am going to object
6 to that last question and ask the answer be stricken. There
7 is no evidence that the videotape is blank. Assumes facts
8 not in evidence, Your Honor.
9     THE COURT: Overruled.
10 BY MS. SULTON:
11 Q.    I just handed you a document with a Bates stamp number
12 on it. Have you ever seen that document before?
13 A.    No.
14 Q.    Are you familiar with facts pertaining to the MVR
15 videotape taken from that car?
16 A.    Yes.
17 Q.    Do you know whether or not there are any reports about
18 the MVR machine not working on that day?
19 A.    I do not know, no.
20 Q.    Do you know of any reports that talk about repairing
21 the MVR machine that was in that car at any time prior to
22 this incident?
23 A.    No, I do not know.
24     MS. SULTON: Nothing further. Thank you.
25     THE COURT: You may redirect.

B-066

736

1 REDIRECT EXAMINATION

2 BY MR. FINEMAN:

3 Q.    When you described crouching, are you referring to

4 crouching all the way down to the ground, or just bent over

5 a little bit?

6 A.    Just bent over --

7          THE COURT: Your witness. Don't lead him.

8 BY MR. FINEMAN:

9 Q.    How would you describe crouching?

10 A.    Can I describe exactly how I saw it?

11          THE COURT: Sure.

12          (Witness steps down from stand.)

13          THE WITNESS: He would have been in this type of

14 position, like this, crouching.

15          THE COURT: With bent knees, Lieutenant?

16          THE WITNESS: Correct. Not standing straight

17 up. Just crouching in this position here.

18          THE COURT: With both arms held out straight?

19          THE WITNESS: Correct.

20          (Witness resumes stand.)

21 BY MR. FINEMAN:

22 Q.    Based on your observations at the scene at the time

23 you were there, did you believe it was necessary for Officer

24 Ciritella, Officer Dempsey, and Officer Kurten to use deadly

25 force?

737

1 A.    Yes.

2          MR. FINEMAN: No further questions.

3          THE COURT: Thank you, Detective.

4          (Witness excused.)

5          MR. PARKINS: The defendants call Lieutenant

6 William Browne.

7          ... WILLIAM BROWNE, having been duly

8 sworn as a witness, was examined and testified as

9 follows ...

10          DIRECT EXAMINATION

11 BY MR. PARKINS:

12 Q.    Lieutenant Browne, where are you employed?

13 A.    The Wilmington Police Department.

14 Q.    Were you employed at the Wilmington Police Department

15 on September 13 in 2003?

16 A.    Yes, I was.

17 Q.    When did you first join the Police Department?

18 A.    In January of 1985.

19 Q.    So as of 2003 you would have been an officer for

20 roughly 18 years?

21 A.    Yes.

22 Q.    What was your rank on September the 13th of 2003?

23 A.    I was a Master Sergeant.

24 Q.    What were your duties on that day?

25 A.    I was assigned to the Criminal Investigation Division

738

1 as a detective supervisor.

2 Q.    Do you recall what shift you were working on that day?

3 A.    4 to 12.

4 Q.    Let's focus on the incident that began on 14th and

5 Washington for a few minutes.

6          Where were you when you first heard about this

7 incident unfolding?

8 A.    I was in the Detective Division at Wilmington Police

9 Headquarters.

10 Q.    Down on Fourth and Walnut?

11 A.    Yes.

12 Q.    What were you doing?

13 A.    I was doing some administrative work, paperwork.

14 Q.    How did you hear about this incident?

15 A.    I heard it over the police radio.

16 Q.    What did you do when you heard about it?

17 A.    I immediately left the building, responded in my car,

18 and started to head off in the direction of the pursuit.

19 Q.    Tell the jury the route that you took in this pursuit.

20 A.    When I left the police station at Fourth and Walnut, I

21 exited onto Fourth Street and proceeded westbound as I was

22 monitoring the chase.

23 Q.    Did you at any time -- did you first see the suspect

24 in the stolen police vehicle?

25 A.    I first saw him at Fourth and Monroe.

739

1 Q.    Would you describe his driving for us as you observed

2 it?

3 A.    The suspect vehicle came out onto Fourth Street from

4 Monroe. He was driving erratically and at a high rate of

5 speed, initially when he came out onto Fourth Street and

6 went out across both westbound lanes, crossed over the

7 centerline and recovered and continued westbound.

8 Q.    Was it in the eastbound lane before it recovered?

9 A.    Yes.

10 Q.    How far behind Vehicle 1180 were you?

11 A.    After 1180 came out onto Fourth Street, Detective

12 Lawson's vehicle came out behind it and I fell in behind

13 Detective Lawson.

14 Q.    Did you follow the vehicle when it turned right on Van

15 Buren Street?

16 A.    Yes, I did.

17 Q.    Did you follow the vehicle when it made a left-hand

18 turn onto Fifth Street?

19 A.    Yes.

20 Q.    Describe for the ladies and gentlemen of the jury,

21 please, what you observed the vehicle do once it was on

22 Fifth Street?

23 A.    Once the suspect vehicle turned onto Fifth Street in

24 the 1100 block, there were cars parked on both sides of the

25 street, just about all the way to Harrison Street. As I

B-067

**740**

1 looked as I saw that there were the police cars that had
2 crossed over Fifth Street and were blocking the way, they
3 were blocking the end of the roadway at Harrison Street.
4          Again, the suspect vehicle was followed by
5 another marked unit who had joined the chase at Fourth and
6 Jackson, detectives Lawson's vehicle, then my vehicle.
7          As the suspect vehicle approached the two
8 vehicles that were parked at the end of the -- at the
9 roadway there, it began to slow down, and it appeared to me
10 it had come to a stop temporarily.
11 Q.   About how far from Fifth Street was the stolen vehicle
12 when it came to a stop?
13 A.   How far from Harrison Street?
14 Q.   Yes.
15 A.   Approximately two carlengths.
16 Q.   What did the police vehicles in front of you do when
17 the stolen police vehicle came to a stop?
18 A.   They stopped, also. And everyone began to exit their
19 cars.
20 Q.   Did you start to get out of your car?
21 A.   Yes, I did.
22 Q.   What happened next?
23 A.   As I got out of my vehicle, and I started to move
24 towards the front of it, towards the suspect vehicle, I
25 observed the Vehicle 180, the suspect vehicle, immediately

**741**

1 take off, veer to the right and drive directly at Detective
2 Ciritella.
3 Q.   Before the suspect vehicle took off, what were the
4 officers in the cars in front of you doing?
5 A.   They were also getting out of their cars.
6 Q.   Describe the rate of speed, if you would, of the
7 suspect vehicle as it approached Detective Ciritella?
8 A.   The suspect vehicle was accelerating at a high rate of
9 speed at that point.
10 Q.   Was it to one side of Detective Ciritella?
11 A.   No. It was going directly at him.
12 Q.   At that time, what did you think Detective Ciritella's
13 prospects were?
14 A.   Not too good.
15 Q.   Did you see or hear Detective Ciritella fire his
16 weapon?
17 A.   Yes, I did.
18 Q.   Can you estimate for the jury how far away from him
19 the car was when he fired his weapon?
20 A.   When the suspect vehicle turned directly at him, he
21 began to retreat and fire at the same time. The vehicle was
22 extremely close to him, just maybe a couple feet. And I
23 believed at that point he may have been hit by the car.
24 Q.   You thought at the time he was hit?
25 A.   I did.

**742**

1 Q.   What happened next?
2 A.   The suspect vehicle crossed over the corner of the
3 sidewalk, very close to the building line, the corner of the
4 building that was located on the corner of Fifth and
5 Harrison Street, drove across the sidewalk, struck a Jeep
6 that was parked on the corner, that was legally parked at
7 the curb line on Harrison Street, hit it hard enough to
8 drive the car, the Jeep around about 180 degrees.
9          The suspect vehicle then continued to accelerate
10 and proceeded up Harrison Street, in a northbound direction
11 against the regular flow of traffic.
12 Q.   What did you do as the car proceeded towards Harriso
13 Street?
14 A.   At that point, there was additional gunfire. And I
15 ran from my position, where I was when I got out of my car
16 up to the corner at Fifth and Harrison Street.
17 Q.   About how far was that?
18 A.   Maybe 50, 60 feet.
19 Q.   Did you see or hear any gunfire after you arrived at
20 the corner of Fifth and Harrison Street?
21 A.   No. By the time I got to the corner, the gunfire was
22 over.
23 Q.   How long did it take between the time the gunfire
24 started and the time the gunfire stopped?
25 A.   It may have been ten seconds.

**743**

1 Q.   Would you tell the jury, if you can, how long did
2 Detective Ciritella have in which to react to the car
3 driving at him?
4 A.   Almost no time at all. Maybe a second or two.
5 Q.   What was the car doing when you arrived at the corne
6 of Fifth and Harrison?
7 A.   When I got there, the car appeared to be stopped. It
8 may have been starting to drift backwards. I saw Detective
9 Ciritella in the vehicle from the right passenger side, from
10 the passenger side of the car, I later learned he put the
11 car in park at that point. There were other officers in the
12 area who removed the suspect from the vehicle.
13 Q.   Did you see any of the officers firing at the car
14 after you turned the corner?
15 A.   No.
16 Q.   Did you see any of the officers shooting at the car
17 after it was stopped?
18 A.   No.
19 Q.   What did you do after you saw Detective Ciritella
20 reach in and put the car in park?
21 A.   At that point, there was a woman on the sidewalk next
22 to me, we later learned that she had been hit in the leg
23 with a round. I stayed with her, notified paramedics and
24 remained with her, or nearby her until they arrived.
25 Q.   Was that woman Marilyn Garcia?

B-068

752

1  is. Do you need another part of the drawing?

2  A.    No. I believe that was identified as Vehicle A.

3  Q.    Yes. Is this, by the way, north?

4  A.    Yes. The driver's side rear tire --

5  Q.    The driver's side rear tire --

6  A.    -- was located 116 feet, 11 inches north.

7  Q.    That is a tire. It is 116 feet.

8  A.    And the passenger rear was 117 feet, eight inches.

9  Q.    I am just going to call it 117 feet for a second.

10  Then the rear of the car would have been back around here

11  somewhere?

12  A.    Yes.

13  Q.    Okay. How far from the rear driver's wheel was shell

14  casing C31?

15  A.    Eight feet.

16  Q.    How far was it from shell casing C32?

17  A.    Eleven feet.

18  Q.    And then --

19  A.    Fourteen feet for casing C30.

20  Q.    Were any of Detective Ciritella's shell casings found

21  any further north than C31?

22  A.    No.

23  Q.    Were any police officers' shell casings found any

24  further north than C31?

25  A.    No.

753

1  Q.    Okay. Now, the medical examiner has testified that

2  the bullet which struck Mr. Smith in the head was going from

3  right to left.

4  A.    Yes.

5  Q.    Have you identified which of the officers fired that

6  bullet?

7  A.    Detective Ciritella.

8  Q.    And how was that done?

9  A.    Again, the projectile was recovered from the suspect

10  at the Medical Examiner's Office during the autopsy. It was

11  later sent to the ATF. And they identified and it's being

12  fired from Detective Ciritella's handgun.

13  Q.    If Detective Ciritella were to be firing across the

14  vehicle, where would he be standing when he fired roughly

15  C30, 31 and 32?

16  A.    If you look at the hands of a clock, and the vehicle

17  is heading in a northbound direction heading towards 12:00,

18  Detective Ciritella would have had to be standing somewhere

19  around two or three o'clock at the time he fired it.

20  Q.    It is not possible, is it, to predict or decide

21  exactly where Detective Ciritella was standing when he fired

22  each of those three shell casings? Is that correct?

23  A.    No, you can't.

24  Q.    Which way do the shell casings eject from Detective

25  Ciritella's handgun?

754

1  A.    To the right.

2  Q.    So he would have been this way, and they would have

3  been ejecting that way. Is that correct?

4  A.    Yes.

5  Q.    So assuming for the moment, would it be fair to

6  conclude that he is at least somewhere south of where these

7  shell casings are found?

8  A.    Yes.

9  Q.    So he would have been somewhere more than eight fee

10  from where the car stopped where his shell casings were

11  found?

12  A.    Yes.

13  Q.    What does that tell you about what the car was doing

14  when he fired his shots?

15  A.    It tells me that the car was still moving forward at

16  the time.

17  Q.    Because it ended up here as opposed to stopping here?

18  A.    Yes.

19  Q.    Okay. Thank you.

20         (Witness resumes stand.)

21  BY MR. PARKINS:

22  Q.    I understand from your earlier testimony that you

23  interviewed witnesses both that evening and later in

24  connection with this investigation?

25  A.    Yes, I did.

755

1  Q.    Did you ever interview David Gwyn?

2  A.    Yes, I did.

3  Q.    When did you interview Mr. Gwyn?

4  A.    I interviewed Mr. Gwyn on the date of the incident,

5  approximately two hours after the incident.

6  Q.    Where was he when you interviewed him?

7  A.    At his home.

8  Q.    What did he tell you?

9  A.    Mr. Gwyn advised me that he was seated out on his

10  porch when he observed a police car go southbound on

11  Harrison Street and then turn eastbound on Fourth Street.

12  He believed something was going on, so he got up to see wha

13  it was. At one point he then saw the police vehicle come

14  around the corner at Fifth and Harrison Street, strike a

15  parked car, the Jeep, and then proceed up Harrison Street.

16  He then told me that he saw an officer running behind the

17  car and shooting at it approximately five or six times.

18  Q.    One officer running behind the car shooting five or

19  six times?

20  A.    That's what he said.

21  Q.    Did he tell you that he saw an officer walk up to the

22  side of the car after it was stopped and shoot into the

23  driver's body?

24  A.    No, he didn't.

25  Q.    Did he tell you that he saw any officers shoot at the

B-069

1   car after the car had stopped.

2   A.   No.

3   Q.   Is it your practice to make notes of these interviews?

4   A.   Yes.

5   Q.   Do you make them at the time of the interviews?

6   A.   Yes, I do.

7   Q.   Did you do so in this case of Mr. Gwyn's interview?

8           MR. PARKINS:  One moment, Your Honor.  May I ask

9   Ms. Sulton a question?

10          (Pause.)

11          MR. PARKINS:  I would like to show DX-55,

12  please, Mr. White.

13  BY MR. PARKINS:

14  Q.   Are these your notes of David Gwyn's interview?

15  A.   Yes, they are.

16  Q.   Would you please read them for the jury?  Maybe you

17  could interpret the abbreviations,

18  A.   I apologize for my handwriting.

19          Up at the top left corner it has 2110.  That

20  refers to the time, 9:10 p.m.  David Gwyn with his address

21  and phone number.  He stated at that time that he saw a

22  black-and-white go southbound on Harrison Street to Fourth

23  and turned eastbound.  He saw the defendant's vehicle turn

24  the corner and started up Harrison Street and he got up, saw

25  the defendant's vehicle hit a Jeep.  He saw more police cars

757

1   coming.  He said the shooting started.  His wife ran into

2   the house.  And he ran onto a neighbor's porch.  He said one

3   officer shot into the rear window five or six times and it

4   was a uniformed officer.  I asked him if he had heard any

5   shots prior to the car hitting the Jeep.  And he said no.

6   He didn't hear any shots prior to the impact with the Jeep.

7   He said after the shooting the officers surrounded the car

8   and pulled the defendant out.  He didn't see anything else

9   occur at the corner.  He saw officers chasing on foot.  And

10  he said the shooting started once -- and I believe there is

11  a second page of this, there may be one line on it.  The

12  shooting starting once they were up the block, is what he

13  said.

14  Q.   Did someone interview Betty Gwyn that evening?

15  A.   I did not.

16  Q.   Did you interview any other individuals who lived in

17  the vicinity of Fifth and Harrison Street that night?

18  A.   No.

19  Q.   Did anyone -- did you ever interview the Reverend

20  Bernard Thompson?

21  A.   Yes, I did.

22  Q.   Tell the jury the circumstances under which you

23  interviewed Bernard Thompson?

24  A.   Several months after the incident, I learned that Mr.

25  Thompson had stood up at a City Council meeting and

1   announced that he was a witness to this incident.  I had not

2   spoken to him or heard of him until that time.  So I called

3   him and arranged a meeting.

4   Q.   Did he come in to see you?

5   A.   Yes, he did.

6   Q.   Describe or tell the jury what he told you.

7   A.   Mr. Thompson stated that he was sitting on his front

8   steps or the front of his home, which is in the 1100 block

9   of West Sixth Street, which is north of where the incident

10  occurred and around the corner.

11          He said he saw a car go down the street, police

12  car, go down the street.  He said he heard a lot of -- there

13  were shots being fired when he went up to the corner, and

14  there were some children there.  He said he collected the

15  children.  He brought them back down near the front of his

16  house or out of harm's way, what he described.  Then he went

17  back up to the corner, where he saw uniformed officers on

18  both sides of the vehicle shooting at the car after it was

19  stopped.

20  Q.   Did you lend any credence to what Mr. -- Reverend

21  Thompson said to you?

22  A.   No, I didn't.

23  Q.   Tell us why.

24  A.   Well, first of all, the physical evidence in this case

25  did not support anything that he said.  Secondly, I knew

759

1   that the incident was over in a matter of seconds.  He

2   wouldn't have had time to, number one, see the shooting

3   start, then collect children, move them down the street and

4   then return.  The incident was over in a matter of seconds.

5   But mostly because the physical evidence didn't support his

6   allegations.

7   Q.   What were the inconsistencies between the physical

8   evidence and what you told you?

9   A.   Number one, there was no uniformed officer on the east

10  side of Harrison Street.  The only officer that fired from

11  that side of the street was Detective Ciritella.  We know

12  this because his shell casings are the only ones there.  We

13  can account for each one of the shots that Detective

14  Ciritella fired.  There were no more and no less shots fired

15  on that side.

16          On top of that, Detective Ciritella was not in

17  uniform.  He was in plain clothes.

18          Additionally, I know that no officer fired from

19  directly outside the driver's door.  The Vehicle 1180 had no

20  impacts that were coming in at a right angle to that side of

21  the car.  And the suspect had no injuries on that side of

22  his body from bullet wounds.

23  Q.   Lieutenant, as part of your investigation, did you

24  review the so-called MVR tape?

25  A.   Yes, I did.

B-070