B70.1 - B104

760

1  Q.  Would you tell the jury what an MVR tape is, or was?

2  A.  It was a tape recorder that was set up in the police

3  car that was made to activate when the officers activated

4  their emergency equipment. It was tied to a camera. It was

5  face-forward. And it would record audio and visual

6  encounters that the police would have on car stops and

7  things of that nature.

8  Q.  What sort of things would activate this video

9  recorder?

10  A.  I believe the officers could turn it on manually, or

11  if they turned on the emergency lights, the 360s on the

12  police vehicle, it would activate automatically.

13  Q.  Does the Wilmington Police Department still use MVRs?

14  A.  No, we don't.

15  Q.  Why not?

16  A.  There was a lot of problems with them. They weren't

17  reliable.

18       MR. PARKINS: Your Honor, I would like to show

19  to the jury the MVR tape that was recovered by the

20  Detective.

21       THE COURT: That is fine.

22       MR. PARKINS: Can we use, Ms. Sulton, your video

23  machine?

24       MS. SULTON: Of course.

25       MR. PARKINS: Thank you.

761

1       THE COURT: That's the Court's video machine.

2       MS. SULTON: Excuse me, Your Honor.

3       THE COURT: You brought one, too. Okay.

4  BY MR. PARKINS:

5  Q.  Can you see it from there, Lieutenant?

6  A.  Yes.

7       (Tape turned on.)

8       MR. PARKINS: Can you fast-forward this, Mr.

9  White?

10  BY MR. PARKINS:

11  Q.  Lieutenant, did the video which you observed have

12  images on it?

13  A.  I am sorry?

14  Q.  Did the video which you observed, the MVR video, have

15  images on it?

16  A.  Yes, it had some images on it. None of the 13th.

17  Q.  Can you see the date of the video here, was it 9/10?

18  A.  Yes, it's 9/10/03.

19  Q.  Would this have been taken from Patrol Car 1180?

20  A.  Yes.

21  Q.  By the way, the tape itself is in a case locked, it's

22  in the trunk?

23  A.  Yes, it is. It is in a secure vault in the trunk, the

24  recording unit, which is locked. The officers that are

25  driving the cars don't have access to it.

762

1       MR. PARKINS: Mr. White, can we maybe proceed,

2  fast-forward for a little bit now.

3       Mr. White, can you go at a normal speed for a

4  second to see if there are any images here.

5       Go fast-forward to another image.

6  BY MR. PARKINS:

7  Q.  Is this what you would expect to see on a properly

8  functioning MVR?

9  A.  No. It should turn on and off when it is activated.

10  You have got audio and video.

11       MR. PARKINS: Is this now normal speed?

12       MR. WHITE: Yes.

13       MR. PARKINS: Mr. White, if you can fast-forward

14  to the last image.

15  BY MR. PARKINS:

16  Q.  All right. Now, this is 9/11.

17       MS. SULTON: Your Honor, may we have a sidebar?

18       THE COURT: Yes.

19       (The following took place at sidebar.)

20       MS. SULTON: I don't think that Mr. Parkins is

21  qualified to enter evidence about the sequencing of the

22  dates on the videotape. I think we need to have someone wh

23  is familiar with this particular tape, the maintenance of

24  the machine, and so forth.

25       It is a major contention in our -- not a major

763

1  contention. But it is a contention of our case that this

2  tape did not record the incident. There are no reports of

3  which we are aware that indicate this machine was not

4  properly working. And I am very concerned about Mr. Parkins

5  offering testimony that, well, it wasn't working for a

6  couple days before and nobody knew it.

7       THE COURT: Are you just now objecting to it?

8       MS. SULTON: I didn't know he was going to do

9  it.

10       THE COURT: He has been doing it for ten minutes

11  or thereabouts.

12       MR. PARKINS: The point is, this is the tape

13  that came out of the car. It is the best evidence there is.

14       THE COURT: You are not the best proponent of

15  this evidence, is her objection. In effect, you are. That

16  has finally drawn an objection.

17       MR. PARKINS: I am sorry. I will ask the

18  witness the dates on the machine. What happens is the

19  sequence of dates on this particular tape is I think

20  September 10th, it goes to the 11th, then it goes back to

21  September 9th is the next in the sequence. And this witness

22  will testify that what happens is when it goes through, and

23  if it is not removed, it automatically rewinds. So it was

24  in the car on September 8th, September 9th, and then it

25  rewound and it went up again to September 11. And then it

B-070.1

764

1  stopped working. And it would have been impossible to have
2  erased --
3          THE COURT: You know all that because he has
4  investigated? Is he qualified?
5          MR. PARKINS: Yes. He is the one that
6  investigated this. He was the chief investigator for this.
7          MS. SULTON: Your Honor, I think that if he lays
8  the proper foundation that this witness has personal
9  knowledge that that's what happened, then I think that's
10 fine. But I haven't seen any -- there was no disclosure to
11 me that this particular gentleman had information, that kind
12 of information about this videotape.
13         THE COURT: I thought there was a discussion
14 between counsel about the videotape. This is not the
15 videotape?
16         MR. PARKINS: No. I think that was the video
17 deposition.
18         MS. SULTON: I didn't know --
19         THE COURT: Have counsel previously discussed
20 this issue?
21         MS. SULTON: No. I didn't know he was going to
22 use it like this.
23         THE COURT: Okay.
24         MS. SULTON: If he has a witness --
25         THE COURT: Who maintains custody and control

765

1  over these videotapes?
2          MR. PARKINS: He had custody.
3          THE COURT: Who is the IT person who does?
4          MR. PARKINS: Because this is evidence, it got
5  locked away.
6          THE COURT: Whose function is it at Wilmington
7  Department of Police to work with these videos, to bring
8  them in and out of the car, install them, reinstall them,
9  that kind of thing?
10         MR. PARKINS: No one now, of course, because
11 they don't use them. It was not this witness. He didn't do
12 that in 2003, except he did in this case.
13         THE COURT: Essentially, there is a hearsay
14 problem, also, with regard to the result of his
15 investigation, because he is going to say what others told
16 him. You are offering these things for the truth of the
17 matter?
18         MR. PARKINS: Can I just introduce the tape.
19 The tape is a tape. It speaks for itself.
20         MS. SULTON: I believe the tape is in.
21         THE COURT: There was no objection to the tape?
22         MS. SULTON: No, sir.
23         THE COURT: I do think the tape speaks for
24 itself. If the jury wants to view it --
25         MR. PARKINS: Is it fair to ask him what dates

766

1  did he observe on the date where it was --
2          THE COURT: Sure. If he observed the date,
3  sure, yes.
4          MR. PARKINS: Okay.
5          THE COURT: He went through the tape.
6          MS. SULTON: Well, Your Honor, I think that he
7  would be able to say that when he looked at the tape he saw
8  some date stamps. Is that what you are talking about?
9          THE COURT: He can say what he saw on the tape
10 based on his observations. Can we expedite this in some
11 way?
12         MR. PARKINS: I am going to move on.
13         (End of sidebar conference.)
14         THE COURT: Mr. White, you can turn that off.
15 BY MR. PARKINS:
16 Q.   Detective, can you tell the jury the dates that you
17 saw on this tape and the order in which those dates
18 appeared?
19 A.   I believe the dates on this tape were 10, 11, 12 and a
20 nine, something like that. But they were out of sequence.
21 Q.   Was there --
22 A.   I believe it was 10, 11, 12, and then it went back to
23 9.
24 Q.   Was there any footage for September 13?
25 A.   No, there wasn't.

767

1  Q.   All right.
2          Detective, I want to ask you about interviews.
3  One of the interviews that you conducted was of Mr. Smith.
4  Am I correct?
5  A.   Yes.
6  Q.   And when was that interview conducted?
7  A.   It was conducted later that night, on the 13th.
8  Q.   Mr. White, can you play Mr. Smith's interview, the
9  second one that we have?
10         (Tape played.)
11 BY MR. PARSONS:
12 Q.   You gave your card that night to Mr. Smith?
13 A.   Yes, I did.
14 Q.   Did any of the Smiths ever contact you to find out
15 what was happening?
16 A.   No.
17 Q.   Have you received training in the use of deadly force?
18 A.   Yes, I have.
19 Q.   Based upon what you saw that night, do you think tha
20 the officers' use of deadly force was necessary?
21 A.   Yes, it was.
22 Q.   Why?
23 A.   Well, I believe we had that night, what I believe is
24 that we had a dangerous subject who posed a serious threa
25 an imminent threat of serious physical injury or death

B-070.2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -   -   -

 4    HARRY SMITH JR., and        :      Civil Action
      ROSYLN WOODARD SMITH,       :
 5    individually and as         :
      Adminstrators of the        :
 6    ESTATE OF HARRY SMITH, III  :
                                  :
 7                Plaintiffs,     :
                                  :
 8         v.                     :
                                  :
 9    CITY OF WILMINGTON,         :
      JOHN CIRITELLA, in his      :
10    individual capacity and in  :
      his capacity as a police    :
11    officer of the Wilmington   :
      Police Department,          :
12    THOMAS DEMPSEY, in his      :
      individual capacity and in  :
13    his capacity as a police    :
      officer of the Wilmington   :
14    Police Department, and      :
      MATTHEW KURTEN, in his      :
15    individual capacity and in  :
      his capacity as a police    :
16    officer of the Wilmington   :
      Police Department,          :
17                                :
                Defendants.       :      No. 04-1254-GMS
18
                          -   -   -
19
                    Wilmington, Delaware
20                  Friday, April 13, 2007
                          9:25 a.m.
21
                          -   -   -
22
      BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
23                                    and a jury

24                    FIFTH DAY OF TRIAL

25
```

B-071

692

1  APPEARANCES:

2      KESTER I.H. CROSSE, ESQ.
          -and-
3      ANNE T. SULTON, ESQ.
       (Olympia, WA)

4
              Counsel for Plaintiffs

5
6      JOHN A. PARKINS, ESQ., and
       STEVEN J. FINEMAN, ESQ.
       Richards, Layton & Finger

7
              Counsel for Defendants

8
9              - - -

10             THE COURT:  Good morning.
11      May I see counsel.
12      (The following took place at sidebar.)
13             THE COURT:  Unfortunately, the Court has had to
14  spend its time looking at cases and analyzing your
15  afternoon with regard to the defendants' desires to have
16  admitted pursuant to 803(8)(C) a report entitled Report of
17  Attorney General, Wilmington Police Department, Shooting
18  September 13, 2003.
19             I take it there has previously been an objection
20  interposed to the admission of this report.  Is that
21  correct?
22             MS. SULTON:  That's correct.
23             THE COURT:  Why didn't this matter come up
24  during the pretrial conference when I asked whether there
25  were additional matters?  This is a significant issue, and I

693

1  spent an hour and a half looking at cases and analyzing your
2  memorandum this morning.
3             MR. PARKINS:  I am sorry, Your Honor.  At the
4  time of the pretrial conference, I tried to cover the
5  issues.  There were lots of objections.
6             THE COURT:  This strikes me that it should have
7  been the subject of a motion in limine one way or the other,
8  perhaps by both.
9             MR. PARKINS:  I understand that.  In retrospect,
10  I apologize for the Court's time.
11             MS. SULTON:  Your Honor, I received his motion
12  at the same time you received it.
13             THE COURT:  No.  You received notice much
14  earlier that he wanted to use two reports, the Attorney
15  General's report and as I understood it from yesterday, Mr.
16  Parkins, you told me the City Solicitor's report.  You have
17  since have withdrawn that request.
18             MR. PARKINS:  Yes.  Last night Ms. Sulton and I
19  spoke, and I told her I would withdraw that request.
20             MS. SULTON:  When I spoke with him last evening,
21  I told him I might not --
22             THE COURT:  I don't want to spend any more time.
23  I am just chastising the two of you.
24             What I am interested in is your position on this
25  Attorney General's report.

694

1             MS. SULTON:  I haven't yet made a decision.  I
2  was hoping Mr. Parkins had conveyed to the Court that since
3  we are going to spend two hours watching the video --
4             THE COURT:  I thought this was an hour-and-
5  change.
6             MR. PARKINS:  Hour and 45 minutes, or an hour
7  and a half.  My direct is 40 minutes long, I think.
8             THE COURT:  This is your police use of force
9  expert?
10             MR. PARKINS:  Yes.
11             MS. SULTON:  And I was going to read it then,
12  because I might not have an objection to it at this point
13  given the state of the evidence, Your Honor.  And I told Mr.
14  Parkins that yesterday and asked him to convey it to you
15  this morning.
16             THE COURT:  Mr. Crosse, make sure you read this
17  report.
18             MR. PARKINS:  I misspoke.  It is not the use of
19  force expert.  It is the forensic expert.
20             THE COURT:  Take some time, counsel.  You read
21  the report.  You let me know if you want to maintain an
22  objection to it.  I have looked at the law.  I have looked
23  at the report.  I, quite frankly, think it is irrelevant.  I
24  will give Mr. Parkins a chance to tell me why it is
25  relevant.  But I think you are swimming decidedly upstream

695

1  on this one, Mr. Parkins.  That is just the first problem
2  that this report has.  If there is no objection...
3             MR. CROSSE:  Your Honor, I am pretty sure we
4  would object.  The ultimate result is to clear the
5  defendants in this case.
6             THE COURT:  Let's take a few moments here and
7  talk about this report.
8             This is from the report itself language.  I am
9  reading at Page 2.  Do you want to get your copy?
10             MR. PARKINS:  Yes, sir.
11             THE COURT:  Just looking, Mr. Parkins, and
12  counsel, at Page 2, under Purpose of the Attorney General's
13  Report, we find the third sentence in that first paragraph,
14  "The Attorney General does not establish or enforce internal
15  policies concerning the proper use of deadly force by police
16  officers."
17             At the last paragraph, on Page 6, "Based on the
18  above investigation, the Office of the Attorney General
19  concludes that the use of deadly force by members of the
20  Police Department was justified as outlined in 11 Del. Code.
21  The purpose of this investigation, as stated, was to
22  determine whether a crime had been committed."
23             What does that have to do with the civil
24  liability of these officers?
25             MR. PARKINS:  Because they have a claim under 1

B-072

696

1  Del. Code.

2      THE COURT: No. Explain. Elaborate.

3      MR. PARKINS: I think it's alleged in the

4  complaint that they base a claim on 11 Del. Code.

5      THE COURT: The complainant does.

6      MR. PARKINS: Yes.

7      THE COURT: Let me see that. There are other

8  hurdles you are going to have to mount. I want to talk

9  about relevance.

10      He is saying the complaint in point of fact

11  recites a violation in one of its paragraphs as the basis

12  for the relief you are seeking on behalf of your clients,

13  that there was a violation of Delaware criminal law.

14      MS. SULTON: I don't believe so. Delaware

15  constitutional law.

16      THE COURT: You are saying 467.

17      MS. SULTON: I don't believe I was that

18  specific, Your Honor.

19      MR. PARKINS: If they are not basing a claim on

20  Section 467, then I will withdraw the request.

21      THE COURT: Do you want to go back and look? I

22  will permit an amendment of the complaint right here. I

23  won't let you argue that to the jury, if that is your

24  position. Do you want to reexamine?

25      This is completely different. This report is

697

1  rife with other examples of why I believe it would be, it's

2  not relevant, and it would be problematic for other reasons.

3  I think it would confuse the jury. There are two different

4  standards.

5      Let's talk about one problem that I see. I will

6  reference you to the page. Page 3, under Conclusion. The

7  first paragraph. Last sentence. "Under Delaware law, it is

8  the subjective state of mind of Detective John Ciritella

9  which is of critical importance in determining whether his

10  use of deadly force was justifiable in the case."

11      Subjective state of mind doesn't have anything

12  to do with the 1983 inquiry of the officers, I think we can

13  agree.

14      MR. PARKINS: Agree.

15      THE COURT: I have concern that might confuse

16  the jury as to what standard are they to apply. What are

17  they supposed to do, use the officer's subjective or

18  objective state of mind? Admittedly, insofar as the

19  wrongful death claim is concerned, there is an element of

20  state of mind there. For purposes of the 383 inquiry, I am

21  concerned about that.

22      MR. PARKINS: I agree that the states of mind

23  are different. Again, this was based on my understanding

24  that there was a claim based on the statute.

25      THE COURT: I am hearing you. So do you want,

698

1  while the videotape is being viewed by the jury, counsel for

2  plaintiff, take a look more thoroughly at the report, back

3  at your complaint, then we can reconvene before this matter

4  becomes ready to be discussed further.

5      MR. PARKINS: As far as I am concerned, I don't

6  intend to use this today. It is something we could do at

7  the end of the day.

8      THE COURT: I am sorry. I should have asked. I

9  assumed it was going to be used today. My assumption. You

10  know about assumptions. I shouldn't have made that

11  assumption. I thought it was an important enough issue that

12  I wanted to understand the positions.

13      MR. PARKINS: I neglected to make that clear.

14      THE COURT: Let's get the jury in.

15      There is an exhibit issue, I understand.

16      MS. SULTON: Yes. I had a witness mark this --

17      THE COURT: He didn't mark it -- you didn't have

18  it marked as an exhibit. Is there any objection to it being

19  marked?

20      MR. PARKINS: No.

21      THE COURT: Any objection to its admission?

22      MR. PARKINS: No.

23      THE COURT: I assume you are seeking its

24  admission.

25      MS. SULTON: Yes.

699

1      MR. PARKINS: Your Honor, now that I think about

2  this, there is one other question. We haven't discussed the

3  use of voir dire to play to the jury.

4      MR. CROSSE: She said she wasn't going to play

5  it.

6      THE COURT: We can resolve what number it shoul

7  be given later. We are looking at the Google map of the

8  Harrison Street area, 507 Harrison.

9      MR. PARKINS: Can I get a copy of that?

10      THE COURT: We don't have a color copier.

11      MR. PARKINS: Black and white is fine.

12      (End of sidebar conference.)

13      (Jury enters courtroom at 9:33 a.m.)

14      THE COURT: Good morning, members of the jury.

15      Take your seats.

16      We will proceed now with the defense's

17  case-in-chief. I believe we have some video testimony.

18      Mr. Parkins, do you want to share with the jury

19  what they are going to be seeing?

20      MR. PARKINS: Yes, if I may, Your Honor.

21      Ladies and gentlemen of the jury, the defendants

22  retained a forensic scientist as an expert witness, Dr. Jon

23  Nordby. Dr. Nordby has an office in Tacoma, Washington. He

24  suffers from a very serious illness which prevents him from

25  coming to trial today. So in lieu of his live testimony, we

700

1  will present a videotape deposition that was taken by Ms.
2  Sulton and myself on April the 2nd of this year in his
3  office in Tacoma.
4       I believe that Judge Sleet will tell you at the
5  end of the case that his deposition testimony should be
6  considered in the same light as if it were given live in the
7  courtroom.
8       THE COURT: Right. Thank you, Mr. Parkins.
9       MR. PARKINS: Thank you, Your Honor.
10      (At this point the videotape deposition of Jon
11 J. Nordby was played.)
12           - - -
13      THE COURT: Let's take our morning break, ladies
14 and gentlemen.
15      (Jury leaves courtroom at 11:31 a.m.)
16      (Recess taken.)
17      THE COURT: How much more do you have?
18      MR. PARKINS: 33 minutes, Your Honor.
19      (Jury enters courtroom at 11:57 a.m.)
20      THE COURT: Please be seated, ladies and
21 gentlemen. I am told we have about a half an hour left.
22      (Videotape completed.)
23      THE COURT: Next witness.
24      MR. PARKINS: John Ciritella.
25      ... JOHN CIRITELLA, having been duly sworn as a

701

1  witness, was examined and testified as follows ...
2           DIRECT EXAMINATION
3  BY MR. PARKINS:
4  Q.   Detective, how old are you?
5  A.   Forty-two.
6  Q.   Where were you born?
7  A.   Wilmington, Delaware.
8  Q.   Tell us where you went to high school?
9  A.   St. Elizabeth's High School.
10 Q.   When did you graduate from high school?
11 A.   1982.
12 Q.   What did you do after you graduated from high school?
13 A.   Went to work at a company called Gates Engineering.
14 Q.   And how long were you at Gates?
15 A.   Approximately two years.
16 Q.   Did you work at any other place after Gates?
17 A.   St. Joe's Container Company.
18 Q.   How long were you there?
19 A.   Approximately two years.
20 Q.   Are you employed by the Wilmington Police Department?
21 A.   That is correct.
22 Q.   When did you join the Police Department?
23 A.   1986.
24 Q.   Did you attend a training academy when you joined the
25 Police Department?

702

1  A.   Yes, I did.
2  Q.   How long did it last?
3  A.   It was about six months.
4  Q.   Could you tell us a little bit about what sorts of
5  things were taught at the training academy?
6  A.   The training academy lists a variety of training
7  methods, anywhere from firearms training, report-writing,
8  some constitutional law, motor vehicle violations, again,
9  laws of arrest.
10 Q.   Did you receive any instruction in the academy on the
11 use of force?
12 A.   Yes, I did.
13 Q.   Did you use any -- specifically, did you receive any
14 training on the use of deadly force?
15 A.   Yes, I did.
16 Q.   Were you taught when and when it is not appropriate to
17 use that force?
18 A.   I did.
19 Q.   After you graduated from the academy, did you go out
20 on the street by yourself?
21 A.   No, sir.
22 Q.   What happened then?
23 A.   Generally in Wilmington, we generally go out on a
24 probationary period. That is anywhere from 12 to 18 months.
25 Q.   What does the probationary period mean?

703

1  A.   Generally, you are assigned to an FOT or Field
2  Training Officer and you will ride with that person.
3  Generally, for that time, you are usually assigned to
4  another person as a two-man car for again 12 to 18 months.
5  Q.   Does the Wilmington Police Department provide you wit
6  periodic retraining or training?
7  A.   That is correct.
8  Q.   Could you tell us a little bit about the source of
9  things that you receive, training you receive from the
10 Police Department?
11 A.   It generally varies. Yearly we are mandated to have X
12 amount of training of in-service hours. It could be our
13 CPR, it could be updates in memos. It could be, again, laws
14 of arrest. Certain cases dictate certain things for us.
15 Q.   Are you entitled to qualify on the range, your weapon?
16 A.   Yes.
17 Q.   Tell us, for those of the jury who might not be
18 familiar with weapons, what does it mean to qualify?
19 A.   Generally, yearly we have to qualify with our weapon,
20 which means we have to go down the range and it is required
21 it's three shoots, two daytime shoots and one nighttime
22 shoot. You have to acquire a score that qualifies you to
23 carry a firearm.                      B-074
24 Q.   What happens if you fail to qualify?
25 A.   You cannot go out on the street.

1  A.  Yes.
2  Q.  Does Wilmington Police Department have a SWAT team?
3  A.  Yes, it does.
4  Q.  Are you a member of that SWAT team?
5  A.  Yes, I am.
6  Q.  Would you please tell the ladies and gentlemen of the
7  jury when you became a member of the SWAT team and how it is
8  that you qualified to become a member?
9  A.  I became a member in 1988.  We currently have, I
10 believe, 20 to 30 members.  Again, it depends on our
11 military leave.  We have normal, I guess, actual training,
12 it comes up once a month, and it depends on that training,
13 and you have to actually yearly make X amount of training to
14 be continued for the following year via our SWAT team.
15 Q.  Do you simply sign up for the SWAT team?
16 A.  No.  You actually have to qualify via a physical
17 fitness test and an oral board.
18 Q.  Do you receive any special training as a result of
19 your membership in the SWAT team?
20 A.  We probably train a little bit more, we probably train
21 more often than the general patrol officer, yes.
22 Q.  I don't want to go back through your entire career.
23 But have you received any commendations, let's say since
24 2000?
25 A.  I generally have unit citations within the SWAT team,

1  Criminal Investigations Division.  I have some individual
2  awards, whether it is an outstanding or a merit award.  And
3  I am actually a Kiwanis Board winner for a quarter.
4  Q.  Have you received any disciplinary actions, let's say
5  since 2000?
6  A.  No, sir.
7  Q.  Did you receive a commendation for this incident?
8  A.  No, sir.
9  Q.  Were you disciplined for this incident?
10 A.  No, sir.
11 Q.  Aside from this incident, have you ever fired your
12 weapon away from the range?
13 A.  No, sir.
14 Q.  Detective, what I would like to do is to begin by
15 discussion of the events of September 13.  I would like to
16 make a list of what information became available to you as
17 these events unfolded.  To do that, with the Court's
18 permission, I would like the Detective to help me make a
19 chart of the information and when it became available?
20      THE COURT:  Okay.
21      MR. PARKINS:  Thank you.
22      THE COURT:  You can wait until he is set up.
23      MR. PARKINS:  Your Honor, I have arbitrarily
24 divided these events into four different segments for
25 purposes of identifying when information became available to

2  the witness.
2       THE COURT:  You might identify the segments for
3  the record, Mr. Parkins.
4       MR. PARKINS:  Yes, sir.  The first segment is
5  before joining the pursuit.  The second segment is during
6  pursuit.  The third segment is Fifth Street.  And the last
7  segment is Harrison Street.
8       May I ask the witness to come down, please?
9       (Witness steps down from stand.)
10 BY MR. PARKINS:
11 Q.  Let's focus on what it is that you learned before
12 joining the pursuit.  Perhaps you could tell the jury what
13 you were doing when you first heard about this unfolding
14 incident.
15 A.  On September 13 I was actually working my Criminal
16 Investigations Division, a 4-to-12 shift or 1600-to-2400
17 shift.  I was actually at my desk doing paperwork, typing a
18 report.
19 Q.  And how did you hear about this incident?
20 A.  I have a handheld radio that's right next to me.  And
21 I heard the call come in, it was a call for backup, which I
22 in turn took as a call for assistance because of the tone of
23 the officer's voice.
24 Q.  Before you joined the pursuit, why don't we list what
25 you knew before you got into your car and joined the

1  pursuit?
2  A.  Again, I will call it a radio call, is what I
3  received.  And again, I took that as a call for assistance
4  because of his tone.
5       THE COURT:  Members of the jury, can you read
6  that?
7       Okay.
8       THE WITNESS:  Again, can everybody hear me okay?
9  BY MR. PARKINS:
10 Q.  Yes.  What else did you learn?
11 A.  As soon as I heard the initial call for assistance, I
12 grabbed my radio.  My car keys were right there.  Because it
13 was an on-call weekend, our back parking lot to our Police
14 Department is kind of empty, so I was actually close in the
15 parking lot.
16      Again, with that call I grabbed my radio, with
17 his tone of his voice, and I went down actually two flights
18 of stairs, down into the back parking lot area.
19 Q.  Did you learn anything as you were proceeding back
20 towards the back parking lot area?
21 A.  As I got out to the back parking lot, I then heard a
22 "Shots fired, shots fired, police car taken."
23 Q.  Would you please write on there "Shots fired"?
24      (Witness complies.)
25 Q.  Did you learn anything about what happened to the

1 police car as you were proceeding down the stairs.

2 A.     Again, with the "shots fired" call, the next

3 transmission was "Police car taken."

4 Q.     So would you put on there something to indicate that

5 information?

6         (Witness complies.)

7 Q.     And, then, did you learn anything else about this

8 event before you got into your car?

9 A.     Again, as I heard this on the radio and I got in the

10 car, I then heard Sergeant Donohue that was actually

11 pursuing the vehicle.

12 Q.    All right.  What did you do when you got into your

13 car?

14 A.     As soon as I got in my car, I believe the transmission

15 was, "Location on Washington Street," at which point -- our

16 rear lock comes out of Fourth and Poplar Street on Fourth

17 Street, is where I exited out on.  Washington Street is west

18 of me.  I started in a westbound direction.

19 Q.     When did you first see the stolen police car?

20 A.     I actually saw it at Fourth and Jefferson Streets.  I

21 was traveling westbound on Fourth Street.  At Jefferson

22 Street, I saw the vehicle.

23 Q.     You were at Jefferson Street?

24 A.     I was at Jefferson Street.

25 Q.     And where was the stolen police car?

1 A.     first saw the police car on Fourth and Monroe under Pursuit?

2 A.     I guess what I saw is the wide turn, I guess erratic

3 driving.  Then I saw, actually, the red light both at Fourth

4 and Adams westbound and Fourth and Jackson.  So he ran bot

5 of those red lights.  But his manner as he came up to

6 Jackson Street, again, he couldn't get around traffic.  It

7 has like a turning lane to the left.  So he had to actually

8 I guess maneuver through and accelerate through Jackson

9 Street.

10 Q.    So he was maneuvering around cars?

11 A.    That's correct.

12 Q.    Why don't you indicate that information, please.

13        (Witness complies.)

14 A.     The other thing I noticed at this particular time

15 which was difficult to see is again there was enough police

16 presence there that he hadn't stopped at this particular

17 time.  So from the initial chase that was given which was

18 initiated by a supervisor, at that particular time, he

19 hadn't stopped.  And there was visible police presence there

20 at that time.

21 Q.    So he wasn't stopping for police?

22 A.    Not at that time, no.

23 Q.    Could you add that to your list, please?

24        (Witness complies.)

25 Q.    How many red lights did he run?

---

713

1 A.     The radio transmission at that particular time was the

2 vehicle was traveling in a southbound manner on Monroe

3 Street.  And I knew that Jefferson -- I guess Monroe Street

4 is one block west.  And I knew that I would intersect with

5 it as the vehicle was coming out.

6 Q.     Where was the stolen police car when you first saw it?

7 A.     It came out from Monroe Street onto Fourth Street

8 westbound.

9 Q.     Would you describe for the ladies and gentlemen of the

10 jury the manner in which it pulled out onto Fourth Street?

11 A.     When it came out on Fourth Street, again, from the

12 radio transmissions, you could see the vehicle kind of go

13 wide of that.  Of course, I could see at that particular

14 time, there was actually two detective vehicles in front of

15 me, where I was situated.  And as the car came out, you

16 could see another I guess it's a marked unit join the chase,

17 and there was another detective car right there.

18 Q.     Was the wide turn something that was of some

19 importance or significant to you?

20 A.     He turned, I would call it wide, which would be the

21 eastbound lane, he turned, and as he was approaching, the

22 next block is Adams Street.  As he came to Adams Street, I

23 could then visually see, there is a red light at Adams.  And

24 he continued westbound through that red light.

25 Q.     Why don't we list the information you learned when you

715

1 A.     At least two that I visually saw.

2 Q.     They were at Adams and Jackson Street?

3 A.     That's correct.

4 Q.     For some of the jurors who may not be from Wilmington

5 could you describe the intersection of Fourth and Adams?

6 A.     Fourth and Adams probably, in the City of Wilmington,

7 Fourth Street is actually, it is actually, I guess it's two

8 lanes westbound, two lanes eastbound.  It is actually a

9 fairly busy street for the City of Wilmington.  And I would

10 call Fourth and Adams and Fourth and Jackson a very busy

11 street, because we have I guess it is a southbound off-ramp

12 that comes off right there on Jackson Street, along with

13 Jackson that runs, I guess, parallel with it.  So it is a

14 very busy intersection for us.

15 Q.     Southbound off-ramp from I-95?

16 A.     That's correct.

17 Q.     So some of this traffic coming southbound from I-95

18 crosses Fourth and Adams?                    B-076

19 A.     Yes.

20 Q.     What about traffic trying to get on the southbound

21 lane of I-95?

22 A.     Southbound actually goes down to Second and Jackson,

23 or Lancaster and Jackson.

24 Q.     There are people coming down Jackson Street?

25 A.     That's correct.

1  Q.  Come back over here.

2  A.  Yes.

3  Q.  Is Jackson Street just a one-lane road?

4  A.  No. Jackson Street is actually, if anybody has ever

5  been off I-95, I think it is about four lanes, three lanes

6  at least, in a southbound manner.

7  Q.  Had you heard while you were in the pursuit, had you

8  already heard about the route that his pursuit was -- he was

9  taking in the car?

10  A.  Yes, I did. By the time I got in my car, I knew they

11  were westbound, then I started hearing the directions that

12  they were in a westbound manner on Seventh Street, which is

13  one way. Seventh Street in the City of Wilmington travels

14  eastbound -- yes, eastbound. So he was already on that

15  street driving. And then he went down to Monroe Street.

16  And he started southbound on Monroe Street.

17  Q.  So he was going one way, the wrong way on Seventh

18  Street?

19  A.  On Seventh Street.

20  Q.  Would you put that in, please, as information that you

21  acquired?

22      (Witness complies.)

23  Q.  What was his speed like on Fourth Street?

24  A.  I would say he was accelerating, because at that

25  particular time, even though I had a couple cars in front of

---

717

1  me, I don't think any of us could really catch up to him at

2  that particular time.

3  Q.  Could you please put that on the list of things that

4  you learned?

5      (Witness complies.)

6  Q.  Okay. Now, let's focus, if we could, on what happened

7  on Fifth Street. Let's tell the jury, first, what did you

8  do when you were following the suspect on Fourth and he

9  turned?

10  A.  What was happening is, as he was coming up, I guess,

11  through Fourth and Jackson, I actually had to maneuver a

12  little bit more I guess into the eastbound lane kind of

13  get through traffic myself. I know for a fact, I think

14  there was another couple cars that came from Fourth and

15  Jackson Street that added into the chase, or the pursuit.

16      But when we got to Fourth and Van Buren, I

17  realized there was multiple cars that were following the

18  stolen police car at that particular time. I decided to

19  parallel the chase, and at least go one block to Harrison,

20  at which point I decided to go northbound on Harrison Street

21  in the 400 block, with the thought that if the gentleman

22  comes out, gets out of his car, there is a containment, I

23  can at least contain that block, or if he continues in a

24  northbound manner on Van Buren Street, I can continue to

25  parallel that chase and hope he would be at least contained

---

2  Q.  You were driving an unmarked car at that time?

3  A.  Unmarked detective car, yes.

4  Q.  Did you have an emergency light available to you?

5  A.  Yes. That car is equipped with wig-wags on, the

6  flashing lights, the headlights. I have a visor light that

7  comes down, and two rear mounted lights.

8  Q.  When you say a flashing headlight, the kinds that

9  alternate, sort of waggle?

10  A.  I guess they are called wig-wags.

11  Q.  Did you have those on?

12  A.  Yes.

13  Q.  Did you drive against traffic on Harrison Street?

14  A.  Yes, I did.

15  Q.  Was there any traffic coming your way?

16  A.  No, sir.

17  Q.  Did any cars have to turn to avoid you?

18  A.  No.

19  Q.  Where were you when you learned that the stolen police

20  car had taken a left and was going west on Fifth Street?

21  A.  I had actually, at that particular time, when I moved

22  into the 400 block, I was able to get to Fifth Street, at

23  which time, probably as soon as I got to Fifth Street I

24  could hear the radio transmission that he was westbound on

25  Fifth Street, which, again, I looked to my right, I could

---

719

1  see he was coming in my direction.

2  Q.  What did you do?

3  A.  I got out of the vehicle, and I moved over to, it's

4  the northeast corner of Fifth and Harrison Street, behind

5  the building line at that particular time.

6  Q.  Did you go behind the building, behind meaning on the

7  Harrison Street side of the building?

8  A.  I would have been on the Harrison Street side of that

9  corner, yes.

10  Q.  What did you see next?

11  A.  At that particular time, he began driving, again, in a

12  westbound manner in the 1100 block. And then he, the

13  subject stops. As the subject stops, I begin to

14  approach him. The reason I put the vehicle out there is

15  again to kind of slow down the chase, actually deescalate

16  the events that are happening. It is a pursuit through the

17  city.

18      One of the things here, it's the shots fired,

19  that's a deadly force. I already know that I have deadly

20  force --

21      THE COURT: Mr. Parkins, the witness' testimony

22  should be responsive to questions.

23      MR. PARKINS: Yes, sir. I am sorry, Your Honor.

24  BY MR. PARKINS:

25  Q.  What did you conclude about the situation as you

B-077

**720**

1  pulled into the intersection at Fifth and Harrison
2  A.    At the time I pulled into the intersection, I already
3  knew of a shots fired complaint. And I took that as a
4  deadly force had been used.
5      Again, it's a police car that was taken. I know
6  that is at least two armed police officers.
7      How did he get the vehicle? What crime was
8  committed? All factors that I have to take in at that
9  particular time.
10     By pulling the car in, it's just, again,
11  deescalating the event.
12  Q.    So you pulled in the car to deescalate the event?
13  A.    And contain the area.
14  Q.    Now, what did you do when you got out of your car?
15  A.    Went over to the northeast corner at Fifth and
16  Harrison Streets.
17  Q.    And what did you see next?
18  A.    At that particular time the vehicle came into the 1100
19  block of West Fifth, and it stopped.
20  Q.    What did you do?
21  A.    At that particular time, I moved out of the vehicle
22  and began verbal commands to the vehicle, identifying myself
23  as a Wilmington police officer, "Turn off the car and get
24  out of the vehicle."
25  Q.    Were you in plain clothes?

**721**

1  A.    I was, yes.
2  Q.    Did the driver of the stolen car respond to you when
3  you were shouting at him?
4  A.    Yes.
5  Q.    What did he do?
6  A.    As I was giving my verbal commands, the driver of the
7  vehicle, who I knew was not a Wilmington police officer,
8  made eye contact with me.
9  Q.    Did he turn his head or look straight ahead at you?
10  A.    He looked straight ahead at me.
11  Q.    But did he turn his head to look at you?
12  A.    Yes.
13  Q.    What happened after he looked at you?
14  A.    At that particular time, I thought that he observed me
15  and that he was going to comply by getting out of the car
16  and be taken into custody.
17  Q.    What happened?
18  A.    At that particular time, the car accelerated towards
19  me.
20  Q.    Was it going close to you or was it going at you or
21  what?
22  A.    The position that I was at, as the vehicle started
23  accelerating, because the position I was taking is I wasn't
24  sure if the vehicles behind us, which were marked police
25  cars, were going to do any type of stop on him.

**722**

1  A.    Behind the stolen vehicle. The stolen vehicle and the
2  suspect begin driving at me at a high rate of speed, meaning
3  that I have to back up to get out of the way at that
4  particular time.
5  Q.    What did you do?
6  A.    I kept on backing up. And I just thought I was going
7  to run out of real estate, run out of room.
8  Q.    Did you fire your weapon at this time?
9  A.    Yes, I did.
10  Q.    Please tell the jury why you fired your weapon at this
11  time?
12  A.    Because I thought the suspect was going to kill me.
13  Q.    Let's put down here what we know, what you knew as
14  result of the events on Fifth Street. You said you gave him
15  verbal commands. Am I correct?
16  A.    On Fifth Street, yes, I did.
17  Q.    Did he respond to those, comply?
18  A.    I took his eye contact that he knew that I was giving
19  him verbal commands.
20  Q.    Did he comply with your commands?
21  A.    No.
22  Q.    Would you please put that information on here for us?
23      (Witness complies.)
24  Q.    I believe you said he made eye contact?

**723**

1  A.    That's correct.
2  Q.    What was your belief at that time as to whether he
3  knew you were there?
4  A.    I believe that he saw me and he knew I was there.
5  Q.    What happened? You said he accelerated the car?
6  A.    That's correct.
7  Q.    In what direction did he drive?
8  A.    Right at me.
9  Q.    Would you please put that on there?
10      (Witness complies.)
11  Q.    What did you do?
12  A.    I fired my weapon at that particular time.
13  Q.    Did you move first?
14  A.    At which particular time?
15  Q.    When he was driving at you?
16  A.    I was backpedaling.
17  Q.    Would you please put that on?
18      (Witness complies.)
19  Q.    Why did you fire your weapon?
20  A.    Because, again, I thought his intent was to kill me.
21  Q.    Please put that on.                B-078
22      (Witness complies.)
23  Q.    Now, let's talk about what happened as he drove past
24  you. How close was he to you when he drove past?
25  A.    Within arm's length.

**724**

1  Q.  Close than you are to this jury box?

2  A.  Yes.

3  Q.  As close as I am to this jury box?

4  A.  About. That's arm's length.

5  Q.  What did he do after he went past you?

6  A.  As he went past me, he struck, I guess, a white Jeep

7  Cherokee that was parked right on the corner of the 500

8  block of North Harrison Street.

9  Q.  And what happened then?

10  A.  He began to turn that vehicle -- well, at that

11  particular time I knew he crashed the vehicle. I wasn't

12  sure if he was going to go westbound. From where my vehicle

13  I knew was parked, I didn't know at this point where he was

14  going to go, if it was westbound on Fifth

15  Street. In fact, what happened is when he hit the Cherokee

16  he started turning it in a 180-degree fashion, and began to

17  travel northbound in the 500 block of Harrison Street.

18  Q.  Incidentally, at this time did you know that Officer

19  Kurten had pulled his car in behind yours?

20  A.  No, I did not.

21  Q.  So after he hit the car what did he do, and he spun

22  the Jeep?

23  A.  He turned the Jeep about 180 degrees northbound, and

24  then at that particular time he continued, he continued

25  northbound in the 500 block himself.

**725**

1  Q.  What did you see or hear or smell at that time?

2  A.  I could smell that there was tires burning, rubber was

3  burning. I can hear the acceleration of the engine at that

4  particular time.

5  Q.  Could you hear tires?

6  A.  Yes, I could.

7  Q.  What were they doing?

8  A.  It seemed like they were just burning and squealing.

9  Q.  Why don't we put some of this information that is now

10  available to you, and let's -- first of all, did he stop at

11  all after you fired your weapon at him?

12  A.  No. He hasn't stopped for any police at that

13  particular time.

14  Q.  Would you please put that on?

15       (Witness complies.)

16  Q.  Now, you are a detective. Am I correct?

17  A.  That is correct.

18  Q.  Do you make decisions about, in the initial instance,

19  about what to charge people with when you arrest them?

20  A.  I can, yes.

21  Q.  And in this particular instance, as you were on the

22  corner, what would you have decided about what to charge Mr.

23  Smith with?

24  A.  My first contact with Mr. Smith?

25  Q.  No. Once he drove in your direction.

**726**

1  would personally charge him with an attempted

2  murder.

3  Q.  And it was murder of you, attempted?

4  A.  In the State of Delaware, murder in the first

5  degree — correction. Attempted murder first, any law

6  enforcement officer is in that statute, murder in the first

7  degree.

8  Q.  The killing of a police officer in the exercise of his

9  duties is murder in the first degree?

10  A.  That's correct. In the State of Delaware.

11  Q.  Would you please put that on?

12       (Witness complies.)

13  Q.  Now, I gather that at no time did you actually see a

14  deadly weapon in the possession of Mr. Smith. Am I correct?

15  A.  I had the car as his deadly weapon.

16  Q.  Would you please put that on?

17       (Witness complies.)

18  Q.  And then you mentioned he hit the Jeep Cherokee?

19  A.  Yes.

20  Q.  Was that something of significance to you at the time?

21  A.  Again, his continued I guess just disregard for

22  anybody that was out there and his eluding of the police at

23  that particular time.

24  Q.  Would you please put on there the hitting the Jeep

25  Cherokee?

**727**

1       (Witness complies.)

2  Q.  And then you saw him accelerate up Harrison Street?

3  A.  Yes. He eventually I guess got clear of the Jeep that

4  he was pushing, at which point he did get clear of the Jeep.

5  Q.  Some of the ladies and gentlemen of the jury might be

6  curious as to why you think he was trying to accelerate --

7       THE COURT: We don't need a speech, Mr. Parkins.

8  Ask a question.

9       MR. PARKINS: Yes, sir.

10  BY MR. PARKINS:

11  Q.  If you were able to walk up the hill, which we will

12  talk about later, and follow him, why is it that you believe

13  he was accelerating or trying to accelerate up the hill?

14  A.  To continue to flee.

15  Q.  No. What makes you say he was trying to accelerate if

16  you were able to walk after him?

17  A.  Because again, just the overall -- the burn marks that

18  I could smell, I could hear, just the engine, and just the

19  acceleration at that particular time.

20  Q.  All right. Why don't you put on there "accelerate"?

21       (Witness complies.)

22       MR. PARKINS: Your Honor, I don't mean to

23  dictate to the Court any schedule. I am about to switch to

24  a different set of demonstratives.             **B-079**

25       THE COURT: Are you going to need the Detective

**[Page 732 / 734 — top]**

| # | Left column (732) |
|---|---|
| 1 | Q.    Or was it even with it -- was the car even with |
| 2 | in front of it or behind it? |
| 3 | A.    I would say it was at least even with it. |
| 4 | Q.    What did you do when the car stopped at that position? |
| 5 | A.    At this particular time I thought the pursuit was |
| 6 | actually going to deescalate, meaning that we had control of |
| 7 | it and we could be in control of this pursuit at this |
| 8 | particular time. |
| 9 | Again, I was on this corner.  And I began coming |
| 10 | out in this direction, in here. |
| 11 | Q.    You are gesturing as if you came out in a sort of |
| 12 | southeasterly direction? |
| 13 | A.    I would say that was a southbound, I took a |
| 14 | southeasterly approach towards the vehicle. |
| 15 | Q.    Did you go on the east side of the stop sign there, |
| 16 | the side away from us or the side that is facing us? |
| 17 | A.    I was on the other side, the east side of the stop |
| 18 | sign. |
| 19 | THE COURT:  The sidewalk side, Detective? |
| 20 | THE WITNESS:  I started on the sidewalk -- I am |
| 21 | sorry.  It's on the other side, where you could actually |
| 22 | read the stop sign. |
| 23 | BY MR. PARKINS: |
| 24 | Q.    Why don't you just point? |
| 25 | A.    I am sorry.  Again, from the building line, on the |

**Right column (734):**

1  Q.    Were you on the sidewalk when you began shouting these
2  orders and identifying yourself as a police officer?
3
4  MR. CROSSE:  Your Honor, this is leading.
5  THE COURT:  It is.  Sustained.
6  BY MR. PARKINS:
7  Q.    Where were you first when you began to shout at the
8  driver?
9  A.    As soon as I began moving to the car, I began my
10 announcements.
11 Q.    Did you continue to shout when you went into the
12 street?
13 A.    Yes, I did.
14 Q.    What happened next?
15 A.    Again, I am coming from the sidewalk out into the
16 street, at which point I am yelling.  And at that particular
17 time, again, I can see the driver.  He is not a Wilmington
18 police officer at this particular time, at which point,
19 again, because of the situation, meaning that we weren't
20 sure at that particular time what measures we were going to
21 take next, meaning was it going to be a car stop, and seeing
22 what the operator was going to do at that particular time,
23 continue my verbal commands.
24 Q.    What did the driver do if anything before he began to
25 drive forward again?

**[Page 733 / 735 — bottom]**

**Left column (733):**

1  sidewalk, and then out into the street.
2  THE COURT:  Okay.
3  BY MR. PARKINS:
4  Q.    How far out into the street did you get?
5  A.    Again, it was at least a carlength -- width.
6  Q.    Car width?
7  A.    Yes, sir.
8  Q.    At what point were you when you began shouting verbal
9  orders to Mr. Smith?
10 A.    When the vehicle came to a stop and I began moving
11 towards it, I began announcing myself as police.
12 Q.    What were you wearing at that time?
13 A.    I had a shirt with the Wilmington Police Detective
14 logo on the chest.  And knowing that, I began my verbal
15 commands, making sure that I at least identify myself and
16 then hopefully I could get some response from him.
17 Q.    Did you have your badge?
18 A.    Yes, I did.
19 Q.    Where was that?
20 A.    That was on, attached.  It's a clip and it's on the
21 right side of my belt line.
22 THE COURT:  Were you wearing a jacket?
23 THE WITNESS:  No, sir.
24 BY MR. PARKINS:
25 Q.    Was the badge visible as you were outside?

**Right column (735):**

1  A.    He actually -- we made eye contact.  He actually
2  looked at me.
3  Q.    At that time did you have a belief as to whether he
4  saw you or not?
5  A.    I took that as he did see me.
6  THE COURT:  We have been through this already.
7  I certainly appreciate your wanting to have the Detective
8  illustrate by photograph, which I think is an excellent way
9  to demonstrate where people are positioned.  But we have
10 been through this testimony.
11 MR. PARKINS:  We will speed it up, Your Honor.
12 BY MR. PARKINS:
13 Q.    Show the direction that the car drove when it started
14 to come forward?
15 A.    Again, it would have been in a manner in this
16 direction here.
17 Q.    And you are gesturing from essentially the center of
18 Fifth Street towards the northern edge of Fifth Street,
19 beyond the stop sign.  Is that correct?
20 A.    Again, if we are going to use the truck as just a
21 guide mark, the vehicle began westbound, and again, it began
22 coming in this direction westbound.  Again, it was in
23 between here (indicating).
24 Q.    Would you point out to the ladies and gentlemen of the
25 jury where you were when you fired your first shots?

736

```
 1   A.    Cases have been so close where this area contained
 2   on the street, maybe three feet from the curb line.
 3   Q.    Did you fire shots after that while on Fifth Street?
 4   A.    Yes, I did.
 5   Q.    And where were you so far as you can remember when you
 6   fired those shots?
 7   A.    Again, because of the car's acceleration at this
 8   particular time and I am backpedaling, I am on -- eventually
 9   I get to the curb, at which point, again, the vehicle is
10   right on top of me.
11   Q.    And you are on the sidewalk at this time, sir?
12   A.    That's correct.
13   Q.    Let's see if we can take a look at the Photograph 69.
14   What does this photograph depict?
15   A.    This is the 500 block of North Harrison, normal
16   traffic, if you can see this vehicle right here, faces in a
17   southbound -- that is normal traffic flow.  But that vehicle
18   is parked, but that is the normal traffic, it would be this
19   direction is normal traffic.
20   Q.    When you say that vehicle is parked, you are pointing
21   to a blue?  I can't tell what that is, but a blue car?
22   A.    That's correct.
23   Q.    Show the jury what path the stolen police car took as
24   it went through here?
25   A.    In this particular photograph, the front of my car,
```

737

```
 1   the vehicle came through and just in front of my car, and
 2   again, the Jeep here, this is the white Jeep Cherokee that I
 3   talked about, was again in front of the blue car here in
 4   this area, facing southbound, so it was facing the same
 5   direction as the vehicle here.  And the stolen police car
 6   came through, striking the white Jeep.
 7   Q.    What did it do after it hit the white Jeep?
 8   A.    The police car continued to push this Jeep in the
 9   direction that you currently see it in the photograph.
10   Q.    I see over there some placards, it looks like 17 and a
11   19.  Do you see those, sir?
12   A.    It would be these two right here?
13   Q.    Yes.  Do you know what those likely represent?
14   A.    Again, EDU, the Evidence Detection Unit puts placards
15   out.  I can assume what they are.  But they would either be,
16   in a situation like this they could be spent shell casings.
17   They can be projectiles or any other items of evidence that
18   the evidence unit felt was necessary to preserve.
19   Q.    Did you fire any shots while you were in this area?
20   A.    In this particular area?
21   Q.    Yes.
22   A.    No, sir.
23   Q.    Would you -- what did you do after the stolen police
24   car hit the Jeep?
25   A.    Again, as the police car began -- after I realized
```

738

```
 1   that the vehicle, now the stolen police car, was going to take a
 2   northbound route, I began to continue up the sidewalk,
 3   monitoring the police vehicle.  You have to realize it was
 4   on the outside of the Jeep at this particular time, in this
 5   area.
 6   Q.    You say you continued on the sidewalk and you are
 7   pointing to the eastern sidewalk of Harrison Street?
 8   A.    This would be the east side of North Harrison Street.
 9   Again, I was taking a northbound direction.  It would be up
10   the street.
11   Q.    Is there a hill there?
12   A.    There is, yes.
13   Q.    Going up or down the hill?
14   A.    I would call it in a northbound direction.  But I was
15   going up the hill.
16   Q.    Did you at any time enter into the street on Harrison
17   Street?
18   A.    I did.  And it's beyond this vehicle in this area
19   right here.
20   Q.    When you say beyond this vehicle, you are gesturing to
21   beyond the blue vehicle?
22   A.    That is correct.  Beyond this blue vehicle.  It would
23   be, I guess, the back trunk area, the rear bumper.
24   Q.    And where were you, sir, when you fired your final
25   three shots?  In what general area?
```

739

```
 1   A.    I would have been in the street, in that particular
 2   area.
 3   Q.    Behind the parked blue vehicle?
 4   A.    Yes.
 5         MR. PARKINS:  Would you show me, Mr. White,
 6   please, DX-79.
 7   BY MR. PARKINS:
 8   Q.    Does this photograph -- what does this photograph
 9   depict?
10   A.    This is the front of the white Cherokee.  Obviously,
11   you can see the vehicle damage at this particular time from
12   the impact of the stolen police car.  The other thing you
13   can also see is, again, this is a mark that was determined
14   to be an acceleration mark.
15   Q.    What vehicle caused the acceleration mark?
16   A.    That was the stolen police car.
17   Q.    Thank you.
18         Thank you, Mr. White.
19         Detective, what I would like to do is to review
20   with you briefly some of the policies of the Wilmington
21   Police Department and ask you how you applied those policies
22   in this particular situation.
23   A.    Yes, sir.
24   Q.    Detective, can you see that from where you are?
25   A.    Yes, I can.
```

B-081

**Page 740**

1  Q.  What is the highlighted information that we have in —
2  A.  This is our force continuum that we have for the
3  Wilmington Police Department.
4  Q.  Can you explain to the jury what a force continuum is
5  insofar as the Wilmington Police Department interprets it?
6  A.  Any use of force that the Wilmington Police Department
7  is going to take, we use the continuum. What a continuum
8  is, if you could read it here, again, it goes from different
9  elements of what we kind of use as our continuum. Some
10  people call it I guess a ladder. There is other
11  definitions. But it's a force continuum. What you do is
12  try to exercise each of those elements as it applies when
13  you are effecting an arrest.
14  Q.  What are the elements in the force continuum here?
15  A.  You have physical presence. Verbal warning. Verbal
16  command. You have a hands-on control. A hands-on
17  countermeasure. Intermediate weapon. The last one would be
18  a deadly weapon -- correction, deadly force.
19  Q.  I think all of us can understand the first three. We
20  won't take time to explain those. But what are hands-on
21  countermeasures?
22  A.  Hands-on countermeasures would be if you have to use
23  your hands or I guess even your feet. If may be you have a
24  subject resisting in a manner that maybe you have to apply
25  either a wrist lock or leg sweep to an individual maybe.

**Page 742**

2  What does that mean?
3  A.  What that pretty much says is that as you go -- if I
4  have to arrest a subject -- and again, there is different
5  levels. If he actively resists, there is different
6  elements. What happens is, if he doesn't have gun, so to
7  speak, and I go to approach him and he pulls out a gun, the
8  force continuum could change immediately as I effect that
9  arrest. Thus, we don't have to necessarily stay with each
10  of those steps as prescribed.
11  Q.  Were you able to go through the entire force continuum
12  on the night of September 13th?
13  A.  No, I was not.
14  Q.  Where did you start?
15  A.  I started at police presence, continued to verbal
16  commands.
17  Q.  Then what was the next step that you used?
18  A.  Deadly force.
19  Q.  The next procedure or policy that we have highlighted
20  are some of the parameters for using deadly force. Would
21  you please read for us Item 1, so that we have a record of
22  it?
23  A.  Yes, sir. No. 1.
24       "An officer is authorized to unholster his
25  pistol whenever he has reasonable suspicion to believe that

**Page 741**

1  That would be considered a hands-on countermeasure.
2  Q.  The next item is intermediate weapon, which includes
3  choice of a chemical weapon, asp baton, or taser. What is
4  an -- what is the chemical weapon referred to here?
5  A.  Chemical weapon is generally our pepper spray or OC
6  spray that we carry.
7  Q.  What is an asp baton?
8  A.  Our asp baton is actually the expandable bat. You
9  actually kind of give it a wrist throw and it will expand.
10  Q.  And a taser, I think most of us have heard about that.
11  Maybe you could tell us?
12  A.  A taser is an electronic device. We carry one that
13  actually shoots darts at a distance of 21 feet.
14  Q.  Did you have on that night a chemical weapon, an asp
15  baton or taser with you?
16  A.  No, sir.
17  Q.  Let's look at the next paragraph for a second. Can
18  you tell us -- I guess I will have to read it for the
19  record:
20       "However, members should be mindful that the
21  force needed to control an incident may not fall on the
22  prescribed continuum sequentially in all circumstances.
23  Therefore, members should use their discretion to quickly
24  and safely apply the necessary level of force to meet
25  situations involving arresting, safety of citizens or

**Page 743**

1  he or anyone in his immediate vicinity is in imminent danger
2  of physical harm."
3  Q.  Earlier this morning you prepared this chart which
4  contains the information that you knew. Can you see that
5  from here, Detective?
6  A.  I can, some of it, yes. That's okay.
7  Q.  Which of these factors in your view authorized you to
8  unholster your weapon?
9  A.  The initial "Shots fired" call is a deadly force. I
10  took that as at least I could unholster my weapon at that
11  particular time.
12  Q.  The next item in the use of force parameters or deadly
13  force parameters, "If feasible, prior to using a firearm,
14  the officer shall identify himself as a police officer and
15  shall give warning."
16       Did you do that on this evening?
17  A.  Yes, sir.
18  Q.  What did you do to identify yourself?
19  A.  I told --
20       THE COURT: You have gone through that, Mr.
21  Parkins. I would like to move this along.
22       MR. PARKINS: Yes, sir.
23       THE COURT: This is the third time you have
24  asked him to discuss this.
25       MR. PARKINS: Yes, sir.

**B-082**

748

BY MR. PARKINS:

Q.   Did you have a belief as to whether there were

exceptional circumstances here?

A.   Yes.

Q.   And is the belief based on anything other than what

you have already told us?

A.   No, it is not.

Q.   Detective, how long were you at the scene after the

shooting was concluded?

A.   Not long.

Q.   Did you see any jubilation or high-fiving or laughing

among the officers?

A.   No, sir.

Q.   What was the mood in the police car as you were taken

back -- first you went for coffee -- strike that.

Where did you go after you left the scene?

A.   We were sequestered into a vehicle, at which point we

knew we were going back to our police headquarters, which is

protocol. We did stop for coffee. But again, the mood in

the car was I guess very calm, in the degree that no one was

really talking at all, from the situation.

Q.   No laughing?

A.   No, sir.

Q.   Joking?

A.   No, sir.

749

Q.   High-fiving?

A.   No.

Q.   Did you at any time ever shoot at this vehicle while

it was stopped?

A.   While it was stopped? No, sir.

Q.   Looking back on things, how do you feel about these

events today?

A.   Tragic incident. I wish I never used -- I wish I was

never placed in a predicament to use deadly force. I don't

think any law enforcement officer wants to do that, no.

MR. PARKINS: Thank you. Nothing further.

THE COURT: Ms. Sulton, you may cross-examine.

Detective, Mr. Parkins has asked a couple of

witnesses about a beanbag gun. What is it?

THE WITNESS: Wilmington Police, we do have a

beanbag gun. We use it as a shotgun. It comes in a

12-gauge variety. Our SWAT team is authorized to take that

out. Again, that is considered a less than lethal, I guess

firearm that we use. But again, only our SWAT team is

qualified in that because we never want to give that to our

patrol units to criss-cross our rounds. So we are

authorized to take it out.

THE COURT: I wanted to make sure the jury

understands.

THE WITNESS: Again, a beanbag, again, is a less

750

than lethal, from a distance -- say a subject had a knife.

You could effectively, from here, even maybe to the wall,

direct a shot with a beanbag round and hopefully have that

suspect again drop the knife or at least gain control of

that situation. It's just a less than lethal use that we

have within our department.

THE COURT: Thank you.

Ms. Sulton, do you need that easel up?

MS. SULTON: I might.

THE COURT: I was going to have Mr. Parkins

remove it.

MS. SULTON: That is not necessary, Your Honor.

CROSS-EXAMINATION

BY MS. SULTON:

Q.   I would like to take you back just briefly to the

pursuit, Detective Ciritella. What number car were you

behind Car 1180?

A.   At which point, ma'am?

Q.   When you joined the pursuit, were you car No. 5, 6, 7,

8?

A.   Initially, when I saw the vehicle at Fourth and

Jefferson Street, I would describe my number maybe as No. 6

Q.   And was there any point at which you were, prior to

the point at which you broke off and went in the other

direction from the caravan, was there any point at which you

751

were closer than 35 feet to the rear bumper of Car 1180?

A.   I don't believe so, no.

Q.   Could you explain how you could see Car 1180 drive

erratically when you did not see Marilyn Garcia, who was

sitting on the porch on the steps at the intersection of

Fifth and Harrison Street?

A.   The intersection of Fourth and Jefferson in the City

of Wilmington, again, what I see on this particular day very

clear, at that particular time in the city -- it is actually

I guess a downgrade, it actually kind of slopes down, at

that particular time, we are in -- I guess we are traveling

westbound, but we are kind of in the middle with our lights

activated. As the vehicle comes out of Fourth and Monroe

Street, he comes out, he comes out to my line of view.

Q.   Did you see Car 1180 hit another car?

A.   Yes. The white Jeep Cherokee.

Q.   Other than that, along the pursuit?

A.   No, ma'am.

Q.   Did you see it hit a person?

A.   No, ma'am.

Q.   Do you know whether or not Officer Donohue was

reporting what was going on along the route?

A.   Yes, she was.

Q.   And are you aware that Officer Donohue was reporting

that there were no injuries or accidents along the way?

B-083

756

1  A.    It would have been in between my vehicle, which is the
2  maroon Crown Vic, Crown Victoria -- this is actually a stop
3  sign. I don't know if you can see it in the photograph. It
4  would have been in this path right here, ma'am.
5  Q.    Do you see those stairs that are just adjoined almost
6  to the building there, or the home on the corner, they are
7  white stairs? Can you tell that from this photograph?
8  A.    I believe you are talking about this area right in
9  here ma'am?
10  Q.    Yes.
11  A.    Yes, ma'am.
12  Q.    That's where Marilyn Garcia was sitting when she was
13  shot. Correct?
14  A.    That is reported, yes, ma'am.
15  Q.    And you were standing right at that corner after you
16  exited your vehicle?
17  A.    That's correct, ma'am.
18  Q.    And you never saw Marilyn Garcia?
19  A.    No, ma'am.
20  Q.    While you were walking up the street shooting at Mr.
21  Smith, did you ever see Mr. Gwyn standing right on the
22  sidewalk on the other side of the street?
23  A.    And I believe you would be referring to this sidewalk,
24  that would be the west side of the street?
25  Q.    Correct.

757

1  A.    No, ma'am.
2  Q.    And this is daylight, again. Correct?
3  A.    That's correct.
4  Q.    Did you see Officer Kurten shooting while you are
5  shooting?
6  A.    No, ma'am.
7  Q.    Did you see Officer Dempsey shooting?
8  A.    No, ma'am.
9  Q.    And he was on the driver's side of the vehicle, he
10  testified. Correct?
11  A.    That's correct, ma'am. I never saw him engaged in
12  this target -- or this suspect. He would have been, it's
13  just off the picture line. It would have been to the
14  driver's side of my door when I first saw Sergeant Dempsey.
15  He would have been in that area, ma'am.
16  Q.    And you never saw the other people who were located on
17  the street or on the sidewalks or on the porches on Harrison
18  Street?
19  A.    No, ma'am.
20  Q.    So at any time during which you fired 13 shots, you
21  never saw Ms. Garcia, you never saw Officer Dempsey, you
22  never saw Officer Kurten, you never saw Mr. Gwyn or Mrs.
23  Gwyn, none of those people?
24  A.    I think I testified to seeing Officer, or Sergeant
25  Dempsey. Again --

758

1  Q.    While firing?
2  A.    While firing, no, ma'am, I did not.
3  Q.    Who, then, in the immediate vicinity was in an
4  imminent threat of serious injury or death?
5  A.    At this particular time, as the vehicle drives past,
6  Officer Dempsey is in this line. I still do not know which
7  direction the vehicle is going.
8  Q.    So let me widen the time frame. From the moment that
9  you discharged your first bullet to the moment at which you
10  fired your 13th bullet, who at the time that you are doing
11  the firing, who was in the immediate vicinity at imminent
12  risk or threat of death or serious bodily injury? Who?
13  A.    Sergeant Dempsey.
14  Q.    When?
15  A.    When the vehicle drives past me, he is on the driver's
16  side, as I indicated. Again, the stolen police vehicle has
17  not made a directional change at that particular time. As
18  it turns, I stop firing.
19  Q.    So how many shots did you fire while you thought
20  Officer Dempsey was in imminent risk of serious death or --
21  I mean serious injury or death?
22  A.    I would say four-to-six range, ma'am.
23  Q.    Okay. So if we subtract six shots -- let's subtract
24  nine. Who was in the immediate vicinity when you fired your
25  last four shots?

759

1  A.    In the immediate vicinity, he posed a threat by his
2  actions at that particular time.
3  Q.    Who is in the immediate vicinity?
4  A.    I am in the immediate vicinity at that particular
5  time. He is still a risk. He still has control of the
6  scene. The other officers while he is driving in a
7  northbound manner are in that vicinity. He has a car,
8  ma'am, which is not on foot.
9        The element that he has a vehicle means that he
10  can go, the general public, if he continues past that
11  intersection, continues to drive, everyone is at risk at
12  this particular time, as I perceive it.
13  Q.    Are you bound by the requirements of the use of deadly
14  force policy as articulated in the police officers' manual?
15  A.    No, ma'am.
16  Q.    I would like to ask you a little bit about Sergeant
17  Browne. You have worked with him for well over a decade.
18  Correct? I believe his title is Lieutenant Browne, William
19  Browne, who testified here yesterday. Correct?
20  A.    Yes, ma'am.
21  Q.    And you have worked with him for over a decade.
22  Correct?
23  A.    I have been on the force with him for 20-plus years.
24  But as my immediate supervisor, is that what you are asking
25  me?

B-084

**760**

1  Q.  No, is it fair to say that in your work at the police
2  department that you have come to know William Browne?
3  A.  That's accurate.
4  Q.  And is it fair to say that in your opinion, based upon
5  your experience with him, that he strives to be accurate
6  when writing reports?
7  A.  I would say that is correct.
8  Q.  You are aware that Mr. Browne conducted the
9  investigation in this case.  Correct?
10  A.  Correct.
11  Q.  And you are aware that he wrote a report as a result
12  of his investigation?
13  A.  That's correct.
14  Q.  So if he says in his report, during this time
15  Detective Ciritella was aware of the other officers firing,
16  he was incorrect?
17  A.  I would say that's yes.
18  Q.  If he says in his report that you were crouched in a
19  tactical position, would he be incorrect?
20  A.  I think I have described a tactical position, and
21  again, I guess, if you want to call it a crouch, maybe an
22  isosceles, it is a stance that I describe, I call it a
23  tactical stance.  So, no, he wouldn't be inaccurate at that.
24  Q.  Do you recall me taking your deposition and asking you
25  whether or not you were crouched in a tactical position?

**761**

1  A.  Yes, ma'am, I do.
2  Q.  Do you recall your answer?
3  A.  I believe I did not have an example of what you define
4  as crouching in my deposition.
5  Q.  Didn't you deny that you were in a crouched tactical
6  position?
7  A.  No, ma'am.  I don't think we ever defined what a
8  crouching position was in my deposition.
9  Q.  Let's take a look at your deposition.
10  A.  Yes, ma'am.
11       MS. SULTON:  If you would be kind enough,
12  counsel, I'm on Page 90.
13       THE WITNESS:  I am sorry.  I didn't hear you.
14  BY MS. SULTON:
15  Q.  Page 90.  Let's start at Line 8.  Let me know when you
16  are there.
17  A.  Yes, ma'am.
18  Q.  My question was:  "Then you fire between two and four
19  rounds into the windshield?"
20       And your answer?
21  A.  "That's correct."
22  Q.  My question:  "You are backpedaling as you are
23  discharging your weapon these first two or four times"?
24       And your answer?
25  A.  "That I don't know."

**762**

1  Q.  "Question:  Was there ever any point at which you had
2  got into a crouching position and --"
3       Your answer?
4  A.  "No, ma'am."
5  Q.  "Question:  No?  So if someone says in some report
6  somewhere that you got into a crouching position, that's
7  just incorrect because that didn't happen, did it?"
8       And your answer?
9  A.  "I don't believe so, no."
10  Q.  If you thought that Mr. Smith posed such a danger when
11  you left the police station, as a member of the SWAT team,
12  why did you not call for their assistance?
13  A.  Because I am not authorized to do that, ma'am.
14  Q.  Do you know if the SWAT team was ever called out?
15  A.  No, ma'am, they were not.
16       MS. SULTON:  If I can have just a minute, Your
17  Honor.
18       THE COURT:  Sure.
19  BY MS. SULTON:
20  Q.  So, now, after the Car 1180 passes you, and it passes
21  this sidewalk, and it's going up the hill, was there a point
22  at which before you shot Mr. Smith in the head that you knew
23  you had hit him with another round?
24  A.  I am sorry.  Repeat your question one more time,
25  please.

**763**

1  Q.  After the car crosses the curb and goes from Fifth
2  Street up Harrison Street --
3  A.  Ma'am, can I walk through?  I want to make sure you
4  are accurate.
5  Q.  I would like to ask the question.  If I don't ask a
6  proper question, please let me know.
7  A.  Yes, ma'am.
8  Q.  Let me try again.  After the car crosses the curb, and
9  it is now heading the wrong way up Harrison Street, was
10  there a point at which you realized you hit Mr. Smith with a
11  bullet?
12  A.  No, ma'am, there was no time that I hit him, in this
13  area while he was driving the vehicle, I still had eye
14  contact with him and he was still fully operable of the
15  stolen police car at that particular time.
16  Q.  And how far was your body from the vehicle?
17  A.  At this particular time, I am on this sidewalk right
18  here, and again, he is accelerating in a northbound, pushing
19  the white Jeep Cherokee in a 180-degree direction, at which
20  point I then come up behind, I guess this is a blue, it
21  looks like a Grand Prix on the picture.
22  Q.  Okay.  So after that point, you are still firing your
23  gun.  Correct?
24  A.  No, ma'am, I am not.  I had stopped firing as the
25  vehicle passed me.

B-085

764

1  Q.    So you stopped firing as the vehicle passed you.
2  Correct?
3  A.    That's correct.
4  Q.    And it's also correct that you started firing as the
5  vehicle is passing you.  Correct?
6  A.    At which point?
7  Q.    When you fired your first shot, the vehicle had
8  already passed you.  Correct?
9  A.    No, ma'am.
10  Q.    Well, let's take a look at -- do you have the black
11  book?  Let's take a look at another exhibit.
12  A.    Yes, ma'am.
13  Q.    If you could take a look at Exhibit No. 17?
14  A.    17, ma'am?
15  Q.    Yes, please.
16  A.    Yes, ma'am.
17  Q.    I am going to show you just a little bit clearer
18  version of that photograph.  You have seen this photograph
19  before.  Correct?
20  A.    I believe yesterday, ma'am.
21  Q.    And you see that there are dowel sticks that are
22  placed there, I am going to represent to you that they were
23  done by someone at the Wilmington Police Department.
24  A.    That's correct.
25  Q.    Do you see that the dowel sticks indicate that the

765

1  bullets came in at an angle?  Correct?
2  A.    No, I do not, ma'am.
3  Q.    You don't see that?
4  A.    The dowel marks are marks are used in the Evidence
5  Detection Unit to get an idea of how this incident happened.
6  The dowel marks are placed in the car.  Again, if you
7  notice, that dowel mark, let's just use the hood, if they
8  are just laying on the hood, the trajectory is not accurate.
9  And again, because of the hole in the windshield, it can be
10  moved, to change the trajectory.
11        I don't know any of the writing -- I can't tell
12  you which round is mine on this particular photograph,
13  ma'am.
14  Q.    Do you know anyone else, sir, who was firing bullets
15  from the passenger side of that vehicle other than you?
16  A.    No, ma'am, I was the only one.
17  Q.    So let's take a look at another photo.  Let's take a
18  look at Exhibit No. 18.
19  A.    Yes, ma'am.
20  Q.    It's a collection of photos.  Do you see those dowel
21  markers or dowel sticks?
22  A.    I see four photographs, ma'am, with I guess dowel
23  markers.
24  Q.    If we go to the one that is on the top right, you see
25  that there are some dowel markers that suggest that there

766

1  were some shots fired, some additional shots fired on the
2  passenger side.
3  A.    We are talking about this photograph here, ma'am?
4  Q.    That is correct.
5  A.    Are they entrances or exits?  Impact rounds?  Can you
6  tell me what they are?
7  Q.    Do you know?
8  A.    No, ma'am, I do not.
9  Q.    So you are on Harrison Street.  There is a point at
10  which you step from the sidewalk into the street.  Correct?
11  A.    That is correct.
12  Q.    And you begin firing again.  Correct?
13  A.    No, ma'am.  The vehicle approaches me, attempts to run
14  me over --
15  Q.    I am sorry, sir.  Let me sharpen my question.
16        We are now on Harrison Street?
17  A.    Harrison Street, yes, ma'am.
18  Q.    The Car 1180 has moved beyond where the Jeep Cheroke
19  comes to rest?
20  A.    Yes, ma'am.
21  Q.    Does there come a point when you step out into the
22  street on Harrison Street?
23  A.    Yes, ma'am.
24  Q.    And what do you do after you step into the street?
25  A.    I fire into the Vehicle 1180.

767

1  Q.    How far are you from the Vehicle 1180 at the time that
2  you begin those shots?
3  A.    Probably less than eight feet.
4  Q.    Less than eight feet?
5  A.    If I am out on the street, I know I am now a
6  carlength -- width out into the sidewalk.  So I am half of a
7  carlength, what is the width of a vehicle, seven, eight
8  feet.  I am half of that distance, then Vehicle 1180 is
9  right there.
10  Q.    So when you start your second round of firing, are you
11  behind the car or are you even with it?  When I say even
12  with, say at a 3:00 position, as it relates to the front
13  passenger door?
14  A.    I would say I was at the 3:00 position, ma'am.
15  Q.    Of the front passenger door?
16  A.    Yes, ma'am.
17  Q.    When you fire your second round of shots?
18  A.    Yes, ma'am.
19  Q.    And how many shots did you fire while you were in that
20  position?
21  A.    Three, ma'am.
22  Q.    And what were you shooting at?
23  A.    I was shooting at the threat.  Mr. Smith was still
24  operable in the vehicle.  At that particular time he still
25  had control of that situation.

B-086

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                       -  -  -

 4    HARRY SMITH JR., and        :     Civil Action
      ROSYLN WOODARD SMITH,       :
 5    individually and as         :
      Administrators of The       :
 6    ESTATE OF HARRY SMITH, III :
                                  :
 7              Plaintiffs,       :
                                  :
 8         v.                     :
                                  :
 9    CITY OF WILMINGTON,         :
      JOHN CIRITELLA, in his      :
10    individual capacity and in :
      his capacity as a police    :
11    officer of the Wilmington   :
      Police Department,          :
12    THOMAS DEMPSEY, in his      :
      individual capacity and in :
13    his capacity as a police    :
      officer of the Wilmington   :
14    Police Department, and      :
      MATTHEW KURTEN, in his      :
15    individual capacity and in :
      his capacity as a police    :
16    officer of the Wilmington   :
      Police Department,          :
17                                :
                Defendants.       :     No. 04-1254-GMS
18
                         -  -  -
19
                    Wilmington, Delaware
20                  Monday, April 16, 2007
                         9:00 a.m.
21
                         -  -  -
22
      BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.,
23                                    and a jury

24

25
```

B-087

862

1  written reports were done by any of these defendants.

2          THE COURT: I don't think that is accurate.

3  Let's talk about it. I think I recall hearing testimony

4  about at least one of the defendants writing a report. I

5  could be wrong about that. Am I wrong about that?

6          MR. PARKINS: I think what you may recall, Your

7  Honor, is there was evidence about one of the defendants

8  gave another statement to Internal Affairs, which was

9  transcribed.

10         THE COURT: Maybe it was that.

11         MS. SULTON: That is Exhibit 21.

12         So you contend what? And please be specific,

13 counsel.

14         MS. SULTON: We contend that the defendants have

15 either spoiled or hidden information about what occurred on

16 that evening, and that that includes the videotape that

17 should have recorded almost all of this incident as well as

18 the failure to write reports on this incident. We believe

19 that they intentionally have either spoiled or concealed

20 that information from us, and we should be able to have the

21 jury so instructed, that whatever that information is, it

22 would have been detrimental to them.

23         THE COURT: The evidence that supports your

24 contention.

25         Your belief, Mr. Crosse?

863

1          MR. CROSSE: Your Honor, as I understood it --

2  and I am just thinking of the practice -- when I was with

3  the City Solicitor's Office, was that when there was a

4  shooting, the three officers, or two officers are brought

5  in. You write a report. You write a report. You write a

6  report. Then somebody looks at all three of those reports.

7          That didn't happen in this case. We had Mr.

8  Wiener brought in to counsel the police officers, and there

9  is a videotape of a statement. The only thing that was

10 written was the front page that said, you are willing to

11 give a statement.

12         So it just seems that they didn't comply with

13 the policy that says there should be a written report. They

14 took a statement from the guys with counsel present. You

15 know, I would hope that counsel spoke with them before they

16 put them in the room and explained what happened, rather

17 than them coming in and writing fresh in their mind, what

18 did you do? What did you see?

19         THE COURT: Let me ask this: Were these

20 interviews with these officers videotaped?

21         MR. CROSSE: Yes, Your Honor.

22         MS. SULTON: And it is in evidence. It is an

23 admitted exhibit.

24         THE COURT: You were provided with the

25 videotapes of the videotaped interviews of each officer?

864

1          MR. CROSSE: Yes, sir. I think they are about

2  ten minutes apiece.

3          THE COURT: These videotaped interviews were

4  done immediately upon the officers' return to headquarters?

5  When were they done?

6          MR. CROSSE: I think late that night.

7          MS. SULTON: About six hours or so.

8          THE COURT: I understand the contention, and I

9  will hear from the defendants on why the procedure wasn't

10 followed. Were these, as far as you know, done in lieu of

11 written reports?

12         MR. CROSSE: I don't know if that is an argument

13 that is going to be made. But I specifically asked their

14 expert, should it be done? He said yes. Do you know why it

15 wasn't taken? He said that's an internal disciplinary matter

16 to be taken up.

17         So he recognized it. That was Mr. Traenkle.

18         THE COURT: So it's the plaintiffs' contention

19 that the writings would have somehow been materially

20 different from the video recordings and that they left out

21 information during the video interviews that would have been

22 included in the written reports that would have been

23 detrimental to the defendants' case.

24         MR. CROSSE: We don't know. It would have been

25 an individual statement by the defendants as to what they

865

1  recall happening. And then Browne could have taken that and

2  interviewed them. But instead, what we have is the video

3  interview with an attorney present, and tell us what

4  happened.

5          THE COURT: What is the specific police policy?

6          MS. SULTON: It is 6.7 and 6.8. Both of those

7  are in evidence at Tab 12.

8          THE COURT: Do we have it here?

9          MS. SULTON: The policy specifically says that a

10 written report must be done. It doesn't say anything about

11 in lieu of an interview.

12         THE COURT: I want to say this to both

13 plaintiffs' counsel, that in your proposed instruction you

14 don't mention anything about written reports. You talk

15 about the videotape. So you have added, apparently -- I

16 don't see anything regarding interviews. I know that

17 something has been made of this during the course of the

18 trial and before.

19         So the record is clear, and so Messrs. Parkins

20 and Fineman know where I am looking, I have been handed

21 plaintiffs' exhibit book. I am looking at Exhibit 12,

22 specifically at Subsection (d), Reporting Uses of Force. Is

23 this 6.7?

24         MR. CROSSE: I am not sure.

25         THE COURT: Let me just take a quick look.

**B-088**

866

1    (Pause.)

2        So it would seem a good place to start perhaps

3    might be with counsel, somebody telling me what counsel's

4    understandings are, what you believe, whatever the proper

5    English is, of the standard that I am to apply in addressing

6    the whole issue of spoliation. The standard, what are the

7    factors that I should consider in determining whether to

8    give a charge of this type?

9        MS. SULTON: Well, I am not specifically certain

10    if there are set standards in place.

11        THE COURT: There are factors. I have written

12    on it, quite frankly, if you could look me up. I have

13    written a fairly strong opinion on the issue of spoliation

14    in a case that is fairly well-known around these parts.

15        So there are considerations. There are factors.

16    There are standards that guide most of what judges do. And

17    certainly there are standards that guide this issue, should

18    guide me on this issue as well. And it strikes me, would it

19    not be a federal law issue? An issue of perhaps federal

20    common law probably?

21        MS. SULTON: It is my understanding that if the

22    defendants -- if the party against whom the issue is being

23    raised had control, so it's in their control, I think that

24    is one of the issues.

25        THE COURT: I don't think there is any dispute

867

1    about that.

2        MS. SULTON: And that if, under all of the other

3    facts and circumstances, that item of evidence should have

4    been available, and it's not, and there is no explanation

5    provided by the defendants for why that item of evidence is

6    not available when they had control, and every other fact

7    and circumstance suggests that it should have been

8    available, then I think those are among the factors that the

9    Court would consider to determine whether or not the

10    instruction should be given.

11        In this particular case, it happens to be a

12    critical piece of information.

13        THE COURT: Which are we talking about, the

14    reports or the video or both?

15        MS. SULTON: I am talking about both. But if

16    you want me to focus just on the video at first, I can.

17        THE COURT: We were talking about the reports.

18    Let's keep our focus there.

19        Given that there were recorded interviews,

20    video-recorded interviews, why do you characterize the

21    absence of written reports as a critical failing or failure?

22        MS. SULTON: The absence of written reports is

23    critical because, not just 6.7, but 6.8, on the pursuit

24    policy, also requires an officer as well as the officer's

25    supervisor to ensure that that officer has a written report

868

1    filed. And they list a number of reasons in their rules for

2    why they believe a written report is required.

3        THE COURT: I am sure there are very good

4    reasons for writing written reports. Quite frankly, I think

5    it is unimportant that there are not written reports in this

6    matter.

7        MS. SULTON: And I asked each of the officers,

8    were there any other circumstances, when they were involve

9    in a serious matter, if they hadn't written a report? I am

10    not certain I asked Mr. Ciritella that. I did ask the

11    others.

12        THE COURT: I am accepting for the moment that

13    the process that is prescribed by the Wilmington Department

14    of Police, the preferred process, if not the required

15    process, is that written reports be prepared. But what we

16    have is a situation where apparently, in lieu of written

17    reports -- and perhaps it's not fair for the Court to

18    characterize it that way -- we do have some reporting that

19    was recorded from at least three of the participants. I

20    don't remember who else was interviewed, if anybody else.

21    But we know the three defendants were interviewed. Those

22    interviews were recorded.

23        MS. SULTON: Yes.

24        THE COURT: I don't know what was, commanders

25    and supervisors, what was on their minds when they decided

869

1    not to have a writing. But it's not as if they didn't have

2    a recording made, some preservation of the recollections of

3    these participants exists.

4        MS. SULTON: That is correct, Your Honor.

5    However, the matter they were investigating, it was a

6    criminal investigation when it first started. And the

7    ten-minute -- some of these interviews I am not even certain

8    run ten minutes -- are not a substitute nor are they in lieu

9    of a written report, the requirement that a written report

10    be done. In a --

11        THE COURT: Says who?

12        MR. CROSSE: Says the regs.

13        THE COURT: Let me get a response.

14        MR. PARKINS: I don't know where to begin. I

15    will start -- I will work forward.

16        Your Honor asked about, among other things, the

17    factors to be considered in spoliation. I know that Your

18    Honor has written probably more spoliation opinions than the

19    rest of the judiciary combined, both state and federal here.

20        As Your Honor is well-aware, one of the issues

21    is whether the defendants in this case had anything to do

22    with the destruction of the evidence. And there is not one

23    iota of evidence that the defendants had any role whatsoever

24    in the decision not to require written reports. They just

25    did what they were told: Don't do these written reports.

878

1  or touched it.  It was removed that night after these
2  officers had left the scene.  So they had no control over
3  it.
4          Secondly, whether there should have been a slip
5  or not is not the fault of these defendants.
6          THE COURT:  Mr. Crosse, the problem with your
7  argument that you make is exactly that which Mr. Parkins
8  points out.  The city is not at this table.  They are not at
9  the defense table.  Had that been the case, this might be a
10  different discussion altogether.
11          So I won't give a spoliation instruction with
12  regard to the videotape or the absence of written reports,
13  given the defendants that are at the table.
14          MS. SULTON:  If I could just finish my record,
15  Your Honor.
16          THE COURT:  No.  You have preserved your record.
17          MS. SULTON:  Thank you, sir.
18          MR. CROSSE:  Your Honor, we won't be prohibited
19  from arguing about it, though.
20          THE COURT:  Well, I guess we should talk about
21  that.
22          MR. CROSSE:  I would think that the jury should
23  be allowed to make whatever inference they can make, that
24  there is a tape there, that it was working the day before,
25  and somehow it does not have this instance on it.

879

1          THE COURT:  Mr. Parkins.
2          MR. PARKINS:  There is no rational inference
3  that these defendants are at fault because the tape wasn't
4  working.
5          THE COURT:  See, we can talk about this a little
6  bit more.  The concern that I have is that they didn't have
7  control over 1180.  We are talking about the tape from 1180.
8  Right?
9          MR. CROSSE:  Yes, Your Honor.
10          THE COURT:  The only person who could
11  conceivably be said to have had any contact with the video,
12  and we know from the testimony that even he couldn't, was
13  Whitehead, who testified in this case -- that is, his
14  partner I don't think testified.  So again we have Kurten,
15  Dempsey and Ciritella, who, there is no evidence, as far as
16  I recollect from the record, had anything to do with 1180
17  other than shooting at it, at its occupant, Mr. Smith.
18          So I don't know how it would be fair -- I don't
19  know how it would be reasonable, Mr. Crosse -- let's presume
20  that I permitted you to say, ladies and gentlemen, isn't it
21  mysterious that the static, the fact we see very few clear
22  images on the videotape, you can reasonably infer from that,
23  or reasonably infer the liability of these officers.  That's
24  ultimately what you want them to do.  That is that they were
25  hiding something, whatever it is you might argue.

880

1          I am trying to fathom how that would be a
2  reasonable inference, that is, that these officers did
3  something that should bear upon their liability in this
4  jury's mind with regard to this videotape, not having had
5  any contact with it or any ability to control it.  Do you
6  see the problem I am having?  I am trying to make the
7  logical connection, the reasonable connection, that a jury
8  might make.  I think that would lead them afield.  Again, it
9  would certainly be incumbent, would have been incumbent upo
10  the City of Wilmington, the Department of Police, to take
11  into custody, to preserve the chain of custody, to make
12  sure, whatever they needed to do to preserve this evidence,
13  this particular item being a videotape, if it had evidence.
14  But they are not here anymore.
15          MR. CROSSE:  But there has been testimony about
16  the videotape and its functioning or non-functioning in this
17  case.
18          THE COURT:  And the jury is going to wonder
19  about that, in all likelihood.
20          MR. CROSSE:  Then I should be able to say, it's
21  not working.  And he should be able to say, it's not their
22  fault.  And they make whatever inference and common-sense
23  conclusion that may warrant.  It is not just to have it in
24  the case and nobody can talk about it.  I would rather let
25  them see the positions, and then let them decide.

881

1          THE COURT:  Mr. Parkins, Mr. Crosse implies a
2  point.  That is that the questions along those lines didn't
3  draw an objection.  The objection might have been sustained.
4          MR. PARKINS:  Given Mr. Crosse's point, if what
5  he is going to say is it's not working, that's fine.  If he
6  is going to say and it's not working and it's not working
7  because it had evidence that was --
8          THE COURT:  He can't affirmatively say that.
9          MR. CROSSE:  Nobody knows.
10          THE COURT:  Mr. Crosse, I will accede to your
11  point.
12          MR. PARKINS:  All right.
13          THE COURT:  We need a probable cause
14  instruction, I am just reminded.  I am at Page 18, is the
15  next of the plaintiffs' federal claims.
16          MS. SULTON:  There were some changes that we
17  made to that.
18          THE COURT:  Did you deal with the italicized
19  language?                                    B-090
20          MR. FINEMAN:  No, Your Honor.  There were a
21  couple of minor changes which the parties have agreed to,
22  subject to the Court's approval, of course.
23          THE COURT:  But let's first talk about the more
24  significant issue.  That is the italicized language.  I want
25  to know what the course of that is.

890

1  case, I actually printed it out, plaintiffs propose a

2  state-law-created damage claim. I will hear you, but I

3  don't see it here. Ms. Sulton, or whoever is going to argue

4  this, it is at Page 20.

5  　　　　MS. SULTON: Your Honor, it is our position that

6  the conduct of the officers, whether it be the point at

7  which Mr. Whitehead allowed someone to take his car or

8  Officer Ciritella stepping out into the way of this vehicle,

9  that they created the situation where they then turn around

10  and say, okay, he now is this very, very dangerous felon who

11  has now attempted a murder on Mr. Ciritella. And we would

12  like an instruction, the one we found that was closest was

13  the state-created danger instructions.

14  　　　　THE COURT: Did you look at the facts of Kneipp?

15  Do you want to tell me what the facts of that case are?

16  　　　　MS. SULTON: I am not familiar with the specific

17  facts of that case.

18  　　　　THE COURT: Didn't you cite to it?

19  　　　　MS. SULTON: Yes, I did.

20  　　　　THE COURT: I am sorry. That is cited in the

21  defendants' objection.

22  　　　　MS. SULTON: I was using the Third Circuit model

23  that I took off the Internet, off their website, Your Honor.

24  I recall the Court telling me previously --

25  　　　　THE COURT: Kneipp v. Tedder provides a good

891

1  recitation of the so-called state-created danger doctrine

2  and a good discussion of that issue. You haven't had a

3  chance.

4  　　　　MR. CROSSE: I am not familiar with the facts of

5  that.

6  　　　　MS. SULTON: I just don't recall it offhand,

7  Your Honor.

8  　　　　THE COURT: Mr. Parkins, do you want to discuss

9  this?

10  　　　　MR. PARKINS: The Kneipp case, as I recall, says

11  that the state-created danger doctrine arises under the 14th

12  Amendment. This has never been pled in this particular

13  case. As the Court is aware, it has a long time ago

14  dismissed all of the plaintiffs' 14th Amendment claims. To

15  sort of raise it at this late hour when it should have been

16  something which should have been in the initial pleading

17  seems way too late and something which is unfair. The facts

18  giving rises to it have been known -- if there are any

19  giving rise to it, have been known to the plaintiffs for a

20  long, long time.

21  　　　　I don't recall sitting here today as to the

22  specific facts of the Kneipp case except that I do recall

23  reading, when I read the case, that they were clearly

24  different than what is presented here.

25  　　　　THE COURT: Tell me why you think there is an

892

1  entitlement, other than the fact that it exists in the model

2  instructions, why you think the facts of this case warrant a

3  state-created danger doctrine instruction.

4  　　　　MS. SULTON: Well, it is our view, Your Honor --

5  and we were trying to get the model instruction that we

6  thought was closest to the facts of this case. There is

7  evidence before the jury that Mr. Whitehead left his car in

8  a position where a person who was mentally ill was able to

9  take it and drive off, and that creates the chain of events

10  that leads us, then, to the Fifth and Harrison Street

11  incident.

12  　　　　And then we have this testimony about Mr.

13  Ciritella positioning himself so that he now is in a zone of

14  danger for arguably his car hitting him. And it is our

15  position to say that the escaping, or the actions of

16  the person creates the justification for him now being

17  identified as this very dangerous felon is simply, is not

18  the case.

19  　　　　So we wanted an instruction that would allow the

20  jury to take that into consideration. And as I looked at

21  what was available, this was the only instruction that I

22  found on the Third Circuit's website.

23  　　　　THE COURT: Let's for a moment suppose that the

24  Third Circuit website didn't exist. Why would you think the

25  Court should instruct along these lines?

893

1  　　　　MS. SULTON: The way the 1983 federal claim is

2  written, and the emphasis of many of these, or at least some

3  of the instructions, is on the issue of what can an officer

4  do if a felon is escaping. But if it is the officer's

5  actions that allegedly create, or arguably create the

6  felony, then that's something that the jury should consider.

7  It's not like we have a situation with a bank robber

8  fleeing, what the officers classify is a bank robber, so he

9  knows he is chasing a fleeing felon.

10  　　　　What we have is someone who is using a police

11  car in an unauthorized manner. He doesn't have the right to

12  do that. And then they are saying, okay, now the felony

13  begins because he is trying to run over Ciritella.

14  　　　　THE COURT: No. With respect, Ms. Sulton, it

15  seems to me that the -- one could interpret the facts that

16  way. But one could also interpret, this jury could, there

17  is evidence from which it could conclude that the officers

18  were in fact chasing a fleeing felon.

19  　　　　MS. SULTON: Because of the car itself?

20  　　　　THE COURT: There was an attempted carjacking o

21  the gentleman in the Mercedes, which Officer Whitehead

22  witnessed. Am I wrong about that? He witnessed that. Now

23  then there was the actual taking -- the word carjacking is

24  used, for some curious reason -- there was a taking, which

25  the statute calls carjacking, of Officer Whitehead's car.

998

1　of Harrison Street, we know that Officer Kurten is,
2　according to his testimony, some 12 or 17 feet behind the
3　car, so we know that he is not in any danger. We know that
4　Officer Dempsey is on the driver's side of the car, perhaps
5　slightly behind it. So we know he is not in any danger. We
6　know that Officer Ciritella is walking along the passenger
7　side of the car shooting out those windows, so we know that
8　he is not in any danger. We also know that they had not
9　exhausted all of the avenues, or all of the means of
10　apprehension that were available to them because we know,
11　based upon the testimony of Lieutenant Fioravanti as well as
12　Heather Brown Pierson, that they were right there, just
13　right about the top of Sixth Street. We know that there are
14　other officers around.
15　　　So if we were to place in the balance whether or
16　not it was reasonable on September 13, 2003, to shoot 31
17　bullets at Mr. Smith, endangering both him and others in the
18　immediate vicinity, when we look at that issue, we know that
19　it is not reasonable for an officer in similar circumstances
20　to so do.
21　　　And you have the guidance of Mr. Stine, given
22　his credentials and experience, to help you understand the
23　facts in that regard.
24　　　Let me end by saying that we know that there are
25　difficult challenges that the police face. We want them to

999

1　aggressively protect our rights, our children, our lives.
2　But we also want them to follow the law. And they were
3　trained. They had rules and regulations to follow. They
4　chose not to do that. And when I asked Mr. Ciritella -- and
5　let me go directly to the trial transcript so that I don't
6　misquote him -- when I asked Mr. Ciritella whether or not he
7　was bound by the rules, he said -- and let me just find that
8　particular piece of paper, and I am going to put it up here
9　on the little screen so that you can see it -- I asked him,
10　and this is on Page 759 of the trial transcript, at Line 13:
11　　　"Are you bound by the requirements of the use of
12　deadly force policy as articulated in the police officers
13　manual?"
14　　　And he said, "No, ma'am."
15　　　None of us are above the law. And what occurred
16　is in broad daylight, in a densely populated neighborhood,
17　while children played on the street and elderly people sat
18　in front of their home in chairs enjoying the afternoon,
19　with 31 bullets flying throughout their neighborhood at a
20　man who could have been apprehended if officers had been
21　reasonable in their approach to their duties.
22　　　Thank you.
23　　　THE COURT: Thank you, Ms. Sulton.
24　　　Mr. Parkins.
25　　　MR. PARKINS: Good afternoon.

1000

1　　　When this case is, this trial is stripped of its
2　rhetoric and we examine the evidence in this case, it
3　becomes pretty straightforward.
4　　　The police did what they could to allow this
5　matter to come to a nonviolent end. Indeed, it is
6　undisputed that they began to fire their weapons only after
7　Harry Smith, III began to accelerate in the direction of
8　John Ciritella.
9　　　You have heard the evidence about how the stolen
10　police car, once it passed John Ciritella, crashed into the
11　parked Jeep Cherokee. That is undisputed. And it's
12　undisputed that the stolen police car, after it crashed into
13　the Jeep Cherokee, accelerated up Harrison Street. And it's
14　undisputed that Harry Smith, then, once he became free of
15　the Jeep Cherokee, continued to drive up Harrison Street.
16　　　As he drove up Harrison Street, there were two
17　things that were evident to these police officers. Number
18　one, Harry Smith, III, was willing to take a life, and
19　number two, Harry Smith, III would stop at nothing to avoid
20　apprehension by the police.
21　　　These defendants had no choice but to stop him
22　at that time.
23　　　I thought today I would briefly review the
24　important evidence with you, and then I would talk with you
25　about how it is that the jury instructions apply to this

1001

1　evidence. And then finally I will briefly review with you
2　the verdict form which Judge Sleet has given you to complete
3　at the end of your deliberations.
4　　　Let's begin with the evidence.
5　　　At Washington Street, you have heard the
6　officers call "Send backup, send backup. Shots fired, shots
7　fired. He has got the car, he has got the car."
8　　　This is certainly not, as Joseph Stine seemed to
9　describe it, a lark by Harry Smith, III. You have heard
10　about the pursuit, about the erratic driving, about the fact
11　that he went the wrong way on Seventh Street and how cars
12　had to pull to get out of the way. About how he made the
13　wide turn onto Fourth Street and went into the eastbound
14　lane when he was heading west.
15　　　You heard the testimony about how he ran stop
16　signs on Monroe Street. You have heard testimony about how
17　he ran two red lights, one at Jackson Street and the other
18　at Adams Street, which are both major intersections here in
19　the City of Wilmington, intersections which funnel traffic
20　off of I-95 or onto I-95.
21　　　Let's focus, if we could, on the evidence about
22　what happened at Fifth and Harrison Street. It is
23　undisputed -- we have heard lots of evidence about the fact
24　that Harry Smith, III on this day was suffering from some
25　recent onset of mental problems. But there is not one piece

1002

1 of evidence that these gentlemen knew about that.

2    What they knew about was that there had been an

3 incident involving shots fired and that there had been a

4 semi-wild chase through the City of Wilmington which brought

5 them to Fifth and Harrison Street.

6    It is undisputed that the police shouted at Mr.

7 Smith, "Stop the car, stop the car. Get out of the car."

8 There is not one resident -- and remember, according to

9 plaintiffs, the streets were crowded with people, and they

10 brought not one resident here to dispute that. And indeed,

11 you remember David Gwyn? David Gwyn testified that his

12 curiosity was first aroused when in his words he heard some

13 hollering down on Fifth and Harrison Street. That hollering

14 was John Ciritella yelling, "Get out of the car, stop the

15 car."

16    It is undisputed that the officers here did not

17 fire their weapons until after Mr. Smith drove at Detective

18 Ciritella.

19    Once again, the streets are crowded with people.

20 And the plaintiffs have brought you no one to dispute what

21 these police officers and other police officers told you.

22    There is no dispute, really, that Mr. Smith

23 drove directly at Officer Ciritella. You have heard police

24 officer after police officer who was there say, I saw him

25 drive directly at John Ciritella. I asked them about what

1003

1 did you think about Detective Ciritella's prospects, and

2 they said things like, I thought he was going to die, I

3 thought he was going to be run over.

4    Once again, the streets are crowded with people,

5 and the plaintiffs have brought you no one to dispute what

6 happened there.

7    And you heard the testimony of John Nordsby, the

8 forensic scientist, who told you that the physical evidence

9 is consistent with what Detective John Ciritella told you.

10 Now, the plaintiffs have attempted to disparage Dr. Nordby.

11 They refer to the fact that he had a Ph.D. in philosophy.

12 Well, he told you in his deposition testimony, in his video

13 deposition, that the reason he had a Ph.D. in the philosophy

14 of science was because when he went to school there were no

15 course offerings in forensic science. So he had to take

16 that.

17    Dr. Nordby's curriculum vitae, or his resume, is

18 one of the exhibits that we have sent back or will send back

19 to you. If you are curious, you can take a look at it. You

20 will see that Dr. Nordby is a Phi Beta Kappa. He is a

21 Diplomat of the American Board of Medical Death

22 Investigators. He is on the board of the American Academy

23 of Forensic Sciences. He has published books. He has

24 written papers. He has given lectures and instruction to

25 police departments around the country, and to medical

1004

1 examiners around the country.

2    He is, indeed, one of the premier experts in the

3 world on what we are talking about.

4    It is undisputed, of course, that after Mr.

5 Smith attempted to -- appeared, at least, to be attempting

6 to run down Detective Ciritella, that he hit the Jeep

7 Cherokee. At one point in time the plaintiffs suggested

8 that, well, it must not have been a high-speed crash because

9 there was no air bag deployment. But Dr. Nordby told you

10 that the airbags -- the sensors on the stolen police car

11 were not impacted. So the absence of air bag deployment on

12 the stolen police car meant nothing as far as what the speed

13 of the car was when it hit that Jeep.

14    But we do know that the police car after hitting

15 the Jeep accelerated. John Ciritella told you that when he

16 was standing on the corner, he heard tires screaming and he

17 smelled rubber burning. And there is physical proof of

18 that. That is the photographs on the street with the

19 acceleration tire marks left there by Vehicle 1180.

20    Then the plaintiffs claim that these defendant

21 officers shot at the car after it stopped. And they have

22 provided to you two pieces of evidence. One is the

23 testimony of David Gwyn. And the other is the testimony of

24 Reverend Bernard Thompson.

25    You may recall that in my opening statement to

1005

1 you I told you that there would be only one person who would

2 testify that they saw the police car being shot at after it

3 stopped. Well, Judge Sleet in his instructions has told you

4 that Reverend Thompson's testimony became known to the

5 parties and to the Court only after the trial started, and

6 that I was not being disingenuous or fooling you when I said

7 there was only one person who would testify that way.

8    Let's look at the testimony of Mr. Gwyn for a

9 second.

10    Mr. Gwyn didn't even see John Ciritella. He saw

11 three uniformed officers which he claimed were running down

12 from the west side of Fifth Street. Mr. Gwyn didn't even

13 see the police cars blocking Fifth Street. He claimed that

14 he saw 1180 simply come around the intersection in the

15 street and then crash into the parked Jeep Cherokee.

16    But most importantly of all, Mr. Gwyn has told

17 three different stories.

18    You heard how he told Detective Lieutenant

19 Browne, who interviewed him that very night, that he saw on

20 officer firing five or six shots. Then you heard how he

21 signed an affidavit, which the plaintiffs filed earlier in

22 this lawsuit, in which he said he saw a police officer walk

23 up to the side of the police car, and he described it as the

24 driver's side of the police car, and shoot into the body of

25 the driver. Well, there is a problem with that. And

B-093

1006

1 apparently Mr. Gwyn must have sensed it or somebody did,
2 because the problem is that the fatal shot, according to the
3 description being given by Mr. Gwyn, would have hit Mr.
4 Smith on this side of his head, the side of his head towards
5 the driver's side. The fatal shot was on this side.
6          So, apparently sensing that, Mr. Gwyn told yet a
7 third story, this time in his deposition. And in his third
8 story, he told you, or told us, and told you here, that the
9 car had stopped and he saw the police officers continue to
10 shoot at the car after the car had stopped.
11          Now, either of those last two stories seems to
12 me to be pretty remarkable. It would seem to me that to
13 have seen police officers either walk up and shoot him after
14 the car had stopped or to shoot from behind after the car
15 had stopped would be a pretty horrific sight.
16          We asked, when his wife was testifying, we asked
17 her, did you and your husband talk about this event? Now,
18 what do you think -- and she said yes. Doesn't your common
19 sense tell you, if they had talked about this event, Mr.
20 Gwyn would have told her about these horrific events that he
21 claims to have seen? And doesn't your common sense tell you
22 that if Mrs. Gwyn had heard that, she would have remembered
23 it?
24          But when we asked Mrs. Gwyn, do you remember
25 your husband ever saying that he saw a police officer walk

1007

1 up to the side of the car and shoot into the body of Harry
2 Smith, she said no.
3          When we asked Mrs. Gwyn, do you ever remember
4 your husband ever saying to you he had seen police officers
5 shooting into the back of the car after it stopped and the
6 man was stumped slumped over the wheel? She said no.
7          Doesn't your common sense tell you that she
8 would have remembered that if her husband had ever told her
9 that? And doesn't that mean to you he never said anything
10 to her about it?
11          And then finally, doesn't that mean to you he
12 never saw it?
13          Let's talk about Reverend Thompson for just a
14 moment. Reverend Thompson has all kinds of problems with
15 his testimony. First, he has the wrong position of the
16 officers. According to every other piece of physical
17 evidence, the position he has drawn is wrong. Now, you may
18 recall that during the course of his testimony, we brought
19 out that -- we had had a deposition the night before or two
20 nights before, and during a break in the deposition, I and
21 my colleagues left the room to confer for a moment, leaving
22 Reverend Thompson and Ms. Sulton together. And during that
23 break, Ms. Sulton and Reverend Thompson talked about the
24 case and about his testimony.
25          Well, Judge Sleet has told you that it is

1008

1 inappropriate for a lawyer to talk to a witness about his or
2 her testimony while the witness is being examined or
3 questioned by an opposing party. And Judge Sleet will tell
4 you that you may infer, if you choose to do so, that Ms.
5 Sulton was attempting to coach Reverend Thompson about his
6 testimony. You may recall, when we had on the Elmo here the
7 drawing which we had Reverend Thompson make, that there wer
8 X's placed on that drawing for the correct position for the
9 police officers, and there X's were drawn by Ms. Sulton.
10          There are yet more problems with Reverend
11 Thompson's testimony.
12          First of all, he said he didn't see Detective
13 Ciritella, either. Recall that Detective Ciritella was in
14 plain clothes that night. Reverend Thompson told you that
15 he saw only uniformed officers. Then Reverend Thompson told
16 you about how it is that he was in front of his house. He
17 saw two police cars go speeding down Van Buren Street. He
18 lived in the 600 block of Van Buren. He saw two police cars
19 go speeding down. And he went around the corner and he
20 heard gunshots down there. So he gathered up his
21 grandchildren, five or six of them, and herded them back
22 towards his house to safety on Sixth Street, and then went
23 back out again and looked down and saw the police shooting
24 at the stopped police car.
25          Well, this makes no sense, for two reasons. One

1009

1 is, what sane man would stick his head out or his body out
2 from behind safety to watch police shooting up the street
3 just as a matter of curiosity? And also, it makes no sense
4 because the officers, and every one of them has told you
5 that the entire incident at Fifth and Harrison took between
6 five and ten seconds. Not enough time for Reverend Thompson
7 to have heard the shooting, seen what was going on -- he
8 said he saw the car down there -- herd his grandchildren
9 back, and then walk back out again.
10          There is still more. He said he saw two police
11 cars coming down the street and park in front of the stolen
12 police car as the officers on foot continued to shoot at the
13 car. You heard the testimony from Detective Gifford and
14 Officer Heather Brown Pierson, who were in one car, and you
15 heard the testimony from Sergeant Fioravanti. All of them
16 testified, they did not arrive and see the scene until after
17 the shooting had stopped.          B-094
18          And yet Reverend Thompson would have them down
19 half a carlength in front of the stolen police car while the
20 defendants are allegedly shooting at the stolen police car.
21          And that raises the next thing. Does it make
22 any common sense whatsoever to think, as Reverend Thompson
23 has told you, that these police officers would shoot at the
24 stolen police car when just a half a carlength beyond it was
25 a police car occupied by their brother officers? No.

1 Then Reverend Thompson told you about seeing the
2 officers after the event was over high-fiving and
3 celebrating and laughing. David Gwyn didn't see that.
4 David Gwyn didn't tell you anything about high-fiving and
5 celebrating and laughing. What he told you about were
6 police officers trying to do CPR on Harry Smith.
7 And then, maybe most curious of all, Reverend
8 Thompson did not tell the police about what he had seen for
9 six months, nothing. Don't you suppose that if you had seen
10 what he describes having seen that you would tell somebody
11 right away? And, in fact, he told you that he talked with
12 Heather Brown Pierson that very night while she was doing
13 traffic control. And he didn't tell her. He waited for six
14 months.
15 And when he did talk to Lieutenant Browne, he
16 told him things that were not believable. He told him
17 things about the position of these officers which in
18 Lieutenant Browne's mind were entirely inconsistent with the
19 physical evidence in this case. There were no bullet
20 strikes on the right side of the car, and yet Reverend
21 Thompson said he saw a police officer shooting at the right
22 side of the car.
23 There were no shell casings in any proximity to
24 where he placed the officers.
25 His testimony is simply unbelievable.

1011

1 Well, let's look, if we could, at what the
2 physical evidence is.
3 The physical evidence has at least one advantage
4 over human beings. The physical evidence doesn't get
5 confused and the physical evidence does not lie. And the
6 physical evidence in this case shows beyond any doubt that
7 the car was moving when John Ciritella fired the fatal shot.
8 You heard the testimony of John Nordsby, the
9 forensic scientist, about the fact that the physical
10 evidence shows that, number one, the car was moving, and
11 number two, that Mr. Smith was sitting upright and looking
12 ahead when he was shot in the head.
13 I want to show you exactly what Dr. Nordby was
14 saying when he said the car was moving.
15 (Video played.)
16 This is a rather crude diagram, but I think it
17 will serve the purpose. You heard the testimony from Dr.
18 Nordby that the shot that hit Mr. Smith in the head came
19 from 3:00. If I am looking at Judge Sleet, he is at noon
20 and you folks, of course, are at 3:00. And the shot came
21 from 3:00. And you heard, also, from the medical examiner
22 that the shot went into this part of his head and went
23 almost straight, on a straight course through part of Mr.
24 Smith's brain, which means that Mr. Ciritella would have
25 been in this position when he fired the shot which hit Mr.

1 Smith in the head. And by the way, there are bullet strikes
2 and other wounds which would be consistent with this
3 position, as Dr. Nordby said.
4 You also heard how it is that John Ciritella's
5 .40-caliber Smith & Wesson injects its shell casings to the
6 right and slightly to the back, which means that the shell
7 casings which he fired, which we, by the way, you may
8 recall, we measured 30, 31 and 32, those numbers, would hav
9 been right here to John Ciritella's right.
10 Now if, in fact, the car was stopped when he was
11 shooting, this is where you would have found the car, and
12 this is where you would have found the shell casings. But
13 instead, this is where the car was found.
14 There is only one conclusion that you can draw
15 from this, and that is that after John Ciritella fired these
16 shots, the car continued to move, which means the car could
17 not have been stopped when they fired those shots.
18 Then there is the issue of the expert witnesses,
19 in particular, the plaintiffs called two, Elbert Waters and
20 Joseph Stine.
21 I would like to, if I could, point out some of
22 the inconsistencies between their testimony. I wish I were
23 tall enough to write up at the top.
24 Joseph Stine said, for example, no roadblock.
25 On the other hand, Elbert Waters said, a

1013

1 roadblock was a good plan.
2 Joseph Stine said, should not have tried to
3 apprehend Mr. Smith. Elbert Waters said, the police needed
4 to apprehend him.
5 Joseph Stine said that John Ciritella should
6 have stayed behind the building, and for a short phrase I
7 will say "hide," and let the police officers from behind do
8 the felon stop. Well, you did hear, by the way, the police
9 officers from behind started to do a felon stop and at that
10 point in time Mr. Smith drove away.
11 Elbert Waters says something entirely different.
12 He said that John Ciritella should have come out into the
13 street, "Stop, stop, stop," and then, if needed, proceed to
14 use deadly force.
15 We have all seen at one time or another TV shows
16 or movies where one of the characters has a little devil and
17 an angel on his shoulder and the devil is telling the
18 character something and the angel is telling the character
19 something else, and I sometimes wonder what would have
20 happened to John Ciritella if he had had little miniature
21 Elbert Waters on one side and a miniature Joseph Stine on
22 the other and Mr. Waters saying, roadblock, roadblock, and
23 the other one saying, no, no, no. Who knows what would have
24 happened?
25 All right. I will just mention a few things

B-095

**Page 1014**

1  that Joseph Stine told you and ask you whether these make
2  any sense at all.
3  　　He told you during his trial testimony that
4  maybe what could have happened, as far as these gentlemen
5  were concerned, was that maybe they had gone from a lunch
6  break and then they came back to their car and they found
7  Mr. Smith in it driving away. Well, you heard the radio
8  call from Johnny Saunders, the police officer who was there.
9  Does that sound to you like a situation in which officers
10 came back from a lunch break and saw somebody driving away
11 in their car? Of course not.
12 　　And then Joseph Stine told you, well, one of the
13 things that the Wilmington Police could have done was to
14 call Action News and get Channel 6 to send its helicopter
15 down here from Philadelphia. Does that make any sense at
16 all? No.
17 　　On the other hand, you heard from Ron Traenkle.
18 Ron Traenkle teaches law enforcement agencies around the
19 country, and he teaches them about a number of things,
20 including the use of deadly force. I will ask you, did Ron
21 Traenkle's testimony make sense to you? Did he advocate
22 calling Action News and asking for the use of their
23 helicopter? No.
24 　　I would like to mention just a little bit about
25 some sort of miscellaneous evidence that came through here.

**Page 1015**

1  One is about the so-called MVR, the mobile video recorder.
2  The fact is, it wasn't working. You heard the testimony
3  that the Wilmington Police had so much difficulty with the
4  MVRs in their police cars that they got rid of them. There
5  are no longer mobile video recorders in any Wilmington
6  Police car because they just weren't reliable.
7  　　And there is evidence, of course, that this one
8  was not working.
9  　　Ms. Sulton told you in her opening statement and
10 repeated that when she got a copy of the tape that was at
11 1180, it was a blank tape. Well, it's not a blank tape.
12 You may recall having seen it, and every once in a while
13 there would be a snippet of a scene. And what that meant
14 was that it was working sometimes and not working others.
15 And then finally -- not finally, but if you were to play
16 this tape through in the jury room during your
17 deliberations, you will hear, but not see, an officer
18 complaining that he can't get it to work. There is audio
19 but there is no video.
20 　　Finally, insofar as the MVR is concerned,
21 Lieutenant Browne, who was the chief investigator in this
22 case, told you that when he looked at the tape, he could
23 find recordings for September 10, 11, 12, and 9 in this
24 order on the tape. Seems peculiar. But there is a logical
25 explanation, if you think about it. At one time, in all

**Page 1016**

1  likelihood, this tape contained 6, 7, 8, 9. September 6, 7,
2  8, 9. When it got to 9, it got near the end of the tape and
3  it rewound, and started recording the 10th, the 11th and
4  12th, and sometime on the 12th it broke. And that's why we
5  have 10, 11, 12 and 9.
6  　　One other thing. Think about this. If there
7  was some incriminating evidence on that tape, we would not
8  be able to erase the 13th. You wouldn't have the 9th on
9  there because it would have erased everything on that tape,
10 not just the 13th, it would have erased anything on that
11 tape. So it was impossible to erase part of the tape so
12 that you would have 10, 11, 12 and 9.
13 　　In other words, it just was not working on the
14 13th.
15 　　There was a lot of discussion about policies. I
16 won't go through them again because I know you have heard i
17 probably more than you care to. But I will say a few
18 things.
19 　　Number one, 3.2, which you have heard already,
20 is for roadblocks and applies to the Traffic Division.
21 These gentlemen and the other gentlemen who were in the
22 pursuit, and the ladies in the pursuit, were not in the
23 Traffic Division.
24 　　6.7 says you can't shoot at a moving vehicle
25 except under exigent circumstances. And you heard when Joh

**Page 1017**

1  Ciritella explained to you why this was an exigent
2  circumstance and why he was permitted under the policy to
3  shoot at a moving motor vehicle.
4  　　And 6.7 regulates the use of deadly force. And
5  you heard John Ciritella explain to you why 6.7 allowed him
6  to use deadly force.
7  　　Then you heard about shotguns and patrol cars.
8  And I assume that this is because the plaintiffs want you to
9  believe it was unreasonable for these gentlemen to
10 anticipate the likelihood that there was a shotgun in the
11 patrol car. And you heard about the 1995 policy, which
12 hasn't been changed since then. But you heard that it was
13 sometime after 1995 that the police began to purchase patrol
14 cars with shotgun racks.
15 　　Now, does it make any sense if they would
16 purchase Crown Victorias with optional shotgun racks in the
17 front part and then require the police to put them in the
18 trunk? No.　　　　　　　B-096
19 　　You heard about Johnny Whitehead testified he
20 was trained to put the shotgun in the front. And you heard
21 about the fact that the shotgun racks that go behind the
22 police officers' heads is -- sometimes they don't function
23 very well and a shotgun will come tumbling forward.
24 　　These police were entirely reasonable in
25 anticipating that 1180, like most patrol cars, had a shotgun

1018

1 somewhere in the front seat.

2          Then you heard about 6.8, which is the do no

3 blocking, cutting off, or ramming. You heard John Ciritella

4 say that when he placed his patrol car there, it was neither

5 blocking, cutting off, or ramming, as defined by that

6 particular policy. And he said, even if it was the policy,

7 it permits officers to do so in exceptional circumstances,

8 and this was an exceptional circumstance.

9          Finally, today, you heard Ms. Sulton talking to

10 you about the unholster policy. No expert came here and

11 said that it was inappropriate for the defendants to

12 unholster their weapons. And you heard about how they can't

13 unholster except if there is a threat in the immediate

14 vicinity. But there was one in the immediate vicinity. It

15 was right in front of him.

16          I would like to take just a moment or two to

17 relate the instructions to what the evidence clearly shows

18 in this case. The really important instructions are found

19 in Page 13 and Page 14.

20          The first one I would like to talk to you about

21 for just a moment is, Judge Sleet has told you that, "A law

22 enforcement officer may use deadly force to prevent escape

23 by a fleeing suspect when the officer has probable cause to

24 believe that the fleeing suspect poses a threat of serious

25 physical harm, either to the officer or to others."

1019

1          Here is what John Ciritella and Cliff Dempsey

2 and Matt Kurten knew on September 13 at the time that they

3 began to use deadly force.

4          They knew that the suspect had been involved in

5 an incident on 14th and Washington Street in which shots

6 were fired. They knew that the suspect had obtained

7 possession of a police car from two armed policemen. They

8 knew that in all likelihood there was a shotgun in the front

9 seat. They knew about the possibility of this person being

10 armed with a knife. They knew about the fact that he had

11 driven erratically, driving through red lights and things of

12 that nature, on the street. And most importantly of all,

13 they knew that the suspect had attempted or appeared to have

14 been trying to run down Detective Ciritella.

15          Under those circumstances, no reasonable person

16 would conclude anything other than the suspect poses a

17 threat of serious harm to others if he were allowed to

18 escape.

19          The next instruction which is important here is

20 that, "you should consider all of the relevant facts and

21 circumstances leading up to the time of the attempt to

22 prevent the escape and apprehend Mr. Smith that the

23 defendants reasonably believed to be true at the time."

24          We have spent the last week and a portion

25 together dissecting what happened. But it is important to

1020

1 keep in mind, even if you believe that, gee, if I had been

2 Officer Ciritella, I might have, instead of backtracking, I

3 might have turned and run, or something along those lines,

4 but it is important to know that this situation is to be

5 judged through their eyes and through what they reasonably

6 believed at this time.

7          I believe you will find that they, through their

8 eyes, reasonably believed this was a deadly situation in

9 which John Ciritella's life was at stake and later the

10 people of the City of Wilmington.

11          The next one that is important is, "In

12 determining whether the defendants' acts were reasonable,

13 you must consider that a police officer is often forced to

14 make split-second judgments under circumstances that are

15 sometimes tense, uncertain and rapidly evolving."

16          None of us, so far as I know, has ever been in a

17 situation like that faced by John Ciritella that night.

18 None of us has had to stare death face-to-face from a

19 carlength-and-a-half away.

20          None of us had a split-second decision, do I

21 backtrack? Do I shoot my weapon? What do I do?

22          And the law takes into account that as John

23 Ciritella and Matt Kurten and Cliff Dempsey were out on that

24 street, they didn't know what was going to happen next.

25 They had to make split-second decisions.

1021

1          Now, finally, Judge Sleet has given you some

2 factors which you can consider in making your determination

3 whether these officers acted reasonably.

4          You can find those, I believe, on Page, I think

5 it's 16 of your instructions. I am sorry. You will find

6 them on Page 15 of your instructions.

7          There they are, the severity of the crime at

8 issue, those factors.

9          What we thought we would do here is summarize

10 what was known to these people at this time.

11          First, the severity of the threat. Officer

12 Ciritella thought he was going to die. Killing a police

13 officer, as you heard him say, while he is about his duties

14 is murder in the first degree in this state. And attempting

15 to kill a police officer is attempted murder in the first

16 degree.

17          Now, keep in mind, I know that the plaintiffs

18 will say, well, Harry Smith, III was mentally deranged. But

19 that wasn't known to John Ciritella at that time. And even

20 if it were known, John Ciritella would have had the right to

21 shoot to protect his own life.                    B-097

22          Secondly, the threat. We know from what these

23 officers knew that it appeared that Harry Smith, III was

24 willing to take a life. And we also know that he would stop

25 at nothing to avoid apprehension. After all, he rammed into

1022

1  a parked Jeep in an effort to get away.
2          How about the possibility he was armed?  If you
3  listened to the tape, you will hear the dispatcher say the
4  man was armed with a knife. Turned out to be a scalpel.
5  And you know that it was found in the car.
6          Number two, he was possibly armed with a
7  shotgun.
8          And then finally, and most importantly of all,
9  and I will put this as my number one, the car was a deadly
10  weapon.  And he used it that way.
11          What about resisting or evading?  Was he
12  resisting or evading arrest?  Well, I will tell you what.  I
13  will tell you what the plaintiffs' expert had to say about
14  that when they were here before you.
15          Mr. Waters said, I asked him, At any time during
16  this incident did it appear that Mr. Smith was trying to
17  avoid arrest by flight?  And he said, I would say yes.
18          When?
19          At the point he was coming down the street on
20  Fifth.
21          And Joseph Stine said, I asked him, Would you
22  agree, Mr. Stine, with us that when Mr. Smith drove down
23  around the barricade it was reasonable for the officers at
24  the scene to conclude that he was trying to escape?
25          The answer: Yes.

1023

1          So plaintiffs' own experts established that for
2  us.
3          The duration of the defendants' actions. The
4  only testimony as to how long this took was five or ten
5  seconds. So I am going to put on here ten seconds. This is
6  not a situation where they had that chance to organize
7  another blockade. This is not a situation where they could
8  say, let's call out the SWAT team or let's call out some
9  other team. They had ten seconds, split-seconds in which to
10  do what they had to do.
11          And then finally, the next thing is whether
12  physical force applied to such an extent as to lead to
13  unnecessary death or injury.
14          What were the officers' alternatives?  No
15  beanbag gun. It wouldn't have worked anyway, he is in the
16  car.  No taser.  Didn't have one.  But it wouldn't have
17  worked anyway, he was in a car.  No spike strips.  You heard
18  the plaintiffs' expert say that you can't shoot to warn.
19  You heard the plaintiffs' expert say you can't shoot the
20  tires out.
21          And then you heard that they saw no one up ahead
22  who would have apprehended Mr. Smith if they had let him go.
23          We have heard a lot of testimony about officers
24  coming to the scene, but every one of them got there after
25  the shots had been fired. There is not one bit of evidence

1024

1  that there was an officer on the scene who these officers
2  were in a position to see who could have apprehended Mr.
3  Smith if they had let him go.
4          And then, ask yourself this question:  If they
5  had let him go, would the officer, some unknown officer up
6  Harrison Street, have had the same problem and been at the
7  same risk as John Ciritella?
8          We respectfully suggest to you that the evidence
9  is overwhelming that the factors that you can consider show
10  beyond any doubt, really, that the officers behaved
11  reasonably and responsibly in this particular instance.
12          What I would like to do to finish is to just
13  briefly show you the verdict form, which I am not certain if
14  the Court has distributed to you yet, but it will if it
15  hasn't shortly.
16          The verdict form, as you may or may not know, is
17  a series of questions which you are to answer.  Now, I don't
18  want presume to tell you how to do your job.  But I do want
19  to show you how we believe you should answer the jury
20  verdict form if you agree with our position and our views of
21  the evidence.
22          The first question relates to the constitutional
23  claim.  That is what I just described for you just a second
24  ago.
25          And it asks you, Do you find by a preponderance

1025

1  of the evidence that any of the defendants used excessive
2  force and deprived Harry Smith, III of his rights under the
3  United States Constitution or the Delaware Constitution?
4          The Delaware Constitution, for all intents and
5  purposes here, is one and the same as the United States
6  Constitution. And Judge Sleet has not told you that there
7  is a different test somehow for the Delaware Constitution.
8          And if you agree with us that John Ciritella and
9  Cliff Dempsey and Matt Kurten had no choice but to do what
10  they did, then we suggest that you should answer, or check
11  no to these.
12          The next question that you would be directed to
13  go to in this instance is to go to Question 3, if you see
14  the instruction down here.
15          Question 3 talks about the wrongful death of
16  Harry Smith. And under state law you must find two things
17  before you can find for wrongful death. First. You must
18  find that these officers used excessive force. And for the
19  reason I have just told you about for the last several
20  minutes, they haven't. But even if you find that, you must
21  find, must determine whether they acted maliciously or
22  wantonly. And those terms are defined for you in the
23  instructions which Judge Sleet gave to you.
24          You don't need to reach that determination if,
25  in fact, you find that the officers did not use excessive

1 force. And so we suggest to you that the appropriate
2 answers to this question are also no.
3          Now, if you in fact reach those same conclusions
4 that we urge you to, then your job with the questionnaire is
5 finished.
6          However, if you were to find that one or more of
7 the defendants is liable -- and by the way, as the Judge has
8 told you, the fact that one is liable doesn't mean they are
9 all liable -- then you must answer some questions at the
10 end, which I can't show you because I wrote notes on them.
11 The questions at the end are Question 8, which says, Do you
12 find by a preponderance of the evidence that -- do we have
13 another verdict form?
14          THE COURT: They have it in front of them, Mr.
15 Parkins.
16          MR. PARKINS: I am sorry. I didn't know they
17 had been distributed.
18          The question at the end is, Do you find by a
19 preponderance of the evidence that John Ciritella was not
20 placed in danger by Harry Smith, III?
21          If you find that the plaintiffs, even though
22 they have produced no witnesses to dispute the story about
23 what John Ciritella said, if you find he was never in
24 danger, then you should check yes. If you agree with our
25 presentation that he was, then you should check no.

1 of these officers' sworn duty to protect the citizens of
2 Wilmington for them to have let Harry Smith go.
3          Thank you so much for your time and your
4 attention.
5          THE COURT: Thank you, Mr. Parkins.
6          Ms. Sulton, your rebuttal.
7          Mr. Crosse, are you going to handle it?
8          MR. CROSSE: Yes, Your Honor. Could there be a
9 short break?
10          THE COURT: How long do you need?
11          MR. CROSSE: Five minutes.
12          THE COURT: We will take five minutes, ladies
13 and gentlemen.
14          (Jury leaves courtroom at 5:30 p.m.)
15          (Recess taken.)
16          THE COURT: Ms. McDavid, please bring in the
17 jury.
18          (Jury enters courtroom at 5:45 p.m.)
19          THE COURT: Ladies and gentlemen, please take
20 your seats. We will now hear the plaintiffs' rebuttal.
21          Mr. Crosse.
22          MR. CROSSE: Thank you very much, Your Honor.
23          Ladies and gentlemen, good afternoon. It is
24 almost good evening.
25          I, like other counsel before me, wish to say a

                                                    1027

1          Likewise, you are asked whether Harry Smith
2 presented a threat of serious injury to others. If you
3 agree with our presentation and our contentions, then you
4 should check no.
5          And then finally, if you agree with our
6 contention that the defendants did not continue to shoot at
7 the car after it stopped, then you should likewise check no.
8          Once again, you only need to answer these
9 questions if you find that one of the defendants is liable.
10          This case can be best perhaps summed up in the
11 testimony of two experts, Elbert Waters and Ron Traenkle.
12 Elbert Waters in his deposition, which was played for you in
13 part, told us this: What they should have done was just
14 jumped out front, since he had room to jump in front of a
15 parked car, there are plenty of parked cars along, at least
16 only six feet between a parked car and a curb, he should
17 have tried one more time, jumped out, waved his hands, stop,
18 stop, stop, and at that time proceeded to use deadly force.
19 Once again, he should have tried one more time, jumped out,
20 waved his hand, stop, stop, stop, and at that point
21 proceeded to use a deadly weapon.
22          That was their expert telling you what John
23 Ciritella should have done, and that's exactly what he did.
24          And then finally, the testimony of Ron Traenkle.
25 Ron Traenkle told you that it would have been a dereliction

                                                    1029

1 word of thanks to each and every one of you for your time
2 and attention in hearing this case. It is an important case
3 to all the parties involved, particularly the plaintiffs.
4          There have been breaks and interruptions and in
5 and out. We really appreciate your patience in hanging in
6 there with us, because that is what happens in litigation.
7 These cases are not like in TV where they can be packaged
8 and ended in an hour, because unexpected things happen.
9 Documents have to be reviewed, et cetera.
10          So I again say thank you just in case I may
11 forget at the end of my presentation.
12          Now, you have heard a lot of stuff. It is
13 getting late in the evening. I ask you to bear with me in
14 that I am in the position of really having to advance a
15 position and, to use a fight analogy, to counterpunch for
16 some of the things that you have heard today.
17          Let me first just address that verdict sheet.
18 Of course, Mr. Parkins put it up on the Elmo or whatever.
19 And it's his position that you should answer no to those
20 questions. Of course, our position is that the answers
21 should be yes. I hope that I will be able to tell you why.
22 And I hope that you will use the answer that talks about
23 money. We need to discuss that. I wore my green tie today
24 So when you see this tie, think money, because it's
25 considered a dirty thing, but it is the way that justice is

B-099

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY SMITH, JR., and ROSLYN       )
WOODARD SMITH, individually and    )
as Administrators of the ESTATE    )
OF HARRY SMITH, III,               )
                                   )
        Plaintiffs,              )
                                   )
        v.                       ) No. 04-1254-GMS
                                   )
CITY OF WILMINGTON, JOHN           )
CIRITELLA, THOMAS DEMPSEY and      )
MATTHEW KURTEN,                    )
                                   )
        Defendants.              )

COPY

Videotape Deposition Upon Oral Examination

of

JON J. NORDBY, PH.D.

Taken at 3532 Soundview Drive West

University Place, Washington

# CONDENSED TRANSCRIPT

DATE:  Monday, April 2, 2007

REPORTED BY:  Ronald L. Cook
                  CCR, RMR, CRR



**B-100**

**PREMIERE**
**REALTIME REPORTING & VIDEOGRAPHY, LLC**
Phone: 206.389.9321 • Fax: 206.405.1799 • www.premiererealtime.com • info@premiererealtime.com

29

| | | |
|---|---|---|
| 14:10 | 1 | was retrieved from Mr. Smith match the test bullet that -- |
| | 2 | that you fired? |
| | 3 | A.   Yes, both class and individual |
| | 4 | characteristics show that the bullet recovered from |
| 14:10 | 5 | Mr. Harry Smith III was fired through that particular |
| | 6 | pistol. |
| | 7 | Q.   Do you have an understanding who that pistol |
| | 8 | was used by? |
| | 9 | A.   Yes. I was told that it was Officer |
| 14:10 | 10 | Ciritella's pistol. |
| | 11 | Q.   Thank you. |
| | 12 | Was this the bullet that was retrieved from |
| | 13 | Mr. Smith's brain? |
| | 14 | A.   Yes, I believe so. |
| 14:11 | 15 | Q.   Okay. |
| | 16 | Would you take a look at Page 8 and tell us |
| | 17 | briefly what is there. |
| | 18 | A.   Excuse me. Exhibit 8? |
| | 19 | Q.   I mean Exhibit 8. I'm sorry. |
| 14:11 | 20 | A.   Yes. This, again, shows two -- two |
| | 21 | photographs. The top photograph compares a known with an |
| | 22 | unknown -- a known cartridge case fired through this |
| | 23 | particular pistol, Officer Ciritella's pistol, and an |
| | 24 | unknown item from Harrison Street, found at the scene. And |
| 14:11 | 25 | again, these are firing pin impressions in the primer of the |

30

| | | |
|---|---|---|
| 14:11 | 1 | cartridge, and the firing pin on a pistol will leave |
| | 2 | characteristic impressions that can be analyzed in terms of |
| | 3 | their class as well as individual characteristics. |
| | 4 | Q.   Do you have an opinion as to whether the same |
| 14:12 | 5 | weapon fired both of -- used -- |
| | 6 | Excuse me. Do you have an opinion as to |
| | 7 | whether the shell casings were both fired from the same |
| | 8 | weapon? |
| | 9 | A.   Yes, they were. |
| 14:12 | 10 | Q.   Okay. |
| | 11 | One last photograph to look at, please. |
| | 12 | I'm going to ask the reporter to mark as |
| | 13 | Exhibit 9, I believe, Page 4 from Part 7 of the appendix. |
| | 14 | (Deposition Exhibit 9 was marked |
| 14:12 | 15 | for identification.) |
| | 16 | MR. PARKINS:  Is that 9? |
| | 17 | THE REPORTER:  Yes. |
| | 18 | Q.   BY MR. PARKINS:  Without any detailed |
| | 19 | scientific explanation, can you just briefly tell us what |
| 14:13 | 20 | Exhibit 9 represents? |
| | 21 | A.   This is a graph, which represents spectra |
| | 22 | from x-ray fluorescence analysis of particular items. In |
| | 23 | this case it's the headliner from the driver's side of |
| | 24 | Patrol Car 1180. And what -- what this does is -- x-ray |
| 14:14 | 25 | fluorescence is a -- a scientific technique that we use to |

31

| | | |
|---|---|---|
| 14:14 | 1 | determine the elements that are present in a particular |
| | 2 | sample, and x-ray fluorescence works particularly well on |
| | 3 | metals. |
| | 4 | Q.   Were you looking for any particular elements |
| 14:14 | 5 | in -- in this study? |
| | 6 | A.   Yes. When a -- a cartridge is fired in a |
| | 7 | pistol such as Officer Ciritella's pistol, a primer is |
| | 8 | struck by the firing pin and that primer initiates the burn |
| | 9 | for the gunpowder to fire the bullet through the pistol, and |
| 14:14 | 10 | characteristically there's antimony, barium and lead in most |
| | 11 | primers, and one indicator of the proximity of a -- the |
| | 12 | discharge of a firearm to a particular target is the |
| | 13 | presence of antimony, barium and lead fused as one particle. |
| | 14 | Q.   Did you find any evidence of antimony, barium |
| 14:15 | 15 | and lead in the headliner of the car? |
| | 16 | A.   No. |
| | 17 | Q.   Did you similarly analyze the clothing worn |
| | 18 | by Mr. Smith at the time of this event? |
| | 19 | A.   Yes, I did. |
| 14:15 | 20 | Q.   Did you find any antimony, barium or lead on |
| | 21 | his clothing? |
| | 22 | A.   No, I did not. |
| | 23 | Q.   What does the absence of such a finding tell |
| | 24 | you? |
| 14:15 | 25 | A.   Well, one has to be careful whenever one |

32

| | | |
|---|---|---|
| 14:15 | 1 | infers from the absence of something, but certainly in this |
| | 2 | case, considering other factors, as well, that -- the |
| | 3 | conclusion is that we can't say that any of those items, |
| | 4 | whether it be headliner or clothing, was within three feet |
| 14:15 | 5 | of the discharge of a -- of a firearm. |
| | 6 | Q.   If someone had stuck a firearm into the car |
| | 7 | to shoot Mr. Smith, would you have expected to find those |
| | 8 | elements in the materials you tested? |
| | 9 | A.   Yes, I would expect to find them. |
| 14:16 | 10 | Q.   Let's move on to your conclusions for a few |
| | 11 | minutes. And I'd like to focus your attention first on the |
| | 12 | events on 5th Street. The plaintiffs in this case I believe |
| | 13 | contend that Mr. Smith was trying to drive away from |
| | 14 | Detective Ciritella on 5th Street, and the defendants |
| 14:16 | 15 | contend that Mr. Smith was driving towards Detective |
| | 16 | Ciritella on the 5th Street. What does the physical |
| | 17 | evidence tell us about what happened at that time? |
| | 18 | A.   The physical evidence indicates that Patrol |
| | 19 | Car 1180 was going toward the position that Officer |
| 14:17 | 20 | Ciritella had taken at the corner and was going toward and |
| | 21 | past him. |
| | 22 | Q.   And what physical evidence tells us that? |
| | 23 | A.   There are several factors.  One is the |
| | 24 | presence of glass on the corner.  The glass is from the side |
| 14:17 | 25 | window.  At least it is typical of side-window glass from |

8   (Pages 29 to 32)

33

| | | |
|---|---|---|
| 14:17 | 1 | the -- from the patrol car. It is tempered glass. |
| | 2 | Then also there are two cartridge cases that |
| | 3 | were fired through Officer Ciritella's pistol that were |
| | 4 | found, one in the vehicle itself, in the front seat of |
| 14:17 | 5 | the -- of the patrol car, and one found in the windshield |
| | 6 | wiper well of the vehicle. |
| | 7 | And the other factor are -- involves tire |
| | 8 | impressions and tire marks, and the impact between the |
| | 9 | patrol car and a parked vehicle, which was a white Jeep. |
| 14:18 | 10 | Q.   Let's -- let's focus for a moment on the |
| | 11 | shell casings, one of which was found in the car and one on |
| | 12 | the -- in the windshield wiper well. Did you test Detective |
| | 13 | Ciritella's weapon to see how it ejected shell casings? |
| | 14 | A.   Yes. I fired the weapon over a flat concrete |
| 14:18 | 15 | surface so we could understand the characteristic patterns, |
| | 16 | if there are characteristic patterns, that result from |
| | 17 | firing the same type of ammunition with the same amount of |
| | 18 | powder, the same general configuration and design as those |
| | 19 | used by the Wilmington Police Department at the time of this |
| 14:19 | 20 | shooting. |
| | 21 | The measurements were taken showing the -- |
| | 22 | the location that ejected cartridge cases would fall when |
| | 23 | discharged from the weapon, and there's a wide variety, as |
| | 24 | one would expect, of distances, which were documented and |
| 14:19 | 25 | put together in a chart. |

34

| | | |
|---|---|---|
| 14:19 | 1 | Q.   Did you use the same kind of ammunition as |
| | 2 | Detective Ciritella was using that night? |
| | 3 | A.   Yes. |
| | 4 | Q.   What general conclusions can you reach as to |
| 14:19 | 5 | the pattern of ejection of the shells -- shell casings? |
| | 6 | A.   That the particular pistol discharges its |
| | 7 | spent cartridge cases slightly backward and to the right, |
| | 8 | which is the design of the weapon. Also, depending on the |
| | 9 | particular location that the shooter holds the weapon, it's |
| 14:20 | 10 | possible and it happened several times that the ejected |
| | 11 | cartridge casing hit the shooter, and sometimes went higher, |
| | 12 | sometimes went lower, but the cartridge cases seemed to spin |
| | 13 | and stay in the air for some period of time rather than just |
| | 14 | go straight down. |
| 14:20 | 15 | Q.   What does the fact that there was one of |
| | 16 | Detective Ciritella's shell casings found in the car tell |
| | 17 | you? |
| | 18 | A.   Well, that tells me given the testing that |
| | 19 | we -- we did -- that I did with -- with respect to the |
| 14:20 | 20 | ejection patterns -- that tells me that within a range of |
| | 21 | distances we -- we -- we can put that cartridge case and |
| | 22 | its -- the fact that it's a spent cartridge case in |
| | 23 | proximity with that squad car, so that in order for that |
| | 24 | cartridge case to be in the front seat along the center |
| 14:21 | 25 | console area of the squad car, the squad car and the ejected |

35

| | | |
|---|---|---|
| 14:21 | 1 | cartridge case had to be very close to each other in -- in |
| | 2 | space and time. |
| | 3 | Q.   Would that suggest the direction in which the |
| | 4 | squad car was driving? |
| 14:21 | 5 | A.   It -- it would. It would suggest that the |
| | 6 | car was moving -- if we're facing at direct -- sideways, |
| | 7 | facing the passenger door, that it was moving from -- from |
| | 8 | left to right, and that since the pistol ejects cartridge |
| | 9 | cases also to the -- to the right and slightly backward and |
| 14:22 | 10 | upward, that the cartridge case came through the window of |
| | 11 | the -- of the squad car while it was still in the air, |
| | 12 | meaning that -- that the car was fairly close. |
| | 13 | Q.   Does that suggest whether the car was driving |
| | 14 | toward -- behind Mr. Ciritella? |
| 14:22 | 15 | A.   I'm sorry. Could -- |
| | 16 | Q.   Was driving left to right; am I correct? |
| | 17 | A.   Yes. |
| | 18 | Q.   Was it also moving in a -- towards his rear? |
| | 19 | A.   No, it would be moving away, toward -- |
| 14:22 | 20 | Q.   Was the car moving away from Detective |
| | 21 | Ciritella when he was shooting? |
| | 22 | A.   No. It would be coming right up to him. |
| | 23 | Q.   Right. |
| | 24 | A.   So -- |
| 14:22 | 25 | Q.   I'm sorry. |

36

| | | |
|---|---|---|
| 14:23 | 1 | A.   I'm not sure I understood. |
| | 2 | Q.   No. |
| | 3 | You -- you also made reference to glass. |
| | 4 | A.   Yes. |
| 14:23 | 5 | Q.   I'm going to show you a photograph which you |
| | 6 | reproduced in part of your report at Page -- supplemental |
| | 7 | report at Page 4. |
| | 8 | Would we have the court reporter mark that as |
| | 9 | I believe Exhibit 9. |
| 14:23 | 10 | THE REPORTER: 10, Counsel. 10. |
| | 11 | MR. PARKINS: 10. Sorry. |
| | 12 | (Deposition Exhibit 10 was marked |
| | 13 | for identification.) |
| | 14 | MR. PARKINS: Anne, for purposes of the |
| 14:23 | 15 | record, the only portion of Exhibit 10 is the photograph and |
| | 16 | not the accompanying text, and not the report. |
| | 17 | Q.   What does this photograph depict, Dr. Nordby? |
| | 18 | A.   It shows a police officer pointing to glass |
| | 19 | from a tempered glass side window on the corner of 5th and |
| 14:24 | 20 | Harrison. |
| | 21 | Q.   BY MR. PARKINS: Is this the glass to which |
| | 22 | you earlier referred when you were telling us about the |
| | 23 | proximity of the motor vehicle? |
| | 24 | A.   Yes. |
| 14:24 | 25 | Q.   Okay. Thank you. |

41

| | | |
|---|---|---|
| 14:32 | 1 | bullets struck anything before hitting Mr. Smith? |
| | 2 | A.  Yes. |
| | 3 | MS. SULTON: I'm going to object to this |
| | 4 | entire line of questioning about any injuries, the cause |
| 14:32 | 5 | and/or manner of death of Mr. Smith, because Dr. Nordby is |
| | 6 | not qualified to render an opinion about physical injuries. |
| | 7 | He is not a medical doctor, has no education in the field of |
| | 8 | medicine, and is not board certified as a pathologist. So I |
| | 9 | will leave that as a continuing objection. |
| 14:32 | 10 | MR. PARKINS: That's fine. |
| | 11 | MS. SULTON: Thank you, Counsel. |
| | 12 | MR. PARKINS: Would you like the question |
| | 13 | reread? |
| | 14 | THE WITNESS: Please. |
| 14:32 | 15 | MR. PARKINS: Ron, would you do that for me, |
| | 16 | please. |
| | 17 | (Record read.) |
| | 18 | THE WITNESS: Yes. We did a number of -- |
| | 19 | made a number of observations. The -- one bullet had struck |
| 14:33 | 20 | the headrest and the other bullet had to go through |
| | 21 | Plexiglas in order to reach that area of the -- of the car |
| | 22 | occupied by the decedent. |
| | 23 | Q.  BY MR. PARKINS: The Plexiglas meaning the |
| | 24 | barrier between the front and back seats? |
| 14:33 | 25 | A.  Yes, that's correct. |

42

| | | |
|---|---|---|
| 14:33 | 1 | Q.  Did the car which -- the bullet which struck |
| | 2 | the headrest also have to hit the Plexiglas first? |
| | 3 | A.  Yes. |
| | 4 | Q.  What happens when bullets hit Plexiglas? |
| 14:34 | 5 | A.  There is a -- in this particular case the -- |
| | 6 | the jacketed hollow-point ammunition will expand, and it's |
| | 7 | designed to expand in -- in size. Also, Plexiglas, in the |
| | 8 | experiments that I've done in the past by shooting |
| | 9 | ammunition through Plexiglas, indicate that there's a slight |
| 14:34 | 10 | downward deflection when a projectile strikes that, because |
| | 11 | obviously when that projectile is going at a certain rate, |
| | 12 | it slows markedly when it strikes the object such as |
| | 13 | Plexiglas. |
| | 14 | Q.  Do you have an opinion as to whether |
| 14:34 | 15 | Mr. Smith was sitting upright or slumped forward over the |
| | 16 | steering wheel when he was struck by these two bullets? |
| | 17 | MS. SULTON: I want to again reiterate my |
| | 18 | standing objection to any testimony being offered by this |
| | 19 | particular witness, because he is not qualified to render |
| 14:35 | 20 | testimony about the cause or manner of death. |
| | 21 | Thank you, Counsel. |
| | 22 | THE WITNESS: Repeat. |
| | 23 | MR. PARKINS: Would you read it back, please, |
| | 24 | Ron. |
| 14:35 | 25 | (Record read.) |

43

| | | |
|---|---|---|
| 14:35 | 1 | THE WITNESS: The evidence shows that he was |
| | 2 | upright, given the trajectories and the wound path described |
| | 3 | by the pathologist. |
| | 4 | Q.  BY MR. PARKINS: And what do you mean by the |
| 14:35 | 5 | trajectories? |
| | 6 | A.  The trajectories meaning the incoming rounds |
| | 7 | through the vehicle, the angles at which all of those |
| | 8 | potential bullets had to take in order to reach the occupied |
| | 9 | space. |
| 14:36 | 10 | Q.  Thank you. |
| | 11 | Let's focus, if we could, on the shot that |
| | 12 | struck Mr. Smith in the head.  Do you have an opinion as to |
| | 13 | what trajectory that bullet took? |
| | 14 | A.  Yes. |
| 14:36 | 15 | Q.  What trajectory did that take? |
| | 16 | A.  Well, the bullet came in from the side.  One |
| | 17 | has to be cautious in -- in putting together shooting |
| | 18 | scenarios in this sense because heads obviously move, but |
| | 19 | when we put together the information we have from the squad |
| 14:36 | 20 | car itself and damage to the vehicle, the bloodstain pattern |
| | 21 | evidence which is present inside the vehicle, the medical |
| | 22 | examiner's account of the direction of the bullet impact |
| | 23 | through the decedent's head, we can come up with a |
| | 24 | trajectory, as you put it, that the bullet came from the |
| 14:37 | 25 | right side or the passenger side of the car, and that the |

44

| | | |
|---|---|---|
| 14:37 | 1 | decedent was upright in the -- in the vehicle when this |
| | 2 | bullet struck his head. |
| | 3 | Q.  The plaintiffs have alleged in this case that |
| | 4 | Mr. -- that the defendant officers shot Mr. Smith after the |
| 14:37 | 5 | police car had come to a stop.  Do you have an opinion as |
| | 6 | to whether the car was still moving when the shot which hit |
| | 7 | him in the head was fired? |
| | 8 | A.  The movement of the vehicle is not something |
| | 9 | that is captured by an analysis of an impact of an injury or |
| 14:38 | 10 | damage to the -- to the vehicle itself.  It occurs to me |
| | 11 | that we have to consider the -- the scene, as well, the |
| | 12 | glass, the fractures of different types of glass, the |
| | 13 | striking the Jeep and the movement of the Jeep, as well, and |
| | 14 | the fact that for that bullet to have struck the decedent in |
| 14:38 | 15 | the head, that there had to be a relationship between -- |
| | 16 | between him and the vehicle.  And that's what we can look at |
| | 17 | the bloodstain patterns to tell us. |
| | 18 | Q.  Is it your understanding that when the car |
| | 19 | was on Harrison Street it was moving northbound? |
| 14:39 | 20 | A.  My understanding is that it was moving |
| | 21 | northbound. |
| | 22 | Q.  Where were Detective Ciritella's shell |
| | 23 | casings found vis-a-vis the end point of the -- of the trip, |
| | 24 | the car? |
| 14:39 | 25 | A.  They were found toward the back end of the |

45

| 14:39 | 1 | car, if I'm understanding your question correctly. |
| | 2 | Q.   Were they found south of the front of the |
| | 3 | car? |
| | 4 | A.   South of the front of the car, that's |
| 14:39 | 5 | correct. |
| | 6 | Q.   If the car had been stopped and Detective |
| | 7 | Ciritella had fired his weapon, where would you have |
| | 8 | expected to find them? |
| | 9 | A.   I would have expected to find them either in |
| 14:39 | 10 | the same area as the car or north of the car. |
| | 11 | Q.   What does the fact that they were found south |
| | 12 | of that area tell you? |
| | 13 | A.   Tells me that the car was moving and |
| | 14 | continued to move after those shots were fired. |
| 14:40 | 15 | Q.   Okay. |
| | 16 | The plaintiffs in this case allege that |
| | 17 | Mr. Smith was slumped over the driving -- over the steering |
| | 18 | wheel. The defendants will testify -- or the police |
| | 19 | officers will testify that when they arrived at the stopped |
| 14:40 | 20 | car he was slumped to the right. What does the physical |
| | 21 | evidence tell you about what happened? |
| | 22 | A.   The physical evidence indicates that when the |
| | 23 | bullet struck the decedent's head his head was upright, and |
| | 24 | we can determine that by looking at the bloodstain patterns |
| 14:40 | 25 | on the clipboard that are between the passenger and driver's |

46

| 14:41 | 1 | seat in the front seat of the squad car, that allows us to |
| | 2 | form a point of origin for those -- for those blood -- |
| | 3 | bloodstains. |
| | 4 | And the second feature is that there's |
| 14:41 | 5 | projected blood, which can only come from a compromised |
| | 6 | artery, for example, and that blood is projected behind and |
| | 7 | to the right side of the driver's backrest, and that would |
| | 8 | place the decedent slumped to the right at the time those |
| | 9 | projected stains struck the partition. |
| 14:41 | 10 | Q.   The plaintiffs in this case allege that |
| | 11 | Mr. Smith on 5th Street was trying to drive away from |
| | 12 | Detective Ciritella and that Detective Ciritella was never |
| | 13 | in danger. The plaintiffs further allege, as I've |
| | 14 | mentioned, that the detectives -- the defendants, excuse me, |
| 14:42 | 15 | shot and wounded Mr. Smith after the car had stopped. The |
| | 16 | plaintiffs -- excuse me. The defendants claim that |
| | 17 | Mr. Smith narrowly missed Detective Ciritella as he drove in |
| | 18 | his direction, he accelerated around the corner, and that |
| | 19 | the defendants never fired at the car -- at the car after |
| 14:42 | 20 | the car was stopped. Which version does the physical |
| | 21 | evidence support? |
| | 22 | A.   The physical evidence clearly supports the |
| | 23 | latter version. |
| | 24 | Q.   You have expressed a number of opinions today |
| 14:42 | 25 | about the most likely event based on the physical evidence. |

47

| 14:42 | 1 | Have those opinions been expressed to a reasonable degree of |
| | 2 | scientific probability? |
| | 3 | A.   Yes. |
| | 4 | MR. PARKINS:  Thank you.  I have nothing |
| 14:43 | 5 | further. |
| | 6 | Do you want to take a short break? |
| | 7 | MS. SULTON:  If the doctor would like to. |
| | 8 | THE WITNESS:  Yeah, short.  I'm not feeling |
| | 9 | very good. |
| 14:43 | 10 | MS. SULTON:  Off the record. |
| | 11 | THE VIDEOGRAPHER:  We're going off the |
| | 12 | record. The time is 2:43 p.m.  Please stand by. |
| | 13 | (Short recess.) |
| | 14 | THE VIDEOGRAPHER:  We're back on the record. |
| 14:49 | 15 | The time is 2:49 p.m. |
| | 16 | |
| | 17 | EXAMINATION |
| | 18 | BY MS. SULTON: |
| | 19 | Q.   Good morning, Dr. Nord -- or good afternoon, |
| 14:49 | 20 | I should say. |
| | 21 | A.   Mm-hmm. |
| | 22 | Q.   I am reserving all of the objections I've |
| | 23 | made prior to the point at which we began your deposition. |
| | 24 | I wanted to go through just a couple of |
| 14:49 | 25 | issues with you, if I may. |

48

| 14:49 | 1 | Do you know whether or not Mr. Ciritella is |
| | 2 | right- or left-handed? |
| | 3 | A.   No.  Not off the top of my head. |
| | 4 | Q.   When did you look at Patrol Car 1180? |
| 14:50 | 5 | A.   It was in I believe June of 2006. |
| | 6 | Q.   And this incident occurred September 13th of |
| | 7 | 2003? |
| | 8 | A.   That's correct. |
| | 9 | Q.   Do you have any idea of how many people were |
| 14:50 | 10 | inside that car before you saw it in the summer of 2006? |
| | 11 | A.   Just from the photographs that were supplied |
| | 12 | to me showing the work that had been done, but -- but -- the |
| | 13 | exact number I'm not sure, but I would -- I would venture to |
| | 14 | say that several people had been in there. |
| 14:51 | 15 | Q.   When you looked at the car, did you see the |
| | 16 | car as it was -- the state of the -- the physical state of |
| | 17 | the car as it was on September 13th, 2003, within hours of |
| | 18 | the shooting? |
| | 19 | A.   No one would be in that position unless they |
| 14:51 | 20 | were at the scene of the shooting and able to look at the |
| | 21 | vehicle at that time. |
| | 22 | Q.   I'm sorry, Doctor.  Let me try to sharpen my |
| | 23 | question a bit, if I could. |
| | 24 | A.   Sure. |
| 14:51 | 25 | Q.   When you looked at the car it had already |

12   (Pages 45 to 48)

B-104

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

> Kester I.H. Crosse, Esquire
> Williams & Crosse
> 1214 King Street
> Suite 300
> Wilmington, DE 19801

I hereby certify that I will send on July 9, 2007, by Electronic Mail, the foregoing document to the following non-registered participants:

> Anne T. Sulton, Esquire
> Post Office Box 2763
> Olympia, WA 98507

> John A. Parkins, Jr. (#859)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> parkins@rlf.com

RLF1-2884836-1